**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **DAVID JACKSON,** ) | |
| ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| vs. ) | **Civil Action No.** |
| ) | **2:06-CV0412-WHA** |
| ) | |
| **E&R MANUFACTURING CO., INC.,** ) | |
| **et al.,** ) | |
| ) | |
|     **Defendants.** ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

    COMES NOW the Defendant, E&R Manufacturing Co., Inc., and hereby submits this Brief in Support of its Motion for Summary Judgment. For the reasons and arguments discussed below, this Defendant is entitled to summary judgment as there exist no genuine issue of material fact.

### I.    NARRATIVE SUMMARY OF UNDISPUTED FACTS

    As alleged in his Second Amended Complaint, David Jackson was injured on December 17, 2004. (Exhibit 1, Plaintiff's Complaint). At the time of his accident, Plaintiff was employed by Able Body Temp Services and was working at Couch Block USA ("Block USA") in Andalusia, Alabama as a laborer running the block splitter machine.[1] (Exhibit 2, Deposition of David Jackson, p. 10, l. 11-15; p. 13, l. 6-11). Jackson had been employed in this capacity for approximately three months. (Exhibit 2, p. 10, l. 16-19; p. 11, l. 18-20). Mr. Jackson's duties and responsibilities as a laborer at Block USA included keeping the ground under and around the splitter clean, chipping

---

[1] The subject splitter is an E&R Manufacturing Company, Inc. model CM-24 (the "splitter").

blocks, pulling blocks and cleaning debris out of the splitter. (Exhibit 2, p. 13, l. 4-11; p. 15, l. 4-10). Mr. Jackson's deposition testimony revealed that he was familiar with the block splitter, that he had been shown how to clean out the machine, and that he understood how it worked. (Exhibit 2, p. 13, l. 15-23). Furthermore, Jackson knew how to shut off the splitter and testified that nothing prevented him from doing so on the day of his accident. (Exhibit 2, p. 24, l. 2-20).

On a typical working day at Block USA, it was normal to experience debris coming from the blocks that were being cut by the block splitter machine. On average, Block USA would split between 5,000 and 6,000 blocks a day. (Exhibit 3, Deposition of John Stephens, p. 37, l. 3-6; Exhibit 4, Deposition of Karry Mackey, p. 29, l. 1-4). On the day of Jackson's accident, Block USA was splitting eight-inch Diamond Pro Tan Bevel retaining wall blocks. (Exhibit 3, p. 19, l. 1-8). With this type of block, the splitter's side knives are set at an angle to cut out a wedge on the side of the blocks. (Exhibit 3, p. 24, l. 3-20). Once this wedge is cut out, any debris left behind is normally pushed out with the next block, well away from the splitter's knives, and tossed away by a laborer, i.e. David Jackson. (Exhibit 3, p. 26, l. 1-11; p. 86, l. 17-22).

On the day of his accident, Mr. Jackson was working at the block splitter machine as usual. (Exhibit 2, p. 51, l. 3-5). Jackson explained the details of his accident as follows: "when I was working I had been doing this for all along for the last two-and-a-half months off and on, everything. So I got pretty -- I mean, you get comfortable with what you're doing… So when I was reaching in there to get this debris out, there was a piece hung up in there. And I was trying to get it out so that knife could come over. And I was coming out, the corner of my glove got caught on that daggum bolt and side knife right

2

there together, and that's how my hand got hung up in there to begin with." (Exhibit 2, p. 51, l. 3-14). Jackson further testified, "that's when -- when I was starting to come out is when everything got hung up and my glove got hung up and the machine started pushing my hand. I tried to snatch my hand out of my glove and I couldn't get it out. So that's how it happened." (Exhibit 2, p. 52, l. 3-8). As soon as his hand went through the cycle, he pulled it out, grabbed it and held it, and then went to the office. (Exhibit 2, p. 64, l. 9-12). Jackson was later taken to the emergency room at Andalusia Regional Hospital where he received treatment for the injuries he sustained to his hand. Following the accident, Jackson stated to John Stephens while in route to the hospital that he knew better than to stick his hand into the splitter and that the accident was his fault. (Exhibit 3, p. 67, l. 1-12). These comments were also made by Jackson to Karry Mackey while in the hospital emergency room. (Exhibit 4, p. 51, l. 15-23).

