**EXHIBIT "1"**

RECEIVED SEP 1 8 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| DAVID JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 2:06CV0412-WHA-DRB |
| E & R MANUFACTURING | ) | |
| COMPANY, INC., | ) | DEMAND FOR JURY TRIAL |
| CARY MACKEY, | ) | |
| BESSER COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Comes Now the Plaintiff, David Jackson, in the above styled action and hereby Amends his Complaint so as to read as follows:

## STATEMENT OF THE PARTIES

1.      Plaintiff, David Jackson, is over the age of nineteen (19) years and is a resident citizen of Leesburg, Georgia.

2.      Defendant E & R Manufacturing Company, Inc., (hereinafter referred to as "E & R" or "E&R Manufacturing") is, upon information and belief, a foreign corporation, with its principle place of business in Kirklin, Indiana, with its State of Incorporation in Indiana, and was doing business at all times material hereto in Covington County, Alabama.

3.      Defendant Besser Company (hereinafter referred to as "Besser") is, upon information and belief, a foreign corporation, with its principle place of business in Alpena,

Michigan, with its State of Incorporation in Michigan, and wasd doing business at all times material hereto in Covington County, Alabama.

4.    Defendant Cary Mackey, upon information and belief, is a citizen and resident of the State of Alabama.

## STATEMENT OF THE FACTS

5.    On or about December 17, 2004, Plaintiff David Jackson, was an employee of Able Body Temp Services stationed at Concrete & Asphalt Construction/Couch Ready Mix USA in Andalusia, Covington County, Alabama.

6.    On the date of injury, Plaintiff was engaged in his normal job duties in operating a block splitter machine (hereafter "the machine" or "subject machine").

7.    The block splitter machine was designed, engineered, manufactured and marketed by Defendant E & R Manufacturing Company, Inc. and/or Besser Company.

8.    While operating the subject block splitter machine, Plaintiff's hand became caught and entrapped in the machine.   As a result, Plaintiff suffered severe injuries resulting in the amputation of multiple fingers on his right hand.

## COUNT ONE
**(Alabama Extended Manufacturer's Liability Doctrine)**

9.    Plaintiff re-alleges the allegations of all previous paragraphs of the Complaint as if set out here in full.

10.    Defendants E & R Manufacturing Company, Inc. and/or Besser Company designed, manufactured, sold, or distributed the subject block splitter machine which is the subject matter of this lawsuit.

11.    The subject block splitter machine as manufactured, designed, sold and

distributed by Defendants E & R Manufacturing Company, Inc. and/or Besser Company, was unreasonably dangerous and defective in that it created an unreasonable risk of serious injury to the expected or intended users.

12.     The subject machine was unreasonably dangerous by design, manufacture, and warnings that accompanied it.

13.     As a proximate consequence of the defective nature of the subject machine, Plaintiff David Jackson was seriously injured when his right hand became caught in the machine, and he suffered severe and permanent injuries that resulted in the amputation of three fingers on his right hand. He was caused to be hospitalized; he was caused to undergo surgery and will be required to undergo surgery in the future; he was caused to suffer severe mental and physical pain and will do so in the future; he is permanently disabled; he is permanently scarred and disfigured; he has incurred substantial medical expenses and will do so in the future; he has lost earnings and will continue to do so into the future and has lost his earning capacity; he has lost the enjoyment of life and he has been otherwise injured and damaged.

WHEREFORE, Plaintiff David Jackson demands judgment against Defendants E & R Manufacturing Company, Inc. and/or Besser Company for compensatory and punitive damages as a jury may award, plus the cost of this action.

## COUNT TWO
### (Negligence)

14.     Plaintiff realleges the allegations of all previous paragraphs of the Complaint as if set out here in full.

15.     Defendants E & R Manufacturing Company, Inc. and/or Besser Company,

negligently designed, manufactured, sold, leased, inspected, maintained and/or repaired the subject block splitter machine in a defective or unreasonably dangerous condition.

16.    Defendant E & R Manufacturing Company, Inc. and/or Besser Company negligently failed to warn of the potential hazard associated with the use of its product and negligently failed to issue a notice of the hazard or recall regarding the hazard.

17.    As a proximate consequence of the negligence of Defendant E & R Manufacturing Company, Inc. and/or Besser Company, Plaintiff David Jackson was injured as alleged in paragraph 13 above.

WHEREFORE, Plaintiff David Jackson demands judgment against Defendants E & R Manufacturing Company, Inc. and/or Besser Company in such an amount of compensatory damages as a jury may award, plus the cost of this action.

## COUNT THREE
### (Wantonness)

18.    Plaintiff realleges the allegations of all previous paragraphs of the Complaint as if set out here in full.

19.    Defendants E & R Manufacturing Company, Inc. and/or Besser Company wantonly designed, manufactured, sold, leased, inspected, maintained and/or repaired the subject block splitter machine in a defective or unreasonably dangerous condition.

20.    Defendants E & R Manufacturing Company, Inc. and/or Besser Company knew or should have known that failing to design a reasonably safe product could result in severe injury to expected or intended users.

21.    Defendants E & R Manufacturing Company, Inc. and/or Besser Company wantonly failed to warn of the potential hazard associated with use of its product and failed to issue a notice of the hazard or recall regarding the hazard.

4

22.    As a proximate consequence of the wantonness of Defendants E & R Manufacturing Company, Inc. and/or Besser Company, Plaintiff David Jackson was injured as alleged in paragraph 13 above.

WHEREFORE, Plaintiff David Jackson demands judgment against said Defendants in such an amount of compensatory and punitive damages as a jury may award, plus the cost of this action.

## COUNT FOUR

23.    Plaintiff realleges the allegations of all previous paragraphs of the Complaint as if set out here in full.

24.    At the aforementioned times and places, Defendants negligently, recklessly, wantonly, and/or willfully acted in such a manner, or failed to act, so as to cause injuries to Plaintiff David Jackson as set forth in Paragraph 13 hereinabove.

25.    As a proximate consequence of the negligent, reckless, wanton, and willful actions and/or omissions of said Defendants Plaintiff David Jackson suffered injuries as set forth in paragraph 13 hereinabove.

WHEREFORE, Plaintiff David Jackson demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury may award, plus the cost of this action.

## COUNT FIVE

26.    Plaintiffs re-allege the allegations of all previous paragraphs of the Complaint as if set out here in full.

27.    Defendant Cary Mackey was a co-employee of Plaintiff at the time of the accident giving rise to this lawsuit.

28.   Defendant Cary Mackey is, upon information and belief, the safety supervisor, plant supervisor, and/or otherwise in charge of the plant operations including safety and supervision at Plaintiff's place of employment.

29.   Defendant Mackey was aware of and/or should have been aware of a guard provided by the manufacturer which could have prevented Plaintiff's accident.

30.   Defendant Mackey with full knowledge of the guard negligently, recklessly, wantonly and/or willfully removed, failed to install, and/or failed to maintain the safety devices provided by the manufacturer.

31.   As a direct and proximate result of the removal of the guard, the failure by Defendant Mackey to install the safety guard, and/or maintain the safety guard, Plaintiff was injured and damaged as set out in paragraph 13 above.

32.   The failure to act by Defendant Mackey was negligent, reckless, wanton and/or willful in nature.

33.   Plaintiff brings this cause of action pursuant to Alabama Code § 25-5-11 (1975).

WHEREFORE, Plaintiff David Jackson demands judgment against said Defendants in such an amount of damages as a jury may award for his personal injuries and other damages, plus the cost of this action.

Dated this 14 day of September, 2006.

S. Mark Andrews (AND063)
Attorney for Plaintiff
MORRIS, CARY, ANDREWS,
TALMADGE, JONES & DRIGGERS
P.O. Box 1649
Dothan, Alabama 36302
(334) 792-1420

6

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

_____
OF COUNSEL

**DEFENDANT MAY BE SERVED AT:**

**Besser Company**
**801 Johnson Street**
**P.O. Box 336**
**Alpena, Michigan 49707**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the _14_ day of September, 2006 mailed a copy of the foregoing document, properly addressed and postage prepaid to the following:

Steadman Shealy, Esq.
Cobb, Shealy, Crum & Derrick
P.O. Box 6346
Dothan, AL 36302

T. Kelly May
Christopher S. Rodgers
Huie, Fernambucq & Stewart, LLP
Three Protective Center
Suite 200
2801 Highway 280 South
Birmingham, AL 35223-2484

_____
S. Mark Andrews (AND063)

**EXHIBIT "2"**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


DAVID JACKSON,

      Plaintiff,

vs.                              CIVIL ACTION NO.:

E & R MANUFACTURING CO., INC.,   2:06 CV0412-DRB

ET AL.,

      Defendants.


_____\


The deposition of DAVID JACKSON taken

pursuant to the Federal Rules of Civil Procedure

before Karen D. Strickland, Court Reporter and

Notary Public, State at Large, at the law offices

of Morris, Cary, Andrews, Talmadge, Jones &

Driggers, L.L.C., 3334 Ross Clark Circle, Dothan,

Alabama, 36301 on the 22nd day of May, 2007,

commencing at approximately 10:30 a.m.

