IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


DAVID JACKSON,

        Plaintiff,

vs.                              CIVIL ACTION NO.:

E & R MANUFACTURING CO., INC.,    2:06 CV0412-DRB

ET AL.,

        Defendants.


_____\


        The deposition of DAVID JACKSON taken
pursuant to the Federal Rules of Civil Procedure
before Karen D. Strickland, Court Reporter and
Notary Public, State at Large, at the law offices
of Morris, Cary, Andrews, Talmadge, Jones &
Driggers, L.L.C., 3334 Ross Clark Circle, Dothan,
Alabama, 36301 on the 22nd day of May, 2007,
commencing at approximately 10:30 a.m.

EXHIBIT

B

Blumberg No. 5119



APPEARANCES

FOR THE PLAINTIFF:

    Hon. Mark Andrews

    MORRIS, CARY, ANDREWS, TALMADGE, JONES &

    DRIGGERS, L.L.C.

    3334 Ross Clark Circle

    Post Office Box 1649

    Dothan, Alabama  36302


FOR THE DEFENDANT/E & R MANUFACTURING:

    Steadman S. Shealy, Jr.

    COBB, SHEALY, CRUM, DERRICK & PIKE

    Post Office Box 6346

    206 North Lena Street

    Dothan, Alabama  36302

```
 1              APPEARANCES  (continued)

 2

 3

 4   FOR THE DEFENDANT/KARRY MACKEY:

 5        Hon.  Christopher  S.  Rodgers

 6        HUIE,  FERNAMBUCQ  &  STEWART,  LLP

 7        Three  Protective  Center,  Suite  200

 8        2801  Highway  280  South

 9        Birmingham,  Alabama   35223-2484

10

11

12   FOR THE DEFENDANT/BESSER COMPANY:

13        Hon.  Cory  Curtis

14        BAKER  &  HOSTETLER,  LLP

15        303  East  17th  Avenue

16        Suite  100

17        Denver,  Colorado   80203

18

19

20

21

22

23
```

## STIPULATION

IT IS STIPULATED by and between Counsel for the parties that this deposition be taken at this time by Karen D. Strickland, Court Reporter and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition be taken down stenographically, transcribed and certified by the commissioner.

Except for objections as to the form of the questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection, then and there assigned.

The reading and signing of the deposition is waived.



INDEX

EXAMINATION BY:                          PAGE NO.

Mr. Shealy                                6 - 118

Mr. Curtis                              119 - 174

Mr. Rodgers                             174 - 175


EXHIBIT INDEX

                                          MAR
Defendant's

  1        Photograph                        21

  2        Photograph                        23

  3        Photograph                        34

  4        Photograph                        79

  5        Photograph                        84

  6        Photograph                        91

  7        Photograph                       107

  8        Photograph                       134

  9        Photograph                       143

 10        Initial Evaluation              164



1                       DAVID JACKSON,

2  being first duly sworn to tell the truth testified

3  as follows:

4

5                REPORTER:   (Usual stipulations?)

6                MR. ANDREWS:  Yes.

7

8                  EXAMINATION

9  BY MR. SHEALY:

10     Q.    State your name, please, sir.

11     A.    Elzie David Jackson, Jr.

12     Q.    Mr. Jackson, you're going to have to

13  speak up, okay.

14     A.    Uh-huh.  Okay.

15     Q.    And don't say uh-huh or huh-uh.  Say yes

16  or no, okay?

17     A.    Yes.

18

19                MR. ANDREWS:  What he's trying to

20             tell you is that on the record, Uh-huh

21             and Huh-uh does not look right.  So yes

22             or no, so that it reads properly.

23

1    Q.    What's your address?

2    A.    311 Tanglewood Drive, Albany, Georgia.

3    Q.    How long have you lived there?

4    A.    Seven months, I think.  Since November

5  of last year.

6    Q.    Who do you live with?

7    A.    My wife and my daughter.

8    Q.    Is your wife's name Lori Leigh Jackson?

9    A.    Yes.

10   Q.    And your daughter is -- what's her name?

11   A.    Ashley.

12   Q.    How old is your daughter?

13   A.    15.

14   Q.    Why are you living in Albany?

15   A.    Because originally my dad had got cancer

16 and I went over there to be with him while he was

17 going through it, but he's passed now and I just

18 ain't been able to get out.

19   Q.    When did you move back to Albany?

20   A.    I think it was '04 or '05.  One of them.

21 I ain't real positive.

22   Q.    Well, your accident was 12-16 of '04.

23 Was it after your accident or before?

1    A.    It was after all that.

2    Q.    So would it have been '05?

3    A.    Yes.

4

5         MR. ANDREWS:  When you're talking

6    and he's talking, she can't get

7    everything down.  Even though you might

8    know the answer already, just let him

9    get done and then answer.

