1    A.    Yeah.  All the same time I still had a
2 job to do.  No matter what you coming up with, I
3 had a job to do.
4    Q.    I understand.  All right.  Let's go back
5 to what Karry Mackey told you in regard to running
6 the block splitter.  Excuse me, you don't like that
7 word.  What was your job, exactly?
8    A.    I was just a flunky.
9    Q.    What did you -- I'm not trying -- I'm
10 not trying to give you a hard time, okay.  I'm just
11 trying to get my questions answered and stuff.
12 What were you called, or what was your job where
13 the X is on this exhibit?
14    A.    I don't know what I would be called as
15 far as a label for that particular job.
16    Q.    So it didn't have a name?
17    A.    No.
18    Q.    You just were removing debris from the
19 block splitter, moving the blocks as they were
20 split down the conveyor line?
21    A.    Yes.
22    Q.    Is that true?
23    A.    That's true.



1     Q.    How many had you done prior to this
2  accident?

3     A.    A number, I couldn't tell.

4     Q.    I'm talking about that day.  Let's go to
5  the day of the accident.  It starts at probably
6  5:30 or 5:15.  I don't know.  Somewhere around
7  there.  You were injured at 6:00.  How many times
8  had you put your hand in this area where your hand
9  was cut off?

10     A.    I cannot give you an exact amount of
11  time.

12     Q.    Would it have been more than once?

13     A.    Oh, yeah, a lot more than once.

14     Q.    Ten times?

15     A.    More than that.

16     Q.    20 times?

17     A.    Probably a lot more than that.  I just
18  ain't sure about how many times, and I ain't going
19  to give you no number because I ain't sure.

20     Q.    That's fine.  But it had been numerous
21  times prior to you having your hand hurt?

22     A.    That's correct.

23     Q.    Tell me as best you can how it came



51



1    about that you were injured at this block

2    splitter.

3        A.    When I was working I had been doing this

4    for all along for the last two-and-a-half months

5    off and on, everything.  So I got pretty -- I mean,

6    you get comfortable with what you're doing when

7    things ain't happening and going crazy.  So when I

8    was reaching in there to get this debris out, there

9    was a piece that was hung up in there.  And I was

10   trying to get it out so that knife could come

11   over.  And as I was coming out, the corner of my

12   glove got caught on that daggum bolt and side knife

13   right there together, and that's how my hand got

14   hung up there to begin with.

15       Q.    So you put your hand right where the

16   side knife is located?

17       A.    Yes, because there's a little slot right

18   there.  I was trying to pull that piece out, and it

19   was just hung up.  When I finally got it --

20       Q.    The piece --

21

22            MR. ANDREWS:  Hold on, let him

23            finish.  When you finally got to it,



1        what?

2

3        A.      That's when -- when I was starting to

4  come out is when everything got hung up and my

5  glove got hung up and the machine started pushing

6  my hand.  I tried to snatch my hand out of my glove

7  and I couldn't get it out.  So that's how it

8  happened.

9        Q.      Would it be a fair statement that the

10 block itself was hung up down in that slot more

11 than maybe before?

12       A.      Yeah, it was.

13       Q.      And you probably spent a little bit too

14 much time trying to yank it out?

15       A.      Good possibility, yes, sir.

16       Q.      Well, I'm not trying to -- I mean that

17 sounds like a fair statement as to what happened?

18       A.      Actually what happened was -- it don't

19 usually get hung up like that and you can usually

20 push it on out pretty easy.  But this time it just

21 happened to be a little bit longer.

22       Q.      So it got hung up and you spent a little

23 more time trying to get it out, and then as you

1    were trying to yank it your glove got caught --

2        A.    Correct.

3        Q.    And then all the sudden the block is

4    there, and then this closes on your hand; is that

5    true?

6        A.    That's true right there.

7        Q.    Every time before this, were you trying

8    to beat the cycle?  In other words, when you put

9    your hand in there you knew if you didn't get it

10   out quickly, something could happen?

11       A.    Why sure.

12       Q.    Okay.  And so you had -- you would pull

13   with your left hand, clear debris with your right

14   hand, and you knew that you had just a couple

15   seconds to get whatever debris was there out of the

16   way and get your hand out of there; is that a fair

17   statement?

18       A.    Yes, that's a fair statement.

19       Q.    Okay.  And that happened every time

20   before this accident where your glove got hung, you

21   were kind of under the clock, so to speak, to get

22   in there and get it done quickly, get debris, and

23   get your hand out of there?



1    A.    Yeah, but most of the time you didn't

2    have to really rush because it was pretty simple.

3    I mean, it wasn't a hard thing.

4    Q.    But you didn't dally either?

5    A.    No, you didn't.  Common sense tell you

6    don't leave your hand there.

7    Q.    I gotcha.  Okay.  Did you feel like this

8    machine was dangerous?

9    A.    I mean, no, because I worked

10   construction all my life, so, you know, danger is

11   in everything you do.  So I didn't look at it as

12   any danger.

13

14          MR. ANDREWS:  You've answered his

15          question.

