


1    A.    No, I didn't.

2

3         (Whereupon, Defendant's Exhibit 9 was

4         marked for identification and same is

5         attached hereto.)

6

7    Q.    Can you identify what's in Exhibit 9?

8    A.    Chipping hammer.

9    Q.    Have you ever seen that hammer at the

10   block plant?

11   A.    Yes.

12   Q.    What was it used for?

13   A.    To chip the blocks, the extra pieces

14   that was hanging on the side of the block after it

15   come out of the splitter.

16   Q.    Just to make sure I'm understanding,

17   pieces of block would kind of dangle?

18   A.    Yeah, there might -- let me show you.

19   Like right here, see how that little piece is, that

20   little lip right there?

21   Q.    Yes.

22   A.    That ain't supposed to be there.  And

23   you got to chip that off with that hammer.



Q.    Where down the line would someone do that?

A.    Right past the splitter -- if you are standing where I was operating, working at right there, it would be back behind here, this a-way.

MR. ANDREWS:  We're looking a Exhibit 1 and he's describing down these conveyor rollers that is depicted in Exhibit 9.

Q.    Now, the person -- as you explained before, there would be generally two or three people manning this machine?

A.    Down this line.

Q.    Down the line.  Now, would the person who does the chipping of the block not be the same person that cleans debris?

A.    No, it could be.

Q.    It could be the same person?

A.    It could be, yeah.

Q.    Did you ever see anyone use the hammer in Exhibit 9 to clear debris?



1    A.    No.

2    Q.    Did anyone ever show you how to clean

3  debris out of the machine?

4    A.    Yeah, John did.

5    Q.    How did he show you?

6    A.    With his hands, by reaching up in there

7  just like I did.

8    Q.    Was the machine on or off?

9    A.    It was on, running, going through.  We

10  was running a line.

11    Q.    Do you know what the proper way is to

12  remove debris from the machine?

13    A.    I have no clue.  If the way I was doing

14  it wasn't the proper way, I don't know.

15    Q.    Do you think it was proper?

16    A.    It was fine with me.  I didn't see

17  nothing wrong with it, you know.

18    Q.    Well, if I recall, one of the first days

19  you were at the block plant you met Karry Mackey?

20    A.    Uh-huh.

21    Q.    And on that first meeting with Karry

22  Mackey he told you about his accident; is that

23  correct?

1    A.    Yes.

2    Q.    What did he tell you about the accident?

3    A.    That he was stupid because he put his

4  hand on top of the block and then turned around and

5  was talking to somebody and the machine went

6  through the process and cut the tips of his fingers

7  off.

8    Q.    Was that the first day on the job?

9    A.    I can't answer that.

10    Q.    But it was very close?

11    A.    It was somewhere thereabouts, yes.  I

12  can't answer exactly when because I don't remember.

13    Q.    What was your reaction to his story,

14  Karry Mackey's story?

15    A.    Just to be careful.

16    Q.    So hearing Karry Mackey's story at the

17  beginning of working at the block plant made you be

18  careful about how you operated the machine?

19    A.    Yes.

20    Q.    And you knew it was possible for that

21  machine to cut fingers off?

22    A.    Yes, but at the same time I still had a

23  job to do.

1    Q.    I understand you had a job to do.

2    A.    And that consisted of doing what I was

3    told to do, to put my hand there and pull the

4    debris out.

5    Q.    So, I take it later on you learned how

6    to -- someone showed you how to clear out debris

7    after you learned about Karry Mackey's accident?

8    A.    Yes.

9    Q.    Looking at the blocks and how the

10   splitter works, can you tell me, is there

11   varying -- are there different amounts of debris

12   that build up, or is it always the same piece of

13   debris?

14   A.    No, it ain't always the same.  I mean,

15   everything -- every brick breaks different.  I

16   mean, there might be a lot of debris one time, be a

17   little the next time.

18   Q.    How do you know the debris needs to be

19   cleared out?

20   A.    Just because it's built up right there.

21   At the knives it builds up right there.

22   Q.    It builds up after a series of cycles?

23   A.    I don't know exactly what you mean by

1   that.

2        Q.    Do you have debris after one block is

3   split?

4        A.    Yeah, you have debris after every block.

5        Q.    There's debris after every block is

6   split?

7        A.    Yeah.

8        Q.    At some point you have to make a call to

9   remove the debris; is that correct?  You have to

10  decide?

