**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06 CV0412-DRB

DAVID JACKSON,
    Plaintiff,
vs.
E & R MANUFACTURING CO., INC.
ET AL,

    Defendants.

_____

DEPOSITION OF KARRY MACKEY

Date:  May 23, 2007

Time: 12 p.m.

COURT REPORTER:
APRIL R. BENDINGER, CSR

---

**Page 2**

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Mr. Mark Andrews
5        MORRIS, CARY, ANDREWS, TALMADGE, JONES
6        & DRIGGERS
7        3334 Ross Clark Circle
8        Dothan, Alabama 36303
9
10   FOR THE DEFENDANT:
11       Mr. Steadman Shealy
12       SHEALY, CRUM & PIKE
13       100 Camellia Drive
14       Suite 101
15       Dothan, Alabama 36302
16
17   FOR THE DEFENDANT:
18       Mr. Cory M. Curtis
19       BAKER & HOSTETLER
20       303 East 17th Avenue
21       Suite 1100
22       Denver, CO 80203
23

---

**Page 3**

1    A P P E A R A N C E S
2
3
4    FOR THE DEFENDANT, STEPHENS AND MACKEY:
5        Mr. Christopher Rodgers
6        HUIE, FERNAMBUCQ & STEWART
7        Three Protective Center
8        Suite 200
9        2801 Highway 280 South
10       Birmingham, AL 35223
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**Page 4**

1    EXAMINATION INDEX
2
3    KARRY MACKEY
4        BY MR. ANDREWS . . . . . . . . . . .  7
5        BY MR. SHEALY . . . . . . . . . . . . 56
6        BY MR. CURTIS . . . . . . . . . . . . 80
7        BY MR. ANDREWS . . . . . . . . . . .  89
8        BY MR. CURTIS . . . . . . . . . . . . 106
9        BY MR. ANDREWS . . . . . . . . . . . 107
10
11
12
13
         EXHIBIT INDEX
13                                MAR
14   Defendant's
15   1   Manual                   83
16
17
18
19
20
21
22
23



EXHIBIT
C
Blumberg No. 5119

## Page 5

STIPULATION

    IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of KARRY MACKEY may be taken before April R. Bendinger, Notary Public, State at Large, at the Law Offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama on May 23, 2007, commencing at approximately 12 p.m.

    IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

    IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said depositions is

## Page 6

offered in evidence, or prior thereto.

    I, April R. Bendinger, a Court Reporter of Dothan, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama commencing at approximately 12 p.m. on May 23, 2007, KARRY MACKEY in the above cause, for oral examination, whereupon the following proceedings were had:

## Page 7

    KARRY MACKEY, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ANDREWS:

    Q.   Tell us your name, please, sir.

    A.   Karry Mackey.

    Q.   How do you spell that?

    A.   K-A-R-R-Y.

    Q.   Mr. Mackey, you sat through Mr. John Stephens' deposition just now?

    A.   Yeah.

    Q.   I want to take your deposition about Mr. Jackson's accident as well. We met before we got on the record. But again, I'm Mark Andrews, and I represent Mr. David Jackson with regard to his accident and injuries out there at Block USA when operating this block splitter machine. Do you remember that accident?

    A.   Yes.

    Q.   Were you there that day?

    A.   Yes, I was.

## Page 8

    Q.   Were you there at the plant?

    A.   I wasn't at the plant when the accident occurred, but later.

    Q.   In other words, you were employed there, but you weren't on the premises at the time of the accident?

    A.   Right.

    Q.   I understood you were not present at the time of the accident; is that true?

    A.   That's true.

    Q.   It's safe to say that you didn't see the accident happen?

    A.   No, I didn't.

    Q.   All the information you may have about how the accident happened is based on what somebody else told you, I guess?

    A.   Yes.

    Q.   Quickly, if you need a break, let me know. If you don't understand my questions, let me know. Try to answer with a yes or no. Head nods and and uh-huh and uh-uh don't get down on the record very well. Have you given a deposition before?

Page 9

1   A.   Yes.
2   Q.   Tell me about that.
3   A.   It was back in '74.
4   Q.   What was it about?
5   A.   GentlemAn was hurt on-the-job.
6   Q.   Where?
7   A.   Michigan.
8   Q.   Is that where you're from?
9   A.   That's where I was raised.
10  Q.   What part of Michigan?
11  A.   Westland.
12  Q.   What part?
13  A.   Westland.  Southern Michigan.
14  Right across the Ohio line.  About 25 miles
15  outside of Detroit.
16  Q.   What was the name of the place you
17  were working at that time?
18  A.   National Block Company.
19  Q.   What type of injury was it?
20  A.   It was a foot injury.
21  Q.   What type of equipment?
22  A.   Cuber.
23  Q.   What happened?

Page 10

1   A.   He climbed up on the cuber while
2   the slight conveyer was running and caught his
3   foot.
4   Q.   Do you know who made the machine?
5   A.   Besser.
6   Q.   You have been around Besser
7   equipment for a good long time, haven't you?
8   A.   Yes, sir.
9   Q.   Are you familiar with Besser?
10  A.   Very.
11  Q.   Do you have any dealings or
12  contact with them?
13  A.   On a weEkly basis.
14  Q.   Do you talk to them about upgrades
15  or safety features for equipment at all?
16  A.   No.
17  Q.   Have you ever asked them about
18  any?
19  A.   No.
20  Q.   Have they ever told you about any?
21  A.   No.
22  Q.   You heard some of my questions I
23  asked Mr. Stephens, did you know on this kind of

Page 11

1   block splitter that was involved in this
2   accident, I will call it the subject block
3   splitter, did you know on this subject block
4   splitter that E & R and Besser, they had
5   considered several different safety features,
6   including light curtains and guards that would
7   protect workers from getting their hands caught
8   in that area?
9        MR. SHEALY:  Object to the form.
10       MR. CURTIS:  Object to the form.
11  Q.   Would you have liked to have known
12  about that?
13  A.   Yes.
14  Q.   You suffered an injury on this
15  machine as well, didn't you?
16  A.   Yes.
17  Q.   You personally would have had a
18  vested interest in knowing about that safety
19  equipment, wouldn't you?
20  A.   Yes.
21  Q.   Do you know why it is they did not
22  tell you or make it available on this machine?
23  A.   No.

Page 12

1   Q.   What is your current title?
2   A.   Plant manager.
3   Q.   Before I leave that subject about
4   the other deposition, is that the only other
5   deposition you have given?
6   A.   Yes.
7   Q.   When you had your accident, did
8   you make a claim about that at all?
9   A.   Workmans' comp?  Yes.
10  Q.   Did you make any other kind of
11  claim at all?
12  A.   No.
13  Q.   Who was your lawyer?
14  A.   Um --
15  Q.   Did you use a lawyer?
16  A.   Workmans' comp lawyer.  I don't
17  remember his name.
18       MR. RODGERS:  Were you
19  represented?
20  A.   Yes.
21  Q.   Was he here in Andalusia?
22  A.   No.  Dothan, I believe.
23  Q.   Was a lawsuit filed?

Page 13

1    A.    No.
2    Q.    As plant manager, what are your
3  job duties?
4    A.    Raw production, trucks, personnel,
5  maintenance.
6    Q.    Sort of over the whole plant?
7    A.    Everything.
8    Q.    Would it be safe to say that you
9  don't involve yourself in every aspect in fine
10  detail, but you do involve yourself in the big
11  picture?
12    A.    Sometimes the fine detail, if I'm
13  needed.
14    Q.    You have worked this block
15  splitter machine too, haven't you?
16    A.    Yes.
17    Q.    Is that typical of you to do that?
18    A.    No.
19    Q.    When did you stop doing that?
20    A.    I haven't stopped.
21    Q.    Just not something that you
22  typically do?
23    A.    Right.

Page 14

1    Q.    How long have you been employed
2  out there?
3    A.    Seventeen years in July.
4    Q.    What position were you hired on
5  as?
6    A.    Plant manager.
7    Q.    Has anybody ever been the manager
8  of that plant besides you?
9    A.    No.
10    Q.    I guess you were there when the
11  subject machine was installed?
12    A.    Yes, sir.
13    Q.    How did you split block before
14  this block splitter was installed?
15    A.    We didn't. I take that back. We
16  had a used splitter for a short period of time.
17    Q.    Do you know what kind that was?
18    A.    Columbia.
19    Q.    Do you know what happened to it?
20    A.    I believe it went to Dothan.
21    Q.    Is there a plant in Dothan?
22    A.    Uh-huh, (affirmative).
23      MR. RODGERS:  Is that a yes?

Page 15

1    A.    Yes.
2    Q.    Did it look different than this
3  block splitter?
4    A.    Yes.
5    Q.    How did it differ?
6    A.    It was larger. Basically did the
7  same job, just larger. Different brand.
8    Q.    But as far as the knives, could
9  you see the knives and reach into those knives
10  as well?
11    A.    Uh-huh, (affirmative).
12    Q.    Is that a yes?
13    A.    Yes.
14    Q.    Were there any guards or anything
15  on that machine?
16    A.    No.
17    Q.    Do you know how old that machine
18  was?
19    A.    No.
20    Q.    This machine was made and
21  delivered in 1997; is that right?
22    A.    Yes.
23    Q.    Did you participate in selecting

Page 16

1  this particular splitter?
2    A.    No.
3    Q.    Who did?
4    A.    My supervisor.
5    Q.    Is that somewhere besides
6  Andalusia?
7    A.    Yes.
8    Q.    At that time, who were your
9  supervisors?
10    A.    At that time Hal Webster and Doug
11  Buss.
12    Q.    Doug who?
13    A.    Buss.
14    Q.    B-U-S?
15    A.    S.
16    Q.    Are they still employed with Block
17  USA?
18    A.    Yes.
19    Q.    When this was made -- when this
20  block splitter was purchased, were you at all
21  consulted about the selection of this block
22  splitter?
23    A.    Yes.

Page 17

1  Q.  Did you know that shut off
2  switches or stop buttons were available for this
3  machine or could have been installed on the
4  subject machine like we see in Plaintiff's
5  Exhibit 8 like we see to Mr. Rondeau's
6  deposition?
7  A.  No.
8  Q.  Do you see these stop buttons I'm
9  talking about?
10  A.  Yes.
11  Q.  If you had known that was made
12  available where stop buttons could have been
13  installed where a chunk puller would be
14  stationed, do you think that would have been
15  important to know?
16  A.  Yes.
17  Q.  Would you have wanted that to be
18  in place, if possible?
19  A.  Yes.
20  Q.  Do you think it would make the
21  machine safer?
22  A.  Yes.
23  Q.  When the machine was installed,

Page 18

1  did anyone from Besser or E & R come down and
2  meet with everybody about how to operate this
3  machine?
4  A.  No.
5  Q.  Did anyone at E & R or Besser tell
6  anybody at your plant about other accidents that
7  had taken place on this machine when chunk
8  pullers got their hand caught in the machine?
9  A.  No.
10  Q.  Would you have thought that would
11  have been important to know?
12  A.  Yes.
13  Q.  Why is that?
14  A.  It would have just been
15  important.  I would have liked to have known
16  about it.
17  Q.  You felt like it would have made
18  you more aware of what could happen on this
19  machine?
20  A.  Yes.
21  Q.  You had an accident on this
22  machine as well, correct?
23  A.  Yes.

