## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06 CV-0412-DRB

DAVID JACKSON,
    Plaintiff,
vs.
E & R MANUFACTURING
COMPANY, INC.,

    Defendant.

_____

DEPOSITION OF JOHN STEPHENS

Date:  May 23, 2007

Time:  9:30 a.m.

COURT REPORTER:
APRIL R. BENDINGER, CSR

## Page 2

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Mr. Mark Andrews
5        MORRIS, CARY, ANDREWS, TALMADGE, JONES
6        & DRIGGERS
7        3334 Ross Clark Circle
8        Dothan, Alabama 36303
9
10   FOR THE DEFENDANT:
11       Mr. Steadman Shealy
12       SHEALY, CRUM & PIKE
13       100 Camellia Drive
14       Suite 101
15       Dothan, Alabama 36302
16
17   FOR THE DEFENDANT:
18       Mr. Cory M. Curtis
19       BAKER & HOSTETLER
20       303 East 17th Avenue
21       Suite 1100
22       Denver, CO 80203
23

## Page 3

1    A P P E A R A N C E S
2
3
4    FOR THE DEFENDANT, STEPHENS AND MACKEY:
5        Mr. Christopher Rodgers
6        HUIE, FERNAMBUCQ & STEWART
7        Three Protective Center
8        Suite 200
9        2801 Highway 280 South
10       Birmingham, AL 35223
11
12   ALSO PRESENT:
13   Mr. Karry Mackey
14
15
16
17
18
19
20
21
22
23

## Page 4

1    EXAMINATION INDEX
2
3    JOHN STEPHENS
4        BY MR. ANDREWS . . . . . . . . . .    7
5        BY MR. SHEALY . . . . . . . . . .   84
6        BY MR. ANDREWS . . . . . . . . . .   103
7
        EXHIBIT INDEX
8
              MAR
9    Plaintiff's
10   1    Splitter picture              22
11
12
13
14
15
16
17
18
19
20
21
22
23


EXHIBIT
D

Page 5

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of JOHN STEPHENS may be taken before April R. Bendinger, Notary Public, State at Large, at the Law Offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama on May 23, 2007, commencing at approximately 9:30 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said depositions is

Page 6

offered in evidence, or prior thereto.

I, April R. Bendinger, a Court Reporter of Dothan, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama commencing at approximately 9:30 a.m. on May 23, 2007, JOHN STEPHENS in the above cause, for oral examination, whereupon the following proceedings were had:

Page 7

JOHN STEPHENS, being first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. ANDREWS:

Q. Will you tell us your name, please, sir?

A. John Stephens.

Q. Mr. Stephens, I'm Mark Andrews, and I represent Mr. David Jackson regarding an accident out at Block USA. I'm going to take your deposition today, and I want to ask you some questions about that accident. If you don't understand anything I'm asking you, please let me know. If you need a break, please let me know. Try to answer with a yes or no, because uh-uh or uh-huh or head nods don't go down very well. If you let me know, I will try to rephrase the question; otherwise, I will assume you understood the question. Okay?

A. Okay.

Q. What is your address?

Page 8

A. 14138 Wren Lane, W-R-E-N, Andalusia 36421.

Q. Okay. How are you currently employed?

A. Block USA.

Q. What's your position out there?

A. Yard man.

Q. How long have you worked at Block USA?

A. Eight years.

Q. Is that all continuous eight years?

A. Yes.

Q. Have you always been the yard man?

A. No.

Q. What other positions have you held?

A. Utility man, cuber operator.

Q. Anything else?

A. No.

Q. Have you ever worked the splitter? This accident happened on the splitter, have you ever worked at the splitter

Page 9

1  before?
2      A.    Yes.
3      Q.    What position would that be, would
4  it be the utility man or the cuber when you
5  worked the splitter?
6      A.    Utility.
7      Q.    Help me understand, what is a
8  utility man?
9      A.    An all around guy.
10          MR. SHEALY:  Kind of like
11  infielder, utility infield.
12      Q.    In other words, you fill whatever
13  position needs to be filled at the moment?
14      A.    Yes.
15      Q.    Have you ever given a deposition
16  or been deposed before?
17      A.    Yes.
18      Q.    Tell me about that.
19      A.    1990.
20      Q.    What was that about?
21      A.    Injury.
22      Q.    To you or somebody else?
23      A.    Me.

Page 10

1      Q.    What was your injury?
2      A.    Back.
3      Q.    Was it on-the-job?
4      A.    Yeah.
5      Q.    Where were you employed then?
6      A.    Stones Plumbing in Orlando,
7  Florida.
8      Q.    Were you making a workers'
9  compensation claim?
10      A.    Yes.
11      Q.    Just generally, what happened?
12  Did you bend over and pick up something or what?
13      A.    Bent over to pick up a water
14  heater and just pulled my back.
15      Q.    Okay.  I hate to ask these
16  questions, but I have to ask them.  Do you have
17  a criminal history?
18      A.    No.
19      Q.    Have you ever served in the
20  military?
21      A.    Yes.
22      Q.    What branch?
23      A.    Army.

Page 11

1      Q.    Were you honorably discharged?
2      A.    Yes.
3      Q.    As a yard man, do you stay outside
4  where the splitter and cuber and all the
5  equipment is?
6      A.    Yes, I stay outside.
7      Q.    Help me understand what a yard man
8  does?
9      A.    I load trucks, put up block off
10  the line, fill the bins with material.
11      Q.    My understanding of a yard man is
12  that out there at the Block USA plant, there is
13  a building where all the equipment is that makes
14  the block, outside is where the trucks and fork
15  lifts operate.  Is that where you're talking
16  about outside?
17      A.    Yes.
18      Q.    Do you have anybody that works out
19  there with you?
20      A.    No.
21      Q.    Are you the only one that works in
22  the yard?
23      A.    Yes.

Page 12

1      Q.    How many employees work at Block
2  USA typically?
3      A.    Eight.
4      Q.    Eight everywhere or eight inside
5  the warehouse?
6      A.    Eight total, drivers and all.
7      Q.    Okay.  Can you name the current
8  employees?  Karry Mackey, John Stephens, who are
9  the other six?
10      A.    Dewayne Biggs, Marcus McInnis,
11  John Coleman, Eddie Moore, Michael King.
12      Q.    K-I-N-G?
13      A.    Uh-huh, (affirmative).  Mike
14  Hudson.  Ted Garrison.  And Joe, I can't
15  pronounce his last name, Gust-something.
16      Q.    Joe G.?
17      A.    Yeah.
18      Q.    Okay.  All these guys that you
19  just named are currently employed out there,
20  right?
21      A.    Yes.
22      Q.    Are there any names that you can
23  think of that used to work out there that don't

Page 13

1  work there now that would have operated that
2  splitter where Mr. Jackson's accident took
3  place?
4       A.    Brian Schoolmaster.
5            MR. SHEALY:  Did you say
6  Schoolmaster?
7       A.    Yes.
8       Q.    Who else?
9       A.    That's it that worked the
10 splitter.
11      Q.    Have there ever been any other
12 utility man like yourself?
13      A.    Randy Templeton.
14      Q.    Randy Templeton.  Anybody else?
15      A.    Basically, that's it.
16      Q.    Randy doesn't work there anymore?
17      A.    No.
18      Q.    Brian Schoolmaster doesn't work
19 there anymore?
20      A.    No.
21      Q.    Do you know where they are
22 currently employed?
23      A.    Randy is employed with First

Page 14

1  Choice Rental in Andalusia.
2       Q.    And Brian?
3       A.    I do not know.
4       Q.    Does he still live in Andalusia as
5  far as you know?
6       A.    No, I believe he moved back to
7  Michigan.
8       Q.    Were either of these guys, Brian
9  or Randy, were they employed through Able Body,
10 or employed directly through Couch or Block USA?
11      A.    I do not know.
12      Q.    I will say that all day long in
13 both these depositions, but when I say Couch or
14 Block USA, is that the same thing?
15      A.    Yes.
16      Q.    Can you tell me or give me an
17 understanding of what the true name is and what
18 the relationship is with Couch?
19      A.    True name, Couch Ready Mix USA or
20 Couch Block USA.
21      Q.    You use those terms
22 interchangeably, either one?
23      A.    Yes.

Page 15

1       Q.    How long have you been at Block
2  USA?
3       A.    Eight years.
4       Q.    Where were you employed before
5  that, the plumbing place?
6       A.    No, Manhattan Shirt Factory.
7       Q.    Here in Andalusia?
8       A.    Yes.
9       Q.    What was your job there?
10      A.    Fork lift driver.
11      Q.    How long were you there?
12      A.    Two Andalusia and a half years.
13      Q.    Before that?
14      A.    Couch.
15      Q.    Back at the same plant?
16      A.    Yes.
17      Q.    How long were you employed that
18 time?
19      A.    A year.
20      Q.    What was your position then?
21      A.    Brick hand stacker.
22      Q.    What year would that have been
23 approximately?

Page 16

1       A.    '95.
2       Q.    The splitter we are here about
3  today, where Mr. Jackson's accident took place,
4  was it at the Block USA plant when you worked at
5  Couch USA in 1995?
6       A.    Not that I recall.
7       Q.    My understanding is it was
8  delivered or bought in about 1997.  I'm just
9  curious, do you remember when it was delivered
10 to the plant?
11      A.    No, I don't.  I was not employed
12 there.
13      Q.    How was block being split before
14 this splitter was there, or did you have a
15 splitting operation then?
16      A.    I can't answer that question.  I
17 was a stacking block by hand, that was my job.
18      Q.    Did they have a splitter inside,
19 just another kind of splitter?
20      A.    Not that I recall.
21      Q.    Okay.  You don't know if it was a
22 another piece of equipment that got removed out
23 of there and this block splitter replaced it or

Page 17

1  anything?
2      A.    Right.
3      Q.    Do you know who would know, do you
4  think Mr. Mackey would know?
5      A.    Yes, my supervisor.
6      Q.    Was Karry Mackey your supervisor?
7      A.    Yes, he is.
8      Q.    Is he the plant manager out there?
9      A.    Yes.
10     Q.    Okay. When you worked there for
11  that year before, did you ever go up inside the
12  plant?
13     A.    Yes, I was inside the plant.
14     Q.    Is that where you stacked inside?
15     A.    Yes.
16     Q.    Would it have been doing a
17  stacking job by hand similar to what the cuber
18  and stacker does now?
19     A.    Yes.
20         MR. SHEALY: Were you exhausted at
21  the end of the day?
22     A.    Yes.
23     Q.    At some point around '95, '97,

