# Exhibit 4

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~

5

6    DAVID JACKSON,

7                                    ORIGINAL

8           Plaintiff,

9

10      vs.                  Case No. 2:06CV412-DRB

11

12   BESSER COMPANY, ET AL.,

13

14          Defendants.

15              ~~~~~~~~~~~~~~~~~~~~~

16                  Deposition of

17              DUANE RONDEAU

18

19                March 21, 2007

20                  9:05 a.m.

21

22                  Taken at:

23          Baker & Hostetler, LLP

24      1900 East Ninth Street, Suite 3200

                 Cleveland, Ohio

25

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 2

1      APPEARANCES:

2

3          On behalf of the Plaintiff:

4              Morris, Cary, Andrews, Talmadge

5              & Jones, LLC, by

6              S. MARK ANDREWS, ESQ.

7              3334 Ross Clark Circle

8              P.O. Box 1649

9              Dothan, Alabama  36302

10             (334)792-1420

11             mcatlaw.com

12

13         On behalf of Defendant Besser Company:

14             Baker & Hostetler, LLP, by

15             WADE A. MITCHELL, ESQ.

16             3200 National City Center

17             1900 East Ninth Street

18             Cleveland, Ohio  44114

19             (216)861-7971

20             wmitchell@bakerlaw.com

21

22

23

24

25

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 3

1    APPEARANCES, Continued:

2        On behalf of Defendant Besser Company:

3            (Via telephone)

4            Baker & Hostetler, LLP, by

5            CORY M. CURTIS, ESQ.

6            303 East 17th Avenue

7            Suite 1100

8            Denver, Colorado  80203

9            (303)861-0600

10           ccurtis@bakerlaw.com

11

12       On behalf of Defendant Cary Mackey:

13           Huie, Fernambucq & Stewart, LLP, by

14           JACOB W. CRAWFORD, ESQ.

15           Three Protective Center

16           2801 Highway 280 South

17           Suite 200

18           Birmingham, Alabama  35223

19           (205)251-1193

20           jwc@hfsllp.com

21

22

23

24

25

Page 4

1      APPEARANCES, Continued:

2          On behalf of Defendant E&R Manufacturing:

3              (Via telephone)

4              Shealy, Crum & Pike, by

5              STEADMAN SHEALY, JR., ESQ.

6              P.O. Box 6346

7              Dothan, Alabama  36302

8              (334)677-3000

9              sshealy@scplaw.com

10                        ~ ~ ~ ~ ~

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 5

```
 1                    I N D E X

 2

 3

 4    EXAMINATION  OF  DUANE           6              6

 5    RONDEAU

 6    BY MR. ANDREWS

 7    EXAMINATION  OF  DUANE          219             2

 8    RONDEAU

 9    BY MR. CRAWFORD

10

11

12    Exhibit  1  was  marked          6             23

13    Exhibit  2  was  marked         10             19

14    Exhibit  3  was  marked         44             23

15    Exhibit  4  was  marked         51              2

16    Exhibit  5  was  marked         65             16

17    Exhibit  6  was  marked         79             16

18    Exhibit  7  was  marked        120             22

19    Exhibit  8  was  marked        164             17

20    Exhibit  9  was  marked        167             14

21    Exhibit  10  was  marked       176              1

22    Exhibit  11  was  marked       179             11

23    Exhibit  12  was  marked       188              5

24    Exhibit  13  was  marked       195             16

25
```

Page 6

1                   DUANE RONDEAU, of lawful age,

2      called for examination, as provided by the

3      Federal Rules of Civil Procedure, being by me

4      first duly sworn, as hereinafter certified,

5      deposed and said as follows:

6                   EXAMINATION OF DUANE RONDEAU

7      BY MR. ANDREWS:

8           Q.     Will you tell us your name, please,

9      sir?

10          A.     Duane Rondeau.

11          Q.     How are you employed?

12          A.     I'm director of technical services

13     with Besser Company.

14          Q.     You understand you've been

15     designated or put up today as the corporate

16     representative for Besser Company with regard

17     to a lawsuit styled David Jackson versus

18     Besser Company, were you aware of that?

19          A.     Yes.

20               MR. ANDREWS:  I'm going to mark

21     as Exhibit 1 a copy of the deposition notice.

22                    -   -   -   -   -

23               (Thereupon, Plaintiff's Exhibit 1

24               was marked for purposes of

25               identification.)

Page 7

1                    -   -   -   -   -

2        Q.     Have you had a chance to review

3    this notice before today?

4        A.     Yes, I have.

5        Q.     You understand that you are being

6    put up and represented as the person most

7    knowledgeable as to the categories enumerated

8    in this notice on behalf of Besser Company?

9            MR. MITCHELL:  Subject to our

10   objections and reservations that I sent you

11   last week, go ahead, Duane.

12       A.     Yes, I do.

13       Q.     You understand you're speaking for

14   Besser Company subject to those objections?

15       A.     Yes.

16       Q.     At the end of this notice, I

17   believe this is actually the original notice,

18   there was a specific area that I requested some

19   specific documents.  Do you remember looking

20   at that?

21       A.     Yes, I do.

22       Q.     Have you endeavored to find these

23   documents as best you can?

24       A.     I began the investigation, and I

25   don't have everything yet.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 8

1    Q.    Do you believe that you may be in

2    possession of some of these items, just

3    haven't been able to put your hands on it

4    yet?

5    A.    The items at the end here?

6    Q.    Yes.

7    A.    Yes.  I know the depositions we

8    spoke about.

9    Q.    Before we got on the record I asked

10   you specifically about any prior depositions.

11   Have you given a deposition before?

12   A.    Yes, I have.

13   Q.    How many times have you given a

14   deposition?

15   A.    Six or seven.

16   Q.    Are they in instances such as this

17   where you were speaking as the corporate

18   representative for Besser?

19   A.    Yes.

20   Q.    Were they in cases involving

21   product liability lawsuits?

22   A.    Yes.

23   Q.    Which law firm represented you in

24   those case?

25   A.    Wilson Elser.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 9

1          Q.    In all of them?

2          A.    Yes.

3          Q.    Let me just spend a little time

4    following up on that.  On the cases that you

5    testified in, do you remember the allegations

6    of those cases?

7          A.    They were accidents on Besser

8    equipment.

9          Q.    What kind of accidents?

10         A.    Involving different pieces of

11   equipment.

12         Q.    What kind of injuries did the

13   Plaintiffs suffer?

14         A.    There was a foot injury, there was

15   a crushing, an arm, there was one death, I

16   can't remember the rest.

17         Q.    Do you remember where they were

18   filed?

19         A.    No, not right offhand.

20         Q.    Do you remember the states?

21         A.    I believe one was in New York, one

22   was in Michigan, there was one in Virginia,

23   there may have been one in Alabama or

24   Mississippi.  That's all I can remember.

25         Q.    There were some documents that were

Page 10

1    disclosed in this lawsuit previously that

2    revealed other accidents involving E&R block

3    splitters.  Do you remember those documents,

4    are you familiar with those documents?

5        A.    Yes, I do.

6        Q.    Are those the cases that you're

7    referring to?

8        A.    No.

9        Q.    So there would be not necessarily

10   the -- in other words, the items that were --

11   and I believe they were Bates stamped Besser

12   1 through 17 --

13          MR. MITCHELL:  They were

14   further back in the stack than that.  They

15   start at Besser 26 through --

16          MR. ANDREWS:  I'm going to mark

17   them as Exhibit 2 to your deposition.

18                -   -   -   -   -

19          (Thereupon, Plaintiff's Exhibit 2

20          was marked for purposes of

21          identification.)

22                -   -   -   -   -

23       Q.    Have you seen those documents

24   before?

25       A.    Yes, I have.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 11

1          Q.      What are the documents in Exhibit

2     2?

3          A.      These are printouts from a database

4     that pertain to accidents that we have heard

5     about and these pertain specifically to

6     splitters.

7          Q.      Just so I understand then, your

8     company maintains a database of all accidents

9     involving any piece of machinery that you all

10    produce or put into the marketplace?

11         A.      That we produce or sell.

12         Q.      Produce or sell.  Okay.

13    And so what we have in Exhibit 2 is a

14    printout of the accidents related to a

15    splitter?

16         A.      That's correct.

17         Q.      Are they also limited to the E&R

18    splitters?

19         A.      No.

20         Q.      Are there any in here that are not

21    E&R splitters?

22         A.      I believe so.

23         Q.      Can you identify which ones are not

24    to your knowledge E&R splitters?

25         A.      This one I'm not sure about.  It

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 12

1    doesn't list --

2         Q.    For the record, if you could call

3    out the Bates number you see at the bottom.

4         A.    BES 0025 does not say which type of

5    splitter it was; BES 0024 does not say what

6    type of splitter it was; BES 0023 is a 6386,

7    which would have been a Lithibar splitter;

8    BES 0021 is a model 6386, which was a

9    Lithibar splitter; BES 0020 is the CM24,

10   which would be E&R; BES 0019 is a CM24, which

11   is E&R as well, BES 0018 is E&R, as well as

12   BES 0017 and BES 0022 is a Lithibar splitter.

13        Q.    Okay.

14              Now, with regard to the documents

15   in Plaintiff's Exhibit 2, did all of these

16   accidents result in a lawsuit, or do you

17   know?

18        A.    No.

19        Q.    You don't know or no, they did not?

20        A.    No, they did not.

21        Q.    The lawsuits that we discussed

22   earlier, the six or seven times that you've

23   been deposed, I take it then that those

24   lawsuits would be different accidents than the

25   ones in Plaintiff's Exhibit 2?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 13

1          A.      That's correct.

2          Q.      In preparation for this deposition,

3    did you look to see what safety standards you

4    have in your possession that relate to block

5    splitters?

6          A.      There's none that specifically

7    relate to block splitters.

8          Q.      No safety standards?

9          A.      That's correct.

10         Q.      Which safety standards would cover

11   block splitters?

12         A.      I don't believe there's any

13   specific to just splitters.  We follow some for

14   controls and different types of things, but

15   nothing specifically that we know of for

16   splitters.

17         Q.      If I understand correctly, there's

18   no specific standard under ANSI or OSHA or any

19   other standard promulgating entity that

20   specifically says a splitter falls under this

21   standard; is that what you're saying?

22         A.      That's what I'm saying.

23         Q.      However, there would be power press

24   standards under ANSI, for example, correct?

25         A.      Yes.

Page 14

1    Q.    And a splitter may fall under the

2    power press standard, true?

3            MR. MITCHELL:   Objection.

4    A.    It may but --

5    Q.    You may answer.

6    A.    It may, but no one has ever said

7    they have.

8    Q.    Have you ever asked to find out

9    which ANSI standards or OSHA standards cover

10   any of the block splitters that Besser sells?

