1      MR. SHEALY:    Same objection.

2  A   Right.

3  Q   I mean can you point to anything that blocks a

4      worker from reaching in to clear out some debris

5      like we talked about that would -- to keep their

6      hand from getting caught with a side knife?  Can

7      you point to anything in these pictures that would

8      stop that?

9  A   Yeah.

10 Q   Where?

11 A   If you leave the block there.

12 Q   No.  No.  Okay.  My question is can you point to

13     anything that would stop a hand from reaching in

14     there and being caught with the side knife cycle?

15 A   Well, I don't think you got my point.

16 Q   Okay.

17 A   If the first block that's split is allowed to set

18     there on the table, then there is no way you can

19     reach in there.

20 Q   Okay.

21 A   Then the machine goes ahead and pushes that away

22     from the point of operation.

23 Q   Let me come at it this way.  We know Mr. Mackey's

24     fingers got cut off on the top blade; correct?

25 A   I don't know.

1   Q  Or got cut off in the point of operation?

2   A  I don't know.

3        MR. CURTIS:   Object to form.

4   Q  I thought you told me that you talked to Mr. Mackey

5      and his fingers got cut off in this machine?

6   A  Right, but he didn't tell me whether it was the

7      top, side.

8   Q  But he got cut off in the operation of the heads in

9      this machine.

10  A  Right.

11  Q  We know the plaintiff in this case got his hands

12     cut off, fingers cut off in some of the operation

13     of this machine as well; right?

14  A  Right.

15  Q  And we know that Mr. Domenici lost his fingers, or

16     some fingers, in the point of operation in this

17     machine as well; right?

18  A  Right.

19  Q  With that knowledge, would you agree with me there

20     is nothing that keeps -- there is no barrier, no

21     protection, no guard that prevents an operator from

22     having his hand in the point of operation when the

23     machine cycles?

24        MR. CURTIS:   Objection.

25  Q  At the side knives.

1        MR. SHEALY:  Okay.

2        MR. CURTIS:  Object to form.

3  Q  You can answer.

4  A  Right.

5  Q  Do you know why that is?  Why there is no

6     protection there?

7  A  Why there is no guard?

8  Q  Right.

9  A  There is absolutely no way that after it splits

10    that you can get something from both sides to

11    protect that area.  There is no way.

12  Q  Okay.

13  A  And you've got three -- less than three seconds to

14    do it.

15  Q  The ANSI standards that we're referring to, those

16    standards and the OSHA standards, do you agree with

17    me that those are the best standards known in the

18    industry for manufacturing machines like this?

19  A  As far as I know, yes.

20  Q  When you bought this company in 1970 -- did you

21    say?

22  A  Right.

23  Q  -- was this machine being manufactured then?

24  A  No.

25  Q  When did this machine get started?

1   A   The prototype in about '73, '74.

2   Q   Have there been any changes to the design since

3       then of any significance, I guess?  Any major

4       changes, let me start there.

5   A   What is significant changes?

6   Q   Have there been any changes to the design of this

7       originally?

8   A   Oh, yes.

9   Q   What?

10  A   Computer control, linear transducer, the actuation

11      on the split, the method we use there.

12  Q   Tell me about that change.

13  A   Okay.  Originally, the splitting cycle was direct

14      drive.  You are limited on the cycle rate, so we

15      went to electric clutch brakes.  And then they came

16      out with an electric over air clutch brake for

17      higher cycle rates yet.

18  Q   To make the knives go quicker or produce more cuts

19      per minute?

20  A   Right.

21  Q   Okay.

22  A   And basically that's the main changes that we made.

23  Q   With regard to the configuration of the head in an

24      open fashion like we see in Exhibit 5, has that

25      design changed at all since the original design?

1   A   None.   The original did not have barrier guards.

2   Q   Like we see, the OSHA orange one here?

3   A   Right.

4   Q   That was added in about 1990?

5   A   Right.

6   Q   That's when you endeavored to retrofit all the

7       machines?

8   A   Right.

9   Q   And that was as a result of the Domenici lawsuit?

10  A   Basically, yes.

11  Q   The chain that we see here, why is there no

12      protection over that chain?

13  A   That adjustment is strictly hand-operated.   There

14      is no power to it on that whatsoever.

15  Q   When you design --

16  A   It's just an adjustment.

17  Q   When you designed this machine originally in 1970

18      or 1973, did you have any engineering analysis done

19      to it at that time?

20  A   No.

21  Q   Have you had any since?

22  A   No.

23  Q   Did you have a patent on this machine then?

24  A   On some of the components, yes.

25  Q   Are you aware of any other manufacturer that has

1   taken your design and --

2 A Copied it?

3 Q Yes.

4 A Yes.

5 Q Who?

6 A There used to be a company in Missouri that I think

7   are out of business now, and there was a company in

8   France.

9 Q Now, before you designed this machine in 1970 or

10   '73, did you copy some parts of this from another?

11 A No.

12 Q How were the blocks -- how was the head designed in

13   the models that predated the CM-24?

14 A Exhibit 8.

15 Q Is that the way they looked?

16 A That's one model, yes.  The No. 1 in sales.

17 Q Okay.  The picture we see in Exhibit 8, the heads

18   look very similar to the machine that was involved

19   in Mr. Jackson's accident in so much as four posts

20   that support the head, the top knife, et cetera, do

21   you see what I'm talking about?

22 A Right.

23 Q You agree that's a similar design; right?

24 A Right.

25 Q Did you copy this design from Exhibit 8 when you

1    designed your machine in '70, '73?

2  A  Right.

3  Q  Now, the design of this head, had it been like that

4    since 1954?

5  A  No.  That head design came out in probably '57,

6    '58.

7  Q  Basically, if I'm understanding you correctly, E&R

8    has used the same head design since about 1957?

9  A  Right.

10  Q  Are you aware of any other manufacturer -- first,

11    did Mr. -- did Elmer copy this head design from

12    some other machine?

13  A  No.  That was a patent.

14  Q  Okay.  Are you aware of any other companies that

15    copied this design from Mr. Elmer?

16  A  Yes.

17  Q  Who?

18  A  Besser.

19  Q  Okay.  Anybody else?

20  A  There have been others that have copied it.  I

21    don't recall any names right now.

22  Q  Now, the ones overseas, how are theirs different?

23    Like the Tiger and Columbia, how are those designs

24    different?

25  A  Those are strictly hydraulic, completely hydraulic.

108

1   Q  How is the head configured?

2   A  It's very similar to ours, only it's straight, one

3      piece straight knife.  We use multiple knives.

4   Q  Are the Columbia heads, are they open in design

5      like this?

6   A  Yes.

7   Q  Are you aware of any competitors that closes up

8      their heads?

9   A  None that I know of.

10  Q  And the reason that they are left open, is that so

11     that access to the area of cutting can be made if

12     need be?

13  A  That's part of the reason, and the other part or

14     reason is you have to have an area there that the

15     block will go in.

16  Q  Right.  So you've got to have it big enough for the

17     block to fit in; right?

18  A  Right.

19  Q  And another part of the reason is so that you can

20     gain access to clean out that area if you need to?

21  A  If you need to, yes.

22  Q  Has E&R sold these machines in all 50 states as far

23     as you know?

24  A  All over the world.

25  Q  Okay.

1   A   Yes.

2   Q   Do you have any copies of -- could you list all the

3       countries you have sold in?

4   A   By heart?

5   Q   Yeah, if you can.  If you can't, then my question

6       is do you have documentation of it.somewhere that

7       we could get access to?

8   A   I don't know of a country that we haven't sold in.

9   Q   Okay.

10          MR. SHEALY:  Well, okay.

11  Q   How many locations are there of E&R?

12  A   One.

13  Q   Do you know how many machines have been sold into

14      Alabama?

15  A   No.

16  Q   Do you have an estimation?

17  A   I really don't know.  I would say fewer than ten.

18  Q   Now, there is some documentation I have seen that

19      E&R makes a CM-18?

20  A   Yes.

21  Q   Is that this one we see here in Exhibit 8?

22  A   No.  Are you talking about just the model number is

23      CM-18?

24  Q   I probably abbreviated it somewhat.  Is there

25      variations on CM-18?

110

1    A    Well, we used to make a CM-18 with a P, and that

2        P meant powered.  We still make a machine called a

3        CM-18.

4    Q    Does the CM-18 or the CM-18P, did it incorporate

5        any head design different than the subject machine?

6    A    Somewhat different, yeah.  It had two uprights.

7    Q    Instead of four?

8    A    Right.

9    Q    Was there any protection or barriers --

10   A    Nothing.

11   Q    -- around it?

12   A    No.

13   Q    What about the Besser -- I'm sure these are

14       abbreviated.  Are you familiar with the Besser

15       models?

