# Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06 CV-0412-DRB


DAVID JACKSON,

     Plaintiff,

vs.

E & R MANUFACTURING
COMPANY, INC.,

     Defendant.

_____


DEPOSITION OF JOHN STEPHENS

Date:  May 23, 2007

Time: 9:30 a.m.


COURT REPORTER:

APRIL R. BENDINGER, CSR

 COPY

BENDINGER & ASSOCIATES
334.803.0161

Page 2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4           Mr. Mark Andrews

 5           MORRIS, CARY, ANDREWS, TALMADGE, JONES

 6           & DRIGGERS

 7           3334 Ross Clark Circle

 8           Dothan, Alabama 36303

 9

10   FOR THE DEFENDANT:

11           Mr. Steadman Shealy

12           SHEALY, CRUM & PIKE

13           100 Camellia Drive

14           Suite 101

15           Dothan, Alabama 36302

16

17   FOR THE DEFENDANT:

18           Mr. Cory M. Curtis

19           BAKER & HOSTETLER

20           303 East 17th Avenue

21           Suite 1100

22           Denver, CO 80203

23
```

```
 1              A P P E A R A N C E S

 2

 3

 4   FOR THE DEFENDANT, STEPHENS AND MACKEY:

 5            Mr. Christopher Rodgers

 6            HUIE, FERNAMBUCQ & STEWART

 7            Three Protective Center

 8            Suite 200

 9            2801 Highway 280 South

10            Birmingham, AL 35223

11

12   ALSO PRESENT:

13   Mr. Karry Mackey

14

15

16

17

18

19

20

21

22

23
```

BENDINGER & ASSOCIATES
334.803.0161

Page 4

```
 1              EXAMINATION INDEX

 2

 3   JOHN STEPHENS

 4       BY MR. ANDREWS . . . . . . . . . .      7

 5       BY MR. SHEALY . . . . . . . . . . .     84

 6       BY MR. ANDREWS . . . . . . . . . .     103

 7                 EXHIBIT INDEX

 8
                                              MAR
 9   Plaintiff's

10   1        Splitter picture                 22

11

12

13

14

15

16

17

18

19

20

21

22

23
```

BENDINGER & ASSOCIATES
334.803.0161

Page 5

1                    S T I P U L A T I O N

2                    IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of JOHN STEPHENS may

5    be taken before April R. Bendinger, Notary

6    Public, State at Large, at the Law Offices of

7    Albrittons, Clifton, Alverson, Moody & Bowden,

8    109 on Avenue, Andalusia, Alabama on May 23,

9    2007, commencing at approximately 9:30 a.m.

10                   IT IS FURTHER STIPULATED AND

11   AGREED that the signature to and the reading of

12   the deposition by the witness is waived, the

13   deposition to have the same force and effect as

14   if full compliance had been had with all laws

15   and rules of Court relating to the taking of

16   depositions.

17                   IT IS FURTHER STIPULATED AND

18   AGREED that it shall not be necessary for any

19   objections to be made by counsel to any

20   questions, except as to form or leading

21   questions and that counsel for the parties may

22   make objections and assign grounds at the time

23   of trial or at the time said depositions is

Page 6

1    offered in evidence, or prior thereto.

2              I, April R. Bendinger, a Court

3    Reporter of Dothan, Alabama, and a Notary Public

4    for the State of Alabama at Large, acting as

5    Commissioner, certify that on this date,

6    pursuant to the Federal Rules of Civil

7    Procedure, and the foregoing stipulation of

8    counsel, there came before me at the offices of

9    Albrittons, Clifton, Alverson, Moody & Bowden,

10   109 on Avenue, Andalusia, Alabama commencing at

11   approximately 9:30 a.m. on May 23, 2007, JOHN

12   STEPHENS in the above cause, for oral

13   examination, whereupon the following

14   proceedings were had:

15

16

17

18

19

20

21

22

23

Page 7

1                    JOHN STEPHENS,

2      being first duly sworn, was examined and

3      testified as follows:

4

5                    EXAMINATION

6      BY MR. ANDREWS:

7          Q.      Will you tell us your name,

8      please, sir?

9          A.      John Stephens.

10         Q.      Mr. Stephens, I'm Mark Andrews,

11     and I represent Mr. David Jackson regarding an

12     accident out at Block USA.  I'm going to take

13     your deposition today, and I want to ask you

14     some questions about that accident.  If you

15     don't understand anything I'm asking you, please

16     let me know.  If you need a break, please let me

17     know.  Try to answer with a yes or no, because

18     uh-uh or uh-huh or head nods don't go down very

19     well.  If you let me know, I will try to

20     rephrase the question; otherwise, I will assume

21     you understood the question.  Okay?

22         A.      Okay.

23         Q.      What is your address?

Page 8

1      A.      14138 Wren Lane, W-R-E-N,
2   Andalusia 36421.
3      Q.      Okay.  How are you currently
4   employed?
5      A.      Block USA.
6      Q.      What's your position out there?
7      A.      Yard man.
8      Q.      How long have you worked at Block
9   USA?
10     A.      Eight years.
11     Q.      Is that all continuous eight
12   years?
13     A.      Yes.
14     Q.      Have you always been the yard man?
15     A.      No.
16     Q.      What other positions have you
17   held?
18     A.      Utility man, cuber operator.
19     Q.      Anything else?
20     A.      No.
21     Q.      Have you ever worked the
22   splitter?  This accident happened on the
23   splitter, have you ever worked at the splitter

Page 9

1    before?

2         A.      Yes.

3         Q.      What position would that be, would

4    it be the utility man or the cuber when you

5    worked the splitter?

6         A.      Utility.

7         Q.      Help me understand, what is a

8    utility man?

9         A.      An all around guy.

10             MR. SHEALY:  Kind of like

11   infielder, utility infield.

12        Q.      In other words, you fill whatever

13   position needs to be filled at the moment?

14        A.      Yes.

15        Q.      Have you ever given a deposition

16   or been deposed before?

17        A.      Yes.

18        Q.      Tell me about that.

19        A.      1990.

20        Q.      What was that about?

21        A.      Injury.

22        Q.      To you or somebody else?

23        A.      Me.

Page 10

1        Q.      What was your injury?

2        A.      Back.

3        Q.      Was it on-the-job?

4        A.      Yeah.

5        Q.      Where were you employed then?

6        A.      Stones Plumbing in Orlando,

7    Florida.

8        Q.      Were you making a workers'

9    compensation claim?

10       A.      Yes.

11       Q.      Just generally, what happened?

12   Did you bend over and pick up something or what?

13       A.      Bent over to pick up a water

14   heater and just pulled my back.

15       Q.      Okay.  I hate to ask these

16   questions, but I have to ask them.  Do you have

17   a criminal history?

18       A.      No.

19       Q.      Have you ever served in the

20   military?

21       A.      Yes.

22       Q.      What branch?

23       A.      Army.

Page 11

1      Q.     Were you honorably discharged?

2      A.     Yes.

3      Q.     As a yard man, do you stay outside

4 where the splitter and cuber and all the

5 equipment is?

6      A.     Yes, I stay outside.

7      Q.     Help me understand what a yard man

8 does?

9      A.     I load trucks, put up block off

10 the line, fill the bins with material.

11      Q.     My understanding of a yard man is

12 that out there at the Block USA plant, there is

13 a building where all the equipment is that makes

14 the block, outside is where the trucks and fork

15 lifts operate.  Is that where you're talking

16 about outside?

17      A.     Yes.

18      Q.     Do you have anybody that works out

19 there with you?

20      A.     No.

21      Q.     Are you the only one that works in

22 the yard?

23      A.     Yes.

Page 12

1     Q.     How many employees work at Block
2   USA typically?
3     A.     Eight.
4     Q.     Eight everywhere or eight inside
5   the warehouse?
6     A.     Eight total, drivers and all.
7     Q.     Okay.  Can you name the current
8   employees?  Karry Mackey, John Stephens, who are
9   the other six?
10    A.     Dewayne Biggs, Marcus McInnis,
11  John Coleman, Eddie Moore, Michael King.
12    Q.     K-I-N-G?
13    A.     Uh-huh, (affirmative).  Mike
14  Hudson.  Ted Garrison.  And Joe, I can't
15  pronounce his last name, Gust-something.
16    Q.     Joe G.?
17    A.     Yeah.
18    Q.     Okay.  All these guys that you
19  just named are currently employed out there,
20  right?
21    A.     Yes.
22    Q.     Are there any names that you can
23  think of that used to work out there that don't

Page 13

1    work there now that would have operated that

2    splitter where Mr. Jackson's accident took

3    place?

4         A.    Brian Schoolmaster.

5              MR. SHEALY:  Did you say

6    Schoolmaster?

7         A.    Yes.

8         Q.    Who else?

9         A.    That's it that worked the

10   splitter.

11        Q.    Have there ever been any other

12   utility man like yourself?

13        A.    Randy Templeton.

14        Q.    Randy Templeton.  Anybody else?

15        A.    Basically, that's it.

16        Q.    Randy doesn't work there anymore?

17        A.    No.

18        Q.    Brian Schoolmaster doesn't work

19   there anymore?

20        A.    No.

21        Q.    Do you know where they are

22   currently employed?

23        A.    Randy is employed with First

Page 14

1    Choice Rental in Andalusia.

2        Q.      And Brian?

3        A.      I do not know.

4        Q.      Does he still live in Andalusia as

5    far as you know?

6        A.      No, I believe he moved back to

7    Michigan.

8        Q.      Were either of these guys, Brian

9    or Randy, were they employed through Able Body,

10   or employed directly through Couch or Block USA?

11       A.      I do not know.

12       Q.      I will say that all day long in

13   both these depositions, but when I say Couch or

14   Block USA, is that the same thing?

15       A.      Yes.

16       Q.      Can you tell me or give me an

17   understanding of what the true name is and what

18   the relationship is with Couch?

19       A.      True name, Couch Ready Mix USA or

20   Couch Block USA.

21       Q.      You use those terms

22   interchangeably, either one?

23       A.      Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 15

1          Q.       How long have you been at Block

2     USA?

3          A.       Eight years.

4          Q.       Where were you employed before

5     that, the plumbing place?

6          A.       No, Manhattan Shirt Factory.

7          Q.       Here in Andalusia?

8          A.       Yes.

9          Q.       What was your job there?

10         A.       Fork lift driver.

11         Q.       How long were you there?

12         A.       Two Andalusia and a half years.

13         Q.       Before that?

14         A.       Couch.

15         Q.       Back at the same plant?

16         A.       Yes.

17         Q.       How long were you employed that

18     time?

19         A.       A year.

20         Q.       What was your position then?

21         A.       Brick hand stacker.

22         Q.       What year would that have been

23     approximately?

BENDINGER & ASSOCIATES
334.803.0161

Page 16

1     A.     '95.

2     Q.     The splitter we are here about

3 today, where Mr. Jackson's accident took place,

4 was it at the Block USA plant when you worked at

5 Couch USA in 1995?