It was the testimony of Mr. Jackson that he never received any training on the subject block splitter. (Exhibit 2, p. 40, l. 22). However, John Stephens, an employee with Block USA, testified that he trained Mr. Jackson as to how the block splitter was to be operated. (Exhibit 3, p. 65, l. 9-20). In fact, the following testimony was elicited by Mr. Stephens during his deposition:

> Q. Did you train Mr. Jackson?
> A. Yes.
> Q. On the operation or how to pull chunks?
> A. Yes.
> Q. And how to clean debris?
> A. Yes.
> Q. What did you tell him?
> A. ***Do not stick your hands in the side knives, use the stick or cut the machine off.*** That if something jammed up, turn around and get me, and I will straighten it up.

(Exhibit 3, p. 65, l. 9-20). [Emphasis Added].

In keeping with this line of testimony, Mr. Stephens stated that in addition to telling Mr. Jackson that he should not stick his hands in the side knives, he showed Jackson how to turn the machine off and on at the control panel. (Exhibit 3, p. 64, l. 22-23; p. 86, l. 9-16). In fact, just the day before the accident, John Stephens told David Jackson not to put his hand where the side knives were located while the machine was running. (Exhibit 3, p. 88, l. 9-13). Mr. Stephens testified that he told this to Jackson on more than one occasion. (Exhibit 3, p. 88, l. 18-20). Additionally, it was the testimony of Mr. Stephens that had Mr. Jackson followed his instructions and turned the machine off, he would not have injured his hand. (Exhibit 3, p. 93, l. 20-23; p. 94, l. 1-4).

Prior to and after his accident, Mr. Jackson was aware of a warning sign located on the block splitter that said, "Keep Hands Clear." (Exhibit 2, p. 86, l. 12). In fact, Mr. Jackson stated during his deposition that he knew the sign was there but he hardly ever paid any attention to it. (Exhibit 2, p. 86, l. 8-13). It was further the testimony of Mr. Jackson that he knew if he put his hand in the machine and the side knives closed that it would injure his hand. (Exhibit 2, p. 20, l. 18-23). …

> Q.   If you put your hand in there and the side knives closed, would it injure your hand?
> A.   *Well of course.*
> Q.   And you knew that before this accident, didn't you?
> A.   *Of course, I knew that.*

(Exhibit 2, p. 20, l. 18-23). [Emphasis Added].

Then in response to a direct question, Jackson admitted:

> Q.   … And you knew that if you didn't beat the cycle, it would injure your hand badly; isn't that true?
> A.   *Well, it's just common sense, but, yes.*

(Exhibit 2, p. 43, l. 10-14). [Emphasis Added].

In addition to this, Karry Mackey, the plant manager, explained to Mr. Jackson when he began working for the plant that the block splitter could cut your fingers off if you stuck your hand in there while it was running. (Exhibit 2, p. 48, l. 1-12). To prove that this could happen, Mr. Mackey showed Mr. Jackson his missing fingers which had been cut off by the block splitter.[2] (Exhibit 2, p. 48, l. 1-12). In fact, Mr. Mackey testified during his deposition that he discussed his hand injury with Mr. Jackson and made it clear that he was not to put his hand into the area where the knives were located. (Exhibit 4, p. 56, l. 18-23). Again, Mr. Jackson was aware that it was possible for the machine to cut his fingers off should he stick his hand in the machine while it was running. (Exhibit 2, p. 48, l. 18-20).

At the deposition of John Stephens, Mr. Stephens testified as to the following in reference to Mr. Jackson's accident:

> Q. What is your understanding of how the accident happened?
> A. He stuck his hand in there without cutting the machine off to get the chunks out. The next block came into the splitter, and before he could get his hand out, it made the eye that pushes the block forward to the knives, and he couldn't get his hand out. *He said it was stupid of him to do it*.
> Q. Mr. Jackson said that?
> A. *He told me that it was his fault*.
> Q. When did he tell you that?
> A. When did he tell me that?
> Q. Yes, sir.
> A. When I was holding his hand on the way to the hospital.
> Q. What else did you hear him say?