CONDENSED

## Page 2

```
 1              APPEARANCES
 2
 3
 4   FOR THE PLAINTIFF:
 5       Hon. Mark Andrews
 6       MORRIS, CARY, ANDREWS, TALMADGE, JONES &
 7       DRIGGERS, L.L.C.
 8       3334 Ross Clark Circle
 9       Post Office Box 1649
10       Dothan, Alabama  36302
11
12
13   FOR THE DEFENDANT/E & R MANUFACTURING:
14       Steadman S. Shealy, Jr.
15       COBB, SHEALY, CRUM, DERRICK & PIKE
16       Post Office Box 6346
17       206 North Lena Street
18       Dothan, Alabama  36302
19
20
21
22
23
```

## Page 3

```
 1        APPEARANCES (continued)
 2
 3
 4   FOR THE DEFENDANT/KARRY MACKEY:
 5       Hon. Christopher S. Rodgers
 6       HUIE, FERNAMBUCQ & STEWART, LLP
 7       Three Protective Center, Suite 200
 8       2801 Highway 280 South
 9       Birmingham, Alabama  35223-2484
10
11
12   FOR THE DEFENDANT/BESSER COMPANY:
13       Hon. Cory Curtis
14       BAKER & HOSTETLER, LLP
15       303 East 17th Avenue
16       Suite 100
17       Denver, Colorado  80203
18
19
20
21
22
23
```

## Page 4

```
 1              STIPULATION
 2
 3       IT IS STIPULATED by and between Counsel
 4   for the parties that this deposition be taken at
 5   this time by Karen D. Strickland, Court Reporter
 6   and Notary Public, State at Large, who is to act as
 7   commissioner without formal issuance of commission
 8   to her; that said deposition be taken down
 9   stenographically, transcribed and certified by the
10   commissioner.
11       Except for objections as to the form of
12   the questions, no objections need be made at the
13   time of the taking of the deposition by either
14   party, but objections may be interposed by either
15   party at the time the deposition is read into
16   evidence, which shall be ruled upon by the Court on
17   the trial of the cause upon the grounds of
18   objection, then and there assigned.
19       The reading and signing of the deposition
20   is waived.
21
22
23
```

## Page 5

```
 1                INDEX
 2
 3   EXAMINATION BY:              PAGE NO.
 4   Mr. Shealy                    6 - 118
 5   Mr. Curtis                  119 - 174
 6   Mr. Rodgers                 174 - 175
 7
 8
 9
10            EXHIBIT INDEX
11                                      MAR
     Defendant's
12    1    Photograph                   21
13    2    Photograph                   23
14    3    Photograph                   34
15    4    Photograph                   79
16    5    Photograph                   84
17    6    Photograph                   91
18    7    Photograph                  107
19    8    Photograph                  134
20    9    Photograph                  143
21   10    Initial Evaluation          154
22
23
```

Karen D. Strickland, CCR

Page 10

1    Q.    And how long have you been working for
2    Able Body Labors?
3    A.    I would say about five months.
4    Q.    And what were you making an hour?
5    A.    Eight dollars.
6    Q.    Were you getting any benefits?
7    A.    No.
8    Q.    So you were just getting eight dollars
9    an hour; is that correct?
10   A.    Correct.
11   Q.    And with Able Body Labors, where were
12   you told to go to work?
13   A.    Andalusia.
14   Q.    Where in Andalusia?
15   A.    At Block USA.
16   Q.    How long had you worked at Block USA
17   before your accident?
18   A.    Well, this time two weeks, but I worked
19   there about two-and-a-half months before that.
20   Q.    Well, we are going to talk about that.
21   Okay.  You went to work for Able Body Labors about
22   five months prior to your accident; is that
23   correct?

Page 11

1    A.    Yes.
2    Q.    Where is the first place you went to
3    work?
4    A.    They sent me all over.  I worked all
5    over the place, down at the beach.
6    Q.    When you mean sent you all over, doing
7    what?
8    A.    Just general construction work.
9    Q.    Did you consider yourself a carpenter, a
10   laborer?  What did you consider --
11   A.    I was doing labor work.
12   Q.    Do you have carpentry skills?
13   A.    No.
14   Q.    Do you have block laying skills?
15   A.    No.
16   Q.    Brick, any of that?
17   A.    No.
18   Q.    And you said you had been working at
19   Block USA for two weeks prior to your accident?
20   A.    Yes, this particular time, yeah.
21   Q.    Okay.  Now, let's talk about that a
22   minute.  Had you been working at Block USA in
23   Andalusia before?

Page 12

1    A.    Correct.
2    Q.    When was that?
3    A.    Just about a month -- I was off from
4    there for about a month and then I went -- they
5    sent me back over there.
6    Q.    And how long had you worked the first
7    time you were there?
8    A.    I was there about two months.  Something
9    like that.
10   Q.    So had you ever worked at Block USA
11   before that?
12   A.    No, sir.
13   Q.    So you went to work at Able Body
14   Labors.  They sent you over to Block USA.  You
15   worked there for two months?
16   A.    Roughly, yes, sir.
17   Q.    Is that correct?
18   A.    Yes, sir.
19   Q.    Then you got laid off, or why?
20   A.    No.  They just -- they sent other people
21   over there and sent me somewhere else.
22   Q.    Where did they send you?
23   A.    Down on the beach cleaning up with

Page 13

1    construction crews.
2    Q.    And what company were you working for?
3    A.    I don't know, man.
4    Q.    Okay.  During the two months that you
5    worked for Block USA, what were you doing?
6    A.    Just in general we was working on the
7    line where the blocks got split at the splitter,
8    and coming out and going back to the cuber, and it
9    involved chipping -- chipping stuff off the blocks
10   that didn't cut, pulling the blocks and cleaning
11   the debris out of the machine.
12   Q.    Is that what you did during those first
13   two months?
14   A.    Yeah, I did some of all of that.
15   Q.    So you were familiar with the machine,
16   how it worked, the procedures, training and all the
17   various aspects of the block splitter?
18   A.    I was familiar with the block splitter a
19   little bit, yeah.
20   Q.    Had you been trained on the block
21   splitter?
22   A.    Other than what I was doing -- just
23   showed me how to clean it out and all that.  That's

Karen D. Strickland, CCR

## Page 14

1  the only training I got.

2      Q.    But you had been cleaning it out and

3  doing that kind of work during the first two months

4  that you were at Block USA; is that a fair

5  statement?

6      A.    Yes.

7      Q.    And then you went to work at the beach

8  for a while, for about a month?

9      A.    Correct.

10      Q.    And then they sent you back to Block

11  USA?

12      A.    Correct.

13      Q.    And you worked two weeks and during the

14  two weeks you were there prior to your accident,

15  what were you assigned to do?

16      A.    Basically the same thing I just told you

17  but I was standing right at the back of the machine

18  most of the time where the blocks come out of the

19  splitter.

20      Q.    And it would be fair to say that you ran

21  the machine every day for two weeks prior to your

22  accident?

23      A.    I didn't run the machine.

## Page 15

1      Q.    You stood by the machine and watched it

2  work; is that right?

3      A.    Yeah.

4      Q.    And what was your duties and

5  responsibilities as a laborer at Block USA working

6  for Able Body Labors at the time of your accident?

7      A.    To keep debris cleaned out of the block

8  splitter and clean up the ground, keep the ground

9  clean, chip blocks, just whatever in general needed

10  to be done right there.

11      Q.    And you did that every day for two weeks

12  prior to your accident?

13      A.    Yes.

14      Q.    Now, tell us what kind of training you

15  had in regard to what you were doing at the time of

16  your accident?

17      A.    I was just showed by John and them how

18  to --

19      Q.    Hold on.  Who is John?

20      A.    I don't know what his last name is, but

21  John is one of the workers for Block USA.

22      Q.    Okay.  But John showed you how to do

23  what?

## Page 16

1      A.    To go up in there and clean the block

2  splitter out, the debris out of it.

3      Q.    Explain to us how you were told or

4  explained or trained to do that.

5      A.    You just had to take and stick your hand

6  up in there, and on the side knives right here

7  where it come out you had to pull the debris out of

8  there, the little chips and stuff, because it was

9  actually supposed to fall down into a bucket or

10  whatever, but it didn't do that.  So you had to

11  clean it out.

12      Q.    Okay.

13      A.    And that's what I was showed to do.

14      Q.    So you were showed to put your hand

15  where the side knives are located, correct?

16      A.    In between the cycles, that's correct.

17      Q.    So your training was in between cycles

18  to place hands in the area where the side knives

19  were located to clean out debris; is that correct?

20      A.    Correct.

21      Q.    Did I say that right?

22      A.    Yes, sir.

23      Q.    And had you put your hand in the area

## Page 17

1  where the side knives are located prior to this

2  accident?

3      A.    Had I?

4      Q.    Yes.

5      A.    I don't understand exactly what you're

6  trying to get --

7

8          MR. ANDREWS:  He's asking had you

9          ever cleaned it out just like you were

10          doing at the time of the accident, had

11          you done that before?

12

13      A.    Yes.

14      Q.    Had you done it numerous times?

15      A.    Oh, yeah, I've done it for -- like I

16  said, off and on for the last two-and-a-half months

17  other than, you know, that little break.

18      Q.    All right.  And why were you having to

19  put your hands in the area where the side knife was

20  located?