10

11    Q.    Where were you living at the time of the

12 accident?

13    A.    In Hartford, Alabama.  I don't know the

14 address.

15    Q.    Well, did you own your home?  Were you

16 renting?  Did you live with somebody?

17    A.    No, I rented.

18    Q.    Who were you living with?

19    A.    My wife.

20    Q.    Same Lori Leigh Jackson?

21    A.    Yes.

22    Q.    Was your daughter living with you at

23 that time?

1    A.    Yes.

2    Q.    Anybody else living with you?

3    A.    No.

4    Q.    And you don't know where you lived in

5    Hartford?

6    A.    I just don't remember the address, no.

7    Q.    Why were you living in Hartford?

8    A.    I was working over in Andalusia.

9    Q.    Why not live in Andalusia?

10    A.    I can't answer that.

11    Q.    Okay.  Had you worked in Hartford before

12    going to work in Andalusia?

13    A.    Yes.

14    Q.    Where did you work?

15    A.    I worked in Andalusia, not Hartford.

16    Q.    Okay.  Well, I guess what I'm asking

17    you, what made you pick Hartford?  Had you ever

18    lived there before?

19    A.    No.  Nothing in particular made me pick

20    it.

21    Q.    Okay.  At the time of your accident, who

22    were you working for?

23    A.    Able Body Labors.



1    Q.    And how long have you been working for

2    Able Body Labors?

3    A.    I would say about five months.

4    Q.    And what were you making an hour?

5    A.    Eight dollars.

6    Q.    Were you getting any benefits?

7    A.    No.

8    Q.    So you were just getting eight dollars

9    an hour; is that correct?

10    A.    Correct.

11    Q.    And with Able Body Labors, where were

12    you told to go to work?

13    A.    Andalusia.

14    Q.    Where in Andalusia?

15    A.    At Block USA.

16    Q.    How long had you worked at Block USA

17    before your accident?

18    A.    Well, this time two weeks, but I worked

19    there about two-and-a-half months before that.

20    Q.    Well, we are going to talk about that.

21    Okay.  You went to work for Able Body Labors about

22    five months prior to your accident; is that

23    correct?



1    A.    Yes.

2    Q.    Where is the first place you went to

3    work?

4    A.    They sent me all over.  I worked all

5    over the place, down at the beach.

6    Q.    When you mean sent you all over, doing

7    what?

8    A.    Just general construction work.

9    Q.    Did you consider yourself a carpenter, a

10    laborer?  What did you consider --

11    A.    I was doing labor work.

12    Q.    Do you have carpentry skills?

13    A.    No.

14    Q.    Do you have block laying skills?

15    A.    No.

16    Q.    Brick, any of that?

17    A.    No.

18    Q.    And you said you had been working at

19    Block USA for two weeks prior to your accident?

20    A.    Yes, this particular time, yeah.

21    Q.    Okay.  Now, let's talk about that a

22    minute.  Had you been working at Block USA in

23    Andalusia before?





1    A.    Correct.

2    Q.    When was that?

3    A.    Just about a month -- I was off from

4    there for about a month and then I went -- they

5    sent me back over there.

6    Q.    And how long had you worked the first

7    time you were there?

8    A.    I was there about two months.  Something

9    like that.

10    Q.    So had you ever worked at Block USA

11    before that?



12    A.    No, sir.

13    Q.    So you went to work at Able Body

14    Labors.  They sent you over to Block USA.  You

15    worked there for two months?

16    A.    Roughly, yes, sir.

17    Q.    Is that correct?

18    A.    Yes, sir.

19    Q.    Then you got laid off, or why?

20    A.    No.  They just -- they sent other people

21    over there and sent me somewhere else.

22    Q.    Where did they send you?

23    A.    Down on the beach cleaning up with



1    construction crews.

2         Q.    And what company were you working for?

3         A.    I don't know, man.

4         Q.    Okay.  During the two months that you

5    worked for Block USA, what were you doing?

6         A.    Just in general we was working on the

7    line where the blocks got split at the splitter,

8    and coming out and going back to the cuber, and it

9    involved chipping -- chipping stuff off the blocks

10   that didn't cut, pulling the blocks and cleaning

11   the debris out of the machine.

12        Q.    Is that what you did during those first

13   two months?

14        A.    Yeah, I did some of all of that.

15        Q.    So you were familiar with the machine,

16   how it worked, the procedures, training and all the

17   various aspects of the block splitter?

18        A.    I was familiar with the block splitter a

19   little bit, yeah.

20        Q.    Had you been trained on the block

21   splitter?

22        A.    Other than what I was doing -- just

23   showed me how to clean it out and all that.  That's





1    the only training I got.