16

17   Q.    Do you feel like the machine was

18   defective in any way?

19   A.    I felt like there should have been some

20   kind of way for you to be able to get up in there

21   and that machine not keep operating, yeah, the

22   whole time I was working on that machine.

23   Q.    Did you mention that to Karry Mackey and



1    the people that worked there?

2        A.    No.

3        Q.    Did you mention it to any other laborers

4    that you felt that was what --

5        A.    Not that I can recall, no.

6        Q.    In other words, you may have felt that

7    way, but you didn't express it to anyone?

8        A.    No.

9        Q.    Is that true?

10        A.    No.

11        Q.    Is that a yes?

12        A.    Yes.

13        Q.    It's going to read --

14

15            MR. ANDREWS:  Wait a minute.  Wait

16        a minute.  Let's do this.  Listen to his

17        questions and you answer his questions.

18        If you don't understand his questions,

19        tell him you don't understand the

20        question.  We don't need to ramble.  We

21        don't need to add extra information.

22            And the other thing is, you're not

23        an expert, you're not an engineer.  So







1    he's not asking you specific things that

2    ought to be on there.  Just answer his

3    questions.

4         THE WITNESS:  Okay.

5

6    Q.    (By Mr. Shealy)  Did you feel like this

7    machine was unreasonably dangerous?

8

9         MR. ANDREWS:  And I object to the

10         extent that calls for a legal conclusion

11         or an engineering expert opinion.  Based

12         on the knowledge you had at the time of

13         this accident, feel free to answer.

14

15    A.    No dangerous than any other job.

16    Q.    Okay.  Did the machine function and do

17    what it was intended to do, and that's split

18    block?  Did it work appropriately?

19    A.    I don't know that I could really answer

20    that question, because I don't know how that

21    machine was supposed to work anyway.  I've never

22    seen one of them before until I went to work



23    there.  It worked the same as it always did since




1  I've been there.

2      Q.    What did you understand was the purpose

3  of this machine?

4      A.    To split block.

5      Q.    Did it split block?

6      A.    Yes.

7      Q.    Did it split block that y'all sold to

8  people?

9      A.    Yes, sir.

10     Q.    Did y'all load the block on trucks, take

11 them out and sell it?  I mean, in other words, did

12 it -- you understood it was a block splitter?

13     A.    Correct.

14     Q.    The purpose of a block splitter is to

15 split block?

16     A.    Correct.

17     Q.    Different height, different size; is

18 that true?

19     A.    True.

20     Q.    Did it operate and work as a block

21 splitter?

22     A.    Yes.

23     Q.    And did it split hundreds and hundreds

1    and hundreds of block every day, successfully?

2        A.    Yes.

3        Q.    And did people work around these

4    hundreds and hundreds and thousands of block every

5    day that you were there those two-and-a-half months

6    and there wasn't a problem?

7

8            MR. ANDREWS:   Objection.

9

10       Q.    Is that true?

11       A.    No.

12       Q.    It's not true?

13       A.    No.   There was problems.   The machine

14   breaks down.

15       Q.    Okay.   Let's say it breaks down a time

16   or two.   All right.   I mean we all know machines

17   break down.   My point is:   Hundreds of blocks would

18   run through the block splitter and would be sold.

19       A.    Correct.

20       Q.    Every day?

21

22            MR. ANDREWS:   Wait a minute.   Let

23            him ask a question.   He's making a

1              statement.

2

3        Q.     Is that true?

4        A.     Say it again, please.

5        Q.     Hundreds of blocks would go through this

6   machine every day that would be sold to the public;

7   is that true?

8        A.     Yes.

9        Q.     In the two-and-a-half months that you

10  were there, did you see anyone else get their hand

11  caught or injured on this block splitter machine?

12       A.     No, I didn't.

13       Q.     Now, the other people that were to do

14  your job that you were doing at the time of this

15  accident, how did they do it?

16       A.     The same way I did it.

17       Q.     So they would pull the block off through

18  the -- as it's moving out of the block splitter

19  with their left hand, stick their right hand where

20  the side knife is located and remove debris?

21       A.     Yes.

22       Q.     Is that what you're telling me how the

23  other people did the job?

1    A.    Yes.

2    Q.    And you're telling me that nobody used a

3    stick or a wand to help clean debris out?

4    A.    No.

5    Q.    And was there any reason that you

6    couldn't have walked around and hit the stop button

7    to stop the machine and then remove that piece of

8    debris that was caught or lodged in there?

9    A.    No, because my job was to stand right

10   there and operate and do what I was supposed to do.

11   Q.    I know that's what your job was, but was

12   there anything that prevented you physically --

13

14         MR. ANDREWS:    A barrier you mean?

15

16   Q.    Or in any way from walking five feet and

17   hitting a button because a piece of block got

18   lodged in the side where the side knives were

19   located?

20   A.    I don't guess there would be, but, I

21   mean, I wasn't trained to do all that.  I was told

22   to stand right there and work.