11       A.    I reckon you do got to make a decision,

12  but they just said that once you see the debris to

13  get it out of the way.  So that's what I did.

14       Q.    Is it a fist size amount of debris?

15       A.    No.

16       Q.    Is it a pencil eraser size?

17       A.    No.

18       Q.    What are we talking about?

19       A.    I don't know.  I don't know how much it

20  was.  I didn't never measure it or nothing in no

21  kind of way.  I just knocked it out of the way.

22       Q.    How did you know when to do that?

23       A.    I did it just about every time when the



1    debris got there.

2         Q.    When you say the debris got there, what

3    are you looking at?

4

5                    MR. ANDREWS:  Concrete chips.

6

7         Q.    How much concrete chips?

8         A.    That's what I'm saying, I can't measure

9    how much.  I don't know how much.

10        Q.    Then if you're standing there working

11   and part of your job is to clear out the debris,

12   how do you know when to do it?

13        A.    Because they said it had to be cleaned

14   out.  That's how I know.  And if there was some

15   debris there, I pushed it out of the way.

16        Q.    Okay.  Just so I'm understanding,

17   whenever you saw any debris you cleared it out with

18   your hand?

19        A.    That's right.

20        Q.    Did you always wear a glove?

21        A.    Yes, I did.

22        Q.    Did you think the glove would protect

23   your hand?



1    A.    The glove did protect my hand because it

2  would eat your fingertips off trying to remove all

3  that concrete because it's just like sandpaper.

4    Q.    Did you think the glove would protect

5  you from the blades?


7          MR. ANDREWS:  You mean from

8          getting cut?

9          MR. CURTIS:  Yeah.


11    A.    I didn't feel uncomfortable with it or

12  nothing like that.  I mean, I just -- I used it to

13  protect my hands is what I did.

14    Q.    Okay.  Would you describe the block

15  plant as having a safety culture?  Was safety

16  something that was emphasized at the plant?

17    A.    Well, they didn't have no safety meeting

18  or nothing like that.  So I don't know how to

19  answer that question, other than to me I felt safe.

20  I mean, I didn't feel like I was going to get hurt

21  or nothing like that.

22    Q.    Did your supervisor ever talk to you

23  about the safe operation of the machine?

1    A.    No.

2    Q.    Never?

3    A.    Not that I can recall.

4    Q.    What about your co-workers, did they

5    ever talk about the safe --

6    A.    Oh, we always talked amongst each other

7    about y'all be careful when we was there.

8    Q.    You always talked about being careful?

9    A.    Yeah.  I worked with labor-ready people,

10   so we always just said, Y'all, let's have a good

11   safe day.

12   Q.    What did it mean to you to be careful?

13   A.    Just pay attention to what you was

14   doing.

15   Q.    So in your case, operating -- or manning

16   the splitter, it's an automatic machine, it runs

17   every three seconds, so being careful is being

18   quick?

19

20           MR. ANDREWS:  Objection.  Is that

21       a question?

22

23   Q.    How could you be careful -- how could





1  you act carefully in sticking your hand into the

2  machine to clean out the debris?

3      A.     Because when I stuck my hand into the

4  machine it wasn't operating.  I mean, you had two

5  or three seconds there -- whatever it might have

6  been I ain't exactly sure -- to get that debris

7  out.

8      Q.     So it's your testimony that because you

9  had two or three seconds, it was enough time, so it

10  was careful?  It was a safe thing to do?

11      A.     I felt safe about it.

12      Q.     Okay.  In your second amended complaint,

13  which is -- I'm sure your lawyer has shown you

14  these things.  There's an allegation that says, As

15  a direct and proximate result of the removal of the

16  guard, the failure by Mr. Mackey to install the

17  safety guard and/or maintain the safety guard,

18  plaintiff was injured.

19              What guard exactly are you talking

20  about in your second amended complaint?

21      A.     What I was thinking was there should

22  have been something running down the side of it to

23  keep you from being able to get up in there, or at



1    least something that would stop that machine from

2    operating while you was in there.

3        Q.    How would -- how would you have hit --

4    what's the best way to ask this.  Did you ever see

5    a guard on the machine?

6        A.    No, sir.

7        Q.    The guard that you testified about just

8    a minute ago was hypothetical, right?