Page 19

1  Q.  Tell us, when did your accident
2  happen?
3  A.  2001.
4  Q.  What were you doing?
5  A.  I was over showing an Able Body
6  rental person how to pull chunks.
7  Q.  And what happened?
8  A.  Well, I got concerned with him.  I
9  was pulling the block down, and several times
10  when I pulled the block down, I pinched his
11  fingers.  So I was more concerned about his
12  fingers than I was my hand, and at the time I
13  wasn't pulling a chunk when this happened, I
14  reached up to grab the block, and I was watching
15  the Able Body rental person, and put my hand in
16  too far.
17  Q.  You weren't even reaching for a
18  chunk at the time?
19  A.  No.
20  Q.  So would it be a safe statement
21  that your fingers can get cut off in this block
22  splitter machine even when you're not reaching
23  in to clean debris, but when you're trying to

Page 20

1  pull block out, that's what happened to you?
2  A.  You would have to reach in it.  I
3  just reached in it too far.  Before the block
4  was out, I reached over the block.
5  Q.  Sure.  I understand you obviously
6  reached in too far because you are missing two
7  fingers; is that right?
8  A.  Three.
9  Q.  Three fingers.  Which three
10  fingers?
11  A.  (Witness showing hand).
12  Q.  You're missing the tip of your
13  long finger, and basically all of your ring and
14  small finger?
15  A.  Right.
16  Q.  That happened not while you were
17  reaching for a chunk; is that right?
18  A.  That's right.
19  Q.  Was it on the side knife or top
20  knife?
21  A.  Side knife.
22  Q.  Was that the same area of the
23  block splitter machine that Mr. Jackson's

Page 21

1  accident?
2      A.    I was reaching to the other side.
3  I was standing on that side, but I was reaching
4  to the other side.
5      Q.    I see.  You were standing in the
6  same position Mr. Jackson was standing; is that
7  true?
8      A.    That's correct.
9      Q.    However, you are saying you were
10  reaching across the conveyer across the
11  production line to the other knife?
12      A.    Right.
13      Q.    Okay.  At that time, was debris
14  created at the time -- this debris we talked
15  about when the knives come in and break the
16  blocks, was debris created at that time as well?
17      A.    Yes.
18      Q.    How did you clean it out?
19      A.    Shut the machine off.
20      Q.    Did you use a tool, is what I'm
21  asking, at the time?
22      A.    The tools were available.  No, I
23  didn't use a tool.

Page 22

1      Q.    When were tools first decided to
2  be used at that plant?
3      A.    From day one.  But it was -- you
4  know, we started out using less -- even with the
5  tool, I always emphasized to people, turn it
6  off.
7      Q.    I see.  But you said the tool was
8  used from day one when this machine was
9  installed?
10      A.    Yes.
11      Q.    Did that tool come with the
12  machine?
13      A.    No.
14      Q.    Did it come as a result of any
15  instruction or direction from Besser or E & R?
16      A.    No.
17      Q.    Did it come from your experience
18  around this type of machinery?
19      A.    Yes.
20      Q.    Have you ever seen workers reach
21  in there and clean debris out with their hands?
22      A.    Yes.
23      Q.    At your plant here in Andalusia?

Page 23

1      A.    Yes.
2      Q.    Is it because that is easier and
3  quicker to get the debris out with your hands?
4      MR. CURTIS:  Object to the form.
5  Again, with machine on or off?
6      Q.    Sorry.  With the machine running.
7      A.    With the machine, would it be
8  easier?
9      Q.    I'm sorry.  Let me back up, and
10  ask you this again.  You have seen workers reach
11  in and clean debris out with their hands?
12      A.    Yes.
13      Q.    And that is while the machine is
14  still running and before they shut it off?
15      A.    Yes.
16      Q.    That's here in Andalusia?
17      A.    Yes.
18      Q.    Now we're back to where we were.
19  Is that because in your opinion, is it because
20  it's just quicker for the worker to reach in
21  there and clean the debris out with their hand
22  than with a tool?
23      A.    In their opinion it's probably

Page 24

1  quicker, yes.
2      Q.    What I'm getting at is, I've never
3  done it.  But it seems to me if you had to stop
4  and grab a tool from somewhere or pick up a
5  tool, that is just one step a little bit longer
6  than simply reaching in there with your hand; is
7  that a fair statement?
8      A.    When you're using the tool, you
9  are holding it at all times.  You don't have to
10  pick it up.
11      Q.    But apparently even when you're
12  holding the tool, it is a little quicker because
13  you have your bare hand there to reach in and
14  clean the debris out?
15      A.    No, not necessarily.  It's just as
16  fast with the tools.
17      Q.    Is it just because it's
18  instinctively, I guess, that you reach in, that
19  they would do that, if you know?
20      MR. RODGERS:  If you know.
21      MR. SHEALY:  Or is it stupidity?
22      MR. ANDREWS:  Wait a minute, you
23  can ask the questions, I'm asking some right

Page 25

1　now.
2　　　　MR. SHEALY: Sorry, that slipped.
3　　　　MR. ANDREWS: Sure.
4　　Q.　How often have you ever seen that
5　before, people reaching in there with their
6　hands?
7　　A.　Not very often.
8　　Q.　Can you think of any names of any
9　of them that have done that?
10　　A.　No, they are normally always
11　around people.
12　　Q.　You mean the --
13　　A.　Able Body.
14　　Q.　Is that who you typically use out
15　there?
16　　A.　Who I used then. I don't use Able
17　Body anymore.
18　　Q.　We talked about a lady named
19　Sherry that got her hand caught in this machine
20　as well.
21　　A.　Yes.
22　　Q.　Or Mr. Stephens did. Do you
23　remember her name?

Page 26

1　　A.　Sherry. I don't recall her last
2　name, no.
3　　Q.　Which Able Body office was she out
4　of?
5　　A.　Defuniak.
6　　Q.　Do you know if she was a local
7　residence or from somewhere else?
8　　A.　I believe, she lived in Defuniak,
9　yes.
10　　Q.　Now, how would she have been --
11　I'm trying to find out any documentation I can
12　to help us locate this Sherry. Is there going
13　to be any documentation at your office to locate
14　her?
15　　A.　No.
16　　Q.　Is there any wage information or
17　pay stubs or W-2 information?
18　　A.　No. Not at my office.
19　　Q.　Do you know if somewhere at the
20　corporate office if there will be some
21　documentation?
22　　A.　No. They were strictly paid by
23　Able Body.

Page 27

1　　Q.　Is there a contact person at Able
2　Body that you usually used that might know this
3　person's name?
4　　A.　It was always different people.
5　　Q.　When Sherry's accident happened,
6　did she have to go to the hospital?
7　　A.　Yes.
8　　Q.　Did workmans' comp have to pay the
9　bills, if you know?
10　　A.　Their workmans' comp, yes.
11　　Q.　Do you know which hospital she
12　went to?
13　　A.　Here in Andalusia.
14　　Q.　Do you know how her accident
15　happened?
16　　A.　Uh-huh, (affirmative).
17　　Q.　What happened? Is that a yes?
18　　A.　Yes. Just like David Jackson.
19　She stuck her hand in there to pull a chunk.
20　Just like David Jackson, admitted it was her
21　fault.
22　　Q.　Was she standing in the same spot
23　as David Jackson?

Page 28

1　　A.　Yes.
2　　Q.　Was she pulling chunk?
3　　A.　Yes.
4　　Q.　Did you tell her to use a tool?
5　　A.　Yes.
6　　Q.　Did she use a tool?
7　　A.　No.
8　　Q.　How much of her hand or fingers
9　were cut off?
10　　A.　Small tip.
11　　Q.　On index finger?
12　　A.　Yes.
13　　Q.　Now, we've heard Mr. John Stephens
14　and others testify -- how often in your opinion
15　does this debris need be cleaned from the side
16　knives when the splitting process is going on?
17　Every block, every other block, or how often?
18　　A.　Like John said, sometimes that
19　machine will run for 35 or 40 minutes --
20　　Q.　And nothing?
21　　A.　-- nothing.
22　　Q.　And sometimes it will run almost
23　every other block?

Page 29

1   A.   Sometimes you might get two or
2   three in a row. I mean, you know, if you are
3   running 5 or 6,000 a day, it's not happening
4   every other block.
5   Q.   Okay. None the less, when it does
6   happen, it does have to be removed?
7   A.   That's right.
8   Q.   You cannot allow the debris to
9   remain in there or else it will start to mess up
10  the block?
11  A.   Correct.
12  Q.   Is there anything in the Besser
13  manual or E & R manual that tells you how to
14  properly clean out the debris?
15       MR. CURTIS: Object to the form.
16  A.   Not to my knowledge.
17  Q.   Is there anything that tells you
18  how to clean it out at all?
19       MR. CURTIS: Object to the form.
20  A.   Not to my knowledge.
21  Q.   As my understand, at the time of
22  Mr. Jackson's accident, no one was standing at
23  the operator panel; is that your understanding

Page 30

1   as well?
2   A.   Yes.
3   Q.   Like Mr. Stephens said, that's not
4   uncommon, is it, for someone to not be at the
5   panel?
6   A.   No.
7   Q.   My understanding is that is more
8   common than not, more typical that someone will
9   not be at the panel, and be in another position
10  up and down the line?
11  A.   Yes.
12  Q.   At the panel is the only location
13  for this stop button or on/off switch?
14  A.   Other than the emergency stop in
15  the office.
16  Q.   So there's only two. One way
17  inside the office, inside your office?
18  A.   That's correct.
19  Q.   And one on the machine, which is
20  on the panel?
21  A.   Two on the machine.
22  Q.   Are they both on that panel?
23  A.   Yes.

Page 31

1   Q.   There's two stop buttons on the
2   panel on the machine?
3   A.   Yes.
4   Q.   But there's only two locations for
5   any stop buttons: Two on the panel and the one
6   in your office?
7   A.   Yes.
8   Q.   And the panel is further than
9   arms' reach from where a chunk puller typically
10  stands; is it not? You can't reach over the top
11  of the splitter, that knife, and reach the
12  control panel?
13  A.   No.
14  Q.   That's true, isn't it?
15  A.   That's true.
16  Q.   Just like I asked Mr. Stephens,
17  production is important, is it not?
18  A.   Yes.
19  Q.   It's a goal at Block USA to keep
20  the blocks going if you can, without having to
21  stop the machine?
22  A.   Yes.
23  Q.   So the quicker you can clean any

Page 32

1   debris out or unjam the machine, the better.
2   Right?
3   A.   Yes.
4   Q.   Would it be a goal of any of the
5   chunk pullers or the machine operators to try to
6   avoid turning the machine off if you can?
7   A.   Be a goal to turn it off?
8   Q.   To try to not turn it off, if you
9   can.
10  A.   Not if it involves someone getting
11  hurt. No, I would rather them turn it off.
12  Q.   I understand your testimony is
13  that if the debris comes down, your testimony as
14  I understand, the worker is supposed to go over
15  and turn it off?
16  A.   Yes.
17  Q.   My question is: If you can keep
18  it to a minimum, is that not a goal out there?
19  A.   Yes.
20  Q.   Are there any incentives for
21  workers to keep machines going at all, like pay
22  incentives?
23  A.   No.