Page 18

1  there were some upgrades. You were not employed
2  there as I understand, but is that a fair
3  explanation, there were some upgrades in the
4  plant?
5      A.    Yes.
6      Q.    I think I already know the answer,
7  were you involved in any way with the purchase
8  of this block splitter?
9      A.    No.
10     Q.    In general terms, what all does
11  Block USA do? Do they just make concrete
12  blocks?
13     A.    Yes.
14     Q.    Is that during the eight years you
15  have been there and the year you were there
16  before, is that all they have ever done?
17     A.    Concrete block, brick. Other
18  concrete blocks.
19     Q.    And as I understand, there are
20  several different styles of brick or shapes of
21  brick; is that a fair statement?
22     A.    Yes. Different styles of block.
23     Q.    The one being split the day of

Page 19

1  Mr. Jackson's accident was sort of a honeycomb
2  shaped block, it wasn't a square or rectangle
3  block --
4      A.    Right.
5      Q.    What is that called?
6      A.    8-inch diamond pro bevel.
7          MR. SHEALY: Say that slowly.
8      A.    8-inch diamond pro bevel.
9          MR. SHEALY: 8-inch pro bevel.
10     Q.    And the bevel, I guess, is the
11  angle on the corners of the brick?
12     A.    Right.
13     Q.    That type of block, that's a block
14  not a brick, correct?
15     A.    Yes.
16     Q.    Is that block manufactured pretty
17  regularly out there?
18     A.    Yes.
19     Q.    What I mean by that, it's not like
20  a very unusual event to be making 8-inch diamond
21  pro bevel block, is it?
22     A.    No.
23     Q.    What would be the most typical

Page 20

1  block that Block USA makes out there?
2      A.    Various. Depends on demand.
3      Q.    Would it be a fair statement,
4  then, that this 8-inch diamond pro bevel is no
5  more or no less typical than any other block out
6  there?
7      A.    Yes.
8      Q.    And when you make this block, the
9  8-inch diamond pro bevel and then the other
10  regular kind, what do you call the standard
11  kind?
12     A.    Just a regular block.
13     Q.    When you make the different
14  blocks, do all the block have to come through
15  this splitter?
16     A.    No.
17     Q.    Tell me which ones have to come
18  through the splitter?
19     A.    Diamond pro, diamonds, split
20  faced, 4-inch split face, 4-inch L-return
21  corners, 8-inch L-return corners, windsor. Any
22  split face block has to go through there. A
23  rough face block.

Page 21

1    Q.    The rough face means when a
2  concrete block is formed and it's form, there is
3  a smooth precision type edge, as opposed to when
4  it goes through the block splitter, it's cracked
5  and has a rough face; is that right?
6    A.    Right.
7    Q.    Any of that block that has a rough
8  face has to go through the splitter, or we know
9  it has gone through the splitter because it has
10  the rough face?
11    A.    Yes.
12    Q.    As I also understand, there's some
13  different knives that go on the splitter
14  depending on which block you're splitting?
15    A.    Yes.
16    Q.    How many different knives are
17  there?
18    A.    Let's see, 8-inch diamond pro, you
19  got the 6-inch diamond, 8-inch straight split,
20  you got the T-split, you got the windsor --
21  probably about six.
22    Q.    Okay. Now, the diamond pro block
23  is split with a wedge shaped knife; is that

Page 22

1  right?
2    A.    On the sides, it's two straight
3  knives.
4    Q.    On the sides?
5    A.    Top and bottom has the wedge.
6    Q.    Okay. What type block uses the
7  wedge on the side?
8    A.    The 8-inch diamond pro and 6-inch
9  diamond and the windsor.
10    (Whereupon, Plaintiff's Exhibit 1
11  was marked for identification.)
12  BY MR. ANDREWS:
13    Q.    I will show you what I will mark
14  as Exhibit 1 to your deposition.
15    MR. ANDREWS: I will mark it 1
16  John Stephens.
17    Q.    What is that a picture of?
18    A.    4-inch windsor split. That is the
19  bottom -- top knife.
20    Q.    On the edges, right here on these
21  edges right here, that comes in at an angle. Do
22  you see what I'm talking about?
23    A.    Yes.

Page 23

1    Q.    When I'm talking about the side
2  knives having an angle, this is what I'm talking
3  about. Is this what you're talking about having
4  a straight edge?
5    A.    No. That is not a side knife.
6    Q.    That is the top knife?
7    A.    Right.
8    Q.    Are there side knives that come in
9  with a wedge like this?
10    A.    There are two knives straight.
11    Q.    I will show you Defendant's
12  Exhibit 4 to Mr. Jackson's deposition that was
13  taken yesterday. The knives shown here on the
14  side that I'm pointing to, that is the side
15  knife, right?
16    A.    Yes.
17    Q.    Is that a straight edge side
18  knife?
19    A.    Yes.
20    Q.    Are there side knives that go here
21  that have a wedge shape to them similar to what
22  we see in Plaintiff's Exhibit 1 to your
23  deposition?

Page 24

1    A.    No.
2    Q.    There are none that have that?
3    A.    No. There's just two knives --
4  straight knives like that that are separated
5  apart.
6    Q.    I see. When you install the two
7  knives on the side, what's purpose of having two
8  knives on the side?
9    A.    Depends on how big a chunk gets
10  split out through your bevel split.
11    Q.    Do you remember what kind of block
12  was being split on the day of Mr. Jackson's
13  accident?
14    A.    8-inch diamond pro diamond tan.
15    Q.    Would it have a straight edge
16  blade on the side?
17    A.    It would have two on each side.
18    Q.    It would have two on each side to
19  cut out a wedge on the side of the blocks?
20    A.    Right.
21    Q.    I will show you Plaintiff's
22  Exhibit 7 to Mr. Ronald Neese's deposition. Do
23  you see the knives here?

Page 25

1    A.    Yes.
2    Q.    Are those the two knives that
3  you're talking about?  See the one line there
4  and the one line there?
5    A.    Yes.
6    Q.    What kind of blocks are we cutting
7  here?
8    A.    8-inch diamond pro bevel.
9    Q.    The block that we see in
10  Plaintiff's Exhibit 7 to Mr. Neese's deposition,
11  is that the kind of block and kind of knives
12  that would've been in use on the day of
13  Mr. Jackson's accident?
14    A.    Yes.
15    Q.    When those knives operate or
16  cycle, it's my understanding that the knives
17  come in and hit the block we can see in
18  Plaintiff's Exhibit 7 to Mr. Neese's deposition,
19  and operate a bite out a chunk of the concrete
20  at an angle?
21    A.    Yes.
22    Q.    What happens to the concrete once
23  the concrete is bitten out or sliced into?

Page 26

1    A.    It is pushed out by the next block
2  coming in.
3    Q.    Does that chip or concrete
4  sometimes fall into the knives?
5    A.    Yes.
6    Q.    As I understand, we have been
7  calling it debris, for lack of a better phrase,
8  concrete pieces or chips that fall down beside
9  these knives after the knives cycle.  Are you
10  familiar with that term?
11    A.    Yes.
12    Q.    Is that a fair characterization of
13  what happens?
14    A.    Yes.
15    Q.    As I also understand, regardless
16  of the block you're splitting or the knife
17  you're using, there is going to be some amount
18  of concrete that falls down every time?
19    A.    No.
20    Q.    Tell me when it will and when it
21  won't?
22    A.    Straight split won't; everything
23  else will.

Page 27

1    Q.    When you're using these double
2  sided knives -- what should I call these knives
3  that we see in Plaintiff's Exhibit 7 to
4  Mr. Neese's deposition?
5    A.    8-inch diamond pro side knife --
6  bevel split side knife.
7    Q.    When using that kind of side
8  knife, is there going to be some debris created
9  every time a cycle is made?
10    A.    No, just occasionally.
11    Q.    Okay.  Maybe that was a poor
12  question.  As I understand, every time there is
13  going to be some concrete taken out of the
14  block.  Are you saying sometimes it doesn't fall
15  down beside the knives and sometimes it does?
16    MR. SHEALY:  Object to the form.
17  That is not what he said.
18    Q.    Let me go back through it.  I
19  asked you if there was going to be some debris
20  created every time and you said no, not every
21  time.
22    A.    No.
23    Q.    When I'm saying debris --

Page 28

1    MR. RODGERS:  He's thinking debris
2  is being piled up next to the knives instead of
3  the chunk being cut out.
4    Q.    Sometimes a chunk is cut out every
5  time?
6    MR. SHEALY:  Can we take a one
7  minute break?
8        10:18 a.m.
9        (Off the record)
10        10:22 a.m.
11  BY MR. ANDREWS:
12    Q.    Okay.  John, before we took a
13  break, we were talking about different kinds of
14  knives and splitting the block and where the
15  debris may be create that falls down beside the
16  knives or not.  Do you remember that line of
17  questioning?
18    A.    Yes.
19    Q.    As I understand, you told us the
20  straight knives typically do not create any
21  debris because nothing cracks off the block; is
22  that true?
23    A.    Yes.

Page 29

1    Q.    Before I leave the straight
2 knives, sometimes does the block crack
3 imperfectly and create something that comes
4 down?
5    A.    Yes.
6    Q.    Is that just not very typical, but
7 it happens with a straight knife?
8    A.    Yes.
9    Q.    Then the knives that have the
10 8-inch pro diamond bevel edge, that knife like
11 we see the Exhibit 7 -- Plaintiff's Exhibit 7 to
12 Mr. Neese's deposition -- that type of knife is
13 more typical or more prone to create some debris
14 when it cycles; is that a true statement?
15    A.    Yes.
16    Q.    Let me try to establish this.
17 When the side knives come in that have the two
18 blades, every time that side knife cycles, it
19 has to bite out a piece or -- I will call it
20 bite out a piece of concrete every time; is that
21 right?
22    A.    Yes.
23    Q.    Are you telling us that

Page 30

1 sometimes -- what do you call that, a chunk?
2    A.    A chunk.
3    Q.    When the chunk is created, does
4 the chunk sometimes fall down beside the knives?
5    A.    Yes.
6    Q.    Sometimes the chunk does not fall
7 down?
8    A.    Yes.
9    Q.    Is there any pattern or
10 consistency with that that you can tell, or just
11 watch it and see whether it does it or not?
12    A.    Just have to watch it.
13    Q.    Is it more common to do it or not
14 to do it, or about half?
15    A.    About half.
16    Q.    Would it be a fair statement then
17 if you were to run 100 blocks, it might be every
18 other block for example?
19    A.    Yes.
20    Q.    If that chunk is left down beside
21 the knives, can it be left down beside the
22 knives?
23    A.    Yes.

Page 31

1    Q.    What happens if it is left down
2 there?
3    A.    It gets crushed and messes up the
4 next block?
5    Q.    Do you have to get that chunk out
6 of there?
7    A.    Yes, if you cut the machine off.
8    Q.    That's what I'm going to get to in
9 just a second.  First, let me establish, a chunk
10 has to be gotten out of there or else it will
11 mess up the next block?
12    A.    Yes.
13    Q.    If it stays in there, it will mess
14 up the next block?
15    A.    Yes.
16    Q.    Would it be a fair statement that
17 the more debris left in there, there is going to
18 more debris created next time, and mess up the
19 block even further next time?
20    A.    Yes.
21    Q.    Now, there is a control panel that
22 operates this splitter; isn't that right?
23    A.    Yes.