11           MR. MITCHELL:   Are you asking

12   he personally or has the company?

13   Q.    Has the company or have you, either

14   one?

15   A.    No.

16   Q.    Do you know why that is?

17   A.    No, I don't.

18   Q.    Do you know whether any of the

19   products that Besser sells comply with ANSI

20   standards?

21   A.    We've designed safety labels with

22   ANSI Z535.1 or something like that.  We design

23   electrical control panels with the National

24   Electric Code.

25           OSHA standards relate to the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 15

1    workplace, which really isn't the

2    manufacturers.  We also purchase components to

3    ASTM specs and things like that, but nothing

4    specific for a splitter.

5         Q.    So as far as ANSI compliance, as

6    far as you know, the warnings, you seek to have

7    the warnings comply with ANSI but nothing else;

8    is that true?

9              MR. MITCHELL:  Objection.

10        Q.    You may answer.

11        A.    There's nothing else that's

12   relative to a splitter specifically.

13        Q.    I take it by having given

14   depositions before you're familiar with the

15   process, but if you need a break, let me know.

16   Try to answer out loud with a yes or no so she

17   can get down yes or no, not an uh-huh or

18   huh-uh.

19              Okay?

20        A.    Not a problem.

21        Q.    If you don't understand any of my

22   questions, please let me know and I will try

23   to restate it for you.

24        A.    I will.

25        Q.    Now, you told me your title.  What

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 16

1    was your title again?

2         A.    Director of technical services and

3    product safety.

4         Q.    So you are in charge of product

5    safety for Besser?

6         A.    Yes.

7         Q.    What do you do in that capacity?

8         A.    I would -- we have a team of people

9    at one location -- actually, one individual at

10   each of our manufacturing locations that's

11   responsible for the safety of the products

12   that they put out there, and I coordinate

13   that effort.

14              If there's any questions at that

15   facility regarding safety or guarding, they

16   would come to me.  We would review it and see

17   how we want to come up with something.

18        Q.    Tell me what steps Besser engages

19   in to evaluate a product for the need for

20   guarding or any of the safety concerns that

21   you've just described.

22        A.    Each of the engineers, as they

23   design the product, does their own I guess

24   informal risk assessment based upon their

25   experience, knowledge, any types of accidents

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 17

1    that they have heard, any types of electrical

2    code standards, things like that.

3              Then if they had any questions on

4    that, they would go to the safety individual at

5    that facility.  If there was any questions

6    about anything, and if he didn't know, he

7    would come to me.

8         Q.    So there are engineers at each

9    facility?

10        A.    Correct.

11        Q.    That engage in what you've called

12   hazard analysis?

13        A.    Yes.

14        Q.    Do you know what a hazard analysis

15   is?

16        A.    Yes, I do.

17        Q.    What is a hazard analysis?

18        A.    I would look at the piece of

19   equipment and identify any potential hazard

20   that would be on that piece of equipment.

21        Q.    Hazard would be something that

22   could potentially cause an injury to a user of

23   the machine?

24        A.    It could.

25        Q.    That would be what you would be

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 18

1    looking for, correct?

2         A.    Correct.

3         Q.    Are you an engineer?

4         A.    Yes, I am.

5         Q.    Where did you get your degree?

6         A.    Michigan Technological University.

7         Q.    When did you get that?

8         A.    1988.

9         Q.    Before I get into your background,

10   from what I understand of your testimony, the

11   engineers at each of these facilities would

12   engage in this hazard analysis as they design

13   a product; is that what your testimony was?

14        A.    Yes.

15        Q.    Would they also do that when a

16   product is sold from any of these facilities

17   that Besser may not design?

18        A.    No.

19        Q.    Why is that?

20        A.    The designer and manufacturer of

21   that piece of equipment would be performing

22   that themselves.

23        Q.    In other words, if you bought a

24   splitter from E&R Manufacturing, Besser would

25   rely on E&R to perform the hazard analysis?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 19

1    A.    That's correct.

2    Q.    But, nonetheless, Besser does want

3  to make sure that any product it places into

4  the stream of commerce or sells is a safe

5  product; would that be true?

6    A.    Yes.

7    Q.    How does Besser engage in that

8  analysis?

9    A.    We would use our accident database

10  as part of that to keep track of any near

11  misses or accidents that have taken place.

12    Q.    Why are those important?

13    A.    To look at where we felt there were

14  hazards or may have missed where we thought

15  there were hazards and utilize that in any

16  future designs.

17    Q.    Would you also get with the

18  manufacturer who makes a machine like E&R to

19  discuss any of these prior accidents?

20    A.    We possibly could.

21    Q.    That would be a good safety

22  practice, would you agree with that?

23        MR. MITCHELL:  Objection.

24    A.    That would be a practice.

25    Q.    Would you agree with me that would

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 20

1    be a good idea or safe?

2              MR. MITCHELL:   Same objection.

3              Go ahead.

4         A.    That would be a good idea.

5         Q.    In other words, if you see an

6    accident or if you hear about an accident and

7    you document it in your database with a machine

8    made by E&R, for example, or a machine by any

9    other company, and it's a near miss or an

10   accident as you've described, you would agree

11   with me that it's a good idea to get with E&R

12   to discuss this and see if there's any way

13   that that hazard could be designed out or

14   guarded against; would you agree with that?

15        A.    We have no control over the design,

16   so all we could do is just inform them of the

17   accident.

18        Q.    And do you all do that?

19        A.    I don't know if we did that with

20   E&R.

21        Q.    Why not?

22        A.    I don't have anyone that was around

23   during those accidents, couldn't find any

24   documents regarding that.

25        Q.    So as you sit here today, Besser

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 21

1    does not know if Besser relayed the accidents

2    to E&R prior to the accident that made the

3    basis of this lawsuit?

4         A.    That's correct.

5         Q.    When did you come with the company?

6         A.    1988.

7         Q.    Since that time have you endeavored

8    to make sure that all accidents reported by

9    Besser have been relayed to E&R or any of the

10   other companies that you may buy a product

11   from?

12        A.    Not since '88.

13        Q.    What did you do in '88?

14        A.    I was a product engineer.

15        Q.    Who was in charge of safety then?

16        A.    I don't know who that was.

17        Q.    You just don't recall?

18        A.    I don't know.

19        Q.    Who was in your position

20   immediately before you?

21        A.    Amy Essex.

22        Q.    Is she still with the company?

23        A.    No.

24        Q.    What about Ryan Wilkinson?

25        A.    Ryan Wilkinson is a mechanical

Page 22

1    engineer at one of our facilities.

2          Q.    Is he still with the company?

3          A.    Yes, he is.

4          Q.    Where is Amy Essex now?

5          A.    She is with a bank.

6          Q.    Was she an engineer?

7          A.    No.

8          Q.    She was in charge of safety at

9    Besser before you?

10         A.    On the liability side.

11         Q.    What do you mean by that?

12         A.    She was risk manager.

13         Q.    Who was responsible for product

14   safety like you are now, who was before you?

15         A.    I don't know if anyone specifically

16   had this title before.  We had one individual

17   who is Arnold Gengerke.

18         Q.    Could you spell that last name?

19         A.    I will do my best.

20   G-e-n-g-e-r-k-e.

21         Q.    Is he still with the company?

22         A.    No.

23         Q.    Where is he?

24         A.    He's retired.

25         Q.    Do you know where he lives?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 23

1          A.      I believe he's in the Alpena area.

2          Q.      Is he an engineer?

3          A.      I don't believe so.

4          Q.      Before you came into the position

5     that you're in now, did anybody serve in the

6     capacity -- I guess you would say Arnold --

7     how do you say his name again?

8          A.      Gengerke.

9          Q.      Arnold was in this position before

10    you; is that right?

11         A.      For the Alpena location.

12         Q.      The subject machine we're here

13    about today, was it made out of the Alpena

14    location?

15         A.      It wasn't made at all.

16         Q.      I'm sorry.

17                 Was it sold out of the Alpena

18    location?

19         A.      Yes.

20         Q.      Was there anybody besides Arnold at

21    any of the other Besser locations that serve in

22    the capacity as safety director?

23         A.      No, not corporate wide.

24         Q.      Was there a corporate-wide safety

25    director before you?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 24

1        A.      No.

2        Q.      Do you know why that is?

3        A.      No, I don't.

4        Q.      At the time the E&R machine was

5    sold into Alabama, was there a corporate-wide

6    safety director?

7        A.      No.

8        Q.      When did you start as the

9    corporate-wide safety director?

10       A.      2004.

11       Q.      How long has Besser been

12   maintaining accident records like the database

13   we see in Exhibit 2?

14       A.      I'm not sure of the exact date.

15       Q.      We know at least it goes back to

16   '85 or '86, right?

17       A.      Right.

18       Q.      And so once again even though

19   Besser had this information that we see in

20   Exhibit 2, there was no one in your position to

21   serve as the company wide or corporate-wide

22   safety director and there was no one that would

23   report this information or relay it to E&R?

24               MR. MITCHELL:  Objection.

25               Answer if you can.

Page 25

1          A.    I'm not sure if anyone reported it.

2          Q.    You came on as the corporate-wide

3   safety director in 2004?

4          A.    Correct.

5          Q.    And you started with Besser in

6   1988?

7          A.    Yes.

8          Q.    What was your position or what were

9   your positions between 1988 and 2004?

10          A.    I began as a product engineer in

11   1988; and in 1993 I became a senior product

12   engineer; in 1998 or thereabouts I became

13   engineering manager for Alpena; 2004 to 2005

14   I was the corporate safety director; and 2006

15   I became director of technical services and

16   product safety.

17          Q.    As a product engineer were you

18   designing products?

19          A.    Yes, I was.

20          Q.    What type of products were you

21   designing?

22          A.    Transfer cars, rack handling

23   equipment.

24          Q.    Project engineer with Besser?

25          A.    That's correct.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 26

1      Q.     You were designing transfer cars?

2      A.     What we call rack loader/unloaders,

3  from '88 to '93.

4      Q.     At any time from '88 to '93 did you

5  ever design block splitter machines?

6      A.     No, I didn't.

7      Q.     Have you ever designed a block

8  splitter machine?

9      A.     No.

10      Q.     From '93 to '98 you were senior

11  product engineer?

12      A.     That's correct.

13      Q.     What did you do then?

14      A.     Continued to design equipment, we

15  added the transfer car product line, and I

16  became responsible for two other engineers and

17  I think four or five designers.

18      Q.     Basically you moved up in a

19  seniority role but doing the same thing?

20      A.     Yes.

21      Q.     Now, when you say designed

22  equipment, did you design any equipment that

23  has a point of operation or a mechanized

24  machine?

25            MR. MITCHELL:  I'm going to

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 27

1  object.  Those are two different things.

2       Q.    Have you ever designed one with a

3  point of operation?