16   A    No.

17   Q    Do you know what a failure mode and effect analysis

18       is or a finite element analysis is?

19   A    No.

20   Q    Do you know what a hazard tree --

21   A    No.

22   Q    Have you ever heard of a fault tree?

23   A    No.

24   Q    If you heard of any -- when you heard of

25       Mr. Jackson's accident, did it ever cross your mind

1     that you should take steps to determine if there

2     was a way that you could provide guarding to guard

3     against accidents such as Mr. Jackson's?

4  A  The first I heard about it was Karry called and

5     ordered some parts and he told me about it.

6  Q  What parts did he order?

7  A  Replacement parts.  I don't remember.

8  Q  What did he say about it?

9  A  He told me that one of the men got his hand caught

10    in the splitter, and I asked him how it happened,

11    and he told me that he did not shut it off and he

12    didn't use good common sense in what he was trying

13    to do.

14  Q  Okay.  What else did he tell you?

15  A  That's all of it he told me.

16  Q  Did you discuss the presence of a guard on the

17    machine?

18  A  Yes.  I asked him about these barrier guards, and

19    he said on the one side there is none on there, and

20    I said, "Karry, there were guards on there."  "No,

21    there weren't either."

22  Q  He said on one side?

23  A  Yes.  And those pictures are here somewhere.

24  Q  What pictures?

25  A  Of the machine with the guards off, the barriers

112

1    off.

2        MR. SHEALY:  Those are the ones I think Joey

3    took.

4        (Plaintiff(s) Deposition Exhibit(s) 13 and 14

5    marked for identification.)

6  Q  I hand you Exhibits 13 and 14.  I'll represent to

7    you these are photographs taken at the plant and

8    show the machine involved in Mr. Jackson's

9    accident.  Are those the pictures you're talking

10   about that did not have the barrier guard in place?

11 A  That's right.  Picture No. 13 is what I was

12   referring to.

13 Q  Picture No. 13?

14 A  Right.

15 Q  Okay.  Now, looking at Exhibits 12 and 13 -- I'm

16   sorry -- 13 and 14, would you agree with me that

17   there is nothing present on the machine shown in

18   Exhibits 13 and 14 that would protect against an

19   operator's hand being in the point of operation

20   when it cycles?

21       MR. CURTIS:  Object to form.

22       MR. SHEALY:  Same objection.

23 Q  When the knives cycle, there is nothing here at

24   all, on top or sides, is there?

25 A  No.

113

1    Q    Okay.  In Exhibit -- in both of them you can see

2         that the sticker has -- there is a warning sticker,

3         isn't there?

4    A    Yes.

5    Q    Is that the way the sticker left E&R?

6    A    No.

7    Q    What's different about this warning sticker?

8    A    The writing has been blacked out.

9    Q    What does that writing say?

10   A    "If you can read this sign, a guard has been

11        removed.  Do not operate with guard removed."

12   Q    Okay.  And you can't read that language on the

13        warning we see in Exhibits 13 and 14, can you?

14   A    No, you cannot.

15   Q    Do you know why that has been blacked out?

16   A    I have no idea.

17   Q    Have you ever talked with anybody down at Andalusia

18        to find out?

19   A    No.

20   Q    When you talked with Mr. Mackey, was there any

21        discussion about this whatsoever?

22   A    About blacking out the --

23   Q    Yes.

24   A    No.

25   Q    Was there any discussion with him about any of the

1      warnings?

2   A  Yes.

3   Q  Tell me about it.

4   A  He told me that the barrier guards were gone off of

5      it and he didn't recall any guards ever being on

6      there when he got the machine.    .

7   Q  Now, the guard, would it fit where this piano hinge

8      is we see in Exhibit 13?

9   A  That's exactly where it goes.

10   Q  And the guards hinge up?

11   A  It hinges and comes down on top of the block.

12   Q  If that guard had been in place -- I think I asked

13      you this already -- but even if that guard for the

14      top knife had been in place, assuming Mr. Jackson's

15      hand got caught in the side, would that guard have

16      provided him with any protection from entrapment in

17      the side knife?

18   A  No.

19   Q  Now, you are familiar with interlocking and in fact

20      have used interlocking devices on the subject

21      machine, have you not?

22   A  Right.

23   Q  The panel door is interlocked, isn't it?

24   A  Yes.

25   Q  If it's open the machine won't operate; right?

1    A    Right.

2    Q    Why didn't you interlock the barrier guard on the

3         top knife?

4    A    The vibration and shock on this top head is really

5         severe, and the life of a switch or any device up

6         there is going to be limited, very limited.

7    Q    So you considered putting an interlock there?

8    A    We have thought about it, yes.

9    Q    But just decided it's not feasible?

10   A    Right.  On the Pitchmaster we use a rotary switch.

11   Q    Tell me about that.

12   A    And whenever the guard is moved or whatever, it

13        shuts the machine off.  But on the Pitchmaster, we

14        don't have the vibration problem that we do on

15        this, the abuse.  And on the Pitchmaster, once in

16        awhile we do have contacts that are broken in the

17        switch.

18   Q    Speaking of the abuse, the environment of use of

19        any product should be considered when designing a

20        machine, would you agree with that?

21   A    Yes.

22             (Plaintiff(s) Deposition Exhibit(s) 15 marked

23        for identification.)

24   Q    I'm going to show you Exhibit 15.  This is sort of

25        a broad view of the subject machine, is it not?

1   A   Right.

2   Q   You would agree with me that machine shows

3       considerable wear and tear, does it not?

4   A   Yes, it does.

5   Q   Is that to be expected when you use a concrete

6       block splitting machine?

7   A   When they run day-in and day-out, yes.

8   Q   I mean that doesn't surprise you to see it in this

9       condition because that machine has been used and

10      that's the way it's supposed to be; right?

11  A   Yes.

12  Q   Now, can you show me any warnings on this machine

13      or any of these photographs that are present that

14      say "This machine cycles automatically" or anything

15      like that?

16  A   "This cycles automatically" right here

17      (indicating).

18  Q   The caution on the top of the panel?

19  A   Yes.

20  Q   Are there any warnings that you can see down

21      here -- and I'm pointing to this area.  I don't

22      know what to call this particular area.  What is

23      this?

24  A   The side knife area.

25              (Plaintiff(s) Deposition Exhibit(s) 16 marked

1      for identification.)

2   Q  I'm going to show you Exhibit 16.  Here is my

3      question.  16 shows placement of various warnings

4      for the subject machine; is that right?

5   A  Right.

6   Q  It shows that 6 and 7 there should be a sticker

7      right here at the side knife.  Is that an actuator

8      for the side knife?

9   A  Yes, that's a hydraulic cylinder.

10  Q  And it shows 6 and 7 should be down here at the

11     bottom of the machine.  What is that area?

12  A  The main drive motor and the clutch brake.

13  Q  When I look up here, this ledge, it says "Keep

14     Guard" -- "Warning - Keep Guard" and "Warning -

15     Guard Removed".  What -- what warnings are those

16     and --

17  A  See this right here (indicating)?

18  Q  You're referring to Exhibit --

19  A  13.  On the side knife assembly, there is guards

20     that cover this.  As this extends, these cam

21     followers roll, which are pinch points; and on the

22     sliding part here, there is a warning sticker that

23     says "A guard has been removed" right here

24     (indicating).

25  Q  On the side knives?

1    A   On the side knives, right here (indicating).

2    Q   Do we see it in Exhibit 13?

3    A   No.

4            MR. SHEALY:   Because the guard has been

5        removed.

6    Q   What did you start to say, Mr. Neese?

7    A   It's covered with dirt.

8    Q   It's covered with dirt?

9    A   Yes.  You can't see the sticker on there.

10   Q   Oh, is it there?

11   A   Right here, yeah (indicating).

12   Q   Okay.  I think I understand what you're saying.

13       Let me make sure for the record.

14           Exhibit 13, we're looking at -- when this

15       knife slides out, you can see the -- you can see

16       the sticker and when it slides back in it's behind

17       this area; is that right?

18   A   No.

19           MR. SHEALY:   No.  The sticker is right here,

20       it's got dirt on it.  There is normally a guard

21       over this, but the guard is removed.

22   Q   Look at Exhibit 5.

23           MR. SHEALY:   If you look, you will see the

24       guard.  Let me show you right here (indicating).

25   Q   Mr. Neese, looking at Exhibit 5, do you see the

1    guard in that?

2  A  Yes.  The guard covers that whole assembly.

3  Q  And it's not present on Exhibit 13?

4  A  No.

5  Q  The guard that is on Exhibit 5 that you see -- take

6     my pen and circle it.

7  A  (Witness Complies).

8  Q  Now, I'll darken that circle to make sure it's on

9     there.  Is that the area that the guard exists?