6     A.     Not that I recall.

7     Q.     My understanding is it was

8 delivered or bought in in about 1997.  I'm just

9 curious, do you remember when it was delivered

10 to the plant?

11    A.     No, I don't.  I was not employed

12 there.

13    Q.     How was block being split before

14 this splitter was there, or did you have a

15 splitting operation then?

16    A.     I can't answer that question.  I

17 was a stacking block by hand, that was my job.

18    Q.     Did they have a splitter inside,

19 just another kind of splitter?

20    A.     Not that I recall.

21    Q.     Okay.  You don't know if it was a

22 another piece of equipment that got removed out

23 of there and this block splitter replaced it or

BENDINGER & ASSOCIATES
334.803.0161

Page 17

1    anything?

2          A.      Right.

3          Q.      Do you know who would know, do you

4    think Mr. Mackey would know?

5          A.      Yes, my supervisor.

6          Q.      Was Karry Mackey your supervisor?

7          A.      Yes, he is.

8          Q.      Is he the plant manager out there?

9          A.      Yes.

10         Q.      Okay.  When you worked there for

11   that year before, did you ever go up inside the

12   plant?

13         A.      Yes, I was inside the plant.

14         Q.      Is that where you stacked inside?

15         A.      Yes.

16         Q.      Would it have been doing a

17   stacking job by hand similar to what the cuber

18   and stacker does now?

19         A.      Yes.

20                 MR. SHEALY:  Were you exhausted at

21   the end of the day?

22         A.      Yes.

23         Q.      At some point around '95, '97,

Page 18

1    there were some upgrades. You were not employed

2    there as I understand, but is that a fair

3    explanation, there were some upgrades in the

4    plant?

5         A.    Yes.

6         Q.    I think I already know the answer,

7    were you involved in any way with the purchase

8    of this block splitter?

9         A.    No.

10         Q.    In general terms, what all does

11   Block USA do? Do they just make concrete

12   blocks?

13         A.    Yes.

14         Q.    Is that during the eight years you

15   have been there and the year you were there

16   before, is that all they have ever done?

17         A.    Concrete block, brick. Other

18   concrete blocks.

19         Q.    And as I understand, there are

20   several different styles of brick or shapes of

21   brick; is that a fair statement?

22         A.    Yes. Different styles of block.

23         Q.    The one being split the day of

Page 19

1    Mr. Jackson's accident was sort of a honeycomb

2    shaped block, it wasn't a square or rectangle

3    block --

4            A.    Right.

5            Q.    What is that called?

6            A.    8-inch diamond pro bevel.

7                  MR. SHEALY:  Say that slowly.

8            A.    8-inch diamond pro bevel.

9                  MR. SHEALY:  8-inch pro bevel.

10           Q.    And the bevel, I guess, is the

11   angle on the corners of the brick?

12           A.    Right.

13           Q.    That type of block, that's a block

14   not a brick, correct?

15           A.    Yes.

16           Q.    Is that block manufactured pretty

17   regularly out there?

18           A.    Yes.

19           Q.    What I mean by that, it's not like

20   a very unusual event to be making 8-inch diamond

21   pro bevel block, is it?

22           A.    No.

23           Q.    What would be the most typical

Page 20

1    block that Block USA makes out there?

2          A.      Various.  Depends on demand.

3          Q.      Would it be a fair statement,

4    then, that this 8-inch diamond pro bevel is no

5    more or no less typical than any other block out

6    there?

7          A.      Yes.

8          Q.      And when you make this block, the

9    8-inch diamond pro bevel and then the other

10   regular kind, what do you call the standard

11   kind?

12         A.      Just a regular block.

13         Q.      When you make the different

14   blocks, do all the block have to come through

15   this splitter?

16         A.      No.

17         Q.      Tell me which ones have to come

18   through the splitter?

19         A.      Diamond pro, diamonds, split

20   faced, 4-inch split face, 4-inch L-return

21   corners, 8-inch L-return corners, windsor.  Any

22   split face block has to go through there.  A

23   rough face block.

Page 21

1     Q.     The rough face means when a

2 concrete block is formed and it's form, there is

3 a smooth precision type edge, as opposed to when

4 it goes through the block splitter, it's cracked

5 and has a rough face; is that right?

6     A.     Right.

7     Q.     Any of that block that has a rough

8 face has to go through the splitter, or we know

9 it has gone through the splitter because it has

10 the rough face?

11     A.     Yes.

12     Q.     As I also understand, there's some

13 different knives that go on the splitter

14 depending on which block you're splitting?

15     A.     Yes.

16     Q.     How many different knives are

17 there?

18     A.     Let's see, 8-inch diamond pro, you

19 got the 6-inch diamond, 8-inch straight split,

20 you got the T-split, you got the windsor --

21 probably about six.

22     Q.     Okay.  Now, the diamond pro block

23 is split with a wedge shaped knife; is that

Page 22

1    right?

2          A.      On the sides, it's two straight

3    knives.

4          Q.      On the sides?

5          A.      Top and bottom has the wedge.

6          Q.      Okay.  What type block uses the

7    wedge on the side?

8          A.      The 8-inch diamond pro and 6-inch

9    diamond and the windsor.

10                 (Whereupon, Plaintiff's Exhibit 1

11   was marked for identification.)

12   BY MR. ANDREWS:

13         Q.      I will show you what I will mark

14   as Exhibit 1 to your deposition.

15                 MR. ANDREWS:  I will mark it 1

16   John Stephens.

17         Q.      What is that a picture of?

18         A.      4-inch windsor split.  That is the

19   bottom -- top knife.

20         Q.      On the edges, right here on these

21   edges right here, that comes in at an angle.  Do

22   you see what I'm talking about?

23         A.      Yes.

Page 23

1          Q.      When I'm talking about the side
2    knives having an angle, this is what I'm talking
3    about.  Is this what you're talking about having
4    a straight edge?
5          A.      No.  That is not a side knife.
6          Q.      That is the top knife?
7          A.      Right.
8          Q.      Are there side knives that come in
9    with a wedge like this?
10         A.      There are two knives straight.
11         Q.      I will show you Defendant's
12   Exhibit 4 to Mr. Jackson's deposition that was
13   taken yesterday.  The knives shown here on the
14   side that I'm pointing to, that is the side
15   knife, right?
16         A.      Yes.
17         Q.      Is that a straight edge side
18   knife?
19         A.      Yes.
20         Q.      Are there side knives that go here
21   that have a wedge shape to them similar to what
22   we see in Plaintiff's Exhibit 1 to your
23   deposition?

BENDINGER & ASSOCIATES
334.803.0161

Page 24

1    A.    No.

2    Q.    There are none that have that?

3    A.    No.  There's just two knives --
4    straight knives like that that are separated
5    apart.

6    Q.    I see.  When you install the two
7    knives on the side, what's purpose of having two
8    knives on the side?

9    A.    Depends on how big a chunk gets
10    split out through your bevel split.

11    Q.    Do you remember what kind of block
12    was being split on the day of Mr. Jackson's
13    accident?

14    A.    8-inch diamond pro diamond tan.

15    Q.    Would it have a straight edge
16    blade on the side?

17    A.    It would have two on each side.

18    Q.    It would have two on each side to
19    cut out a wedge on the side of the blocks?

20    A.    Right.

21    Q.    I will show you Plaintiff's
22    Exhibit 7 to Mr. Ronald Neese's deposition.  Do
23    you see the knives here?

Page 25

1       A.      Yes.

2       Q.      Are those the two knives that
3   you're talking about?  See the one line there
4   and the one line there?

5       A.      Yes.

6       Q.      What kind of blocks are we cutting
7   here?

8       A.      8-inch diamond pro bevel.

9       Q.      The block that we see in
10  Plaintiff's Exhibit 7 to Mr. Neese's deposition,
11  is that the kind of block and kind of knives
12  that would've been in use on the day of
13  Mr. Jackson's accident?

14      A.      Yes.

15      Q.      When those knives operate or
16  cycle, it's my understanding that the knives
17  come in and hit the block we can see in
18  Plaintiff's Exhibit 7 to Mr. Neese's deposition,
19  and operate a bite out a chunk of the concrete
20  at an angle?

21      A.      Yes.

22      Q.      What happens to the concrete once
23  the concrete is bitten out or sliced into?

Page 26

1      A.      It is pushed out by the next block
2  coming in.

3      Q.      Does that chip or concrete
4  sometimes fall into the knives?

5      A.      Yes.

6      Q.      As I understand, we have been
7  calling it debris, for lack of a better phrase,
8  concrete pieces or chips that fall down beside
9  these knives after the knives cycle.  Are you
10 familiar with that term?

11     A.      Yes.

12     Q.      Is that a fair characterization of
13 what happens?

14     A.      Yes.

15     Q.      As I also understand, regardless
16 of the block you're splitting or the knife
17 you're using, there is going to be some amount
18 of concrete that falls down every time?

19     A.      No.

20     Q.      Tell me when it will and when it
21 won't?

22     A.      Straight split won't; everything
23 else will.

Page 27

1      Q.      When you're using these double

2  sided knives -- what should I call these knives

3  that we see in Plaintiff's Exhibit 7 to

4  Mr. Neese's deposition?

5      A.      8-inch diamond pro side knife --

6  bevel split side knife.

7      Q.      When using that kind of side

8  knife, is there going to be some debris created

9  every time a cycle is made?

10     A.      No, just occasionally.

11     Q.      Okay.  Maybe that was a poor

12  question.  As I understand, every time there is

13  going to be some concrete taken out of the

14  block.  Are you saying sometimes it doesn't fall

15  down beside the knives and sometimes it does?

16          MR. SHEALY:  Object to the form.

17  That is not what he said.

18     Q.      Let me go back through it.  I

19  asked you if there was going to be some debris

20  created every time and you said no, not every

21  time.

22     A.      No.

23     Q.      When I'm saying debris --

BENDINGER & ASSOCIATES
334.803.0161

Page 28

1          MR. RODGERS:  He's thinking debris

2     is being piled up next to the knives instead of

3     the chunk being cut out.

4         Q.      Sometimes a chunk is cut out every

5     time?

6          MR. SHEALY:  Can we take a one

7     minute break?

8              10:18 a.m.

9            (Off the record)

10             10:22 a.m.

11    BY MR. ANDREWS:

12        Q.      Okay.  John, before we took a

13    break, we were talking about different kinds of

14    knives and splitting the block and where the

15    debris may be create that falls down beside the