---

[2] In 2001, Mr. Mackey had an accident on the splitter and lost three of his fingers. Mr. Mackey's accident was admittedly due to his own negligence and is not similar at all to Jackson's accident. Mr. Mackey was engaged in a conversation with another worker, was not looking at the splitter and accidentally reached in too far. (Exhibit 4, p. 19, l. 3-19; p. 77, l. 17-23; p. 78, l. 1-9; p. 83, l. 8-23).

5

    A.    Basically that was it. ***It was my fault. I knew better than to stick my hand in there.***

(Exhibit 3, p. 66, l. 16-23; p. 67, l. 12). [Emphasis Added].

In addition, Karry Mackey stated during his deposition testimony that he did not consider David Jackson to be a safe worker in that he had to keep telling him not to stick his hands in the splitter. (Exhibit 4, p. 39, l. 20-23; p. 40, l. 1-5). Mr. Jackson also stated that he spoke with Mr. Jackson at the hospital…

    Q.    Did you talk with Mr. Jackson about the accident?
    A.    Yes, I did.
    Q.    What did he say?
    A.    ***His first words were it was stupidity and his fault.***

(Exhibit 4, p. 42, l. 5-10). [Emphasis Added].

Mr. Mackey further testified that he felt like what Mr. Jackson did was unreasonable [to put his hand into the machine where the side knife was located while it was running]. (Exhibit 4, p. 65, l. 7-11).

When asked if he thought the block splitter was dangerous, Jackson stated that he did not feel like the machine was unreasonably dangerous. (Exhibit 2, p. 56, l. 6-7; 15). Furthermore, Mr. Jackson stated that he felt safe and that he did not feel like he was going to get hurt. (Exhibit 2, p. 150, l. 20-21). The testimony of both John Stephens and Karry Mackey indicated that they felt this was a reasonably safe machine and that it worked well and did what is was intended to do. (Exhibit 3, p. 94, l. 19-23; Exhibit 4, p. 59, l. 8-9). In fact, the company in Andalusia is still using this block splitter today even after Mr. Jackson's accident (Exhibit 4, p. 75, l. 19-21).

## II. SUMMARY JUDGMENT STANDARD

"Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Chase v. Kawasaki Motors Corp., 140 F. Supp.2d 1280, 1284 (M.D.Ala. 2001) *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying these portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id. at 1284 *citing* Celotex, 477 U.S. at 323, 106 S.Ct. 2548 (1986). The movant "can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." Id.

"Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id.. "To avoid summary judgment, the nonmoving party must do more than show that there is some metaphysical doubt as to the material facts." Id., *quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "However, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor." Id. Also, see Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. Also, see Fed.R.Civ.P. 56 (c).

### III. ISSUE

A.   WHETHER THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON ALL PLAINTIFF'S CLAIMS WHEN THE UNDISPUTED FACTUAL RECORD SHOWS THAT PLAINTIFF WAS GUILTY OF CONTRIBUTORY NEGLIGENCE AND ASSUMED THE RISK?

### IV. ANALYSIS

Plaintiff, in his Second Amended Complaint, brings four counts against Defendant E&R Manufacturing. Count One of Plaintiff's Complaint alleges defective product and failure to warn claims under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). Count Two alleges negligent design/distribution and negligent failure to warn and Count Three alleges wanton design/distribution and wanton failure to warn. Count Four of Plaintiff's Complaint asserts general allegations of negligence, recklessness, wantonness and/or willfulness.