21      A.    Because if you didn't clean that out

22  that block would get turned sideways and when that

23  split -- that knives come in, it would split that

Page 18

1  block to where all you had to do was just throw it
2  in that dumpster, because it was no good.
3     Q.    And where were you supposed to stand
4  during the entire time that you were working?
5     A.    Well, when you was doing that particular
6  thing, you had to stand right where the block come
7  out of the splitter at.  It's like right to the
8  right right there.  And you had to just reach in
9  there and knock the debris out.
10     Q.    So you were standing to the right of the
11  block splitter where the side knives are located?
12
13              MR. ANDREWS:  Objection.
14
15     Q.    Is that correct?  That's what you just
16  told me; is that right?
17
18              MR. ANDREWS:  The right, looking
19        from which way?
20              MR. SHEALY:  I'm just saying what
21        he said.
22              MR. ANDREWS:  Okay.  I understand.
23        That was my objection.

Page 19

1
2     A.    If you're facing the machine, I was on
3  the right side of the conveyor --
4     Q.    Right.
5     A.    Where the machine -- the blocks come
6  out.  I was on the right side in the corner right
7  there.
8     Q.    All right.  What kind of block were
9  y'all splitting at the time of your accident?
10     A.    I don't know the name of them.
11     Q.    Was there anything unusual about this
12  kind of block versus other block that was being
13  split?
14     A.    Yeah, it was -- they was shaped like --
15  they had two like 45 degree angles on each side,
16  and then it was like straight.  You come up like
17  this, this.  I know that don't go on that, but
18  that's how the blocks was shaped when they got cut.
19     Q.    Had you ever seen blocks split like this
20  before?
21     A.    Before this, no, sir.
22     Q.    Was this kind of an unusual running of
23  this type of block at the plant, or do you know?

Page 20

1     A.    No.  This block got run quite often as
2  far as that plant goes.
3     Q.    You just never saw it done before?
4     A.    Not until I went to work there.
5     Q.    Okay.  But you had seen that block being
6  split before, correct?
7     A.    After I started working there, yes, sir.
8     Q.    And had you seen the side knives split
9  the block before your accident?
10     A.    Uh-huh.
11     Q.    Is that a yes?
12     A.    Yes.
13     Q.    So you saw that the side knives were
14  sharp, correct?
15     A.    I wouldn't say they were sharp.
16     Q.    Well, okay.  Let me ask it this way.
17     A.    They are a blunt-type blade.
18     Q.    If you put your hand in there and side
19  knives closed, would it injure your hand?
20     A.    Well, of course.
21     Q.    And you knew that before this accident,
22  didn't you?
23     A.    Of course, I knew that.

Page 21

1     Q.    Okay.
2     A.    But all at the same time I got to do
3  what I'm told to do.
4     Q.    I understand.
5
6              MR. SHEALY:  I'm going to mark as
7        Defendant's Exhibit -- is that okay with
8        y'all?
9              MR. CURTIS:  Let's call it Jackson
10        Depo 1.
11
12        (Whereupon, Defendant's Exhibit 1 was
13        marked for identification and same is
14        attached hereto.)
15
16     Q.    Mr. Jackson, I'm going to show you what
17  I've marked as Defendant's Exhibit 1 to your
18  deposition.  Can you put an X where you were
19  standing at the time of your accident.
20     A.    (Witness Complies).  All right, that's
21  it.
22     Q.    Now, did you have to stand there the
23  entire time or would you just kind of move around

Page 22

1   in that general area?
2       A.    Let me see that.
3       Q.    (Hands Document, Defendant's Exhibit 1
4   to Witness).
5       A.    From right there --
6       Q.    Whoa, whoa, right there doesn't mean
7   anything.
8       A.    From where I was standing at the --
9       Q.    You're pointing where the X is located?
10      A.    Right.  Back -- there's another machine
11  back here.
12      Q.    And that's going away from the machine
13  towards --
14
15            MR. SHEALY:  What's it called,
16      Mark?
17            MR. ANDREWS:  The cuber.  As you
18      look at Exhibit 1, he's pointing from
19      the X to the left.
20
21      A.    And that's the area I worked.
22      Q.    All right.  Was there any rule where, or
23  were you told that you couldn't walk around the

Page 23

1   machine towards the control panel?
2       A.    I don't think there was.
3
4            (Whereupon, Defendant's Exhibit 2 was
5            marked for identification and same is
6            attached hereto.)
7
8       Q.    Let me show you what I've marked as
9   Defendant's Exhibit 2 to your deposition.  Is this
10  the control panel?
11      A.    Yes, that's the control panel.
12      Q.    Tell me what the control panel does.
13      A.    Operates that block splitter.
14      Q.    Can you stop the block splitter at the
15  control panel?
16      A.    Yes.  But at the same time you can't
17  shut the machine down and stop production with
18  Karry Mackey sitting in there because he want to go
19  irate on you.
20
21            MR. ANDREWS:  Just answer his
22      questions.
23            THE WITNESS:  Okay.

Page 24

1
2       Q.    I understand.  But there was no reason
3   that if a piece of block was caught in the block
4   splitter you couldn't walk three or four feet and
5   hit a button and it would stop the machine?
6       A.    Probably a few more feet than that, but
7   you would be correct.
8       Q.    Well, let's say five feet.
9       A.    It might be close.
10
11            MR. ANDREWS:  Are you talking
12      about and keeping the machine running?
13
14      Q.    There was no reason why you couldn't --
15  and there was a button that would stop the machine,
16  correct?
17      A.    Yeah, but not where I was at.
18      Q.    I understand that.  But there was a
19  button within five feet?
20      A.    Somewhere abouts there, yeah, I guess.
21      Q.    Okay.  And there was -- I mean, we've
22  all been out to the plant.  There was -- and you
23  can see in Defendant's Exhibit 1, there's an

Page 25

1   individual there.  There wasn't any rule that you
2   couldn't be right where that individual was located
3   if you needed to be; isn't that true?
4       A.    I guess if I needed to go do something
5   down there, I could.
6       Q.    Well, what I mean is:  You just stood
7   around in that area anyway, right?
8
9            MR. ANDREWS:  Objection.
10
11      Q.    And as long as the blocks didn't get
12  caught, there wasn't anything for you to do?
13
14            MR. ANDREWS:  Objection.
15
16      Q.    Is that true?
17      A.    No, it ain't true.
18      Q.    Okay.  Well, you tell where I'm wrong.
19      A.    Because I have to make sure that this
20  line stays running.
21      Q.    Okay.
22      A.    And my job pertains to cleaning that
23  machine right there, running back here, and

## Page 42

1   there until after the block split; is that true?

2       A.    Yes.

3       Q.    Then once the block is split, another

4   block is coming in there to be split again?

5       A.    It will be coming in there.

6       Q.    Is that true?

7       A.    Yes.  That's why you have to be quick

8   about it.  Get it in there and out.

9       Q.    All right.  So, then, once you pull a

10  block out that's been split, and you move it down

11  the assembly line or the conveyer; is that right?

12      A.    Yes, sir.

13      Q.    Then you put your right hand in the area

14  where the side knives would close to split the

15  block; is that true?

16      A.    I'm actually doing it all at about the

17  same time.  As you're pulling out with this hand,

18  you're cleaning this out too, so that the block

19  don't come in on you.

20      Q.    So you would pull the block out with

21  your left hand and use your right hand to clean the

22  debris out so that the block doesn't come in on

23  you?

## Page 43

1       A.    That's right.

2       Q.    Is that true?

3       A.    That's what you're trying to do.

4       Q.    And you know that it's a very quick

5   process before this cycle starts again and those

6   side knives split that block, and you know a block

7   is coming right behind it; isn't that true?

8       A.    Yeah, that is true, but all at the same

9   time I got a job to do as far as --

10      Q.    I understand that's what your employer

11  told you to do.  Okay.  And you knew that if you

12  didn't beat the cycle, it would injure your hand

13  badly; isn't that true?

14      A.    Well, it's just common sense, but, yes.

15      Q.    I mean, common sense is what you know,

16  you know what I mean.  So you knew that at the time

17  that you put your hand in there, that if you didn't

18  beat the cycle, it was going to cut your hand off

19  or injure your hand; is that true?

20

21            MR. ANDREWS:  Objection.  He

22            didn't put it in there on the cycle.

23

## Page 44

1       A.    It was after the cycle.  I had time to

2   do what I was doing.

3       Q.    In other words, if that block comes in

4   there while your hand is there, you knew before you

5   were injured that it would hurt your hand, isn't

6   that true, and badly hurt it?

7       A.    I knew it could hurt you, but that don't

8   mean that you still ain't got to go and do what you

9   got to do.

10      Q.    I understand that.  But you knew that

11  before you were injured on 12-16 of '04; isn't that

12  true?

13

14            MR. ANDREWS:  Objection.

15

16      A.    I don't even want to answer it.  I'm

17  tired of being rambled about it.

18

19            MR. ANDREWS:  Well, you've got to

20            answer the question.  What he's trying

21            to ask you --

22            MR. SHEALY:  Whoa, whoa --

23            MR. ANDREWS:  Okay.  You got to

## Page 45

1            answer his question.

2

3       Q.    Just answer my question.  Would you like

4   for me to ask it again?

5       A.    Yes.

6       Q.    How about if I have her read it to you?

7       A.    All right, that would be fine.

8

9            MR. SHEALY:  Read it back.

10

11            (Whereupon, the following question was

12            read back by the court reporter:

13            "Q.    In other words, if that

14            block comes in there while your hand is

15            there, you knew before you were injured

16            that it would hurt your hand, isn't that

17            true, and badly hurt it?")

18

19      A.    Well, it never crossed my mind because

20  it hadn't happened before, I mean, as far as

21  getting hurt.  I mean, it really didn't cross my

22  mind.

23      Q.    Well, you already told me it did.  Why

Page 46

1  are you changing your testimony?