2         Q.     But you had been cleaning it out and

3    doing that kind of work during the first two months

4    that you were at Block USA; is that a fair

5    statement?

6         A.     Yes.

7         Q.     And then you went to work at the beach

8    for a while, for about a month?

9         A.     Correct.

10        Q.     And then they sent you back to Block

11   USA?

12        A.     Correct.

13        Q.     And you worked two weeks and during the

14   two weeks you were there prior to your accident,

15   what were you assigned to do?

16        A.     Basically the same thing I just told you

17   but I was standing right at the back of the machine

18   most of the time where the blocks come out of the

19   splitter.

20        Q.     And it would be fair to say that you ran

21   the machine every day for two weeks prior to your

22   accident?

23        A.     I didn't run the machine.



1    Q.    You stood by the machine and watched it
2  work; is that right?
3    A.    Yeah.
4    Q.    And what was your duties and
5  responsibilities as a laborer at Block USA working
6  for Able Body Labors at the time of your accident?
7    A.    To keep debris cleaned out of the block
8  splitter and clean up the ground, keep the ground
9  clean, chip blocks, just whatever in general needed
10  to be done right there.
11    Q.    And you did that every day for two weeks
12  prior to your accident?
13    A.    Yes.
14    Q.    Now, tell us what kind of training you
15  had in regard to what you were doing at the time of
16  your accident?
17    A.    I was just showed by John and them how
18  to --
19    Q.    Hold on.  Who is John?
20    A.    I don't know what his last name is, but
21  John is one of the workers for Block USA.
22    Q.    Okay.  But John showed you how to do
23  what?

1      A.      To go up in there and clean the block

2  splitter out, the debris out of it.

3      Q.      Explain to us how you were told or

4  explained or trained to do that.

5      A.      You just had to take and stick your hand

6  up in there, and on the side knives right here

7  where it come out you had to pull the debris out of

8  there, the little chips and stuff, because it was

9  actually supposed to fall down into a bucket or

10  whatever, but it didn't do that.  So you had to

11  clean it out.

12      Q.      Okay.

13      A.      And that's what I was showed to do.

14      Q.      So you were showed to put your hand

15  where the side knives are located, correct?

16      A.      In between the cycles, that's correct.

17      Q.      So your training was in between cycles

18  to place hands in the area where the side knives

19  were located to clean out debris; is that correct?

20      A.      Correct.

21      Q.      Did I say that right?

22      A.      Yes, sir.

23      Q.      And had you put your hand in the area



1    where the side knives are located prior to this

2    accident?

3        A.    Had I?

4        Q.    Yes.

5        A.    I don't understand exactly what you're

6    trying to get --

7

8                MR. ANDREWS:  He's asking had you

9                ever cleaned it out just like you were

10               doing at the time of the accident, had

11               you done that before?

12



13       A.    Yes.

14       Q.    Had you done it numerous times?

15       A.    Oh, yeah, I've done it for -- like I

16    said, off and on for the last two-and-a-half months

17    other than, you know, that little break.

18       Q.    All right.  And why were you having to

19    put your hands in the area where the side knife was

20    located?

21       A.    Because if you didn't clean that out

22    that block would get turned sideways and when that

23    split -- that knives come in, it would split that



1  block to where all you had to do was just throw it

2  in that dumpster, because it was no good.

3      Q.    And where were you supposed to stand

4  during the entire time that you were working?

5      A.    Well, when you was doing that particular

6  thing, you had to stand right where the block come

7  out of the splitter at.  It's like right to the

8  right right there.  And you had to just reach in

9  there and knock the debris out.

10     Q.    So you were standing to the right of the

11 block splitter where the side knives are located?

12

13              MR. ANDREWS:  Objection.

14

15     Q.    Is that correct?  That's what you just

16 told me; is that right?

17

18              MR. ANDREWS:  The right, looking

19         from which way?

20              MR. SHEALY:  I'm just saying what

21         he said.

22              MR. ANDREWS:  Okay.  I understand.

23         That was my objection.



1

2      A.     If you're facing the machine, I was on

3      the right side of the conveyor --

4      Q.     Right.

5      A.     Where the machine -- the blocks come

6      out.  I was on the right side in the corner right

7      there.

8      Q.     All right.  What kind of block were

9      y'all splitting at the time of your accident?

10      A.     I don't know the name of them.

11      Q.     Was there anything unusual about this

12      kind of block versus other block that was being

13      split?

14      A.     Yeah, it was -- they was shaped like --

15      they had two like 45 degree angles on each side,

16      and then it was like straight.  You come up like

17      this, this.  I know that don't go on that, but

18      that's how the blocks was shaped when they got cut.