23   Q.    I'm not talking about your training.

1  I'm just saying, was there any reason you

2  couldn't --

3

4              MR. ANDREWS:  He's answered.

5

6    Q.    -- walk five feet and do that?

7

8              MR. ANDREWS:  He's answered the

9         question.

10

11   A.    I already answered that.

12   Q.    No, you hadn't answered it.

13

14             MR. ANDREWS:  Yes, he did.  He

15        just answered the question.  He said

16        there was no barrier that kept him from

17        doing it, but that was not what he was

18        trained to do.

19

20   Q.    I guess my question, I thought, was:

21  Was there anything that kept you from being able to

22  walk five feet?

23

1    MR. ANDREWS:  Asked and answered.

2    THE WITNESS:  What?

3    MR. ANDREWS:  I said, That's asked

4    and answered.  You go ahead.  You've

5    already answered it one time, but you

6    can go ahead and answer it again.

7

8    A.    No, there was nothing to stop me from

9    walking over there.

10    Q.    Okay.  And if you had -- once you

11    realized that it was lodged, if you had taken your

12    hand out and walked around you could have hit the

13    stop button and it would have stopped the block;

14    is that true?

15    A.    Yeah, that's true.

16    Q.    Let me ask you this way.  Once you

17    realized that there was a piece of block lodged as

18    you were pulling the block off, there wasn't

19    anything or any reason you couldn't have walked

20    around and hit a stop button at that time, was

21    there?

22    A.    At that time I didn't know the piece of

23    block was lodged in there until I got off into it.



1     Q.    Would you -- as you were pulling the

2  block off with your left hand, would you always put

3  your right hand in there, or were there times that

4  you didn't have to do that?

5     A.    I didn't have to every single time.

6     Q.    In other words, sometimes it would split

7  right and you would just pull it with your left

8  hand.  You don't put your right hand in there every

9  time?

10     A.    That's correct.

11     Q.    Isn't that true?

12     A.    That's true.

13     Q.    What would happen to the block as to

14  make you feel like you had to put your right hand

15  in the area where the side knives were located?

16     A.    Just a piece of the block it get split

17  off, the trash that comes off, two knives on each

18  one of the side knives where it splits it right

19  there, some of that trash falls right there and

20  won't let that knife come out and you got to move

21  it.

22     Q.    Would the knife not work if that block

23  is in there?



1     A.     No, it will work, but it just won't
2  split the block like it's supposed to.
3     Q.     It messes up your block?
4     A.     Yes.
5     Q.     Now, after you injured your hand, what
6  happened?
7     A.     Do you mean directly right afterwards?
8     Q.     Yes, sir.
9     A.     As soon as my hand went through the
10 cycle, when I got my hand out I just grabbed it and
11 held it and went to the office and went to the
12 emergency room.
13    Q.     Did you talk to anybody in the office?
14    A.     I can't really say, because I ain't real
15 sure.
16    Q.     Did you tell anybody in the office that
17 it was your fault?
18    A.     No.
19    Q.     That you knew better than to do that?
20    A.     No.
21    Q.     Did anybody see or witness your hand
22 being cut or injured that you know of?
23    A.     Not unless John and them back there at

1   the cuber was able to see anything that happened.

2   I think actually John actually figured it out after

3   I held my hand up and told him I got my hand

4   caught.

5        Q.    Have you talked to John about how the

6   accident happened?

7        A.    No.

8        Q.    So you don't know if anybody actually

9   saw the accident, you hadn't talked to them about

10  it?

11       A.    No, sir.

12       Q.    Have you been back to work since this

13  accident?

14       A.    To there?

15       Q.    Yes.

16       A.    No, I ain't never been back to the block

17  plant since then.

18       Q.    Have you talked to anybody at the block

19  plant, any employees that were there, anybody with

20  Able Body Labors about what may have happened or

21  how the accident happened?

22       A.    I don't think in general I have.  I may

23  have talked to John and Karry, I don't know.  I've

1    been up there to see them, but I really didn't talk

2    to them about the accident.

3         Q.    You went up there after the accident and

4    talked to them?

5         A.    I went up there and showed them my hand

6    and stuff like that.

7         Q.    Did y'all discuss how it happened?

8         A.    I can't say that we did.  I vaguely

9    don't remember all that.

10         Q.    Did you tell them how it happened, or

11    did you admit that there was --

12         A.    Not them, I didn't, no.

13         Q.    Have you told anyone?

14         A.    Somebody took a statement from me -- I

15    don't remember who it was -- with the workmen's

16    comp people.  Other than that, I don't know.

17

18              MR. SHEALY:  Do we have that?

19              MR. ANDREWS:  (Shakes Head.)

20              MR. CURTIS:  I asked for that in

21         discovery.  I don't remember getting any

22         kind of statement.

23              MR. SHEALY:  Did you send a

1    subpoena to them?

2         MR. ANDREWS:  I don't think

3    there's a written statement from

4    anybody.

5         MR. SHEALY:  Off the record.

6

7    (Whereupon, a discussion was held off the

8    record.)

9

10   Q.    (By Mr. Shealy)  Who is the worker's

11   comp, do you know?