9        A.    From what I know now, yes, sir.  But at

10   that time, no, sir, it wasn't.

11       Q.    Okay.  I understand.

12       A.    Okay.

13       Q.    You understood the machine ran

14   automatically, correct?

15       A.    Correct.

16       Q.    And you also understood that it

17   wouldn't -- that it would not stop by itself?

18       A.    Yes, I guess I did.  I mean, I didn't

19   never -- I ain't never thought about it, but...

20       Q.    You understood for the machine to stop

21   running, someone had to turn it off?

22       A.    Hit the button, yes, sir.

23       Q.    Okay.  You testified before that you saw

1    this sign here on Exhibit 5 where it says, Keep

2    Hands Clear?

3        A.    Correct.

4        Q.    And you saw that before the accident?

5        A.    Yes.

6        Q.    Now, if you had followed that warning

7    and kept your hands clear, would that have

8    prevented the accident?

9

10            MR. ANDREWS:  You mean when --

11

12        Q.    Had you just done what this says, Keep

13    Hands Clear, would you have had your accident?

14        A.    No, because when --

15        Q.    Okay.

16        A.    Let me explain.  When I put my hand in

17    there, this machine wasn't operating it.  And when

18    -- I understood that that's what that meant, when

19    that machine was operating that I didn't stick my

20    hand in there.  That's the way I felt about it.

21

22            MR. ANDREWS:  In other words, you

23            understood that when you read to, Keep

1      Hands Clear --

2                MR. SHEALY:  Huh-uh, huh-uh.

3      Object to the form.

4                MR. ANDREWS:  You can answer.

5                MR. SHEALY:  Object to the form.

6

7      Q.     (By Mr. Curtis)  Quite a while back you

8  had a motorcycle accident; is that correct?

9      A.     Back in '84.

10     Q.     Did you injure a hand in that motorcycle

11 accident?

12     A.     This hand.

13     Q.     The left hand?

14     A.     Yes.

15     Q.     Do you have any problems with your left

16 hand from that motorcycle accident?

17     A.     No.

18     Q.     Did you injure your right hand in this

19 motorcycle accident?

20     A.     No.

21     Q.     Did you have any other injuries from

22 that motorcycle accident?

23     A.     No.



1    Q.    You had a series of surgeries.  It looks
2  like about five?
3    A.    I think it was six or either seven.  I'm
4  not real positive, to be honest with you.
5    Q.    Okay.  I count six.
6    A.    Okay.  Well, that's what it was then.

7

8        MR. ANDREWS:  It's whatever the
9        record shows.

10

11    Q.    Now, I want to understand what happened.
12  On December 16th, 2004, that was the day of the
13  accident; is that correct?
14    A.    That's correct.
15    Q.    You went to the emergency room that day;
16  is that correct?
17    A.    That's correct.
18    Q.    Did you go by ambulance?
19    A.    No.  Some guy that drives a truck for
20  them took me in his car with John in his truck.
21    Q.    With John?
22    A.    Yes, sir.
23    Q.    Did you go immediately after your

1   accident to the hospital?

2       A.      Yes.

3       Q.      Did they perform surgery on you on the

4   day of the accident?

5       A.      Yes.

6       Q.      The next date I have is December 20th,

7   2004, as another surgery?

8       A.      Okay.

9       Q.      Do you know what happened, what that

10  surgery was for?

11      A.      I ain't exactly sure what it was for,

12  no, sir.  He said he had to do some more stuff

13  inside there.  I don't know if he was still working

14  on circulation or what.

15      Q.      I'm not trying to play hide the ball.

16  Let me back up.  When you first had the accident on

17  December 16th, 2004, were your fingers amputated?

18      A.      No.

19      Q.      At what point were your fingers

20  amputated?

21      A.      I'm not absolutely -- I think it was the

22  fifth one and the sixth one, if I ain't mistaken.

23  The fifth one they cut them off short and I

1   couldn't function with it because of not being able

2   to do nothing, they got in the way.  They were

3   little bitty stubs.

4        Q.    Was your last surgery about March 24th,

5   2005?  Does that sound about right?

6        A.    Sounds close, I just ain't sure about

7   dates.

8        Q.    Did your doctor, Dr. Anderson, did he

9   tell you to quit smoking?

10       A.    Yes, he did, and I tried to quit

11  smoking.  Me and my wife both tried to quit

12  smoking.  I went out and bought patches, gum, and

13  everything else, until he told me it don't matter

14  no more, I can go to smoking.