Page 33

```
1      Q.    Are there any bonuses that you, as
2  plant manager, to keep it going?
3      A.    Production bonus, yes.
4      Q.    Tell me about that bonus.
5      A.    Get it every year.
6      Q.    What is it based on?
7      A.    Production.
8      Q.    The more block that you put out,
9  the more your bonus will be?
10     A.    Yes.
11     Q.    That's at the end of the year?
12     A.    Yes.
13     Q.    Are you the only one at the plant
14  that gets that incentive or bonus?
15     A.    No.
16     Q.    Who else gets that?
17     A.    All the employees.
18     Q.    Even the temporary ones?
19     A.    No.
20     Q.    Who would be the Couch employees
21  that would be subject to that year-end bonus?
22     A.    Dewayne Biggs. John Coleman,
23  which they haven't got yet, they are new
```

Page 34

```
1  employees, except for Dewayne. Eddie Moore.
2  Marcus McInnis.
3      Q.    John Stephens?
4      A.    No. John's -- his bonus is based
5  on other things.
6      Q.    Dewayne. John who?
7      A.    Coleman.
8      Q.    Dewayne. John Coleman. Eddie?
9      A.    Moore.
10     Q.    Marcus McInnis?
11     A.    Uh-huh, (affirmative).
12     Q.    Then yourself?
13     A.    Correct.
14     Q.    Anyone else?
15     A.    No, that would be it.
16     Q.    Can you think of any names of any
17  workers that don't work there anymore that used
18  to work there that operated this splitter, have
19  been a chunk puller?
20     A.    Brian Schoolmaster. Randy
21  Templeton.
22     Q.    Okay.
23     A.    That would be about it.
```

Page 35

```
1      Q.    Okay. You have been there longer
2  than John Stephens; is that right?
3      A.    Yes.
4      Q.    You just can't think of any more
5  names?
6      A.    No. But since John has been
7  there, is about the only time we had the
8  splitter.
9      Q.    Do you know where Mr. Schoolmaster
10  or Templeton are now?
11     A.    Mr. Templeton is in Andalusia.
12     Q.    Do you know where he works?
13     A.    Rental place here in Andalusia.
14     Q.    Do you know where Mr. Schoolmaster
15  is?
16     A.    In Michigan. Where, I don't know.
17     Q.    I see. What about any of the Able
18  Body temporary people, do you know any of their
19  names that might have operated this splitter?
20     A.    Only the ones that were brought to
21  my attention like David Jackson and Sherry.
22  Other than that, it was different people.
23     Q.    This Willy Jackson guy, do you
```

Page 36

```
1  know him?
2      A.    Uh-huh, (affirmative).
3      Q.    Does he still work there?
4      A.    He was temporary labor.
5      Q.    Does he still work there now?
6      A.    Off and on.
7      Q.    Is he currently employed out there
8  now today?
9      A.    No.
10     Q.    He may come back and forth, is
11  that what you're saying?
12     A.    Right.
13     Q.    Is it your testimony when a piece
14  of debris is created that needs to be cleaned
15  out, does the machine have to be locked out and
16  tagged out? Turned off, locked out and tagged
17  out, then the debris cleaned out?
18     A.    No.
19     Q.    Tell me what's the proper method
20  of cleaning the debris.
21     A.    Turn the power off at the panel,
22  which kills all power. Clean it out. Three
23  buttons to start it back up.
```

Page 37

1    Q.    I think I asked Mr. Stephens, is
2  that an automatic start up, or does the machine
3  have to cycle back up at all?
4    A.    Yeah, it starts right back up.  I
5  mean, there is no movement when it starts back
6  up, just the power comes back on.
7    Q.    How long does it take before
8  movement starts to take place?
9    A.    When another block comes back in.
10  Three to five seconds.
11    Q.    Now, the people that made this
12  machine have testified that they have known, I
13  think, you heard me telling Mr. Stephens this,
14  they have known that workers in the real world
15  will reach their hand into the machine while
16  it's in operation.  And I understand that you
17  are critical of that, and everybody in this case
18  may be critical of that but nonetheless that
19  does happen, does it not?
20    A.    Yes.
21    Q.    In other words, you agree with the
22  people that made this machine that that is
23  certainly foreseeable the worker will reach into

Page 38

1  the machine with their hand while the machine is
2  on, without stopping it to try to clean out some
3  debris?
4    MR. CURTIS:  Form.
5    Q.    How often do you see that happen
6  out there at your plant?
7    A.    Very few.
8    Q.    Is it typically the Able Body
9  people?
10    A.    Yes, it is.
11    Q.    Have you ever reprimanded any of
12  them with a written reprimand?
13    A.    No, I'm not allowed, not rental
14  people.
15    Q.    So do you tell them, instruct them
16  verbally, not to do that anymore?
17    A.    Or certain people I have not
18  brought back.
19    Q.    Because of that?
20    A.    Well, that and different things.
21    Q.    Anybody specifically because of
22  that?
23    A.    No.

Page 39

1    Q.    Okay.  Make sure I got a clear
2  question.  There is nobody you can think of that
3  you have refused back at your plant in Andalusia
4  that works for Able Body specifically because
5  they reached their hand in a splitter?
6    A.    Normally when you tell them, they
7  are smart enough, for the most.
8    Q.    Mr. Jackson was not cited or
9  written up because of this accident, was he?
10    A.    No.
11    Q.    Y'all didn't terminate him because
12  of reaching his hand in the machine, did you?
13    A.    No.
14    Q.    Did you know Mr. Jackson, other
15  than working with him out here?
16    A.    No.
17    Q.    Like Mr. Stephens said, was he one
18  to follow instructions?
19    A.    Yes.
20    Q.    Typically, did you consider him to
21  be a safe worker, Mr. Jackson?
22    A.    No.
23    Q.    Tell me what you mean by that.  Do

Page 40

1  you have any specific instances in mind or just
2  generally?
3    A.    Well, the splitter thing.  He kept
4  having to be told about the splitter just like
5  they all did.
6    Q.    When you say they all, all the
7  Able Body employees?
8    A.    Right.
9    Q.    You had to stay on the Able Body
10  employees?
11    A.    Right.
12    Q.    Was it a daily thing to tell them,
13  "don't reach your hand in there"?
14    A.    Well, they were all told on a
15  daily basis, "do not stick your hand in there".
16    Q.    Was it because on a daily basis
17  they would be reaching their hand in there?
18    A.    Because on a daily basis it was a
19  dangerous job, and we felt like we needed to
20  tell them.
21    Q.    But on a daily basis did you run
22  into that where workers were reaching into the
23  machine?

Page 41

1    A.    Yes, at least once a day you would
2  see it.
3    Q.    And since it happened, at least
4  once a day, there wasn't an accident once a day,
5  was there?
6    A.    No.
7    Q.    There's enough time for the knife
8  to cycle and a worker to reach his hand in
9  there, even though that may be improper, they
10  can reach their hand in there and get it out
11  without getting injured, can't they?  Because
12  there's not an accident every day, right?
13    A.    Well, you're not reaching your
14  hand in there on a steady basis.
15    Q.    How do you understand
16  Mr. Jackson's accident occurred?
17    A.    How do I understand it occurred?
18    Q.    Yes, who told you about his
19  accident?
20    A.    John Stephens.
21    Q.    Okay.  And what did he tell you?
22    A.    He told me a chunk was hung, he
23  tried to reach in from the top to pull it out,

Page 42

1  he couldn't get it out.  He reached in from this
2  side to pull it out, and got his finger.
3    Q.    With his palm towards the knife?
4    A.    That's right.
5    Q.    Did you talk with Mr. Jackson
6  about the accident?
7    A.    Yes, I did.
8    Q.    What did he say?
9    A.    His first words were it was
10  stupidity and his fault.
11    Q.    Was that in your office?
12    A.    At the hospital.
13    Q.    At the hospital.  Now, did you
14  ever prepare any report about this accident?
15    A.    Safety director did; I didn't.
16    Q.    Who is the safety director?
17    A.    David Rabold.  At that time I
18  believe it was Thomas Hawthorne.
19    Q.    Where is Mr. Hawthorne's office?
20    A.    Dothan.
21    Q.    Did he create a written report
22  about this accident?
23    A.    I believe he did.

Page 43

1    Q.    Does Mr. Hawthorne work there now?
2    A.    I believe he does, yes.
3    Q.    David who, the other fella?
4    A.    Rabold.
5    Q.    R-A-Y --
6    A.    R-A-B-O-L-D.
7    Q.    Where is his office?
8    A.    Theodore.
9    Q.    Mr. Rabold is now the safety
10  director?
11    A.    Yes, he is.
12    Q.    Mr. Hawthorne, he used to be the
13  safety director?
14    A.    That's correct.
15    Q.    What does Mr. Hawthorne do now?
16    A.    I believe, he is still safety
17  director.  He is on the ready mix side.
18    Q.    Okay.  Were you aware that the
19  First Report of Injury in this case, the report
20  that was turned into workers' compensation, did
21  you know that report indicated Mr. Jackson's
22  glove was caught on the splitter as he was
23  trying to pull his hand out?

Page 44

1    A.    No.
2    Q.    I will show you Plaintiff's
3  Exhibit 10 to Besser's corporate representative,
4  Mr. Duane Rondeau.  This is, I believe, a Model
5  40, or may have a different number than a CM 24,
6  which is the kind of splitter that was involved
7  in Mr. Jackson's accident.  Do you see the head
8  where the splitter is, can you see there is a
9  guard or flaps all the way around the knives on
10  this machine?
11    A.    Uh-huh, (affirmative).
12    Q.    Is that a yes?
13    A.    Yes.
14    Q.    Do you know that guard existed or
15  was in existence for the splitters that are made
16  by E & R and Besser?
17    A.    No.
18    Q.    Do you know why this type of guard
19  was not on the machine as it existed at the day
20  of your accident and Mr. Jackson's accident?
21    A.    No.
22    Q.    When this machine, the subject
23  machine was delivered, did it have any guards

Page 45

1   around the knives?
2       A.   No, it didn't.
3       Q.   After Mr. Jackson's accident, did
4   you have any conversations with the E & R and
5   find out there were pieces missing?
6       A.   Yes, I did.
7       Q.   Have you taken any guards off this
8   machine?
9       A.   No.
10      Q.   Have you removed any piece of this
11  machine?
12      A.   No.
13      Q.   Do you know if anybody at that
14  plant has taken any guard or safety device off
15  this machine?
16      A.   Not to my knowledge.
17      Q.   On Defendant's Exhibit 4 to
18  Mr. Jackson's deposition, do you see this
19  sticker I'm pointing at?
20      A.   Yes.
21      Q.   Do you know why it is this
22  particular area is blacked out, where the
23  language would be but everything else is not?

Page 46

1       A.   Just dirt.
2       Q.   It just happened to be in that
3   form right there?
4       A.   Yes.
5       Q.   Can you take this knife off, you
6   can unbolt this from the machine?
7       A.   Yes.
8       Q.   In fact, you do do that sometimes?
9       A.   Yes.
10      Q.   This still exists out there at the
11  plant, doesn't it?
12      A.   Yes.
13      Q.   We could go look at it or pull it
14  off, and let the ladies and gentlemen of the
15  jury look to see if that's dirt or not, right?
16      A.   Yes.
17      Q.   Do you know what that language
18  says under there?
19      A.   I believe it's a sign saying don't
20  stick your -- it's something similar so that.
21      Q.   You're pointing to Exhibit 1 to
22  Mr. Stephens' deposition?
23      A.   Yes.

Page 47

1       Q.   Could you read the language on
2   that warning sticker?
3       A.   If you can read this sign, a guard
4   has been removed.  Do not --
5       Q.   If you could read that.
6       A.   I can't see it.
7       Q.   Let me see it, I will try to read
8   it.  It says:  If you can read this sign, a
9   guard has been removed.  Do not operate with
10  guard removed.
11      Did I read that accurately?
12      MR. RODGERS:  If he can't see it,
13  he can't say.
14      Q.   Did you know that's what the
15  sticker said?
16      A.   No, I didn't.
17      Q.   Do you know if any guard was ever
18  removed on this subject splitter before
19  Mr. Jackson's accident?
20      A.   No.
21      Q.   To your knowledge, did this
22  machine come in without guards in place?
23      A.   Yes.

Page 48

1       Q.   Do you think those guards would
2   have assisted in keeping Mr. Jackson's hand from
3   getting in a position where the block could
4   entrap it?
5       A.   No.
6       Q.   Why is that?
7       A.   Because they are more or less just
8   rubber curtains.
9       Q.   And --
10      A.   He stuck his hand in from the top.
11      Q.   In other words, the side knife is
12  what cut his hand, right?
13      A.   Right.
14      Q.   Not the knife where this guard
15  would have been located; is that true?
16      A.   The guard does hang down, but all
17  it is is a rubber curtain.
18      Q.   Your testimony is, even if the
19  guard was in place, that wouldn't have protected
20  Mr. Jackson's hand; is that true?
21      A.   That's true.
22      Q.   Did you know Besser and E & R had
23  been sued at least back in 1984 or '85, about

Page 49

1 someone losing their fingers when pulling chunks
2 out of CM-24 splitter machine just like the
3 subject machine, and in that lawsuit an engineer
4 with MIT designed some safety devices and guards
5 to prevent workers from having their hands
6 caught in the point of operation?
7        MR. CURTIS: Object to the form.
8    Q.   Did you know that?
9    A.   No.
10   Q.   Would you have liked to have known
11 there were guards existed, or they had knowledge
12 of those guards?
13   A.   Yes.
14       MR. CURTIS: Object to the form.
15   A.   Yes.
16   Q.   Do you think those kind of guards
17 would have helped your hand or Mr. Jackson's
18 hand?
19       MR. CURTIS: Object to the form.
20       MR. RODGERS: Don't guess or
21 speculate. If you know, then you can answer the
22 question.
23   A.   No.