Page 32

1    Q.    Is that the only place you can
2 turn on the machine and turn it off?
3    A.    No.
4    Q.    Is there another place to turn it
5 on and off?
6    A.    Yes.
7    Q.    Where is there?
8    A.    The main control panel inside the
9 breaker box.
10    Q.    Located somewhere besides the
11 splitter?
12    A.    Located inside the office.
13    Q.    You mean, up there where
14 Mr. Mackey's office is?
15    A.    Yes.
16    Q.    As far as on the machine itself,
17 that control panel on the machine, is that the
18 only place you can turn the machine on and off?
19    A.    Yes.
20    Q.    Now, when the block comes out of
21 the splitter, sometimes are there still some
22 chips that need to be chipped off those blocks?
23    A.    Yes.

Page 33

1    Q.    How do you accomplish that? How
2  is that done?
3    A.    With a chipping hammer.
4    Q.    There is a picture of a chipping
5  hammer, I believe, marked yesterday to
6  Mr. Jackson's deposition. Defendant's Exhibit 9
7  Mr. Jackson's deposition, is that a chipping
8  hammer?
9    A.    Yes.
10   Q.    And the people that do the
11 chipping, where do they usually stand when
12 they're doing the chipping?
13   A.    Down on the conveyer line past the
14 splitter.
15   Q.    So the chipping will take place
16 past the splitter, between the splitter and
17 cuber?
18   A.    Yes.
19   Q.    Then Defendant's Exhibit 7 to
20 Mr. Jackson's deposition, what kind of block is
21 that?
22   A.    8-inch diamond pro bevel gray.
23   Q.    And the corners where they cut an

Page 34

1  angle, is that what happens when these two edge
2  side knives come in to the block?
3    A.    Yes, when the top knife comes
4  down.
5    Q.    It all works together, the top and
6  bottom -- isn't there a bottom knife, too?
7    A.    Yes.
8    Q.    Now, when you were hired at Block
9  USA, did you go through any training to operate
10 this machine, the block splitter?
11   A.    Yes.
12   Q.    Who gave you the training?
13   A.    Brian Schoolmaster.
14   Q.    Okay. Did you have to look at any
15 documents or was it all verbal?
16   A.    Verbal and on-hand.
17   Q.    In other words, verbal and
18 actually getting in there and doing it?
19   A.    Yes.
20   Q.    Let me ask it this way: Have you
21 seen any manual for this block splitter machine
22 at all?
23   A.    Yes.

Page 35

1    Q.    In that manual, have you ever seen
2  any language that tells you about any of this
3  debris that is created that reference the
4  debris?
5    A.    No.
6    Q.    What did Brian tell you about the
7  debris, if you recall?
8    A.    Not to stick your hand in there
9  and pull it out.
10   Q.    What else did he tell you?
11   A.    Turn the machine and take a stick
12 or a rod and push it out.
13   Q.    When he told you to cut it off,
14 did he tell you to lock it out and tag it out?
15   A.    Yes.
16   Q.    Did he go to through the steps of
17 how to lock it out and tag it out?
18   A.    Yes.
19   Q.    How did he tell you how to do
20 that?
21   A.    Shut the power off. Get a tag
22 out. And then grab the lock and lock it out.
23   Q.    Where did you have a lock?

Page 36

1    A.    In the office.
2    Q.    Is there one lock for this machine?
3    A.    Yes.
4    Q.    So you would have to do that, I
5  guess, when you're cutting these diamond edged
6  or angled blocks, every other blocks basically?
7    A.    Yes.
8    Q.    When you're in production with
9  these blocks like we see in Defendant's Exhibit
10 7 to Mr. Jackson's deposition -- how many of
11 those would you run at a time when you run these
12 type of blocks?
13   A.    Through the splitter?
14   Q.    Yes.
15   A.    Two.
16   Q.    No, I'm sorry. In a shift or how
17 many days would you run these?
18   A.    Depends on the demand.
19   Q.    Typically when you get to the
20 machine, the splitter that's set up to run this
21 type of block that we see in Defendant's Exhibit
22 7 to Mr. Jackson's deposition, how many of those
23 would you run through there before you go to

Page 37

1 another type of block typically?
2     A.    Two or three days.
3     Q.    How many blocks do you run in
4 there in a day?
5     A.    Probably about five thousand.
6     Q.    Five thousand per day?
7     A.    Yes.
8     Q.    Is there just one shift out there
9 at the plant?
10     A.    Yes.
11     Q.    When is that?
12     A.    Day shift. 6 to 5.
13     Q.    You would run about three or four
14 days of that?
15     A.    Yes.
16     Q.    15 to 20,000 block, then shift to
17 another block for example?
18     A.    Yes.
19     Q.    That is not necessarily going to
20 be verbatim what happens, that's just an example
21 of it?
22     A.    Yes.
23     Q.    If this debris is created on the

Page 38

1 side knives when running this type of block, is
2 it your testimony that every other block or
3 pretty frequently you have to stop, go to the
4 office, get the lock, come back out and lock out
5 the machine, put a tag on it, clear the debris,
6 then go return the lock to the machine to the
7 office, then start the machine back up?
8     A.    No.
9     Q.    How do you do that?
10     A.    Turn the machine off. Cut the
11 power switch off. Take your stick and push your
12 chunk out and turn the machine back on.
13     Q.    So you don't always get the lock
14 or a tag?
15     A.    No, just if it's a problem.
16     Q.    When you say it's a problem, like
17 if the chunk might be stuck in there?
18     A.    No, electrical or mechanical.
19     Q.    Let me address that right quick.
20 If you're changing out the knives, do you lock
21 out and tag out the machine then?
22     A.    Yes.
23     Q.    If there is a mechanical defect or

Page 39

1 something that has come apart on the machine, I
2 assume you would lock/out and tag/out the
3 machine then?
4     A.    Yes.
5     Q.    If you're doing a routine cleaning
6 out the debris, is it your testimony you don't
7 always lock/out and tag/out the machine?
8     A.    No.
9     Q.    What is your testimony?
10     A.    You would turn the machine off.
11 Turn the power switch off. Take your rod or
12 stick and push it out, and turn it back on.
13     Q.    I think that is what I said. What
14 I understand you to say is: That if you are
15 just cleaning the debris out, you would turn the
16 machine off, but you wouldn't lock it out or tag
17 it out?
18     A.    Yes.
19     Q.    Is that true?
20     A.    Yes.
21     Q.    So then when you're running this
22 5,000 blocks per day, do you turn the machine
23 off almost every other block to clean the

Page 40

1 debris, then turn it back on?
2     A.    Yes.
3     Q.    Where do you stand when you do
4 that?
5     A.    I was standing behind -- I was
6 chipping.
7         MR. RODGERS: He's not asking
8 you --
9     A.    Where would you stand? In front
10 of the panel.
11     Q.    All right. We have taken the
12 deposition of the corporate representative for
13 the people who made the machine, E & R
14 Manufacturing and Besser Corporation. And they
15 have testified that typically when you're
16 running block, nobody stands at the control
17 panel when cleaning out this debris. You stand
18 on the conveyer side of the splitter?
19     A.    Yes.
20     Q.    Is that true?
21     A.    Yes.
22     Q.    Is that the practice that goes on
23 out there at the plant in Andalusia?

Page 41

1    A.   Yes.
2    Q.   As I understand, that is where
3 Mr. Jackson was standing at the time of his
4 accident?
5         MR. SHEALY:  Let me object to the
6 form, and add one thing.  After the machine is
7 turned off.
8         MR. ANDREWS:  No, when the block
9 is being split.
10         MR. SHEALY:  You said to clean out
11 the debris.
12         MR. ANDREWS:  Right.
13         MR. SHEALY:  Well, the question is
14 misleading in that --
15         MR. ANDREWS:  Hold on.
16         MR. SHEALY:  Read back the
17 question.
18         MR. ANDREWS:  I can clear it up.
19         MR. SHEALY:  Let me object to the
20 form.
21    Q.   It's my understand that when
22 someone is working when they're operating this
23 block splitter machine, based on the testimony

Page 42

1 from E & R Manufacturing and Besser, the person
2 that stands at this block splitter machine will
3 stand on the side of the block splitter machine,
4 between the block splitter and the conveyer,
5 down towards the cuber?
6    A.   Yes.
7    Q.   That is while the blocks are being
8 produced or sent through the splitter; is that
9 right?
10    A.   Yes.
11    Q.   That's where we see this gentleman
12 standing in Plaintiff's Exhibit 7 to Mr. Neese's
13 deposition?
14    A.   Yes.
15    Q.   Is that what you were saying
16 earlier?
17    A.   Yes.
18    Q.   When this person is standing in
19 this position, what's their job?
20    A.   To pull the chunk out after the
21 next block pushes it out.
22    Q.   You mean --
23    A.   To throw it away.

Page 43

1    Q.   Right.  And so once the block is
2 split, the block comes through the splitter,
3 that person is supposed to pull the chunk out
4 and throw it away so it doesn't pile up right
5 there around the splitter?
6    A.   Yes.
7    Q.   Now, is that person also supposed
8 to be looking to see if any debris is created
9 down by the side knives?
10    A.   Yes.
11    Q.   Is there anybody else that stands
12 on the other side of the machine as well?
13    A.   No.
14    Q.   Why is that?
15    A.   Just need one person there
16 necessarily.  It's there preference to stand on
17 which side they want to stand on.
18    Q.   But typically they stand on this
19 side of the machine; is that right?
20    A.   Yes.
21    Q.   As I understand from E & R and
22 Besser, typically no one stands at the control
23 panel when this is going on; is that true?

Page 44

1    A.   Yes.
2    Q.   Typically the workers are where
3 this gentleman is in Exhibit 7 to Mr. Neese's
4 deposition, and then down the conveyer doing the
5 block chipping and down at the cuber?
6    A.   Yes.
7    Q.   Is there anybody upstream at all
8 from where this gentleman would be standing
9 during a typical production process?
10    A.   Depends on which block you're
11 running through the splitter.
12    Q.   If you're running this kind of
13 block, Defendant's Exhibit 7 to Mr. Jackson's
14 deposition --
15    A.   No.
16    Q.   Why is that?
17    A.   Because some block gets run
18 through the splitter.  If they hit before they
19 get to the splitter, they break.  And you have
20 to have a person to keep them from hitting to
21 push them into the splitter.
22    Q.   Does this kind of block do that?
23    A.   No.