4       A.    I don't understand what you mean by

5  designed a point of operation.

6       Q.    Have you ever designed a machine

7  that is automatic and has a point of operation,

8  like the splitter machine where the knives

9  come together and cut the block?

10      A.    No.

11      Q.    Do you know what a point of

12  operation is?

13      A.    Point of operation is not what

14  you're describing.

15      Q.    What do you understand the point of

16  operation to be?

17      A.    Point of operation could be any

18  mechanical or powered device.

19      Q.    Okay.

20            Is that what you understand a point

21  of operation to be?

22      A.    I don't use that term.  There's

23  point of operation guarding I've heard, but not

24  described the way you are.

25      Q.    What have you heard about point of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 28

1    operation guarding?

2         A.    It would be a guard to eliminate a

3    hazard or block out a hazard.

4         Q.    Would it be a hazard at a point of

5    operation?

6         A.    I just don't understand the

7    operation term.  There's operation going on

8    throughout the equipment.

9         Q.    Have you ever been involved in

10   designing a guard for a point of operation or

11   a point of operation guard as you've

12   described?

13        A.    Yes.

14        Q.    Tell me about that.

15        A.    We would put guarding around all of

16   our power transmission sprockets or chains or

17   belts.

18        Q.    On what machines would those be?

19        A.    I did it on a rack loader/unloader.

20        Q.    Would you consult with any safety

21   standards in designing those guards or did

22   you just come up with the guards because you

23   knew that they needed to be guarded or why

24   did you come up with these point of operation

25   guards?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 29

1      A.     If we identified any hazards, pinch

2   points, we could utilize OSHA standards in

3   the development of the guard, whether it was

4   mesh or solid or how far away it had to be.

5      Q.     So did you know that OSHA standards

6   were important in designing a machine?

7      A.     OSHA standards are important for

8   the workplace, but we utilized them in

9   manufacturing and designing equipment.

10     Q.     Why did you utilize them?

11     A.     It aided in designing the

12  equipment.

13     Q.     Why is that a good idea?

14     A.     It's better to have something to

15  guide you than nothing at all.

16     Q.     Are you familiar with Section

17  1910.212 OSHA?

18     A.     You have to tell me what the topic

19  is.

20     Q.     It deals with guarding machinery in

21  general and dictates that all points of

22  operation should be guarded so that the

23  operator may not reach into the point of

24  operation?

25     A.     No.

Page 30

1    Q.    Have you ever seen that standard

2    before?

3    A.    I may have.

4    Q.    In your designing of this

5    equipment, do you also consider all foreseeable

6    uses and misuses of the product?

7    A.    Yes.

8    Q.    Why is that?

9    A.    To know what typically would happen

10   in a block plant.

11   Q.    What other machines have you

12   designed?

13   A.    Rack transfer equipment, I've

14   worked on block machines, I've worked on

15   concrete mixers, mold components, that would be

16   it.

17   Q.    The mold components, describe what

18   that machine does.

19   A.    It's not a machine.  It's a

20   component that goes in our block machine.

21   Q.    So you just designed the component?

22   A.    Correct.

23   Q.    Have you designed the block making

24   machine?

25   A.    I haven't designed the whole

Page 31

1    machine, but I was part of the team that did.

2        Q.    Can you think of the names of any

3    engineers that are no longer employed with

4    Besser?

5        A.    All engineers?

6        Q.    Any that would have been involved

7    in safety or designing a machine from a safety

8    standpoint?

9        A.    There's a lot that are designing

10   our machines, but we didn't have anyone

11   specifically there to design safety.

12       Q.    When did Besser start having an

13   engineer on staff specific for safety?

14       A.    Never had one.

15       Q.    Do you know why that is?

16       A.    No, I don't.

17       Q.    Do you think it would be a good

18   idea as director of safety at Besser?

19       A.    Each engineer is trained on safety.

20   As they're designing the equipment, they're the

21   ones that are looking at it and responsible

22   for that product.

23       Q.    Who makes sure that they are

24   following the standards?

25       A.    I would.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 32

1          Q.      How do you go about doing that?

2          A.      Again, I would make sure that they

3    have any type of training that they need.  If

4    there's questions, I'm available.  I keep

5    them informed of any accidents or field

6    concerns.

7          Q.      Have you heard of any accidents

8    similar to the Plaintiff's accident other than

9    we see in Exhibit 2?

10         A.      No.

11         Q.      Now, you've been referencing safety

12   analysis that the engineers do when the

13   engineers at Besser design products that are

14   designed by Besser and sold by Besser.

15                 What about safety analysis by Besser

16   of any product that they buy from someone like

17   E&R?

18                 MR. MITCHELL:  I'm going to

19   object just because of the way that question

20   was worded, the form.

21         Q.      I think you may know where I'm

22   going with that question.  Let me try to

23   rephrase it.

24                 I understand from you that Besser

25   has engineers that design equipment for Besser

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 33

1    and that you expect they would perform safety

2    analysis for those machines that are designed

3    by Besser.

4              I want to know and can you tell me

5    about what safety analysis, hazard analysis,

6    and concerns Besser has for safety of users

7    of machines that Besser buys from another

8    company like E&R and sells through Besser?

9         A.    I cannot say anything for when we

10   purchased the E&R splitters.  Currently we

11   would just work with the supplier if we had

12   any issues.  I can't recall of any since I've

13   been doing it.

14        Q.    In other words, would you get with

15   -- I'm going to pick E&R because I understand

16   the subject machine was bought from E&R by

17   Besser; is that your understanding?

18        A.    Can you say that again?

19        Q.    I understand that the subject

20   machine was bought by Besser and then sold to

21   Couch or BlockUSA in Alabama?

22        A.    That's correct.

23        Q.    So Besser bought it from E&R and

24   sold it to Alabama, to BlockUSA?

25        A.    Correct.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 34

1          Q.      And in that instance I think what

2     you just told me was that today Besser would

3     get with E&R and analyze the product from a

4     safety standpoint?

5          A.      If we had issues with it.  We

6     wouldn't just look at it upfront.

7          Q.      Why is that?

8          A.      Looking at the equipment, it

9     doesn't look like there would be any issues,

10    just reputation of the company.  We wouldn't

11    deal with somebody that would provide unsafe

12    equipment.

13         Q.      Today do you still purchase block

14    splitters from E&R?

15         A.      No.

16         Q.      Why not?

17         A.      We purchased a company that had a

18    line of splitters as well.

19         Q.      Is that Lithibar?

20         A.      Yes.

21         Q.      I'm going to come back to that.

22               But did the number of accidents

23    involving E&R block splitters have anything

24    to do with Besser's decision not to purchase

25    any more E&R block splitters?

Page 35

1       A.      No.

2       Q.      At all?

3       A.      No.

4       Q.      At any time since the accidents

5    that we have identified in Exhibit 2 has Besser

6    been in contact with E&R to discuss the hazard

7    of the block splitter that happens when workers

8    try to clear a jam in the machine?

9       A.      Not that I know of.

10      Q.      Since this accident has Besser

11   contacted E&R to let them know that?

12      A.      No.

13      Q.      Why not?

14      A.      Because of the litigation that was

15   going on.

16      Q.      Don't you think that would be a

17   good idea though?

18           MR. MITCHELL:   I'm going to

19   object.  They're acting on advice of counsel

20   right at this moment.

21      Q.      I understand your lawyer told you

22   not to contact E&R.  From a safety standpoint,

23   do you plan to contact E&R and discuss ways

24   that the hazard of a block splitter machine can

25   be minimized or eliminated?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 36

1      A.    We aren't purchasing any more

2   splitters from them.

3      Q.    What about the machines that are in

4   the marketplace already?

5      A.    I would believe that would be E&R's

6   responsibility.

7      Q.    Even though Besser sold them?

8      A.    Correct.

9      Q.    Does Besser have any intent to

10  contact any of the end users of the machines to

11  let them know about hazards in the workplace?

12     A.    I can't answer that one.

13     Q.    As an engineer, do you agree it's

14  of paramount concern to hold safety of the

15  public paramount?

16         MR. MITCHELL:  Objection.  Go

17  ahead and answer if you can.

18     A.    It's at the top of the list.

19     Q.    It's number one, isn't it?

20     A.    Yes.

21     Q.    What did you do to prepare for this

22  deposition?

23     A.    I reviewed your request or notice

24  for my deposition, and I also reviewed the

25  documents that we provided during discovery.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 37

1    Q.    Have you had a chance to read the

2    deposition of the corporate representative

3    for E&R?

4    A.    No, I didn't.

5    Q.    Have you been to the scene of the

6    accident?

7    A.    Yes, I have.

8    Q.    When did you go down there?

9    A.    Sometime in December of 2006.

10   Q.    Who all was there?

11   A.    Two of my attorneys, Cory Curtis,

12   Wade Mitchell --

13          MR. CRAWFORD:  Jacob Crawford.

14   A.    -- Jacob Crawford, and I believe it

15   was the regional safety director for BlockUSA,

16   I think his name was David, but I don't know.

17   Q.    Did you take any pictures of the

18   scene?

19   A.    No, I didn't.

20   Q.    Have you seen any pictures of the

21   scene?

22   A.    No.

23   Q.    What about any witness statements,

24   have you seen any or read any witness

25   statements?

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 38

1        A.      No.

2        Q.      Do you know if there are any

3    witnesses to this accident?

4        A.      I don't know that.

5        Q.      As I understand, Besser sells their

6    products in Europe as well?

7        A.      Correct.

8        Q.      Actually they are sold all over the

9    world?

10       A.      Yes.

11       Q.      Are you responsible for compliance

12   with safety standards outside of the United

13   States?

14       A.      Yes.

15       Q.      That would include CE standards?

16       A.      Yes.

17       Q.      Tell me about the standards.  Which

18   standards does Besser follow outside the United

19   States?

20       A.      There would be three under the CE

21   directive, we would do the machinery directive,

22   low voltage directive, and electromagnetic

23   compatibility directive.

24       Q.      Those are under the CE directives?

25       A.      Those are the CE marking, correct.

Page 39

1      Q.    When you say CE marking, what does

2  that mean?

3      A.    CE stands for Compliance European,

4  and there are certain directives underneath

5  that.

6      Q.    As I understand you have to get a

7  mark on the machine or on your product before

8  it could be sold in Europe?

9      A.    We need to apply a CE sticker to

10  it.

11      Q.    Before you can get that sticker you

12  have to show that you've complied with these

13  standards?

14      A.    That's correct.

15      Q.    How does Besser show compliance

16  with the CE machinery standards?

17      A.    The machinery directive and low

18  voltage directive we self-declare.  The EMC

19  directive, we have an outside firm do the

20  testing on our control panels.

21      Q.    So Besser is allowed to

22  self-declare that they're in compliance with

23  the CE machinery directive?