10 A  Right.

11 Q  And on Exhibit 13, circle the area that it should

12    be but is not.

13 A  (Witness Complies).

14 Q  Now, on Exhibit 13 you circled the area where a

15    guard is missing?

16 A  Right.

17 Q  If that guard that is not seen in Exhibit 13 and

18    that we have circled on Exhibit 5, if that guard

19    had been present on the day of Mr. Jackson's

20    accident, would that guard have protected him

21    against his injury?

22 A  No.  No.

23 Q  What is that guard intended to guard against, what

24    potential hazard?

25 A  These pinch points here between the contact of the

120

1      roller and this side knife mechanism.

2  Q  So you are protecting against fingers and hands,

3      that sort of thing?

4  A  Fingers and hands, yes.

5  Q  What fingers or hands would be in this area when

6      these rollers are being activated?  Or what

7      foreseeable event is that that you're talking

8      about?

9  A  Why would anybody stick their hands in there?

10  Q  No.  No.  I'm saying you have taken -- you have

11      provided a guard to guard against pinch points.

12  A  Yes.

13  Q  What is it that made you think that something --

14  A  That is guardable.  No. 1, it is guardable.  You

15      can eliminate the hazard.  Really we didn't even

16      need the warning sticker on the outside of the

17      guard, just the warning sticker on the inside that

18      the guard is gone is actually all we needed.

19  Q  Okay.

20  A  Now, why anybody would stick their finger in there,

21      I want to ask the same person why would you stick

22      your finger down there.

23  Q  Nonetheless, in order to comply with safety for the

24      operator and ANSI standards and OSHA standards, you

25      have taken it upon yourself as a reasonably prudent

1    designer should to guard against foreseeable events

2    like this; right?

3  A  That's right, absolutely.

4  Q  And that's why you did that.

5  A  Right.

6  Q  Okay.  Because you could anticipate that might

7    happen and you know the duty is incumbent upon you

8    to protect against that.

9  A  Right.

10  Q  Who is Neff Engineering?

11  A  They are the supplier for hydraulic components.

12  Q  Did they participate in the design of this machine

13    whatsoever?

14  A  No.

15  Q  Can you think of any other parties, companies,

16    individuals who may have some responsibility for

17    the design of this machine whatsoever?

18  A  (Negative nod).

19  Q  Is that a no?

20  A  No.  Excuse me.

21  Q  Can you define your target market of this product

22    for me?  Tell me who you target and market.

23  A  Concrete block producers.

24  Q  Okay.  And do you have knowledge or can you

25    describe a typical operator of one of these

1   machines as far as his education and training?

2   What would that person be like?

3  A  I can't really say, you know.  I know that he's not

4    a Ph.D., I know he hasn't been to law school.  Some

5    of the smartest people I know of I know probably

6    didn't get out of the third or fourth grade and

7    can't even read.

8  Q  All right.  But the typical worker --

9  A  But mechanically they really know the equipment.

10  Q  Right.  But the typical worker, you would agree

11    with me, is typically uneducated or of low

12    education; is that what you're saying?

13  A  No, I don't want to lump everybody in that.

14  Q  When you're saying they're not Ph.D.s, I take it

15    what you're saying is they are not the most

16    highest-educated people.  That's the point you were

17    making; right?

18  A  Right.

19  Q  Would you agree that you as the manufacturer of

20    this machine are in a better position about design

21    and guarding principles than they would?

22  A  Yes.

23  Q  Are there any former employees of E&R that don't --

24    people that don't work there anymore?

25  A  Retired.

123

1   Q   Mr. Mangis?

2   A   Are you talking about former employees that retired

3       from the company?

4   Q   Yes.

5   A   Yes.

6   Q   Who is that?

7   A   Marilyn Price ran the bookkeeping part of it for

8       30 years.  Burl Tharp, which is Joe's brother,

9       worked there 40 years.  Dale Neuenschwander worked

10      there for --

11  Q   Spell his name for me.

12  A   Neuenschwander.

13  Q   Can you spell that?

14  A   No.

15  Q   Phonetically?

16  A   N-e-u -- N-e-u-e-n-s-c-h-w-a-n-d-e-r.

17  Q   Okay.

18  A   Dale Neuenschwander worked there for over 20 years.

19      We had an employee that retired after 35 years by

20      the name of Ted Behr, B-e-h-r.  Who else have I

21      missed?  I know there is several others that have

22      retired.

23  Q   Okay.  Is that pretty much all you can remember?

24  A   That's all I can remember right now.

25  Q   I think I've got a handle on it, but using these

1    photographs, these various exhibits, can you tell

2    me how a block goes through this operation?

3  A  Machine?

4  Q  Yes.  Start to finish, what's the intended use?

5  A  The block are generally fed into the machine from

6    the depalleter which pushes them off onto our

7    machine.

8  Q  Is there an operator that stands at that point of

9    the operation?

10  A  No, there is not.  However, some pictures I saw

11    from Couch's plant --

12        MR. SHEALY:  Is that what he asked you?  He

13    told you to explain how it happens, okay, and then

14    he asked you a question about does an operator

15    stand there.  He either does or he doesn't.  Now,

16    go ahead.

17        MR. ANDREWS:  Mr. Neese, you're doing fine.

18  A  What I was saying was the pictures that you showed

19    me --

20        MR. SHEALY:  He didn't ask you about those

21    pictures.

22        THE WITNESS:  Okay.

23        MR. SHEALY:  He wants to get your

24    understanding.

25  A  No, there is nobody there.

1  Q  All right.  But aside from the pictures that you

2      may have seen with someone standing there, is it

3      expected or reasonably foreseeable that someone

4      would stand there during the cycle, during the

5      operation that someone is going to stand there?

6  A  No.

7  Q  You wouldn't anticipate somebody?

8  A  No.

9  Q  Go ahead.

10  A  They are fed onto the splitter.  The splitter and

11      the depalleter are tied together electrically, so

12      when this -- the depalleter feeds a pallet load,

13      the splitter takes it away.  In other words, it

14      doesn't -- so it won't gang the block to the

15      splitter.

16  Q  In other words, the speed of the conveyor on the

17      depalleter should be synchronized to the speed of

18      the conveyor on the splitter?

19  A  Right.

20  Q  So one block will not be slammed against another

21      and chip it or break it?

22  A  Right.

23  Q  Go ahead.

24  A  Then the splitter picks up this pallet load of

25      block and pushes it forward into the pre-programmed

126

1    position where you want that block split.

2  Q  And the person that pre-programs that, programs it

3    by way of this panel --

4  A  Right, into the PC, into the computer.

5  Q  Would there be someone expected to stand at that

6    location?

7  A  No, nobody is there either.

8  Q  Okay.

9  A  And then the next pallet of block come on, comes

10    onto the splitter, push forward, and these go on

11    down the conveyor line (indicating).

12  Q  Okay.  To the cuber.

13  A  To the cuber, yes.

14  Q  Which also the conveyor there should be

15    synchronized there as well; true?

16  A  There is generally -- yes, should be

17    synchronization or gap between pallet loads.

18  Q  Okay.  Is that pretty much the life of a block in

19    this operation?

20  A  That is the sequence, yes.

21  Q  That's the intended sequence of events to split a

22    block?

23  A  Right.

24  Q  Now, we have already looked at Photographs 6 and 7

25    and established that it's foreseeable that someone

127

1     could be standing where this gentleman is standing.

2  A  Yes.

3  Q  Okay.  So we have established that there is not

4     going -- you don't anticipate someone to be

5     standing at the junction between the depalleter and

6     the start of the splitter, do you?

7  A  No.

8  Q  And you don't -- you apparently don't anticipate

9     someone to be standing at the operation panel, do

10    you?

11  A  No.

12  Q  But you do anticipate or foresee that someone may

13    be standing on the other side of the splitter at

14    the end of the splitter between the splitter and

15    the conveyor to the cuber?

16       MR. SHEALY:  Object to the form.

17  Q  Like we see in Exhibits 6 and 7.

18       MR. SHEALY:  He didn't -- I think you asked

19    him is it foreseeable that someone could stand

20    there.

21       MR. ANDREWS:  Yes.

22  Q  Yes, that's right.

23  A  Again, now it depends entirely on the product that

24    you are producing.

25  Q  Sure.  Concrete block though, nonetheless.

1   A   If you are taking out little chunks, yes, somebody

2       is up here (indicating).

3   Q   At the -- somebody is up where?  Where are they

4       going to be?  Where we see in Exhibits 6 and 7?

5   A   Behind the splitter.

6   Q   Between the splitter and the --

7   A   Cuber, conveyor line.

8   Q   You would expect from time to time that someone

9       would be standing there for some purpose, to remove

10      the small chunks like you're talking about?