16    knives or not.  Do you remember that line of

17    questioning?

18        A.      Yes.

19        Q.      As I understand, you told us the

20    straight knives typically do not create any

21    debris because nothing cracks off the block; is

22    that true?

23        A.      Yes.

Page 29

1         Q.      Before I leave the straight

2    knives, sometimes does the block crack

3    imperfectly and create something that comes

4    down?

5         A.      Yes.

6         Q.      Is that just not very typical, but

7    it happens with a straight knife?

8         A.      Yes.

9         Q.      Then the knives that have the

10   8-inch pro diamond bevel edge, that knife like

11   we see the Exhibit 7 -- Plaintiff's Exhibit 7 to

12   Mr. Neese's deposition -- that type of knife is

13   more typical or more prone to create some debris

14   when it cycles; is that a true statement?

15        A.      Yes.

16        Q.      Let me try to establish this.

17   When the side knives come in that have the two

18   blades, every time that side knife cycles, it

19   has to bite out a piece or -- I will call it

20   bite out a piece of concrete every time; is that

21   right?

22        A.      Yes.

23        Q.      Are you telling us that

Page 30

1  sometimes -- what do you call that, a chunk?

2       A.      A chunk.

3       Q.      When the chunk is created, does
4  the chunk sometimes fall down beside the knives?

5       A.      Yes.

6       Q.      Sometimes the chunk does not fall
7  down?

8       A.      Yes.

9       Q.      Is there any pattern or
10 consistency with that that you can tell, or just
11 watch it and see whether it does it or not?

12      A.      Just have to watch it.

13      Q.      Is it more common to do it or not
14 to do it, or about half?

15      A.      About half.

16      Q.      Would it be a fair statement then
17 if you were to run 100 blocks, it might be every
18 other block for example?

19      A.      Yes.

20      Q.      If that chunk is left down beside
21 the knives, can it be left down beside the
22 knives?

23      A.      Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 31

1      Q.      What happens if it is left down
2  there?

3      A.      It gets crushed and messes up the
4  next block?

5      Q.      Do you have to get that chunk out
6  of there?

7      A.      Yes, if you cut the machine off.

8      Q.      That's what I'm going to get to in
9  just a second.  First, let me establish, a chunk
10  has to be gotten out of there or else it will
11  mess up the next block?

12      A.      Yes.

13      Q.      If it stays in there, it will mess
14  up the next block?

15      A.      Yes.

16      Q.      Would it be a fair statement that
17  the more debris left in there, there is going to
18  more debris created next time, and mess up the
19  block even further next time?

20      A.      Yes.

21      Q.      Now, there is a control panel that
22  operates this splitter; isn't that right?

23      A.      Yes.

Page 32

1    Q.    Is that the only place you can
2 turn on the machine and turn it off?
3    A.    No.
4    Q.    Is there another place to turn it
5 on and off?
6    A.    Yes.
7    Q.    Where is there?
8    A.    The main control panel inside the
9 breaker box.
10    Q.    Located somewhere besides the
11 splitter?
12    A.    Located inside the office.
13    Q.    You mean, up there where
14 Mr. Mackey's office is?
15    A.    Yes.
16    Q.    As far as on the machine itself,
17 that control panel on the machine, is that the
18 only place you can turn the machine on and off?
19    A.    Yes.
20    Q.    Now, when the block comes out of
21 the splitter, sometimes are there still some
22 chips that need to be chipped off those blocks?
23    A.    Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 33

1          Q.      How do you accomplish that?  How

2    is that done?

3          A.      With a chipping hammer.

4          Q.      There is a picture of a chipping

5    hammer, I believe, marked yesterday to

6    Mr. Jackson's deposition.  Defendant's Exhibit 9

7    Mr. Jackson's deposition, is that a chipping

8    hammer?

9          A.      Yes.

10          Q.      And the people that do the

11    chipping, where do they usually stand when

12    they're doing the chipping?

13          A.      Down on the conveyer line past the

14    splitter.

15          Q.      So the chipping will take place

16    past the splitter, between the splitter and

17    cuber?

18          A.      Yes.

19          Q.      Then Defendant's Exhibit 7 to

20    Mr. Jackson's deposition, what kind of block is

21    that?

22          A.      8-inch diamond pro bevel gray.

23          Q.      And the corners where they cut an

Page 34

1    angle, is that what happens when these two edge
2    side knives come in to the block?

3           A.       Yes, when the top knife comes
4    down.

5           Q.       It all works together, the top and
6    bottom -- isn't there a bottom knife, too?

7           A.       Yes.

8           Q.       Now, when you were hired at Block
9    USA, did you go through any training to operate
10   this machine, the block splitter?

11          A.       Yes.

12          Q.       Who gave you the training?

13          A.       Brian Schoolmaster.

14          Q.       Okay.  Did you have to look at any
15   documents or was it all verbal?

16          A.       Verbal and on-hand.

17          Q.       In other words, verbal and
18   actually getting in there and doing it?

19          A.       Yes.

20          Q.       Let me ask it this way:  Have you
21   seen any manual for this block splitter machine
22   at all?

23          A.       Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 35

1    Q.    In that manual, have you ever seen
2  any language that tells you about any of this
3  debris that is created that reference the
4  debris?

5    A.    No.

6    Q.    What did Brian tell you about the
7  debris, if you recall?

8    A.    Not to stick your hand in there
9  and pull it out.

10    Q.    What else did he tell you?

11    A.    Turn the machine and take a stick
12  or a rod and push it out.

13    Q.    When he told you to cut it off,
14  did he tell you to lock it out and tag it out?

15    A.    Yes.

16    Q.    Did he go to through the steps of
17  how to lock it out and tag it out?

18    A.    Yes.

19    Q.    How did he tell you how to do
20  that?

21    A.    Shut the power off.  Get a tag
22  out.  And then grab the lock and lock it out.

23    Q.    Where did you have a lock?

Page 36

1      A.      In the office.

2      Q.      Is there one lock for this machine?

3      A.      Yes.

4      Q.      So you would have to do that, I
5   guess, when you're cutting these diamond edged
6   or angled blocks, every other blocks basically?

7      A.      Yes.

8      Q.      When you're in production with
9   these blocks like we see in Defendant's Exhibit
10  7 to Mr. Jackson's deposition -- how many of
11  those would you run at a time when you run these
12  type of blocks?

13     A.      Through the splitter?

14     Q.      Yes.

15     A.      Two.

16     Q.      No, I'm sorry.  In a shift or how
17  many days would you run these?

18     A.      Depends on the demand.

19     Q.      Typically when you get to the
20  machine, the splitter that's set up to run this
21  type of block that we see in Defendant's Exhibit
22  7 to Mr. Jackson's deposition, how many of those
23  would you run through there before you go to

BENDINGER & ASSOCIATES
334.803.0161

Page 37

1    another type of block typically?

2        A.      Two or three days.

3        Q.      How many blocks do you run in

4    there in a day?

5        A.      Probably about five thousand.

6        Q.      Five thousand per day?

7        A.      Yes.

8        Q.      Is there just one shift out there

9    at the plant?

10       A.      Yes.

11       Q.      When is that?

12       A.      Day shift.  6 to 5.

13       Q.      You would run about three or four

14   days of that?

15       A.      Yes.

16       Q.      15 to 20,000 block, then shift to

17   another block for example?

18       A.      Yes.

19       Q.      That is not necessarily going to

20   be verbatim what happens, that's just an example

21   of it?

22       A.      Yes.

23       Q.      If this debris is created on the

Page 38

1    side knives when running this type of block, is

2    it your testimony that every other block or

3    pretty frequently you have to stop, go to the

4    office, get the lock, come back out and lock out

5    the machine, put a tag on it, clear the debris,

6    then go return the lock to the machine to the

7    office, then start the machine back up?

8         A.    No.

9         Q.    How do you do that?

10        A.    Turn the machine off.  Cut the

11   power switch off.  Take your stick and push your

12   chunk out and turn the machine back on.

13        Q.    So you don't always get the lock

14   or a tag?

15        A.    No, just if it's a problem.

16        Q.    When you say it's a problem, like

17   if the chunk might be stuck in there?

18        A.    No, electrical or mechanical.

19        Q.    Let me address that right quick.

20   If you're changing out the knives, do you lock

21   out and tag out the machine then?

22        A.    Yes.

23        Q.    If there is a mechanical defect or

Page 39

1    something that has come apart on the machine, I

2    assume you would lock/out and tag/out the

3    machine then?

4        A.    Yes.

5        Q.    If you're doing a routine cleaning

6    out the debris, is it your testimony you don't

7    always lock/out and tag/out the machine?

8        A.    No.

9        Q.    What is your testimony?

10       A.    You would turn the machine off.

11   Turn the power switch off.  Take your rod or

12   stick and push it out, and turn it back on.

13       Q.    I think that is what I said.  What

14   I understand you to say is:  That if you are

15   just cleaning the debris out, you would turn the

16   machine off, but you wouldn't lock it out or tag

17   it out?

18       A.    Yes.

19       Q.    Is that true?

20       A.    Yes.

21       Q.    So then when you're running this

22   5,000 blocks per day, do you turn the machine

23   off almost every other block to clean the

BENDINGER & ASSOCIATES
334.803.0161

Page 40

1    debris, then turn it back on?

2        A.    Yes.

3        Q.    Where do you stand when you do

4    that?

5        A.    I was standing behind -- I was

6    chipping.

7              MR. RODGERS:  He's not asking

8    you --

9        A.    Where would you stand?  In front

10   of the panel.

11       Q.    All right.  We have taken the

12   deposition of the corporate representative for

13   the people who made the machine, E & R

14   Manufacturing and Besser Corporation.  And they

15   have testified that typically when you're

16   running block, nobody stands at the control

17   panel when cleaning out this debris.  You stand

18   on the conveyer side of the splitter?

19       A.    Yes.

20       Q.    Is that true?

21       A.    Yes.

22       Q.    Is that the practice that goes on

23   out there at the plant in Andalusia?

Page 41

1      A.      Yes.

2      Q.      As I understand, that is where

3  Mr. Jackson was standing at the time of his

4  accident?

5              MR. SHEALY:   Let me object to the