It is quite evident from the facts and evidence presented in this matter that Plaintiff's claims for AEMLD, and negligent and wanton failure to warn fail considerably. In order to establish liability under the Alabama Extended Manufacturer's Liability Doctrine the Plaintiff must show (1) the defendant placed a defective product on the market which was unreasonably dangerous and which caused injury or damage; (2) the defendant was

engaged in the business of selling the product; and (3) the product was expected to and did reach the user or consumer without substantial change in condition. See <u>Reynolds v. Bridgestone/Firestone, Inc.</u>, 989 F.2d 465 (11th Cir. 1993), *citing* <u>Casrell v. Altec Industries, Inc.</u>, 335 So.2d 128, 132-133 (Ala. 1976). "Alabama defines a defect as 'that which renders a product unreasonably dangerous,' i.e. not fit for its intended purpose." <u>Casrell at 133.</u> Likewise, in order to make a prima facie case for negligent failure to warn, the plaintiff must prove that the defendant breached a duty, and that breach proximately caused the plaintiff's injuries. <u>Gurley v. American Honda Motor Co., Inc.</u>, 505 So.2d 358, 361 (Ala. 1987). See also, <u>Abney v. Crosman Corp.</u>, 919 So.2d 289, 296 (Ala. 2005) (holding that when a negligent failure to warn claim fails because the danger is open and obvious, so too does a wanton failure to warn claim).

Additionally, the defense of contributory negligence would bar recovery under the Alabama Extended Manufacturer's Liability Doctrine. <u>Reynolds v. Bridgestone/Firestone, Inc.</u>, 989 F.2d 465 (11th Cir. 1993). Furthermore, assumption of the risk is a form of contributory negligence and the defense of assumption of the risk requires proof of three elements "(1) knowledge by plaintiff of the condition; (2) appreciation by the plaintiff of the danger or risk posed by that condition; and (3) a voluntary, affirmative exposure to the danger or risk." Id. at 470.

As stated above, in order to prove a prima facie case under the Alabama Extended Manufacturer's Liability Doctrine the Plaintiff must first prove the defendant placed a defective product on the market which was unreasonably dangerous and which caused injury or damage. While the subject machine did cause the injury alleged by Plaintiff, it is quite clear that the machine was not unreasonably dangerous. Plaintiff, himself, testified

during his deposition that he did not feel that the block splitter machine was unreasonably dangerous nor did he feel like he was going to be hurt by this machine, and that the danger posed by the machine was obvious and a matter of "common sense". Furthermore, he testified that he was aware of the danger associated with placing his hand in this machine while it was still running. As to the second and third elements of this doctrine, this Defendant stipulates that it was engaged in the business of selling the product and that the product was expected to and did reach the user or consumer without substantial change in condition.

Even if the Plaintiff is able to prove his case under the Alabama Extended Manufacturer's Liability Doctrine and his claims for negligence and wantonness, the Defendant can assert the defense of contributory negligence. According to the case of Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465 (11th Cir. 1993), assumption of the risk is a form of contributory negligence. As previously discussed, "assumption of the risk requires proof of three elements." Id. at 470. The first element that the Defendant must show is that the plaintiff had knowledge of the condition. It is completely undisputed in this matter that the Plaintiff had knowledge of the dangers associated with this machine. The evidence is clear that not only were there posted warning signs which stated, "Keep Hands Clear," but the danger posed by this machine was open and obvious. In fact, the Plaintiff's deposition testimony revealed that he knew the sign was there but that he hardly ever paid any attention to it. Furthermore, Plaintiff acknowledged that he was aware that this machine could cause significant injuries as it was his testimony that he knew if he put his hand in the machine and the side knives closed that it would injure his hand. For example, Jackson testified during his deposition as to the following:

> Q. But you had seen that block being split before, correct?
> A. After I had started working there, yes sir.
> Q. And had you seen the side knives split the block before your accident?
> A. Yes.
> Q. So you saw that the side knives were sharp, correct?
> A. I wouldn't say they were sharp… they are a blunt type blade.
> Q. If you put your hand in there and [the] side knives closed, would it injure your hand?
> A. ***Well, of course.***
> Q. And you knew that before the accident, didn't you?
> A. ***Of course, I knew that.***

(Exhibit 2, p. 20, l. 5-23).

Additionally, Jackson testified that he was aware of the danger associated with trying to beat the three second cycle:

> Q. Every time before this, were you trying to beat the cycle? In other words, when you put your hand in there you knew if you didn't get it out quickly, something could happen?
> A. ***Why sure.***

(Exhibit 2, p. 53, l. 7-11).