2      A.    I'm not changing my testimony.

3      Q.    Do you want me to have her read back

4  what's on there?  You've already told me that

5  common sense --

6

7             MR. ANDREWS:  Stop.  Stop.  Let's

8             don't argue and harass him.  His

9             testimony is what his testimony is.

10            Let's just ask questions and let him

11            answer them.  He had most of his hand

12            cut off, he's doing the best he can.

13

14     Q.    Let me ask you a question.  I'm going to

15  ask it one last time.  Prior to you injuring and

16  cutting your hand by these side knives, you knew

17  that it was dangerous and you knew that you had

18  just a split second to get your hand in and out or

19  it would be injured?

20

21            MR. ANDREWS:  Objection, not a

22            split second.

23

Page 47

1      Q.    Let's say a second and a half, or two

2  seconds, whatever.

3

4             MR. ANDREWS:  Objection.

5

6      Q.    You knew it was going to be quick, is

7  that true, or it was going to hurt your hand?

8      A.    That is true that it can hurt your hand.

9      Q.    And you knew that; isn't that true?

10     A.    I guess you could say I knew it, but I

11  didn't know it, I mean, because I never even

12  thought about it.

13     Q.    You say that, and that's interesting

14  that you said you never thought about it.  Because

15  isn't it true that Karry Mackey talked to you about

16  it prior to this accident?

17     A.    The only thing that Karry said -- when

18  all this was going on, the only thing that Karry

19  ever said was it can cut your fingers off, be

20  careful how you do it.

21     Q.    So you did think about it?

22     A.    No, I didn't think about it, other than

23  doing my job.

Page 48

1      Q.    Prior to this accident, Karry Mackey

2  says, and even shows you his missing fingers; isn't

3  that true?

4      A.    That's true.

5      Q.    Prior to this accident, he showed you

6  his missing fingers; isn't that true?

7      A.    When I first came in that building he

8  showed me.

9      Q.    He showed you his and said, This block

10  splitter that cut your hand off will cut your

11  fingers off?  He told you that, didn't he?

12     A.    He said it could.

13     Q.    Right.  So you knew --

14

15            MR. ANDREWS:  When he's doing his

16            job.

17

18     Q.    You knew that this block splitter, if

19  you put your hand in there would cut your hand or

20  fingers off, prior to this accident, didn't you?

21

22            MR. ANDREWS:  Objection.

23

Page 49

1      A.    Yeah.  All the same time I still had a

2  job to do.  No matter what you coming up with, I

3  had a job to do.

4      Q.    I understand.  All right.  Let's go back

5  to what Karry Mackey told you in regard to running

6  the block splitter.  Excuse me, you don't like that

7  word.  What was your job, exactly?

8      A.    I was just a flunky.

9      Q.    What did you -- I'm not trying -- I'm

10  not trying to give you a hard time, okay.  I'm just

11  trying to get my questions answered and stuff.

12  What were you called, or what was your job where

13  the X is on this exhibit?

14     A.    I don't know what I would be called as

15  far as a label for that particular job.

16     Q.    So it didn't have a name?

17     A.    No.

18     Q.    You just were removing debris from the

19  block splitter, moving the blocks as they were

20  split down the conveyor line?

21     A.    Yes.

22     Q.    Is that true?

23     A.    That's true.

## Page 50

1    Q.    How many had you done prior to this
2 accident?
3    A.    A number, I couldn't tell.
4    Q.    I'm talking about that day.  Let's go to
5 the day of the accident.  It starts at probably
6 5:30 or 5:15.  I don't know.  Somewhere around
7 there.  You were injured at 6:00.  How many times
8 had you put your hand in this area where your hand
9 was cut off?
10    A.    I cannot give you an exact amount of
11 time.
12    Q.    Would it have been more than once?
13    A.    Oh, yeah, a lot more than once.
14    Q.    Ten times?
15    A.    More than that.
16    Q.    20 times?
17    A.    Probably a lot more than that.  I just
18 ain't sure about how many times, and I ain't going
19 to give you no number because I ain't sure.
20    Q.    That's fine.  But it had been numerous
21 times prior to you having your hand hurt?
22    A.    That's correct.
23    Q.    Tell me as best you can how it came

## Page 51

1 about that you were injured at this block
2 splitter.
3    A.    When I was working I had been doing this
4 for all along for the last two-and-a-half months
5 off and on, everything.  So I got pretty -- I mean,
6 you get comfortable with what you're doing when
7 things ain't happening and going crazy.  So when I
8 was reaching in there to get this debris out, there
9 was a piece that was hung up in there.  And I was
10 trying to get it out so that knife could come
11 over.  And as I was coming out, the corner of my
12 glove got caught on that daggum bolt and side knife
13 right there together, and that's how my hand got
14 hung up there to begin with.
15    Q.    So you put your hand right where the
16 side knife is located?
17    A.    Yes, because there's a little slot right
18 there.  I was trying to pull that piece out, and it
19 was just hung up.  When I finally got it --
20    Q.    The piece --
21
22         MR. ANDREWS:  Hold on, let him
23         finish.  When you finally got to it,

## Page 52

1    what?
2
3    A.    That's when -- when I was starting to
4 come out is when everything got hung up and my
5 glove got hung up and the machine started pushing
6 my hand.  I tried to snatch my hand out of my glove
7 and I couldn't get it out.  So that's how it
8 happened.
9    Q.    Would it be a fair statement that the
10 block itself was hung up down in that slot more
11 than maybe before?
12    A.    Yeah, it was.
13    Q.    And you probably spent a little bit too
14 much time trying to yank it out?
15    A.    Good possibility, yes, sir.
16    Q.    Well, I'm not trying to -- I mean that
17 sounds like a fair statement as to what happened?
18    A.    Actually what happened was -- it don't
19 usually get hung up like that and you can usually
20 push it on out pretty easy.  But this time it just
21 happened to be a little bit longer.
22    Q.    So it got hung up and you spent a little
23 more time trying to get it out, and then as you

## Page 53

1 were trying to yank it your glove got caught --
2    A.    Correct.
3    Q.    And then all the sudden the block is
4 there, and then this closes on your hand; is that
5 true?
6    A.    That's true right there.
7    Q.    Every time before this, were you trying
8 to beat the cycle?  In other words, when you put
9 your hand in there you knew if you didn't get it
10 out quickly, something could happen?
11    A.    Why sure.
12    Q.    Okay.  And so you had -- you would pull
13 with your left hand, clear debris with your right
14 hand, and you knew that you had just a couple
15 seconds to get whatever debris was there out of the
16 way and get your hand out of there; is that a fair
17 statement?
18    A.    Yes, that's a fair statement.
19    Q.    Okay.  And that happened every time
20 before this accident where your glove got hung, you
21 were kind of under the clock, so to speak, to get
22 in there and get it done quickly, get debris, and
23 get your hand out of there?

## Page 54

1    A.    Yeah, but most of the time you didn't
2  have to really rush because it was pretty simple.
3  I mean, it wasn't a hard thing.
4    Q.    But you didn't dally either?
5    A.    No, you didn't. Common sense tell you
6  don't leave your hand there.
7    Q.    I gotcha. Okay. Did you feel like this
8  machine was dangerous?
9    A.    I mean, no, because I worked
10 construction all my life, so, you know, danger is
11 in everything you do. So I didn't look at it as
12 any danger.
13
14    MR. ANDREWS:    You've answered his
15    question.
16
17    Q.    Do you feel like the machine was
18 defective in any way?
19    A.    I felt like there should have been some
20 kind of way for you to be able to get up in there
21 and that machine not keep operating, yeah, the
22 whole time I was working on that machine.
23    Q.    Did you mention that to Karry Mackey and

## Page 55

1  the people that worked there?
2    A.    No.
3    Q.    Did you mention it to any other laborers
4  that you felt that was what --
5    A.    Not that I can recall, no.
6    Q.    In other words, you may have felt that
7  way, but you didn't express it to anyone?
8    A.    No.
9    Q.    Is that true?
10    A.    No.
11    Q.    Is that a yes?
12    A.    Yes.
13    Q.    It's going to read --
14
15    MR. ANDREWS:    Wait a minute. Wait
16    a minute. Let's do this. Listen to his
17    questions and you answer his questions.
18    If you don't understand his questions,
19    tell him you don't understand the
20    question. We don't need to ramble. We
21    don't need to add extra information.
22    And the other thing is, you're not
23    an expert, you're not an engineer. So

## Page 56

1  he's not asking you specific things that
2  ought to be on there. Just answer his
3  questions.
4    THE WITNESS:    Okay.
5
6    Q.    (By Mr. Shealy) Did you feel like this
7  machine was unreasonably dangerous?
8
9    MR. ANDREWS:    And I object to the
10    extent that calls for a legal conclusion
11    or an engineering expert opinion. Based
12    on the knowledge you had at the time of
13    this accident, feel free to answer.
14
15    A.    No dangerous than any other job.
16    Q.    Okay. Did the machine function and do
17 what it was intended to do, and that's split
18 block? Did it work appropriately?
19    A.    I don't know that I could really answer
20 that question, because I don't know how that
21 machine was supposed to work anyway. I've never
22 seen one of them before until I went to work
23 there. It worked the same as it always did since

## Page 57

1  I've been there.
2    Q.    What did you understand was the purpose
3  of this machine?
4    A.    To split block.
5    Q.    Did it split block?
6    A.    Yes.
7    Q.    Did it split block that y'all sold to
8  people?
9    A.    Yes, sir.
10    Q.    Did y'all load the block on trucks, take
11 them out and sell it? I mean, in other words, did
12 it -- you understood it was a block splitter?
13    A.    Correct.
14    Q.    The purpose of a block splitter is to
15 split block?
16    A.    Correct.
17    Q.    Different height, different size; is
18 that true?
19    A.    True.
20    Q.    Did it operate and work as a block
21 splitter?
22    A.    Yes.
23    Q.    And did it split hundreds and hundreds

Page 62

1      MR. ANDREWS:  Asked and answered.
2      THE WITNESS:  What?
3      MR. ANDREWS:  I said, That's asked
4   and answered.  You go ahead.  You've
5   already answered it one time, but you
6   can go ahead and answer it again.
7
8      A.    No, there was nothing to stop me from
9   walking over there.
10     Q.    Okay.  And if you had -- once you
11  realized that it was lodged, if you had taken your
12  hand out and walked around you could have hit the
13  stop button and it would have stopped the block;
14  is that true?
15     A.    Yeah, that's true.
16     Q.    Let me ask you this way.  Once you
17  realized that there was a piece of block lodged as
18  you were pulling the block off, there wasn't
19  anything or any reason you couldn't have walked
20  around and hit a stop button at that time, was
21  there?
22     A.    At that time I didn't know the piece of
23  block was lodged in there until I got off into it.