19      Q.     Had you ever seen blocks split like this

20      before?

21      A.     Before this, no, sir.

22      Q.     Was this kind of an unusual running of

23      this type of block at the plant, or do you know?



1      A.      No.  This block got run quite often as
2  far as that plant goes.

3      Q.      You just never saw it done before?

4      A.      Not until I went to work there.

5      Q.      Okay.  But you had seen that block being
6  split before, correct?

7      A.      After I started working there, yes, sir.

8      Q.      And had you seen the side knives split
9  the block before your accident?

10      A.      Uh-huh.

11      Q.      Is that a yes?

12      A.      Yes.

13      Q.      So you saw that the side knives were
14  sharp, correct?

15      A.      I wouldn't say they were sharp.

16      Q.      Well, okay.  Let me ask it this way.

17      A.      They are a blunt-type blade.

18      Q.      If you put your hand in there and side
19  knives closed, would it injure your hand?

20      A.      Well, of course.

21      Q.      And you knew that before this accident,
22  didn't you?

23      A.      Of course, I knew that.

1    Q.    Okay.

2    A.    But all at the same time I got to do

3  what I'm told to do.

4    Q.    I understand.

5

6          MR. SHEALY:  I'm going to mark as

7          Defendant's Exhibit -- is that okay with

8          y'all?

9          MR. CURTIS:  Let's call it Jackson

10         Depo 1.

11

12         (Whereupon, Defendant's Exhibit 1 was

13         marked for identification and same is

14         attached hereto.)

15

16   Q.    Mr. Jackson, I'm going to show you what

17  I've marked as Defendant's Exhibit 1 to your

18  deposition.  Can you put an X where you were

19  standing at the time of your accident.

20   A.    (Witness Complies).  All right, that's

21  it.

22   Q.    Now, did you have to stand there the

23  entire time or would you just kind of move around



1   in that general area?

2        A.    Let me see that.

3        Q.    (Hands Document, Defendant's Exhibit 1

4   to Witness).

5        A.    From right there --

6        Q.    Whoa, whoa, right there doesn't mean

7   anything.

8        A.    From where I was standing at the --

9        Q.    You're pointing where the X is located?

10       A.    Right.  Back -- there's another machine

11  back here.

12       Q.    And that's going away from the machine

13  towards --

14

15            MR. SHEALY:  What's it called,

16            Mark?

17            MR. ANDREWS:  The cuber.  As you

18            look at Exhibit 1, he's pointing from

19            the X to the left.

20

21       A.    And that's the area I worked.

22       Q.    All right.  Was there any rule where, or

23  were you told that you couldn't walk around the





1    machine towards the control panel?

2        A.     I don't think there was.

3

4             (Whereupon, Defendant's Exhibit 2 was

5             marked for identification and same is

6             attached hereto.)

7

8        Q.     Let me show you what I've marked as

9    Defendant's Exhibit 2 to your deposition.  Is this

10   the control panel?

11       A.     Yes, that's the control panel.

12       Q.     Tell me what the control panel does.

13       A.     Operates that block splitter.

14       Q.     Can you stop the block splitter at the

15   control panel?

16       A.     Yes.  But at the same time you can't

17   shut the machine down and stop production with

18   Karry Mackey sitting in there because he want to go

19   irate on you.

20

21             MR. ANDREWS:  Just answer his

22             questions.

23             THE WITNESS:  Okay.



Q.     I understand.  But there was no reason that if a piece of block was caught in the block splitter you couldn't walk three or four feet and hit a button and it would stop the machine?

A.     Probably a few more feet than that, but you would be correct.

Q.     Well, let's say five feet.

A.     It might be close.

MR. ANDREWS:  Are you talking about and keeping the machine running?

Q.     There was no reason why you couldn't -- and there was a button that would stop the machine, correct?

A.     Yeah, but not where I was at.

Q.     I understand that.  But there was a button within five feet?

A.     Somewhere abouts there, yeah, I guess.

Q.     Okay.  And there was -- I mean, we've all been out to the plant.  There was -- and you can see in Defendant's Exhibit 1, there's an

1  individual there.  There wasn't any rule that you

2  couldn't be right where that individual was located

3  if you needed to be; isn't that true?

4      A.    I guess if I needed to go do something

5  down there, I could.

6      Q.    Well, what I mean is:  You just stood

7  around in that area anyway, right?

8

9            MR. ANDREWS:  Objection.

10

11     Q.    And as long as the blocks didn't get

12 caught, there wasn't anything for you to do?

13

14            MR. ANDREWS:  Objection.

15

16     Q.    Is that true?

17     A.    No, it ain't true.

18     Q.    Okay.  Well, you tell where I'm wrong.

19     A.    Because I have to make sure that this

20 line stays running.