12   A.    Right off the top of my head, I can't

13   think of the name of it.

14

15        MR. CURTIS:  Crawford.

16

17   A.    Crawford, that's it.  Crawford and

18   Company.

19

20        MR. SHEALY:  They are the third

21   party administrators.

22        MR. RODGERS:  They are the

23   adjusters.



1      MR. SHEALY:  So they actually

2          handled it?

3      MR. RODGERS:  Yes.

4

5   Q.    (By Mr. Shealy)  You settled with your

6   worker's comp carrier; is that correct?

7   A.    Yes.

8   Q.    How much did you settle for?

9   A.    It was 21 thousand, I think.

10   Q.    Did you close meds out?

11   A.    No, sir.

12   Q.    Are meds left open?

13   A.    Yes, sir.

14   Q.    Has worker's comp paid all your medical

15   bills?

16   A.    Yes.

17   Q.    So you're not making any claim for

18   medical bills in this case; is that true?

19

20          MR. ANDREWS:  Objection.  We are

21          making a claim for medical bills.  They

22          will be entitled to a subrogation

23          claim.  But we are going to be able to

1    present his medical damages in the case.

2    Let me put this on the record --

3         MR. SHEALY:  The employer is

4    responsible for the bill.  Of course,

5    I've always wondered how you can ask for

6    it and they get it back.

7         MR. ANDREWS:  That's the law.

8    The question is, are we making a claim

9    for it?  Of course, we are.

10

11   Q.    (By Mr. Shealy)  But you haven't had to

12   pay for it and you weren't responsible to pay for

13   it, your employer was; is that true?

14   A.    That's correct.

15   Q.    And they are responsible to pay for any

16   future medical care; isn't that true?

17   A.    As far as I know, workmen's comp has

18   still got it.

19   Q.    And they paid you 21 thousand dollars

20   for the injury to your hand; is that true?

21   A.    Yes.

22   Q.    Is that true?

23   A.    Yes, sir.

1

2          MR. ANDREWS:  And let me -- I

3     don't think you're making a big deal out

4     of it, but to the extent he can recover

5     under work comp.

6          MR. SHEALY:  I'm just saying

7     that's what work comp paid him.

8          MR. ANDREWS:  Right.

9          MR. SHEALY:  I'm not talking about

10    to what extent.

11

12    Q.    (By Mr. Shirley)  Just whatever they

13 paid you, they paid you 21 thousand dollars; isn't

14 that true?

15    A.    I think that's what it was.

16    Q.    And they paid all your meds, and that's

17 true, correct?

18    A.    That is true, correct.

19    Q.    At the time of this accident, did you

20 have any kind of health insurance?

21    A.    No, sir.

22    Q.    Do you today have any kind of health

23 insurance?



1    A.    No, sir.

2    Q.    Have you had any health insurance in the

3  last five years?

4    A.    No, sir.

5    Q.    Are you presently working?

6    A.    Yes, sir.

7    Q.    What are you doing?

8    A.    Roofing houses.

9    Q.    How much do you make by the hour?

10    A.    I don't get paid by the hour.  I do my

11  own.  I'm a subcontractor.

12    Q.    What's the name of your business?

13    A.    I really ain't got a name.  I mean, I

14  just --

15    Q.    So you sub out --

16    A.    I've been working for a guy named Ken

17  Drawdy.

18    Q.    Where is he located?

19    A.    Albany, Georgia.  D-r-a-w-d-y.  He owns

20  the company that I've been working under.

21    Q.    Do you work 40 hours, 50 hours, 60 hours

22  a week?

23    A.    Probably more than that.

```
1    Q.    70 hours a week?

2    A.    Give or take a little bit, yeah.

3    Q.    And are you on roofs?

4    A.    Yes, sir.

5    Q.    Are you doing the nailing of the

6    shingles?

7    A.    Yes, sir.

8    Q.    So you can at least do your roofing?

9    A.    Well, yeah, I can now, but I had to go

10   and get me a bunch of different tools to be able to

11   do the job with because I can't hold my hammer no

12   more.

13   Q.    I gotcha.  But you're working 70 hours a

14   week doing roofing hard as you can go; is that

15   true?

16   A.    Yes, sir.

17   Q.    And you're making a lot more than eight

18   dollars an hour; isn't that true?

19   A.    Not really, because I pay four other

20   people so I can get the job done.

21   Q.    Okay.  Well, how much do you make?

22   A.    I average about three hundred, three

23   fifty a week, if I had to try to figure it all
```



1    out.  It might vary.  One week I might make six

2    hundred, the next week I might make two.

3         Q.    You're doing it by the job.  But you're

4    making at least as much money as you were before

5    and probably more?

6         A.    Right at it, I'm sure.

7         Q.    All right.  And how long have you been

8    roofing, working 70 hours a week?

9         A.    For the last seven months.

10        Q.    Had you worked -- and you are working

11   for the same guy?

12        A.    Yes, sir.

13        Q.    Does he build a lot of houses?

14        A.    No, he's just a roofer.

15        Q.    He's just a roofer, but he stays real

16   busy?