15       Q.    Did he tell you why it was important

16  that you quit smoking?

17       A.    For the circulation to try and help my

18  fingers not lose their circulation.

19       Q.    What did you understand would happen if

20  your fingers lost circulation?

21       A.    That I could lose them.

22       Q.    Did you ever understand there was a

23  relationship between gangrene and smoking?

1    A.    No, I didn't.  Not me personally, no,

2    sir.

3    Q.    Do you understand that the reason -- let

4    me ask it this way.  Why do you understand that

5    your fingers were amputated?

6    A.    Because they got gangrene.  They turned

7    black.

8    Q.    Okay.

9    A.    Whether that's gangrene or not, I don't

10   know.

11   Q.    So there was a chance then, as of

12   December 16th of '04 when you first had the

13   accident -- at that point in time, there was a

14   chance that your fingers would not need to be

15   amputated?

16

17            MR. ANDREWS:  Object to the form.

18            That calls for medical testimony.  The

19            medical records actually say the doctor

20            does not think he's going to be able to

21            save the fingers, but he's going to try.

22            He's already testified he doesn't know

23            about gangrene or circulation.

1              MR. CURTIS:  We can ask the

2          doctors, that's fine.

3

4      Q.     (By Mr. Curtis)  Do you remember going

5  to a hospital called the Flowers Hospital about

6  December 20th, '04?  It was right after the

7  accident.

8      A.     I went there one time or another when I

9  run out of some meds, trying to get some more meds.

10     Q.     And that was the reason you went there?

11     A.     Yes.  Because my hand was hurting.

12     Q.     To get pain killers?

13     A.     Uh-huh.

14     Q.     As a result of this accident, how do you

15  contend that you're disabled?

16

17              MR. ANDREWS:  Try to put that in

18          words.

19              THE WITNESS:  That's what I'm

20          trying to do.  I'm trying to think of

21          it.

22

23     A.     I'm disabled because I cannot hold a lot



1  of different things with the same hand that I'm

2  used to operating with.  So it's having to make me

3  regroup my whole life; so therefore, that makes me

4  disabled.

5      Q.    The disability you're describing is a

6  physical disability; is that correct?

7      A.    That's correct.

8

9          MR. ANDREWS:  I want to make sure

10         he understands.  You are asking, if I'm

11         not mistaken, about any way that that's

12         disabling -- disabling to you, not just

13         your gripping.  Tell him how this has

14         affected your life.  I think that's what

15         you're asking as well, correct?

16         MR. CURTIS:  Sure.

17         MR. ANDREWS:  In other words, this

18         is a big question.  You might want to

19         tell him every way that this has

20         affected you, because I don't want him

21         later to say that you didn't tell him.

22         THE WITNESS:  Maybe I just ain't

23         understanding what's going on this

1          second.

2

3          Q.     (By Mr. Curtis)  Why aren't you

4    understanding what's going on right this second?

5          A.     I don't understand exactly what you're

6    trying to get at.

7          Q.     You sued a number of defendants for

8    money?

9          A.     Who?

10         Q.     Besser Company, E & R Manufacturing and

11   Karry Mackey.

12         A.     Okay.

13         Q.     And some of the items that are in your

14   complaint say that you're permanently disabled.

15   I'm asking you, how are you disabled?

16         A.     Because I don't have no fingers on my

17   hand no more.

18         Q.     Okay.

19

20                    MR. ANDREWS:  And again --

21                    MR. CURTIS:  Well, at this point

22              there's no more --

23                    MR. ANDREWS:  That's fine.  That's

1  fine.  If you don't want to hear all --

2  if you don't want to hear his full

3  testimony, that's fine with me.  But I

4  want to make sure -- he's here today and

5  if you want to ask him open-ended

6  questions and not follow up on any

7  emotional -- I mean, he's missing three

8  fingers on his dominant hand.  He's

9  already talked about pain.  He's talked

10  about pain medicines.  He's talked about

11  how it's affected his ability to work.

12  If you want to ask him about all those,

13  that's fine.  If you don't want to know

14  it, that's fine too.

15          MR. CURTIS:  I'm not saying either

16  one of those things.  I'm just asking my

17  question.