Page 50

1    Q.   No, you don't know, or no, they
2 wouldn't have helped?
3    A.   I don't know if they would have
4 helped.
5    Q.   You don't know what those guards
6 might have looked like or anything, do you?
7    A.   No, I don't.
8    Q.   Where were you when you first
9 learned of this accident?
10   A.   In the office.
11   Q.   Where, at Block USA?
12   A.   Block USA.
13   Q.   Had they already gone to the
14 hospital or something?
15   A.   Yes, they just left when I got
16 there.
17   Q.   Who called you?
18   A.   No one called me. I was on my
19 way. I pulled up right after they left. Within
20 five minutes they were -- yeah, I didn't get a
21 phone call.
22   Q.   When you pulled up, did you see
23 them about to leave?

Page 51

1    A.   No, they had just left.
2    Q.   Who was the first person who said
3 something to you about this accident?
4    A.   Dewayne Biggs.
5    Q.   What did he say?
6    A.   He explained to me what had
7 happened and who was involved and who just left.
8 And I left at that time and went to the
9 hospital.
10   Q.   Is Dewayne still employed out
11 there?
12   A.   Yes.
13   Q.   Then you went to the hospital?
14   A.   Yes.
15   Q.   When you got to the hospital, who
16 did you see?
17   A.   I seen David.
18   Q.   Did you go up to him?
19   A.   Yes, I did.
20   Q.   What did he say?
21   A.   When I walked in, he was shaking
22 his head and said, "stupid me," that's what came
23 out of his mouth.

Page 52

1    Q.   Did you have any other
2 conversations with him there at the hospital?
3    A.   Not about the accident because he
4 knew it had already been explained to me.
5    Q.   Okay. Then did you go back to the
6 office?
7    A.   About an hour, hour and a half I
8 did.
9    Q.   Has Mr. Jackson been back out
10 there to work at all?
11   A.   Not to work, but he's been out
12 there.
13   Q.   Have you talked to him about the
14 accident since then?
15   A.   Not about the accident. Just
16 about his hand.
17   Q.   So really the only conversation
18 you had about how the accident happened, would
19 have been the one time there at the emergency
20 room?
21   A.   That's correct.
22   Q.   Did you ever take a statement from
23 him at all?

Page 53

1    A.    No.
2    Q.    Are you aware of any eyewitnesses
3  to this accident?
4    A.    No.
5    Q.    Did you participate at all in
6  training Mr. Jackson, or was that John Stephens
7  that did that?
8    A.    No, I didn't participate in
9  training. But I told him the same thing John
10  told him, and showed him my hand and this is
11  what will happen to you if you stick your hand
12  in there.
13    Q.    When you showed him your hand,
14  were you talking about in terms of while you're
15  pulling chunks? Be careful about getting your
16  hand in the area.
17    A.    Yes, I did.
18    Q.    Because you knew your hand had to
19  be in the area when pulling chunks, right?
20    A.    In the area, yeah, not inside the
21  knife.
22    Q.    So what you were saying was: Be
23  careful while you're sticking your hand in that

Page 54

1  area because you can get your hand caught like
2  yours, even when you're not pulling chunks,
3  right?
4    A.    Yes, sir.
5    Q.    Are you the one that chose this
6  kind of tool to use to clean the debris out?
7    A.    Yes.
8    Q.    How many tools are there?
9    A.    Just a piece of steel and wooden
10  lass?
11    Q.    Wooden what?
12    A.    Lass. A flat piece of wood.
13    Q.    Okay. So you just expect that the
14  chunk puller or whoever is standing in that
15  position to use that or go get one of the --
16    A.    Las.
17    Q.    Okay. Now, when they're not
18  pulling chunks, when they're using the knives
19  that create a chunk, do people still have to
20  stand there and watch the debris they build up
21  in smaller amounts?
22    A.    Are you saying is there someone
23  there all the time?

Page 55

1    Q.    Yes.
2    A.    Yes. All the time.
3    Q.    What are they doing when they're
4  there all the time?
5    A.    The chunks had come out, and they
6  take the chunks and pick them up and throw them
7  in the dumpster.
8    Q.    That regardless really of what
9  kind of block is being split, someone has to
10  stand in that position all the time?
11    A.    No.
12    Q.    Is there someone standing in that
13  position all the time when?
14    A.    Only when making a bevel split.
15    Q.    Okay. Otherwise does anyone need
16  to be standing in that chunk pulling position?
17    A.    No.
18    Q.    Is that a fair way to describe it,
19  a chunk pulling position?
20    A.    Right. Yes.
21    Q.    There was no protocol that you
22  went through in trying to figure out what
23  qualifies as a good tool. There's nothing

Page 56

1  scientific about it, you just said grab
2  something that's long to reach in there with; is
3  that right?
4    A.    Well, I suggested the wood or a
5  bar. In the same token, I suggested I would
6  rather you turn the machine off.
7    Q.    But you also know that you have to
8  try to keep production going as best you can,
9  don't you?
10    A.    Yes.
11    Q.    If you can clean the machine out
12  without turning it off, try to do that, right?
13    A.    Right.
14    MR. ANDREWS: I believe that's all
15  the questions I have.
16    EXAMINATION
17  BY MR. SHEALY:
18    Q.    When you were discussing with
19  Mr. Jackson about your hand, you made it very
20  clear to him not to put his hand in the area
21  where the side knife is located?
22    A.    Yes.
23    Q.    He understood that?

Page 57

```
 1      A.    Yes.
 2      Q.    Do you feel like you adequately
 3  and fully explained to him if you do, that
 4  you're going to get your hand cut or injured
 5  just like you did?
 6      A.    Yes.
 7      Q.    He was aware of that?
 8      A.    Yes, he was.
 9      Q.    And you also saw these warnings
10  that were on the machine to keep hands clear,
11  there were pictorials, if you put your hand in
12  where a knife is, it's going to get cut?
13      A.    Yes.
14      Q.    Those warnings and pictorials were
15  there when the machine first arrived; is that
16  correct?
17      A.    Yes.  Plus some have been added.
18      Q.    USA Block set up this machine,
19  right?
20      A.    Yes.
21      Q.    You would have had electricians
22  and people come out and hook it all up and do
23  whatever it is you do; is that right?
```

Page 58

```
 1      A.    Yes.
 2      Q.    If you wanted a stop button you,
 3  could have put one right there where the guy
 4  operates the machine if you thought it was
 5  necessary; isn't that true?
 6      A.    Yes.
 7      Q.    That is no big deal, is it?
 8      A.    No.
 9      Q.    That is something you could do if
10  you wanted to?
11      A.    Yes.
12      Q.    In fact, you chose not to since
13  the control panel is within a couple of steps of
14  where the chunk remover's located as part of his
15  job when there's an occasion to do that?
16      A.    Yes.
17      Q.    In fact, you testified that
18  sometimes it's 30 to 45 minutes before you even
19  have some block jammed into the knives that have
20  to be cleaned out; is that true?
21      A.    Yes.
22      Q.    This is an automatic block
23  machine?
```

Page 59

```
 1      A.    Yes.
 2      Q.    It's to work automatically?
 3      A.    Yes.
 4      Q.    Isn't that true?
 5      A.    Yes.
 6      Q.    Isn't that why you got it?
 7      A.    Yes.
 8      Q.    Does the machine work well and do
 9  what it's intended to do?
10      A.    Yes.
11      Q.    Do you feel like it's safe?
12      A.    Yes.
13      Q.    You wouldn't want your men working
14  on a machine that you didn't feel was safe,
15  would you?
16      A.    No.
17      Q.    You have been around block
18  splitters, block cutters, the block industry
19  almost your whole life, haven't you?
20      A.    Yes.
21      Q.    Do you feel like you have
22  knowledge of machines such as the one that's
23  made the subject of this lawsuit?
```

Page 60

```
 1      A.    Yes.
 2      Q.    You have worked around them,
 3  haven't you?
 4      A.    Yes.
 5      Q.    And you are familiar with how they
 6  work, are you not?
 7      A.    Yes.
 8      Q.    You have seen various
 9  manufacturers of this machine, have you not?
10      A.    Yes.
11      Q.    Do you feel like this machine that
12  Mr. Ron Neese and E & R Manufacturing sent to
13  Besser who sent it down to Block USA, where it
14  was located, that it was a reasonably safe
15  machine when put to its intended use of
16  splitting block?
17          MR. ANDREWS: Objection. Calls
18  for expert opinion.
19      A.    Yes.
20      Q.    Well, let me ask you this:  You
21  have worked around block machines your whole
22  life, haven't you?
23      A.    Yes.
```

Page 61

1     Q.    You are familiar with how they
2  work?
3     A.    Yes.
4     Q.    Do you feel like this block
5  machine is reasonably safe?
6     A.    Yes.
7          MR. ANDREWS:  Objection.
8     Q.    Do you feel like in any way it's
9  unreasonably defective when put to its intended
10 use?
11         MR. ANDREWS:  Objection.
12    A.    No.
13    Q.    You know Ron Neese, don't you?
14    A.    Yes.
15    Q.    Do y'all talk?
16    A.    Yes.
17    Q.    Do you feel like Ron Neese would
18 in any way, as Mr. Andrews has tried to portray
19 to you, send out a block machine that wouldn't
20 be reasonably safe?
21    A.    No.
22    Q.    Does he appear to be the kind of
23 guy who cares about the workers and cares about

Page 62

1  doing a good job and responding to any needs
2  that you may have?
3     A.    Yes.
4     Q.    That's the kind of guy he is,
5  isn't it?
6     A.    Yes, he is.
7     Q.    You know, your understanding of
8  the accident, if I'm correct, is that he
9  actually put his hand down in the slot right at
10 the bottom part of where the bottom knife comes
11 up and the side knife comes up; isn't that true?
12    A.    Yes.
13    Q.    Is that your understanding?
14    A.    Yes.
15    Q.    Help me out here, I'm looking at
16 this guard Mr. Andrews showed you, but he didn't
17 show it to you very closely, okay.
18         Let me show you something:  That guard
19 doesn't guard down below where his hand would
20 have been, does it?  Because the knife won't
21 even work down there, will it?
22    A.    No.
23         MR. CURTIS:  For the record, what

Page 63

1  exhibit is that?
2          MR. SHEALY:  Plaintiff's Exhibit
3  Number 10.
4     Q.    You have been around these block
5  splitter machines all your life, and you have
6  never seen a guard around the side knife, have
7  you?
8     A.    No, sir.
9     Q.    Because a machine has to operate,
10 and the reason the side knives cut blocks is
11 they have to go out and cut them to do its job;
12 isn't that true?
13    A.    Yes.
14    Q.    Now, as a plant manager and as a
15 block worker, you felt like you knew how to do
16 your job, and that's manufacture block, right?
17    A.    Yes.
18    Q.    You didn't expect E & R to send
19 you a hammer to chip off part of the block that
20 is being manufactured, did you?
21    A.    No.
22    Q.    You didn't expect E & R to send
23 you a steel pole if you decided to clean out

Page 64

1  debris, and not turn the machine off, did you?
2     A.    No.
3     Q.    You don't think that's not being a
4  good manufacturer, do you?
5     A.    No.
6     Q.    You would have expected that as a
7  customer, would you?
8     A.    No.
9     Q.    If you decided to use a pole of
10 wood or tell them to cut it off or move where
11 the cut off, that's your decision that you could
12 make as a customer or as an employer or as a
13 producer of block; isn't that true?
14    A.    Yes.
15    Q.    You wouldn't expect the
16 manufacturer to do that, would you?
17    A.    No.
18    Q.    Now, do you use a lawn mower?
19    A.    Only when I have to.
20    Q.    Have you ever used one?
21    A.    Yes.
22    Q.    Does grass get caught in it
23 sometimes?