Page 45

1    Q.    If you're running a different kind
2  of block than what was happening on the day of
3  Mr. Jackson's accident, you need someone up
4  stream or before the block gets to a splitter?
5    A.    Yes, on a different block.
6    Q.    But you don't need that when
7  you're doing the kind of block being split on
8  the day of Mr. Jackson's accident?
9    A.    No.
10    Q.    Now, when block is being run
11  through the splitter, the kind of block being
12  done on the day of Mr. Jackson's accident, does
13  this person, once they realize some debris is
14  down in the knives, do they have to stop, walk
15  around to the control panel, and turn it off
16  there?
17    A.    Yes.
18    Q.    How does that effect production?
19    A.    It don't.  It don't take but a few
20  minutes.
21    Q.    As I understand from E & R, the
22  corporate representative for E & R and from
23  Besser, they understand it does slow down

Page 46

1  production some.  Is that what you have seen out
2  there as well?
3    A.    Yes.
4    Q.    Isn't production important out
5  there at the plant?
6    A.    Yes.
7    Q.    And isn't it true that every
8  effort is made to keep production going as best
9  you can?
10    A.    Yes.
11    Q.    When you were trained by
12  Mr. Schoolmaster, were you told there was a tool
13  that came with this machine?
14    A.    No.
15    Q.    Do you know if a tool came with
16  this machine, when we say tool, to clean out the
17  debris?
18    A.    No, I do not know.
19    Q.    It's my understanding from the
20  people that made this machine, that no tool --
21  they did not make a tool for anyone to use that
22  comes with this machine, is that what you
23  understand as well?

Page 47

1    MR. RODGERS:  Specifically to
2  clean it out?
3    MR. ANDREWS:  Yeah.
4    A.    Yes.
5    Q.    So what kind of tools do y'all use
6  out there?
7    A.    A piece of steel rod or a piece of
8  a stick.
9    Q.    Wooden stick?
10    A.    Yes.
11    Q.    Do you know how long that stick
12  has to be?
13    A.    2 or 3 feet.
14    Q.    Does it sometimes get cut up in
15  the knives?
16    A.    Yes.
17    Q.    Does it mess up the knives?
18    A.    No.
19    Q.    Does the manual tell you how to
20  use this tool at all?
21    A.    No.
22    Q.    It is up to the operator to know
23  how to stick it in there and clean it out?

Page 48

1    A.    Yes.
2    Q.    Sometimes can you get all the
3  debris out at one time, or do you have to keep
4  doing it?
5    A.    Yes.  Sometimes you can at one
6  time.
7    Q.    Have you ever seen anybody use
8  their hand to clean the area out, at all,
9  without stopping the machine?
10    A.    No.
11    Q.    Never seen anybody ever do that?
12    A.    No.
13    Q.    Can you recognize the person in
14  Plaintiff's Exhibit 7 to Mr. Neese's
15  deposition?  Do you know who that gentleman is?
16    A.    Yes.
17    Q.    Who is that?
18    A.    Willy Jackson.
19    Q.    Does he still work out there?
20    A.    No.
21    Q.    Do you know if Mr. Jackson reached
22  his hand in there to clean out the debris?
23    A.    No, I do not.

Page 49

1    Q.    Do you know where Mr. Jackson
2  lives?
3    A.    No.
4    Q.    Do you know why he doesn't work
5  there anymore?  Did he quit?
6    A.    No, I do not know.
7    Q.    Let me ask you this:  When
8  production is up and going, does this
9  operator -- I'm calling him operator, what is
10  this person called, a laborer?
11    A.    Yes.
12    Q.    He's not really the operator of
13  the machine because he's not standing at the
14  panel, is he?
15    A.    No.
16    Q.    Is that a fair statement?
17    A.    Yes.
18    Q.    When this person, like we see
19  Mr. Jackson, where he's standing, once he gets
20  into the groove, isn't there a routine or
21  pattern of grabbing the block and getting the
22  area clean, then the next block comes in and
23  there is sort of an assembly line, production

Page 50

1  type of pace?
2    A.    Yes.
3    Q.    Does this person ever -- or have
4  you ever done that position?
5    A.    Yes.
6    Q.    Do you get into a groove where you
7  are trying to get everything cleaned out the
8  best you can to keep production going?
9    A.    Yes.
10    Q.    Would it surprise you to if a
11  worker in that position, to keep production
12  going, tries to clean that area out with his
13  hand?
14    A.    No.
15    Q.    Why wouldn't it surprise you?
16    A.    They would think it would be
17  faster to do it with your hand than to cut the
18  machine off and use a stick.
19    Q.    I will tell you that we have taken
20  the deposition of the people who made this
21  machine, and they have said they understand and
22  foresee that workers may reach their hand in
23  there and have known it since 1954 when they

Page 51

1  made the machine.
2      MR. CURTIS:  Object to the form.
3      MR. SHEALY:  Same objection.
4    Q.    Workers may reach their hand in
5  there and clean this debris out, like we're
6  talking about, and so it's not surprising to
7  them.  Again, is that surprising to you?
8    A.    No.
9    Q.    While you say you haven't seen
10  anybody, I guess, with your own eyes reach into
11  the machine, you're not saying it hasn't
12  happened, are you?
13    A.    No.
14    Q.    You haven't particularly seen it?
15    A.    Yes.
16    Q.    Now, Mr. Jackson, on the day of
17  the accident, as I understand -- did you see his
18  accident happen?
19    A.    No.
20    Q.    Did you know of anybody that did
21  see it?
22    A.    No.
23    Q.    My understanding from testimony in

Page 52

1  this case is that when these blocks were being
2  split, one of these chunks got down in there and
3  he tried to reach out in there to clear it out
4  real quick without turning the machine off.
5  Does that surprise you?
6    A.    Yes.
7    Q.    Why is that?
8    A.    Because he didn't turn the machine
9  off, he should have.
10    Q.    We just talked about that --
11    A.    Well, I mean --
12    Q.    Sure.  I'm not asking you if
13  you're critical of it, I'm asking you: Does it
14  surprise you that someone would reflexively try
15  to get that debris out?
16    A.    No.
17    Q.    It's understandable based on your
18  experience working on this machine that someone
19  may reflexively reach in there and try to get
20  that stuff?
21      MR. SHEALY:  Object to the form,
22  and to the term reflexively.
23      MR. ANDREWS:  You can answer.

Page 53

1    MR. CURTIS: Same objection.
2    MR. SHEALY: That is not in any
3  way what he said in his deposition yesterday.
4    MR. ANDREWS: I'm not quoting
5  anybody.
6    MR. SHEALY: But you're asking
7  him, saying reflexively --
8    MR. ANDREWS: Wait, wait, wait.
9  Object to the form. Don't go down that road we
10  did yesterday. I'm not quoting anybody or
11  coming up with anything anybody said yesterday.
12  I'm asking this man if he thinks it's shocking
13  somebody would reach in there reflexively, it's
14  just a word, to clear the debris out.
15    MR. SHEALY: My objection is to
16  the form of what you call reflexively. That is
17  not what Jackson said. He said he did it with
18  his left hand, stuck his hand in there, knew
19  what I was doing, pulled out. That's the way he
20  did it, and these guys never told him to use a
21  stick and never trained him or --
22    MR. ANDREWS: Listen, listen.
23  This is exactly what I'm trying to stop. This

Page 54

1  is going to be miserable day if we start going
2  down that road. Because we're all going to get
3  in there and try to testify on the record. The
4  testimony is what the testimony is. Your
5  corporate representative knew people used hands,
6  he had seen it himself in other plants with
7  these nine other accidents, but never told this
8  man about people getting fingers cut off or
9  Mr. Mackey and his missing fingers. If we are
10  going to start testifying, it's going to take a
11  long time.
12    MR. CURTIS: Can we be clear about
13  whether the machine is on or off when someone is
14  reaching their hand in there. Because he did
15  testify people shut down the machine, so there
16  could be a circumstance where the machine is
17  shut down, so just clarify.
18    Q.  Mr. Stephens, once you recognize
19  some debris is create that needs to be cleaned
20  out of the side knives, you told us the proper
21  way to handle that would be to walk around the
22  knives and go to the panel and turn the machine
23  off; is that right?

Page 55

1    A.    Yes.
2    Q.    Then when the machine is turned
3  off, could you use your hand to clean the debris
4  out then?
5    A.    Yes.
6    Q.    Have you done that as well?
7    A.    Yes.
8    Q.    Have you seen others do that as
9  well?
10    A.    No.
11    Q.    But you have done that?
12    A.    Yes.
13    Q.    Once the machine is turned off,
14  you are saying it's okay to use your hand?
15    A.    Yes.
16    Q.    Do you remember when someone first
17  started using a tool to clean this debris out?
18    A.    Probably before I went back to
19  work there.
20    Q.    Mr. Mackey also had an accident on
21  this machine, did you know that?
22    A.    Yes.
23    Q.    Were you there when that happened?

Page 56

1    A.    Yes.
2    Q.    Do you know how that happened?
3    A.    No. I did not see it personally.
4    Q.    What is your general understanding
5  of how that accident happened?
6    A.    My general understanding,
7  Mr. Mackey was paying attention to a rental help
8  and accidentally had his hand up there.
9    Q.    Okay. You don't know what he was
10  doing, why his hand was up there, you just know
11  it was up there?
12    A.    He was doing 4-inch windsor, he
13  was pulling chunks.
14    Q.    Pulling chunks out of the -- is
15  that like we see Mr. Willy Johnson --
16    A.    Yes.
17    Q.    -- when you refer to what this
18  person is doing, does that refer to pulling
19  chunks?
20    A.    Yes.
21    Q.    Would that be what Mr. Jackson was
22  doing on the day of his accident?
23    A.    Yes.

Page 57

1    Q.    Is that what Mr. Mackey was doing
2  on the day of his accident?
3    A.    Yes.
4    Q.    When they're pulling chunks, or
5  when Mr. Mackey was pulling chunks, you're
6  saying your understanding is he wasn't watching
7  what he was doing and his hand got in there?
8    A.    I didn't see him when it
9  happened. I was running the cuber. I had my
10 back to him.
11   Q.    Is that the similar position you
12 had when Mr. Jackson's accident took place?
13   A.    I was standing right behind
14 Mr. Jackson using a chipping hammer.
15   Q.    Were you facing him or had your
16 back to him?
17   A.    I had my back to him.
18   Q.    Back to Mr. Jackson as well?
19   A.    Yeah, I just heard him holler.
20   Q.    Okay. Have you always used a
21 stick or a rod since you have been back?
22   A.    No.
23   Q.    Tell me about that.

Page 58

1    A.    I did not use one, because I cut
2  the machine off to clean it out.
3    Q.    Have you ever used a stick or a
4  rod then?
5    A.    Yes.
6    Q.    But you typically would use your
7  hand?
8    A.    Yes.
9    Q.    Is it quicker?
10   A.    Uh-huh, (affirmative).
11   Q.    Is that a yes?
12   A.    Yes. After you cut the machine
13 off.
14   Q.    Is that because it's quicker to
15 use your hand after you cut the machine off?
16   A.    Yes.
17   Q.    Do you know of anybody out there
18 that's ever been reprimanded for using their
19 hand to clean the debris out?
20   A.    No.
21   Q.    Can you look at Plaintiff's
22 Exhibit 7 to Mr. Neese's deposition and see this
23 gentleman standing right back here?