24      A.    That's correct.

25      Q.    Do you know what CE directive it

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 40

1    is, do you know the number?

2        A.    No.    There are -- there's European

3    norm numbers underneath each one of those, but

4    there's numerous ones.

5        Q.    I guess is the title of the

6    directive the machinery directive or is it --

7        A.    Machinery directive is one, low

8    voltage directive is another, EMC is another.

9        Q.    I assume those last two deal with

10   electronics of the machine?

11       A.    Correct.

12       Q.    Right now I'm focused on the

13   machinery directive for purposes of this

14   question.

15            Would that be the directive that

16   would include guarding requirements for the

17   machines that you sell?

18       A.    Yes.

19       Q.    Do you sell splitters in Europe?

20       A.    Yes.

21       Q.    Do you know what directives or what

22   guarding is required by the CE machinery

23   directive in Europe?

24       A.    There are European norms that we

25   would follow.    I don't know the exact numbers.

Page 41

1    Q.    Who else besides you ensures that

2  Besser products are in compliance with CE

3  directives in Europe?

4    A.    We would have our European office.

5    Q.    Where is that located?

6    A.    Emden, Germany.

7    Q.    You would have your office look at

8  it?

9    A.    If there's questions.

10    Q.    Are the Besser products designed in

11  America and then sold in United States?

12    MR. MITCHELL:   Do you want to

13  rephrase that?

14    Q.    Are the Besser block splitters or

15  Lithibar block splitters that you sell today,

16  are they designed in America and sold in

17  Europe?

18    A.    Yes.

19    Q.    Does Besser have any locations in

20  Alabama?

21    A.    No.

22    Q.    There's a regional office that

23  covers the Alabama area, right?

24    A.    There's a regional manager.

25    Q.    Who is that?

Page 42

1    A.    Rick Dolly.

2    Q.    Where is he based?

3    A.    In Florida.

4    Q.    Rick Dolly?

5    A.    Dolly.

6    Q.    D-o-l-l-e-y?

7    A.    D-o-l-l-y.

8    Q.    Like Dolly?

9    A.    Yes, it is.

10    Q.    Is Alabama under Rick's region?

11    A.    Yes.

12    Q.    And what does that encompass, does

13    Rick service the machines that are sold in

14    Alabama?  Tell me what Rick's responsibilities

15    are for Besser in Alabama.

16    A.    He's a regional sales manager.  He

17    would handle day-to-day sales questions,

18    proposals.

19    Q.    Was Rick involved in the sale of

20    the machine we're here about today?

21    A.    I don't believe so.

22    Q.    Do you know who was?

23    A.    I believe it was Mike Hadley.

24    Q.    Is he still with the company?

25    A.    No.

Page 43

1      Q.    Mike Hadley?

2      A.    Yes.

3      Q.    Do you know where Mike Hadley is

4    located?

5      A.    He's retired.

6      Q.    Do you know where he lived?

7      A.    It was in the Virginia area.

8      Q.    What businesses besides BlockUSA

9    does Besser regularly sell to in Alabama?

10          MR. MITCHELL:  While he's

11   thinking about it, for the record, we're not

12   going to test his personal jurisdiction.

13     A.    I can't think of any.  BlockUSA is

14   one of the larger customers in Alabama.  I

15   really can't think of any right offhand.

16     Q.    Do you regularly sell products to

17   BlockUSA?

18     A.    Yes.

19     Q.    Today, ongoing today I mean?

20     A.    We will sell components.  We

21   haven't sold any equipment recently.

22     Q.    Do you know how many block

23   splitters Besser has sold to Couch or BlockUSA?

24     A.    No.

25     Q.    Would it be more than the one we're

Page 44

1    here about today?

2         A.    I would think so.

3         Q.    Do you know how many E&R products

4    Besser has sold to Couch or BlockUSA?

5         A.    Not right offhand, but I know we

6    provided all of our E&R sales to you.

7         Q.    So where are those?

8         A.    That was a spreadsheet.

9         Q.    This?

10         A.    No.  It was previously disclosed to

11    you.

12         MR. MITCHELL:  Assuming that

13    mine are numbered the same as yours, if you

14    look at the spreadsheet which I think you

15    have already.  Mine have different numbering

16    from yours for whatever reason.

17         MR. ANDREWS:  I do not.  I have

18    not seen this document.

19         MR. MITCHELL:  I apologize.

20         MR. ANDREWS:  I'm going to mark

21    it as Exhibit 3 to your deposition.

22              -  -  -  -  -

23         (Thereupon, Plaintiff's Exhibit 3

24         was marked for purposes of

25         identification.)

Page 45

1                    -   -   -   -   -

2              MR. ANDREWS:  I will note for

3    the record that it is labeled BES 0023, but I

4    also have another document labeled BES 0023

5    that deals with an amputation in Virginia

6    that is one of the other documents.

7         Q.     Nonetheless, let's look at Exhibit

8    3.

9              Tell me what that document is.

10        A.     This is a spreadsheet of E&R

11   splitters that we've sold in the last ten

12   years.

13        Q.     There's only one that looks like

14   it's in Alabama, in '97, the one that's bold?

15        A.     Yes.

16        Q.     Is that the subject machine,

17   although it's labeled Dothan, Alabama, is that

18   the one that we're here about today that was

19   sold in Andalusia, Alabama?

20        A.     That's what we believe.

21        Q.     When was Lithibar purchased?

22        A.     We entered into a marketing

23   agreement with them sometime around 1997 or

24   '98, and then we purchased them around 2001,

25   2003.

Page 46

1    Q.    When did Besser stop buying E&R

2    block splitters?

3    A.    2004.

4    Q.    You were able to look at this

5    Exhibit 3 and tell me.  The one in Nigeria, is

6    that the last one you sold?

7    A.    That's correct.

8    Q.    It was E&R model CM-18?

9    A.    Correct.

10    Q.    Do you know when Besser first sold

11    an E&R block splitter machine, what year?

12    A.    No, I don't.

13    Q.    Do you have records that would go

14    back and show as far as back as Besser keeps

15    records to show all the E&R block splitters

16    Besser has ever sold?

17    A.    Ten years is as far as we could go

18    back.

19    Q.    Well, Exhibit 2 we know shows

20    machines going back to 1985 or '86 with Mr.

21    Domenici's accident for sure, right?

22    A.    That's correct.

23    Q.    And I would assume that the machine

24    that was involved in that 1986 accident was

25    sold before 1986?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 47

1    A.    It may have.

2    Q.    And do you know, therefore, if

3    Besser keeps records further back than 1986?

4         MR. MITCHELL:  '86 or '96?

5         MR. ANDREWS:  '86.

6    A.    I don't know that.  We were able to

7    find those documents there and put together

8    the spreadsheet for ten years.

9    Q.    You just don't know if there's any

10   other ways to find out any other sales other

11   than this ten-year period?

12   A.    That's correct.

13   Q.    I guess today --

14        MR. MITCHELL:  Let me interject.

15   If you were to tell us a specific customer, I

16   believe we could go to the specific customer

17   and tell you what equipment they had.  But as

18   far as a vendor that way, it's much more

19   difficult.

20        MR. ANDREWS:  I see.

21   Q.    Today does Besser sell ongoing

22   sales to BlockUSA in Alabama and sell Lithibar

23   products?

24   A.    That's what we promote, yes.

25   Q.    Do you know how the Lithibar block

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 48

1    splitter differs from the E&R block splitter?

2         A.    Yes.  Somewhat.

3         Q.    Tell me about that.

4         A.    The Lithibar splitter is truly a

5    hydraulic machine.  It has vertical cylinders

6    which split the block to where the E&R

7    splitters was electrohydraulic and utilized a

8    cam motion to split the block.

9         Q.    As far as the configuration of the

10   heads and the open exposed knives, is there

11   any difference?

12        A.    The current Besser/Lithibar

13   splitters aren't accessible from the side, but

14   they still have the block coming through front

15   and back.

16        Q.    Are they guarded on the sides?

17        A.    Yes.

18        Q.    With what's called barrier guards?

19        A.    No.  They would actually have a

20   physical guard on the end of the machine.

21        Q.    Tell me about the guards on the

22   current Lithibar block splitters.

23        A.    There is basically a door that

24   opens from the side that accesses the machine.

25        Q.    Why would you need to have a door

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1    that would access the machine?

2         A.    It keeps the people out from that

3    area.

4         Q.    The guard is intended to keep

5    operators from accessing the splitting area of

6    the machine?

7         A.    From the sides.

8         Q.    Do you have a picture or any

9    drawing of it?

10        A.    I think we provided you with some

11   drawings.

12        Q.    Of Lithibar machines?

13        A.    Yes.

14             MR. ANDREWS:  Once again, I

15   don't believe I have any.

16             MR. MITCHELL:  I have reduced

17   ones.  You may have full size.

18             MR. ANDREWS:  I only have one

19   document that's labeled BES 0026, and it's a

20   plant layout in Andalusia, Alabama so it

21   would not be a Lithibar machine.

22             MR. CURTIS:  I don't believe

23   that any pictures of Lithibar splitters were

24   provided.  I think we are focusing on the

25   subject machine.

Page 50

1              MR. MITCHELL:  That would

2    explain why mine are numbered differently

3    then.  No, we didn't give you the Lithibar

4    drawings.

5              MR. ANDREWS:  Do we have some

6    today that we could look at and talk about so

7    he can explain the guarding that he's talking

8    about?

9              MR. MITCHELL:  Subject to

10   objection to discussion of an unrelated

11   product, certainly.  Give me a continuing

12   objection.

13             MR. SHEALY:  Could you fax me a

14   copy?  Is that possible?

15             MR. MITCHELL:  Not on the

16   immediate term.  I can get them to you later.

17             First of all, they're very reduced

18   drawings.  I have what I suspect were 24 by 30

19   drawings reduced to an 8 and a half by 11

20   sheet.

21             I'm probably better off scanning

22   them and e-mailing them to your paralegal.

23             MR. SHEALY:  Okay.

24             MR. ANDREWS:  I'm going to mark

25   this composite as Exhibit 4.

Page 51

1                    -   -   -   -   -

2              (Thereupon, Plaintiff's Exhibit 4

3              was marked for purposes of

4              identification.)

5                    -   -   -   -   -

6              MR. CURTIS:  Is there a Bates

7    number on Exhibit 4?

8              MR. MITCHELL:  No.  It's stuff

9    that got renumbered somewhere along the line.

10             MR. ANDREWS:  It's handwritten

11   on there, "Wade's copies," and it's BES 1

12   through 9.

13             MR. CURTIS:  Okay.

14             THE WITNESS:  Could we take a

15   break right now?

16             MR. ANDREWS:  You need a

17   break?

18             THE WITNESS:  Yes.

19        Q.    I don't mind taking a break at all,

20   but I just want you to tell me where the

21   guarding is on these drawings that you're

22   describing?