11  A   Right.

12  Q   Go ahead.

13  A   But if you are just splitting regular line block,

14      one right after another, nobody.

15  Q   Okay.  When you say line feed --

16  A   Line block.

17  Q   I'm sorry, Line block.

18          (Plaintiff(s) Deposition Exhibit(s) 17 marked

19      for identification.)

20  Q   Exhibit 17, is that what you're talking about there

21      with line block?

22          MR. SHEALY:  What he's talking about is this

23      is --

24  A   It appears so, yes.

25  Q   In other words, that's what you're talking about

1    when there is one right after another being cut

2    like that?

3   A   Yes.

4        MR. SHEALY:   Explain to him the two different

5    types of cuttings.

6        THE WITNESS:   You mean the difference between

7    a line block and a retaining wall block?

8        MR. SHEALY:   No.   Between a straight cut.

9        THE WITNESS:   And a bevel cut?

10       MR. SHEALY:   Yes.   And what's the bevel cut

11   called.

12       THE WITNESS:   What's it called?   Miter.

13   That's only true for retaining wall block, the

14   miter cut.

15  Q   That's not the only two types of cuts this machine

16   makes, is it?

17  A   No.   It makes a third called -- where you turn

18   corners, where these ends here are split.

19  Q   And when you would expect someone to be standing

20   behind the splitter like we see in Exhibits 6

21   and 7, that is when what type of block is being

22   split?

23  A   Retaining wall, beveled retaining wall.

24  Q   That's the mitered?

25  A   Mitered.

1   Q   Okay.

2   A   Because that's the only time you split out a chunk.

3   Q   That's the chunk that has to be removed?

4   A   Right.

5   Q   Like we see this gentleman doing in 6 and 7?

6           MR. SHEALY:   Objection to the form.

7           MR. CURTIS:   Objection.

8           MR. SHEALY:   That's assuming it has to be

9       removed.   The block can be removed.   That's a

10      straight cut?

11          THE WITNESS:   Yeah.   I was looking up here

12      (indicating).

13          (Plaintiff(s) Deposition Exhibit(s) 18 marked

14      for identification.)

15  Q   Exhibit 18 is a photograph with some numbers at the

16      bottom in these different positions that we have

17      talked about.   No. 1 being after the depalleter.

18      No. 2 being right there at the control panel.

19      No. 3 being behind the splitter head.

20  A   Yes.

21  Q   These are the three positions that we have

22      discussed; isn't that right?

23  A   Right.

24  Q   So far what I have understood you to say you don't

25      really expect anybody to be at No. 1 or 2, but when

1    the miter cut is being made you would expect

2    someone to be at No. 3?

3  A  Right.

4  Q  Have you ever considered having some kind of air or

5    vacuum to blow out the debris that falls down?

6  A  Yes.

7  Q  Tell me about that.

8  A  That's an OSHA violation right away.

9  Q  Okay.  Why is that?

10  A  You are only allowed 30 PSI on external air sources

11    for that, and 30 PSI is not enough to clean the

12    area.

13  Q  What about maybe some brushes that would come down

14    and brush, have you ever thought about that?

15  A  No.

16  Q  Would that be feasible?

17  A  No.

18  Q  Why not?

19  A  I don't know how you could ever get brushes in

20    there.  Actually the block as they come across

21    there carries the debris with it, except when you

22    get into the big chunks.

23  Q  And then that's when you've got to take steps to

24    remove the big chunks?

25  A  Behind the splitter.

132

1    Q    Like where we see -- in position 3 on Exhibit 18

2         and like the man standing in Exhibits 6 and 7?

3    A    Is that a question?

4    Q    Yes.   That's what you're saying is -- you said

5         except when the V shape was being cut, and I said

6         that's when you expect someone to be standing at

7         this position 3 like we talked about.

8    A    Where you got this 3 here, nobody stands there.

9    Q    I'll represent to you that this 3 is intended to be

10        behind the splitter like the man is in Exhibit 6

11        and 7.

12   A    Okay.   But if the block carried the chunks away

13        from the splitting heads, there is no reason to

14        have him standing right there and reaching in.

15   Q    But otherwise, if the blocks don't carry it away,

16        that's when they need to be there; is that what

17        you're telling me?

18   A    No.

19   Q    What are you telling me?   When are you telling

20        me --

21   A    If the block doesn't carry that chunk away --

22   Q    Right.

23   A    See, after it splits, the two block have got those

24        chunks trapped in there.   As it pushes on towards

25        the off-bear end, it brings those chunks with it.

1     If the chunks don't come, then the pusher stops.

2     If you are running auto cycle, the splitter shuts

3     off.

4  Q  But we have established that there are times that

5     you have seen and are aware of and foresee that

6     these chunks may fall off, not be pushed out with

7     the block and would need to be removed.

8  A  Right.

9  Q  And they would not jam the machine, they would need

10    to be manually removed.

11  A  Well, they are eventually going to jam the machine,

12    they are that big.

13  Q  But before they jam the machine, they need to be

14    removed so they don't render the next product

15    useless, isn't that what we talked about?

16       MR. CURTIS:  Object to the form.

17  A  Possibly, yes.

18  Q  You follow me and you --

19  A  I follow you.

20  Q  I am correct in my understanding, am I not?

21  A  Right.  Okay.

22  Q  Now, the size of the chunk that may be created,

23    left, is that size dependent upon the setting of

24    those knives?

25  A  No.

1   Q   Okay.   Is there any training video that you or

2       Besser or anybody puts out as to the operation of

3       this machine?

4           MR. CURTIS:   Object to the form.

5   A   Not that I'm aware of.

6   Q   Have you ever seen one that Besser·puts out?

7   A   No.

8   Q   Do you know if they do?

9   A   I don't know.

10  Q   You agree with me that a worker could be walking up

11      to this machine and stumble into this area, could

12      he not; is that foreseeable?

13  A   No.

14  Q   You don't think that's possible?

15  A   No.   Unless he's drunk.

16  Q   Okay.

17  A   Or under the influence of drugs.

18  Q   You don't think it's a reasonably foreseeable event

19      for a worker in a concrete facility to be walking

20      near an operating splitter and trip on something

21      and fall into this point of operation?

22  A   No.

23  Q   Is there any way that a worker may reach into this

24      point of operation safely without risk of serious

25      injury when cycling?

1          MR. CURTIS:   Object to the form.

2    A   Restate it.

3    Q   Is there any way that an operator can safely reach

4        into this machine while it's running as it's about

5        to cycle without the risk of serious injury?

6    A   No.

7    Q   How high do you -- how great a risk is it?  Is it

8        like 100 percent, or how high is that risk?

9    A   I would say it would be 100 percent.

10   Q   And the severity that's going to result is going to

11       be a loss of some portion of your hand if it's in

12       there when it cycles, is it not?

13         MR. CURTIS:   Object to the form.

14   A   Right.                              .

15         MR. SHEALY:   Same objection.

16   A   The only area accessible is around the perimeter of

17       the block and that's where the heads are all

18       touching the block.

19   Q   Has E&R ever provided or called for or recommended

20       the use of a tool of any kind to reach into that

21       machine?

22   A   Like a rake or a hoe?

23   Q   Sure, or a bar or a pipe or a crowbar?

24   A   On setup, initial setups of the machine, it's

25       discussed.

136

1  Q  Tell me about that.

2  A  We don't have it in the manual itself, but the

3     first thing we emphasize is if you have to put your

4     hands in there, you shut it off.

5  Q  Okay.

6  A  You don't take a chance even though you have three

7     seconds.

8  Q  Okay.  So tell me about the rake and the hoe that

9     you talk about during initial setup.

10 A  If they are running a retaining wall block --

11 Q  Which is that beveled edge?

12 A  Yes.  And for some reason the chunk lodges in the

13    side knife assembly, that you pull it out with a

14    hoe or piece of bent metal, after you shut it off.

15    After you shut it off.

16 Q  Okay.  How large does that piece have to be before

17    you resort to a hoe?

18 A  To the chunk?

19 Q  Yes.

20 A  I would say the height of the block and three

21    inches on the widest part.

22 Q  Okay.  If it's not that large, is it okay to use

23    your hand?

24 A  No.  With the power on?

25 Q  Sure.

1  A  No.

2  Q  Is it -- okay.

3  A  You'll never work in my block plant.

4  Q  What basis are you relying upon to contend that the

5     operator must lock out and tag out the machine to

6     clean it out?

7  A  What basis?

8  Q  Yes.  Are you relying on standard or just your own

9     belief or what are you relying on?

10 A  Well, No. 1, it is an OSHA regulation that any time

11    that you work on a piece of machinery that you do

12    have a lockout procedure.  Now, I will agree that

13    you don't need to go to excess.

14 Q  Tell me about that.

15 A  Well, there are two mushroom buttons on there

16    (witness gesturing), it's off, it can't restart.