6  form, and add one thing.   After the machine is

7  turned off.

8              MR. ANDREWS:   No, when the block

9  is being split.

10             MR. SHEALY:   You said to clean out

11  the debris.

12             MR. ANDREWS:   Right.

13             MR. SHEALY:   Well, the question is

14  misleading in that --

15             MR. ANDREWS:   Hold on.

16             MR. SHEALY:   Read back the

17  question.

18             MR. ANDREWS:   I can clear it up.

19             MR. SHEALY:   Let me object to the

20  form.

21     Q.      It's my understand that when

22  someone is working when they're operating this

23  block splitter machine, based on the testimony

BENDINGER & ASSOCIATES
334.803.0161

Page 42

1    from E & R Manufacturing and Besser, the person

2    that stands at this block splitter machine will

3    stand on the side of the block splitter machine,

4    between the block splitter and the conveyer,

5    down towards the cuber?

6        A.    Yes.

7        Q.    That is while the blocks are being

8    produced or sent through the splitter; is that

9    right?

10       A.    Yes.

11       Q.    That's where we see this gentleman

12   standing in Plaintiff's Exhibit 7 to Mr. Neese's

13   deposition?

14       A.    Yes.

15       Q.    Is that what you were saying

16   earlier?

17       A.    Yes.

18       Q.    When this person is standing in

19   this position, what's their job?

20       A.    To pull the chunk out after the

21   next block pushes it out.

22       Q.    You mean --

23       A.    To throw it away.

Page 43

1    Q.    Right.   And so once the block is

2    split, the block comes through the splitter,

3    that person is supposed to pull the chunk out

4    and throw it away so it doesn't pile up right

5    there around the splitter?

6    A.    Yes.

7    Q.    Now, is that person also supposed

8    to be looking to see if any debris is created

9    down by the side knives?

10    A.    Yes.

11    Q.    Is there anybody else that stands

12    on the other side of the machine as well?

13    A.    No.

14    Q.    Why is that?

15    A.    Just need one person there

16    necessarily.   It's there preference to stand on

17    which side they want to stand on.

18    Q.    But typically they stand on this

19    side of the machine; is that right?

20    A.    Yes.

21    Q.    As I understand from E & R and

22    Besser, typically no one stands at the control

23    panel when this is going on; is that true?

Page 44

1      A.      Yes.

2      Q.      Typically the workers are where
3   this gentleman is in Exhibit 7 to Mr. Neese's
4   deposition, and then down the conveyer doing the
5   block chipping and down at the cuber?

6      A.      Yes.

7      Q.      Is there anybody upstream at all
8   from where this gentleman would be standing
9   during a typical production process?

10      A.      Depends on which block you're
11   running through the splitter.

12      Q.      If you're running this kind of
13   block, Defendant's Exhibit 7 to Mr. Jackson's
14   deposition --

15      A.      No.

16      Q.      Why is that?

17      A.      Because some block gets run
18   through the splitter.  If they hit before they
19   get to the splitter, they break.  And you have
20   to have a person to keep them from hitting to
21   push them into the splitter.

22      Q.      Does this kind of block do that?

23      A.      No.

Page 45

1    Q.    If you're running a different kind

2    of block than what was happening on the day of

3    Mr. Jackson's accident, you need someone up

4    stream or before the block gets to a splitter?

5    A.    Yes, on a different block.

6    Q.    But you don't need that when

7    you're doing the kind of block being split on

8    the day of Mr. Jackson's accident?

9    A.    No.

10    Q.    Now, when block is being run

11    through the splitter, the kind of block being

12    done on the day of Mr. Jackson's accident, does

13    this person, once they realize some debris is

14    down in the knives, do they have to stop, walk

15    around to the control panel, and turn it off

16    there?

17    A.    Yes.

18    Q.    How does that effect production?

19    A.    It don't.  It don't take but a few

20    minutes.

21    Q.    As I understand from E & R, the

22    corporate representative for E & R and from

23    Besser, they understand it does slow down

BENDINGER & ASSOCIATES
334.803.0161

Page 46

1    production some.  Is that what you have seen out

2    there as well?

3        A.      Yes.

4        Q.      Isn't production important out

5    there at the plant?

6        A.      Yes.

7        Q.      And isn't it true that every

8    effort is made to keep production going as best

9    you can?

10       A.      Yes.

11       Q.      When you were trained by

12   Mr. Schoolmaster, were you told there was a tool

13   that came with this machine?

14       A.      No.

15       Q.      Do you know if a tool came with

16   this machine, when we say tool, to clean out the

17   debris?

18       A.      No, I do not know.

19       Q.      It's my understanding from the

20   people that made this machine, that no tool --

21   they did not make a tool for anyone to use that

22   comes with this machine, is that what you

23   understand as well?

Page 47

1          MR. RODGERS:  Specifically to
2    clean it out?

3          MR. ANDREWS:  Yeah.

4     A.     Yes.

5     Q.     So what kind of tools do y'all use
6    out there?

7     A.     A piece of steel rod or a piece of
8    a stick.

9     Q.     Wooden stick?

10     A.     Yes.

11     Q.     Do you know how long that stick
12    has to be?

13     A.     2 or 3 feet.

14     Q.     Does it sometimes get cut up in
15    the knives?

16     A.     Yes.

17     Q.     Does it mess up the knives?

18     A.     No.

19     Q.     Does the manual tell you how to
20    use this tool at all?

21     A.     No.

22     Q.     It is up to the operator to know
23    how to stick it in there and clean it out?

BENDINGER & ASSOCIATES
334.803.0161

Page 48

1        A.      Yes.

2        Q.      Sometimes can you get all the

3   debris out at one time, or do you have to keep

4   doing it?

5        A.      Yes.   Sometimes you can at one

6   time.

7        Q.      Have you ever seen anybody use

8   their hand to clean the area out, at all,

9   without stopping the machine?

10       A.      No.

11       Q.      Never seen anybody ever do that?

12       A.      No.

13       Q.      Can you recognize the person in

14  Plaintiff's Exhibit 7 to Mr. Neese's

15  deposition?  Do you know who that gentleman is?

16       A.      Yes.

17       Q.      Who is that?

18       A.      Willy Jackson.

19       Q.      Does he still work out there?

20       A.      No.

21       Q.      Do you know if Mr. Jackson reached

22  his hand in there to clean out the debris?

23       A.      No, I do not.

BENDINGER & ASSOCIATES
334.803.0161

Page 49

1       Q.      Do you know where Mr. Jackson
2  lives?

3       A.      No.

4       Q.      Do you know why he doesn't work
5  there anymore?  Did he quit?

6       A.      No, I do not know.

7       Q.      Let me ask you this:  When
8  production is up and going, does this
9  operator -- I'm calling him operator, what is
10 this person called, a laborer?

11      A.      Yes.

12      Q.      He's not really the operator of
13 the machine because he's not standing at the
14 panel, is he?

15      A.      No.

16      Q.      Is that a fair statement?

17      A.      Yes.

18      Q.      When this person, like we see
19 Mr. Jackson, where he's standing, once he gets
20 into the groove, isn't there a routine or
21 pattern of grabbing the block and getting the
22 area clean, then the next block comes in and
23 there is sort of an assembly line, production

Page 50

1   type of pace?

2          A.       Yes.

3          Q.       Does this person ever -- or have

4   you ever done that position?

5          A.       Yes.

6          Q.       Do you get into a groove where you

7   are trying to get everything cleaned out the

8   best you can to keep production going?

9          A.       Yes.

10         Q.       Would it surprise you to if a

11  worker in that position, to keep production

12  going, tries to clean that area out with his

13  hand?

14         A.       No.

15         Q.       Why wouldn't it surprise you?

16         A.       They would think it would be

17  faster to do it with your hand than to cut the

18  machine off and use a stick.

19         Q.       I will tell you that we have taken

20  the deposition of the people who made this

21  machine, and they have said they understand and

22  foresee that workers may reach their hand in

23  there and have known it since 1954 when they

BENDINGER & ASSOCIATES
334.803.0161

Page 51

1    made the machine.

2                  MR. CURTIS:   Object to the form.

3                  MR. SHEALY:   Same objection.

4        Q.      Workers may reach their hand in

5    there and clean this debris out, like we're

6    talking about, and so it's not surprising to

7    them.  Again, is that surprising to you?

8        A.      No.

9        Q.      While you say you haven't seen

10   anybody, I guess, with your own eyes reach into

11   the machine, you're not saying it hasn't

12   happened, are you?

13       A.      No.

14       Q.      You haven't particularly seen it?

15       A.      Yes.

16       Q.      Now, Mr. Jackson, on the day of

17   the accident, as I understand -- did you see his

18   accident happen?

19       A.      No.

20       Q.      Did you know of anybody that did

21   see it?

22       A.      No.

23       Q.      My understanding from testimony in

Page 52

1    this case is that when these blocks were being

2    split, one of these chunks got down in there and

3    he tried to reach out in there to clear it out

4    real quick without turning the machine off.

5    Does that surprise you?

6         A.    Yes.

7         Q.    Why is that?

8         A.    Because he didn't turn the machine

9    off, he should have.

10        Q.    We just talked about that --

11        A.    Well, I mean --

12        Q.    Sure.  I'm not asking you if

13   you're critical of it, I'm asking you: Does it

14   surprise you that someone would reflexively try

15   to get that debris out?

16        A.    No.

17        Q.    It's understandable based on your

18   experience working on this machine that someone

19   may reflexively reach in there and try to get

20   that stuff?

21             MR. SHEALY:  Object to the form,

22   and to the term reflexively.

23             MR. ANDREWS:  You can answer.

BENDINGER & ASSOCIATES
334.803.0161

Page 53

1          MR. CURTIS:  Same objection.

2          MR. SHEALY:  That is not in any

3    way what he said in his deposition yesterday.

4          MR. ANDREWS:  I'm not quoting

5    anybody.

6          MR. SHEALY:  But you're asking

7    him, saying reflexively --

8          MR. ANDREWS:  Wait, wait, wait.

9    Object to the form.  Don't go down that road we

10   did yesterday.  I'm not quoting anybody or

11   coming up with anything anybody said yesterday.

12   I'm asking this man if he thinks it's shocking

13   somebody would reach in there reflexively, it's

14   just a word, to clear the debris out.

15         MR. SHEALY:  My objection is to

16   the form of what you call reflexively.  That is