> Q. You knew that if you didn't beat the cycle, it would injure your hand badly; isn't that true?
> A. ***Well, it's just common sense, but yes.***

(Exhibit 2, p. 43, l. 11-14).

The next element that the defendant must show is that the Plaintiff appreciated the danger or risk posed by that condition. Clearly, as stated in the abovementioned paragraph, Plaintiff knew and appreciated the risks and dangers associated with this machine and he was aware that the danger of the side knives was open and obvious. Again, he was aware that if he placed his hand in the block splitter while it was still running that it could cause significant injuries to his hand. The final element that the

11

Defendant must prove is that the Plaintiff had a voluntary, affirmative exposure to the danger or risk. Again, the testimony in this matter is undisputed and clear that the Plaintiff willfully and voluntarily stuck his hand into this machine while it was running with full knowledge of the potential consequences. Additionally, the Plaintiff did so while ignoring the posted manufacturers warning signs which stated that you must keep your hands clear of this area.

In addition to this, it is quite evident that the danger presented by the splitter's side knives was open and obvious to Jackson. Clearly, a seller "is under no duty to warn a user of every danger which may exist during the use of the product, *especially where the danger is open and obvious*." Gurley, 505 So.2d at 361 (Emphasis Added]. The duty to warn extends only to those dangers a user "would not be aware of under the particular circumstances of his use of the product in question." Abney v. Crosman Corp., 919 So.2d 289, 294 (Ala. 2005). Thus, a seller "is under no duty to warn when the danger associated with a product is obvious." Abney, 919 So.2d at 295. As stated in the facts above, the danger exhibited by the side knives was open and obvious to Mr. Jackson. Jackson testified during his deposition that he knew the dangers and risks associated with placing his hands in or around the splitter's side knives:

> Q. … You had seen that block being split before, correct?
> A.  After I had starting working there, yes, sir.
> Q. And had you seen the side knives split the block before your accident?
> A. Yes.
> Q. So you saw that the side knives were sharp, correct.
> A. I wouldn't say they were sharp… they are a blunt type blade.
> Q. If you put your hand in there and [the] side knives closed, would it injure your hand?
> A. ***Well of course.***

   Q. And you knew that before this accident, didn't you?
   A. ***Of course, I knew that.***

(Exhibit 2, p. 20, l. 5-23). [Emphasis Added].

Thus, the Plaintiff was well aware of the dangers and risks associated with running the block splitter machine and as such, E & R Manufacturing, Co., Inc. owed no duty to warn Jackson under Alabama law. Furthermore, E & R Manufacturing was relieved of its duty to warn under the theory of negligence due to Jackson's knowledge of the dangers and risks associated with the subject splitter, thus E & R Manufacturing has an absolute affirmative defense under the AEMLD.

 As to the defense of contributory negligence, the Defendant cites the case of <u>Rowden By and Through Rowden v. Tomlinson</u>, 538 So.2d 15 (Ala. 1988), which is virtually identical in fact to the case at bar. The facts in the <u>Rowden</u> case show that the Plaintiff had been working as a farmer's helper for approximately two weeks and that while on the job he was injured by a combining machine. At some point, a mechanical problem developed which stopped the forward movement of the machine; however, it did not stop the motor and the auger mechanism continued to rotate. <u>Id. at 16.</u> While another individual worked on said combine, Rowden, the Plaintiff in this case, placed his hands and arms near the rotating augers and was pulled into the grain bin which caused significant injuries. <u>Rowden</u>, 538 So.2d 15, at 16 (1988). Suit was filed in this matter and the Defendants moved for summary judgment which was ultimately granted in that the Court held "Rowden was contributorily negligent as a matter of law, where he knowingly placed his hands near the auger mechanism of the combine, which was in plain sight,

13

while the mechanism was running, knowing it was dangerous to do so." Rowden at 15 (1988).