Page 63

1      Q.    Would you -- as you were pulling the
2   block off with your left hand, would you always put
3   your right hand in there, or were there times that
4   you didn't have to do that?
5      A.    I didn't have to every single time.
6      Q.    In other words, sometimes it would split
7   right and you would just pull it with your left
8   hand.  You don't put your right hand in there every
9   time?
10     A.    That's correct.
11     Q.    Isn't that true?
12     A.    That's true.
13     Q.    What would happen to the block as to
14  make you feel like you had to put your right hand
15  in the area where the side knives were located?
16     A.    Just a piece of the block it get split
17  off, the trash that comes off, two knives on each
18  one of the side knives where it splits it right
19  there, some of that trash falls right there and
20  won't let that knife come out and you got to move
21  it.
22     Q.    Would the knife not work if that block
23  is in there?

Page 64

1      A.    No, it will work, but it just won't
2   split the block like it's supposed to.
3      Q.    It messes up your block?
4      A.    Yes.
5      Q.    Now, after you injured your hand, what
6   happened?
7      A.    Do you mean directly right afterwards?
8      Q.    Yes, sir.
9      A.    As soon as my hand went through the
10  cycle, when I got my hand out I just grabbed it and
11  held it and went to the office and went to the
12  emergency room.
13     Q.    Did you talk to anybody in the office?
14     A.    I can't really say, because I ain't real
15  sure.
16     Q.    Did you tell anybody in the office that
17  it was your fault?
18     A.    No.
19     Q.    That you knew better than to do that?
20     A.    No.
21     Q.    Did anybody see or witness your hand
22  being cut or injured that you know of?
23     A.    Not unless John and them back there at

Page 65

1   the cuber was able to see anything that happened.
2   I think actually John actually figured it out after
3   I held my hand up and told him I got my hand
4   caught.
5      Q.    Have you talked to John about how the
6   accident happened?
7      A.    No.
8      Q.    So you don't know if anybody actually
9   saw the accident, you hadn't talked to them about
10  it?
11     A.    No, sir.
12     Q.    Have you been back to work since this
13  accident?
14     A.    To there?
15     Q.    Yes.
16     A.    No, I ain't never been back to the block
17  plant since then.
18     Q.    Have you talked to anybody at the block
19  plant, any employees that were there, anybody with
20  Able Body Labors about what may have happened or
21  how the accident happened?
22     A.    I don't think in general I have.  I may
23  have talked to John and Karry, I don't know.  I've

Page 86

1  right there.
2      Q.    Okay.  So you can see, Keep Hands Clear,
3  and as you're looking -- if you were working down
4  at the cuber and were looking back towards the
5  area, you would be able to see this warning and
6  the, Keep Hands Clear, if you were looking; is that
7  true?
8      A.    If that's what you was looking at,
9  correct.  But that ain't -- that ain't what I -- I
10  hardly ever paid anything any attention except for
11  what was going on right in there.  So I never
12  looked up.  I knew that sign was there.  But, I
13  mean...
14      Q.    I gotcha.  Why would someone black out
15  that warning, do you know?
16      A.    I have no clue.
17      Q.    Okay.  Now, what would happen if debris
18  was caught on the other side of the machine?  You
19  know, your right hand -- you're using your left
20  hand to pull the block, right hand to clean on the
21  knife side that's closest to you.  What about the
22  other side, because isn't their a knife on the
23  other side?

Page 87

1      A.    All the debris fell down on the ground
2  over there on the back side of that machine.
3      Q.    So it never got caught on the back side?
4      A.    It did, but it never did it like the
5  other side and John always cleaned that side when
6  he was up there.
7      Q.    Well, what about when you're up there?
8      A.    I don't work on that side.
9      Q.    Was there somebody working on the other
10  side?
11      A.    No, sir.
12      Q.    So it wouldn't get messed up on the
13  other side then, it would just be on the side --
14      A.    Most of it fell down on the floor.
15      Q.    Isn't that the way normally it is
16  supposed to work, that the debris falls down and
17  the blocks just keep running?  Isn't that how it
18  normally works?
19      A.    It ain't never worked that way since
20  I've been there, but.
21      Q.    So you're saying what, then?  You told
22  me you didn't have to clean out every block?
23      A.    No, you don't.

Page 88

1      Q.    Some would run through there and no
2  problem?
3      A.    And they would fall.
4      Q.    Okay.  But you're telling me that on the
5  back side, it would never, the block, get caught in
6  the knife or anything?  You didn't never have to
7  clean it out that you know of?
8      A.    I didn't, no.
9      Q.    Okay.  And the only time you would have
10  to clean it out would be on your side over here,
11  which is where you were standing; is that true?
12      A.    That's all I ever did, yes, sir.
13      Q.    Why would you stand on the side that you
14  were standing and not on the other side?
15      A.    Because that's where I was told to
16  stand.
17      Q.    But I mean, why?
18      A.    I don't have a clue, except to clean it
19  out.
20      Q.    So you don't know why they told you to
21  stand there?
22      A.    To clean it out.
23      Q.    Okay.

Page 89

1      A.    To clean the debris out of that side
2  knife right there.  And we worked that side of the
3  line.
4      Q.    Okay.  Let me show you -- do you see
5  this hammer, Keep Hands Clear, on Defendant's
6  Exhibit 1?
7      A.    What, this?
8      Q.    Yes.  There's a hammer sitting up there,
9  do you see it?
10      A.    Yeah.  I see the hammer handle right
11  there, yes.
12      Q.    Would y'all ever use the hammer?  Why
13  would you use the hammer?
14      A.    I never used that hammer.
15      Q.    Do you know what it was used for?  Did
16  anybody ever use it?
17      A.    Not that I know of.
18      Q.    I mean, we go out there to inspect the
19  machine and I didn't know why there was a hammer
20  there, do you know?
21      A.    No.
22      Q.    Do you know what its use was for?
23      A.    No, I don't.

Page 150

1    A.    The glove did protect my hand because it
2  would eat your fingertips off trying to remove all
3  that concrete because it's just like sandpaper.
4    Q.    Did you think the glove would protect
5  you from the blades?
6
7          MR. ANDREWS:  You mean from
8          getting cut?
9          MR. CURTIS:  Yeah.
10
11   A.    I didn't feel uncomfortable with it or
12 nothing like that.  I mean, I just -- I used it to
13 protect my hands is what I did.
14   Q.    Okay.  Would you describe the block
15 plant as having a safety culture?  Was safety
16 something that was emphasized at the plant?
17   A.    Well, they didn't have no safety meeting
18 or nothing like that.  So I don't know how to
19 answer that question, other than to me I felt safe.
20 I mean, I didn't feel like I was going to get hurt
21 or nothing like that.
22   Q.    Did your supervisor ever talk to you
23 about the safe operation of the machine?