21     Q.    Okay.

22     A.    And my job pertains to cleaning that

23 machine right there, running back here, and

1    chipping blocks that didn't come out of that

2    splitter right.  So I couldn't be up there.

3

4                    MR. ANDREWS:  For the record, he

5              means up by the control panel.

6

7      Q.    Let me tell you what I'm -- I think we

8    are not as far off with each other.  I just meant

9    if you wanted to be where this guy was and

10   everything is going great, there wasn't anything

11   that prevented you from just walking around and

12   standing right near where this guy was standing?

13

14                    MR. ANDREWS:  Objection.  Go

15             ahead, you can answer.

16

17     A.    Wording it like that, yeah.  I mean, you

18   know --

19     Q.    I'm just saying as long as everything is

20   going smoothly?

21     A.    Right.  I mean, I could do that.  There

22   wasn't no problem with that.

23     Q.    I guess what I was trying to cover,





1    there wasn't -- you were not told by Mr. Mackey or

2    anybody at Block USA that you couldn't walk over

3    here to this control panel and hit a stop button,

4    correct?

5        A.    I wasn't trained to hit that stop

6    button.  I knew what did it, but that's just from

7    me watching.  I was trained to --

8        Q.    In other words, the other guys would hit

9    the stop button?

10       A.    That was John's job.

11       Q.    During the time that the block is

12   running -- for instance, like at the time of your

13   accident, tell me where -- how many people would be

14   along the assembly line.

15       A.    It would be three, sometimes four,

16   sometimes five people.

17       Q.    Where would they be located?

18       A.    One would be at the cuber and there

19   would be two to three people on this conveyor right

20   here that's behind where I was standing when I got

21   hurt.

22       Q.    Would it be to your left?

23       A.    Yeah, it would be to my left.





1    Q.    So there were two or three people to
2  your left.  What were they doing?
3    A.    They were doing the same thing I was
4  doing, chipping blocks and making them go straight
5  down the line, stuff like that.
6    Q.    And then you just happened to be the one
7  closest to where the actual splitting of the block
8  took place?
9    A.    That particular day that's where I was
10  told to work, yes, sir.
11    Q.    Were there other days that you might
12  work on down the line?
13    A.    That's correct.
14    Q.    So y'all would rotate out when you would
15  work?
16    A.    Yes, sir.
17    Q.    Okay.  Now, there's a gentleman in this
18  picture.  Was somebody required to be where he's
19  standing at the time of the operation?
20    A.    Well, that's where John was supposed to
21  work and that's -- that was his job, was to run
22  that splitter.
23    Q.    Okay.





1    A.    He wasn't there.    Something had happened

2  down at the cuber, and he took off and went down

3  there.

4    Q.    So in actuality at the time you were

5  injured, there was supposed to be a worker?

6

7            MR. ANDREWS:    Objection.

8

9    A.    Yes, sir.

10    Q.    Right where this gentleman in this

11  picture is located in Defendant's Exhibit 1; is

12  that correct?

13    A.    That's correct.

14    Q.    And there wouldn't have been any reason

15  why when a piece of block got hung up you couldn't

16  say, John, hit the stop button?

17    A.    That's correct.

18    Q.    And John would have done it?

19    A.    Would have done it, that's right.

20    Q.    All right.    But you said at the time you

21  were injured he somehow had left his post and had

22  gone somewhere else?

23    A.    Down at the cuber.

1    Q.    So he had gone down to the cuber, so

2    there wasn't anybody located up near the control

3    panel?

4    A.    No, sir.

5    Q.    Let's talk a little bit about the

6    control panel.  What is the purpose of the control

7    panel?

8    A.    To operate the machinery, I guess.  Is

9    what I would think, I mean.

10    Q.    If you hit the stop button, does it stop

11    the conveyer, or the block splitter?

12    A.    Yes, sir.

13    Q.    Does the conveyer keep going?

14    A.    I think there's another button for the

15    conveyer.  I'm not sure because I don't know how

16    that operates because I was never trained on it.

17    So I have no clue.

18    Q.    But the control panel had a stop button

19    to stop the splitter so the side knives wouldn't

20    activate; is that correct?

21    A.    That is correct.

22    Q.    And that is right or near the exact spot

23    where John was supposed to be?

1    A.    Correct.

2    Q.    True?

3    A.    True.

4

5         MR. ANDREWS:  Objection.  Not

6    supposed to be.  He can be there.  The

7    worker can be there.

8

9    Q.    Well, at the time you were injured he

10   was supposed to be in that area; isn't that true?

11

12        MR. ANDREWS:  Objection.

13

14   A.    Well, he was -- I mean, that was his job

15   description as far as I knew, that he was the block

16   splitter operator.