17        A.    Yeah, he's got plenty of work.

18        Q.    And you've been working for him for

19   seven months as a subcontractor?

20        A.    I've only been with him for about four

21   months.

22        Q.    Okay.  Did you work for somebody else

23   the other three months?



74



1      A.      Just myself on some new houses,

2  different builders and stuff like that.

3      Q.      So you're -- okay.  But you're staying

4  real busy with him?

5      A.      Yeah, I'm staying fairly busy with

6  Drawdy.

7      Q.      Do you have guys that work under you?

8      A.      Yeah.

9      Q.      And you have a crew?

10     A.      Yeah.  I got three other guys that work

11 with me.



12     Q.      Do you have a roofing crew?

13     A.      Yeah.

14     Q.      Are you required to pay worker's comp or

15 any kind of --

16     A.      No, it's --

17     Q.      Social security?

18     A.      Drawdy takes all of that out of my --

19     Q.      So he does that for you?

20     A.      Yeah, he's handling all of that.

21     Q.      So in a way you're really like an

22 employee?

23     A.      Well, I'm being 1099'd every year.

1      Q.     They just want to call you an
2  independent contractor?
3      A.     So they don't have to pay taxes, right.
4      Q.     I gotcha.  About how much do you get
5  paid?
6      A.     It's hard to figure, man.
7      Q.     Well, you're going to go roof a house.
8  What do you charge them?  Don't you have like a set
9  fee?
10      A.     Yeah, I get like 17.50 and 30 dollars a
11  square.
12      Q.     17.50?
13      A.     17.50 for a walkable roof, that you can
14  get up there and walk on.
15      Q.     Explain to me.  I don't understand.
16
17             MR. ANDREWS:  He's trying to.
18
19      A.     That's what I'm trying to do.  Anything
20  you can get up there and not have to toe board
21  it -- you know, put any kind of boards up there
22  where you can walk around on --
23      Q.     We are not communicating.  I don't

1  understand the 17.50.

2      A.    That's a square for three bundles of

3  shingles.   Did that explain it to you?

4      Q.    Yeah.

5      A.    Three bundles of shingles is a square.

6      Q.    So you get 17.50 a square?

7      A.    Yes, sir.

8      Q.    And then you get --

9      A.    If I do one where I tear the roof off,

10  an old roof off and put it back on, I will get

11  30.00 dollars a square.

12      Q.    What's your average job?

13      A.    Somewhere between 40 square, 50 square

14  maybe.

15      Q.    And then how long does it take you to

16  roof a house?

17      A.    About four days.

18      Q.    Okay.   So if you have 40 times 17.50,

19  that's about seven hundred and something dollars?

20      A.    That's right.

21      Q.    Every four days?

22      A.    But I got three other people that work

23  with me.



1    Q.    I understand.

2    A.    It ain't like I'm walking away from the

3    table --

4    Q.    I'm just asking.  I guess the bigger the

5    roof, the more money you make?

6    A.    That is correct.  Unless it's a new

7    roof.

8    Q.    But if you have to tear it off, then you

9    make 30.00 dollars?

10    A.    Yes.

11    Q.    Then you make 12 hundred dollars.  Let

12    me ask you something.  Does it take you four days

13    to do 40 squares, or is that tearing a roof off and

14    doing it?

15    A.    Takes me --

16    Q.    With four guys?

17    A.    No, it don't take that long with four

18    guys.

19    Q.    I was going to say, you can do 40

20    squares in a day.

21    A.    No, you can't.

22    Q.    With four guys?

23    A.    I would like to meet that guy, that



78



1  crew.  At least my crew don't.

2     Q.    Okay.  What does it take you, two days?

3     A.    About three days.

4     Q.    All right.  What's your education?

5     A.    Tenth grade, completed the ninth.

6     Q.    Can you read the newspaper?

7     A.    Yes.

8     Q.    Can you read the Bible?

9     A.    Yes.

10    Q.    Can you read a book?

11    A.    Yes.

12    Q.    Can you like look at these exhibits

13 here, for instance -- and there's nothing behind

14 this.  But it's got, Danger.  Can you read that

15 word?

16    A.    Yes.

17    Q.    And it says, Hazardous Voltage, Follow

18 Lockout Procedure Before Servicing Panel of the

19 Machine.

20    A.    Uh-huh.

21    Q.    Is that a yes?  Can you read and

22 understand that?  If you read that --

23    A.    Yes, I can read and understand that.

1    Q.    Okay.  And I'm not trying to be

2    disrespectful, but I've been doing this over 23

3    years and I've had all different kinds of responses

4    about understanding things.

5    A.    On that lock --

6

7              MR. ANDREWS:  Hold on.  He hadn't

8         asked you a question.  You've answered

9         his last question.

10             THE WITNESS:  Okay.

11

12         (Whereupon, Defendant's Exhibit 4 was

13         marked for identification and same is

14         attached hereto.)