18          MR. ANDREWS:  Sure.

19          MR. CURTIS:  And I asked him that

20  same question --

21          MR. ANDREWS:  Okay.  That's fine.

22          MR. CURTIS:    -- kind of a couple

23  different ways with a couple of the same



1    answers.

2              MR. ANDREWS:  That's fine.

3              MR. CURTIS:  But it's on my

4    outline.

5              MR. ANDREWS:  Sure.

6

7    Q.     (By Mr. Curtis)  Some of the things you

8    did in order to get better were physical therapy;

9    is that correct?

10   A.     Yes.

11   Q.     How much physical therapy did you do?

12   A.     I ain't real sure how long.  I think it

13   was about three months or so, I think.

14   Q.     About three months?

15   A.     I'm not sure.

16   Q.     If I told -- well --

17

18        (Whereupon, Defendant's Exhibit 10 was

19        marked for identification and same is

20        attached hereto.)

21

22   Q.     Have you had an opportunity to review

23   Defendant's Exhibit 10?

1    A.    Yes.

2    Q.    What is the title of this document?

3    A.    Initial Evaluation.

4    Q.    And this is from Flowers Hospital, The

5  Hand Center; is that correct?

6    A.    That is correct.

7    Q.    Does this refresh your recollection as

8  to when you started physical therapy?

9    A.    1-27-05 is what it says right there.

10    Q.    Is it correct that you started physical

11  therapy on January 27th, 2005?

12    A.    Yes.

13    Q.    Go down toward the bottom of that page

14  and it says, Long Term Goals?

15    A.    Yes.

16    Q.    Can you tell me what the only Long Term

17  Goal is?  Can you read that for me?

18    A.    Functional use of his right hand.

19    Q.    And what's the time frame?

20    A.    10 weeks.

21    Q.    Now, were you told that at physical

22  therapy when you began, that you could have

23  functional use of your right hand?



1     A.    Yes.

2     Q.    Do you recall --

3     A.    That's all I can get out of it.  That's

4  all he could get in the time frame that we had.

5     Q.    Okay.  So this is post the amputation,

6  okay, January 27th, 05; is that correct?

7     A.    Yes.

8     Q.    Okay.

9     A.    Post or after?

10    Q.    This is after.

11    A.    That's what I thought.

12    Q.    Did you do any physical therapy before

13  the amputation?

14    A.    No.

15    Q.    So have you seen a psychiatrist about

16  this injury?

17

18           MR. ANDREWS:  I'm going to object

19        to the form.  He doesn't have to testify

20        about any kind of psychiatry treatment.

21           MR. CURTIS:  We can just lay a

22        foundation for it, right?  If you're

23        going to assert the privilege you have

1   the burden to prove it, so at least I

2   can ask him if he has seen a

3   psychiatrist.

4           MR. ANDREWS:  Well, I'm going to

5   assert the privilege and you can answer

6   it.

7           MR. CURTIS:  You're going to

8   assert --

9           MR. ANDREWS:  I can tell you what

10  the answer is.  He hasn't ever seen a

11  psychiatrist.

12          MR. CURTIS:  Well, I need to hear

13  that from him.

14

15  A.   No, I have not seen a psychiatrist.

16  Q.   Have you seen a psychotherapist?

17  A.   No.

18  Q.   Have you seen a therapist of any kind

19  about your injury from the accident?

20  A.   Brian Shealy.

21

22          MR. SHEALY:  Shelley.

23

1    A.    Shelley, whatever.

2    Q.    You've seen Brian Shelley?

3    A.    I mean for this therapy on my hand.

4    Q.    That's physical therapy.

5    A.    Okay.

6    Q.    Have you seen any doctor or therapist

7 about your emotional health?

8    A.    No, sir

9    Q.    As a result of the accident, have you

10 sought any treatment for mental suffering?

11    A.    No.

12    Q.    Have you experienced depression since

13 the accident?

14    A.    Yeah, I'm depressed all the time.

15    Q.    Have you been treated for the

16 depression?

17    A.    No.

18    Q.    Have you experienced depression at any

19 other time in your life before the accident?

20    A.    When I was doing drugs -- I mean, you

21 get depressed when you're doing drugs anyway.

22    Q.    Have you ever taken medication for

23 depression?



1      A.      No.

2      Q.      Have you ever seen a doctor for

3   depression?

4      A.      No.

5      Q.      After your accident, did you follow all

6   of your doctor's instructions to give yourself the

7   best chance you could to save your fingers?