Page 65

1    A.   Yes.
2    Q.   If grass was caught in it, but it
3 would still run, would you pull it up and try to
4 beat the swinging blade to try to get the grass
5 out or would you turn it off?
6    A.   I would turn it off.
7    Q.   Do you feel like what Mr. Jackson
8 did was unreasonable to put his hand in this
9 machine where the side knife was located while
10 it was running?
11    A.   Yes.
12    Q.   That is not what a reasonably
13 prudent person would do, is it?
14    MR. ANDREWS:  Object to the form.
15    A.   No.
16    Q.   That's not a what a person would
17 do that had been instructed not to do it on
18 numerous occasions; is that true?
19    A.   True.
20    Q.   Mr. Jackson had been instructed?
21    A.   Yes.
22    Q.   Mr. Jackson admitted that he had
23 done something stupid and that it was his fault

Page 66

1 to you within less than an hour of this accident
2 taking place?
3    A.   Yes.
4    Q.   Mr. Andrews was asking, why didn't
5 this come up.  Well, USA is not even the comp
6 carrier, is it?  The workers' comp is through
7 Able Body labor, isn't it?
8    A.   Yes.
9    Q.   So y'all would have really even
10 had anything to do with Mr. Jackson, that would
11 have been Able Body labor?  That was essentially
12 his employer, wasn't it?
13    A.   Yes.
14    Q.   Did anybody ever asked you, before
15 you got sued, what Mr. Jackson said, that it was
16 stupid, and it's my fault?
17    A.   Did he say he was stupid?
18    Q.   No, he said that.  Did they ever
19 ask you about that?
20    A.   No.
21    Q.   If somebody would have just
22 approached you before you got sued, you would
23 have told them, wouldn't you?

Page 67

1    A.   Yes.
2    Q.   Mr. Jackson testified to something
3 yesterday I need you to help me with.  He said
4 in his deposition that he would reach in there
5 every time with his left hand and pull the block
6 through, and with his right hand, clean debris.
7 That's what he did continually.  As a chunk
8 puller, is that how you do your job?
9    A.   I think there is a
10 misunderstanding about cleaning debris.  There
11 is chunk, which is not considered -- not which I
12 call debris.  When I reach up there to get the
13 chunks, those chunks are clear of the knives
14 already.
15    Q.   So you are not even near the
16 knives, are you?
17    A.   No.  When the block is pushed
18 through it, it pushes the chunks, the chunks are
19 grabbed and thrown in a container.  What John
20 was calling debris and what we call debris is
21 little pieces that gets down, it's stuck, left
22 off the chunk.
23    Q.   That's what would happen when you

Page 68

1 would have to, on an indication, to where you
2 might have to turn the machine off?
3    A.   That's right.
4    Q.   That's why all this stuff about
5 production is really a bunch of hogwash; isn't
6 it?
7    A.   Yes.
8    MR. ANDREWS:  Objection.
9    Q.   Because that's the way a lawyer
10 creates to try to somehow --
11    MR. ANDREWS:  Wait a minute.  Wow,
12 wow, wow.  He doesn't know what a lawyer does.
13    MR. SHEALY:  I know.
14    MR. ANDREWS:  Well, you're on a
15 roll, but he doesn't know what a lawyer does.
16    Q.   Let me ask you this --
17    A.   I put safety first.
18    Q.   I understand.  You do put safety
19 above production, don't you?
20    A.   Yes.
21    Q.   That's why you tell these people
22 from Able Body labor or from your company that
23 if a chunk gets caught in the knife area, just

Page 69

1   like Mr. Jackson, to turn the machine off?
2       A.   Right.
3       Q.   That doesn't happen that often
4   during the day, does it?
5       A.   No.
6       Q.   So if a picture is being painted
7   here, that a worker has got his hands around
8   these knives all the time, that is not even
9   true, is it?
10      A.   He is in a vicinity of the knives,
11  yes, but not in the knives.
12      Q.   They are not in the knives, are
13  they?
14      A.   No.
15      Q.   Not in an area where the knives
16  can hurt him?
17      A.   No.  To do his job.
18      Q.   To do his job, isn't that true?
19      A.   Yes.
20      Q.   So to occasionally ask somebody to
21  walk three steps and take three seconds to turn
22  the machine off, is not unreasonable, is it, by
23  a manufacturer?

Page 70

1       A.   No.
2       Q.   And by the way this machine was
3   set up, that you approved?
4       A.   Yes.
5       Q.   Isn't that true?
6       A.   Yes.
7       Q.   You approved it, didn't you?
8       A.   Yes.
9       Q.   It doesn't happen that often that
10  a piece of block gets lodged down in the knife
11  area, like what happened to Mr. Jackson?
12      A.   No.  Not steadily.
13      Q.   That would mess up production if
14  it happened every other one?
15      A.   Yes, it would.
16      Q.   That isn't how it happens, true?
17      A.   True.  Yes.
18      Q.   If you choose not to turn the
19  machine off, you use the steel pole and go boom,
20  and move on; isn't that true?
21      A.   Yes.
22      Q.   Real simple, right?
23      A.   Yes.

Page 71

1       Q.   That is why you tell them not to
2   put your hands in there, there is no reason to,
3   isn't that true?
4       A.   Yes.
5       Q.   Isn't that true?
6       A.   Yes.
7       Q.   Your accident wasn't like
8   Mr. Jackson's accident, was it?
9       A.   No.
10      Q.   Not even close?
11      A.   No.
12          MR. ANDREWS:  Objection.
13      Q.   So it's not even substantially
14  similar to his accident, was it?
15          MR. ANDREWS:  Objection.
16      A.   No.
17      Q.   Okay.  And Able Body Laborer
18  wouldn't read the owner's manual, would they?
19      A.   No.
20      Q.   That's not something you have the
21  temporary help do; isn't that true?
22      A.   Right.
23      Q.   You would be the one that you

Page 72

1   would expect how to train people how to clean
2   out debris; isn't that true?  Or let me say
3   this, your people, not the manufacturer.  You
4   wouldn't expect Ron Neese --
5          MR. ANDREWS:  Objection.
6       Q.   -- to train your people how to
7   clean out debris, would you?
8          MR. ANDREWS:  Objection.
9       A.   No.
10      Q.   Would that even be reasonable?
11      A.   No.
12      Q.   Would that be ludicrous to even
13  suggest that?  That's something that you know
14  how to do; isn't that true?
15      A.   Yes.
16      Q.   You would train people how to
17  clean debris out and how to be safe around the
18  machine, and how to do all the proper things
19  that ought to be done in running a block
20  operation, wouldn't you?
21      A.   Yes.
22      Q.   Now, you said you would on an
23  occasional see a worker put a hand in there?

Page 73

1    A.    Yes.
2    Q.    Is that true?
3    A.    Yes.
4    Q.    You would reprimand them or at
5  least get on them and tell them not, and they
6  would stop?
7    A.    Yes.
8    Q.    If they didn't, you would fire
9  them, or tell them to go home?
10    A.    Yes.
11    Q.    The way your operation is set up
12  and the way this splitter is used, do you feel
13  the way it's set up is safe?
14    A.    Well, there's not a lot you could
15  do to that splitter to make it any safer and
16  still produce the kind of product that we
17  produce.
18    Q.    Let me ask it this way:  You
19  participated in setting up this machine, did you
20  not?
21    A.    Yes.
22    Q.    And I guess you had some thoughts
23  about how you wanted it to set up and how it

Page 74

1  worked best, true?
2    A.    Yes.
3    Q.    In fact, you decided how it would
4  be set up?
5    A.    Yes.
6    Q.    Not the manufacturer; isn't that
7  true?
8    A.    Yes.
9    Q.    What they did is send it to Besser
10  or through Besser, but they shipped it down
11  there and you set it up totally?
12    A.    Yes.
13    Q.    E & R didn't know how exactly you
14  were going to use it or in what way you were
15  going to use it, per se, they just sent you a
16  block splitter, you set it up so you could make
17  production and produce your product the best way
18  you felt possible; isn't that true?
19        MR. RODGERS:  Objection.
20    Q.    True?
21    A.    Yes.
22    Q.    How long have you been in the
23  block production and manufacturing business?

Page 75

1    A.    Thirty-seven years.
2    Q.    Do you feel like you are
3  experienced?
4    A.    Yes.
5    Q.    Do you feel like you are
6  knowledgeable?
7    A.    Yes.
8    Q.    Do you feel like you are
9  knowledgeable of block splitters?
10    A.    Yes.
11    Q.    Do you feel like you are
12  knowledgeable about how they work and operate in
13  the safety of block splitters?
14    A.    Yes.
15    Q.    Do you feel like this block
16  splitter that you have at your plant that you're
17  still using is a reasonably safe block splitter?
18    A.    Yes.
19    Q.    And you're still using this block
20  splitter?
21    A.    Yes.
22    Q.    And, I think, we have asked this,
23  but Block USA, your company, doesn't put safety

Page 76

1  ahead of production, does it?
2    A.    Yes, they do.
3        MR. SHEALY:  Strike the question.
4    Q.    Block USA doesn't put production
5  ahead of safety?
6    A.    No, they don't.
7    Q.    In fact, Mr. Jackson, he got paid
8  $8 an hour whether he produced any block or
9  didn't produce, he didn't get any production,
10  did he?
11    A.    No.
12    Q.    There wasn't any reason for him to
13  not go turn the machine off?
14    A.    No.
15    Q.    Did you also instruct him to turn
16  the machine off and not put his hand in there?
17    A.    Yes, I did.
18    Q.    Was he aware that he was to turn
19  the machine off before he ever cleaned out any
20  debris in the area around or near where the
21  knives are located?
22    A.    Yes.
23    Q.    You told him that before this

Page 77

1  accident, did you not?
2      A.    Yes.
3      Q.    He understood that?
4      A.    Yes.
5      Q.    Did he acknowledge to you he
6  understood that?
7      A.    Yes, he did.
8      Q.    Did he acknowledge to you that if
9  you put your hand where the knives are located,
10 that that is a hazardous place he could be
11 injured?
12     A.    Yes.
13     Q.    He knew that?
14     A.    Yes.
15     Q.    You talked to him about that?
16     A.    Yes.
17     Q.    In fact, you showed your hand what
18 the knives could do to you?
19     A.    Yes.
20     Q.    Okay.  When you injured your hand,
21 you didn't sue Ron Neese or the manufacturer,
22 did you?
23     A.    No.

Page 78

1      Q.    You didn't feel like they did
2  anything wrong, did you?
3      A.    No.
4      Q.    You felt like you just made a
5  mistake, it was your fault, and you honed up to
6  it, and that was that; isn't that true?
7      A.    Yes.
8      Q.    You didn't sue Besser Company
9  either, did you?
10     A.    No.
11     Q.    What's your education?
12     A.    High school.
13     Q.    High school.  What's your
14 experience around block splitters such as the
15 one that this lawsuit is about?
16         MR. ANDREWS:  Asked and answered.
17 Objection.
18     A.    What?
19         MR. RODGERS:  How long have you
20 been working around splitters?
21     A.    Twenty-five years.
22     Q.    Have you had training?
23     A.    Yes.

Page 79

1      Q.    Tell me about your training?
2      A.    Well, I attended Alpena Community
3  College in block making, splitter machines.
4      Q.    Did you take courses on them?
5      A.    Yes.
6      Q.    Have you gained knowledge as to
7  how they operate and work?
8      A.    Yes.
9      Q.    As a part of that, have you taken
10 safety courses?
11     A.    Safety courses towards splitter
12 or --
13     Q.    Yeah.  Splitters and in general.
14     A.    Not directly to splitters, no.
15     Q.    But you had just general safety
16 courses?
17     A.    Yes.
18     Q.    Would you consider yourself
19 knowledgeable of splitters?
20     A.    Yes, I would.
21     Q.    Would you consider this splitter
22 that is at your plant being used probably right
23 now, as a reasonably safe machine when put to

Page 80

1  its intended use?
2          MR. ANDREWS:  Objection.
3      A.    Yes.
4      Q.    Would you agree it's designed in
5  its operation that's reasonably safe for your
6  workers and the people to use it?
7          MR. ANDREWS:  Objection.
8      A.    Yes.
9          MR. SHEALY:  That's all.
10         EXAMINATION
11 BY MR. CURTIS:
12     Q.    Hi, Mr. Mackey.  My name is Corey
13 Curtis, I represent one of the defendants in
14 this case, Besser Company.  I have a few
15 questions I need to follow up with Steadman.
16         When did your plant start making these
17 diamond blocks, the type of blocks being
18 produced when Mr. Jackson had his accident?
19     A.    Approximately six years ago.
20     Q.    Now, I know Mr. Andrews asked you
21 about some information that was contained in the
22 manual for the CM-24.  This may have been marked
23 as an exhibit previously, can you take a look at

Page 81

1   that.
2       First off, is this the manual for the
3   splitter that's at your plant now, the one
4   involved in the accident?  On a note at the top,
5   it says CM-24 HFRC Manual.
6       A.   Best of my knowledge, it's the
7   same one.
8       Q.   Hang on to it, I have flagged a
9   couple of things I want to ask you a couple of
10  questions.  If you can turn to the first flagged
11  item there.  Go down to the fourth paragraph.
12  Can you take a look at the fourth paragraph, it
13  says: Do not attempt to remove broken block.
14      A.   Uh-huh, (affirmative).
15      Q.   Can you review that paragraph,
16  please.
17      A.   This one?
18      Q.   Yeah.
19      A.   (Witness reading.)
20      Q.   Have you had a chance to look at
21  it?
22      A.   Uh-huh, (affirmative).
23          MR. ANDREWS:  Is that a yes?