Page 59

1    A.    Yes.
2    Q.    Who is that?
3    A.    Marcus McInnis.
4    Q.    He still works out there?
5    A.    Yes.
6    Q.    Since we've been talking, can you
7  think of any other names of people besides
8  Mr. Randy Templeton or Brian Schoolmaster who
9  used to work out there on the assembly line that
10 don't work out there now?
11   A.    No.
12   Q.    You talked about rental help. Is
13 that help through the temporary service?
14   A.    Yes.
15   Q.    Are there a lot of people that
16 come through there through the temporary
17 service?
18   A.    Occasionally.
19   Q.    Do those people work in this
20 position pulling chunks sometimes?
21   A.    Yes.
22   Q.    Are there several of those that
23 don't work out there anymore, you just can't

Page 60

1  think of their names?
2    A.    I can't think of any of their
3  names except Mr. Jackson.
4    Q.    Was Mr. Jackson a Couch employee
5  or temporary?
6    A.    Temporary.
7    Q.    Do you know if he's through Able
8  Body?
9    A.    Yes.
10   Q.    I'll tell you also there is a
11 video footage of Mr. Jackson operating this
12 machine that I have seen. Sometimes he uses a
13 rod to clean out debris, sometimes he reaches in
14 and pulls chunks with his hand. Have you ever
15 seen him do that?
16   A.    No. I'm outside.
17   Q.    Okay. Would that be an example of
18 you haven't seen it, but doesn't surprise you
19 somebody does it?
20   A.    No.
21   Q.    No, that is not an example, or no
22 you agree with me?
23   A.    Yes, I agree.

Page 61

1    Q.    On Plaintiff's Exhibit 7 to
2 Mr. Neese's deposition, right here at the top of
3 this picture, there is a rod sticking up. Do
4 you see that?
5    A.    Yes.
6    Q.    Is that the type of rod you're
7 talking about?
8    A.    Yes.
9    Q.    Are there any other types of tools
10 besides that rod?
11    A.    Just a stick.
12    Q.    Okay.
13        MR. CURTIS: I think that rod is a
14 hammer.
15    Q.    It's different, which is my next
16 question. Defendant's Exhibit 1 to
17 Mr. Jackson's deposition, there is a hammer up
18 here at the top. Do you see that?
19    A.    Yes.
20    Q.    Does anybody ever use that hammer?
21    A.    That's the chipping hammer.
22    Q.    Does anybody use that hammer to
23 clean debris out with, or is that down the line

Page 62

1 somebody will use that to chip with?
2    A.    You can use that hammer if the
3 chunk gets hung up in the side knife to knock
4 the chunk a loose so the next block will push it
5 out.
6    Q.    Do you have to turn the machine
7 off before you use the hammer?
8    A.    No.
9    Q.    Can you let the machine keep doing
10 and hammer and knock the chip out?
11    A.    Yes, because the chip is higher
12 than the side knife.
13    Q.    Can use the rod and not turn the
14 machine off?
15    A.    Yeah. To hit the chunk, but not
16 to clean it out.
17    Q.    Even if the debris falls down
18 beside the side knives, it's your testimony if
19 you're going to use a rod, you still need to
20 turn the machine off?
21    A.    Yes.
22    Q.    It would be your testimony then,
23 regardless of whether you're using your hand or

Page 63

1 the rod, pretty much every other block, somebody
2 has to turn the machine off?
3    A.    Yes.
4    Q.    And clean the debris out and then
5 start the machine back up?
6    A.    Yes.
7    Q.    Have you ever heard anybody
8 announce to the whole plant, "I'm locking out
9 and tagging the out machine, step away from
10 the machine"?
11    A.    Not unless it's a mechanical
12 error.
13    Q.    Or when you're changing the
14 knives, I guess, do you announce it then?
15    A.    Splitters are not in line when
16 you're changing the knives.
17    Q.    So you wouldn't announce it then?
18    A.    No.
19    Q.    Who has the key to lock this
20 machine out?
21    A.    The lock and key hangs in the
22 office on the tag/out lock/out board. Whoever
23 locks it out with the lock puts the key in their

Page 64

1 pocket until they get done.
2    Q.    Is that typically the person
3 pulling chunks would be the person to go get it,
4 because they would be the ones to see the debris
5 happen?
6    A.    They notify one of the USA
7 employees and they would lock it out. Whoever
8 the splitter person is that works on it.
9    Q.    So it wouldn't necessarily have to
10 be the person pulling chunks?
11    A.    No, uh-uh.
12    Q.    But it can be the person pulling
13 chunks?
14    A.    Yes.
15    Q.    In other words, Mr. Jackson, when
16 he's pulling chunks, he could go to the office
17 and get the lock and come lock it out and tag it
18 out if he needed to, couldn't he?
19    A.    If he knows how.
20    Q.    Was Mr. Jackson trained on that,
21 do you know?
22    A.    He was showed how to turn the
23 machine off, how to turn it on. If a block is

Page 65

1  hung up or mechanical error, he was told to turn
2  around and get me.
3      Q.   I see. Is that pretty much what
4  Mr. Jackson was told?
5      A.   Yes. I'm the one that told him.
6      Q.   When Mr. Jackson came the work out
7  there, do you remember that?
8      A.   Yes.
9      Q.   Did you train Mr. Jackson?
10     A.   Yes.
11     Q.   On the operation or how to pull
12  chunks?
13     A.   Yes.
14     Q.   And how to clean the debris?
15     A.   Yes.
16     Q.   What did you tell him?
17     A.   Do not stick your hands in the
18  side knives, use the stick or cut the machine
19  off. That if something jammed up, turn around
20  and get me, and I will straighten it up.
21     Q.   I understand from Mr. Jackson that
22  he did see debris fall down beside the block and
23  he did reach in there with his hand to try to

Page 66

1  clear out the side knives. Is that you're
2  understanding as well?
3      A.   Yes.
4      Q.   My understanding is he did not
5  turn the machine off. And his testimony is that
6  that's the way he had always done it, and that's
7  the way he understood he was supposed to it.
8  That's what his testimony was. My question to
9  you is: He says that once he got in there, this
10  block was stuck, and as he was trying to pull
11  his hand out, the glove got stuck on some area
12  on the side knife or bolt or some area up in
13  there. Is that you're understanding of the
14  accident?
15     A.   No.
16     Q.   What is your understanding how the
17  accident happened?
18     A.   He stuck his hand in there without
19  cutting the machine off to get the chunks out.
20  The next block come into the splitter, and
21  before he could get his hand out, it made the
22  eye that pushes the block forward to the knives,
23  and he couldn't get his hand out. He said it

Page 67

1  was stupid of him to do it.
2      Q.   Mr. Jackson said that?
3      A.   He told me that it was his fault.
4      Q.   When did he tell you that?
5      A.   When did he tell me that?
6      Q.   Yes, sir.
7      A.   When I was holding his hand on the
8  way to the hospital.
9      Q.   What else did you hear him say?
10     A.   Basically that was it. It was my
11  fault. I knew better than to stick my hand in
12  there.
13     Q.   The reason I asked is because in
14  the First Report of Injury that was turned in in
15  this case, it says that Mr. Jackson's glove got
16  caught in the machine. It does not reference
17  any of these comments. Did you ever tell
18  anybody else what you just told to me?
19     A.   Yes, my supervisor, Karry Mackey.
20     Q.   Who else have you told that?
21     A.   That's it. Everybody that was in
22  the office that morning heard Mr. Jackson say
23  that.

Page 68

1      Q.   Tell me who else was in there?
2      A.   Donnie Lawson, Dewayne Biggs, me
3  and Mr. Jackson.
4      Q.   Mr. Mackey wasn't there the day of
5  the accident?
6      A.   He had not got there yet.
7      Q.   Donnie Lawson, does he still work
8  there?
9      A.   No.
10     Q.   What was his position when he
11  worked there?
12     A.   Driver.
13     Q.   For Block USA?
14     A.   Yes.
15     Q.   When you're pulling chunks, you do
16  wear gloves, don't you?
17     A.   Yes.
18     Q.   Is that required?
19     A.   No.
20     Q.   But is it typical?
21     A.   Yes.
22     Q.   Why do you wear gloves?
23     A.   To keep from getting your hands

Page 69

1 all skin up.
2    Q.    Have you had any communication
3 with E & R or Besser?
4    A.    No.
5    Q.    You never talked to them about
6 anything to do with the machine at all?
7    A.    Yes.  When I was a splitter
8 operator, yes.
9    Q.    What did you talk to them about?
10    A.    Ordering knives.  Ordering parts.
11    Q.    Did they ever tell you that they
12 have other safety features for this splitter to
13 protect workers from getting their hands caught
14 in the knives?
15        MR. CURTIS:  Object to the form.
16        MR. SHEALY:  Same objection.
17    Q.    Did anybody tell you they have
18 stop buttons that can be located where the chunk
19 puller stands, instead of going around to the
20 front of the panel?
21        MR. CURTIS:  Form.
22    A.    No.
23    Q.    Did they ever tell you they

Page 70

1 considered what's called light curtains so if
2 someone had their hand in the area of operation,
3 like Mr. Mackey did and like Mr. Jackson did,
4 these light curtains would sense their hand and
5 the machine would not cycle?
6        MR. CURTIS:  Form.
7    A.    No.
8    Q.    Did they ever tell you they
9 considered, back in 1986 and prior to that, some
10 guards on the machine that would open up and
11 allow the block to come out so nobody could have
12 their hand in the knife when it cycled?
13        MR. CURTIS:  Form.
14        MR. SHEALY:  Object to the form.
15    A.    No.
16    Q.    Would you have wanted to know that
17 for safety purposes out there, to have the
18 safest machine as you could, any of those
19 options?
20    A.    Yes.
21    Q.    Why is that?
22    A.    To keep somebody from getting
23 hurt.  But the machine was already there when I

Page 71

1 began to work on it.
2    Q.    Sure.  I'm not really even asking
3 you anything other than:  Would you have like to
4 have known that?
5    A.    Yes.
6    Q.    Have there been any other
7 accidents on this machine involving hands
8 getting caught in these knives besides
9 Mr. Mackey and Mr. Jackson?
10    A.    Yes.
11    Q.    Tell me about those.
12    A.    Just a temporary laborer got the
13 tip of her finger cut.
14    Q.    Was it on the top knife or side
15 knife?
16    A.    Side knife.
17    Q.    Was it on this same block
18 splitter?
19    A.    Yes.
20    Q.    Was it on the same side as
21 Mr. Jackson's knife?
22    A.    Yes.
23    Q.    Was it the same knife Mr. Mackey

Page 72

1 got cut on?
2    A.    No.
3    Q.    Which one was Mr. Mackey's?
4    A.    The windsor.
5    Q.    But when I say the same side, I'm
6 asking:  Were they standing in the same place we
7 saw Mr. Jackson standing?
8    A.    Yes.
9    Q.    In other words, Plaintiff's
10 Exhibit 7 to Mr. Neese's deposition shows
11 Mr. Willy Jackson standing at this block
12 splitter in this position.
13    A.    Yes.
14    Q.    Is that where Mr. Jackson was
15 standing?
16    A.    Yes.
17    Q.    Is that where this temporary
18 laborer was also standing?
19    A.    Yes.
20    Q.    To your knowledge, is that where
21 Mr. Mackey was also standing?
22    A.    Yes.
23    Q.    This knife right here, was that

Page 73

1  the same kind of knife that involved in
2  Mr. Jackson's accident?
3      A.   Yes.
4      Q.   Was it the same knife involved
5  in -- what's the person's name that got the tip
6  of her fingers cut off?
7      A.   All I know is Sherry.
8      Q.   Was this the same type of knife
9  that was used when Sherry got cut?
10     A.   Yes.
11     Q.   Was that the same type of knife
12 that was used when Mr. Mackey got cut?
13     A.   No.
14     Q.   Was it similar?
15     A.   Yes.
16     Q.   In that it had two knives?
17     A.   Yes.
18     Q.   Was it similar in that the two
19 knives created chunks?
20     A.   Yes.
21     Q.   Is that the chunks that were being
22 pulled by Mr. Mackey, Mr. Jackson, and Sherry?
23     A.   Yes.