23        A.    These are different splitters.

24             MR. MITCHELL:  First of all,

25   can I have a continuing objection to all

Page 52

1   questions about Lithibar splitters since what

2   we're here about is an E&R splitter?

3         MR. ANDREWS:  I guess you're

4   objecting generally to any questions about

5   Lithibar, but obviously I want to find out

6   any -- I'm looking at any guarding of any

7   block splitter that would be a similar

8   guarding issue as on the subject machine.

9         MR. MITCHELL:  If I could have

10  a continuing objection --

11        MR. ANDREWS:  Sure.

12.       MR. MITCHELL:  -- since we're

13  talking about a different machine designed by

14  different people and produced by a different

15  company, then by all means.

16        MR. ANDREWS:  Sure.

17     Q.   What were you about to say,

18  Mr. Rondeau?

19     A.   These are a few different

20  splitters.

21        Some are manual splitters.  The one

22  that was automatic would have a guard on each

23  end.

24     Q.   You're pointing --

25     A.   Do you see where the cut-away is on

Page 53

1    the right-hand view?

2        Q.    Okay.

3        A.    That would guard each end or each

4    side of the splitter.

5        Q.    So you're looking at number 5 of

6    Exhibit 4 to your deposition?

7        A.    That's correct.

8        Q.    I'm pointing at this drawing.  It

9    may not show up well on the record, but are

10   there guards that come out beyond this area,

11   expanded metal guards that would come out

12   beyond this area?

13       A.    No.

14            MR. ANDREWS:  Do you want to

15   take a break?

16            MR. MITCHELL:  Yes.

17                 (Recess had.)

18       Q.    Mr. Rondeau, we were looking at

19   Exhibit 4 before we took a break, and you were

20   explaining to me on page 5 about a cutout.

21            MR. ANDREWS:  Everybody on the

22   phone, can you all hear that?

23            MR. CURTIS:  Yes.

24            MR. MITCHELL:  Again, this is

25   subject to my continuing objection on

Page 54

1    questions about this particular

2    design of splitter.

3        Q.    You were referencing that there is

4    a door on the side of this machine.  Can you

5    show that to me?

6        A.    Sure.  There's an arrow pointing to

7    it that says, "Guard broken out to show

8    details."

9        Q.    What would be the reason to have a

10   need for a door there?  I think I asked you

11   earlier and you said to keep the operator

12   out.

13            My question though is, why would you

14   need to have access to the inside of that

15   machine?

16       A.    You need to change splitter blades.

17       Q.    Would you also need to clean out

18   debris from the sides of the knives as the

19   product is being split?

20       A.    Not as it's being split.

21       Q.    Tell me about that.

22       A.    It would -- the debris should fall

23   off the side or to the bottom.

24       Q.    You told me you have not read

25   Mr. Neese's deposition.  Mr. Neese explained

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 55

1   to us that the E&R splitter -- I understand

2   this is a Lithibar splitter and I understand

3   we've got objections because these are

4   different machines.  But on the E&R splitter,

5   the people that manufactured it have

6   testified that they knew that workers were

7   going to need to reach into the machine and

8   clean out debris so that the product could be

9   split in an even manner.

10              Were you aware of that?

11              MR. MITCHELL:  Your question

12  is, was he aware of Neese's testimony?

13       Q.    Were you aware of the testimony?  I

14  know the answer to that.  Were you aware that

15  that was what was foreseen by E&R?

16       A.    That would happen occasionally.

17       Q.    How long has Besser known that?

18       A.    I can't give you a date.

19       Q.    That doesn't surprise Besser I

20  guess?

21       A.    That's part of splitting, correct.

22       Q.    The E&R splitter was an automatic

23  splitter where the block was fed into the

24  splitter by way of a conveyor?

25       A.    Correct.

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 56

1      Q.     Or conveying system, it may not be

2    technically called a conveyor, but it was

3    conveyed into the splitter, true?

4      A.     True.

5      Q.     Is that the same with this Lithibar

6    we see in Exhibit 4?

7      A.     Not all of them.

8      Q.     But on the E&R splitter, the one

9    we're here about today, it was an automated

10   system, right?

11     A.     That's correct.

12     Q.     And so the blocks were fed into the

13   splitter in an automated fashion and then

14   split one right after another; is that right?

15     A.     That's correct.

16     Q.     And as I understand from the E&R

17   testimony, when the blocks are split, like

18   you said it's known that's part of splitting,

19   that pieces of the block are going to fall

20   off down beside the knives?

21     A.     Pieces of block will fall off.

22     Q.     If you don't clean out the debris,

23   the debris can render the next break -- it will

24   make the next block potentially be broken in

25   a crooked manner or chip it differently or

Page 57

1  render it a useless product?

2        A.    I would say that's not an ongoing

3  thing though.

4        Q.    It can happen if you don't clean

5  out the debris is what I understand from E&R?

6        A.    It can happen.

7        Q.    So what happens is the workers have

8  to get their hands in there and clean the

9  debris out before the next block is cycled; is

10  that your understanding as well?

11        A.    If there's debris --

12              MR. SHEALY:    Object to the

13  form.

14              (Discussion off the record.)

15        Q.    You can answer.

16        A.    After all that, can you repeat the

17  question?

18        Q.    Yes.  Let me think.

19              E&R has told us that they know that

20  when blocks are fed into the machine, E&R

21  knew that and you've told me that as part of

22  splitting, that chips will fall off, we've

23  established that?

24        A.    Yes.

25        Q.    And that the debris must be cleaned

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 58

1    out to avoid the potential that the next block

2    may be chipped in an irregular fashion and

3    have to be thrown away, we've established

4    that?

5         A.    Occasionally, yes, that's correct.

6         Q.    And you have told me that's not an

7    every time event but that's occasionally?

8         A.    Correct.

9         Q.    As I understand from E&R, they

10   anticipated that workers would, therefore,

11   have to reach into that area to clean out

12   that debris before the next block cycles.

13         Did Besser know that is my question?

14         A.    If they saw there was a problem,

15   they would have to clear the debris out.

16         Q.    So they would have to have their

17   hand in there and clean the debris out like

18   you've told me?

19         A.    Not necessarily their hand.

20         Q.    Tell me how they would do it.

21         MR. MITCHELL:  Do you want him

22   to walk you through the process of cleaning

23   debris?

24         MR. ANDREWS:  Yes, please.

25         A.    The first thing I would do is shut

Page 59

1    the equipment off and lock it out so it can't

2    cycle and then it would clean it out.  After

3    it was locked out then it would be safe to

4    put your hand in there, or you could -- I

5    know at BlockUSA they had a long hammer that

6    they pulled out is what I saw.

7         Q.    Let me make sure that what you've

8    told me.  Number 1, lockout/tagout?

9         A.    Correct.

10        Q.    Number 2?

11        A.    Clear debris.

12        Q.    Clear debris.

13        A.    And that would be by any means.

14        Q.    Number 3, you said use a hammer?

15        A.    No.  I said that's what I saw at

16   BlockUSA.

17        Q.    Is it acceptable in your opinion

18   for operators of an E&R block splitter that are

19   sold by Besser to use a hammer to clean out

20   debris?

21        A.    Only if it's locked out.

22        Q.    Only if it's locked out and tagged

23   out?

24        A.    I wouldn't stick anything in there

25   without it being locked out and tagged out.

Page 60

1          Q.     Would you agree with me that the

2     lockout and tagout will stop the whole cycle

3     of the machine?

4          A.     That's correct.

5          Q.     And that the intent of this machine

6     is for an automated process?

7                 MR. CURTIS:  Hold on one

8     second.

9                 We're talking about the subject

10    machine, not the Lithibar one, right?

11                MR. ANDREWS:  That's correct.

12    I'm talking right now about E&R.  I'm

13    actually talking about the machine in

14    Andalusia, the one that made the basis of

15    this lawsuit, that was sold by Besser and

16    made by E&R.  Okay.

17         Q.     So you would agree with me that the

18    intent of that process was for an automated

19    process to exist?

20         A.     Correct.

21         Q.     And locking out and tagging out

22    interrupts that automated process?

23         A.     Yes.

24         Q.     I understand from testimony from

25    E&R that while the chips and the debris may not

Page 61

1    happen every block, it happens a lot, it's

2    just going to happen?

3         A.    I wouldn't say a lot, but it's

4    going to happen.

5         Q.    Do you know how frequently, do you

6    have any idea how frequently?

7         A.    No, I don't.

8         Q.    Would it surprise you that every

9    other block would create some debris?

10         MR. MITCHELL:    Objection.

11         A.    Every block is going to create

12    debris, but I don't know if every block would

13    cause a problem.

14         Q.    How do you anticipate operators of

15    the machine will engage in the lockout/tagout

16    procedure and still accomplish their

17    productivity through the automated process?

18         A.    They would have a procedure

19    specific to that equipment and follow that.

20    Whatever the plant wanted, that's what they

21    would do.  At the very least you would shut it

22    off.

23         Q.    And where would you shut it off?

24         A.    At the control panel.

25         Q.    As I understand it from the E&R

Page 62

1    testimony, that's the only place where

2    there's a shut-off button?

3         A.    I believe so.

4         Q.    I also understand from the E&R

5    testimony that there's no anticipation that a

6    worker would be stationed at the control

7    panel; is that your understanding as well?

8         A.    I'm not that familiar with it.

9         Q.    How familiar are you with these

10   splitter machines?

11              MR. MITCHELL:  With the E&R

12   splitter?

13              MR. ANDREWS:  With this

14   machine, yes.

15              MR. MITCHELL:  When you say

16   "This," we have Lithibar in front of him.

17   You're talking about the E&R machine?

18              MR. ANDREWS:  Yes.

19        A.    I know the general operation.

20        Q.    Have you ever operated the E&R

21   splitter machine?

22        A.    No, I haven't.

23        Q.    Have you seen it in operation in

24   plants?

25        A.    Yes, I have.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 63

1      Q.    So you've seen the debris that

2  builds up and the workers that reach in to

3  clear it out, right?

4      A.    I have seen some debris.

5      Q.    Have you seen it every time you

6  seen the workers lockout and tagout the

7  machine?

8      A.    I've seen them shut it off.

9      Q.    Not lockout and tagout the machine?

10     A.    Not all the time.

11     Q.    Where's the shut-off button on

12  those machines?

13     A.    I believe it was on the control

14  panel.

15     Q.    Do you know if Besser ever provided

16  shut-off buttons at other locations besides

17  the shut-off panel?

18     A.    I don't know that.

19     Q.    Are you aware of the lockout/tagout

20  standard, are you familiar with the

21  lockout/tagout OSHA standard?