17 Q  Are you familiar with any OSHA standard that

18    provides that frequent activities such as cleaning

19    or adjusting do not require lockout/tagout?

20 A  No, I'm not.

21 Q  You're not familiar with that?

22 A  No.

23 Q  Have you ever heard of that before?

24 A  No, I have not.

25 Q  Now, you would lockout/tagout the machine when you

138

1     are going to change the blade out from a straight

2     blade to a bevel blade; right?

3  A  Yes.  No -- well, yes, you're right.  Yes.

4  Q  What other circumstances would you lockout and

5     tagout the machine during what I would deem

6     servicing the machine, changing blades and that

7     sort of thing?

8  A  Yes, any cleaning operation or greasing, anything

9     that -- a part that's being replaced on it.

10  Q  Now, once again, do you contend that the chips that

11     are left after a split occurs, do you contend that

12     removal of those is servicing the machine?

13  A  Yes.

14  Q  How is it servicing the machine?

15  A  It's to remove a buildup that has accumulated from

16     splitting block.

17  Q  And that buildup we have established and you agree

18     that's going to happen.               .

19  A  It is going to happen.

20  Q  And that's going to happen pretty much with any

21     blades; right?

22  A  Some are worse than others.

23  Q  But there is going to be some amount with any of

24     the blades, straight blade or the beveled blade,

25     there is going to be -- after a certain number of

1     blocks are cut, there is going to be a buildup.

2  A  In the case of lime block, the chips are very

3     small.  They either fall out or they are carried

4     out by the next block.  Never do they build up to

5     where the side knives won't come in or I have never

6     seen them ride over with a small --

7  Q  Never seen that?

8  A  No.

9  Q  Never seen it build up with a straight knife to

10    where it's a large enough amount to be a concern to

11    affect the product?

12 A  Right.

13 Q  You agree it's foreseeable that could happen

14    though?

15 A  It could happen, yes.

16 Q  Now, the pause button that's on the panel there --

17 A  Pause?

18 Q  I'm sorry, the stop button, the two mushroom

19    buttons you talked about.

20 A  Yes.

21 Q  Those are located only on that panel; right?

22 A  Right.

23 Q  And that's at an area where you do not anticipate

24    anybody would ever be standing during this

25    operation?

1   A   Right.

2   Q   Even with the beveled blades.

3   A   Right.

4   Q   Why is the panel located there and not on the other

5       side of the head where you anticipate somebody may

6       be standing under some circumstances so that that

7       person could access that mushroom?

8   A   That's why we recommend auxilliary starts and stops

9       on both ends.

10  Q   So you do recommend that there be one there?

11  A   Yeah, it says right in the manual.

12  Q   And was that offered to this plant?

13  A   No.

14  Q   Why not?

15  A   They -- they furnish their own emergency start/stop

16      stations.

17  Q   Okay.  So to make sure I understand, you're saying

18      you recommend that start/stop buttons be provided

19      at the area that we've been referring to as --

20  A   Here, 1 and 13, yes (indicating).

21  Q   But do you not provide them with --

22  A   We don't provide them, no.

23  Q   Why not?

24  A   We wouldn't know what to provide.  We don't know

25      the area that they are going to go into.  Are they

141

1     going to be mounted on the conveyors, are they

2     going to be mounted on the stand? So we don't know

3     what -- but they can tie into the splitter.

4  Q  It's just up to the end user to do that?

5  A  Right.

6        (Plaintiff(s) Deposition Exhibit(s) 19 marked

7     for identification.)

8  Q  I want to show you Exhibit 19.  Have you ever seen

9     that standard before?

10  A  Yes, uh-huh.

11  Q  When have you seen that?

12  A  When the OSHA guy was in, he pointed it out, OSHA

13     inspector.

14  Q  What OSHA inspector?

15  A  In our plant.

16  Q  When did he inspect?

17  A  Probably '76, '77.

18  Q  What did he say?

19  A  He just pointed this out in the manual that he

20     carries around with him about nip points.

21  Q  Is that when you got educated about the need to

22     guard the point of operation?

23  A  No --

24  Q  Or did you already have that knowledge?

25  A  -- not really.

1  Q  Did you already have that knowledge?

2  A  Yes.

3  Q  What discussion did you have with the OSHA man in

4     the '70s?

5  A  This was concerning cutoff saws, having the

6     unexposed, the unused portion of the blade not

7     protected.

8  Q  Was that another machine that you all made and

9     don't make anymore?

10 A  No, that's a machine that we use all the time to

11    cut steel.

12 Q  I see.  So he was referencing a machine that you

13    use in making the parts to make these block

14    splitters?

15 A  Right.

16 Q  Did he use it in reference to any of your products?

17 A  No.

18 Q  Describe the machine that you're talking about.

19 A  Well, it's a bandsaw for cutting steel.

20 Q  Does it have a chopping mechanism?

21 A  No.

22        MR. SHEALY:  It's like this (indicating) and

23    then you have to (indicating).

24 Q  Let me point to a particular area.  I want to read

25    Section 1910.212(a)(3)(ii).  "The point of

1    operation of machines whose operation exposes an

2    employee to injury, shall be guarded.  The guarding

3    device shall be in conformity with any appropriate

4    standards therefor, or, in the absence of

5    applicable specific standards, shall be so designed

6    and constructed as to prevent the operator from

7    having any part of his body in the danger zone

8    during the operating cycle."

9        Did I read that correctly?

10   A  Well, once again --

11   Q  I'm sorry?

12       MR. SHEALY:  He asked you a question.  Did he

13   read it correctly?

14   Q  Did I read that correctly?

15   A  I couldn't see what you were reading.

16       MR. SHEALY:  We'll agree.  I'll stipulate you

17   read it correctly.

18   Q  Once again, there is nothing on the subject machine

19   that we see certainly in Exhibit 13 at the time of

20   Mr. Jackson's accident that kept his -- that would

21   have prevented him from having any part of his body

22   in the danger zone during an operating cycle;

23   right?

24   A  That's right.

25   Q  And we have established, I think, that there is

1      nothing even on the machine with the barrier guard

2      that should have been there, there is nothing that

3      would have prevented him from having any part of

4      his body in the danger zone at the side knives;

5      right?

6    A  Any part of his hands.

7    Q  Right.  That would be part of his body though;

8      right?

9    A  Correct.

10   Q  Okay.  So would you agree with me then that this

11     machine does not comply with this standard?

12          MR. SHEALY:  Object to the form.

13   Q  You can answer.

14          MR. CURTIS:  Same objection.

15   A  Not according to that, no.

16   Q  Okay.  Do you know what ANSI standard tracks this

17     language?

18   A  No, I don't.

19   Q  Are you familiar with any of the ANSI standards by

20     name or number?

21   A  No, I'm not.

22   Q  Which ANSI standards do you refer to consistently

23     or occasionally or at all?

24   A  We do have some ANSI regulations on file as far as

25     conveyors and that sort of thing.

1   Q   B20 and B --

2   A   I don't remember.  I don't remember.

3   Q   Okay.  You don't know what ANSI standard applies to

4       nip point or point of operations of power presses

5       or power apparatus?

6   A   No.

7   Q   Like I asked you earlier, not to go over it again,

8       but you don't know whether this machine complies

9       with any ANSI standard?

10  A   Right.

11  Q   Okay.  Do you think that would be a good idea to

12      learn if it does?

13  A   I could check, yes.

14  Q   Do you think that it would be in furtherance of

15      your dedication to safety as paramount for the

16      operators to endeavor to find out if your machine

17      complies with ANSI standards?

18  A   Yes.

19  Q   After this accident, have you conducted any

20      investigation?

21  A   Other than talking to Karry, no.

22  Q   Have you been to the scene or anybody besides your

23      lawyer go to the scene?

24  A   No.

25  Q   Have there been any discussions about any recalls

146

1      or need to retrofit these machines like you did in

2      the '90 time period?

3   A  Retrofit it in what respect?

4   Q  To provide guards that would comply with this OSHA

5      section or any ANSI standards?

6   A  No.

7         MR. SHEALY:  Let me object to the form.  That

8      OSHA standard doesn't really apply to where this is

9      located, first of all.

10  Q  Okay.  Have you discussed having an engineer

11     evaluate your product?

12  A  No.

13  Q  Now, you have told me about Mr. Domenici's

14     accident; right?

15  A  Yes.

16        MR. SHEALY:  We don't know anything about the

17     Besser ones, I can just solve that for you, the

18     ones you're looking at, the Besser-produced.  They

19     were reported to Besser, not us.

20  Q  That's one of my questions.  Have you seen evidence

21     that's been produced in this case about other

22     accidents other than Mr. Domenici's accident?