17   not what Jackson said.  He said he did it with

18   his left hand, stuck his hand in there, knew

19   what I was doing, pulled out.  That's the way he

20   did it, and these guys never told him to use a

21   stick and never trained him or --

22         MR. ANDREWS:  Listen, listen.

23   This is exactly what I'm trying to stop.  This

BENDINGER & ASSOCIATES
334.803.0161

Page 54

1   is going to be miserable day if we start going

2   down that road.  Because we're all going to get

3   in there and try to testify on the record.  The

4   testimony is what the testimony is.  Your

5   corporate representative knew people used hands,

6   he had seen it himself in other plants with

7   these nine other accidents, but never told this

8   man about people getting fingers cut off or

9   Mr. Mackey and his missing fingers.  If we are

10  going to start testifying, it's going to take a

11  long time.

12          MR. CURTIS:  Can we be clear about

13  whether the machine is on or off when someone is

14  reaching their hand in there.  Because he did

15  testify people shut down the machine, so there

16  could be a circumstance where the machine is

17  shut down, so just clarify.

18          Q.    Mr. Stephens, once you recognize

19  some debris is create that needs to be cleaned

20  out of the side knives, you told us the proper

21  way to handle that would be to walk around the

22  knives and go to the panel and turn the machine

23  off; is that right?

BENDINGER & ASSOCIATES
334.803.0161

Page 55

1      A.     Yes.

2      Q.     Then when the machine is turned

3  off, could you use your hand to clean the debris

4  out then?

5      A.     Yes.

6      Q.     Have you done that as well?

7      A.     Yes.

8      Q.     Have you seen others do that as

9  well?

10     A.     No.

11     Q.     But you have done that?

12     A.     Yes.

13     Q.     Once the machine is turned off,

14  you are saying it's okay to use your hand?

15     A.     Yes.

16     Q.     Do you remember when someone first

17  started using a tool to clean this debris out?

18     A.     Probably before I went back to

19  work there.

20     Q.     Mr. Mackey also had an accident on

21  this machine, did you know that?

22     A.     Yes.

23     Q.     Were you there when that happened?

Page 56

1       A.      Yes.

2       Q.      Do you know how that happened?

3       A.      No.  I did not see it personally.

4       Q.      What is your general understanding

5    of how that accident happened?

6       A.      My general understanding,

7    Mr. Mackey was paying attention to a rental help

8    and accidentally had his hand up there.

9       Q.      Okay.  You don't know what he was

10   doing, why his hand was up there, you just know

11   it was up there?

12      A.      He was doing 4-inch windsor, he

13   was pulling chunks.

14      Q.      Pulling chunks out of the -- is

15   that like we see Mr. Willy Johnson --

16      A.      Yes.

17      Q.      -- when you refer to what this

18   person is doing, does that refer to pulling

19   chunks?

20      A.      Yes.

21      Q.      Would that be what Mr. Jackson was

22   doing on the day of his accident?

23      A.      Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 57

1      Q.      Is that what Mr. Mackey was doing
2  on the day of his accident?
3      A.      Yes.
4      Q.      When they're pulling chunks, or
5  when Mr. Mackey was pulling chunks, you're
6  saying your understanding is he wasn't watching
7  what he was doing and his hand got in there?
8      A.      I didn't see him when it
9  happened.  I was running the cuber.  I had my
10 back to him.
11     Q.      Is that the similar position you
12 had when Mr. Jackson's accident took place?
13     A.      I was standing right behind
14 Mr. Jackson using a chipping hammer.
15     Q.      Were you facing him or had your
16 back to him?
17     A.      I had my back to him.
18     Q.      Back to Mr. Jackson as well?
19     A.      Yeah, I just heard him holler.
20     Q.      Okay.  Have you always used a
21 stick or a rod since you have been back?
22     A.      No.
23     Q.      Tell me about that.

BENDINGER & ASSOCIATES
334.803.0161

Page 58

1       A.      I did not use one, because I cut
2    the machine off to clean it out.
3       Q.      Have you ever used a stick or a
4    rod then?
5       A.      Yes.
6       Q.      But you typically would use your
7    hand?
8       A.      Yes.
9       Q.      Is it quicker?
10      A.      Uh-huh, (affirmative).
11      Q.      Is that a yes?
12      A.      Yes.  After you cut the machine
13    off.
14      Q.      Is that because it's quicker to
15    use your hand after you cut the machine off?
16      A.      Yes.
17      Q.      Do you know of anybody out there
18    that's ever been reprimanded for using their
19    hand to clean the debris out?
20      A.      No.
21      Q.      Can you look at Plaintiff's
22    Exhibit 7 to Mr. Neese's deposition and see this
23    gentleman standing right back here?

BENDINGER & ASSOCIATES
334.803.0161

Page 59

1      A.      Yes.

2      Q.      Who is that?

3      A.      Marcus McInnis.

4      Q.      He still works out there?

5      A.      Yes.

6      Q.      Since we've been talking, can you

7  think of any other names of people besides

8  Mr. Randy Templeton or Brian Schoolmaster who

9  used to work out there on the assembly line that

10 don't work out there now?

11     A.      No.

12     Q.      You talked about rental help.  Is

13 that help through the temporary service?

14     A.      Yes.

15     Q.      Are there a lot of people that

16 come through there through the temporary

17 service?

18     A.      Occasionally.

19     Q.      Do those people work in this

20 position pulling chunks sometimes?

21     A.      Yes.

22     Q.      Are there several of those that

23 don't work out there anymore, you just can't

Page 60

1   think of their names?

2        A.    I can't think of any of their

3   names except Mr. Jackson.

4        Q.    Was Mr. Jackson a Couch employee

5   or temporary?

6        A.    Temporary.

7        Q.    Do you know if he's through Able

8   Body?

9        A.    Yes.

10       Q.    I'll tell you also there is a

11  video footage of Mr. Jackson operating this

12  machine that I have seen.  Sometimes he uses a

13  rod to clean out debris, sometimes he reaches in

14  and pulls chunks with his hand.  Have you ever

15  seen him do that?

16       A.    No.  I'm outside.

17       Q.    Okay.  Would that be an example of

18  you haven't seen it, but doesn't surprise you

19  somebody does it?

20       A.    No.

21       Q.    No, that is not an example, or no

22  you agree with me?

23       A.    Yes, I agree.

Page 61

1       Q.      On Plaintiff's Exhibit 7 to
2   Mr. Neese's deposition, right here at the top of
3   this picture, there is a rod sticking up.  Do
4   you see that?

5       A.      Yes.

6       Q.      Is that the type of rod you're
7   talking about?

8       A.      Yes.

9       Q.      Are there any other types of tools
10  besides that rod?

11      A.      Just a stick.

12      Q.      Okay.

13              MR. CURTIS:  I think that rod is a
14  hammer.

15      Q.      It's different, which is my next
16  question.  Defendant's Exhibit 1 to
17  Mr. Jackson's deposition, there is a hammer up
18  here at the top.  Do you see that?

19      A.      Yes.

20      Q.      Does anybody ever use that hammer?

21      A.      That's the chipping hammer.

22      Q.      Does anybody use that hammer to
23  clean debris out with, or is that down the line

Page 62

1    somebody will use that to chip with?

2         A.    You can use that hammer if the

3    chunk gets hung up in the side knife to knock

4    the chunk a loose so the next block will push it

5    out.

6         Q.    Do you have to turn the machine

7    off before you use the hammer?

8         A.    No.

9         Q.    Can you let the machine keep doing

10   and hammer and knock the chip out?

11        A.    Yes, because the chip is higher

12   than the side knife.

13        Q.    Can use the rod and not turn the

14   machine off?

15        A.    Yeah.  To hit the chunk, but not

16   to clean it out.

17        Q.    Even if the debris falls down

18   beside the side knives, it's your testimony if

19   you're going to use a rod, you still need to

20   turn the machine off?

21        A.    Yes.

22        Q.    It would be your testimony then,

23   regardless of whether you're using your hand or

Page 63

1   the rod, pretty much every other block, somebody

2   has to turn the machine off?

3       A.     Yes.

4       Q.     And clean the debris out and then

5   start the machine back up?

6       A.     Yes.

7       Q.     Have you ever heard anybody

8   announce to the whole plant, "I'm locking out

9   and tagging the out the machine, step away from

10  the machine"?

11      A.     Not unless it's a mechanical

12  error.

13      Q.     Or when you're changing the

14  knives, I guess, do you announce it then?

15      A.     Splitters are not in line when

16  you're changing the knives.

17      Q.     So you wouldn't announce it then?

18      A.     No.

19      Q.     Who has the key to lock this

20  machine out?

21      A.     The lock and key hangs in the

22  office on the tag/out lock/out board.  Whoever

23  locks it out with the lock puts the key in their

BENDINGER & ASSOCIATES
334.803.0161

Page 64

1    pocket until they get done.

2         Q.      Is that typically the person

3    pulling chunks would be the person to go get it,

4    because they would be the ones to see the debris

5    happen?

6         A.      They notify one of the USA

7    employees and they would lock it out.  Whoever

8    the splitter person is that works on it.

9         Q.      So it wouldn't necessarily have to

10   be the person pulling chunks?

11        A.      No, uh-uh.

12        Q.      But it can be the person pulling

13   chunks?

14        A.      Yes.

15        Q.      In other words, Mr. Jackson, when

16   he's pulling chunks, he could go to the office

17   and get the lock and come lock it out and tag it

18   out if he needed to, couldn't he?

19        A.      If he knows how.

20        Q.      Was Mr. Jackson trained on that,

21   do you know?

22        A.      He was showed how to turn the

23   machine off, how to turn it on.  If a block is

Page 65

1    hung up or mechanical error, he was told to turn

2    around and get me.

3        Q.    I see.  Is that pretty much what

4    Mr. Jackson was told?

5        A.    Yes.  I'm the one that told him.

6        Q.    When Mr. Jackson came the work out

7    there, do you remember that?

8        A.    Yes.

9        Q.    Did you train Mr. Jackson?

10        A.    Yes.

11        Q.    On the operation or how to pull

12    chunks?

13        A.    Yes.

14        Q.    And how to clean the debris?

15        A.    Yes.

16        Q.    What did you tell him?

17        A.    Do not stick your hands in the

18    side knives, use the stick or cut the machine

19    off.  That if something jammed up, turn around

20    and get me, and I will straighten it up.

21        Q.    I understand from Mr. Jackson that

22    he did see debris fall down beside the block and

23    he did reach in there with his hand to try to

BENDINGER & ASSOCIATES
334.803.0161

Page 66

1    clear out the side knives.  Is that you're