In testimony that is eerily similar to the current case at hand, Rowden testified to the following:

> "at the time of the accident, the augers inside the grain bin were operating in plain and open view and that he knew the dangers involved in placing his hands near the moving augers:"
>
> "Q.   You knew it was dangerous to put your hand around a moving auger, didn't you?
> "A.   Yes, sir.
> "Q.   … You had enough judgment to know that was dangerous, didn't you?
> "A.   Yes, sir.
> "Q.   So at the time you realized that there was a risk involved if you should get your hand some way into contact with or touch or get it tangled up with the auger, didn't you?
> "A.   I never thought about it. I just reached in and got the seed – I mean the grass.
> "Q.   You knew it was an opened, exposed auger, didn't you?
> "A.   Yes, sir."
>
> Rowden By and Through Rowden v. Tomlinson, 538 So.2d 15, 17 (1988).

This case further stated that, "it was apparent from this testimony that at the time of the accident Rowden knew that the auger mechanism was unguarded, open and exposed." Rowden at 18. "It is also apparent from his own testimony that Rowden was sufficiently familiar with the machinery to realize the danger involved in placing his hands in the vicinity of the moving parts." Id. at 18. Additionally, "the evidence showed that the rotating auger blades were open and obvious to Rowden's view and that he knew, understood, and appreciated their danger." Id.

Just as in the Rowden case, it was clear and undisputed from Mr. Jackson's testimony that at the time of the accident, he knew the side knives on the block splitter

posed an open and obvious danger while the machine was running. In addition, as evidenced in the following testimony, Jackson knew the risk associated with placing his hand in the block splitter, just as Rowden knew that placing his hands in a running auger would cause injury:

> Q. If you put your hand in there and the side knives closed, would it injure your hand?
> A. *Well of course.*
> Q. And you knew that before this accident, didn't you?
> A. *Of course, I knew that.*

(Exhibit 2, p. 20, l. 18-23). [Emphasis Added].

Furthermore, as evidenced by the aforementioned testimony, Jackson was familiar with the block splitter and knew that if he placed his hands where the side knives were located it would cause significant injury to his hand. Thus, it is clear that Jackson was contributorily negligent in that he had knowledge of the condition; had an appreciation of the danger under the surrounding circumstances; and failed to exercise reasonable care and clearly assumed the risk of injury by ignoring the warnings and trying to beat the machine's cycle. Furthermore, the Plaintiff is unable to show that the machine was unreasonably dangerous when the danger the machine posed was open, obvious, and clearly marked with warning signs. Based on the foregoing, contributory negligence is a complete bar to Plaintiff's AEMLD claim and his claim for negligent design/distribution. As such, Defendants Motion for Summary Judgment is proper and is due to be granted.

## V. CONCLUSION

For the above stated reasons, Defendant, E&R Manufacturing, Co., Inc., requests that this Honorable Court grant summary judgment in favor of E&R Manufacturing and

against Jackson on each of Jackson's claims alleged in his Complaint against E&R Manufacturing.

      RESPECTFULLY submitted this the 31st day of July, 2007.

                                      /s/ Steadman S. Shealy, Jr._____
                                      Attorney for Defendant E & R Mfg. Co., Inc.

OF COUNSEL:
Shealy, Crum & Pike, P.C.
2346 West Main Street
Suite 1
P.O. Box 6346
Dothan, Alabama 36302-6346
Tel: (334) 677-3000
Fax: (334) 677-0030

## **CERTIFICATE OF SERVICE**

      I hereby certify that I have this day mailed a copy of the foregoing, properly addressed and postage prepaid, to:

| | |
|---|---|
| Mark Andrews | Cory Curtis |
| 3334 Ross Clark Circle | Baker & Hostetler, LLP |
| Post Office Box 1649 | 303 East 17th Avenue |
| Dothan, Alabama 36302 | Suite 1100 |
| | Denver, CO 80203 |
| | |
| Christopher S. Rodgers | Constance C. Walker |
| T. Kelly May | Thomas T. Gallion, III |
| Huie, Fernambucq & Stewart, LLP | Haskell, Slaughter, Young & Gallion, LLC |
| Three Protective Center | P.O. Box 4660 |
| Suite 200 | Montgomery, Alabama 36103-4660 |
| 2801 Highway 280 South | |

This the 31st day of July, 2007.

                                      /s/ Steadman S. Shealy, Jr._____
                                      OF COUNSEL