Page 151

1    A.    No.
2    Q.    Never?
3    A.    Not that I can recall.
4    Q.    What about your co-workers, did they
5  ever talk about the safe --
6    A.    Oh, we always talked amongst each other
7  about y'all be careful when we was there.
8    Q.    You always talked about being careful?
9    A.    Yeah.  I worked with labor-ready people,
10 so we always just said, Y'all, let's have a good
11 safe day.
12   Q.    What did it mean to you to be careful?
13   A.    Just pay attention to what you was
14 doing.
15   Q.    So in your case, operating -- or manning
16 the splitter, it's an automatic machine, it runs
17 every three seconds, so being careful is being
18 quick?
19
20          MR. ANDREWS:  Objection.  Is that
21          a question?
22
23   Q.    How could you be careful -- how could

Page 152

1  you act carefully in sticking your hand into the
2  machine to clean out the debris?
3    A.    Because when I stuck my hand into the
4  machine it wasn't operating.  I mean, you had two
5  or three seconds there -- whatever it might have
6  been I ain't exactly sure -- to get that debris
7  out.
8    Q.    So it's your testimony that because you
9  had two or three seconds, it was enough time, so it
10 was careful?  It was a safe thing to do?
11   A.    I felt safe about it.
12   Q.    Okay.  In your second amended complaint,
13 which is -- I'm sure your lawyer has shown you
14 these things.  There's an allegation that says, As
15 a direct and proximate result of the removal of the
16 guard, the failure by Mr. Mackey to install the
17 safety guard and/or maintain the safety guard,
18 plaintiff was injured.
19          What guard exactly are you talking
20 about in your second amended complaint?
21   A.    What I was thinking was there should
22 have been something running down the side of it to
23 keep you from being able to get up in there, or at

Page 153

1  least something that would stop that machine from
2  operating while you was in there.
3    Q.    How would -- how would you have hit --
4  what's the best way to ask this.  Did you ever see
5  a guard on the machine?
6    A.    No, sir.
7    Q.    The guard that you testified about just
8  a minute ago was hypothetical, right?
9    A.    From what I know now, yes, sir.  But at
10 that time, no, sir, it wasn't.
11   Q.    Okay.  I understand.
12   A.    Okay.
13   Q.    You understood the machine ran
14 automatically, correct?
15   A.    Correct.
16   Q.    And you also understood that it
17 wouldn't -- that it would not stop by itself?
18   A.    Yes, I guess I did.  I mean, I didn't
19 never -- I ain't never thought about it, but...
20   Q.    You understood for the machine to stop
21 running, someone had to turn it off?
22   A.    Hit the button, yes, sir.
23   Q.    Okay.  You testified before that you saw

**EXHIBIT "3"**

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06 CV-0412-DRB


DAVID JACKSON,

     Plaintiff,

vs.

E & R MANUFACTURING
COMPANY, INC.,

    Defendant.

_____


DEPOSITION OF JOHN STEPHENS

Date:  May 23, 2007

Time: 9:30 a.m.


COURT REPORTER:

APRIL R. BENDINGER, CSR

BENDINGER & ASSOCIATES
334.803.0161

 COPY

Page 2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4           Mr. Mark Andrews

 5           MORRIS, CARY, ANDREWS, TALMADGE, JONES

 6           & DRIGGERS

 7           3334 Ross Clark Circle

 8           Dothan, Alabama 36303

 9

10   FOR THE DEFENDANT:

11           Mr. Steadman Shealy

12           SHEALY, CRUM & PIKE

13           100 Camellia Drive

14           Suite 101

15           Dothan, Alabama 36302

16

17   FOR THE DEFENDANT:

18           Mr. Cory M. Curtis

19           BAKER & HOSTETLER

20           303 East 17th Avenue

21           Suite 1100

22           Denver, CO 80203

23
```

Page 3

```
 1              A P P E A R A N C E S

 2

 3

 4    FOR THE DEFENDANT, STEPHENS AND MACKEY:

 5            Mr. Christopher Rodgers

 6            HUIE, FERNAMBUCQ & STEWART

 7            Three Protective Center

 8            Suite 200

 9            2801 Highway 280 South

10            Birmingham, AL 35223

11

12    ALSO PRESENT:

13    Mr. Karry Mackey

14

15

16

17

18

19

20

21

22

23
```

Page 4

1                    EXAMINATION INDEX

2

3    JOHN STEPHENS

4         BY MR. ANDREWS . . . . . . . . . .        7

5         BY MR. SHEALY . . . . . . . . . .       84

6         BY MR. ANDREWS . . . . . . . . . .     103

7                      EXHIBIT INDEX

8
                                              MAR
9    Plaintiff's

10   1       Splitter picture                    22

11

12

13

14

15

16

17

18

19

20

21

22

23

BENDINGER & ASSOCIATES
334.803.0161

Page 5

```
1              S T I P U L A T I O N

2                   IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of JOHN STEPHENS may

5    be taken before April R. Bendinger, Notary

6    Public, State at Large, at the Law Offices of

7    Albrittons, Clifton, Alverson, Moody & Bowden,

8    109 on Avenue, Andalusia, Alabama on May 23,

9    2007, commencing at approximately 9:30 a.m.

10                  IT IS FURTHER STIPULATED AND

11   AGREED that the signature to and the reading of

12   the deposition by the witness is waived, the

13   deposition to have the same force and effect as

14   if full compliance had been had with all laws

15   and rules of Court relating to the taking of

16   depositions.

17                  IT IS FURTHER STIPULATED AND

18   AGREED that it shall not be necessary for any

19   objections to be made by counsel to any

20   questions, except as to form or leading

21   questions and that counsel for the parties may

22   make objections and assign grounds at the time

23   of trial or at the time said depositions is
```

Page 6

1    offered in evidence, or prior thereto.

2              I, April R. Bendinger, a Court

3    Reporter of Dothan, Alabama, and a Notary Public

4    for the State of Alabama at Large, acting as

5    Commissioner, certify that on this date,

6    pursuant to the Federal Rules of Civil

7    Procedure, and the foregoing stipulation of

8    counsel, there came before me at the offices of

9    Albrittons, Clifton, Alverson, Moody & Bowden,

10   109 on Avenue, Andalusia, Alabama commencing at

11   approximately 9:30 a.m. on May 23, 2007, JOHN

12   STEPHENS in the above cause, for oral

13   examination, whereupon the following

14   proceedings were had:

15

16

17

18

19

20

21

22

23

Page 19

1    Mr. Jackson's accident was sort of a honeycomb

2    shaped block, it wasn't a square or rectangle

3    block --

4          A.     Right.

5          Q.     What is that called?

6          A.     8-inch diamond pro bevel.

7                 MR. SHEALY:  Say that slowly.

8          A.     8-inch diamond pro bevel.

9                 MR. SHEALY:  8-inch pro bevel.

10         Q.     And the bevel, I guess, is the

11   angle on the corners of the brick?

12         A.     Right.

13         Q.     That type of block, that's a block

14   not a brick, correct?

15         A.     Yes.

16         Q.     Is that block manufactured pretty

17   regularly out there?

18         A.     Yes.

19         Q.     What I mean by that, it's not like

20   a very unusual event to be making 8-inch diamond

21   pro bevel block, is it?

22         A.     No.

23         Q.     What would be the most typical

Page 24

1      A.     No.

2      Q.     There are none that have that?

3      A.     No.  There's just two knives --
4   straight knives like that that are separated
5   apart.

6      Q.     I see.  When you install the two
7   knives on the side, what's purpose of having two
8   knives on the side?

9      A.     Depends on how big a chunk gets
10  split out through your bevel split.

11     Q.     Do you remember what kind of block
12  was being split on the day of Mr. Jackson's
13  accident?

14     A.     8-inch diamond pro diamond tan.

15     Q.     Would it have a straight edge
16  blade on the side?

17     A.     It would have two on each side.

18     Q.     It would have two on each side to
19  cut out a wedge on the side of the blocks?

20     A.     Right.

21     Q.     I will show you Plaintiff's
22  Exhibit 7 to Mr. Ronald Neese's deposition.  Do
23  you see the knives here?

Page 26