17   Q.    Okay.

18   A.    I mean, he done other things too.

19   Q.    But when you're splitting block, the

20   block splitter operator is supposed to be right in

21   that control panel area?

22   A.    I would personally think so, yes, sir.

23   Q.    Okay.  Can you read and write?

1    A.    Yes.

2    Q.    Can you read signs?

3    A.    Yes.

4    Q.    I want to show you Defendant's Exhibit

5    1, and for the court and jury I want you to read

6    something for me.  I want you to read what it says

7    right here above the block splitter.

8    A.    Keep Hands Clear.

9    Q.    Do you understand that?

10    A.    Yes, I understand that.

11    Q.    Okay.

12    A.    But I also understand that my job was to

13    make sure that debris was out of there between

14    cycles.

15    Q.    I understand.

16    A.    I was doing my job.

17    Q.    I understand.  But on this machine in

18    letters you can read and understand on that

19    machine, it said, Keep Hands Clear.  While it's

20    operating, is that what you understood?

21    A.    That's right.

22    Q.    While it's cycling?

23    A.    That's correct.

1    Q.    Is that what you understood?

2    A.    That's the way I understood it.

3    Q.    At any time this machine is actually on

4  and running, is that what you understood?

5

6              MR. ANDREWS:  Objection.

7

8    A.    No, it ain't, because when the machine

9  had finished its cycling and them blocks are coming

10 out, I got to clean that out.

11   Q.    I know, but that's because your employer

12 --

13   A.    That's part of what this is, I mean.

14   Q.    I understand.  But you do recognize that

15 it says, Keep Hands Clear?

16   A.    Yes.

17   Q.    You can read that and you understood

18 that before your accident; is that true?

19   A.    Yes, I will agree with that, that I do

20 understand that.

21   Q.    Okay.  And there are some other --

22

23              MR. CURTIS:  I need to turn the



1    air on.

2

3        (Whereupon, a break was taken.)

4

5        (Whereupon, Defendant's Exhibit 3 was

6        marked for identification and same is

7        attached hereto.)

8

9    Q.    Let me show you what I've marked as

10   Defendant's Exhibit 3, which is a close-up picture

11   of the control panel.

12   A.    All right.

13   Q.    Have you ever seen that control panel

14   before?

15   A.    Yes.

16   Q.    In fact, you saw it every day you were

17   there, didn't you?

18   A.    Yes.

19   Q.    Is that the control panel that controls

20   the operation of the block splitter?

21   A.    As far as I know it operates everything

22   over there.

23   Q.    Okay.  Had you ever touched a button on

1    that control panel before you were injured?

2        A.    I don't use that control panel, no.

3        Q.    But you know how the control panel

4    worked; is that true?

5

6                    MR. ANDREWS:   Objection.

7

8        A.    No, I don't.

9        Q.    But you knew that all you had to do was

10    hit a button and it would stop the block splitter;

11    is that true?

12        A.    Yes.  But, I mean, I wasn't trained on

13    that.  So as far as me going over there and hitting

14    that button, I ain't going to hit it.

15        Q.    Once you hit the button to stop the

16    block splitter, is it anything to hitting it again

17    to start it?

18        A.    I don't know.  I ain't sure about how to

19    start that machine.

20        Q.    Had you ever seen that done before, stop

21    the block splitter and then hit the button again

22    and start it?

23        A.    Not directly standing right there

1  watching nobody do it, no.

2      Q.    Well, I'm just saying, did somebody stop

3  the block splitter and then go boom and start it

4  back?  I mean, is that how it worked?

5      A.    Yes, that's how John did it.

6      Q.    Okay.  So it wasn't a big deal to stop

7  and start the block splitter?

8      A.    I don't guess.

9      Q.    While we were out there inspecting the

10  machine, we were shown a rod.  Do you know anything

11  about a steel rod that you are to use to put in

12  there to clear the debris out?

13      A.    No.

14      Q.    You don't know anything about that?

15      A.    No.

16      Q.    And that's your testimony under oath?

17      A.    Yes, that's my testimony under oath.

18      Q.    So if all the employees at the block

19  company say that they were all told never to put

20  their hand in the block splitter, but to use a

21  steel pipe or pole to clean it out, they would all

22  be wrong?

23      A.    That's right.  As far as that goes --



1  because the only thing that pipe you talking about

2  back over there on that wall was used for was to

3  clean that machine at the end of the day.  That's

4  the only time I ever got showed about that pipe.

5  Nobody never explained you could use this to do

6  this, to clean that debris out.

7      Q.    So you're saying -- you will admit there

8  was a pipe --

9

10          MR. ANDREWS:  He's talking about a

11      metal pipe.