15

16    Q.    Let me show you what I've marked as

17    Defendant's Exhibit 4, okay.  Can you identify

18    Defendant's Exhibit 4, please, sir?

19    A.    It's the end of the block splitter where

20    I was standing.

21    Q.    Okay.  Let me show you something.  Do

22    you see a picture on there that shows somebody -- a

23    knife cutting somebody's hand off, basically in the

1  place where your hand was cut off?

2      A.      Yes.

3      Q.      Did you see that pictorial warning

4  before your accident?

5      A.      No, I ain't never seen it.

6      Q.      Okay.  So it was in front of the block

7  splitter that you worked around, but you never saw

8  it?

9      A.      Uh-huh.

10     Q.      Do you know why it was blacked out?

11     A.      I have no clue.

12     Q.      Okay.  So it's your testimony you never

13  saw that warning that's -- I mean, can you see it

14  now?

15     A.      I see it now.

16     Q.      I'm not fussing with you.

17     A.      I know.

18     Q.      But your testimony is that you never saw

19  this pictorial or warning prior to your accident,

20  is that what you're telling me?

21     A.      Yes.

22     Q.      Let me ask you this.  Was -- in

23  Defendant's Exhibit 1 when it says, Keep Hands



1    Clear, you had seen that before?

2        A.    Yes, that's right in front of you as

3    you're standing right there.  I mean, there's no

4    way to miss that.  I mean, it's right there at you,

5    in your face.

6        Q.    Help me out here.  Where is this located

7    on the block splitter?

8

9             MR. ANDREWS:  He's pointing now to

10            Exhibit 4, or Mr. Shealy is referencing

11            Exhibit 4.

12

13       Q.    Can you tell me where -- if we're

14   looking at Defendant's Exhibit 1, isn't this the

15   stop rail where --

16       A.    That's where -- yeah, that's this part

17   right here.

18       Q.    So if you look --

19       A.    I don't know exactly.  That looks like

20   it's on the under side of the machine to me, from

21   here, from the way it looks.  And I wasn't even --

22   probably wasn't even paying that no mind.

23       Q.    Okay.

1    A.    To be honest.

2

3              MR. ANDREWS:   You can't see it.

4              THE WITNESS:   Uh-huh.

5

6    Q.    Well, let me show you this.   You see

7    this right here, where the block is coming through,

8    it looks like there's some kind of guard right

9    here.   What is this right here?

10    A.    I have no clue.

11    Q.    So the record will understand, I'm

12    pointing to -- as the block is going through the

13    splitter, it appears some type of guard that is

14    hanging down.   Was that there at the time of your

15    accident?

16    A.    I don't think it was.

17    Q.    All right.   We are going to go back to

18    Defendant's Exhibit 1, which is the picture that

19    shows where you were standing.   Can you put an H

20    where you put your hand at the time it was injured?

21    A.    No, you can't actually see where the

22    knives are at on that picture.

23    Q.    Is there a better picture?

1

2          MR. CURTIS:  Let me look.  Here

3      are a couple of real close-up ones.

4

5   Q.     Does that show you anything?

6   A.     I can do it on this one right here.

7

8          MR. ANDREWS:  And it is already

9      marked.

10

11  Q.     All right.  Just put an H.

12

13         MR. ANDREWS:  This is on Exhibit

14     4.

15

16  A.     (Witness Complies).  It's in this

17  general area right here.

18  Q.     Let the record reflect that on

19  Defendant's Exhibit 4 the plaintiff wrote an H in

20  the area where his right hand was injured; is that

21  true?

22  A.     That's correct.  The general area.  I

23  can't say positive.

84

1

2        MR. CURTIS:  Can we take a break?

3        MR. SHEALY:  Sure.

4

5        (Whereupon, Defendant's Exhibit 5 was

6        marked for identification and same is

7        attached hereto.)

8

9    Q.    Let me show you what I've marked as

10 Defendant's Exhibit 5 to your deposition.  Can you

11 look at this exhibit?

12    A.    Uh-huh.

13    Q.    Is that how the machine looked the day

14 of your accident?

15    A.    Looks pretty much like what it looked

16 like.

17    Q.    Is there anything different?

18

19        MR. ANDREWS:  If you have any

20        specific distinction you're looking for,

21        ask him, but if --

22        MR. SHEALY:  Are you going to

23        testify or is he going to testify?

1      MR. ANDREWS:  I would love to

2   testify if you would let me testify.

3      MR. SHEALY:  But you can't.  The

4   witness is supposed to testify.

5      MR. ANDREWS:  I understand that.

6      MR. SHEALY:  And you're supposed

7   to object to the form.  Are we under

8   usual stipulations in federal court?

9      MR. CURTIS:  We are now.

10      MR. SHEALY:  You can object to the

11   form.

12      MR. ANDREWS:  Okay.

13

14   Q.    Go ahead.

15   A.    I answered your question.

16   Q.    You did, what did you say?

17   A.    I said it looks like it's probably the

18   same.

19   Q.    All right.  Do you remember me showing

20   you the warning where it shows somebody's hand

21   getting cut and -- it looks like somebody blacked

22   it out, the warning on this machine?

23   A.    Yeah, I see what you're talking about



1    right there.