8      A.      Yes.

9      Q.      What instructions did he give you?

10     A.      He didn't really -- the only

11  instructions he gave me was at the beginning he

12  told me not to smoke.  That's pretty much the only

13  thing.  I mean, you can't pick nothing up anyway.

14     Q.      The one thing he told you not to do was

15  smoke?

16     A.      Yes, at the beginning.

17     Q.      But you did -- but you smoked anyway?

18     A.      Well, I mean, yeah, I smoked.  But you

19  know what, I've been smoking since I was 15 years

20  old.  You don't walk away from an addiction like

21  that in a minute.

22     Q.      Well, in addition to cigarette smoking

23  you also smoked marijuana?





A.    Well, so.

Q.    After the accident, right?

A.    Before, after.

Q.    Okay.  Were you addicted to marijuana?

A.    No, I'm not addicted to marijuana.

Q.    Thinking about this case and that you're asking the defendants for money, it looks like that's because of the disability that you've described?

A.    Yes.

Q.    I also understand that it's for pain and suffering; is that correct?

A.    That's correct.

Q.    Now, if you had to balance the two, would you say that you want more money for physical disability, or that you want more money for mental disability?

        MR. ANDREWS:  Now, on this, this is legal question, and we are going to ask the jury to return whatever amount they think is appropriate.  And the jury is certainly the one to weigh whether

1   they give more money for disability or

2   whether they give more money for --

3           MR. CURTIS:  And they can --

4           MR. ANDREWS:  He's going to ask

5   the jury -- I can tell you what:  I'm

6   going to be the one asking, and I'm

7   going to ask the jury to assess all of

8   that however they deem fit.  I'm not

9   going to stand up and say, please, give

10  more for disability or give more for

11  depression.  I'm going to tell the jury

12  what this man has been through and let

13  them assess the damage.

14

15      Q.    (By Mr. Curtis)  What do you consider to

16  be more serious, the physical loss of your fingers

17  or the mental suffering you've had as a result of

18  the accident?

19      A.    Personally I think they are both pretty

20  equal.

21      Q.    They are both equal?

22      A.    Yeah.

23      Q.    Do you plan to see a psychiatrist in the

1    future?

2        A.    I hadn't thought about that.

3        Q.    How about to see a therapist?

4        A.    I hadn't really --

5        Q.    You hadn't thought about that?

6        A.    No, sir.

7        Q.    But you're contending they are equal,

8    correct?

9        A.    Yeah, because I just go on -- I got to

10   work, and I can't take and be out of work.  I have

11   to go to work.  I have a family to take care of.

12   And no matter what it takes to do it, this boy is

13   going to do it.  That's all there is to it as far

14   as that goes.  I don't have time to go deal with

15   that.  I have to deal with it in my own way, and I

16   do that.

17       Q.    I understand --

18       A.    Okay, thank you.

19       Q.    But it's true you're taking medication

20   for physical pain, correct?

21       A.    That's correct.

22       Q.    It's true you're not taking medication

23   for anything having to do with any kind of



1    emotional or mental state?

2

3                MR. ANDREWS:  I object.  I think

4        some of the pain medicine probably helps

5        to some --

6                MR. CURTIS:  I understand what you

7        think --

8                MR. ANDREWS:  That's for a doctor

9        to testify to.

10               MR. CURTIS:  Either just object or

11       just let him answer.

12               MR. ANDREWS:  Well, I object.

13               MR. CURTIS:  Can you read back the

14       last question.

15

16       (Whereupon, the following question was

17       read back by the court reporter:

18               "Q.    It's true you're not

19       taking medication for anything having to

20       do with any kind of emotional or mental

21       state?")

22

23    A.    True, I'm not for that particular thing,

1    but the pain pills do help me as far as dealing

2    with being able to work and go on with my everyday

3    life.  Whether they just for that or whatever, they

4    are prescribed for the pain in my hand.

5

6                MR. CURTIS:  I'm all done.

7                MR. RODGERS:  I've got about two

8           questions.

9

10                    EXAMINATION

11   BY MR. RODGERS:

12      Q.    Mr. Jackson, I'm Chris Rodgers and I

13   represent Mr. Mackey.  As I understand what you've

14   testified to here today, your hand actually got

15   caught between the block and the side knife; is

16   that correct?