Page 82

1      A.   Yes.
2      Q.   Do you agree with me that the
3   manual does say that one is not to attempt to
4   remove broken block or to perform any kind of
5   maintenance without shutting off the machine?
6      A.   Yes.
7      Q.   Let's move to the next tabbed
8   item.  Go down to the very last thing that says,
9   "Danger".  Take a look at that sentence or two.
10  In the decal to the right.  Can you read for me
11  what that says?
12      A.   Do not reach under or around the
13  barrier surrounding the splitting edge.
14      Q.   Can you also take a look at the
15  decal and tell me what that says.
16      A.   Blade hazard. Stay clear of
17  splitter.  Follow lock out procedure before
18  servicing.
19      Q.   Do you agree with me then that the
20  manual does address a person putting -- or
21  strike that.  Do you agree the manual says a
22  person cannot stick their hand in or around the
23  blades of the machine?

Page 83

1      A.   Yes.
2      Q.   Okay.
3          MR. SHEALY:  Do you want to mark
4  that as an exhibit?
5          (Whereupon, Defendant's Exhibit 1
6  was marked for identification.)
7  BY MR. CURTIS:
8      Q.   Can you describe for me how your
9  accident was different than Mr. Jackson's
10  accident?
11      A.   My accident?
12      Q.   Yeah.  What facts make it
13  different than Mr. Jackson's.
14      A.   Mr. Jackson was trying to outrun
15  the machine.  I merely wasn't looking in that
16  direction.  I wasn't pulling a chunk.  Like I
17  said, I just reached over the top of the block
18  and grabbed the block.  I was engaging in a
19  conversation with the rental person, and stuck
20  my hand too far.
21      Q.   Which blade caused your injuries?
22      A.   Side knife.
23      Q.   Side knife?

Page 84

1      A.   Right.  On the other side.
2      Q.   Maybe you can explain this to me,
3   I want to be clear, I'm not trying to cause
4   problems for you or anything.  If you go to
5   Interrogatory Number 13.  What your response
6   says, it's a question about your accident.  It
7   says: Yes, I was injured and lost two fingers
8   and a portion of a third finger when I was
9   operating the machine and not paying attention
10  and placed my hand between the block and the
11  blade, the machine activated the top blades when
12  my hand was on the block and crushed my hand.
13  Can you explain to me --
14          MR. RODGERS:  His lawyer made a
15  mistake.
16      A.   No, they weren't on the top.
17      Q.   Fair enough.  Okay.  The only
18  reason I'm asking is just so I understand
19  exactly how that happened.
20      A.   Right.
21      Q.   Okay.  Was your accident reported
22  to Besser Company?
23      A.   Not to my knowledge, no.

Page 85

1    Q.    Was your accident reported to E &
2    R?
3    A.    No.
4    Q.    Okay.
5    A.    It was brought up during a
6    conversation, but it wasn't -- the call wasn't
7    directly -- I was ordering parts and I started
8    talking to Ron about it.
9    Q.    About when was that?
10   A.    A month after it happened.
11   Q.    When you say Ron, did you mean
12   Ron --
13   A.    Ron Neese, right.
14   Q.    Do you believe Mr. Jackson caused
15   this accident?
16   A.    Yes.
17   Q.    Do you believe it was his fault?
18   A.    Yes.
19   Q.    Do you think there was anything
20   wrong with the machine that caused the accident?
21   A.    No.
22   Q.    Again, in one of your discovery
23   responses, you say: Mr. Jackson did not shut

Page 86

1    off the machine as he had been instructed to do
2    prior to placing his hand in the operational
3    section of the block splitter.  In addition,
4    Mr. Jackson was provided with a tool to remove
5    chunks of concrete, which may have been in the
6    way, which may have interfered with the
7    operation of the machine, which he did not
8    utilize.  Which tool was he given?
9    A.    It was just a piece of wood.
10   Q.    Just a piece of wood?
11   A.    Uh-huh, (affirmative).
12   Q.    I know it's been said before that
13   Mr. Jackson was told many times not to stick his
14   hand in the machine while it was running.  Do
15   you know approximately how many times he was
16   told that?
17   A.    That's probably the most
18   emphasized thing that's brought up in the plant,
19   almost on a daily basis.  Splitter, don't stick
20   your hand in there.  It's something that's
21   brought up on a daily basis.
22   Q.    So Mr. Jackson would no doubt be
23   aware of that, not to stick his hand in the

Page 87

1    machine?
2    A.    No doubt.
3    Q.    Going back to the discovery
4    responses, it's Number 11.  Then your response,
5    the question is:  Has the subject product been
6    altered in any way?  The response is:  Yes,
7    after the incident, the manufacture provided
8    some rubber flaps.  Who provided the rubber
9    flaps?
10   A.    Ron Neese.
11   Q.    That was after the Jackson
12   accident?
13   A.    Yes.
14   Q.    Who installed them?
15   A.    Dewayne Biggs and myself.
16   Q.    Where were they installed?
17   A.    On the splitters?
18   Q.    Yeah, what were they for?  Where
19   were they put?
20   A.    They were put above the head.
21   Q.    The flaps that were given after
22   the accident, those would not have prevented
23   Mr. Jackson's accident?

Page 88

1    A.    No.
2    Q.    You're sure those flaps were not
3    included when the machine was originally
4    delivered to the plant in 1997?
5    A.    They were not on there.  I
6    personally unloaded the splitter myself.  It was
7    not on the splitter.
8    Q.    Okay.  After your own accident,
9    did any safety policies change at the plant?
10        MR. RODGERS:  With regard to?
11   Q.    Just the day before your accident,
12   then you had your accident going forward, were
13   employees trained differently, people told to be
14   more careful on the machine?
15   A.    Yeah, it was more emphasized.  But
16   we're very safety oriented.  It's something that
17   we work on a daily basis.  Weekly basis.  And
18   anybody that gets around any equipment over
19   there are told about the safe and unsafe things
20   to do and not to do.
21   Q.    Do you tell most of -- or do you
22   tell employees, generally, about your accident?
23   A.    Right away.

Page 89

1    Q.    When a new employee arrives on the
2  job site, is that one of the first things that
3  you tell them?
4    A.    Yes, it is.
5    Q.    Do you believe that's a good way
6  to warn employees about the potential dangers of
7  sticking your hand where it shouldn't be?
8    A.    Yes, I do.
9    Q.    Did you perform routine
10  maintenance on the machine?
11    A.    Yes.
12    Q.    Can you tell me about what type of
13  maintenance you performed on the machine?
14    A.    We replaced parts constantly on
15  it. Greasing it, replaced barrons, spent a lot
16  of money on the splitter.
17    Q.    Is there a set schedule?
18    A.    No. No set schedule.
19      MR. CURTIS: Okay. I'm done.
20      MR. ANDREWS: I have a few follow
21  up questions.
22      EXAMINATION
23  BY MR. ANDREWS:

Page 90

1    Q.    You said there were some warnings
2  that were added to this machine at some point.
3  You said they came with some warnings, then
4  there were some that were added --
5    A.    Stickers?
6    Q.    Right.
7    A.    Yeah.
8    Q.    That was added or sent by Besser
9  or E & R
10      MR. CURTIS: Object to the form.
11    A.    It was just stickers I had there
12  in the office, and I stuck them up on the panel.
13    Q.    You had some in your office, and
14  you added them to the machine?
15    A.    Yes, I did.
16    Q.    There was testimony -- you know
17  Ron Neese, don't you?
18    A.    Yes, I do.
19    Q.    You are friends with Ron Neese,
20  aren't you?
21    A.    Yes.
22    Q.    How long have you known Ron Neese?
23    A.    Ever since I had that splitter,

Page 91

1  ten years.
2    Q.    But you consider him to be a
3  friend, don't you?
4    A.    Yes.
5    Q.    You wouldn't do anything to hurt
6  Mr. Neese, would you?
7    A.    No, I wouldn't.
8    Q.    There is some testimony from
9  Mr. Neese that he had sent some extra stickers
10  on this machine --
11    A.    He did.
12    Q.    You remember that now?
13    A.    Yes.
14    Q.    You didn't remember that a while
15  ago?
16    A.    Yeah, true. I didn't remember it
17  a while ago, but he did send stickers.
18    Q.    It was part of an upgrade program
19  he was doing, do you remember that, or did you
20  know that?
21    A.    No.
22    Q.    Are you an engineer?
23    A.    No, I'm not.

Page 92

1    Q.    Do you know about when warnings
2  can be used as opposed to when design of a
3  machine -- when you should design out hazard or
4  guard against a hazard or risk of injury? Do
5  you know anything about that?
6    A.    Yes.
7    Q.    What is your understanding about
8  that then?
9    A.    I can understand where to put a
10  guard and where not to put a guard.
11    Q.    Did you know then therefore that
12  you were supposed to design out a hazard, then
13  if you can't design out the hazard, then you are
14  supposed to use a guard to from protect somebody
15  from getting hurt, and only if you can't design
16  out the hazard or put a guard on to prevent an
17  injury, then you can only rely on warning, did
18  you know that?
19    A.    Yes.
20    Q.    Did you know then that the
21  warnings on this machine and in this manual,
22  these are the last step in this design? You
23  already knew that? Of this design phase or

Page 93

1    hierarchy, your testimony is you already knew
2    that?
3        A.    Yes.
4        Q.    Do you know why it is E & R and
5    Besser skipped over the design out and guard
6    against steps, do you know?
7            MR. CURTIS:  Object to the form.
8        A.    No.
9        Q.    Do you know why it is if a company
10   has had at least nine other accidents, before
11   the three we know that happened here in
12   Andalusia, why they didn't take steps to design
13   out this potential for injury, guard against
14   this potential for injury before they started
15   warning against it?
16           MR. CURTIS:  Object to the form.
17       A.    No.
18       Q.    Wouldn't you expect they would
19   make the machine as safe as they possibly could
20   and where they could design out a potential for
21   injury, they ought to do that?
22           MR. SHEALY:  Object to the form.
23           MR. CURTIS:  Object to the form.

Page 94

1            MR. RODGERS:  Object to the form.
2        Q.    You can answer.
3        A.    Yes.
4        Q.    You expect that to be reasonable
5    and prudent actions too, wouldn't you?
6        A.    Yes.
7            MR. CURTIS:  Object to the form.
8        Q.    You know that from being around
9    these blocks splitters all these years, don't
10   you?
11       A.    Yes.
12       Q.    You know this from all this
13   education you received at Alpena Michigan, don't
14   you?
15       A.    Yes.
16       Q.    Do you know Besser is from Alpena,
17   Michigan?
18       A.    Yes.
19       Q.    Are they the one that put on the
20   concrete school that you went to?
21       A.    Yes.
22       Q.    What certifications have you had
23   from Besser?

Page 95

1        A.    I don't really have
2    certifications.
3        Q.    They are the ones that sponsored
4    that school that you went to?
5        A.    Yes.
6        Q.    Are you friends with the folks at
7    Besser too?
8        A.    The ones that I know.
9        Q.    Which ones do you know at Besser?
10       A.    Bob Roland.  Kevin Curtis.
11       Q.    Who else?
12       A.    That's about it.
13       Q.    Have you talked to anyone at
14   Besser about this lawsuit?
15       A.    No.
16       Q.    Have you talked to Ron Neese about
17   this lawsuit?
18       A.    Yes.
19       Q.    What have you talked about with
20   Mr. Ron Neese?
21       A.    Not a lot.  He asked him if I
22   heard anything.  I asked him if he heard
23   anything.  That's basically it.