Page 74

1      Q.   Now, when Mr. Mackey's accident
2  happened, do you know why he wasn't using a
3  tool?
4      A.   No.  That is up to the chunk
5  puller of whether they use the rod or whether
6  they use their hand.
7      Q.   Now, when you came back to work,
8  was this machine, this splitter, already there?
9      A.   Yes.
10     Q.   Do you know of any guards that
11 have been taken off of this machine at all?
12     A.   No.
13     Q.   Looking at Defendant's Exhibit 4
14 to Mr. Jackson's deposition, do you see these
15 little hinges I'm pointing to here?
16     A.   Yes.
17     Q.   I think that's called piano
18 hinges.  Do you know whether there was a guard
19 ever there or not?
20     A.   No, I do not.
21     Q.   Have you ever seen a guard there
22 before Mr. Jackson's accident?
23     A.   No.

Page 75

1      Q.   Do you know if there is one there
2  now?
3      A.   No, because that's on the top
4  knife.
5      Q.   Okay.  Looking at Plaintiff's
6  Exhibit 7 to Mr. Neese's deposition, do you see
7  this area I'm pointing to here?
8      A.   The bottom of the top of the
9  splitter?
10     Q.   Yes, sir.
11     A.   Yes.
12     Q.   Is that the same area that we see
13 in Defendant's Exhibit 4 to Mr. Jackson's
14 deposition?
15     A.   Yes.
16     Q.   Do you know why there is something
17 different in Plaintiff's Exhibit 7 to
18 Mr. Neese's deposition than we see in
19 Defendant's Exhibit 4 to Mr. Jackson's
20 deposition?
21     A.   Yes.
22     Q.   Do you know what that is or why
23 that's in one, but not in the other one?

Page 76

1      A.   Yes.  Mr. Jackson's -- at the time
2  we did not know there was a guard that goes
3  there.
4      Q.   Had it ever been on that machine?
5      A.   No.
6      Q.   As far as you know, when this
7  machine came in from being delivered, did it
8  come in with this --
9      A.   No, as far as I know it wasn't
10 there.
11     Q.   Let me get a clear question.  As
12 far as you know, when this machine came in from
13 being delivered, was that guard in place on the
14 machine?
15     A.   No.
16     Q.   Given the accident, Mr. Jackson's
17 accident happened down here on the side, would
18 this guard have protected his hand?
19     A.   No.
20     Q.   Would it have protected
21 Mr. Mackey's?
22     A.   No.
23     Q.   Would it protected Sherry's?

Page 77

1    A.    No.
2    Q.    Do you know if having a stop
3  button where the operator stands would have
4  helped the operator stop the machine easier and
5  clean out the machine than having to walk around
6  the panel?
7    A.    Yes.  If you had a stop and start
8  button.
9    Q.    Right.  I will show you
10  Plaintiff's Exhibit 8 to Mr. Duane Rondeau's
11  deposition, he is the corporate representative
12  for Besser.  This is another type of splitter
13  they make.  Mr. Rondeau testified these
14  emergency stops, and stop and start buttons here
15  and here I'm pointing to, they put these on the
16  machine that Besser makes and sells, but they
17  don't put them on the one that E & R makes and
18  sells.  Did you know that?
19    A.    No.
20    Q.    Can you see any reason these stop
21  and start buttons couldn't be installed on the
22  splitter that was involved in Mr. Jackson's
23  accident?  For example, in a position where --

Page 78

1    A.    Yes, I can see.
2    Q.    You can see what?
3    A.    The reason they are not
4  installed.
5    Q.    Why is that?
6    A.    Because that picture of that
7  splitter you're showing me from Besser is about
8  three times bigger than the one we got.
9    Q.    My question to you is:  Do --
10    A.    There is not enough room.
11    Q.    My question to you is:  Do you
12  know of any reason wiring couldn't be run to put
13  these stop buttons?
14    A.    No.
15    Q.    If they were put there, do you
16  think people pulling chunks could use them?
17    A.    No.
18    Q.    Do you see that warning sticker,
19  Defendant's Exhibit 4 to Mr. Jackson's
20  deposition?
21    A.    Yes.
22    Q.    Do you know why it's blacked out
23  right there?

Page 79

1    A.    That's dirt and dust.
2    Q.    Okay.
3    A.    May I take a break?
4        MR. ANDREWS:  Sure.
5        11:06 a.m.
6        (Off the record)
7        11:16 a.m.
8  BY MR. ANDREWS:
9    Q.    This temporary worker we were
10  talking about earlier, a Sherry, do you remember
11  Sherry?
12    A.    Yes.
13    Q.    Do you have any idea where Sherry
14  lives?
15    A.    No.
16    Q.    Does she still work out there?
17    A.    No.
18    Q.    How long ago was her accident?
19    A.    I really can't recall.
20    Q.    Was she through Able Body?
21    A.    Yes.
22    Q.    Were you there when her accident
23  happened?

Page 80

1    A.    Yes, on the yard.
2    Q.    Did you hear her say anything
3  about how her accident happened?
4    A.    No.
5    Q.    Have you been told how her
6  accident happened?
7    A.    No.  I was told she was told not
8  to stick her hand in it.
9        MR. SHEALY:  Ask him was it after
10  Jackson or before?
11    Q.    Was it after Mr. Jackson's?
12    A.    Yes.
13    Q.    So do you know about how long ago
14  it was?
15    A.    Probably about a year ago.
16    Q.    Have you talked to anybody that
17  says they saw that accident?
18    A.    No.
19    Q.    Do you know if there is anybody
20  that did see that accident?
21    A.    No.
22    Q.    Do you know how much of her
23  fingers were cut off?

Page 81

1    A.    Just the tip of the index finger.
2    Q.    Did she quit after that, or did
3 she come back to work at all?
4    A.    No, I do not know.
5    Q.    In other words, you don't remember
6 or you don't know if she went to the doctor then
7 came back to work?
8    A.    I don't know whether they sent her
9 back up or not.
10    Q.    I see. Now, we were talking
11 earlier about workers standing at the panel, the
12 operation panel.
13    A.    Yes.
14    Q.    On the day of Mr. Jackson's
15 accident, was there anybody standing at that
16 panel?
17    A.    No.
18    Q.    Is that okay? Is that typical?
19    A.    Yes.
20    Q.    Does anybody have to be at that
21 panel?
22    A.    Not on them block.
23    Q.    As a matter of fact, it's more

Page 82

1 common than not that somebody is not at that
2 panel when cutting this type of block?
3    A.    Yes.
4    Q.    E & R corporate representative
5 testified that he knows that in the real world
6 application of this machine, workers will try to
7 clear the debris without having to stop that
8 machine. Would that be consistent with what you
9 observed as well?
10    A.    Yes.
11    Q.    I guess, your only criticism of
12 Mr. Jackson is he used his hand to reach into
13 the machine while it was still going, rather
14 than using a tool?
15    A.    Yes.
16    Q.    But you will agree with me, I
17 guess, whether you criticize Mr. Jackson or not,
18 using his hand is quicker than using a tool, it
19 can be quicker and easier?
20    A.    Sometimes.
21    Q.    How quick is that cycle when the
22 blocks are being split? Can you vary that
23 cycle?

Page 83

1    A.    No.
2    Q.    Is it a set pattern?
3    A.    Yes.
4    Q.    You told me already what
5 Mr. Jackson said after that accident. Do you
6 remember any other events after the accident?
7    A.    After the accident?
8    Q.    Right.
9    A.    I chased him down, and held his
10 hand.
11    Q.    Was he running?
12    A.    Yes.
13    Q.    Take us through what happened.
14    A.    We started work at five o'clock
15 that morning. At 5:25, Mr. Jackson hollered. I
16 turned around and he was starting to run, and I
17 chased him down. He said he stuck his hand in
18 the splitter, and he knew better than to do it,
19 and his hand was cut. I held it all the way to
20 the emergency room.
21    Q.    Who was driving?
22    A.    Donnie Lawson.
23    Q.    After that, did Mr. Jackson say

Page 84

1 anything else about the accident, or was he
2 focused on his pain?
3    A.    Said he knew better than to do it.
4    Q.    After he said that?
5    A.    I'm saying that's what he said all
6 the way to the hospital, he knew better than to
7 do it. Other than that, he didn't say anything
8 else to me.
9    Q.    Other than telling Mr. Mackey
10 that, have you ever told anybody else that,
11 other than your lawyer?
12    A.    No.
13    Q.    Do you know Mr. Jackson, do you
14 know Mr. David Jackson?
15    A.    Not personally.
16    Q.    Okay. When you worked with him,
17 was he a pretty good fella?
18    A.    Yes. He did what he was told.
19    MR. ANDREWS: I believe that's all
20 the questions I have. Thank you.
21    EXAMINATION
22 BY MR. SHEALY:
23    Q.    My name is Steadman Shealy. I

Page 85

1 represent E & R Manufacturer in this case. We
2 have been sued by Mr. Jackson.
3        It's my understanding from what you've
4 told Mr. Andrews, that Mr. Jackson admitted this
5 accident was his fault?
6        A.    Yes.
7        Q.    Is that a true statement?
8        A.    Yes.
9        Q.    He admitted it on more than one
10 occasion?
11       A.    Yes.
12       Q.    We took Mr. Jackson's deposition
13 yesterday, and he testified that he did not know
14 how to turn on and turn off the machine at the
15 control panel.
16       A.    No. He was showed how to turn it
17 on and turn it off.
18       Q.    Did you see him turn the machine
19 on and off before?
20       A.    Yes.
21       Q.    So if he testified yesterday that
22 first of all, he didn't even know how to turn it
23 on or turn it off at the control panel, which is