22     A.    Yes.

23     Q.    Tell me about that standard.

24     A.    Whenever you would -- you need to

25  have a procedure to isolate energy sources on a

Page 64

1    piece of equipment whenever you would be

2    performing maintenance adjustments, that type

3    of thing.

4        Q.    Are you familiar with the aspect of

5    that OSHA standard, the lockout/tagout

6    standard that provides that where the

7    activity engaged in is routine or repetitive

8    and part of the ongoing process that

9    lockout/tagout is not required?

10        A.    That's part of the lockout/tagout

11    standard is the alternative measures.

12        Q.    Tell me about the alternative

13    measures portion.

14        A.    Alternative measures would be

15    something that the owner of the equipment would

16    deem safe and effective.

17        Q.    So is it up to the end user to set

18    up the lockout/tagout procedure?

19        A.    Yes, it is.

20        Q.    Well, do you consider the cleaning

21    of the debris to be a routine repetitive issue?

22        MR. CRAWFORD:    Object to the

23    form.

24        Q.    You can answer.

25        A.    Yes, I would.

Page 65

1       Q.    So it's your testimony that every

2   time a piece of debris needs to be cleared out

3   that the machine should be shut down and the

4   lockout/tagout procedures followed?

5       A.    They would follow their

6   lockout/tagout procedures, whatever that may

7   be.

8       Q.    Besser encourages or recommends

9   certain lockout/tagout steps, do they not?

10          MR. MITCHELL:  For the E&R?

11          MR. ANDREWS:  For splitters.

12          MR. MITCHELL:  Are you talking

13   about currently?  I think we need to narrow

14   that question a little more.

15              -   -   -   -   -

16          (Thereupon, Plaintiff's Exhibit 5

17          was marked for purposes of

18          identification.)

19              -   -   -   -   -

20       Q.    Let me show you Exhibit 5 to your

21   deposition.  I'm going to hold up Exhibit 5.

22   This is a paper that you have written

23   entitled, "Essentials of plant safety."

24          Do you remember writing that paper

25   or putting together this power point

Page 66

1    presentation?

2        A.    Yes, I do.

3        Q.    Who did you put this together for?

4        A.    I've used that on numerous

5    occasions.

6        Q.    For who, who listens to this?

7        A.    Typically our customers.

8        Q.    Have you given this speech or this

9    power point to BlockUSA?

10        A.    No.

11        Q.    When you say customers, what do you

12    give it to them for, what do you give speeches

13    to them for?

14        A.    I'm asked to participate in masonry

15    association meetings to present something about

16    safety.

17        Q.    And as part of this presentation

18    there's a page titled, "Control of hazardous

19    energy," and I flipped to that, do you see

20    that?

21        A.    Yes.

22        Q.    It reads, "Besser decal provided on

23    each electrical control panel," do you see

24    that?

25        A.    Yes, I do.

Page 67

1      Q.    There are eight steps that

2  apparently Besser recommends for the operator

3  to use in accomplishing lockout/tagout?

4      A.    That's the suggested procedure to

5  our customers.

6      Q.    From Besser to your customers?

7      A.    Yes.

8      Q.    As I understand from this

9  presentation that the steps include:  Number 1,

10  announce lockout to other employees,; number 2,

11  turn off power at main panel, number 3, lockout

12  power in off position; number 4, put key in

13  pocket; number 5, clear machine of all

14  personnel; number 6, test lockout by hitting

15  the run button; number 7, block chain or

16  release stored energy sources; and then

17  number 8, clear machine of personnel before

18  restarting machine.

19          Is that the recommended procedure?

20      A.    Yes.

21      Q.    And I assume that between 7 and 8

22  that you would accomplish whatever task you

23  were needing to accomplish before you restarted

24  the machine?

25      A.    Can I see 7 and 8 again?

Page 68

1       Q.      Sure.  It looks to me like 1

2  through 7 is in effort to stop the machine and

3  lock it out and tag it out, and then the

4  activity that you need to accomplish is done,

5  and then the machine is restarted?

6       A.      That's correct.

7       Q.      So in an instance of any debris

8  that needed to be cleaned from the splitter,

9  the debris would be cleaned out between steps 7

10 and 8?

11      A.      They would have to have their own

12 procedure.  They may have more steps in there

13 than what that is.

14      Q.      Every time a splitter has something

15 in it that needs to be cleaned, this would be

16 the steps that you would have to go through?

17      A.      Not necessarily.

18      Q.      What would be necessary?

19      A.      It would rely on whatever the owner

20 of the equipment's procedure was.

21      Q.      This is what Besser recommends?

22      A.      But part of the control for

23 hazardous energy procedure includes alternative

24 measures.  They may use alternative measures.

25      Q.      Such as what?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1          A.      Turning the power off.

2          Q.      Tell me about that.

3          A.      Hit the stop button.

4          Q.      If you hit the stop button, what

5    happens?

6          A.      It stops the movement of the

7    machine.

8          Q.      And the stop button, is it the

9    emergency stop button?

10         A.      I would believe so, yes.

11         Q.      Do you know if that shuts the whole

12   machine down where it has to be recycled on

13   again or does that stop it momentarily?

14         A.      I believe that would stop the

15   entire machine.

16         Q.      Where it would have to be recycled

17   back on again?

18         A.      It would have to be turned on

19   again.

20         Q.      Do you know how long that process

21   takes?

22         A.      No, I don't.

23         Q.      I'm going to show you photograph 15

24   from Mr. Neese's deposition.  Is this area

25   that I'm pointing to, is that the control

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 70

1    panel?

2        A.    Yes.

3        Q.    One of these buttons here, is that

4    the stop button that you're referring to?

5        A.    The red buttons are typically

6    emergency stops.

7        Q.    I understand from Mr. Neese's

8    testimony that E&R is not anticipating that

9    anyone would stand in this area of the machine

10   while the machine is running, near the stop

11   button, but does anticipate that someone would

12   stand on this side of the block splitter in

13   order to clean out the debris that would

14   develop?

15           MR. MITCHELL:  Let me make the

16   record a little better.  You're saying that

17   no one would stand on the right side of this

18   picture that we're talking about, near the

19   control panel, but on the left side that

20   would be what looks like the --

21           MR. ANDREWS:  Discharge end.

22           MR. MITCHELL:  -- discharge end

23   of the conveyor; is that correct?

24           MR. ANDREWS:  Between the

25   splitter and the cuber.

Page 71

1        Q.      Did you know that?

2        A.      Typically they would be somewhere

3   between there.

4        Q.      Let me make sure your testimony is

5   clear.  Typically Besser understood that a

6   worker would stand between the splitter and

7   the cuber?

8        A.      There's usually a man somewhere

9   along that.  I don't know exactly where.

10       Q.      And one of the reasons for the

11  worker to stand there would be, like E&R

12  testified, would be to clean out the debris as

13  it needs to be cleaned out?

14       A.      Possibly.

15       Q.      Now, what alternative measures do

16  you think the E&R block splitter has for the

17  operator to use instead of locking out and

18  tagging out the machine?

19            MR. MITCHELL:  I would object

20  because I believe he said the alternative

21  measures were the employer's.  Thus, it

22  mischaracterizes his earlier testimony.

23            Go ahead and answer if you can.

24            MR. SHEALY:  Same objection.

25  I'm objecting to the form.

Page 72

1      Q.     The objection I understand is that

2   you're saying that it's up to the employer to

3   set out the standards that the worker should

4   follow.

5          My question to you is, given that

6   you have given presentations on lockout/tagout

7   and recommendations as to control of hazardous

8   energy, and you've referenced the alternative

9   measures for accomplishing control of hazardous

10  energy, can you tell me what you see on the E&R

11  block splitter machine would be options to

12  accomplish the alternative measures for control

13  of hazardous energy?

14          MR. CRAWFORD:  Object to form.

15          MR. MITCHELL:  Likewise.

16     Q.     You can answer.

17     A.     Without knowing the exact operation

18  of it, the first thing I would do would be to

19  hit the E-stops to shut off the equipment.

20     Q.     Do you know why there are no

21  E-stops provided on the machine in the area

22  where E&R and Besser anticipates the worker

23  will be standing?

24          MR. MITCHELL:  Objection.

25          I don't believe he testified

Page 73

1    that Besser anticipated him standing there.

2              MR. CRAWFORD:  Could we have

3    objection for one is good for all?

4              MR. MITCHELL:  We should have

5    that on the record.

6              MR. ANDREWS:  What do you mean,

7    anybody objects, it's for all?

8              MR. CRAWFORD:  It applies to

9    all the Defendants.

10             MR. ANDREWS:  Sure.  That's

11   fine.

12        Q.    You told me earlier that you

13   understood someone would stand -- I'm looking

14   at Exhibit 15 again, and you just told me that

15   you understood that someone would be working on

16   the subject block splitter machine between

17   the heads and the cuber, we talked about

18   that, do you remember that?

19        A.    Yes.

20        Q.    My question to you is, why do you

21   think that Besser -- or why is there not a stop

22   button provided on this machine where the

23   operator would be standing?

24        A.    I don't know why there's none

25   there.

Page 74

1    Q.    Don't you think that would be a
2    good idea?
3          MR. MITCHELL:  Objection.
4          Go ahead.
5    A.    The emergency stop button is only
6    two or three steps away from that position.
7    Q.    So do you think that the operator
8    should take the time to step over here and
9    turn the machine off and then go back to his
10   position?
11   A.    Definitely.
12   Q.    Are you aware of any ANSI standards
13   that address conduct of workers and how they
14   react to the need to clear a jam, for
15   example?
16   A.    No, I'm not.
17   Q.    Are you aware of any standards that
18   indicate that workers act reflexively and
19   take the path of least resistance when
20   working or interacting with a machine?
21   A.    No.  I'm not familiar with that.
22   Q.    I'll represent to you that that is
23   true.  And that having been said, don't you
24   think that it would be a good idea, as a
25   safety person on behalf of Besser, that

Page 75

1    emergency stop could be located here where

2    the worker is going to stand so that they

3    could stop the machine and clear debris?

4           MR. MITCHELL:  You're asking if

5    he personally believes that's a good idea?

6           MR. ANDREWS:  No.  As corporate

7    representative for Besser.

8        A.    That would be an alternative.

9        Q.    Why would that be a good idea in

10   your opinion?

11       A.    It would make it easier for the

12   operator.

13       Q.    It would also make it safer for the

14   operator?

15       A.    I wouldn't say that.

16       Q.    Why not?

17       A.    Because he has an option.  He can

18   shut the power off at the panel.

19       Q.    So you think it would be just as

20   safe to put the button here or here?

21       A.    It would be more convenient there.

22       Q.    Would you think it would be more

23   safe there?

24       A.    It may.  But if he's following

25   procedures, he would be safe.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 76

1      Q.    Sure.  We know, however, from your

2   data at Besser that workers do reach into the

3   machine like we see in Exhibit 2, right?