23  A  No.

24  Q  Are you aware of other accidents?

25  A  Two or three, yes.

1   Q   Okay.  I'm just going to read the names that I

2       have.  Mr. Raymond Domenici, Mr. Peter Woodward in

3       Tennessee, Mr. Laverne Arnold in Tennessee,

4       Mr. David Miller in Minnesota, Mr. Robert Salmon in

5       Virginia, Mr. Wayne Murrock in New York, Mr. Steve

6       Sowers in Virginia, Mr. John Del Freo in

7       Pennsylvania, Mr. Glen Griep, G-r-i-e-p, in

8       Wisconsin.  Those are evidenced in documents Bates

9       stamped BES17 through 25.

10          Have you ever heard of those accidents before?

11  A   No, I have not.

12  Q   Are you familiar with Foster Masonry Products?

13  A   Yes, sir.

14  Q   James Block & Brick?

15  A   Yes.

16  Q   Southland Supply Company?

17  A   Yes.

18  Q   Charles M. Freedman?

19  A   Friedheim?

20  Q   Friedheim, I'm sorry.

21  A   Yes.  Friedheim, that wasn't even that machine.

22  Q   So you do now remember Friedheim?

23  A   We make probably five different models altogether,

24      and that covers all five models, not just that.

25      Friedheim had the CM-24GF, which is --

1  Q  Not the same machine?

2  A  Not the same machine.

3  Q  Mr. Salmon, the description of the accident,

4     indicates that the splitter was jammed and I

5     guess -- I don't know how it was jammed, but when I

6     say jammed, is that -- we've been discussing

7     jamming of this machine because of the debris;

8     correct?

9  A  Right.

10  Q  This says Mr. Salmon reached inside the splitter to

11     remove a chunk of concrete when the pusher bar

12     moved pinching his hand.

13  A  Which machine was that?

14  Q  It says 6386.

15  A  I mean is this at Friedheim?

16  Q  No, sir.  I'll show you it's Bates stamped.  It's

17     BES21 (indicating).

18  A  (Witness reviews).  Well, this machine doesn't even

19     have a pusher bar on it.  The CM-24GF does.

20  Q  Okay.  Serial Model No. 161, does that mean

21     anything?

22  A  It's got to be 40, 50 years old.

23  Q  But that's an E&R machine as far as you --

24  A  (Witness gesturing with hands up).

25  Q  Okay, you don't know.  Barnes & Cohen, do you --

1   A  Cohen.

2   Q  Supreme in Winchester, Virginia?

3   A  I'm not familiar.

4   Q  Mr. Sowers' hand was on top of the block and the

5       splitter blade cycled breaking and cutting his

6       fingers.  This says Model No. 296.  Does that mean

7       anything to you?

8   A  No.  It would have to be 40 years old, if it is.

9   Q  Do you -- does E&R anticipate that their machines

10      have a certain use life or a time period when they

11      are going to be taken out of service?

12   A  The only time they are taken out is when they are

13      obsolete in the speed.

14   Q  Are any of your machines obsolete?

15   A  Not yet.

16   Q  So these machines are made to last right on; is

17      that right?

18   A  That's right.

19   Q  So the fact that a 40, 50-year-old machine is in

20      existence, that's not only not a shock, that was

21      its intended purpose?

22   A  We build them.

23   Q  Was that a yes?

24   A  Yes.

25   Q  Okay.  The last two do not have a serial or model

150

1    number to reference, okay.  Now, assume that --

2    assuming that these are E&R machines, does that

3    concern you that that number of accidents has

4    happened involving a splitter?

5  A  I don't like it because that many happened, but --

6    there is one there that the guy laid his hand on

7    top of the block, no barrier guards on the machine.

8  Q  And his hand was injured?

9  A  Part, yeah.

10  Q  You agree that based on this number of accidents

11    and based on Mr. Jackson's accident, you continue

12    to anticipate or foresee that workers may have

13    their hands in this area of operation and therefore

14    be exposed to risk of injury like we've discussed

15    even today?

16        MR. SHEALY:  Object to the form.

17  A  Not if they shut it off.

18  Q  Okay.  If they don't shut it off, would that be a

19    true statement?

20  A  If they have their hands in there, yes.

21  Q  What is your understanding of Mr. Jackson's

22    accident specifically?

23  A  In other words, you're saying --

24        MR. SHEALY:  He asked you what is your

25    understanding how Mr. Jackson's accident occurred.

151

1    We don't know so you don't have an understanding.

2        THE WITNESS:  No.

3        MR. SHEALY:  Except Karry said something about

4    he just put his hand in there, because we haven't

5    been able to depose him before you got deposed.

6    But if you know a little bit about what happened

7    besides innuendos, whatever, you can answer.

8  A  I really don't know.  I have my theory, but I don't

9    know.

10 Q  Okay.  Do you have a theory as to how Mr. Jackson's

11    accident took place?

12 A  Yes.

13 Q  What's that theory?

14 A  Here is the block (indicating), one piece being

15    indexed into the splitter heads.

16 Q  Right.

17 A  Okay.  The machine cycles, it splits like this

18    (indicating).

19 Q  With a V shape leaving some pieces?

20 A  On each end and the pieces are there.  He pulls

21    this front -- the first block, he pulls it off.

22 Q  Right.

23 A  Leaving the two pieces in here (indicating).  He

24    reaches in here to pull out this chunk; all right?

25 Q  Right.

1  A  Here comes another block to be split down here

2     (indicating).

3  Q  All right.

4  A  Okay.  This head doesn't cycle until it's here

5     (indicating).

6  Q  Okay.

7  A  So he reaches in there and grabs that chunk and

8     then the pusher comes forward and traps his hand

9     between the block and the side knife.

10 Q  Okay.

11 A  The side knife never moves.

12 Q  And then what happened?

13 A  That mashed his hand, cut his fingers against the

14    double knife.

15 Q  So you are thinking that the side knife never

16    cycled again?

17 A  No.  No.  The block -- it wasn't even in split

18    position.

19 Q  Okay.  Now, what makes you have that theory?  I

20    mean have you -- what makes you have the theory

21    that the two pieces were there and he reached in?

22 A  Well, he had to reach in there after something.

23 Q  Let me ask it this way.  Have you seen other people

24    reach in there for that same chunk --

25       MR. SHEALY:  Object to the form.

153

1   Q  -- or the same type of debris?

2   A  Once again, we have warned against that.

3   Q  I understand that.

4   A  I have seen people do it, yes.

5   Q  Where have you seen people do it?

6   A  In different block plants in the United States.  I

7      can't think of any one particular.

8   Q  But you have seen it?

9   A  I have seen it.

10  Q  And it's been while operating your machines?

11  A  Right.

12  Q  And so you knew or had reason to know that that

13     does happen?

14  A  Yes.

15  Q  Okay.  And has that been true for -- I mean did you

16     learn this last week or have you known that for a

17     while?

18  A  No, I have known it for some time.

19  Q  Like how many years?

20  A  Well, fluted block, probably came in about late

21     '80s.

22  Q  So you have known about the potential for an

23     operator to reach in there after this fluted block

24     piece since the late '80s?

25  A  Yes.

154

1   Q  Okay.  Have you ever talked with any eyewitness or

2      anybody claims they were an eyewitness?

3   A  No.

4   Q  Have you ever talked with anybody that claims to

5      attribute any comment or statement to the plaintiff

6      that he said?

7   A  No.

8   Q  Having gone through this standard, talked about

9      hierarchy of design and looked at the other

10     accidents involving E&R machines and talked about

11     various guarding designs, do you now feel that E&R

12     should take steps to implement guarding to guard --

13     for operators to protect operators against injuries

14     such as experienced by Mr. Domenici, Mr. Jackson

15     and any of the others we have described?

16        MR. CURTIS:  Object to the form.

17        MR. SHEALY:  Object to the form.

18  A  I see no way of guarding the area that you're

19     talking about.

20  Q  Okay.  Is that -- so I take it by that comment that

21     you do not think today that E&R should take any

22     further steps than they already have done?

23  A  I think E&R should continue to investigate, but

24     today I see no way to make a fool-proof guard that

25     will not present a greater hazard than what already

155

1   exists.

2   Q   Okay.  As part of your endeavor on behalf of E&R to

3       pursue all available safety features, would that

4       include contacting an engineer to have an

5       independent analysis performed on this machine?

6   A   Our problem is we are so specialized that it's hard

7       to find anybody that can even visualize what the

8       situation is.

9   Q   Right.  My question is would you think it would be

10      smart and do you anticipate or plan to go get an

11      engineer that's independent that could go with you

12      to a plant or facility or see one of your machines

13      in operation or Besser machine in operation that

14      you all have sold on behalf of Besser to analyze it

15      for hazard or safety analysis?