2    understanding as well?

3        A.    Yes.

4        Q.    My understanding is he did not

5    turn the machine off.  And his testimony is that

6    that's the way he had always done it, and that's

7    the way he understood he was supposed to it.

8    That's what his testimony was.  My question to

9    you is:  He says that once he got in there, this

10   block was stuck, and as he was trying to pull

11   his hand out, the glove got stuck on some area

12   on the side knife or bolt or some area up in

13   there.  Is that you're understanding of the

14   accident?

15       A.    No.

16       Q.    What is your understanding how the

17   accident happened?

18       A.    He stuck his hand in there without

19   cutting the machine off to get the chunks out.

20   The next block come into the splitter, and

21   before he could get his hand out, it made the

22   eye that pushes the block forward to the knives,

23   and he couldn't get his hand out.  He said it

Page 67

1  was stupid of him to do it.

2        Q.      Mr. Jackson said that?

3        A.      He told me that it was his fault.

4        Q.      When did he tell you that?

5        A.      When did he tell me that?

6        Q.      Yes, sir.

7        A.      When I was holding his hand on the

8  way to the hospital.

9        Q.      What else did you hear him say?

10       A.      Basically that was it.  It was my

11 fault.  I knew better than to stick my hand in

12 there.

13       Q.      The reason I asked is because in

14 the First Report of Injury that was turned in in

15 this case, it says that Mr. Jackson's glove got

16 caught in the machine.  It does not reference

17 any of these comments.  Did you ever tell

18 anybody else what you just told to me?

19       A.      Yes, my supervisor, Karry Mackey.

20       Q.      Who else have you told that?

21       A.      That's it.  Everybody that was in

22 the office that morning heard Mr. Jackson say

23 that.

BENDINGER & ASSOCIATES
334.803.0161

Page 68

1     Q.     Tell me who else was in there?

2     A.     Donnie Lawson, Dewayne Biggs, me

3 and Mr. Jackson.

4     Q.     Mr. Mackey wasn't there the day of

5 the accident?

6     A.     He had not got there yet.

7     Q.     Donnie Lawson, does he still work

8 there?

9     A.     No.

10    Q.     What was his position when he

11 worked there?

12    A.     Driver.

13    Q.     For Block USA?

14    A.     Yes.

15    Q.     When you're pulling chunks, you do

16 wear gloves, don't you?

17    A.     Yes.

18    Q.     Is that required?

19    A.     No.

20    Q.     But is it typical?

21    A.     Yes.

22    Q.     Why do you wear gloves?

23    A.     To keep from getting your hands

Page 69

1  all skin up.

2      Q.     Have you had any communication
3  with E & R or Besser?

4      A.     No.

5      Q.     You never talked to them about
6  anything to do with the machine at all?

7      A.     Yes.  When I was a splitter
8  operator, yes.

9      Q.     What did you talk to them about?

10     A.     Ordering knives.  Ordering parts.

11     Q.     Did they ever tell you that they
12 have other safety features for this splitter to
13 protect workers from getting their hands caught
14 in the knives?

15         MR. CURTIS:  Object to the form.

16         MR. SHEALY:  Same objection.

17     Q.     Did anybody tell you they have
18 stop buttons that can be located where the chunk
19 puller stands, instead of going around to the
20 front of the panel?

21         MR. CURTIS:  Form.

22     A.     No.

23     Q.     Did they ever tell you they

Page 70

1    considered what's called light curtains so if

2    someone had their hand in the area of operation,

3    like Mr. Mackey did and like Mr. Jackson did,

4    these light curtains would sense their hand and

5    the machine would not cycle?

6                    MR. CURTIS:  Form.

7        A.    No.

8        Q.    Did they ever tell you they

9    considered, back in 1986 and prior to that, some

10   guards on the machine that would open up and

11   allow the block to come out so nobody could have

12   their hand in the knife when it cycled?

13                   MR. CURTIS:  Form.

14                   MR. SHEALY:  Object to the form.

15       A.    No.

16       Q.    Would you have wanted to know that

17   for safety purposes out there, to have the

18   safest machine as you could, any of those

19   options?

20       A.    Yes.

21       Q.    Why is that?

22       A.    To keep somebody from getting

23   hurt.  But the machine was already there when I

Page 71

1    began to work on it.

2         Q.    Sure.  I'm not really even asking

3    you anything other than:  Would you have like to

4    have known that?

5         A.    Yes.

6         Q.    Have there been any other

7    accidents on this machine involving hands

8    getting caught in these knives besides

9    Mr. Mackey and Mr. Jackson?

10        A.    Yes.

11        Q.    Tell me about those.

12        A.    Just a temporary laborer got the

13    tip of her finger cut.

14        Q.    Was it on the top knife or side

15    knife?

16        A.    Side knife.

17        Q.    Was it on this same block

18    splitter?

19        A.    Yes.

20        Q.    Was it on the same side as

21    Mr. Jackson's knife?

22        A.    Yes.

23        Q.    Was it the same knife Mr. Mackey

Page 72

1    got cut on?

2        A.      No.

3        Q.      Which one was Mr. Mackey's?

4        A.      The windsor.

5        Q.      But when I say the same side, I'm

6    asking:  Were they standing in the same place we

7    saw Mr. Jackson standing?

8        A.      Yes.

9        Q.      In other words, Plaintiff's

10   Exhibit 7 to Mr. Neese's deposition shows

11   Mr. Willy Jackson standing at this block

12   splitter in this position.

13       A.      Yes.

14       Q.      Is that where Mr. Jackson was

15   standing?

16       A.      Yes.

17       Q.      Is that where this temporary

18   laborer was also standing?

19       A.      Yes.

20       Q.      To your knowledge, is that where

21   Mr. Mackey was also standing?

22       A.      Yes.

23       Q.      This knife right here, was that

BENDINGER & ASSOCIATES
334.803.0161

Page 73

1    the same kind of knife that involved in

2    Mr. Jackson's accident?

3         A.    Yes.

4         Q.    Was it the same knife involved

5    in -- what's the person's name that got the tip

6    of her fingers cut off?

7         A.    All I know is Sherry.

8         Q.    Was this the same type of knife

9    that was used when Sherry got cut?

10        A.    Yes.

11        Q.    Was that the same type of knife

12   that was used when Mr. Mackey got cut?

13        A.    No.

14        Q.    Was it similar?

15        A.    Yes.

16        Q.    In that it had two knives?

17        A.    Yes.

18        Q.    Was it similar in that the two

19   knives created chunks?

20        A.    Yes.

21        Q.    Is that the chunks that were being

22   pulled by Mr. Mackey, Mr. Jackson, and Sherry?

23        A.    Yes.

Page 74

1      Q.    Now, when Mr. Mackey's accident

2  happened, do you know why he wasn't using a

3  tool?

4      A.    No.  That is up to the chunk

5  puller of whether they use the rod or whether

6  they use their hand.

7      Q.    Now, when you came back to work,

8  was this machine, this splitter, already there?

9      A.    Yes.

10     Q.    Do you know of any guards that

11 have been taken off of this machine at all?

12     A.    No.

13     Q.    Looking at Defendant's Exhibit 4

14 to Mr. Jackson's deposition, do you see these

15 little hinges I'm pointing to here?

16     A.    Yes.

17     Q.    I think that's called piano

18 hinges.  Do you know whether there was a guard

19 ever there or not?

20     A.    No, I do not.

21     Q.    Have you ever seen a guard there

22 before Mr. Jackson's accident?

23     A.    No.

Page 75

1      Q.      Do you know if there is one there
2   now?
3      A.      No, because that's on the top
4   knife.
5      Q.      Okay.  Looking at Plaintiff's
6   Exhibit 7 to Mr. Neese's deposition, do you see
7   this area I'm pointing to here?
8      A.      The bottom of the top of the
9   splitter?
10     Q.      Yes, sir.
11     A.      Yes.
12     Q.      Is that the same area that we see
13   in Defendant's Exhibit 4 to Mr. Jackson's
14   deposition?
15     A.      Yes.
16     Q.      Do you know why there is something
17   different in Plaintiff's Exhibit 7 to
18   Mr. Neese's deposition than we see in
19   Defendant's Exhibit 4 to Mr. Jackson's
20   deposition?
21     A.      Yes.
22     Q.      Do you know what that is or why
23   that's in one, but not in the other one?

Page 76

1       A.      Yes.   Mr. Jackson's -- at the time

2   we did not know there was a guard that goes

3   there.

4       Q.      Had it ever been on that machine?

5       A.      No.

6       Q.      As far as you know, when this

7   machine came in from being delivered, did it

8   come in with this --

9       A.      No, as far as I know it wasn't

10  there.

11      Q.      Let me get a clear question.  As

12  far as you know, when this machine came in from

13  being delivered, was that guard in place on the

14  machine?

15      A.      No.

16      Q.      Given the accident, Mr. Jackson's

17  accident happened down here on the side, would

18  this guard have protected his hand?

19      A.      No.

20      Q.      Would it have protected

21  Mr. Mackey's?

22      A.      No.

23      Q.      Would it protected Sherry's?

Page 77

1    A.    No.

2    Q.    Do you know if having a stop
3  button where the operator stands would have
4  helped the operator stop the machine easier and
5  clean out the machine than having to walk around
6  the panel?

7    A.    Yes.  If you had a stop and start
8  button.

9    Q.    Right.  I will show you
10  Plaintiff's Exhibit 8 to Mr. Duane Rondeau's
11  deposition, he is the corporate representative
12  for Besser.  This is another type of splitter
13  they make.  Mr. Rondeau testified these
14  emergency stops, and stop and start buttons here
15  and here I'm pointing to, they put these on the
16  machine that Besser makes and sells, but they
17  don't put them on the one that E & R makes and
18  sells.  Did you know that?

19    A.    No.

20    Q.    Can you see any reason these stop
21  and start buttons couldn't be installed on the
22  splitter that was involved in Mr. Jackson's
23  accident?  For example, in a position where --

Page 78

1        A.      Yes, I can see.

2        Q.      You can see what?

3        A.      The reason they are not
4    installed.

5        Q.      Why is that?

6        A.      Because that picture of that
7    splitter you're showing me from Besser is about
8    three times bigger than the one we got.

9        Q.      My question to you is:  Do --

10       A.      There is not enough room.

11       Q.      My question to you is:  Do you
12   know of any reason wiring couldn't be run to put
13   these stop buttons?

14       A.      No.

15       Q.      If they were put there, do you
16   think people pulling chunks could use them?

17       A.      No.

18       Q.      Do you see that warning sticker,
19   Defendant's Exhibit 4 to Mr. Jackson's
20   deposition?

21       A.      Yes.

22       Q.      Do you know why it's blacked out
23   right there?

BENDINGER & ASSOCIATES
334.803.0161

Page 79