```
1       A.      It is pushed out by the next block
2   coming in.
3       Q.      Does that chip or concrete
4   sometimes fall into the knives?
5       A.      Yes.
6       Q.      As I understand, we have been
7   calling it debris, for lack of a better phrase,
8   concrete pieces or chips that fall down beside
9   these knives after the knives cycle.  Are you
10  familiar with that term?
11      A.      Yes.
12      Q.      Is that a fair characterization of
13  what happens?
14      A.      Yes.
15      Q.      As I also understand, regardless
16  of the block you're splitting or the knife
17  you're using, there is going to be some amount
18  of concrete that falls down every time?
19      A.      No.
20      Q.      Tell me when it will and when it
21  won't?
22      A.      Straight split won't; everything
23  else will.
```

Page 37

1    another type of block typically?

2        A.    Two or three days.

3        Q.    How many blocks do you run in

4    there in a day?

5        A.    Probably about five thousand.

6        Q.    Five thousand per day?

7        A.    Yes.

8        Q.    Is there just one shift out there

9    at the plant?

10       A.    Yes.

11       Q.    When is that?

12       A.    Day shift.  6 to 5.

13       Q.    You would run about three or four

14   days of that?

15       A.    Yes.

16       Q.    15 to 20,000 block, then shift to

17   another block for example?

18       A.    Yes.

19       Q.    That is not necessarily going to

20   be verbatim what happens, that's just an example

21   of it?

22       A.    Yes.

23       Q.    If this debris is created on the

Page 64

1   pocket until they get done.

2       Q.     Is that typically the person

3   pulling chunks would be the person to go get it,

4   because they would be the ones to see the debris

5   happen?

6       A.     They notify one of the USA

7   employees and they would lock it out.  Whoever

8   the splitter person is that works on it.

9       Q.     So it wouldn't necessarily have to

10  be the person pulling chunks?

11      A.     No, uh-uh.

12      Q.     But it can be the person pulling

13  chunks?

14      A.     Yes.

15      Q.     In other words, Mr. Jackson, when

16  he's pulling chunks, he could go to the office

17  and get the lock and come lock it out and tag it

18  out if he needed to, couldn't he?

19      A.     If he knows how.

20      Q.     Was Mr. Jackson trained on that,

21  do you know?

22      A.     He was showed how to turn the

23  machine off, how to turn it on.  If a block is

Page 65

1    hung up or mechanical error, he was told to turn

2    around and get me.

3        Q.    I see.  Is that pretty much what

4    Mr. Jackson was told?

5        A.    Yes.  I'm the one that told him.

6        Q.    When Mr. Jackson came the work out

7    there, do you remember that?

8        A.    Yes.

9        Q.    Did you train Mr. Jackson?

10       A.    Yes.

11       Q.    On the operation or how to pull

12   chunks?

13       A.    Yes.

14       Q.    And how to clean the debris?

15       A.    Yes.

16       Q.    What did you tell him?

17       A.    Do not stick your hands in the

18   side knives, use the stick or cut the machine

19   off.  That if something jammed up, turn around

20   and get me, and I will straighten it up.

21       Q.    I understand from Mr. Jackson that

22   he did see debris fall down beside the block and

23   he did reach in there with his hand to try to

Page 66

1    clear out the side knives.  Is that you're

2    understanding as well?

3         A.    Yes.

4         Q.    My understanding is he did not

5    turn the machine off.  And his testimony is that

6    that's the way he had always done it, and that's

7    the way he understood he was supposed to it.

8    That's what his testimony was.  My question to

9    you is:  He says that once he got in there, this

10   block was stuck, and as he was trying to pull

11   his hand out, the glove got stuck on some area

12   on the side knife or bolt or some area up in

13   there.  Is that you're understanding of the

14   accident?

15        A.    No.

16        Q.    What is your understanding how the

17   accident happened?

18        A.    He stuck his hand in there without

19   cutting the machine off to get the chunks out.

20   The next block come into the splitter, and

21   before he could get his hand out, it made the

22   eye that pushes the block forward to the knives,

23   and he couldn't get his hand out.  He said it

Page 67

1    was stupid of him to do it.

2        Q.    Mr. Jackson said that?

3        A.    He told me that it was his fault.

4        Q.    When did he tell you that?

5        A.    When did he tell me that?

6        Q.    Yes, sir.

7        A.    When I was holding his hand on the

8    way to the hospital.

9        Q.    What else did you hear him say?

10       A.    Basically that was it.  It was my

11   fault.  I knew better than to stick my hand in

12   there.

13       Q.    The reason I asked is because in

14   the First Report of Injury that was turned in in

15   this case, it says that Mr. Jackson's glove got

16   caught in the machine.  It does not reference

17   any of these comments.  Did you ever tell

18   anybody else what you just told to me?

19       A.    Yes, my supervisor, Karry Mackey.

20       Q.    Who else have you told that?

21       A.    That's it.  Everybody that was in

22   the office that morning heard Mr. Jackson say

23   that.

Page 86

1    the panel right by the block that is split, are

2    we understanding each other?

3         A.    Yes.

4         Q.    He testified that he had seen it

5    turned on and off, and you were the only one

6    that would do that.  Is that an incorrect

7    statement?

8         A.    Yes.

9         Q.    In fact, you had trained or showed

10   Mr. Jackson how to turn this machine on and off

11   on the control panel; is that a true statement?

12        A.    Yes.

13        Q.    You had seen Mr. Jackson turn this

14   machine on and off at the control panel; is that

15   a true statement?

16        A.    Yes.

17        Q.    When you're at the machine where

18   the block is being split, which is what

19   Mr. Jackson was doing, what would you describe

20   that job duties or position called, is that a

21   utility man cleaning out debris?

22        A.    That's a chunk puller.

23        Q.    We are going to call it the chunk

1          Q.      In fact, that was his job to do

2     that, wasn't it?

3          A.      Yes.

4          Q.      If he didn't do it and just stuck

5     his hand in there where the side knives were

6     trying to beat the cycle, that was not his job

7     duties and responsibilities?

8          A.      No.

9          Q.      In fact, you have specifically

10    trained him and told him not to put his hand

11    where those side knives were located exactly in

12    the place where he was injured while the machine

13    was running; is that a true statement?

14         A.      Yes.

15         Q.      You told him that before the day

16    of this accident?

17         A.      Yes.

18         Q.      Had you told him on more than one

19    occasion not to put his hand in the splitter?

20         A.      Yes.

21         Q.      Did y'all ever have safety

22    meetings or gatherings where you would discuss

23    safety in the work place and discuss the fact

Page 93

1      Q.      Is it any big deal to stop the

2  block splitter and start it back?

3      A.      No.

4      Q.      Isn't it just a push of a button?

5      A.      Push of a button to stop it.  Push

6  three buttons to start it back up.

7      Q.      Okay.  And you wouldn't punish

8  Mr. Jackson if he stopped this block splitter in

9  the production process because there was a piece

10  of chunk stuck in there, would you?

11      A.      Yes.

12      Q.      He wasn't paid on production?

13      A.      No.

14      Q.      Wasn't he paid by the hour?

15      A.      Yes.

16      Q.      If he felt like the machine needed

17  to be stopped, you wouldn't have had a problem

18  with it?

19      A.      No.

20      Q.      In fact, if he would have stopped

21  this machine, he would not have injured his

22  hand, would he?

23      A.      Yes.

Page 94

1        Q.      If he would have followed your
2    instructions, he wouldn't have injured his hand;
3    isn't that true?
4        A.      Yes.
5        Q.      You have worked around this block
6    splitter for years?
7        A.      Yes.
8        Q.      Did it do what it was supposed to
9    do?
10       A.      Yes.
11       Q.      Did it split block, work well?
12       A.      Yes.
13       Q.      Have you been happy with it?
14       A.      Yes.
15       Q.      Is there anything that you've seen
16   that's dangerous about this machine that you
17   feel like is not adequate?
18       A.      No.
19       Q.      Do you feel like this is a
20   reasonably safe machine to use if you follow
21   instructions and directions of your employer and
22   the manufacturer?
23       A.      Yes.

EXHIBIT "4"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06 CV0412-DRB


DAVID JACKSON,

     Plaintiff,

vs.

E & R MANUFACTURING CO., INC.
ET AL,

    Defendants.

_____


DEPOSITION OF KARRY MACKEY

Date:  May 23, 2007

Time: 12 p.m.


COURT REPORTER:

APRIL R. BENDINGER, CSR

BENDINGER & ASSOCIATES
334.803.0161

COPY

Page 2

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4            Mr. Mark Andrews

 5            MORRIS, CARY, ANDREWS, TALMADGE, JONES

 6            & DRIGGERS

 7            3334 Ross Clark Circle

 8            Dothan, Alabama 36303

 9

10    FOR THE DEFENDANT:

11            Mr. Steadman Shealy

12            SHEALY, CRUM & PIKE

13            100 Camellia Drive

14            Suite 101

15            Dothan, Alabama 36302

16

17    FOR THE DEFENDANT:

18            Mr. Cory M. Curtis

19            BAKER & HOSTETLER

20            303 East 17th Avenue

21            Suite 1100

22            Denver, CO 80203

23
```

Page 3

1                    A P P E A R A N C E S

2

3

4    FOR THE DEFENDANT, STEPHENS AND MACKEY:

5            Mr. Christopher Rodgers

6            HUIE, FERNAMBUCQ & STEWART

7            Three Protective Center

8            Suite 200

9            2801 Highway 280 South

10           Birmingham, AL 35223

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

```
 1              EXAMINATION INDEX
 2
 3   KARRY MACKEY
 4        BY MR. ANDREWS . . . . . . . . . . .    7
 5        BY MR. SHEALY . . . . . . . . . . .   56
 6        BY MR. CURTIS . . . . . . . . . . .   80
 7        BY MR. ANDREWS . . . . . . . . . . .   89
 8        BY MR. CURTIS . . . . . . . . . .  106
 9        BY MR. ANDREWS . . . . . . . . . . .  107
10
11
12              EXHIBIT INDEX
13
                                          MAR
14   Defendant's
15   1      Manual                          83
16
17
18
19
20
21
22
23
```

BENDINGER & ASSOCIATES
334.803.0161

Page 5

1          S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of KARRY MACKEY may

5    be taken before April R. Bendinger, Notary

6    Public, State at Large, at the Law Offices of

7    Albrittons, Clifton, Alverson, Moody & Bowden,

8    109 on Avenue, Andalusia, Alabama on May 23,

9    2007, commencing at approximately 12 p.m.

10             IT IS FURTHER STIPULATED AND

11   AGREED that the signature to and the reading of

12   the deposition by the witness is waived, the

13   deposition to have the same force and effect as

14   if full compliance had been had with all laws

15   and rules of Court relating to the taking of

16   depositions.

17             IT IS FURTHER STIPULATED AND

18   AGREED that it shall not be necessary for any

19   objections to be made by counsel to any

20   questions, except as to form or leading

21   questions and that counsel for the parties may

22   make objections and assign grounds at the time

23   of trial or at the time said depositions is

Page 6

1   offered in evidence, or prior thereto.

2           I, April R. Bendinger, a Court

3   Reporter of Dothan, Alabama, and a Notary Public

4   for the State of Alabama at Large, acting as

5   Commissioner, certify that on this date,

6   pursuant to the Federal Rules of Civil

7   Procedure, and the foregoing stipulation of

8   counsel, there came before me at the offices of

9   Albrittons, Clifton, Alverson, Moody & Bowden,

10  109 on Avenue, Andalusia, Alabama commencing at

11  approximately 12 p.m. on May 23, 2007, KARRY

12  MACKEY in the above cause, for oral examination,

13  whereupon the following proceedings were had:

14

15

16

17

18

19

20

21

22

23

BENDINGER & ASSOCIATES
334.803.0161

Page 19

1      Q.      Tell us, when did your accident

2    happen?

3      A.      2001.

4      Q.      What were you doing?

5      A.      I was over showing an Able Body

6    rental person how to pull chunks.