12          THE WITNESS:  He ain't talking

13      about the air line?

14          MR. ANDREWS:  No, he's talking

15      about a metal pipe.

16          THE WITNESS:  We had a metal pipe

17      on the end of it that we used to blow

18      the machine out.

19          MR. ANDREWS:  Okay.  At the end of

20      the day.  You may not be talking about

21      the same pipe.

22

23      Q.    (By Mr. Shealy)  I'm talking about a





1  pipe or some kind of object that was used to clean

2  out debris while the machine was operating?

3      A.    No.

4      Q.    You were not told or trained that's the

5  way to clean out the machine?

6      A.    No, sir, I sure wasn't.

7      Q.    And you were not told -- is it your

8  testimony that you were told by Karry Mackey and

9  your employer to put your hands in the block

10  splitter where the side knives were located?

11



12              MR. RODGERS:   Object to the form.

13

14      A.    Karry told us that we had to clean all

15  this debris out.   And when you clean it out, it's

16  after the cycle has run before the next block gets

17  pushed in.   And that's what I was doing.

18      Q.    How long between the cycles?

19      A.    Couple seconds, it ain't long.

20      Q.    So you got two seconds to do that?

21

22              MR. ANDREWS:   Objection.   He said

23          a couple.

1

2    A.    I don't know exactly how long it is.

3

4            MR. SHEALY:  Well, a couple --

5         normally you think of a couple as two.

6

7    A.    Two.

8    Q.    Okay.  So you had two seconds to reach

9  your hand in there at an area where you know can

10 injure your hand, and that's what your employer

11 told you to do?

12   A.    Yeah, that's what he told me to do.  And

13 I've been doing this all this time and I ain't

14 never had no other problem until this particular

15 time.

16   Q.    Were you on any kind of medication or

17 drugs at the time that this accident happened?

18   A.    No.

19   Q.    You weren't on any Schedule 3 narcotic?

20   A.    No.

21   Q.    What time of day did the accident

22 happen?

23   A.    6:00 in the morning, thereabouts.

1    Q.    Was the day just getting started?

2    A.    Would have been there about an hour,

3 give or take.  I ain't real positive.

4    Q.    Well, had y'all been running the machine

5 since 5:00?

6    A.    Yeah, we started up at 5:00 that

7 morning.

8    Q.    So what time did you have to be at work?

9    A.    5:00.

10    Q.    And how long would it take to get the

11 machine started up?

12    A.    It didn't take long.

13    Q.    Who was your person you worked under, or

14 your supervisor?

15    A.    At Able Body?  Or on that job?

16    Q.    Over at Block USA?

17    A.    I guess, it would be Wayne or John or

18 Karry.  I mean, because I answered to all of them

19 and they told me what to do.

20    Q.    Who gave you your training as to how to

21 run the block machine?

22    A.    Ain't nobody trained me how to run it.

23    Q.    Well, who trained you how to do your



1  job?

2      A.      John showed me how to clean the machine

3  out and I cleaned it the same way he did.

4      Q.      And tell me exactly, walk me through how

5  he told you to clean the machine out?

6      A.      Well, after the cycle runs and the block

7  split, you reach up there and pull the block out,

8  help it come out, and you reach in here and you

9  clean it, clean the side knives out with your hand

10  and pull the chips out.

11      Q.      Just for clarification, you put your

12  hand near the block splitter?

13      A.      Correct.

14      Q.      And pull the block out; is that right?

15      A.      You just reach up there where the blocks

16  come out -- where is that exhibit at?  Right here

17  -- you're standing right here, you reach up there

18  and grab that block and just help push it down the

19  -- let it get a good start rolling down the

20  rollers.

21      Q.      And it's already been split?

22      A.      Yes.

23      Q.      Okay.  So you don't put your hand in





1  there until after the block split; is that true?

2      A.      Yes.

3      Q.      Then once the block is split, another

4  block is coming in there to be split again?

5      A.      It will be coming in there.

6      Q.      Is that true?

7      A.      Yes.  That's why you have to be quick

8  about it.  Get it in there and out.

9      Q.      All right.  So, then, once you pull a

10  block out that's been split, and you move it down

11  the assembly line or the conveyer; is that right?

12      A.      Yes, sir.

13      Q.      Then you put your right hand in the area

14  where the side knives would close to split the

15  block; is that true?

16      A.      I'm actually doing it all at about the

17  same time.  As you're pulling out with this hand,

18  you're cleaning this out too, so that the block

19  don't come in on you.

20      Q.      So you would pull the block out with

21  your left hand and use your right hand to clean the

22  debris out so that the block doesn't come in on

23  you?