2        Q.    Okay.  So you can see, Keep Hands Clear,

3    and as you're looking -- if you were working down

4    at the cuber and were looking back towards the

5    area, you would be able to see this warning and

6    the, Keep Hands Clear, if you were looking; is that

7    true?

8        A.    If that's what you was looking at,

9    correct.  But that ain't -- that ain't what I -- I

10   hardly ever paid anything any attention except for

11   what was going on right in there.  So I never

12   looked up.  I knew that sign was there.  But, I

13   mean...

14       Q.    I gotcha.  Why would someone black out

15   that warning, do you know?

16       A.    I have no clue.

17       Q.    Okay.  Now, what would happen if debris

18   was caught on the other side of the machine?  You

19   know, your right hand -- you're using your left

20   hand to pull the block, right hand to clean on the

21   knife side that's closest to you.  What about the

22   other side, because isn't their a knife on the

23   other side?



1      A.    All the debris fell down on the ground

2  over there on the back side of that machine.

3      Q.    So it never got caught on the back side?

4      A.    It did, but it never did it like the

5  other side and John always cleaned that side when

6  he was up there.

7      Q.    Well, what about when you're up there?

8      A.    I don't work on that side.

9      Q.    Was there somebody working on the other

10 side?

11     A.    No, sir.

12     Q.    So it wouldn't get messed up on the

13 other side then, it would just be on the side --

14     A.    Most of it fell down on to the floor.

15     Q.    Isn't that the way normally it is

16 supposed to work, that the debris falls down and

17 the blocks just keep running?  Isn't that how it

18 normally works?

19     A.    It ain't never worked that way since

20 I've been there, but.

21     Q.    So you're saying what, then?  You told

22 me you didn't have to clean out every block?

23     A.    No, you don't.

1    Q.    Some would run through there and no

2    problem?

3    A.    And they would fall.

4    Q.    Okay.  But you're telling me that on the

5    back side, it would never, the block, get caught in

6    the knife or anything?  You didn't never have to

7    clean it out that you know of?

8    A.    I didn't, no.

9    Q.    Okay.  And the only time you would have

10   to clean it out would be on your side over here,

11   which is where you were standing; is that true?

12   A.    That's all I ever did, yes, sir.

13   Q.    Why would you stand on the side that you

14   were standing and not on the other side?

15   A.    Because that's where I was told to

16   stand.

17   Q.    But I mean, why?

18   A.    I don't have a clue, except to clean it

19   out.

20   Q.    So you don't know why they told you to

21   stand there?

22   A.    To clean it out.

23   Q.    Okay.

1    A.    To clean the debris out of that side

2 knife right there.  And we worked that side of the

3 line.

4    Q.    Okay.  Let me show you -- do you see

5 this hammer, Keep Hands Clear, on Defendant's

6 Exhibit 1?

7    A.    What, this?

8    Q.    Yes.  There's a hammer sitting up there,

9 do you see it?

10    A.    Yeah.  I see the hammer handle right

11 there, yes.

12    Q.    Would y'all ever use the hammer?  Why

13 would you use the hammer?

14    A.    I never used that hammer.

15    Q.    Do you know what it was used for?  Did

16 anybody ever use it?

17    A.    Not that I know of.

18    Q.    I mean, we go out there to inspect the

19 machine and I didn't know why there was a hammer

20 there, do you know?

21    A.    No.

22    Q.    Do you know what its use was for?

23    A.    No, I don't.

1    Q.    Explain to me what either Karry Mackey,

2  John, or anyone with USA told you about injuring

3  your hand prior to this accident, that could happen

4  to you while you were doing your job?

5    A.    Other than what Karry said, as I said

6  earlier, you know, but still had to do your job to

7  get the stuff out.  So that's saying be careful and

8  do what you got to do.  And that's what I was

9  doing.

10    Q.    Did they tell you to be careful when you

11  put your hand in there?  Did they actually tell you

12  that?

13    A.    No.  I mean, I really don't know for

14  sure if they told me that or not.

15    Q.    Okay.  Well, I guess I was trying to

16  figure out what -- you know, they told you about

17  the job, I guess.  Did they explain to you what

18  you're supposed to do?

19    A.    Yeah, keep the line clear.

20    Q.    That's all they said?

21    A.    Yes.

22    Q.    They didn't give you any guidance,

23  anymore what to do or not do?

1    A.    Other than just keep the block cleared

2   out -- I mean, the debris cleared out.

3    Q.    Did y'all ever have any safety meetings

4   that you would go to or sign any safety sheets that

5   you've been explained, you know, how to operate or

6   use a block splitter or keep it cleaned out or

7   anything like that?  Did you ever sign any of that?

8    A.    No, sir.

9

10           MR. SHEALY:  Off the record.

11

12        (Whereupon, a discussion was held off the

13        record.)

14

15        (Whereupon, Defendant's Exhibit 6 was

16        marked for identification and same is

17        attached hereto.)