17      A.    That is correct.

18      Q.    Okay.  Are you aware of any evidence

19   that Mr. Mackey ever took a guard off of this block

20   splitter machine?

21      A.    No, sir, I am not.

22

23                MR. RODGERS:  I don't have any



1      other questions.

2          MR. SHEALY:  That's all.

3          MR. CURTIS:  That's all.

4

5        (FURTHER DEPONENT SAITH NAUGHT)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORTER CERTIFICATE

STATE OF ALABAMA   )

COUNTY OF HOUSTON )

     I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

     I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in any way interested in the result of said cause.

     Certified this the 24th day of May, 2007.


Karen D. Strickland

Certified Court Reporter

(334) 793-3673



DEFENDANT'S
EXHIBIT





DEFENDANT'S
EXHIBIT

2



DEFENDANT'S EXHIBIT

3



DEFENDANT'S
EXHIBIT
4



DEFENDANT'S EXHIBIT 5



DEFENDANT'S EXHIBIT



AUTOMATICALLY

## SAFETY INSTRUCTIONS

### SUGGESTED LOCKOUT PROCEDURE

1. Announce lockout to other employees.
2. Turn power off at main panel.
3. Lockout power in off position.
   Put key in pocket.
5. Clear machine of all personnel.
6. Test lockout by hitting run button.
7. Block, chain or release stored energy sources.
8. Clear machine of personnel before restarting machine.

DEFENDANT'S EXHIBIT

8







**FLOWERS HOSPITAL**
4370 WEST MAIN STREET

DOTHAN AL. 36305

**THE HAND CENTER**
(334) 794-5000, EXT 8440

# INITIAL EVALUATION

**PATIENT NAME**: David Jackson
**DATE**: 1/27/05

**MEDICAL RECORDS #**: 334516
**THERAPIST**: Brian Shelley, OTR/L, PT, CHT

**SSN**: 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

Referring Physician: Dr. Landon Anderson

This is a 43 y.o. (R) hand dominant male who was working in Andalusia sustained a severe crush injury to his (R) hand on December 16th, 2004. He underwent salvage procedures to the fingers and the hand apparently times 5 according to the patient. Ultimately ended up in amputations of the long, ring and little fingers either through the MP joint or through the proximal phalanx. The index and thumb apparently sustained essentially no injury. He is now referred to physical therapy for wound care and ROM.

**UPON EXAMINATION TODAY:**
Patient presents with obvious amputations of the long, ring and little fingers approximately through the proximal phalanx areas. He has moderate amount of swelling. He has an open wound in the palm at the distal palmer crease approximately 2 cm by 6 cms. He has open wounds at the tip of the long stump. There is no evidence of infection. We have cleaned the wounds with soap and water. Debrided non-viable tissue and instructed the patient in keeping the hand elevated and redressed. We then fabricated a dynamic MP flexion splint to dynamically flex the MP joint. We instructed him in ROM exercises of the index finger and thumb. ROM of the wrist is essentially WNLs. MP flexion of the index finger is 45°. PIP flexion is 25° and DIP flexion is 15°. Passive extension is WNLs. ROM of the thumb is essentially WNLs. Patient will wear the dynamic splint 30 mins 5 times a day. He does understand this. In between splinting he will work on ROM exercises and joint mobilization, which is what we have worked on here in the clinic, and instruct him in home exercise program.

**SHORT-TERM GOALS:**
1.   Promote wound healing.
     Full active ROM of index finger.
**Time Frame:** 6 weeks

**LONG-TERM GOALS:**
1. Functional use of his (R) hand.
**Time Frame:** 10 weeks

**PLAN OF TREATMENT:** Patient will be followed for ROM exercises and splinting as indicated.

**FREQUENCY & DURATION:** Patient will be followed daily for 2 wks and 3 –x wk for 4 wks.

**CHARGES TODAY:** Initial eval, exercise, wound care and splint.

Thank you very much for this referral.