Page 96

1        Q.    What about your friends at Besser,
2    you wouldn't want to do anything to hurt them
3    either, would you?
4        A.    No.
5        Q.    Now Mr. Shealy asked you if you
6    expect somebody to send you a hammer to chip off
7    concrete block, but you would expect them to
8    make a machine as safe as it could to keep you
9    and your workers from getting your hands cut
10   off, wouldn't you?
11       A.    I feel the machine is safe for
12   what we do.
13       Q.    Would you expect if there are
14   other alternative designs they could take to
15   make this machine safer, you would want them to
16   do it, or you would want them to skip that?
17           MR. CURTIS:  Object to the form.
18       Q.    You can answer.
19       A.    Yes.
20       Q.    You would want them to do that,
21   wouldn't you?
22       A.    Yes.
23       Q.    That's a reasonable and prudent

## Page 97

1 action for somebody to do, isn't it?
2    A.   Yes.
3    Q.   Especially somebody in the
4 business like Besser and E & R of making
5 machines like this, that have the designs and
6 have taken on and know about nine other
7 lawsuits, nine other accidents -- know at least
8 one lawsuit where someone designed a guard for
9 this machine, you would want them to implement
10 it if they could, wouldn't you?
11    MR. CURTIS:  Form.
12    Q.   That would be reasonable and
13 prudent, wouldn't it?
14    MR. CURTIS:  Form.
15    A.   Yes.
16    MR. ANDREWS:  I assume when you're
17 saying form, that is some sort of an objection.
18    MR. CURTIS:  Well, you're talking
19 fast, so --
20    MR. ANDREWS:  Is that a yes?
21    MR. CURTIS:  If I say form, that's
22 shorthand for object to the form.
23    MR. ANDREWS:  Okay.  I just wasn't

## Page 98

1 familiar with it.
2    Q.   Would you agree with E & R or
3 Mr. Neese that no risk of injury is acceptable
4 if it can be designed out or guarded against?
5 Would you agree with that?
6    A.   Yes.
7    Q.   You got your two fingers cut off,
8 was that a painful experience for you?
9    A.   Yes.
10    Q.   Would you expect that had to be a
11 painful experience for Mr. Jackson?
12    A.   Yes.
13    Q.   Even though he is a rental person?
14    A.   Yes.
15    Q.   It's a serious event for somebody
16 to lose their fingers; isn't it?
17    A.   Yes.
18    Q.   Do you think Mr. Jackson meant to
19 lose his fingers?
20    A.   I think he could have prevented
21 it.
22    Q.   Do you think he wanted to lose his
23 fingers?

## Page 99

1    A.   No.
2    Q.   Do you think he is proud he lost
3 his fingers?
4    A.   No.
5    Q.   Do you think it hurt him?
6    A.   Yes.
7    Q.   Don't you think if something could
8 have been done on this machine to guard it and
9 protect him from losing his fingers, that it
10 should have been done?
11    A.   Well, like I said before, the
12 product we run, I just don't think you could
13 do --
14    Q.   The question is --
15    MR. SHEALY:  Objection.  Let him
16 answer his question.  I know you don't like the
17 answer, but --
18    Q.   Well, go ahead and answer then.
19    A.   The products we run, I don't think
20 you can make it safer than what it is right now.
21 It would be in the way, you couldn't produce the
22 product we produce if you had any more guards on
23 there.

## Page 100

1    Q.   Okay.
2    A.   You couldn't do it.
3    Q.   That's your understanding?
4    A.   That's my understanding.
5    Q.   Now, E & R and Besser, both
6 testified and we can see other products they got
7 that could make it safer, do you know why they
8 can do that?
9    MR. SHEALY:  Object to the form.
10    MR. CURTIS:  Object to the form.
11    MR. SHEALY:  That is totally
12 wrong.
13    Q.   You can answer.
14    A.   No.
15    Q.   No what?
16    A.   I don't know.  I don't know how
17 they could do it.
18    Q.   No, you don't know how they could
19 do it?
20    A.   No.
21    Q.   You're not saying they couldn't,
22 you're just saying you don't know?
23    A.   Right.

Page 101

1    Q.    Did you know Mr. Neese testified
2 under oath that he suggested to you or suggested
3 to your company that you put these extra stop
4 buttons on these machines where the chunk
5 pullers were going to be standing, but y'all
6 didn't want it?
7         MR. CURTIS:  Object to the form.
8         MR. SHEALY:  That is totally
9 wrong.
10    Q.    Did you know that?
11        MR. CURTIS:  Object to the form.
12        MR. SHEALY:  Show him the
13 deposition where he says that.
14        MR. ANDREWS:  Sure I will.
15        MR. SHEALY:  Show him where he
16 says this.
17    A.    No, I didn't know that.
18    Q.    Page 140 to Mr. Niece's
19 deposition.  I will read it into evidence.  I
20 will start on Line 4:  Why is the panel located
21 there -- the panel where the stop button is --
22 why is the panel located there and not on the
23 other side of the head where you anticipate

Page 102

1 somebody may be standing under some circumstance
2 so the person can access that mushroom --
3 meaning the stop button.
4         His answer: That's why we recommend
5 auxiliary stop and starts on both ends of the
6 machine is what he's talking about.
7         Question: So you do recommend that there
8 be one there?
9         His answer: Yeah.  It says it right in
10 the manual.
11        And I asked:  Was it offered to this
12 plant? No.
13        Why not?  Because they furnished their
14 own emergency stop/start stations.
15        Did you know --
16        MR. SHEALY:  That's a lot
17 different than what you just said.
18        MR. ANDREWS:  His testimony is
19 what it is.
20    Q.    Did you know these stop/start
21 buttons could be put on the end of this machine,
22 either end?
23    A.    You can put a start/stop button

Page 103

1 anywhere.
2    Q.    Did you know they offered them and
3 suggested them in the manual?
4    A.    No.
5    Q.    This manual that we marked as an
6 exhibit today, was that the same manual that you
7 told Mr. Shealy that the Able Body people -- the
8 rental folks, they don't read?
9    A.    Able Body folks don't read it.
10    Q.    That's the same manual we marked
11 today, right?
12    A.    Yes.
13    Q.    Okay.  Defendant's Exhibit 1 to
14 your deposition; is that correct?
15    A.    Yeah.
16    Q.    You said the workers, when they
17 are working around the splitter, they are not
18 working around the knives, but at least three
19 people had their hands cut up in this machine,
20 haven't they?  That's close enough to the
21 knives, isn't it?
22    A.    Yes.
23    Q.    Now, your accident, there was some

Page 104

1 testimony about whether your accident was
2 substantially similar.  Do you know what that
3 term means, substantially similar, in any kind
4 of legal sense?
5    A.    Legal sense, no.
6    Q.    Now, your accident happened on the
7 side knives of the machine, did it not?
8    A.    Yes it did.
9    Q.    There are only two of those?
10    A.    Yes.
11    Q.    Do they work in a different manner
12 or work in the same manner?
13    A.    Work in the same manner.
14    Q.    You also said you thought
15 Mr. Jackson was trying to outrun the machine.
16 How do you know that?  Or in other words, do you
17 know that or is that what you've been told?
18    A.    That's what he told me.
19    Q.    Now, when you unloaded the
20 machine, did anybody else help you unload this
21 machine?
22    A.    There were -- my employees were
23 there, but I was drove the fork lift.  I picked

Page 105

1  it off the low boy, and took it inside the
2  plant.
3      Q.    You are certain that when you
4  unloaded this machine, there were no guards
5  around the splitter?
6      A.    No guards.
7      Q.    Do you know why that is?
8      A.    I have no idea.
9      Q.    Did you ever ask Ron Neese why
10 that is?
11     A.    I didn't know there were supposed
12 to be guards there. There was nothing to ask.
13     Q.    Nothing on this machine
14 indicated --
15     A.    Like I said before, I don't
16 consider them guards.
17         MR. RODGERS: You have answered.
18     Q.    Nothing on this machine indicated
19 there were any guards that were supposed to be
20 in place.
21     A.    No.
22     Q.    What kind of documents are
23 typically created after an accident where

Page 106

1  somebody loses their fingers?
2         MR. RODGERS: For an employee at
3  Block USA?
4         MR. ANDREWS: Any. Either.
5         MR. RODGERS: Do you do a report
6  if an Able Body person is injured?
7      A.    No.
8      Q.    None at all?
9      A.    No. Just call Able Body.
10     Q.    And let them take it?
11     A.    Yes.
12     Q.    Does the safety director ever do
13 any kind of written reports at all in Dothan?
14     A.    Our safety?
15     Q.    Correct. For an Able Body rental
16 person?
17     A.    No. Not to my knowledge.
18         MR. ANDREWS: Thank you. That's
19 all I have.
20         EXAMINATION
21 BY MR. CURTIS:
22     Q.    Let me ask this question: Did any
23 Besser people participate in the installation of

Page 107

1  the machine?
2      A.    No.
3      Q.    Do you get a trade magazine from
4  Besser called Concrete Impressions?
5      A.    Yes.
6      Q.    Have you seen new model splitters
7  in there, in any of the Concrete Impressions
8  magazines that you have looked at?
9      A.    Not really. Not that I've paid
10 any attention to.
11     Q.    When you were attending the
12 training at Alpena Community College, did you
13 notice any new models?
14     A.    That was years ago.
15         MR. CURTIS: That's all I have.
16         EXAMINATION
17 BY MR. ANDREWS:
18     Q.    Just out of curiosity, what years
19 was that?
20     A.    It was in the 70's and 80's when I
21 attended.
22     Q.    Who at Besser would have
23 participated in that education?

Page 108

1      A.    That would have known I was
2  there?
3      Q.    Yes, sir.
4      A.    Bob Roland.
5      Q.    What is his position at Besser?
6      A.    He was an instructor.
7      Q.    At the college?
8      A.    Yes.
9      Q.    What's the name of the college?
10     A.    Alpena Community College.
11     Q.    What is his position at Besser, if
12 you know?
13     A.    He is retired now.
14     Q.    Do you keep in contact with him at
15 all?
16     A.    I haven't talked to him in a
17 while.
18         MR. ANDREWS: Thank you.
19         Ended at 1:27 p.m.
20         FURTHER DEPONENT SAITH NOT
21
22
23

Page 109

```
 1            C E R T I F I C A T E
 2
 3    STATE OF ALABAMA )
 4    HOUSTON COUNTY  )
 5
 6         I hereby certify that the above
 7    and foregoing deposition was taken down by me in
 8    stenotype, and the questions and answers thereto
 9    were transcribed by means of computer-aided
10    transcription, and that the foregoing represents
11    a true and correct transcript of the deposition
12    give by said witness upon said hearing.
13         I further certify that I am
14    neither of counsel nor of kin to the parties to
15    the action, nor am I in any way interested in
16    the result of said cause.
17
18
19
20    _____
      APRIL BENDINGER, CCR
      CERTIFICATE NUMBER CCR-384
21
      My Commission Expires
22    June 8, 2008
23
```

## CM-24 HFRC MANUAL

### PART NO. A34001
### INDEX

PRODUCT SAFETY POLICY STATEMENT
SAFETY INFORMATION
MAJOR HAZARDS AND THE IDENTIFYING LABELS
WARNING LABEL LOCATIONS
OPERATING MANUAL
LUBRICATION & PERIODIC MAINTENANCE
MACHINE ADJUSTMENTS
PROGRAMABLE CONTROLLER LADDER DIAGRAM
A-B PC MANUAL
DODGE SHAFT MOUNT MANUAL
LINCOLN MOTOR MANUAL
CLUTCH BRAKE SERVICE MANUAL
ADJUSTMENT OF CONTOUR-MATIC
D2600 CONTROL
VICKERS HYDRAULIC FLUID
VICKERS TROUBLESHOOTING
WHITE RS MOTORS
HYDROLINE PARTS LIST - 3 pages
HYDROLINE N5 CATALOG
VICKERS PARTS - FILTER
VICKERS SERVICE - AIR BLEED
VICKERS PARTS - RETURN FILTER
VICKERS SERVICE - FILTER
VICKERS PARTS - PRESS. RED. VALVE
VICKERS SERVICE - STACKING VALVE
VICKERS PARTS - PRESSURE RED. MODULE
VICKERS - CATALOG - SYSTEM STAK VALVES
VICKERS - PARTS - DIRECTIONAL VALVES
VICKERS - SERVICE - DIRECTIONAL VALVES
VICKERS - SERVICE - DIRECTIONAL VALVES
VICKERS - SERVICE - PISTON PUMP
HYDRAULIC SCHEMATIC
CONNECTION DIAGRAM
PARTS LIST  1-50
PARTS LIST  51-72
HEAD ASSEMBLY
STRUCTURAL FEEDER

DEFENDANT'S
EXHIBIT

E & R MANUFACTURING COMPANY, INC.