Page 86

1 the panel right by the block that is split, are
2 we understanding each other?
3        A.    Yes.
4        Q.    He testified that he had seen it
5 turned on and off, and you were the only one
6 that would do that. Is that an incorrect
7 statement?
8        A.    Yes.
9        Q.    In fact, you had trained or showed
10 Mr. Jackson how to turn this machine on and off
11 on the control panel; is that a true statement?
12       A.    Yes.
13       Q.    You had seen Mr. Jackson turn this
14 machine on and off at the control panel; is that
15 a true statement?
16       A.    Yes.
17       Q.    When you're at the machine where
18 the block is being split, which is what
19 Mr. Jackson was doing, what would you describe
20 that job duties or position called, is that a
21 utility man cleaning out debris?
22       A.    That's a chunk puller.
23       Q.    We are going to call it the chunk

Page 87

1 puller. All right. Mr. Jackson was the chunk
2 puller the day of his accident; is that
3 correct?
4        A.    Yes.
5        Q.    Was he trained as the chunk puller
6 to have certain job duties and responsibilities?
7        A.    Yes.
8        Q.    As a part of those job duties and
9 responsibilities, was he trained that if a piece
10 of block was lodged or there was debris built up
11 where the side knives are located, he was
12 supposed to walk about two or three steps and
13 hit the stop button to stop the machine?
14       A.    Yes.
15       Q.    That takes what, about two and a
16 half to three seconds to do that?
17       A.    Yes.
18       Q.    Was that a part of his job duties
19 and responsibilities?
20       A.    Yes.
21       Q.    Would y'all penalize him or get
22 upset with him if he stopped the block splitter?
23       A.    No.

Page 88

1        Q.    In fact, that was his job to do
2 that, wasn't it?
3        A.    Yes.
4        Q.    If he didn't do it and just stuck
5 his hand in there where the side knives were
6 trying to beat the cycle, that was not his job
7 duties and responsibilities?
8        A.    No.
9        Q.    In fact, you have specifically
10 trained him and told him not to put his hand
11 where those side knives were located exactly in
12 the place where he was injured while the machine
13 was running; is that a true statement?
14       A.    Yes.
15       Q.    You told him that before the day
16 of this accident?
17       A.    Yes.
18       Q.    Had you told him on more than one
19 occasion not to put his hand in the splitter?
20       A.    Yes.
21       Q.    Did y'all ever have safety
22 meetings or gatherings where you would discuss
23 safety in the work place and discuss the fact

Page 89

1  you don't put your hand in the block splitter
2  near the knives while it is cycling?
3      A.    We have a safety meeting every
4  week.
5      Q.    Mr. Jackson testified yesterday
6  that you had no safety meetings?
7      A.    When we have a safety meetings,
8  normally Able Body or temporary labor is not
9  there. They are not required to be in our
10  safety meeting.
11      Q.    Well, let me ask you this then:
12  Would Mr. Jackson have been safely trained by
13  you and your staff how to operate or how to be a
14  chunk puller?
15      A.    Yes.
16      Q.    Do you feel like you adequately
17  trained him and told him and made him aware of
18  any type of danger or any issue with this block
19  splitter so he was aware not to put his hand
20  where the side knives were located while the
21  machine is running?
22      A.    Yes, I trained him personally.
23      Q.    He said he received no training?

Page 90

1      A.    That's not true.
2      Q.    You did train him personally?
3      A.    Yes.
4      Q.    You told him personally not to put
5  his hand --
6      A.    Yes.
7      Q.    -- in the area where he was cut or
8  injured while the machine was running?
9      A.    Yes. I tell every temporary help
10  that.
11      Q.    You told him on more than one
12  occasion prior to his injury?
13      A.    Yes.
14      Q.    Now, is a hammer used on the block
15  to chip away?
16      A.    Yes.
17      Q.    Does that come with this machine?
18      A.    No.
19      Q.    But it is a part of something you
20  have to use sometimes to kind of aid with the
21  manufacturing process at your plant?
22      MR. ANDREWS:  Object to the form.
23  That is called a splitter.

Page 91

1      A.    Yes.
2      Q.    Is that true?
3      A.    Yes.
4      Q.    How many seconds does it take for
5  the machine to cycle, do you know?
6      A.    Probably three to five seconds.
7      Q.    Now --
8      A.    For it to push up and the knife to
9  come down and the side knife to go in.
10      Q.    There were warnings on this
11  machine that you saw; is that correct?
12      A.    Yes.
13      Q.    The warnings say, "Keep hands
14  clear"?
15      A.    Yes.
16      Q.    Did you understand that and
17  explain to Mr. Jackson that when it's got "Keep
18  hands clear", that means you don't put your hand
19  in there while the machine is running?
20      A.    Yes.
21      Q.    Could you see those warnings on
22  the day of Mr. Jackson's accident?
23      A.    Yes.

Page 92

1      Q.    Could you understand those
2  warnings?
3      A.    Yes.
4      Q.    Were they clear to you or any
5  reason you couldn't understand a warning that
6  said keep your hands clear from the machine?
7      A.    Were they clear to me or clear to
8  Mr. Jackson?
9      Q.    To you and Mr. Jackson.
10      A.    Yes, it's clear. Big bold letter.
11      MR. ANDREWS:  Let me put on the
12  record, I object to what might have been clear
13  to somebody else besides him. He can testify
14  what is clear to him.
15      Q.    When you were talking to
16  Mr. Jackson and telling him not to put his hands
17  in there, did you say it says "Keep hand clear"?
18      A.    Yes.
19      Q.    Which is Defendant's Exhibit 1?
20      A.    Yes.
21      Q.    That's right in the area where he
22  says he was injured?
23      A.    Yes.

Page 93

1    Q.   Is it any big deal to stop the
2  block splitter and start it back?
3    A.   No.
4    Q.   Isn't it just a push of a button?
5    A.   Push of a button to stop it. Push
6  three buttons to start it back up.
7    Q.   Okay.  And you wouldn't punish
8  Mr. Jackson if he stopped this block splitter in
9  the production process because there was a piece
10  of chunk stuck in there, would you?
11    A.   Yes.
12    Q.   He wasn't paid on production?
13    A.   No.
14    Q.   Wasn't he paid by the hour?
15    A.   Yes.
16    Q.   If he felt like the machine needed
17  to be stopped, you wouldn't have had a problem
18  with it?
19    A.   No.
20    Q.   In fact, if he would have stopped
21  this machine, he would not have injured his
22  hand, would he?
23    A.   Yes.

Page 94

1    Q.   If he would have followed your
2  instructions, he wouldn't have injured his hand;
3  isn't that true?
4    A.   Yes.
5    Q.   You have worked around this block
6  splitter for years?
7    A.   Yes.
8    Q.   Did it do what it was supposed to
9  do?
10    A.   Yes.
11    Q.   Did it split block, work well?
12    A.   Yes.
13    Q.   Have you been happy with it?
14    A.   Yes.
15    Q.   Is there anything that you've seen
16  that's dangerous about this machine that you
17  feel like is not adequate?
18    A.   No.
19    Q.   Do you feel like this is a
20  reasonably safe machine to use if you follow
21  instructions and directions of your employer and
22  the manufacturer?
23    A.   Yes.

Page 95

1    Q.   Mr. Jackson also testified
2  yesterday that he never used the pipe or the
3  stick to clean any debris out of the area where
4  he was injured or in the block splitter area.
5    A.   That was up to the chunk puller
6  whether to use it or use your hand.
7    Q.   Okay.  Well, what I'm going to ask
8  you this:  Did you ever see him use the pipe?
9    A.   No.
10    Q.   So you don't know whether he did
11  or didn't?
12    A.   Right.
13    Q.   But it would have been okay to use
14  your hand to clean out debris as long as you
15  turned the machine off?
16    A.   Yes.
17    Q.   At the control panel?
18    A.   Yes.
19    Q.   There are other places on this
20  machine that say "keep your hands clear"; is
21  that true?
22    A.   Yes.
23    Q.   In working around machinery,

Page 96

1  there's going to be different areas that if you
2  put your hand somewhere, you can get hurt if
3  you're not paying attention?
4    A.   Yes.
5    Q.   You were not there when this
6  machine was delivered and set up; is that
7  correct?
8    A.   That's correct.
9    Q.   You told us you don't know how
10  Mr. Mackey cut his hand, you didn't see it?
11    A.   No, I had my back to him.
12    Q.   In fact, you haven't seen anybody
13  get their hand cut; is that true?
14    A.   True.
15    Q.   In fact, y'all have put through
16  there 5,000 blocks a day for what, six days a
17  week?
18    A.   Basically, five days.
19    Q.   Five days a week ever since you've
20  been back there?
21    A.   Yes.
22    Q.   You've never seen, yourself,
23  anybody get their hand cut on a side knife, have

Page 97

1   you?
2       A.   No.
3       Q.   Now, there is another warning
4   Mr. Andrews asked you about that shows a knife
5   cutting a hand.
6       A.   Yes.
7       Q.   Was that on the machine?
8       A.   Yes.
9       Q.   And what did that mean to you?
10      A.   That if you put your hand in
11  there, it was going to cut it off.
12      Q.   You understood what the picture
13  meant?
14      A.   Yes.
15      Q.   What's your education?
16      A.   12th grade graduate.
17      Q.   Any college?
18      A.   No.
19      Q.   Now, is it my understanding that
20  if a person that's the chunk removal person,
21  that some of them would use the steel pipe to
22  clean the chunk out while it was still running,
23  or would they turn the machine off and then use

Page 98

1   the pipe?
2       A.   While it was running.
3       Q.   But you had explained if you were
4   going to put your hands in there to clean out
5   any debris, you must turn the machine off?
6       A.   Yes.
7       Q.   Was that your understanding in the
8   manual that you read, or do you remember what
9   you read in the manual?
10      A.   I don't remember.
11      Q.   So if what I'm understanding, kind
12  of the way you would do things is, if you were
13  going to put your hand in there, you turn the
14  machine off?
15      A.   Yes.
16      Q.   If you are not going to put your
17  hand in there, but remove some debris, you use
18  the rod?
19      A.   Yes.
20      Q.   That's what you told Mr. Jackson
21  to do?
22      A.   Yes.
23      Q.   That was his instructions from the

Page 99

1   time he got there when he was the chunk remover
2   at the block splitter?
3       A.   Yes.
4       Q.   No doubt in your mind you
5   instructed him to do that?
6       A.   No.
7       Q.   No doubt in your mind you
8   instructed him that if he was going to put his
9   hand in there, to turn the machine off?
10      A.   Right.
11      Q.   Did you feel like it was
12  reasonable to have the control panel right by
13  the block splitter, so you could take a couple
14  of steps to turn the machine on and off?
15      A.   Yes.
16      Q.   Does that work well for y'all at
17  this plant?
18      A.   Yes.
19      Q.   Any issues or problems about that?
20      A.   No.
21      Q.   If Mr. Jackson had followed your
22  instructions, he wouldn't have been injured,
23  would he?