4      A.    Yes.

5      Q.    And we see that in Exhibit 2

6   several instances like Mr. Domenici in 1986 or

7   1985 who reflexively reached into the machine

8   to clear a jam and his hand was caught, we know

9   that happens, right?

10           MR. MITCHELL:  Objection.

11      A.    Yes.

12      Q.    Don't you think it would have been

13   a good idea for instances like that for someone

14   to have a stop button so they could clear the

15   debris and then pull the stop button back

16   out?

17      A.    I don't know all the circumstances

18   of that case.

19      Q.    You just don't know?

20      A.    I don't know what he did.

21      Q.    Do you understand the word

22   detented?

23      A.    In what case, I guess?

24      Q.    I understand from Mr. Neese at E&R

25   that the stop buttons are detented so that they

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1    push in and they stay in, and you pull them

2    back out and the machine can start back up.

3    That's my understanding of that word.

4            Have you ever heard that?

5        A.    I haven't heard detented used for

6    that, but I understand how an E-stop button

7    works.

8        Q.    Does Besser use those E-stop

9    buttons on any of the other products?

10       A.    Yes, we do.

11       Q.    At the area of operation?

12       A.    At different areas, depending on

13   the equipment.

14       Q.    You're familiar with Michigan OSHA,

15   are you not?

16       A.    Yes.

17       Q.    You call it MIOSHA?

18       A.    Yes.

19       Q.    What do you know about MIOSHA as it

20   relates to these splitters?

21       A.    Nothing relating to splitters.

22       Q.    Have you ever reviewed the part 23,

23   hydraulic power presses, and part 1, general

24   provisions, have you ever reviewed those

25   standards?

Page 78

1              MR. MITCHELL:  Of what?

2         Q.    Of MIOSHA?

3         A.    I've looked at them.  I wouldn't

4    say I know them indepth.

5         Q.    Do you know if these standards

6    apply to the block splitter that made the basis

7    of this lawsuit?

8         A.    No.

9         Q.    You're not saying that they don't,

10   you just don't know if it does or not?

11        A.    We've never applied them and no one

12   has told us that we had to apply them.

13             MR. MITCHELL:  I'm going to

14   object because the block splitter is in

15   Alabama so MIOSHA wouldn't have anything to

16   do with it.

17        Q.    I understand from his testimony

18   that he refers to MIOSHA for guidance, the

19   Michigan OSHA, right?

20        A.    Yes.  Federal or Michigan.

21        Q.    And, in fact, the machine that was

22   sold in Alabama, it referenced MIOSHA, a

23   section on there, did it not?

24        A.    I don't know that.

25        Q.    Were you part of the sale of the

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 79

1    subject machine?

2        A.    No.

3        Q.    Do you know if the subject machine

4    complies with any OSHA standards or ANSI

5    standards at all?

6        A.    No, I don't.

7        Q.    As far as you know, it does not,

8    would that be true?

9            MR. MITCHELL:  Objection.

10           MR. SHEALY:  Object to the

11   form.

12       A.    I didn't design it so I don't know.

13       Q.    As far as you know, it may not?

14       A.    It may not.

15            -  -  -  -  -

16            (Thereupon, Plaintiff's Exhibit 6

17            was marked for purposes of

18            identification.)

19            -  -  -  -  -

20       Q.    I'm going to show you Plaintiff's

21   Exhibit 6, do you recognize that document?

22       A.    Yes, I do.

23       Q.    Is that a Besser letterhead?

24       A.    Yes, it is.

25       Q.    And does that deal with the subject

Page 80

1    machine here, the one we're here about today?

2         A.    I believe it does.

3         Q.    Up at the top it references some

4    MIOSHA Act compliance, does it not?

5         A.    Yes, it does.

6         Q.    Was MIOSHA consulted, as far as you

7    know then, on the sale of the subject

8    machine?

9         A.    I don't know that.

10        Q.    Does it appear that way to you?

11        A.    Only for hazard communication and

12    MSDS.

13        Q.    But MIOSHA was consulted on the

14    subject machine; is that right?

15        A.    I don't know that.

16        Q.    Again, it would appear that way to

17    me.

18             Does it appear that way to you

19    based on this exhibit?

20        A.    No, it doesn't.

21        Q.    Why not?

22        A.    It just states a MIOSHA standard.

23        Q.    So MIOSHA standards were consulted

24    at some point for this machine; would that be a

25    fair statement?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 81

1      A.      No.

2      Q.      Why not?

3      A.      I believe this is the generic thing

4  just to make sure that anything you purchase

5  has MSDS sheets.

6      Q.      In other words, is it something

7  that Besser engages in as a standard practice

8  to consult with MIOSHA, at least for this

9  standard?

10     A.      At least for this one.

11     Q.      At least for this standard

12  referenced on Exhibit 6?

13     A.      I believe so.

14     Q.      Now, the machine that was sold, it

15  references it down in the sale item, but it's

16  entitled a Besser CM-24; is that right?

17     A.      Yes.

18     Q.      So when it sold, is it sold as a

19  Besser machine?

20     A.      As a Besser E&R splitter, yes.

21     Q.      When BlockUSA bought it, they

22  understood they were dealing with Besser?

23     A.      Yes.

24     Q.      They weren't dealing directly with

25  E&R at this point; is that true?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 82

1       A.      I believe they were still dealing

2   directly with E&R.

3       Q.      Nonetheless, it was sold as a

4   Besser CM-24 block splitter machine?

5       A.      That's correct.

6       Q.      Was that the typical relationship

7   with E&R, that it would be made by E&R but sold

8   through Besser and it would be called a

9   Besser E&R machine?

10       A.      That was typical.

11       Q.      In fact, looking at some exhibits

12   to Mr. Neese's deposition, Exhibit 8, this is

13   the CM-24 machine, it has Besser's name on it,

14   does it not?

15       A.      Yes, it does.

16       Q.      And on Exhibit 9 it's referred to

17   as a Besser block splitter; is that true?

18       A.      That's true.

19       Q.      Did Besser always put their name on

20   these block splitters when they were sold?

21           MR. MITCHELL:  Objection.

22           Foundation.  Answer if you can.

23       A.      I believe we did.

24       Q.      Why was that?

25       A.      I don't know that.

Page 83

1      Q.      And was Besser familiar with how

2   these block splitters functioned and operated?

3      A.      Somewhat.

4      Q.      In other words, they were familiar

5   enough with how they worked so that they could

6   sell them?

7      A.      Correct.

8      Q.      They were familiar enough to tell

9   the purchaser how they operate and how to use

10   them?

11      A.      Correct.

12      Q.      Besser, as I understand, and tell

13   me if his was true in the subject case, Besser

14   a lot of times will design a plant layout for a

15   customer?

16      A.      Correct.

17      Q.      Was that true in the case in

18   Andalusia?

19      A.      I believe so.

20      Q.      So the E&R block splitter machine

21   would have been integrated into that plant

22   layout and in that overall design of that line,

23   what I would call the block splitting line or

24   the block producing line?

25      A.      Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 84

1       Q.      So would Besser have had knowledge

2   of how that block splitter would operate and

3   how it would function within the overall

4   production line?

5       A.      We would have specifications from

6   E&R.

7       Q.      Would Besser have been familiar

8   with how those specifications functioned and

9   worked and how that splitter worked so they

10  could meet with the customer and explain how

11  the whole line would work?

12      A.      Yes.  We would need specifications

13  to know what size splitter for the product.

14      Q.      Beyond the size, as far as how the

15  machine worked, Besser knew that, right?

16              MR. MITCHELL:  As far as --

17      Q.      How the splitter functioned and how

18  it operated?

19      A.      We knew the basics.

20      Q.      When you say "the basics," tell me

21  what you mean.

22      A.      We had specifications to say how

23  many block it could split in an hour to see if

24  it would keep up to our block machine.

25      Q.      Go ahead.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 85

1          A.      Electrical or hydraulic

2    requirements.

3          Q.      Tell me this, when the machine was

4    sold to BlockUSA or Couch -- it was sold to

5    Couch which is now BlockUSA, right?

6          A.      Yes.

7          Q.      When it was sold in 1997, Besser

8    was aware of this database or these prior

9    accidents that we see in Exhibit 2 at some

10   level at Besser, correct?

11         A.      Yes.

12         Q.      So Besser would have been aware of

13   these other accidents involving E&R block

14   splitters that are the same model as was sold

15   to Alabama?

16         A.      Not all of them were the same

17   model.

18         Q.      The ones that were E&R block

19   splitters that were the same model, Besser was

20   already aware of those accidents that were the

21   same model as the one that was sold to Couch?

22         A.      Yes.

23         Q.      That would have been true in 1997?

24         A.      I believe so.

25         Q.      Back to some of the MIOSHA rules,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 86

1    are you aware of any MIOSHA rule that provides

2    that hand tools should not be substituted for

3    guarding or proper guarding and engineering,

4    safety engineering?

5         A.    No.

6         Q.    Would you agree with that concept,

7    that the use of hand tools cannot substitute

8    proper engineering principles?

9         A.    I would agree with that.

10        Q.    As an engineer you could say that

11   and as common sense you could say that?

12        A.    I can agree with that.

13        Q.    Have you ever heard of two-hand

14   controls?

15        A.    Yes, I have.

16        Q.    Have you ever designed any

17   machinery that has two-hand controls on the

18   machinery to operate the machine?

19             MR. MITCHELL:  Are you talking

20   about him personally or Besser?

21             MR. ANDREWS:  Both.

22        Q.    Have you personally and/or has

23   Besser?

24        A.    Yes, Besser has.

25        Q.    Tell me about that machine.

Page 87

1      A.      We have a semi-automatic block

2    splitter.

3      Q.      Who makes it?

4      A.      It's manufactured in Holland at the

5    Lithibar facility.

6      Q.      How long has that model been made?

7      A.      I don't know that.

8      Q.      Was it part of the Lithibar Company

9    when it was bought by Besser?

10     A.      I believe it was.

11     Q.      What's the model number, if you

12    know?

13     A.      I don't know right offhand.  It's

14    on those drawings though.

15     Q.      On the ones we've marked already?

16     A.      That's correct.

17     Q.      If you could look through there and

18    tell me which one that is.

19     A.      The model is Quick Split II.

20     Q.      The very first page?

21     A.      Yes.

22     Q.      How do the two-hand controls work

23    on that unit or that model?

24     A.      That model, the operator manually

25    feeds the block and positions it underneath the

Page 88

1    splitter.  And then when he has it positioned

2    underneath the blades, then he uses a

3    two-hand control to cycle the machine.

4        Q.    Do you know why two-hand controls

5    are called for or what's the purpose of having

6    two-hand controls?

7        A.    Because there's manual

8    intervention.

9        Q.    What do you mean?

10       A.    The operator is physically

11   positioning the block.