16          MR. CURTIS:  Object to the form.

17          MR. SHEALY:  Same objection.

18  A   We would probably consider it.

19  Q   Okay.  Would you expect that if anybody at Besser

20      had any engineering knowledge or safety abilities

21      they would be in a better position than you to

22      analyze the machine for hazard analysis, would you

23      expect that they would offer any suggestions to

24      you?

25          MR. CURTIS:  Object to the form.

1    A   I would expect them to, yes.

2    Q   If they had offered or told you how to do -- to

3        design your machine in a better fashion or provide

4        guards, would you have done it?

5            MR. CURTIS:   Object to the form?

6    A   We would do that.

7    Q   Why is that, is it because safety of the operator

8        is paramount?

9    A   Right.

10   Q   Do you know of any accidents over in Europe

11       involving your machines or anywhere in the world?

12   A   No.

13   Q   Have you ever had any complaints in the company

14       that are not in the way of a lawsuit, just customer

15       complaints, about injuries?

16   A   No.

17   Q   I mean, for example, Mr. Mackey called you and told

18       you about the accident and there was no lawsuit

19       filed.  Has that ever happened before?

20   A   No.

21   Q   Do you hold Mr. Jackson responsible for anything in

22       this accident?

23   A   Do I hold him?

24   Q   Yes.

25   A   Yes.

1    Q   For what?

2    A   Negligent on his part.

3    Q   In what?

4    A   Well, he was instructed to turn the machine off

5        before he ever stuck his hand in there.

6    Q   How do you know that?  What instruction are you

7        referring to?

8    A   It was in the --

9            MR. SHEALY:  Answers To Interrogatories, as

10       well as the manual and as well as the warnings, as

11       well as --

12   A   In the manual, there are 43 do-nots and warnings,

13       43.  And the manual is supposed to be inside the

14       control panel.

15   Q   Do you know if Mr. Jackson ever got the benefit of

16       the manual?

17   A   I have no idea.

18   Q   Would you agree with me that a guard is better than

19       a warning in a manual?

20   A   If it's guardable.

21   Q   Would you agree with me that even having a warning

22       in a manual is on the lowest rung of the hierarchy

23       of design, of safety and design, that you can only

24       warn after you have designed or guarded against?

25   A   Right.

158

1   Q  Now, with regard to the warnings on this machine,

2      there is some signs like "Keep Hands Clear".  "Keep

3      Hands Clear", do you see that?

4   A  Yes.

5   Q  Earlier in the deposition it was talked about ANSI

6      standards, ANSI Z standards that have the color and

7      the wording.

8   A  Right.

9   Q  These do not comport with those standards, do they?

10   A  No, they do not.  Those were the biggest letters we

11      could put on there.

12   Q  Right.  The Exhibit 14 shows "Keep Hands Clear" and

13      the white sign.  Is that the only sign on the head

14      that addresses the "Keep Hands Clear"?

15   A  No.

16   Q  Is there some other warnings under here

17      (indicating)?

18   A  Where are the barrier guards on there?  Where is

19      this sign on there (indicating)?

20   Q  Right.  And for the record, you're referencing the

21      warning that would have been on the barrier guard?

22   A  Right.

23   Q  That says "Danger, Blade Hazard, Stay Clear of

24      Splitter.  Follow Lockout Procedure Before

25      Servicing"?

1    A   Right.

2    Q   Do you define anywhere in the manual servicing?

3    A   Define what?

4    Q   Servicing.

5    A   Yes.

6    Q   Where?

7    A   There is one section that concerns --

8           MR. SHEALY:  He asked you do you define

9        servicing.

10   A   No.  Excuse me.

11   Q   Would you agree with me then that as far as the

12       operator is concerned, the interpretation of that

13       word "servicing" is left open to his or her

14       interpretation?

15   A   To his boss' interpretation.

16   Q   Or his boss' interpretation.

17   A   Right.

18   Q   Do you agree with that?

19   A   Yes.

20   Q   Do you think that's prudent to rely on the end user

21       or his boss to interpret these -- such a warning or

22       such a language?

23   A   Yes, I do.

24          (Plaintiff(s) Deposition Exhibit(s) 20 marked

25       for identification.)

160

1   Q  I'm going to show you Exhibit 20, which is a

2       photograph of Mr. Jackson's hand.  Have you ever

3       seen this before?

4   A  Yes, I have.

5   Q  Does it surprise you that that amount of damage was

6       done as a result of being caught in the splitter?

7   A  Not really.

8   Q  There is a strobe light in the bottom of this

9       panel.  What's that for?

10  A  That goes on top of the -- it's in the bottom

11      during shipping.  It goes on top and it warns when

12      the splitter is in the manual mode or it is

13      automatically shut down.

14  Q  So is it in Exhibit 5?

15  A  It's inside the panel.

16  Q  Okay.  And it only operates when again?

17  A  When the splitter has shut down or the cut is out

18      of tolerance.

19  Q  Tell me what that means, out of tolerance.  Does

20      that mean it's misaligned?

21  A  Misaligned, for some reason the block was off.  We

22      use a tolerance of sixty-thousandths of an inch.

23      If it's off more than sixty-thousandths it turns

24      that strobe on and tells you something happened.

25  Q  And the reason you want to know that is because

1     it's fixing to render that block useless?

2  A  Yes.

3  Q  In other words, it's going to cut it wrong?

4  A  It's already cut it wrong.  It means the next one.

5     Something was wrong.

6  Q  Okay.  Now, this machine operates on how many

7     different modes; manual and automatic and then what

8     else?

9  A  That's the only two modes.

10  Q  When you are operating it in the automatic mode, is

11     that when the machine can cut up 21, 23 per minute?

12  A  Right.

13  Q  When it's in the manual mode, do you have to have

14     someone at the depalleter to feed blocks into the

15     splitter?

16  A  You go into the manual mode when you initially set

17     up the machine.

18  Q  And then after you get the blocks going, are you

19     expected to switch it to automatic mode?

20  A  Absolutely.

21  Q  Can you nonetheless keep it in manual mode and feed

22     them in?

23  A  No.

24  Q  You can't?

25  A  No.  It won't feed.

1  Q  So if -- you don't ever anticipate someone would

2     stay at the depalleter and manually feed blocks

3     into this machine?

4  A  It won't feed.

5  Q  Okay.  You just get it one time; is that what you

6     do?

7  A  What you mean is can somebody set the block on the

8     conveyor?

9        MR. SHEALY:  Yes, you're saying -- it's called

10     feed --

11  A  It's in the --

12        (Plaintiff(s) Deposition Exhibit(s) 21 marked

13     for identification.)

14  Q  Exhibit 21, is there a strobe light on top of that

15     machine?

16  A  This appears to be a horn.  No.

17        (Plaintiff(s) Deposition Exhibit(s) 22 marked

18     for identification.)

19  Q  Exhibit 22, that's the subject machine, I'll

20     represent to you, and there is a person located to

21     the right of that photograph as you are looking at

22     it.  It looks like he's feeding a block in.  What

23     is he doing?

24  A  I really don't know.

25  Q  Is there any reason for him to be standing there

1   like that?

2  A  Not really.

3  Q  Do you anticipate that someone would be standing in

4     his position?

5  A  No.

6  Q  Okay.  Awhile ago I was asking you about manual

7     feed.  I was thinking of this photograph.  My

8     question was do you ever anticipate someone putting

9     the machine in manual mode and feed blocks into it

10    like this man is doing?

11 A  No.  When it is in manual mode, the feeder index

12    does not work.

13 Q  Okay.  Okay.  In other words, it won't index so as

14    to cut properly in manual mode; is that right?

15 A  It will not index period.

16 Q  Okay.

17 A  That part of the machine won't work at all.

18 Q  When you're talking about indexing, you're talking

19    about pushing the machine into the proper position

20    for proper alignment and cut?

21 A  Right.

22 Q  I'm not going to mark it, but I'll hold up this

23    photograph to get an up-close picture of that

24    knife.  Is that the beveled edge that you're

25    talking about (indicating)?

164

1   A  Yes.

2   Q  You referenced -- I'm not going to list all the

3      different models.  You referenced in Answers To

4      Interrogatories No. 6 various models that E&R has

5      made.

6   A  Right.

7   Q  Do all of the heads and point of operations in

8      those machines, are they similar to the subject

9      machine?

10  A  I --

11  Q  In particular, is the area open like we see in

12     subject machine?

13  A  Yes, it is open.

14  Q  In response to Request For Production No. 22, there

15     are several standards, societies and other

16     organizations that are listed.  Do you see that?

17  A  Yes.

18  Q  Are these the different organizations that E&R

19     endeavors to comply with?

20  A  The component parts that we use are made under one

21     or more of the following specifications.

22  Q  And my question is in the design of this machine,

23     does E&R seek to comply with these standards as

24     best they can?