```
 1        A.      That's dirt and dust.

 2        Q.      Okay.

 3        A.      May I take a break?

 4                MR. ANDREWS:  Sure.

 5                     11:06 a.m.

 6                  (Off the record)

 7                     11:16 a.m.

 8   BY MR. ANDREWS:

 9        Q.      This temporary worker we were

10   talking about earlier, a Sherry, do you remember

11   Sherry?

12        A.      Yes.

13        Q.      Do you have any idea where Sherry

14   lives?

15        A.      No.

16        Q.      Does she still work out there?

17        A.      No.

18        Q.      How long ago was her accident?

19        A.      I really can't recall.

20        Q.      Was she through Able Body?

21        A.      Yes.

22        Q.      Were you there when her accident

23   happened?
```

Page 80

```
1        A.       Yes, on the yard.

2        Q.       Did you hear her say anything
3  about how her accident happened?

4        A.       No.

5        Q.       Have you been told how her
6  accident happened?

7        A.       No.  I was told she was told not
8  to stick her hand in it.

9                 MR. SHEALY:  Ask him was it after
10 Jackson or before?

11       Q.       Was it after Mr. Jackson's?

12       A.       Yes.

13       Q.       So do you know about how long ago
14 it was?

15       A.       Probably about a year ago.

16       Q.       Have you talked to anybody that
17 says they saw that accident?

18       A.       No.

19       Q.       Do you know if there is anybody
20 that did see that accident?

21       A.       No.

22       Q.       Do you know how much of her
23 fingers were cut off?
```

Page 81

1          A.       Just the tip of the index finger.

2          Q.       Did she quit after that, or did

3     she come back to work at all?

4          A.       No, I do not know.

5          Q.       In other words, you don't remember

6     or you don't know if she went to the doctor then

7     came back to work?

8          A.       I don't know whether they sent her

9     back up or not.

10         Q.       I see.  Now, we were talking

11    earlier about workers standing at the panel, the

12    operation panel.

13         A.       Yes.

14         Q.       On the day of Mr. Jackson's

15    accident, was there anybody standing at that

16    panel?

17         A.       No.

18         Q.       Is that okay?  Is that typical?

19         A.       Yes.

20         Q.       Does anybody have to be at that

21    panel?

22         A.       Not on them block.

23         Q.       As a matter of fact, it's more

Page 82

1    common than not that somebody is not at that

2    panel when cutting this type of block?

3         A.    Yes.

4         Q.    E & R corporate representative

5    testified that he knows that in the real world

6    application of this machine, workers will try to

7    clear the debris without having to stop that

8    machine. Would that be consistent with what you

9    observed as well?

10        A.    Yes.

11        Q.    I guess, your only criticism of

12   Mr. Jackson is he used his hand to reach into

13   the machine while it was still going, rather

14   than using a tool?

15        A.    Yes.

16        Q.    But you will agree with me, I

17   guess, whether you criticize Mr. Jackson or not,

18   using his hand is quicker than using a tool, it

19   can be quicker and easier?

20        A.    Sometimes.

21        Q.    How quick is that cycle when the

22   blocks are being split? Can you vary that

23   cycle?

Page 83

1    A.    No.

2    Q.    Is it a set pattern?

3    A.    Yes.

4    Q.    You told me already what
5  Mr. Jackson said after that accident.  Do you
6  remember any other events after the accident?

7    A.    After the accident?

8    Q.    Right.

9    A.    I chased him down, and held his
10  hand.

11    Q.    Was he running?

12    A.    Yes.

13    Q.    Take us through what happened.

14    A.    We started work at five o'clock
15  that morning.  At 5:25, Mr. Jackson hollered.  I
16  turned around and he was starting to run, and I
17  chased him down.  He said he stuck his hand in
18  the splitter, and he knew better than to do it,
19  and his hand was cut.  I held it all the way to
20  the emergency room.

21    Q.    Who was driving?

22    A.    Donnie Lawson.

23    Q.    After that, did Mr. Jackson say

Page 84

1   anything else about the accident, or was he

2   focused on his pain?

3       A.      Said he knew better than to do it.

4       Q.      After he said that?

5       A.      I'm saying that's what he said all

6   the way to the hospital, he knew better than to

7   do it.  Other than that, he didn't say anything

8   else to me.

9       Q.      Other than telling Mr. Mackey

10  that, have you ever told anybody else that,

11  other than your lawyer?

12      A.      No.

13      Q.      Do you know Mr. Jackson, do you

14  know Mr. David Jackson?

15      A.      Not personally.

16      Q.      Okay.  When you worked with him,

17  was he a pretty good fella?

18      A.      Yes.  He did what he was told.

19          MR. ANDREWS:  I believe that's all

20  the questions I have.  Thank you.

21                  EXAMINATION

22  BY MR. SHEALY:

23      Q.      My name is Steadman Shealy.  I

Page 85

1   represent E & R Manufacturer in this case.  We

2   have been sued by Mr. Jackson.

3        It's my understanding from what you've

4   told Mr. Andrews, that Mr. Jackson admitted this

5   accident was his fault?

6        A.    Yes.

7        Q.    Is that a true statement?

8        A.    Yes.

9        Q.    He admitted it on more than one

10  occasion?

11       A.    Yes.

12       Q.    We took Mr. Jackson's deposition

13  yesterday, and he testified that he did not know

14  how to turn on and turn off the machine at the

15  control panel.

16       A.    No.  He was showed how to turn it

17  on and turn it off.

18       Q.    Did you see him turn the machine

19  on and off before?

20       A.    Yes.

21       Q.    So if he testified yesterday that

22  first of all, he didn't even know how to turn it

23  on or turn it off at the control panel, which is

Page 86

1    the panel right by the block that is split, are

2    we understanding each other?

3        A.    Yes.

4        Q.    He testified that he had seen it

5    turned on and off, and you were the only one

6    that would do that.  Is that an incorrect

7    statement?

8        A.    Yes.

9        Q.    In fact, you had trained or showed

10   Mr. Jackson how to turn this machine on and off

11   on the control panel; is that a true statement?

12       A.    Yes.

13       Q.    You had seen Mr. Jackson turn this

14   machine on and off at the control panel; is that

15   a true statement?

16       A.    Yes.

17       Q.    When you're at the machine where

18   the block is being split, which is what

19   Mr. Jackson was doing, what would you describe

20   that job duties or position called, is that a

21   utility man cleaning out debris?

22       A.    That's a chunk puller.

23       Q.    We are going to call it the chunk

Page 87

1   puller. All right. Mr. Jackson was the chunk

2   puller the day of his accident; is that

3   correct?

4        A.     Yes.

5        Q.     Was he trained as the chunk puller

6   to have certain job duties and responsibilities?

7        A.     Yes.

8        Q.     As a part of those job duties and

9   responsibilities, was he trained that if a piece

10  of block was lodged or there was debris built up

11  where the side knives are located, he was

12  supposed to walk about two or three steps and

13  hit the stop button to stop the machine?

14       A.     Yes.

15       Q.     That takes what, about two and a

16  half to three seconds to do that?

17       A.     Yes.

18       Q.     Was that a part of his job duties

19  and responsibilities?

20       A.     Yes.

21       Q.     Would y'all penalize him or get

22  upset with him if he stopped the block splitter?

23       A.     No.

Page 88

1      Q.     In fact, that was his job to do

2   that, wasn't it?

3      A.     Yes.

4      Q.     If he didn't do it and just stuck

5   his hand in there where the side knives were

6   trying to beat the cycle, that was not his job

7   duties and responsibilities?

8      A.     No.

9      Q.     In fact, you have specifically

10  trained him and told him not to put his hand

11  where those side knives were located exactly in

12  the place where he was injured while the machine

13  was running; is that a true statement?

14     A.     Yes.

15     Q.     You told him that before the day

16  of this accident?

17     A.     Yes.

18     Q.     Had you told him on more than one

19  occasion not to put his hand in the splitter?

20     A.     Yes.

21     Q.     Did y'all ever have safety

22  meetings or gatherings where you would discuss

23  safety in the work place and discuss the fact

Page 89

1  you don't put your hand in the block splitter

2  near the knives while it is cycling?

3       A.     We have a safety meeting every

4  week.

5       Q.     Mr. Jackson testified yesterday

6  that you had no safety meetings?

7       A.     When we have a safety meetings,

8  normally Able Body or temporary labor is not

9  there.  They are not required to be in our

10  safety meeting.

11       Q.     Well, let me ask you this then:

12  Would Mr. Jackson have been safely trained by

13  you and your staff how to operate or how to be a

14  chunk puller?

15       A.     Yes.

16       Q.     Do you feel like you adequately

17  trained him and told him and made him aware of

18  any type of danger or any issue with this block

19  splitter so he was aware not to put his hand

20  where the side knives were located while the

21  machine is running?

22       A.     Yes, I trained him personally.

23       Q.     He said he received no training?

BENDINGER & ASSOCIATES
334.803.0161

Page 90

1      A.      That's not true.

2      Q.      You did train him personally?

3      A.      Yes.

4      Q.      You told him personally not to put
5   his hand --

6      A.      Yes.

7      Q.      -- in the area where he was cut or
8   injured while the machine was running?

9      A.      Yes.  I tell every temporary help
10   that.

11      Q.      You told him on more than one
12   occasion prior to his injury?

13      A.      Yes.

14      Q.      Now, is a hammer used on the block
15   to chip away?

16      A.      Yes.

17      Q.      Does that come with this machine?

18      A.      No.

19      Q.      But it is a part of something you
20   have to use sometimes to kind of aid with the
21   manufacturing process at your plant?

22          MR. ANDREWS:  Object to the form.
23   That is called a splitter.

1    A.    Yes.

2    Q.    Is that true?

3    A.    Yes.

4    Q.    How many seconds does it take for

5    the machine to cycle, do you know?

6    A.    Probably three to five seconds.

7    Q.    Now --

8    A.    For it to push up and the knife to

9    come down and the side knife to go in.

10    Q.    There were warnings on this

11    machine that you saw; is that correct?

12    A.    Yes.

13    Q.    The warnings say, "Keep hands

14    clear"?

15    A.    Yes.

16    Q.    Did you understand that and

17    explain to Mr. Jackson that when it's got "Keep

18    hands clear", that means you don't put your hand

19    in there while the machine is running?

20    A.    Yes.

21    Q.    Could you see those warnings on

22    the day of Mr. Jackson's accident?

23    A.    Yes.

Page 92

1     Q.     Could you understand those

2  warnings?

3     A.     Yes.

4     Q.     Were they clear to you or any

5  reason you couldn't understand a warning that

6  said keep your hands clear from the machine?

7     A.     Were they clear to me or clear to

8  Mr. Jackson?

9     Q.     To you and Mr. Jackson.

10    A.     Yes, it's clear.  Big bold letter.

11           MR. ANDREWS:  Let me put on the

12  record, I object to what might have been clear

13  to somebody else besides him.  He can testify

14  what is clear to him.

15    Q.     When you were talking to

16  Mr. Jackson and telling him not to put his hands

17  in there, did you say it says "Keep hand clear"?

18    A.     Yes.

19    Q.     Which is Defendant's Exhibit 1?

20    A.     Yes.

21    Q.     That's right in the area where he

22  says he was injured?

23    A.     Yes.

Page 93

1      Q.      Is it any big deal to stop the

2   block splitter and start it back?

3      A.      No.

4      Q.      Isn't it just a push of a button?

5      A.      Push of a button to stop it.  Push

6   three buttons to start it back up.

7      Q.      Okay.  And you wouldn't punish

8   Mr. Jackson if he stopped this block splitter in

9   the production process because there was a piece

10   of chunk stuck in there, would you?

11      A.      Yes.

12      Q.      He wasn't paid on production?

13      A.      No.

14      Q.      Wasn't he paid by the hour?

15      A.      Yes.

16      Q.      If he felt like the machine needed

17   to be stopped, you wouldn't have had a problem

18   with it?

19      A.      No.

20      Q.      In fact, if he would have stopped

21   this machine, he would not have injured his

22   hand, would he?

23      A.      Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 94

1        Q.      If he would have followed your

2    instructions, he wouldn't have injured his hand;

3    isn't that true?

4        A.      Yes.

5        Q.      You have worked around this block

6    splitter for years?

7        A.      Yes.

8        Q.      Did it do what it was supposed to

9    do?

10       A.      Yes.

11       Q.      Did it split block, work well?

12       A.      Yes.

13       Q.      Have you been happy with it?

14       A.      Yes.

15       Q.      Is there anything that you've seen

16   that's dangerous about this machine that you

17   feel like is not adequate?

18       A.      No.

19       Q.      Do you feel like this is a

20   reasonably safe machine to use if you follow

21   instructions and directions of your employer and

22   the manufacturer?

23       A.      Yes.

Page 95

1     Q.    Mr. Jackson also testified

2 yesterday that he never used the pipe or the

3 stick to clean any debris out of the area where

4 he was injured or in the block splitter area.

5     A.    That was up to the chunk puller

6 whether to use it or use your hand.

7     Q.    Okay.  Well, what I'm going to ask

8 you this:  Did you ever see him use the pipe?

9     A.    No.

10     Q.    So you don't know whether he did

11 or didn't?

12     A.    Right.

13     Q.    But it would have been okay to use

14 your hand to clean out debris as long as you

15 turned the machine off?

16     A.    Yes.

17     Q.    At the control panel?

18     A.    Yes.

19     Q.    There are other places on this

20 machine that say "keep your hands clear"; is

21 that true?

22     A.    Yes.

23     Q.    In working around machinery,

BENDINGER & ASSOCIATES
334.803.0161

Page 96

1    there's going to be different areas that if you

2    put your hand somewhere, you can get hurt if

3    you're not paying attention?

4         A.      Yes.

5         Q.      You were not there when this

6    machine was delivered and set up; is that

7    correct?