7      Q.      And what happened?

8      A.      Well, I got concerned with him.  I

9    was pulling the block down, and several times

10   when I pulled the block down, I pinched his

11   fingers.  So I was more concerned about his

12   fingers than I was my hand, and at the time I

13   wasn't pulling a chunk when this happened, I

14   reached up to grab the block, and I was watching

15   the Able Body rental person, and put my hand in

16   too far.

17     Q.      You weren't even reaching for a

18   chunk at the time?

19     A.      No.

20     Q.      So would it be a safe statement

21   that your fingers can get cut off in this block

22   splitter machine even when you're not reaching

23   in to clean debris, but when you're trying to

Page 39

1          Q.     Okay.  Make sure I got a clear

2     question.  There is nobody you can think of that

3     you have refused back at your plant in Andalusia

4     that works for Able Body specifically because

5     they reached their hand in a splitter?

6          A.      Normally when you tell them, they

7     are smart enough, for the most.

8          Q.      Mr. Jackson was not cited or

9     written up because of this accident, was he?

10         A.     No.

11         Q.     Y'all didn't terminate him because

12    of reaching his hand in the machine, did you?

13         A.     No.

14         Q.     Did you know Mr. Jackson, other

15    than working with him out here?

16         A.     No.

17         Q.     Like Mr. Stephens said, was he one

18    to follow instructions?

19         A.     Yes.

20         Q.     Typically, did you consider him to

21    be a safe worker, Mr. Jackson?

22         A.     No.

23         Q.     Tell me what you mean by that.  Do

BENDINGER & ASSOCIATES
334.803.0161

Page 40

1   you have any specific instances in mind or just

2   generally?

3          A.     Well, the splitter thing.  He kept

4   having to be told about the splitter just like

5   they all did.

6          Q.     When you say they all, all the

7   Able Body employees?

8          A.     Right.

9          Q.     You had to stay on the Able Body

10  employees?

11         A.     Right.

12         Q.     Was it a daily thing to tell them,

13  "don't reach your hand in there"?

14         A.     Well, they were all told on a

15  daily basis, "do not stick your hand in there".

16         Q.     Was it because on a daily basis

17  they would be reaching their hand in there?

18         A.     Because on a daily basis it was a

19  dangerous job, and we felt like we needed to

20  tell them.

21         Q.     But on a daily basis did you run

22  into that where workers were reaching into the

23  machine?

Page 42

1    he couldn't get it out.  He reached in from this

2    side to pull it out, and got his finger.

3            Q.      With his palm towards the knife?

4            A.      That's right.

5            Q.      Did you talk with Mr. Jackson

6    about the accident?

7            A.      Yes, I did.

8            Q.      What did he say?

9            A.      His first words were it was

10   stupidity and his fault.

11           Q.      Was that in your office?

12           A.      At the hospital.

13           Q.      At the hospital.  Now, did you

14   ever prepare any report about this accident?

15           A.      Safety director did; I didn't.

16           Q.      Who is the safety director?

17           A.      David Rabold.  At that time I

18   believe it was Thomas Hawthorne.

19           Q.      Where is Mr. Hawthorne's office?

20           A.      Dothan.

21           Q.      Did he create a written report

22   about this accident?

23           A.      I believe he did.

Page 51

1    A.    No, they had just left.

2    Q.    Who was the first person who said

3 something to you about this accident?

4    A.    Dewayne Biggs.

5    Q.    What did he say?

6    A.    He explained to me what had

7 happened and who was involved and who just left.

8 And I left at that time and went to the

9 hospital.

10    Q.    Is Dewayne still employed out

11 there?

12    A.    Yes.

13    Q.    Then you went to the hospital?

14    A.    Yes.

15    Q.    When you got to the hospital, who

16 did you see?

17    A.    I seen David.

18    Q.    Did you go up to him?

19    A.    Yes, I did.

20    Q.    What did he say?

21    A.    When I walked in, he was shaking

22 his head and said, "stupid me," that's what came

23 out of his mouth.

Page 56

1    scientific about it, you just said grab

2    something that's long to reach in there with; is

3    that right?

4         A.    Well, I suggested the wood or a

5    bar.  In the same token, I suggested I would

6    rather you turn the machine off.

7         Q.    But you also know that you have to

8    try to keep production going as best you can,

9    don't you?

10        A.    Yes.

11        Q.    If you can clean the machine out

12   without turning it off, try to do that, right?

13        A.    Right.

14              MR. ANDREWS:  I believe that's all

15   the questions I have.

16                        EXAMINATION

17   BY MR. SHEALY:

18        Q.    When you were discussing with

19   Mr. Jackson about your hand, you made it very

20   clear to him not to put his hand in the area

21   where the side knife is located?

22        A.    Yes.

23        Q.    He understood that?

Page 59

```
 1        A.      Yes.
 2        Q.      It's to work automatically?
 3        A.      Yes.
 4        Q.      Isn't that true?
 5        A.      Yes.
 6        Q.      Isn't that why you got it?
 7        A.      Yes.
 8        Q.      Does the machine work well and do
 9   what it's intended to do?
10        A.      Yes.
11        Q.      Do you feel like it's safe?
12        A.      Yes.
13        Q.      You wouldn't want your men working
14   on a machine that you didn't feel was safe,
15   would you?
16        A.      No.
17        Q.      You have been around block
18   splitters, block cutters, the block industry
19   almost your whole life, haven't you?
20        A.      Yes.
21        Q.      Do you feel like you have
22   knowledge of machines such as the one that's
23   made the subject of this lawsuit?
```

Page 65

```
 1      A.      Yes.

 2      Q.      If grass was caught in it, but it
 3 would still run, would you pull it up and try to
 4 beat the swinging blade to try to get the grass
 5 out or would you turn it off?

 6      A.      I would turn it off.

 7      Q.      Do you feel like what Mr. Jackson
 8 did was unreasonable to put his hand in this
 9 machine where the side knife was located while
10 it was running?

11      A.      Yes.

12      Q.      That is not what a reasonably
13 prudent person would do, is it?

14              MR. ANDREWS:  Object to the form.

15      A.      No.

16      Q.      That's not a what a person would
17 do that had been instructed not to do it on
18 numerous occasions; is that true?

19      A.      True.

20      Q.      Mr. Jackson had been instructed?

21      A.      Yes.

22      Q.      Mr. Jackson admitted that he had
23 done something stupid and that it was his fault
```

Page 75

1      A.      Thirty-seven years.

2      Q.      Do you feel like you are

3  experienced?

4      A.      Yes.

5      Q.      Do you feel like you are

6  knowledgeable?

7      A.      Yes.

8      Q.      Do you feel like you are

9  knowledgeable of block splitters?

10     A.      Yes.

11     Q.      Do you feel like you are

12 knowledgeable about how they work and operate in

13 the safety of block splitters?

14     A.      Yes.

15     Q.      Do you feel like this block

16 splitter that you have at your plant that you're

17 still using is a reasonably safe block splitter?

18     A.      Yes.

19     Q.      And you're still using this block

20 splitter?

21     A.      Yes.

22     Q.      And, I think, we have asked this,

23 but Block USA, your company, doesn't put safety

Page 77

1    accident, did you not?

2         A.    Yes.

3         Q.    He understood that?

4         A.    Yes.

5         Q.    Did he acknowledge to you he

6    understood that?

7         A.    Yes, he did.

8         Q.    Did he acknowledge to you that if

9    you put your hand where the knives are located,

10   that that is a hazardous place he could be

11   injured?

12        A.    Yes.

13        Q.    He knew that?

14        A.    Yes.

15        Q.    You talked to him about that?

16        A.    Yes.

17        Q.    In fact, you showed your hand what

18   the knives could do to you?

19        A.    Yes.

20        Q.    Okay.  When you injured your hand,

21   you didn't sue Ron Neese or the manufacturer,

22   did you?

23        A.    No.

Page 78

1      Q.     You didn't feel like they did

2   anything wrong, did you?

3      A.     No.

4      Q.     You felt like you just made a

5   mistake, it was your fault, and you honed up to

6   it, and that was that; isn't that true?

7      A.     Yes.

8      Q.     You didn't sue Besser Company

9   either, did you?

10     A.     No.

11     Q.     What's your education?

12     A.     High school.

13     Q.     High school.  What's your

14  experience around block splitters such as the

15  one that this lawsuit is about?

16            MR. ANDREWS:  Asked and answered.

17  Objection.

18     A.     What?

19            MR. RODGERS:  How long have you

20  been working around splitters?

21     A.     Twenty-five years.

22     Q.     Have you had training?

23     A.     Yes.

Page 83

1       A.      Yes.

2       Q.      Okay.

3               MR. SHEALY:  Do you want to mark

4    that as an exhibit?

5               (Whereupon, Defendant's Exhibit 1

6    was marked for identification.)

7    BY MR. CURTIS:

8       Q.      Can you describe for me how your

9    accident was different than Mr. Jackson's

10   accident?

11      A.      My accident?

12      Q.      Yeah.  What facts make it

13   different than Mr. Jackson's.

14      A.      Mr. Jackson was trying to outrun

15   the machine.  I merely wasn't looking in that

16   direction.  I wasn't pulling a chunk.  Like I

17   said, I just reached over the top of the block

18   and grabbed the block.  I was engaging in a

19   conversation with the rental person, and stuck

20   my hand too far.

21      Q.      Which blade caused your injuries?

22      A.      Side knife.

23      Q.      Side knife?