1      A.      That's right.

2      Q.      Is that true?

3      A.      That's what you're trying to do.

4      Q.      And you know that it's a very quick

5  process before this cycle starts again and those

6  side knives split that block, and you know a block

7  is coming right behind it; isn't that true?

8      A.      Yeah, that is true, but all at the same

9  time I got a job to do as far as --

10      Q.      I understand that's what your employer

11  told you to do.  Okay.  And you knew that if you

12  didn't beat the cycle, it would injure your hand

13  badly; isn't that true?

14      A.      Well, it's just common sense, but, yes.

15      Q.      I mean, common sense is what you know,

16  you know what I mean.  So you knew that at the time

17  that you put your hand in there, that if you didn't

18  beat the cycle, it was going to cut your hand off

19  or injure your hand; is that true?

20

21              MR. ANDREWS:  Objection.  He

22              didn't put it in there on the cycle.

23

1    A.    It was after the cycle.  I had time to
2  do what I was doing.

3    Q.    In other words, if that block comes in
4  there while your hand is there, you knew before you
5  were injured that it would hurt your hand, isn't
6  that true, and badly hurt it?

7    A.    I knew it could hurt you, but that don't
8  mean that you still ain't got to go and do what you
9  got to do.

10    Q.    I understand that.  But you knew that
11  before you were injured on 12-16 of '04; isn't that
12  true?

13

14            MR. ANDREWS:  Objection.

15

16    A.    I don't even want to answer it.  I'm
17  tired of being rambled about it.

18

19            MR. ANDREWS:  Well, you've got to
20            answer the question.  What he's trying
21            to ask you --
22            MR. SHEALY:  Whoa, whoa --
23            MR. ANDREWS:  Okay.  You got to

1     answer his question.

2

3     Q.    Just answer my question.   Would you like

4 for me to ask it again?

5     A.    Yes.

6     Q.    How about if I have her read it to you?

7     A.    All right, that would be fine.

8

9               MR. SHEALY:  Read it back.

10

11          (Whereupon, the following question was

12          read back by the court reporter:

13                "Q.    In other words, if that

14          block comes in there while your hand is

15          there, you knew before you were injured

16          that it would hurt your hand, isn't that

17          true, and badly hurt it?")

18

19     A.    Well, it never crossed my mind because

20 it hadn't happened before, I mean, as far as

21 getting hurt.   I mean, it really didn't cross my

22 mind.

23     Q.    Well, you already told me it did.   Why



1   are you changing your testimony?

2        A.    I'm not changing my testimony.

3        Q.    Do you want me to have her read back

4   what's on there?  You've already told me that

5   common sense --

6

7              MR. ANDREWS:  Stop.  Stop.  Let's

8              don't argue and harass him.  His

9              testimony is what his testimony is.

10             Let's just ask questions and let him

11             answer them.  He had most of his hand

12             cut off, he's doing the best he can.

13

14       Q.    Let me ask you a question.  I'm going to

15   ask it one last time.  Prior to you injuring and

16   cutting your hand by these side knives, you knew

17   that it was dangerous and you knew that you had

18   just a split second to get your hand in and out or

19   it would be injured?

20

21             MR. ANDREWS:  Objection, not a

22             split second.

23



1    Q.    Let's say a second and a half, or two

2  seconds, whatever.

3

4              MR. ANDREWS:    Objection.

5

6    Q.    You knew it was going to be quick, is

7  that true, or it was going to hurt your hand?

8    A.    That is true that it can hurt your hand.

9    Q.    And you knew that; isn't that true?

10    A.    I guess you could say I knew it, but I

11  didn't know it, I mean, because I never even

12  thought about it.

13    Q.    You say that, and that's interesting

14  that you said you never thought about it.  Because

15  isn't it true that Karry Mackey talked to you about

16  it prior to this accident?

17    A.    The only thing that Karry said -- when

18  all this was going on, the only thing that Karry

19  ever said was it can cut your fingers off, be

20  careful how you do it.

21    Q.    So you did think about it?

22    A.    No, I didn't think about it, other than

23  doing my job.



1      Q.     Prior to this accident, Karry Mackey

2   says, and even shows you his missing fingers; isn't

3   that true?

4      A.     That's true.

5      Q.     Prior to this accident, he showed you

6   his missing fingers; isn't that true?

7      A.     When I first came in that building he

8   showed me.

9      Q.     He showed you his and said, This block

10  splitter that cut your hand off will cut your

11  fingers off?  He told you that, didn't he?

12     A.     He said it could.

13     Q.     Right.  So you knew --

14

15          MR. ANDREWS:  When he's doing his

16          job.

17

18     Q.     You knew that this block splitter, if

19  you put your hand in there would cut your hand or

20  fingers off, prior to this accident, didn't you?

21

22          MR. ANDREWS:  Objection.

23