18

19    Q.    Let me show you what I've marked as

20   Defendant's Exhibit 6 to your deposition.  I will

21   represent to you this is the new machine that was

22   shipped out.  Just take a look at it.  Does that

23   look somewhat like the block splitter that you were

1  working on at the time of your accident?  It just

2  looks real new and clean?

3      A.     Yes.

4      Q.     And as you can see, you can see, Keep

5  Hands Clear, that was there.  And then you can see

6  a guard that's in red and -- right here -- that has

7  that warning about getting your hand caught, can

8  you see that?

9      A.     Yes, I see it.

10     Q.     Was that removed or the guard or -- from

11 the machine at the time you were using it, was that

12 there?

13     A.     I can't say whether it was or not.

14     Q.     You just don't know?

15     A.     I don't know.

16     Q.     All right.

17     A.     I don't remember seeing it, but I just

18 don't know for sure.

19     Q.     Okay.  Now, how many surgeries -- I

20 think you told me in your answer to interrogatories

21 that you've had numerous surgeries on your hand; is

22 that correct?

23     A.     Yes, sir.



1      Q.     If your hand -- and don't take this the

2   wrong way.  Are you through with the surgeries now

3   as far as your hand goes and you just get along as

4   best you can with it?

5      A.     As far as I know I'm through, yes, sir.

6      Q.     When is the last time you've seen a

7   doctor about any kind of treatment to your hand?

8      A.     You mean for pain management?

9      Q.     In any way.

10     A.     Pain management doctor I still see every

11  month.

12     Q.     Well, are you on medications now?

13     A.     Uh-huh.

14     Q.     What are you on?

15     A.     Methadone.

16     Q.     But being on Methadone means you can

17  work, correct?

18     A.     That's what it makes me be able to do,

19  yes, sir.  Deal with it and work.

20     Q.     How often are you taking your Methadone?

21     A.     40 milligrams a day.

22     Q.     And you're able to roof with your hand

23  as best you can?

1     A.     Uh-huh, yes, sir.

2     Q.     And you're able to work 70 hours a week

3   and do, I guess, the best you can do; is that true?

4     A.     Yes, it's pretty rough, but I deal with

5   it and go on.  I got to live.

6     Q.     Who is your pain management doctor that

7   you're seeing?

8     A.     Dr. Moree at Phoebe Putney in Albany,

9   Georgia.

10    Q.     Is workmen's comp paying for the pain

11  management?

12    A.     That is correct.

13    Q.     So it's not costing you anything?

14    A.     No, sir.

15    Q.     When did you settle your worker's comp

16  claim?

17    A.     I don't know.  Not right off, I don't.

18    Q.     Did you apply for Social Security?

19    A.     No.

20    Q.     Do you file an income tax return every

21  year?

22    A.     No, sir.

23    Q.     When is the last time you filed an

1    income tax return?

2    A.    I probably don't need to discuss that

3    because it might incriminate myself.   1980.

4    Q.    Well, so you have not filed an income

5    tax return since 1980?

6    A.    Yes, that's correct.

7    Q.    Have you made wages since 1980 every

8    year?

9    A.    Yes.  You see my work record.

10    Q.    Well, did you knowingly not file an

11    income tax return?

12

13                    MR. ANDREWS:  Now, wait a minute.

14            If he doesn't feel comfortable -- he's

15            already asserted his -- if he doesn't

16            want to answer, he doesn't have to.  You

17            already know the information you want to

18            know.

19

20    Q.    Let me ask it this way.  You knew you

21    were supposed to file income tax returns; is that

22    true?

23    A.    Yeah.

1    Q.    While we are talking about that -- I

2    don't mean to bring this up, but in reading your

3    answers to interrogatories I saw where you were

4    convicted in 1984 of sexual assault?

5    A.    Yes.

6    Q.    Was that first degree, second degree,

7    third degree?

8    A.    Sexual battery, whatever you want to

9    call it.  I don't know what degree or whatever it

10   was.

11   Q.    Where was that conviction?

12   A.    In Virginia.

13   Q.    Did you serve any time?

14   A.    I did 12 months.  It's all on record.

15   There ain't nothing to hide.

16   Q.    What does sexual battery mean?

17   A.    I have no clue.

18   Q.    Well, I guess what I'm saying is, was it

19   a rape, or a --

20   A.    No, it wasn't no rape.

21   Q.    But sexual battery --

22   A.    Just touch somebody.

23   Q.    And then you were convicted of

1    possession of cocaine in 2001?

2    A.    Yes, sir.

3    Q.    Did you serve any time for that?

4    A.    Yes, sir.

5    Q.    How much time?

6    A.    Ten-and-a-half months.

7    Q.    And where did you serve?

8    A.    Wakulla CI in Florida.

9    Q.    Where?

10   A.    Wakulla.

11   Q.    Where were you caught or convicted, what

12   town?

13   A.    Lakeland, Florida.

14   Q.    Were you charged with possession or

15   charged with selling?

16   A.    Possession.

17   Q.    Had you ever been charged with

18   possession before?

19   A.    No.

20   Q.    Is that your only drug offense?

21   A.    Yes, sir.

22   Q.    And it was cocaine?

23   A.    Yes.