Brian Shelley, OTR/L, PT, CHT



# Flowers Hospital

FLOWERS HOSPITAL  4370 W. MAIN STREET • DOTHAN, AL. 36305

**PATIENT SUMMARY**

## PATIENT

| PATIENT NUMBER | ROOM/TYPE | PT.TYPE | SER | ATTENDING PHYSICIAN | FAMILY PHY | M.R. UNIT NUMBER |
|---|---|---|---|---|---|---|
| 05027-00193 | HAN | HAN | HAN | ANDERSON,LANDON | | 0000334516 |

| ADMIT DATE/TIME | SEX | RACE | MS | DATE OF BIRTH/AGE | SOCIAL SECURITY NUMBER | EMPLOYMENT STATUS |
|---|---|---|---|---|---|---|
| 01/27/05 1031 | M | 1 | M | 10/24/61  43Y | 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 | FULL TIME |

PATIENT
JACKSON,DAVID
305 SOUTH FIFTH AVE   PHONE (334)588-0196

HARTFORD   AL 36344

EMPLOYER
ABLE BODY LABORS
477 WEST NELSON ST   PHONE (850)892-4405
DEFUNIAK SPGS  FL 32433

| SMK | VETERAN | OCCUPATION | BRANCH OF SERVICE | PAY GRADE | MILITARY STATUS |
|---|---|---|---|---|---|
| U | NO | cell# 538-0041 | | | |

*538-0041*
*cell# 248-9203*

## GUARANTOR

GUARANTOR
JACKSON,DAVID
305 SOUTH FIFTH AVE   PHONE (334)588-0196

HARTFORD   AL 36344

*wife 248-9206 Laurie*

GUARANTOR EMPLOYER
ABLE BODY LABORS
477 WEST NELSON ST   PHONE (850)892-4405
DEFUNIAK SPGS  FL 32433

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | EMPLOYMENT STATUS |
|---|---|---|---|
| SELF | 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 | | FULL TIME |

## RELATIVE

RELATIVE/FRIEND (OTHER THAN GUARANTOR)
JACKSON,LORI
305 SOUTH FIFTH AVE   PHONE (334)588-0196

HARTFORD   AL 36344

RELATIVE/FRIEND EMPLOYER
SCOOTER STORE
   PHONE (334)588-0271
HARTFORD   AL 36344

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | EMPLOYMENT STATUS |
|---|---|---|---|
| SPOUSE | 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 | | FULL TIME |

## INS

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| WORKER'S COMPENSATION | 04 | 253296033 | PO BOX 4699 |

INSURED NAME
JACKSON,DAVID   SOCIAL SECURITY NUMBER 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

CLEARWATER  FL 33758

| GROUP NUMBER | COMMENTS |
|---|---|

GROUP PHONE/EXT: (727)771-1111 230

## INS 2

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| W/C 1500 PLAN | 04 | 253295033 | PO BOX 4699 |

INSURED NAME
JACKSON,DAVID   SOCIAL SECURITY NUMBER 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

CLEARWATER  FL 33758

| GROUP NUMBER | COMMENTS |
|---|---|

GROUP PHONE/EXT: (727)771-1111 230

## INS 3

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | 04 | | |

INSURED NAME   SOCIAL SECURITY NUMBER

| GROUP NUMBER | COMMENTS |
|---|---|

GROUP PHONE/EXT:

## INS 4

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | 04 | | |

INSURED NAME   SOCIAL SECURITY NUMBER

| GROUP NUMBER | COMMENTS |
|---|---|

GROUP PHONE/EXT:

*Cindy notes*
*fax 334-764-3398*

## ISC

| DIAG CODE | DIAGNOSIS | ALLERGIES | AMD | ORG | PRC |
|---|---|---|---|---|---|
| | POST OP PROBLEMS | | | | |

| ACCIDENT TYPE | ACCIDENT DATE | ACC. TIME | PLACE OF ACCIDENT | PREVIOUS VISIT DATE | ARRIVAL MODE |
|---|---|---|---|---|---|
| ACCIDENT/EMPLOYMENT | 12/16/04 | 0600 | COVINGTON CO/WORK | 12/21/04 | PERSONAL VEH |

| TRANSFERRING FACILITY | CHURCH | | A.T.C. | INIT. |
|---|---|---|---|---|
| | PATIENT DECLINED | | 3 | |

| COMMENTS | | LOCATION | INIT. |
|---|---|---|---|
| | | HAN | BHJ |

*1/27/05 Cindy w/ Cranford approved therapy.*
*Adj Lorine Gregg 954-491-4470 ext. 7738*
*claim # 2026-56517*

| COPIED | ABSTRACTED | FINAL CHECK |
|---|---|---|

FL BU 6230 (Rev 12-95) ADMISSION FORM