August 16, 1991

CORPORATE PRODUCT SAFETY POLICY STATEMENT

It is and shall continue to be a primary objective of
E & R Manufacturing Company to provide its customers with
reliable and safe products. We, therefore, are committed to
continue surveillance of the design and development as well
as sale, manufacture, installation and service of our
products to prevent as much as humanly possible the
occurrence of injury and loss to those who use our products.

Every employee is encouraged to follow safe work
practices and to indentify hazards in the workplace or
elsewhere that may be associated with the products we
manufacture, testing, marketing, shipping and product use.

We will endeavor to assure that these objectives are
everlasting and each operating activity has the
responsibility for product safety.

Managers and other employees are expected to support
these goals, to report any perceived discrepancies which
would, if uncorrected, result in adverse customer reaction,
potential injury or product failure.

Signed,

E & R Mfg. Co., Inc.

Paul A. Mangis
President

# E & R Mfg. Co., Inc.

## Mission Statement

It is our mission to continue to improve the design, quality, and safety of our products while extending our utmost attention to the past and future customers' needs.

Maintaining world markets, profitability, and respect for the environment through total employee involvement shall be our policy.

### SAFETY INFORMATION

⚠️ **WARNING**--The safety alert symbol is used throughout this manual. Failure to follow directions is likely to result in injury, loss of limb, or life.

To protect yourself from injury <u>Read</u>, <u>Understand</u>, and <u>Follow All</u> the information in this manual. If you have any questions, call the factory. 765-279-8826.

Make sure that everyone involved with the operation and maintenance of the splitter thoroughly understands the information in this manual.

<u>DO NOT</u> attempt to remove broken block or perform any type of maintenance without shutting the disconnect <u>off</u> and follow the lock-out procedure. If your plant has yet to adopt the lock-out rule, remember that it has been mandated **by OSHA**.

<u>DO NOT</u> attempt to defeat the disconnect interlock on the panel door. Keep the panel door fastened.

The pilot light is the transformer type which has a longer bulb life. Remember --pilot lights are only indicators. When the bulb burns out replace it immediately.

Electrical -- The splitter must be wired as per NEMA or local codes. The splitter <u>must be grounded</u>. Remote emergency stop and start stations should be located near the cuber or block machine. There <u>must</u> be an electrical interlock between the depalleter and the splitter to maintain pallet spacing and also to prevent double cycling of the depalleter. If the splitter shuts down then the depalleter should be de-energized.

Keep all shields and guards in place.

## MAJOR HAZARDS AND THE
## IDENTIFYING LABELS

DO NOT reach under or around the barriers. If the splitter requires service, turn the power off and follow the Lock-Out procedure.



Keep hands away from the machine and from between the block and the guides. The splitter is a part of a production line and will start automatically.



The disconnect is equipped with an interlock to prevent you from opening the panel door with the power "on". DO NOT attempt to override the interlock. Keep the panel door closed and fastened.



# SAFETY INSTRUCTIONS

## SUGGESTED LOCKOUT PROCEDURE

1. **Announce lockout to other employees.**

2. **Turn power off at main panel.**

3. **Lockout power in off position.**

4. **Put key in pocket.**

5. **Clear machine of all personnel.**

6. **Test lockout by hitting run button.**

7. **Block, chain or release stored energy sources.**

8. **Clear machine of personnel before restarting machine.**

Hazard Communication Systems, Inc. © 1990    Reorder No. 1590-ER4

The lockout procedure <u>must</u> be followed before
doing any maintenance or repairs to the splitter.



The splitter starts and stops automatically. Follow the lockout procedure before attempting any repairs or maintenance.

<u>Always</u> keep the guards in place. Follow
the lockout procedure <u>before</u> removing a
guard.



This warning label is clearly visible if
a guard has been removed. The disconnect
must be locked out. <u>Do Not</u> Operate the
Machine.



This warning label is clearly visible if
a guard has been removed. The disconnect
must be locked out. <u>Do Not</u> operate the machine.



## WARNING LABEL LOCATIONS

| | PART NO. | DESCRIPTION | NO. REQ'D |
|---|---|---|---|
| 1 | A25146 | **CAUTION**–Starts & Stops Automatically | 1 |
| 2 | B32314 | **DANGER**–Hazardous Voltage | 1 |
| 3 | B32313 | Lockout Procedure | 1 |
| 4 | A25147 | Keep Hands Clear | 4 |
| 5 | A32316 | **DANGER**–Pinch Point | 2 |
| 6 | A32329 | **WARNING** – Keep Guard | 3 |
| 7 | A32331 | **WARNING** – Guard Removed | 3 |
| 8 | B32315 | **DANGER** – Blade Hazard | 2 |
| 9 | A32330 | **WARNING** – Blade Guard Removed | 2 |



### CM-24 HYDRAULIC FEED INSTALLATION

 **WARNING**

Read the manual carefully before attempting to operate or service the machine. If there is something that you don't understand, please call the factory - 317-279-8826.

For best results the splitter should be located directly behind the depalleter. A limit switch or eye must be installed to control the depalleter. A gap of at least 6 inches must be maintained between pallet loads. The splitter can also be installed after the turn-over or after a belt or gravity conveyor, but the gap between pallet loads must be maintained. Do not fasten conveyors to the cutting table.

Verify that the voltage specified on the tag on the control panel is correct.

 **WARNING**

The splitter <u>and</u> power unit must be grounded. The wiring must meet NEMA or local codes. Do not use temporary hook-ups.

Fill the hydraulic reservoir with oil. Use Union 76-UNAX AW32 or equivalent. See the enclosed sheets covering hydraulic oil. Do not use synthetic oil without consulting Vickers. The capacity of the reservoir is 60 gallons. Fill to within 3 inches of the top.

The double wire braid hose must be connected to the pressure side of the power unit. The return line is single braid. The hoses are identified by marks on the valve manifold.

You are now ready to check for rotation of the splitter and power unit motors.

  

First, jog the splitter motor. The rotation must be as indicated. Let the motor run.

Second, jog the hydraulic power unit motor to check rotation. The rotation <u>must</u> be as indicated. Reverse rotation may ruin the pump. After you are sure that the pump is running in the right direction, continue jogging the motor to allow the air bleed valve to purge air from the circuit. This normally takes 30 to 45 seconds.

<u>HYDRAULIC COMPONENTS</u>
<u>AND</u>
<u>THEIR FUNCTIONS</u>

I.   Components - Refer to Fig.1-Hydraulic Controls.

The power unit consist of a 15 horsepower motor driving a variable pressure piston pump.

The side knife circuit consist of a directional valve.

The conveyor motor circuit consists of a pressure reducing module, directional valve and gauge.

The pusher cylinder circuit consists of a pressure reducing module, gauge, directional valve, two flow control valves, and a deceleration valve.

II. Functions:

1.  Directional Valve - Extends and retracts the side knives.

2.  Pressure Reducing Module - Controls the pressure in the pusher cylinder circuit.

3.  Directional Valve - Extends and retracts the pusher cylinder.

4.  Pressure Gauge - Indicates the operating pressure of the pusher cylinder circuit.

5.  Directional Valve - Starts and stops the conveyor.

6.  Pressure Reducing Module - Controls the pressure in the conveyor motor circuit.

7.  Pressure Gauge - Indicates the operating pressure of the conveyor circuit.

8.  Deceleration Valve - Shifts the circuit into deceleration.

2

9.  Flow Control Valve – Controls the speed of the pusher cylinder in deceleration.

10.  Flow Control Valve – Controls the advance speed of the pusher cylinder prior to deceleration.

## OPERATION AND PRESSURE SETTINGS

PUMP
        The amount of pressure required by the side knives determines the pressure setting on the pump.  The conveyor motor and pusher cylinder circuits are protected by pressure reducing modules.  Fluted block normally will require 500 to 700 p.s.i. while an eight inch solid may require 800 to 1200 p.s.i.  Pressure adjustments are made with the pump running and the machine NOT in operation.

SIDE KNIFE CIRCUIT
        The pressure in the circuit is determined ONLY by the pump pressure setting.  The directional valve extends and retracts the cylinders only.  The flow control valves on each cylinder are used to control the advance speed of the side knives and should not be confused as pressure regulators.

CONVEYOR MOTOR CIRCUIT
        The pressure reducing module should be set at 500 p.s.i.  With the pump running and the conveyor off, the pressure read on the gauge is the maximum operating pressure.  When the conveyor is turned on, the gauge will indicate the operating pressure.

PUSHER CYLINDER CIRCUIT
        The normal operating pressure of the pusher cylinder should be 250-300 p.s.i.  As with the conveyor motor, the adjustment of the pusher cylinder pressure reducing module must be made with the pusher cylinder retracted and off.  The pusher cylinder advances forward at a speed determined by the setting of the flow control (10) until the deceleration valve (8) is actuated which slows the cylinder to a speed determined by the flow control valve (9).  The retract speed of the cylinder is controlled only by the preset pressure of the circuit.


Consult the enclosed service sheets concerning servicing and further operation of the various components.

DO NOT USE THE POWER UNIT TO RUN ANY OTHER EXISTING EQUIPMENT

Make sure that the breather and filler breather are in place and kept clean.

3



Figure 1

Components

1.  Directional Valve
2.  Pressure Reducing Module
3.  Directional Valve
4.  Pressure Gage
5.  Directional Valve
6.  Pressure Reducing Module
7.  Pressure Gage
8.  Deceleration Valve
9.  Flow Control Valve
10. Flow Control Valve

## ELECTRICAL COMPONENTS AND THEIR FUNCTIONS

I.  Electrical Controls-(Refer to Fig. 2)

All push buttons and selector switches are identified as
to their function.

1.  The position of the auto-manual switch determines
    whether the machine is to be operated automatically
    or manually.  In the "manual" position, the con-
    veyor and pusher cylinder are out of the circuit.
    The split cycle is then started with the "manual
    start" pushbutton.  If the side knives are "off" with
    the selector switch in "manual", the hydraulic power
    unit will not start.  The "Splitter Start" pushbutton
    must be actuated before any other function will occur.

 **WARNING:   DO NOT RUN SPLITTER WITH SIDE KNIVES ON
    UNLESS A BLOCK IS IN POSITION.**

2.  With the selector switch in the "Automatic" position,
    the splitter motor must be started first then the
    hydraulic power unit.

3.  The side knives may be turned off or on during any part
    of the split cycle.

4.  If the Cycle Stop is actuated during a cycle, the
    splitter will continue to complete the programmed cycle,
    retract, and then stop.

II.  Limit Switch Locations and Their Functions  (For Location-
                                        Refer to Fig. 3)

LS-1  Stops the Conveyor and starts the Pusher Cylinder
      forward.

LS-2  Stops the Pusher Cylinder in the retracted position.

LS-3  Retracts the Pusher Cylinder.

LS-4  Shifts the Pusher Cylinder into deceleration.

LS-5  Stops the Pusher Cylinder and starts the Split Cycle.

LS-6  Stops the splitter on its top stroke after each split
      cycle.

LS-7  Retracts the Side Knives on the up stroke of the
      splitter.

The machine is controlled by a programable controller located
in the electrical panel.  Please read the enclosed literature
on the controller before attempting any service or
changes in the program.