Page 100

1       A.   No.
2       Q.   If Mr. Jackson had done what a
3   reasonable and prudent chunk removal person
4   would have done, he wouldn't have been injured,
5   would he?
6       A.   No.
7       Q.   Do you feel like it was
8   unreasonable for Mr. Jackson to put his hand in
9   there while the machine was still running and
10  cycling with block coming through there?
11      A.   Yeah.
12      Q.   Is what I'm understanding that you
13  told us, you have never seen anybody with the
14  machine running put their hand in there to clean
15  out debris?
16      A.   No.
17      Q.   If you had, you would reprimand
18  them, wouldn't you?
19      A.   Yes.
20      Q.   That would violate their training
21  and that was not part of their job duties and
22  responsibilities to do that?
23      A.   Yes.

Page 101

1    Q.   It was not a part of Mr. Jackson's
2    job duties and responsibilities to stick his
3    hand in the area where the side knife is located
4    with the machine still running; is that true?
5        A.   Yes.
6        Q.   Let me talk a minute how this
7    happened.  Mr. Jackson didn't mention to you
8    that his glove got caught?
9        A.   No.
10       Q.   That is not what he told you at or
11   near the time this accident happened?
12       A.   No.
13       Q.   What he told you was, he was
14   trying to beat the cycle, and a block came
15   through and he didn't get his hand out?
16           MR. ANDREWS:  Objection.
17       Q.   Is that true?
18       A.   Yes.
19       Q.   Then he told you he knew better?
20       A.   Yes.
21       Q.   From what he told you, did he
22   recognize that he shouldn't have put his hand in
23   there, it was dangerous and hazardous to do what

Page 102

1    he did?
2        A.   Yes.
3        Q.   Did he admit that to you?
4        A.   Yes.
5        Q.   At the time that he actually put
6    his hand in there where the side knife was
7    located with the machine running, he recognize
8    there was a hazard, and he chose to put his hand
9    in there?
10       A.   Yes.
11       Q.   Is that what he told you?
12       A.   Yes.  Mr. Jackson told me --
13           MR. RODGERS:  You have answered.
14       Q.   Jackson said when you trained him,
15   that you trained him to reach his hand in there
16   and clean out debris?
17       A.   No.
18       Q.   Okay.  You would not have trained
19   him to do that?
20       A.   No.  Only if the machine was
21   turned off.
22           MR. SHEALY:  Okay.
23           MR. CURTIS:  No questions.

Page 103

1            MR. ANDREWS:  I have a couple of
2    follow up questions.
3            EXAMINATION
4    BY MR. ANDREWS:
5        Q.   We have a list of people from Able
6    Body Labor.  I'm not going to mark it, but ask
7    you if you will look through there, this person
8    named Sherry.  I don't see a Sherry on the
9    list.  I was going to see if you could look
10   through there an see if another name, maybe a
11   last name, rings a bell.
12       A.   No.
13           MR. MACKEY:  How new is that list?
14           MR. ANDREWS:  It's dated May 12 of
15   this year.  Don't think it would be on there.
16       Q.   Do you know why, I will ask him,
17   maybe we could get this quicker, do you know why
18   it wouldn't be on there?
19       A.   May of this year.
20       Q.   Right.  This shows May of this
21   year going back.
22           MR. MACKEY:  She don't work for
23   them anymore.

Page 104

1            MR. ANDREWS:  She doesn't work for
2    Able Body?
3        Q.   Do you know where we might be able
4    to find her name?
5        A.   No.
6        Q.   Do you know if that would exist
7    anywhere in the office?
8        A.   No.
9        Q.   If your lawyer finds it, would you
10   get the information if you can?
11           MR. RODGERS:  If we locate it, we
12   will produce it.
13           MR. ANDREWS:  Great.
14       Q.   You said you told Mr. Jackson more
15   than once not to stick his hand in there when it
16   was running; is that right?
17       A.   Yes.
18       Q.   Had you seen him try to stick his
19   hand in there?
20       A.   Yes.
21       Q.   Had you seen him do it on more
22   than one occasion?
23       A.   Yes.

Page 105

1    Q.    Had you told anybody else that
2  same thing?
3    A.    I tell everybody.
4    Q.    Had you seen other people that you
5  had to reprimand like that?
6    A.    Yes.
7    Q.    Who else had you seen that you had
8  to reprimand?
9    A.    Other Able Body people.  Mainly
10  the Able Body, the temporary help people were
11  ones that were bad about wanting to stick their
12  hands in there.
13    Q.    While it was running?
14    A.    Yes.
15    Q.    While they were pulling chunks?
16    A.    Yes.
17    Q.    Would it be just Mr. Jackson and
18  maybe one other, or would it be several other
19  Able Body people?
20    A.    It would be several.
21    Q.    Was that a constant concern of
22  yours, I guess?
23    A.    Yes.

Page 106

1    Q.    In fact, you did see several
2  people trying to reach their hand in there while
3  it was running?
4    A.    Yes.
5    Q.    Did you ever write up anybody for
6  that or reprimand them for that, other than
7  verbally talk to them?
8    A.    No.
9    Q.    The ones that were doing that,
10  even Mr. Jackson, did you ever successfully see
11  them clean that debris out without getting hurt?
12    A.    No, I didn't see them successfully
13  put their hand in there.
14    Q.    You just saw them reaching towards
15  that direction?
16    A.    Yes.
17    Q.    You said there was safety meetings
18  that took place, but Able Body did not attend
19  those safety meetings?
20    A.    Yes.
21    Q.    Is that true?
22    A.    Yes.
23    Q.    Were there safety meetings with

Page 107

1  Able Body people on a regular basis?
2    A.    No.
3    Q.    Do you know why that is?
4    A.    No.  I just know Block USA has
5  their own safety meetings.
6    Q.    You said the cycle is about three
7  to five seconds, and that's when you can use the
8  tool like you talked about to clean the debris
9  out?
10    A.    Yes.
11    Q.    Is that long enough time to do
12  that?
13    A.    Yeah, to knock the chunk down to
14  let the other block push it out with a tool.
15    Q.    When you're also wiping out the
16  debris with the tool, is there long enough time
17  between that cycle for you to reach that tool
18  down in there and clear it out and get the tool
19  back out?
20    A.    Yes.
21    Q.    And you were asked about these
22  warnings on here.  You are not an engineer, are
23  you?

Page 108

1    A.    No.
2    Q.    You have never designed any
3  equipment, have you?
4    A.    No.
5    Q.    Have you designed any guards or
6  safety equipment?
7    A.    No.
8    Q.    You don't know, do you, the
9  hierarchy of what's proper and when you should
10  resort to giving warnings rather than making a
11  safer machine, do you?
12    A.    No.
13    Q.    I believe I understood you said
14  there were three buttons: one to stop the
15  machine, but three to start it back up?
16    A.    Yes.
17    Q.    Is there a cycle time period the
18  machine has to go through at all?
19    A.    To start it back up?
20    Q.    Right.
21    A.    No, you just push the hydraulic
22  button, the power button, and pusher button.
23    Q.    Is it instant, or does the

## Page 109

1  hydraulic have to build up a little bit?
2      A.  No, it's instant. The only time
3  it has to build up is in the morning time.
4      Q.  I see. You also said you were
5  happy with the machine and have never seen any
6  other injuries, but we know of at least three on
7  this very same machine since 1997, don't we?
8      A.  I didn't see them.
9      Q.  You just didn't see them take
10 place?
11     A.  Right.
12     Q.  But you know they happened?
13     A.  Right.
14     Q.  Were you aware that there were at
15 least nine other accidents on this same kind of
16 machine before Mr. Mackey's, before
17 Mr. Jackson's and before Sherry's?
18     A.  No.
19     Q.  Do you think if you made a machine
20 and had that many accidents happen, wouldn't you
21 think it would be smart to come up with some
22 guards or safety equipment to protect people?
23     MR. CURTIS: Object to the form.

## Page 110

1      MR. SHEALY: Same objection.
2      Q.  You can answer.
3      A.  Depends on if it was the machines
4  fault.
5      Q.  If it was feasible to put on
6  there, don't you think it would be smart?
7      MR. CURTIS: Form.
8      A.  Yes.
9      Q.  If we have video footage of this
10 machine with blocks going through there, would
11 you expect to see that machine being turned off
12 during the video footage for debris being pulled
13 out?
14     A.  Yes, if it's there's a major
15 problem.
16     Q.  If somebody was pulling chunks,
17 would you expect to see them in at least
18 three or four blocks come through, they are
19 eventually going to have to turn that machine
20 off?
21     A.  Yes, if the blocks hang up.
22     Q.  Now, you have never met with me
23 before today?

## Page 111

1      A.  No.
2      Q.  Have you ever met with Mr. Shealy?
3      A.  No.
4      Q.  Mr. Curtis?
5      A.  No.
6      Q.  Never met them before at all?
7      A.  No.
8      Q.  Do you know why it is that this
9  testimony about what Mr. Jackson said and what
10 he did after the accident, why is it just now
11 coming up?
12     A.  No.
13     Q.  Wouldn't you think that would have
14 been important to tell somebody right after the
15 accident?
16     A.  For the injured to tell somebody?
17     Q.  For you to tell somebody.
18     A.  I did. I told my supervisor.
19     Q.  Do you know why it hasn't come up
20 before today?
21     MR. RODGERS: Nobody's been
22 deposed today.
23     A.  Nobody talked about it until we

## Page 112

1  got word to be here today.
2      MR. SHEALY: I haven't talked to
3  him. He hasn't talked to him. That's why it
4  hasn't come up.
5      Q.  Do you know why it hasn't come up
6  in any kind of report before today?
7      A.  No. I'm the yard man. I'm
8  outside. I don't know what goes on in the
9  office or on the phone.
10     MR. ANDREWS: I believe that's all
11 the questions I got.
12     MR. RODGERS: Are you done?
13     MR. SHEALY: Yes
14     MR. ANDREWS: Thank you, John.
15     ENDED AT 11:49 a.m.
16     FURTHER DEPONENT SAITH NOT

Page 113

```
 1           C E R T I F I C A T E
 2
 3   STATE OF ALABAMA )
 4   HOUSTON COUNTY  )
 5
 6        I hereby certify that the above
 7   and foregoing deposition was taken down by me in
 8   stenotype, and the questions and answers thereto
 9   were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the deposition
12   give by said witness upon said hearing.
13        I further certify that I am
14   neither of counsel nor of kin to the parties to
15   the action, nor am I in any way interested in
16   the result of said cause.
17
18
19
20   _____
     APRIL BENDINGER, CCR
     CERTIFICATE NUMBER CCR-384
21
     My Commission Expires
22   June 8, 2008
23
```