12       Q.    So there's manual intervention into

13   the point of operation or the knives?

14       A.    Into the whole process.

15       Q.    And as I understand two-hand

16   controls, the reason is so the operator can

17   have his hand in a safe position before the

18   machine cycles?

19       A.    That would be correct.

20       Q.    And the reason that it's used in

21   this model is because it is a semi-automatic?

22       A.    That's correct.

23       Q.    Would it not function in an

24   automatic machine?

25       A.    No.

Page 89

1          Q.      Why is that?

2          A.      An automatic machine would have

3     conveying systems in and out, it would

4     automatically position the block so the

5     operator wouldn't have to be interfacing with

6     it.

7          Q.      As an engineer, what types of

8     guarding are preferred in an automated system

9     such as what you've described?

10          A.      It depends on the hazards that are

11     there.

12          Q.      Well, like the one we see in the

13     E&R CM-24 block splitter?

14              MR. MITCHELL:  I'm going to

15     object.  He's not being offered as an expert,

16     but go ahead.

17          A.      There's a lot of different ones.

18     It depends on the risk.

19          Q.      For example?

20          A.      Physical guarding, fencing.

21          Q.      A barrier guard?

22          A.      Barrier guard or fencing.

23          Q.      Where would it be?  How could you

24     envision a barrier guard would be installed

25     on the CM-24 machine?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 90

1          MR. MITCHELL:  Same objection.

2     Q.    You can answer.

3     A.    I would see it along the side of

4     the machine.

5     Q.    Looking at Exhibit 15, what do you

6     mean?

7     A.    I would have a physical guard that

8     would go along this portion of the machine

9     from the entrance to the exit of the

10    splitter.

11    Q.    It would be fashioned so that the

12    operator could not reach into the point of

13    operation?

14    A.    Unless it was moved or a door open.

15    Q.    And would the door be interlocked?

16         MR. MITCHELL:  Same objection.

17    A.    It could be.

18    Q.    Would that fencing that you're

19    describing, would it impede the function of

20    this block splitter in any way?

21         MR. MITCHELL:  Same objection.

22    A.    Not if everything was working

23    correctly.

24    Q.    In other words, the fence wouldn't

25    keep the block from going into the knives and

Page 91

1  coming out the other side?

2      A.    That's correct.

3      Q.    Do you know why the subject machine

4  was not designed that way by E&R?

5          MR. MITCHELL:  Same objection.

6      A.    I believe there was originally some

7  barrier guards with them.

8      Q.    What gives you that impression?

9      A.    Our literature says that the

10  barrier guards were removed for the picture.

11     Q.    You're referring to numbers 18 and

12  19 that we were just looking at before, are you

13  not?

14     A.    I'm not sure.  Somewhere in there.

15     Q.    You were looking at Exhibits 8 and

16  9, which is Bates stamped number 14 and 15?

17     A.    That's correct.

18     Q.    In this literature it refers to in

19  small print, "Barrier guards removed for

20  illustration"?

21     A.    Yes.

22     Q.    The barrier guard that you

23  described, it would be along the side of the

24  block splitter going from the entrance of the

25  block splitter and the exit of the block

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 92

1    splitter, is that the barrier guard that you're

2    talking about that you think may have been

3    originally part of this block splitter machine?

4         A.    Yes.   That's what I think was

5    there.

6         Q.    Do any of the block splitters made

7    by Besser have such a barrier guard in place?

8              MR. MITCHELL:  You mean those

9    they're making today?

10             MR. ANDREWS:  Yes.

11        A.    Not all of them.

12        Q.    Do some of them?

13        A.    Some customers require or request

14   permanent guarding around different pieces of

15   equipment.

16        Q.    For example, who?

17        A.    We've had various customers request

18   permanent guarding for the plant.

19        Q.    In America?

20        A.    Yes.

21        Q.    Who were those customers?

22        A.    Tarmac, Cemex, and Oldcastle.

23        Q.    Oldcastle?

24        A.    Yes.

25        Q.    And as I understand the perimeter

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1    guarding, it would be like a gate or fence

2    all the way around the machine, and you could

3    open the door to access the machine if you

4    needed to, but when the door is open, it

5    would be electronically integrated with the

6    machine and a proximity device or an interlock

7    would be activated and the machine would shut

8    down?

9         A.    No.  Not in all cases.

10        Q.    In some cases?

11        A.    In some cases they've requested

12   interlocked gates.

13        Q.    What would be the purpose of having

14   interlocked gates?

15        A.    It would shut the equipment off.

16        Q.    Is that for safety?

17        A.    Yes.

18        Q.    And those fences that we've just

19   discussed or that we were talking about, do

20   those in any way impede the function of the

21   block splitter machine?

22        A.    Not for normal operation.

23        Q.    You said that sometimes customers

24   request this.  Why don't you provide it for

25   all customers?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 94

1        A.      Because if they're following

2    lockout/tagout procedures, the machine should

3    be off before anyone enters.

4        Q.      Is it like it's an either/or

5    situation, you could either follow

6    lockout/tagout or we could provide these

7    barrier guards?

8        A.      I think the interlocked barrier

9    guard is a bandaid for a bad lockout/tagout

10   program.

11       Q.      Tell me about that.

12       A.      Because the interlocked gate only

13   addresses one energy source.

14       Q.      Which energy source is that?

15       A.      Electrical.

16       Q.      So what do you envision is the best

17   policy for prevention of hazards such as what

18   happened to the Plaintiff in this case?

19           MR. MITCHELL:  Objection.

20           This witness isn't being offered as

21   an expert.  Go ahead.

22       Q.      You can answer.

23       A.      He should have been following his

24   plant procedures for lockout/tagout, whatever

25   that may be.

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 95

1          Q.      Do you know if he had a lock or a

2     tag?

3          A.      No, I don't.

4          Q.      If he didn't have a lock or a tag,

5     what does that tell you about the company

6     procedures?

7                  MR. CRAWFORD:   Objection to

8     form.

9          A.      Each individual should have their

10    own individualized lock if they're following

11    lockout/tagout procedures.

12         Q.      Given the number of accidents that

13    we have documented in Exhibit 2 involving

14    workers around block splitters, what does

15    this information tell you about the

16    feasibility of lockout/tagout practices?

17         A.      Can you say that again?

18         Q.      You told me that you keep up with

19    other accidents at Besser in order to learn

20    from them --

21         A.      Yes.

22         Q.      -- and to identify hazards, and in

23    order to prevent future accidents; is that a

24    fair statement?

25         A.      Yes.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 96

1          Q.      What did the information that we

2    have in Exhibit 2, these other accidents, what

3    did that tell you about how workers interact

4    with the machine?

5          A.      I believe a lot of these were prior

6    to control of hazardous energy standards.  I

7    think that came in around '91.  So at that

8    time they weren't following lockout/tagout

9    procedures since they weren't in place.

10   Since then I know there's a few that have

11   just not used them.

12         Q.      Barrier guards were available back

13   in this time, were they not?

14         A.      Yes.

15         Q.      Barrier guards, as you've just

16   described, on the side of the machine could

17   have been used as a means of guarding this

18   subject splitter, right?

19              MR. MITCHELL:  Objection to

20   form.  Go ahead.

21         A.      It could have been.

22         Q.      Would you think that that would be

23   a bandaid or would that have been a proper

24   guard?

25              MR. MITCHELL:  Same objection.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 97

1        A.      It would help.

2        Q.      It would have been a proper guard,

3    right?

4                MR. MITCHELL:  Objection.

5        A.      I wouldn't say a proper guard.  I

6    would say it would have helped.

7        Q.      It would have rendered the machine

8    more safe than it existed on the day of the

9    accident?

10       A.      Yes.

11       Q.      What about light curtains, have you

12   ever worked with light curtains?

13       A.      Yes, I have.

14       Q.      Besser sells light curtains, do

15   they not?

16       A.      We have in the past.

17       Q.      In the parts manual?

18       A.      I don't know about light curtains.

19   Photo lights, yes.

20       Q.      What functions or what purposes

21   does Besser use light curtains for?

22       A.      There's different circumstances.

23       Q.      Like what?

24       A.      I believe the one that you're

25   referring to in the parts book is a slot

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 98

1    conveyor.

2         Q.    Tell me about that.

3         A.    If a person's foot -- typically it

4    was the person's foot was coming off of one

5    conveyor on to another, and if it broke the

6    light, it would shut off that conveyor so it

7    didn't get stuck down into it.

8         Q.    And did you find that to be an

9    effective safety device at Besser?

10        A.    Yes.

11        Q.    And did the light curtains hold up

12   in the concrete block making environment?

13        A.    Yes, it did.

14        Q.    Do you think that light curtains

15   could be installed on either side of the point

16   of operation on this block splitter machine in

17   addition to the barrier guards you described?

18        A.    Which --

19             MR. MITCHELL:  Objection.

20             This witness is being offered

21   as a fact witness, not an expert.  Go ahead.

22             MR. ANDREWS:  He's an engineer

23   and he's the safety director at Besser.  And

24   I'm just asking about whether he thinks that

25   light curtains --

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 99

1          MR. MITCHELL:  I understand.  I

2   just wanted to put it on the record.

3          MR. ANDREWS:  Sure.

4          MR. MITCHELL:  Let's take a

5   break.

6                (Recess had.)

7      Q.    Before we get started, are there

8   any other documents that you brought that I

9   have not talked about with you?

10     A.    I don't know what was provided

11  really.

12         MR. MITCHELL:  You didn't bring

13  anything.

14     A.    I didn't bring anything with me.

15     Q.    I'm going to try to go back to my

16  outline and let's get back on track here.

17         I've learned about all of the

18  lawsuits you've testified in, and I'm aware of

19  the accidents that may not necessarily have

20  been lawsuits that are identified in Exhibit 2.

21         Do you know of any other times that

22  Besser has been sued related to a block

23  splitter machine?

24     A.    The only ones that I know of are

25  the ones that are in those documents.

Page 100

1          Q.      Are the ones in Exhibit 2 all of

2    the accidents that you are aware of involving a

3    block splitter machine sold by Besser?

4          A.      Yes.

5          Q.      That would include all manufactured

6    by E&R?

7          A.      Yes.

8          Q.      The accident that I've referred to

9    as the Domenici accident, the one in 1985, are

10   you familiar with that accident?

11         A.      No.

12         Q.      Were you even employed there then?

13         A.      As a co-op student.

14         Q.      Do you remember the accident?

15         A.      No.

16         Q.      Who would have been involved in

17   that lawsuit as a representative for Besser, if

18   you know?

19         A.      Arnold Gengerke would be the only

20   one I would think would be.

21         Q.      I understand from E&R that in that

22   lawsuit there was an engineer from MIT that

23   explained and told Besser and E&R about an

24   alternative design that could have gates that

25   would open and close and allow the block to