25  A  Yes.

1   Q   Is that important to E&R?

2   A   The component -- the purchased component parts

3       comply to one or more of the following.

4   Q   Right.  Specifically the European Union Standards,

5       the International Organization of ISO Standards,

6       the ANSI standards, Canadian standards --

7   A   That is for purchased components.

8   Q   But does E&R -- you are not telling me now that E&R

9       doesn't want to comply with these standards, are

10      you?

11  A   No, I'm not telling you that, no.

12  Q   E&R does want to comply with these standards, don't

13      they?

14  A   That's right.

15  Q   It's important for E&R to comply with these --

16  A   Right.

17  Q   -- for safety?

18  A   And it's important that we buy parts that conform

19      to those.

20  Q   So as to provide as much safety for the operator as

21      you can.

22  A   Exactly.

23  Q   Now, did Besser install this machine or did E&R?

24  A   Besser did.

25  Q   Did you ever -- did anybody from E&R ever go to

1     Alabama to install this machine?

2  A  No.

3  Q  But you knew it was going to be sent to Alabama, I

4     guess; right?

5  A  Right.

6  Q  Just so I'm clear, is it a true statement that

7     there is no present sensing device under the heads

8     that would -- that causes the blades to cycle?

9  A  There is no sensing device under the blades, no,

10    that's not where the signal comes from.

11  Q  Where does the signal come from?

12  A  The signal comes from the linear transducer.

13  Q  Does E&R make any machine that has a present

14    sensing device like in the Pitchmaster?

15  A  No.

16  Q  FMC, who are they again?

17  A  Food Marketing Corporation.  They used to own a lot

18    of different power transmission companies.

19  Q  Do you have any contact with them currently?

20  A  No.

21        MR. ANDREWS:  Mr. Neese, I believe that's all

22    the questions I may have.  Some of these other

23    gentlemen may have for you.

24        MR. CURTIS:  I have a couple.

25        MR. RODGERS:  One.

1    CROSS-EXAMINATION,

2        QUESTIONS BY CHRISTOPHER S. RODGERS:

3    Q   Do you have any personal knowledge that Karry

4        Mackey may have, or did, remove any portion or

5        guard off of this splitter?

6    A   I do not.

7            MR. RODGERS:   Thank you, sir.

8    FURTHER CROSS-EXAMINATION,

9        QUESTIONS BY CORY M. CURTIS:

10   Q   Did Besser have any involvement in the design of

11       the machine?

12   A   No.

13   Q   E&R manufactured the machine; is that right?

14   A   Right.

15   Q   Did Besser have any involvement in the manufacture

16       of the machine?

17   A   No.

18   Q   The machine was shipped directly from E&R to Couch;

19       is that right?

20   A   Right.

21   Q   Did it have a guard on it when you shipped it?

22   A   The barriers?

23   Q   The barrier.

24   A   Yes.

25   Q   Did you put Besser's name on it when you shipped

1    it?

2  A  No.

3  Q  Have you ever worked in a block plant?

4  A  Have I ever worked?

5  Q  Yes.

6  A  You mean on their payroll, a block plant's payroll?

7  Q  Have you ever spent a day in a block plant where a

8    splitter is operating?

9  A  Many times.

10  Q  Have you ever seen the actual subject machine, the

11    one down in Alabama, have you ever actually seen

12    that one operate?

13  A  No.

14  Q  You mentioned there is a strobe light in the panel.

15  A  Yes.

16  Q  When does that go off?

17  A  When the split is out of tolerance and when the

18    splitter is in the manual mode and also if the oil

19    temperature gets to a preset level on the hydraulic

20    power unit.

21  Q  Does it ever go off because there is debris

22    blocking the blocks from coming through?

23  A  If the splitter shuts down, then the strobe light

24    goes off.

25  Q  Would that be an indication to the operator at that

1  point that debris needs to be removed?

2  A  Absolutely.

3  Q  Would debris need to be removed at any point before

4     that strobe light went on?

5  A  No.

6  Q  When you are designing the machine and you are

7     taking into account reasonably foreseeable hazards,

8     do you also take into account that the operator is

9     going to use common sense when operating the

10    machine?

11 A  Yes, absolutely.

12 Q  Do you also take into account that the operator is

13    going to receive some training in how the machine

14    operates?

15 A  Yes.

16     MR. CURTIS:  That's all I have.

17     MR. ANDREWS:  I have a couple follow-ups.  Do

18    you have any?

19     MR. SHEALY:  No.

20 REDIRECT EXAMINATION,

21    QUESTIONS BY S. MARK ANDREWS:

22 Q  The strobe light is not interlocked or anything.

23    So if it's not hooked up and taken off, the machine

24    will shut down.  It's not interlocked, is it?

25 A  No.

170

1 Q The questions about did Besser design this machine,

2   did you discuss with them the design of the

3   machines and a particular customer's requests?

4 A Repeat that, please.

5 Q Do you at E&R from time to time when selling a

6   machine through Besser, do you have conversations

7   with Besser about the design of your machine?

8 A Yes.

9 Q Would you listen to any recommendations or safety

10   requirements that Besser may --

11 A Absolutely.

12 Q -- may institute?

13 A Yes.

14 Q Besser has engineers; right?

15 A Yes.

16 Q Wouldn't you think that they would know the design

17   of a machine that they are selling?

18 A Yes.

19 Q And does Besser market themselves as far as you

20   know in the sale of this subject machine, did

21   Besser market themselves as having a block splitter

22   machine that they could sell to Couch and then went

23   and got it from you?

24    MR. CURTIS:  Object to form.

25 A Would what now?

1  Q  Besser marketed, as I understand it, the subject

2     machine, they marketed it to Couch so they could

3     sell a block splitter.

4  A  Yeah.

5  Q  Then they went and bought it from you?

6  A  Yes.

7  Q  Besser knew the design of that machine when they

8     sold it.

9         MR. CURTIS:  Object to form.

10 A  Right.

11        MR. ANDREWS:  Okay.  That's all.

12        MR. CURTIS:  One more follow-up.

13 RECROSS-EXAMINATION,

14    QUESTIONS BY CORY M. CURTIS:

15 Q  In the design of the subject machine, did Besser

16    make any recommendations at all?

17 A  None.  None.

18 Q  Was there any involvement whatsoever in the subject

19    machine that Besser had --

20 A  None.

21 Q  -- whether in its design or manufacture?

22 A  None at all.

23        MR. ANDREWS:  Is there anything in here that I

24    don't have?

25        MR. SHEALY:  No, there is not.  Trust me.

172

1          MR. ANDREWS:  Okay.

2          MR. SHEALY:  Trust me.

3          MR. ANDREWS:  Got it.  I think that's all.

4          THE REPORTER:  Signature?

5          MR. SHEALY:  We'll waive it.  Tell her you'll

6     waive it.

7          THE WITNESS:  I'll waive it.

8     AND FURTHER THE DEPONENT SAITH NOT.

9

10                         (Signature Waived)
                           RONALD E. NEESE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF INDIANA        )
                            )  SS:
2   COUNTY OF HENDRICKS     )

3       I, Sherry R. Reckas, RMR, CRR, CSR, a Notary

4   Public in and for the County of Hendricks, State of

5   Indiana at large, do hereby certify that RONALD E.

6   NEESE, the deponent herein, was by me first duly

7   sworn to tell the truth, the whole truth, and

8   nothing but the truth in above-captioned cause.

9       That the foregoing deposition was taken on

10  behalf of the Plaintiff at the law offices of

11  Kincaid, Taylor, Sims, Chadd & Minnete, 127 West

12  Main Street, Lebanon, Tippecanoe County, Indiana, on

13  the 1st day of February, 2007, pursuant to the

14  Applicable Rules.

15      That said deposition was taken down in

16  stenograph notes and afterwards reduced to

17  typewriting under my direction, and that the

18  typewritten transcript is a true record of the

19  testimony given by said deponent; and thereafter

20  presented to said deponent for his/her signature;

21  and that the signature of said deponent to his/her

22  deposition was waived by the deponent and all

23  parties present, the deposition to be read with the

24  same force and effect as if signed by him/her.

25      That the parties were represented by their

1   aforementioned counsel;

2        I do further certify that I am a disinterested

3   person in this cause of action; that I am not a

4   relative or attorney of either party, or otherwise

5   interested in the event of this action, and am not

6   in the employ of the attorneys for either party.

7        IN WITNESS WHEREOF, I have hereunto set my

8   hand and affixed my notarial seal this _____ day of

9   _____, 2007.

10

11        _____

12                        Sherry R. Reckas

    My Commission Expires:
13  September 18, 2007

14  County of Residence:
    Hendricks

15

16

17

18

19

20

21

22

23

24

25