8         A.      That's correct.

9         Q.      You told us you don't know how

10   Mr. Mackey cut his hand, you didn't see it?

11        A.      No, I had my back to him.

12        Q.      In fact, you haven't seen anybody

13   get their hand cut; is that true?

14        A.      True.

15        Q.      In fact, y'all have put through

16   there 5,000 blocks a day for what, six days a

17   week?

18        A.      Basically, five days.

19        Q.      Five days a week ever since you've

20   been back there?

21        A.      Yes.

22        Q.      You've never seen, yourself,

23   anybody get their hand cut on a side knife, have

Page 97

1    you?

2         A.      No.

3         Q.      Now, there is another warning

4    Mr. Andrews asked you about that shows a knife

5    cutting a hand.

6         A.      Yes.

7         Q.      Was that on the machine?

8         A.      Yes.

9         Q.      And what did that mean to you?

10        A.      That if you put your hand in

11   there, it was going to cut it off.

12        Q.      You understood what the picture

13   meant?

14        A.      Yes.

15        Q.      What's your education?

16        A.      12th grade graduate.

17        Q.      Any college?

18        A.      No.

19        Q.      Now, is it my understanding that

20   if a person that's the chunk removal person,

21   that some of them would use the steel pipe to

22   clean the chunk out while it was still running,

23   or would they turn the machine off and then use

Page 98

1    the pipe?

2        A.      While it was running.

3        Q.      But you had explained if you were

4    going to put your hands in there to clean out

5    any debris, you must turn the machine off?

6        A.      Yes.

7        Q.      Was that your understanding in the

8    manual that you read, or do you remember what

9    you read in the manual?

10       A.      I don't remember.

11       Q.      So if what I'm understanding, kind

12   of the way you would do things is, if you were

13   going to put your hand in there, you turn the

14   machine off?

15       A.      Yes.

16       Q.      If you are not going to put your

17   hand in there, but remove some debris, you use

18   the rod?

19       A.      Yes.

20       Q.      That's what you told Mr. Jackson

21   to do?

22       A.      Yes.

23       Q.      That was his instructions from the

Page 99

1    time he got there when he was the chunk remover

2    at the block splitter?

3         A.    Yes.

4         Q.    No doubt in your mind you

5    instructed him to do that?

6         A.    No.

7         Q.    No doubt in your mind you

8    instructed him that if he was going to put his

9    hand in there, to turn the machine off?

10        A.    Right.

11        Q.    Did you feel like it was

12   reasonable to have the control panel right by

13   the block splitter, so you could take a couple

14   of steps to turn the machine on and off?

15        A.    Yes.

16        Q.    Does that work well for y'all at

17   this plant?

18        A.    Yes.

19        Q.    Any issues or problems about that?

20        A.    No.

21        Q.    If Mr. Jackson had followed your

22   instructions, he wouldn't have been injured,

23   would he?

Page 100

1      A.      No.

2      Q.      If Mr. Jackson had done what a

3   reasonable and prudent chunk removal person

4   would have done, he wouldn't have been injured,

5   would he?

6      A.      No.

7      Q.      Do you feel like it was

8   unreasonable for Mr. Jackson to put his hand in

9   there while the machine was still running and

10  cycling with block coming through there?

11     A.      Yeah.

12     Q.      Is what I'm understanding that you

13  told us, you have never seen anybody with the

14  machine running put their hand in there to clean

15  out debris?

16     A.      No.

17     Q.      If you had, you would reprimand

18  them, wouldn't you?

19     A.      Yes.

20     Q.      That would violate their training

21  and that was not part of their job duties and

22  responsibilities to do that?

23     A.      Yes.

Page 101

1        Q.       It was not a part of Mr. Jackson's

2    job duties and responsibilities to stick his

3    hand in the area where the side knife is located

4    with the machine still running; is that true?

5        A.       Yes.

6        Q.       Let me talk a minute how this

7    happened.  Mr. Jackson didn't mention to you

8    that his glove got caught?

9        A.       No.

10        Q.       That is not what he told you at or

11    near the time this accident happened?

12        A.       No.

13        Q.       What he told you was, he was

14    trying to beat the cycle, and a block came

15    through and he didn't get his hand out?

16               MR. ANDREWS:   Objection.

17        Q.       Is that true?

18        A.       Yes.

19        Q.       Then he told you he knew better?

20        A.       Yes.

21        Q.       From what he told you, did he

22    recognize that he shouldn't have put his hand in

23    there, it was dangerous and hazardous to do what

Page 102

1    he did?

2        A.    Yes.

3        Q.    Did he admit that to you?

4        A.    Yes.

5        Q.    At the time that he actually put

6    his hand in there where the side knife was

7    located with the machine running, he recognize

8    there was a hazard, and he chose to put his hand

9    in there?

10        A.    Yes.

11        Q.    Is that what he told you?

12        A.    Yes.  Mr. Jackson told me --

13            MR. RODGERS:  You have answered.

14        Q.    Jackson said when you trained him,

15    that you trained him to reach his hand in there

16    and clean out debris?

17        A.    No.

18        Q.    Okay.  You would not have trained

19    him to do that?

20        A.    No.  Only if the machine was

21    turned off.

22            MR. SHEALY:  Okay.

23            MR. CURTIS:  No questions.

Page 103

1        MR. ANDREWS:  I have a couple of

2    follow up questions.

3                    EXAMINATION

4    BY MR. ANDREWS:

5        Q.    We have a list of people from Able

6    Body Labor.  I'm not going to mark it, but ask

7    you if you will look through there, this person

8    named Sherry.  I don't see a Sherry on the

9    list.  I was going to see if you could look

10   through there an see if another name, maybe a

11   last name, rings a bell.

12       A.    No.

13            MR. MACKEY:  How new is that list?

14            MR. ANDREWS:  It's dated May 12 of

15   this year.  Don't think it would be on there.

16       Q.    Do you know why, I will ask him,

17   maybe we could get this quicker, do you know why

18   it wouldn't be on there?

19       A.    May of this year.

20       Q.    Right.  This shows May of this

21   year going back.

22            MR. MACKEY:  She don't work for

23   them anymore.

BENDINGER & ASSOCIATES
334.803.0161

Page 104

1              MR. ANDREWS:  She doesn't work for

2    Able Body?

3         Q.    Do you know where we might be able

4    to find her name?

5         A.    No.

6         Q.    Do you know if that would exist

7    anywhere in the office?

8         A.    No.

9         Q.    If your lawyer finds it, would you

10   get the information if you can?

11             MR. RODGERS:  If we locate it, we

12   will produce it.

13             MR. ANDREWS:  Great.

14        Q.    You said you told Mr. Jackson more

15   than once not to stick his hand in there when it

16   was running; is that right?

17        A.    Yes.

18        Q.    Had you seen him try to stick his

19   hand in there?

20        A.    Yes.

21        Q.    Had you seen him do it on more

22   than one occasion?

23        A.    Yes.

Page 105

1       Q.      Had you told anybody else that
2   same thing?

3       A.      I tell everybody.

4       Q.      Had you seen other people that you
5   had to reprimand like that?

6       A.      Yes.

7       Q.      Who else had you seen that you had
8   to reprimand?

9       A.      Other Able Body people.  Mainly
10  the Able Body, the temporary help people were
11  ones that were bad about wanting to stick their
12  hands in there.

13      Q.      While it was running?

14      A.      Yes.

15      Q.      While they were pulling chunks?

16      A.      Yes.

17      Q.      Would it be just Mr. Jackson and
18  maybe one other, or would it be several other
19  Able Body people?

20      A.      It would be several.

21      Q.      Was that a constant concern of
22  yours, I guess?

23      A.      Yes.

Page 106

1      Q.      In fact, you did see several
2   people trying to reach their hand in there while
3   it was running?
4      A.      Yes.
5      Q.      Did you ever write up anybody for
6   that or reprimand them for that, other than
7   verbally talk to them?
8      A.      No.
9      Q.      The ones that were doing that,
10  even Mr. Jackson, did you ever successfully see
11  them clean that debris out without getting hurt?
12     A.      No, I didn't see them successfully
13  put their hand in there.
14     Q.      You just saw them reaching towards
15  that direction?
16     A.      Yes.
17     Q.      You said there was safety meetings
18  that took place, but Able Body did not attend
19  those safety meetings?
20     A.      Yes.
21     Q.      Is that true?
22     A.      Yes.
23     Q.      Were there safety meetings with

Page 107

1    Able Body people on a regular basis?

2         A.       No.

3         Q.       Do you know why that is?

4         A.       No.  I just know Block USA has

5    their own safety meetings.

6         Q.       You said the cycle is about three

7    to five seconds, and that's when you can use the

8    tool like you talked about to clean the debris

9    out?

10        A.       Yes.

11        Q.       Is that long enough time to do

12   that?

13        A.       Yeah, to knock the chunk down to

14   let the other block push it out with a tool.

15        Q.       When you're also wiping out the

16   debris with the tool, is there long enough time

17   between that cycle for you to reach that tool

18   down in there and clear it out and get the tool

19   back out?

20        A.       Yes.

21        Q.       And you were asked about these

22   warnings on here.  You are not an engineer, are

23   you?

Page 108

1      A.      No.

2      Q.      You have never designed any

3  equipment, have you?

4      A.      No.

5      Q.      Have you designed any guards or

6  safety equipment?

7      A.      No.

8      Q.      You don't know, do you, the

9  hierarchy of what's proper and when you should

10  resort to giving warnings rather than making a

11  safer machine, do you?

12      A.      No.

13      Q.      I believe I understood you said

14  there were three buttons: one to stop the

15  machine, but three to start it back up?

16      A.      Yes.

17      Q.      Is there a cycle time period the

18  machine has to go through at all?

19      A.      To start it back up?

20      Q.      Right.

21      A.      No, you just push the hydraulic

22  button, the power button, and pusher button.

23      Q.      Is it instant, or does the

BENDINGER & ASSOCIATES
334.803.0161

Page 109

1    hydraulic have to build up a little bit?

2         A.    No, it's instant.  The only time

3    it has to build up is in the morning time.

4         Q.    I see.  You also said you were

5    happy with the machine and have never seen any

6    other injuries, but we know of at least three on

7    this very same machine since 1997, don't we?

8         A.    I didn't see them.

9         Q.    You just didn't see them take

10   place?

11        A.    Right.

12        Q.    But you know they happened?

13        A.    Right.

14        Q.    Were you aware that there were at

15   least nine other accidents on this same kind of

16   machine before Mr. Mackey's, before

17   Mr. Jackson's and before Sherry's?

18        A.    No.

19        Q.    Do you think if you made a machine

20   and had that many accidents happen, wouldn't you

21   think it would be smart to come up with some

22   guards or safety equipment to protect people?

23             MR. CURTIS:  Object to the form.

Page 110

1          MR. SHEALY:  Same objection.

2     Q.     You can answer.

3     A.     Depends on if it was the machines

4  fault.

5     Q.     If it was feasible to put on

6  there, don't you think it would be smart?

7          MR. CURTIS:  Form.

8     A.     Yes.

9     Q.     If we have video footage of this

10  machine with blocks going through there, would

11  you expect to see that machine being turned off

12  during the video footage for debris being pulled

13  out?

14     A.     Yes, if it's there's a major

15  problem.

16     Q.     If somebody was pulling chunks,

17  would you expect to see them in at least in

18  three or four blocks come through, they are

19  eventually going to have to turn that machine

20  off?

21     A.     Yes, if the blocks hang up.

22     Q.     Now, you have never met with me

23  before today?

Page 111

1    A.    No.

2    Q.    Have you ever met with Mr. Shealy?

3    A.    No.

4    Q.    Mr. Curtis?

5    A.    No.

6    Q.    Never met them before at all?

7    A.    No.

8    Q.    Do you know why it is that this
9    testimony about what Mr. Jackson said and what
10   he did after the accident, why is it just now
11   coming up?

12   A.    No.

13   Q.    Wouldn't you think that would have
14   been important to tell somebody right after the
15   accident?

16   A.    For the injured to tell somebody?

17   Q.    For you to tell somebody.

18   A.    I did.  I told my supervisor.

19   Q.    Do you know why it hasn't come up
20   before today?

21         MR. RODGERS:  Nobody's been
22   deposed today.

23   A.    Nobody talked about it until we

Page 112

1   got word to be here today.

2          MR. SHEALY:  I haven't talked to

3   him.  He hasn't talked to him.  That's why it

4   hasn't come up.

5          Q.     Do you know why it hasn't come up

6   in any kind of report before today?

7          A.     No.  I'm the yard man.  I'm

8   outside.  I don't know what goes on in the

9   office or on the phone.

10         MR. ANDREWS:  I believe that's all

11  the questions I got.

12         MR. RODGERS:  Are you done?

13         MR. SHEALY:  Yes

14         MR. ANDREWS:  Thank you, John.

15             ENDED AT 11:49 a.m.

16       FURTHER DEPONENT SAITH NOT

17

18

19

20

21

22

23

Page 113

1                    C E R T I F I C A T E

2

3     STATE OF ALABAMA )

4     HOUSTON COUNTY    )

5

6          I hereby certify that the above

7     and foregoing deposition was taken down by me in

8     stenotype, and the questions and answers thereto

9     were transcribed by means of computer-aided

10    transcription, and that the foregoing represents

11    a true and correct transcript of the deposition

12    give by said witness upon said hearing.

13          I further certify that I am

14    neither of counsel nor of kin to the parties to

15    the action, nor am I in any way interested in

16    the result of said cause.

17

18

19

20    APRIL BENDINGER, CCR
      CERTIFICATE NUMBER CCR-384
21
      My Commission Expires
22    June 8, 2008

23

BENDINGER & ASSOCIATES
334.803.0161