# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06 CV0412-DRB

DAVID JACKSON,
Plaintiff,

vs.

E & R MANUFACTURING CO., INC.
ET AL,

Defendants.

---

DEPOSITION OF KARRY MACKEY

Date: May 23, 2007

Time: 12 p.m.

COURT REPORTER:
APRIL R. BENDINGER, CSR

COPY

A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr. Mark Andrews
MORRIS, CARY, ANDREWS, TALMADGE, JONES & DRIGGERS
3334 Ross Clark Circle
Dothan, Alabama 36303

FOR THE DEFENDANT:

Mr. Steadman Shealy
SHEALY, CRUM & PIKE
100 Camellia Drive
Suite 101
Dothan, Alabama 36302

FOR THE DEFENDANT:

Mr. Cory M. Curtis
BAKER & HOSTETLER
303 East 17th Avenue
Suite 1100
Denver, CO 80203

A P P E A R A N C E S

FOR THE DEFENDANT, STEPHENS AND MACKEY:

Mr. Christopher Rodgers
HUIE, FERNAMBUCQ & STEWART
Three Protective Center
Suite 200
2801 Highway 280 South
Birmingham, AL 35223

EXAMINATION INDEX

KARRY MACKEY

BY MR. ANDREWS . . . . . . . . . . . . . . 7
BY MR. SHEALY . . . . . . . . . . . . . . 56
BY MR. CURTIS . . . . . . . . . . . . . . 80
BY MR. ANDREWS . . . . . . . . . . . . . . 89
BY MR. CURTIS . . . . . . . . . . . . . . 106
BY MR. ANDREWS . . . . . . . . . . . . . . 107

EXHIBIT INDEX

| Defendant's | | MAR |
|---|---|---|
| 1 | Manual | 83 |

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of KARRY MACKEY may be taken before April R. Bendinger, Notary Public, State at Large, at the Law Offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama on May 23, 2007, commencing at approximately 12 p.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said depositions is

offered in evidence, or prior thereto.

I, April R. Bendinger, a Court Reporter of Dothan, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Albrittons, Clifton, Alverson, Moody & Bowden, 109 on Avenue, Andalusia, Alabama commencing at approximately 12 p.m. on May 23, 2007, KARRY MACKEY in the above cause, for oral examination, whereupon the following proceedings were had:

KARRY MACKEY,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ANDREWS:

Q. Tell us your name, please, sir.

A. Karry Mackey.

Q. How do you spell that?

A. K-A-R-R-Y.

Q. Mr. Mackey, you sat through Mr. John Stephens' deposition just now?

A. Yeah.

Q. I want to take your deposition about Mr. Jackson's accident as well. We met before we got on the record. But again, I'm Mark Andrews, and I represent Mr. David Jackson with regard to his accident and injuries out there at Block USA when operating this block splitter machine. Do you remember that accident?

A. Yes.

Q. Were you there that day?

A. Yes, I was.

Q. Were you there at the plant?

A. I wasn't at the plant when the accident occurred, but later.

Q. In other words, you were employed there, but you weren't on the premises at the time of the accident?

A. Right.

Q. I understood you were not present at the time of the accident; is that true?

A. That's true.

Q. It's safe to say that you didn't see the accident happen?

A. No, I didn't.

Q. All the information you may have about how the accident happened is based on what somebody else told you, I guess?

A. Yes.

Q. Quickly, if you need a break, let me know. If you don't understand my questions, let me know. Try to answer with a yes or no. Head nods and and uh-huh and uh-uh don't get down on the record very well. Have you given a deposition before?

A. Yes.

Q. Tell me about that.

A. It was back in '74.

Q. What was it about?

A. GentlemAn was hurt on-the-job.

Q. Where?

A. Michigan.

Q. Is that where you're from?

A. That's where I was raised.

Q. What part of Michigan?

A. Westland.

Q. What part?

A. Westland. Southern Michigan. Right across the Ohio line. About 25 miles outside of Detroit.

Q. What was the name of the place you were working at that time?

A. National Block Company.

Q. What type of injury was it?

A. It was a foot injury.

Q. What type of equipment?

A. Cuber.

Q. What happened?

A. He climbed up on the cuber while the slight conveyer was running and caught his foot.
Q. Do you know who made the machine?
A. Besser.
Q. You have been around Besser equipment for a good long time, haven't you?
A. Yes, sir.
Q. Are you familiar with Besser?
A. Very.
Q. Do you have any dealings or contact with them?
A. On a weEkly basis.
Q. Do you talk to them about upgrades or safety features for equipment at all?
A. No.
Q. Have you ever asked them about any?
A. No.
Q. Have they ever told you about any?
A. No.
Q. You heard some of my questions I asked Mr. Stephens, did you know on this kind of

block splitter that was involved in this accident, I will call it the subject block splitter, did you know on this subject block splitter that E & R and Besser, they had considered several different safety features, including light curtains and guards that would protect workers from getting their hands caught in that area?

MR. SHEALY: Object to the form.

MR. CURTIS: Object to the form.

Q. Would you have liked to have known about that?

A. Yes.

Q. You suffered an injury on this machine as well, didn't you?

A. Yes.

Q. You personally would have had a vested interest in knowing about that safety equipment, wouldn't you?

A. Yes.

Q. Do you know why it is they did not tell you or make it available on this machine?

A. No.

Q. What is your current title?

A. Plant manager.

Q. Before I leave that subject about the other deposition, is that the only other deposition you have given?

A. Yes.

Q. When you had your accident, did you make a claim about that at all?

A. Workmans' comp? Yes.

Q. Did you make any other kind of claim at all?

A. No.

Q. Who was your lawyer?

A. Um --

Q. Did you use a lawyer?

A. Workmans' comp lawyer. I don't remember his name.

MR. RODGERS: Were you represented?

A. Yes.

Q. Was he here in Andalusia?

A. No. Dothan, I believe.

Q. Was a lawsuit filed?

A. No.

Q. As plant manager, what are your job duties?

A. Raw production, trucks, personnel, maintenance.

Q. Sort of over the whole plant?

A. Everything.

Q. Would it be safe to say that you don't involve yourself in every aspect in fine detail, but you do involve yourself in the big picture?

A. Sometimes the fine detail, if I'm needed.

Q. You have worked this block splitter machine too, haven't you?

A. Yes.

Q. Is that typical of you to do that?

A. No.

Q. When did you stop doing that?

A. I haven't stopped.

Q. Just not something that you typically do?

A. Right.

Q. How long have you been employed out there?

A. Seventeen years in July.

Q. What position were you hired on as?

A. Plant manager.

Q. Has anybody ever been the manager of that plant besides you?

A. No.

Q. I guess you were there when the subject machine was installed?

A. Yes, sir.

Q. How did you split block before this block splitter was installed?

A. We didn't. I take that back. We had a used splitter for a short period of time.

Q. Do you know what kind that was?

A. Columbia.

Q. Do you know what happened to it?

A. I believe it went to Dothan.

Q. Is there a plant in Dothan?

A. Uh-huh, (affirmative).

MR. RODGERS: Is that a yes?

A. Yes.
Q. Did it look different than this block splitter?
A. Yes.
Q. How did it differ?
A. It was larger. Basically did the same job, just larger. Different brand.
Q. But as far as the knives, could you see the knives and reach into those knives as well?
A. Uh-huh, (affirmative).
Q. Is that a yes?
A. Yes.
Q. Were there any guards or anything on that machine?
A. No.
Q. Do you know how old that machine was?
A. No.
Q. This machine was made and delivered in 1997; is that right?
A. Yes.
Q. Did you participate in selecting

this particular splitter?

A. No.

Q. Who did?

A. My supervisor.

Q. Is that somewhere besides Andalusia?

A. Yes.

Q. At that time, who were your supervisors?

A. At that time Hal Webster and Doug Buss.

Q. Doug who?

A. Buss.

Q. B-U-S?

A. S.

Q. Are they still employed with Block USA?

A. Yes.

Q. When this was made -- when this block splitter was purchased, were you at all consulted about the selection of this block splitter?

A. Yes.

Q. Did you know that shut off switches or stop buttons were available for this machine or could have been installed on the subject machine like we see in Plaintiff's Exhibit 8 like we see to Mr. Rondeau's deposition?

A. No.

Q. Do you see these stop buttons I'm talking about?

A. Yes.

Q. If you had known that was made available where stop buttons could have been installed where a chunk puller would be stationed, do you think that would have been important to know?

A. Yes.

Q. Would you have wanted that to be in place, if possible?

A. Yes.

Q. Do you think it would make the machine safer?

A. Yes.

Q. When the machine was installed,

did anyone from Besser or E & R come down and meet with everybody about how to operate this machine?

A. No.

Q. Did anyone at E & R or Besser tell anybody at your plant about other accidents that had taken place on this machine when chunk pullers got their hand caught in the machine?

A. No.

Q. Would you have thought that would have been important to know?

A. Yes.

Q. Why is that?

A. It would have just been important. I would have liked to have known about it.

Q. You felt like it would have made you more aware of what could happen on this machine?

A. Yes.

Q. You had an accident on this machine as well, correct?

A. Yes.

Q. Tell us, when did your accident happen?

A. 2001.

Q. What were you doing?

A. I was over showing an Able Body rental person how to pull chunks.

Q. And what happened?

A. Well, I got concerned with him. I was pulling the block down, and several times when I pulled the block down, I pinched his fingers. So I was more concerned about his fingers than I was my hand, and at the time I wasn't pulling a chunk when this happened, I reached up to grab the block, and I was watching the Able Body rental person, and put my hand in too far.

Q. You weren't even reaching for a chunk at the time?

A. No.

Q. So would it be a safe statement that your fingers can get cut off in this block splitter machine even when you're not reaching in to clean debris, but when you're trying to

pull block out, that's what happened to you?

A. You would have to reach in it. I just reached in it too far. Before the block was out, I reached over the block.

Q. Sure. I understand you obviously reached in too far because you are missing two fingers; is that right?

A. Three.

Q. Three fingers. Which three fingers?

A. (Witness showing hand).

Q. You're missing the tip of your long finger, and basically all of your ring and small finger?

A. Right.

Q. That happened not while you were reaching for a chunk; is that right?

A. That's right.

Q. Was it on the side knife or top knife?

A. Side knife.

Q. Was that the same area of the block splitter machine that Mr. Jackson's

accident?

A. I was reaching to the other side. I was standing on that side, but I was reaching to the other side.

Q. I see. You were standing in the same position Mr. Jackson was standing; is that true?

A. That's correct.

Q. However, you are saying you were reaching across the conveyer across the production line to the other knife?

A. Right.

Q. Okay. At that time, was debris created at the time -- this debris we talked about when the knives come in and break the blocks, was debris createD at that time as well?

A. Yes.

Q. How did you clean it out?

A. Shut the machine off.

Q. Did you use a tool, is what I'm asking, at the time?

A. The tools were available. No, I didn't use a tool.

Q. When were tools first decided to be used at that plant?

A. From day one. But it was -- you know, we started out using less -- even with the tool, I always emphasized to people, turn it off.

Q. I see. But you said the tool was used from day one when this machine was installed?

A. Yes.

Q. Did that tool come with the machine?

A. No.

Q. Did it come as a result of any instruction or direction from Besser or E & R?

A. No.

Q. Did it come from your experience around this type of machinery?

A. Yes.

Q. Have you ever seen workers reach in there and clean debris out with their hands?

A. Yes.

Q. At your plant here in Andalusia?

A. Yes.

Q. Is it because that is easier and quicker to get the debris out with your hands?

MR. CURTIS: Object to the form. Again, with machine on or off?

Q. Sorry. With the machine running.

A. With the machine, would it be easier?

Q. I'm sorry. Let me back up, and ask you this again. You have seen workerS reach in and clean debris out with their hands?

A. Yes.

Q. And that is while the machine is still running and before they shut it off?

A. Yes.

Q. That's here in Andalusia?

A. Yes.

Q. Now we're back to where we were. Is that because in your opinion, is it because it's just quicker for the worker to reach in there and clean the debris out with their hand than with a tool?

A. In their opinion it's probably

quicker, yes.

Q. What I'm getting at is, I've never done it. But it seems to me if you had to stop and grab a tool from somewhere or pick up a tool, that is just one step a little bit longer than simply reaching in there with your hand; is that a fair statement?

A. When you're using the tool, you are holding it at all times. You don't have to pick it up.

Q. But apparently even when you're holding the tool, it is a little quicker because you have your bare hand there to reach in and clean the debris out?

A. No, not necessarily. It's just as fast with the tools.

Q. Is it just because it's instinctively, I guess, that you reach in, that they would do that, if you know?

MR. RODGERS: If you know.

MR. SHEALY: Or is it stupidity?

MR. ANDREWS: Wait a minute, you can ask the questions, I'm asking some right

now.

MR. SHEALY: Sorry, that slipped.

MR. ANDREWS: Sure.

Q. How often have you ever seen that before, people reaching in there with their hands?

A. Not very often.

Q. Can you think of any names of any of them that have done that?

A. No, they are normally always around people.

Q. You mean the --

A. Able Body.

Q. Is that who you typically use out there?

A. Who I used then. I don't use Able Body anymore.

Q. We talked about a lady named Sherry that got her hand caught in this machine as well.

A. Yes.

Q. Or Mr. Stephens did. Do you remember her name?

A. Sherry. I don't recall her last name, no.

Q. Which Able Body office was she out of?

A. Defuniak.

Q. Do you know if she was a local residence or from somewhere else?

A. I believe, she lived in Defuniak, yes.

Q. Now, how would she have been -- I'm trying to find out any documentation I can to help us locate this Sherry. Is there going to be any documentation at your office to locate her?

A. No.

Q. Is there any wage information or pay stubs or W-2 information?

A. No. Not at my office.

Q. Do you know if somewhere at the corporate office if there will be some documentation?

A. No. They were strictly paid by Able Body.

Q. Is there a contact person at Able Body that you usually used that might know this person's name?

A. It was always different people.

Q. When Sherry's accident happened, did she have to go to the hospital?

A. Yes.

Q. Did workmans' comp have to pay the bills, if you know?

A. Their workmans' comp, yes.

Q. Do you know which hospital she went to?

A. Here in Andalusia.

Q. Do you know how her accident happened?

A. Uh-huh, (affirmative).

Q. What happened? Is that a yes?

A. Yes. Just like David Jackson. She stuck her hand in there to pull a chunk. Just like David Jackson, admitted it was her fault.

Q. Was she standing in the same spot as David Jackson?

A. Yes.

Q. Was she pulling chunk?

A. Yes.

Q. Did you tell her to use a tool?

A. Yes.

Q. Did she use a tool?

A. No.

Q. How much of her hand or fingers were cut off?

A. Small tip.

Q. On index finger?

A. Yes.

Q. Now, we've heard Mr. John Stephens and others testify -- how often in your opinion does this debris need be cleaned from the side knives when the splitting process is going on? Every block, every other block, or how often?

A. Like John said, sometimes that machine will run for 35 or 40 minutes --

Q. And nothing?

A. -- nothing.

Q. And sometimes it will run almost every other block?

A. Sometimes you might get two or three in a row. I mean, you know, if you are running 5 or 6,000 a day, it's not happening every other block.

Q. Okay. None the less, when it does happen, it does have to be removed?

A. That's right.

Q. You cannot allow the debris to remain in there or else it will start to mess up the block?

A. Correct.

Q. Is there anything in the Besser manual or E & R manual that tells you how to properly clean out the debris?

MR. CURTIS: Object to the form.

A. Not to my knowledge.

Q. Is there anything that tells you how to clean it out at all?

MR. CURTIS: Object to the form.

A. Not to my knowledge.

Q. As my understand, at the time of Mr. Jackson's accident, no one was standing at the operator panel; is that your understanding

as well?

A. Yes.

Q. Like Mr. Stephens said, that's not uncommon, is it, for someone to not be at the panel?

A. No.

Q. My understanding is that is more common than not, more typical that someone will not be at the panel, and be in another position up and down the line?

A. Yes.

Q. At the panel is the only location for this stop button or on/off switch?

A. Other than the emergency stop in the office.

Q. So there's only two. One way inside the office, inside your office?

A. That's correct.

Q. And one on the machine, which is on the panel?

A. Two on the machine.

Q. Are they both on that panel?

A. Yes.

Q. There's two stop buttons on the panel on the machine?

A. Yes.

Q. But there's only two locations for any stop buttons: Two on the panel and the one in your office?

A. Yes.

Q. And the panel is further than arms' reach from where a chunk puller typically stands; is it not? You can't reach over the top of the splitter, that knife, and reach the control panel?

A. No.

Q. That's true, isn't it?

A. That's true.

Q. Just like I asked Mr. Stephens, production is important, is it not?

A. Yes.

Q. It's a goal at Block USA to keep the blocks going if you can, without having to stop the machine?

A. Yes.

Q. So the quicker you can clean any

debris out or unjam the machine, the better. Right?

A. Yes.

Q. Would it be a goal of any of the chunk pullers or the machine operators to try to avoid turning the machine off if you can?

A. Be a goal to turn it off?

Q. To try to not turn it off, if you can.

A. Not if it involves someone getting hurt. No, I would rather them turn it off.

Q. I understand your testimony is that if the debris comes down, your testimony as I understand, the worker is supposed to go over and turn it off?

A. Yes.

Q. My question is: If you can keep it to a minimum, is that not a goal out there?

A. Yes.

Q. Are there any incentives for workers to keep machines going at all, like pay incentives?

A. No.

Q. Are there any bonuses that you, as plant manager, to keep it going?

A. Production bonus, yes.

Q. Tell me about that bonus.

A. Get it every year.

Q. What is it based on?

A. Production.

Q. The more block that you put out, the more your bonus will be?

A. Yes.

Q. That's at the end of the year?

A. Yes.

Q. Are you the only one at the plant that gets that incentive or bonus?

A. No.

Q. Who else gets that?

A. All the employees.

Q. Even the temporary ones?

A. No.

Q. Who would be the Couch employees that would be subject to that year-end bonus?

A. Dewayne Biggs. John Coleman, which they haven't got yet, they are new

employees, except for Dewayne. Eddie Moore. Marcus McInnis.

Q. John Stephens?

A. No. John's -- his bonus is based on other things.

Q. Dewayne. John who?

A. Coleman.

Q. Dewayne. John Coleman. Eddie?

A. Moore.

Q. Marcus McInnis?

A. Uh-huh, (affirmative).

Q. Then yourself?

A. Correct.

Q. Anyone else?

A. No, that would be it.

Q. Can you think of any names of any workers that don't work there anymore that used to work there that operated this splitter, have been a chunk puller?

A. Brian Schoolmaster. Randy Templeton.

Q. Okay.

A. That would be about it.

Q. Okay. You have been there longer than John Stephens; is that right?

A. Yes.

Q. You just can't think of any more names?

A. No. But since John has been there, is about the only time we had the splitter.

Q. Do you know where Mr. Schoolmaster or Templeton are now?

A. Mr. Templeton is in Andalusia.

Q. Do you know where he works?

A. Rental place here in Andalusia.

Q. Do you know where Mr. Schoolmaster is?

A. In Michigan. Where, I don't know.

Q. I see. What about any of the Able Body temporary people, do you know any of their names that might have operated this splitter?

A. Only the ones that were brought to my attention like David Jackson and Sherry. Other than that, it was different people.

Q. This Willy Jackson guy, do you

know him?

A. Uh-huh, (affirmative).

Q. Does he still work there?

A. He was temporary labor.

Q. Does he still work there now?

A. Off and on.

Q. Is he currently employed out there now today?

A. No.

Q. He may come back and forth, is that what you're saying?

A. Right.

Q. Is it your testimony when a piece of debris is created that needs to be cleaned out, does the machine have to be locked out and tagged out? Turned off, locked out and tagged out, then the debris cleaned out?

A. No.

Q. Tell me what's the proper method of cleaning the debris.

A. Turn the power off at the panel, which kills all power. Clean it out. Three buttons to start it back up.

Q. I think I asked Mr. Stephens, is that an automatic start up, or does the machine have to cycle back up at all?

A. Yeah, it starts right back up. I mean, there is no movement when it starts back up, just the power comes back on.

Q. How long does it take before movement starts to take place?

A. When another block comes back in. Three to five seconds.

Q. Now, the people that made this machine have testified that they have known, I think, you heard me telling Mr. Stephens this, they have known that workers in the real world will reach their hand into the machine while it's in operation. And I understand that you are critical of that, and everybody in this case may be critical of that but nonetheless that does happen, does it not?

A. Yes.

Q. In other words, you agree with the people that made this machine that that is certainly foreseeable the worker will reach into

the machine with their hand while the machine is on, without stopping it to try to clean out some debris?

MR. CURTIS: Form.

Q. How often do you see that happen out there at your plant?

A. Very few.

Q. Is it typically the Able Body people?

A. Yes, it is.

Q. Have you ever reprimanded any of them with a written reprimand?

A. No, I'm not allowed, not rental people.

Q. So do you tell them, instruct them verbally, not to do that anymore?

A. Or certain people I have not brought back.

Q. Because of that?

A. Well, that and different things.

Q. Anybody specifically because of that?

A. No.

Q. Okay. Make sure I got a clear question. There is nobody you can think of that you have refused back at your plant in Andalusia that works for Able Body specifically because they reached their hand in a splitter?

A. Normally when you tell them, they are smart enough, for the most.

Q. Mr. Jackson was not cited or written up because of this accident, was he?

A. No.

Q. Y'all didn't terminate him because of reaching his hand in the machine, did you?

A. No.

Q. Did you know Mr. Jackson, other than working with him out here?

A. No.

Q. Like Mr. Stephens said, was he one to follow instructions?

A. Yes.

Q. Typically, did you consider him to be a safe worker, Mr. Jackson?

A. No.

Q. Tell me what you mean by that. Do

you have any specific instances in mind or just generally?

A. Well, the splitter thing. He kept having to be told about the splitter just like they all did.

Q. When you say they all, all the Able Body employees?

A. Right.

Q. You had to stay on the Able Body employees?

A. Right.

Q. Was it a daily thing to tell them, "don't reach your hand in there"?

A. Well, they were all told on a daily basis, "do not stick your hand in there".

Q. Was it because on a daily basis they would be reaching their hand in there?

A. Because on a daily basis it was a dangerous job, and we felt like we needed to tell them.

Q. But on a daily basis did you run into that where workers were reaching into the machine?

A. Yes, at least once a day you would see it.

Q. And since it happened, at least once a day, there wasn't an accident once a day, was there?

A. No.

Q. There's enough time for the knife to cycle and a worker to reach his hand in there, even though that may be improper, they can reach their hand in there and get it out without getting injured, can't they? Because there's not an accident every day, right?

A. Well, you're not reaching your hand in there on a steady basis.

Q. How do you understand Mr. Jackson's accident occurred?

A. How do I understand it occurred?

Q. Yes, who told you about his accident?

A. John Stephens.

Q. Okay. And what did he tell you?

A. He told me a chunk was hung, he tried to reach in from the top to pull it out,

he couldn't get it out. He reached in from this side to pull it out, and got his finger.

Q. With his palm towards the knife?

A. That's right.

Q. Did you talk with Mr. Jackson about the accident?

A. Yes, I did.

Q. What did he say?

A. His first words were it was stupidity and his fault.

Q. Was that in your office?

A. At the hospital.

Q. At the hospital. Now, did you ever prepare any report about this accident?

A. Safety director did; I didn't.

Q. Who is the safety director?

A. David Rabold. At that time I believe it was Thomas Hawthorne.

Q. Where is Mr. Hawthorne's office?

A. Dothan.

Q. Did he create a written report about this accident?

A. I believe he did.

Q. Does Mr. Hawthorne work there now?
A. I believe he does, yes.
Q. David who, the other fella?
A. Rabold.
Q. R-A-Y --
A. R-A-B-O-L-D.
Q. Where is his office?
A. Theodore.
Q. Mr. Rabold is now the safety director?
A. Yes, he is.
Q. Mr. Hawthorne, he used to be the safety director?
A. That's correct.
Q. What does Mr. Hawthorne do now?
A. I believe, he is still safety director. He is on the ready mix side.
Q. Okay. Were you aware that the First Report of Injury in this case, the report that was turned into workers' compensation, did you know that report indicated Mr. Jackson's glove was caught on the splitter as he was trying to pull his hand out?

A. No.

Q. I will show you Plaintiff's Exhibit 10 to Besser's corporate representative, Mr. Duane Rondeau. This is, I believe, a Model 40, or may have a different number than a CM 24, which is the kind of splitter that was involved in Mr. Jackson's accident. Do you see the head where the splitter is, can you see there is a guard or flaps all the way around the knives on this machine?

A. Uh-huh, (affirmative).

Q. Is that a yes?

A. Yes.

Q. Do you know that guard existed or was in existence for the splitters that are made by E & R and Besser?

A. No.

Q. Do you know why this type of guard was not on the machine as it existed at the day of your accident and Mr. Jackson's accident?

A. No.

Q. When this machine, the subject machine was delivered, did it have any guards

around the knives?

A. No, it didn't.

Q. After Mr. Jackson's accident, did you have any conversations with the E & R and find out there were pieces missing?

A. Yes, I did.

Q. Have you taken any guards off this machine?

A. No.

Q. Have you removed any piece of this machine?

A. No.

Q. Do you know if anybody at that plant has taken any guard or safety device off this machine?

A. Not to my knowledge.

Q. On Defendant's Exhibit 4 to Mr. Jackson's deposition, do you see this sticker I'm pointing at?

A. Yes.

Q. Do you know why it is this particular area is blacked out, where the language would be but everything else is not?

A. Just dirt.

Q. It just happened to be in that form right there?

A. Yes.

Q. Can you take this knife off, you can unbolt this from the machine?

A. Yes.

Q. In fact, you do do that sometimes?

A. Yes.

Q. This still exists out there at the plant, doesn't it?

A. Yes.

Q. We could go look at it or pull it off, and let the ladies and gentlemen of the jury look to see if that's dirt or not, right?

A. Yes.

Q. Do you know what that language says under there?

A. I believe it's a sign saying don't stick your -- it's something similar so that.

Q. You're pointing to Exhibit 1 to Mr. Stephens' deposition?

A. Yes.

Q. Could you read the language on that warning sticker?

A. If you can read this sign, a guard has been removed. Do not --

Q. If you could read that.

A. I can't see it.

Q. Let me see it, I will try to read it. It says: If you can read this sign, a guard has been removed. Do not operate with guard removed.

Did I read that accurately?

MR. RODGERS: If he can't see it, he can't say.

Q. Did you know that's what the sticker said?

A. No, I didn't.

Q. Do you know if any guard was ever removed on this subject splitter before Mr. Jackson's accident?

A. No.

Q. To your knowledge, did this machine come in without guards in place?

A. Yes.

Q. Do you think those guards would have assisted in keeping Mr. Jackson's hand from getting in a position where the block could entrap it?
A. No.
Q. Why is that?
A. Because they are more or less just rubber curtains.
Q. And --
A. He stuck his hand in from the top.
Q. In other words, the side knife is what cut his hand, right?
A. Right.
Q. Not the knife where this guard would have been located; is that true?
A. The guard does hang down, but all it is is a rubber curtain.
Q. Your testimony is, even if the guard was in place, that wouldn't have protected Mr. Jackson's hand; is that true?
A. That's true.
Q. Did you know Besser and E & R had been sued at least back in 1984 or '85, about

someone losing their fingers when pulling chunks out of CM-24 splitter machine just like the subject machine, and in that lawsuit an engineer with MIT designed some safety devices and guards to prevent workers from having their hands caught in the point of operation?

MR. CURTIS: Object to the form.

Q. Did you know that?

A. No.

Q. Would you have liked to have known there were guards existed, or they had knowledge of those guards?

A. Yes.

MR. CURTIS: Object to the form.

A. Yes.

Q. Do you think those kind of guards would have helped your hand or Mr. Jackson's hand?

MR. CURTIS: Object to the form.

MR. RODGERS: Don't guess or speculate. If you know, then you can answer the question.

A. No.

Q. No, you don't know, or no, they wouldn't have helped?

A. I don't know if they would have helped.

Q. You don't know what those guards might have looked like or anything, do you?

A. No, I don't.

Q. Where were you when you first learned of this accident?

A. In the office.

Q. Where, at Block USA?

A. Block USA.

Q. Had they already gone to the hospital or something?

A. Yes, they just left when I got there.

Q. Who called you?

A. No one called me. I was on my way. I pulled up right after they left. Within five minutes they were -- yeah, I didn't get a phone call.

Q. When you pulled up, did you see them about to leave?

A. No, they had just left.

Q. Who was the first person who said something to you about this accident?

A. Dewayne Biggs.

Q. What did he say?

A. He explained to me what had happened and who was involved and who just left. And I left at that time and went to the hospital.

Q. Is Dewayne still employed out there?

A. Yes.

Q. Then you went to the hospital?

A. Yes.

Q. When you got to the hospital, who did you see?

A. I seen David.

Q. Did you go up to him?

A. Yes, I did.

Q. What did he say?

A. When I walked in, he was shaking his head and said, "stupid me," that's what came out of his mouth.

Q. Did you have any other conversations with him there at the hospital?

A. Not about the accident because he knew it had already been explained to me.

Q. Okay. Then did you go back to the office?

A. About an hour, hour and a half I did.

Q. Has Mr. Jackson been back out there to work at all?

A. Not to work, but he's been out there.

Q. Have you talked to him about the accident since then?

A. Not about the accident. Just about his hand.

Q. So really the only conversation you had about how the accident happened, would have been the one time there at the emergency room?

A. That's correct.

Q. Did you ever take a statement from him at all?

A. No.

Q. Are you aware of any eyewitnesses to this accident?

A. No.

Q. Did you participate at all in training Mr. Jackson, or was that John Stephens that did that?

A. No, I didn't participate in training. But I told him the same thing John told him, and showed him my hand and this is what will happen to you if you stick your hand in there.

Q. When you showed him your hand, were you talking about in terms of while you're pulling chunks? Be careful about getting your hand in the area.

A. Yes, I did.

Q. Because you knew your hand had to be in the area when pulling chunks, right?

A. In the area, yeah, not inside the knife.

Q. So what you were saying was: Be careful while you're sticking your hand in that

area because you can get your hand caught like yours, even when you're not pulling chunks, right?

A. Yes, sir.

Q. Are you the one that chose this kind of tool to use to clean the debris out?

A. Yes.

Q. How many tools are there?

A. Just a piece of steel and wooden lass?

Q. Wooden what?

A. Lass. A flat piece of wood.

Q. Okay. So you just expect that the chunk puller or whoever is standing in that position to use that or go get one of the --

A. Las.

Q. Okay. Now, when they're not pulling chunks, when they're using the knives that create a chunk, do people still have to stand there and watch the debris they build up in smaller amounts?

A. Are you saying is there someone there all the time?

Q. Yes.

A. Yes. All the time.

Q. What are they doing when they're there all the time?

A. The chunks had come out, and they take the chunks and pick them up and throw them in the dumpster.

Q. That regardless really of what kind of block is being split, someone has to stand in that position all the time?

A. No.

Q. Is there someone standing in that position all the time when?

A. Only when making a bevel split.

Q. Okay. Otherwise does anyone need to be standing in that chunk pulling position?

A. No.

Q. Is that a fair way to describe it, a chunk pulling position?

A. Right. Yes.

Q. There was no protocol that you went through in trying to figure out what qualifies as a good tool. There's nothing

scientific about it, you just said grab something that's long to reach in there with; is that right?

A. Well, I suggested the wood or a bar. In the same token, I suggested I would rather you turn the machine off.

Q. But you also know that you have to try to keep production going as best you can, don't you?

A. Yes.

Q. If you can clean the machine out without turning it off, try to do that, right?

A. Right.

MR. ANDREWS: I believe that's all the questions I have.

EXAMINATION

BY MR. SHEALY:

Q. When you were discussing with Mr. Jackson about your hand, you made it very clear to him not to put his hand in the area where the side knife is located?

A. Yes.

Q. He understood that?

A. Yes.

Q. Do you feel like you adequately and fully explained to him if you do, that you're going to get your hand cut or injured just like you did?

A. Yes.

Q. He was aware of that?

A. Yes, he was.

Q. And you also saw these warnings that were on the machine to keep hands clear, there were pictorials, if you put your hand in where a knife is, it's going to get cut?

A. Yes.

Q. Those warnings and pictorials were there when the machine first arrived; is that correct?

A. Yes. Plus some have been added.

Q. USA Block set up this machine, right?

A. Yes.

Q. You would have had electricians and people come out and hook it all up and do whatever it is you do; is that right?

A. Yes.

Q. If you wanted a stop button you, could have put one right there where the guy operates the machine if you thought it was necessary; isn't that true?

A. Yes.

Q. That is no big deal, is it?

A. No.

Q. That is something you could do if you wanted to?

A. Yes.

Q. In fact, you chose not to since the control panel is within a couple of steps of where the chunk remover's located as part of his job when there's an occasion to do that?

A. Yes.

Q. In fact, you testified that sometimes it's 30 to 45 minutes before you even have some block jammed into the knives that have to be cleaned out; is that true?

A. Yes.

Q. This is an automatic block machine?

A. Yes.

Q. It's to work automatically?

A. Yes.

Q. Isn't that true?

A. Yes.

Q. Isn't that why you got it?

A. Yes.

Q. Does the machine work well and do what it's intended to do?

A. Yes.

Q. Do you feel like it's safe?

A. Yes.

Q. You wouldn't want your men working on a machine that you didn't feel was safe, would you?

A. No.

Q. You have been around block splitters, block cutters, the block industry almost your whole life, haven't you?

A. Yes.

Q. Do you feel like you have knowledge of machines such as the one that's made the subject of this lawsuit?

A. Yes.

Q. You have worked around them, haven't you?

A. Yes.

Q. And you are familiar with how they work, are you not?

A. Yes.

Q. You have seen various manufacturers of this machine, have you not?

A. Yes.

Q. Do you feel like this machine that Mr. Ron Neese and E & R Manufacturing sent to Besser who sent it down to Block USA, where it was located, that it was a reasonably safe machine when put to its intended use of splitting block?

MR. ANDREWS: Objection. Calls for expert opinion.

A. Yes.

Q. Well, let me ask you this: You have worked around block machines your whole life, haven't you?

A. Yes.

Q. You are familiar with how they work?

A. Yes.

Q. Do you feel like this block machine is reasonably safe?

A. Yes.

MR. ANDREWS: Objection.

Q. Do you feel like in any way it's unreasonably defective when put to its intended use?

MR. ANDREWS: Objection.

A. No.

Q. You know Ron Neese, don't you?

A. Yes.

Q. Do y'all talk?

A. Yes.

Q. Do you feel like Ron Neese would in any way, as Mr. Andrews has tried to portray to you, send out a block machine that wouldn't be reasonably safe?

A. No.

Q. Does he appear to be the kind of guy who cares about the workers and cares about

doing a good job and responding to any needs that you may have?

A. Yes.

Q. That's the kind of guy he is, isn't it?

A. Yes, he is.

Q. You know, your understanding of the accident, if I'm correct, is that he actually put his hand down in the slot right at the bottom part of where the bottom knife comes up and the side knife comes up; isn't that true?

A. Yes.

Q. Is that your understanding?

A. Yes.

Q. Help me out here, I'm looking at this guard Mr. Andrews showed you, but he didn't show it to you very closely, okay.

Let me show you something: That guard doesn't guard down below where his hand would have been, does it? Because the knife won't even work down there, will it?

A. No.

MR. CURTIS: For the record, what

exhibit is that?

MR. SHEALY: Plaintiff's Exhibit Number 10.

Q. You have been around these block splitter machines all your life, and you have never seen a guard around the side knife, have you?

A. No, sir.

Q. Because a machine has to operate, and the reason the side knives cut blocks is they have to go out and cut them to do its job; isn't that true?

A. Yes.

Q. Now, as a plant manager and as a block worker, you felt like you knew how to do your job, and that's manufacture block, right?

A. Yes.

Q. You didn't expect E & R to send you a hammer to chip off part of the block that is being manufactured, did you?

A. No.

Q. You didn't expect E & R to send you a steel pole if you decided to clean out

debris, and not turn the machine off, did you?

A. No.

Q. You don't think that's not being a good manufacturer, do you?

A. No.

Q. You would have expected that as a customer, would you?

A. No.

Q. If you decided to use a pole of wood or tell them to cut it off or move where the cut off, that's your decision that you could make as a customer or as an employer or as a producer of block; isn't that true?

A. Yes.

Q. You wouldn't expect the manufacturer to do that, would you?

A. No.

Q. Now, do you use a lawn mower?

A. Only when I have to.

Q. Have you ever used one?

A. Yes.

Q. Does grass get caught in it sometimes?

A. Yes.

Q. If grass was caught in it, but it would still run, would you pull it up and try to beat the swinging blade to try to get the grass out or would you turn it off?

A. I would turn it off.

Q. Do you feel like what Mr. Jackson did was unreasonable to put his hand in this machine where the side knife was located while it was running?

A. Yes.

Q. That is not what a reasonably prudent person would do, is it?

MR. ANDREWS: Object to the form.

A. No.

Q. That's not a what a person would do that had been instructed not to do it on numerous occasions; is that true?

A. True.

Q. Mr. Jackson had been instructed?

A. Yes.

Q. Mr. Jackson admitted that he had done something stupid and that it was his fault

to you within less than an hour of this accident taking place?

A. Yes.

Q. Mr. Andrews was asking, why didn't this come up. Well, USA is not even the comp carrier, is it? The workers' comp is through Able Body labor, isn't it?

A. Yes.

Q. So y'all would have really even had anything to do with Mr. Jackson, that would have been Able Body labor? That was essentially his employer, wasn't it?

A. Yes.

Q. Did anybody ever asked you, before you got sued, what Mr. Jackson said, that it was stupid, and it's my fault?

A. Did he say he was stupid?

Q. No, he said that. Did they ever ask you about that?

A. No.

Q. If somebody would have just approached you before you got sued, you would have told them, wouldn't you?

A. Yes.

Q. Mr. Jackson testified to something yesterday I need you to help me with. He said in his deposition that he would reach in there every time with his left hand and pull the block through, and with his right hand, clean debris. That's what he did continually. As a chunk puller, is that how you do your job?

A. I think there is a misunderstanding about cleaning debris. There is chunk, which is not considered -- not which I call debris. When I reach up there to get the chunks, those chunks are clear of the knives already.

Q. So you are not even near the knives, are you?

A. No. When the block is pushed through it, it pushes the chunks, the chunks are grabbed and thrown in a container. What John was calling debris and what we call debris is little pieces that gets down, it's stuck, left off the chunk.

Q. That's what would happen when you

would have to, on an indication, to where you might have to turn the machine off?

A. That's right.

Q. That's why all this stuff about production is really a bunch of hogwash; isn't it?

A. Yes.

MR. ANDREWS: Objection.

Q. Because that's the way a lawyer creates to try to somehow --

MR. ANDREWS: Wait a minute. Wow, wow, wow. He doesn't know what a lawyer does.

MR. SHEALY: I know.

MR. ANDREWS: Well, you're on a roll, but he doesn't know what a lawyer does.

Q. Let me ask you this --

A. I put safety first.

Q. I understand. You do put safety above production, don't you?

A. Yes.

Q. That's why you tell these people from Able Body labor or from your company that if a chunk gets caught in the knife area, just

like Mr. Jackson, to turn the machine off?

A. Right.

Q. That doesn't happen that often during the day, does it?

A. No.

Q. So if a picture is being painted here, that a worker has got his hands around these knives all the time, that is not even true, is it?

A. He is in a vicinity of the knives, yes, but not in the knives.

Q. They are not in the knives, are they?

A. No.

Q. Not in an area where the knives can hurt him?

A. No. To do his job.

Q. To do his job, isn't that true?

A. Yes.

Q. So to occasionally ask somebody to walk three steps and take three seconds to turn the machine off, is not unreasonable, is it, by a manufacturer?

A. No.

Q. And by the way this machine was set up, that you approved?

A. Yes.

Q. Isn't that true?

A. Yes.

Q. You approved it, didn't you?

A. Yes.

Q. It doesn't happen that often that a piece of block gets lodged down in the knife area, like what happened to Mr. Jackson?

A. No. Not steadily.

Q. That would mess up production if it happened every other one?

A. Yes, it would.

Q. That isn't how it happens, true?

A. True. Yes.

Q. If you choose not to turn the machine off, you use the steel pole and go boom, and move on; isn't that true?

A. Yes.

Q. Real simple, right.

A. Yes.

Q. That is why you tell them not to put your hands in there, there is no reason to, isn't that true?
A. Yes.
Q. Isn't that true?
A. Yes.
Q. Your accident wasn't like Mr. Jackson's accident, was it?
A. No.
Q. Not even close?
A. No.
MR. ANDREWS: Objection.
Q. So it's not even substantially similar to his accident, was it?
MR. ANDREWS: Objection.
A. No.
Q. Okay. And Able Body Laborer wouldn't read the owner's manual, would they?
A. No.
Q. That's not something you have the temporary help do; isn't that true?
A. Right.
Q. You would be the one that you

would expect how to train people how to clean out debris; isn't that true? Or let me say this, your people, not the manufacturer. You wouldn't expect Ron Neese --

MR. ANDREWS: Objection.

Q. -- to train your people how to clean out debris, would you?

MR. ANDREWS: Objection.

A. No.

Q. Would that even be reasonable?

A. No.

Q. Would that be ludicrous to even suggest that? That's something that you know how to do; isn't that true?

A. Yes.

Q. You would train people how to clean debris out and how to be safe around the machine, and how to do all the proper things that ought to be done in running a block operation, wouldn't you?

A. Yes.

Q. Now, you said you would on an occasional see a worker put a hand in there?

A. Yes.

Q. Is that true?

A. Yes.

Q. You would reprimand them or at least get on them and tell them not, and they would stop?

A. Yes.

Q. If they didn't, you would fire them, or tell them to go home?

A. Yes.

Q. The way your operation is set up and the way this splitter is used, do you feel the way it's set up is safe?

A. Well, there's not a lot you could do to that splitter to make it any safer and still produce the kind of product that we produce.

Q. Let me ask it this way: You participated in setting up this machine, did you not?

A. Yes.

Q. And I guess you had some thoughts about how you wanted it to set up and how it

worked best, true?

A. Yes.

Q. In fact, you decided how it would be set up?

A. Yes.

Q. Not the manufacturer; isn't that true?

A. Yes.

Q. What they did is send it to Besser or through Besser, but they shipped it down there and you set it up totally?

A. Yes.

Q. E & R didn't know how exactly you were going to use it or in what way you were going to use it, per se, they just sent you a block splitter, you set it up so you could make production and produce your product the best way you felt possible; isn't that true?

MR. RODGERS: Objection.

Q. True?

A. Yes.

Q. How long have you been in the block production and manufacturing business?

A. Thirty-seven years.

Q. Do you feel like you are experienced?

A. Yes.

Q. Do you feel like you are knowledgeable?

A. Yes.

Q. Do you feel like you are knowledgeable of block splitters?

A. Yes.

Q. Do you feel like you are knowledgeable about how they work and operate in the safety of block splitters?

A. Yes.

Q. Do you feel like this block splitter that you have at your plant that you're still using is a reasonably safe block splitter?

A. Yes.

Q. And you're still using this block splitter?

A. Yes.

Q. And, I think, we have asked this, but Block USA, your company, doesn't put safety

ahead of production, does it?

A. Yes, they do.

MR. SHEALY: Strike the question.

Q. Block USA doesn't put production ahead of safety?

A. No, they don't.

Q. In fact, Mr. Jackson, he got paid $8 an hour whether he produced any block or didn't produce, he didn't get any production, did he?

A. No.

Q. There wasn't any reason for him to not go turn the machine off?

A. No.

Q. Did you also instruct him to turn the machine off and not put his hand in there?

A. Yes, I did.

Q. Was he aware that he was to turn the machine off before he ever cleaned out any debris in the area around or near where the knives are located?

A. Yes.

Q. You told him that before this

accident, did you not?

A. Yes.

Q. He understood that?

A. Yes.

Q. Did he acknowledge to you he understood that?

A. Yes, he did.

Q. Did he acknowledge to you that if you put your hand where the knives are located, that that is a hazardous place he could be injured?

A. Yes.

Q. He knew that?

A. Yes.

Q. You talked to him about that?

A. Yes.

Q. In fact, you showed your hand what the knives could do to you?

A. Yes.

Q. Okay. When you injured your hand, you didn't sue Ron Neese or the manufacturer, did you?

A. No.

Q. You didn't feel like they did anything wrong, did you?

A. No.

Q. You felt like you just made a mistake, it was your fault, and you honed up to it, and that was that; isn't that true?

A. Yes.

Q. You didn't sue Besser Company either, did you?

A. No.

Q. What's your education?

A. High school.

Q. High school. What's your experience around block splitters such as the one that this lawsuit is about?

MR. ANDREWS: Asked and answered. Objection.

A. What?

MR. RODGERS: How long have you been working around splitters?

A. Twenty-five years.

Q. Have you had training?

A. Yes.

Q. Tell me about your training?

A. Well, I attended Alpena Community College in block making, splitter machines.

Q. Did you take courses on them?

A. Yes.

Q. Have you gained knowledge as to how they operate and work?

A. Yes.

Q. As a part of that, have you taken safety courses?

A. Safety courses towards splitter or --

Q. Yeah. Splitters and in general.

A. Not directly to splitters, no.

Q. But you had just general safety courses?

A. Yes.

Q. Would you consider yourself knowledgeable of splitters?

A. Yes, I would.

Q. Would you consider this splitter that is at your plant being used probably right now, as a reasonably safe machine when put to

its intended use?

MR. ANDREWS: Objection.

A. Yes.

Q. Would you agree it's designed in its operation that's reasonably safe for your workers and the people to use it?

MR. ANDREWS: Objection.

A. Yes.

MR. SHEALY: That's all.

EXAMINATION

BY MR. CURTIS:

Q. Hi, Mr. Mackey. My name is Corey Curtis, I represent one of the defendants in this case, Besser Company. I have a few questions I need to follow up with Steadman.

When did your plant start making these diamond blocks, the type of blocks being produced when Mr. Jackson had his accident?

A. Approximately six years ago.

Q. Now, I know Mr. Andrews asked you about some information that was contained in the manual for the CM-24. This may have been marked as an exhibit previously, can you take a look at

that.

First off, is this the manual for the splitter that's at your plant now, the one involved in the accident? On a note at the top, it says CM-24 HFRC Manual.

A. Best of my knowledge, it's the same one.

Q. Hang on to it, I have flagged a couple of things I want to ask you a couple of questions. If you can turn to the first flagged item there. Go down to the fourth paragraph. Can you take a look at the fourth paragraph, it says: Do not attempt to remove broken block.

A. Uh-huh, (affirmative).

Q. Can you review that paragraph, please.

A. This one?

Q. Yeah.

A. (Witness reading.)

Q. Have you had a chance to look at it?

A. Uh-huh, (affirmative).

MR. ANDREWS: Is that a yes?

A. Yes.

Q. Do you agree with me that the manual does say that one is not to attempt to remove broken block or to perform any kind of maintenance without shutting off the machine?

A. Yes.

Q. Let's move to the next tabbed item. Go down to the very last thing that says, "Danger". Take a look at that sentence or two. In the decal to the right. Can you read for me what that says?

A. Do not reach under or around the barrier surrounding the splitting edge.

Q. Can you also take a look at the decal and tell me what that says.

A. Blade hazard. Stay clear of splitter. Follow lock out procedure before servicing.

Q. Do you agree with me then that the manual does address a person putting -- or strike that. Do you agree the manual says a person cannot stick their hand in or around the blades of the machine?

A. Yes.

Q. Okay.

MR. SHEALY: Do you want to mark that as an exhibit?

(Whereupon, Defendant's Exhibit 1 was marked for identification.)

BY MR. CURTIS:

Q. Can you describe for me how your accident was different than Mr. Jackson's accident?

A. My accident?

Q. Yeah. What facts make it different than Mr. Jackson's.

A. Mr. Jackson was trying to outrun the machine. I merely wasn't looking in that direction. I wasn't pulling a chunk. Like I said, I just reached over the top of the block and grabbed the block. I was engaging in a conversation with the rental person, and stuck my hand too far.

Q. Which blade caused your injuries?

A. Side knife.

Q. Side knife?

A. Right. On the other side.

Q. Maybe you can explain this to me, I want to be clear, I'm not trying to cause problems for you or anything. If you go to Interrogatory Number 13. What your response says, it's a question about your accident. It says: Yes, I was injured and lost two fingers and a portion of a third finger when I was operating the machine and not paying attention and placed my hand between the block and the blade, the machine activated the top blades when my hand was on the block and crushed my hand. Can you explain to me --

MR. RODGERS: His lawyer made a mistake.

A. No, they weren't on the top.

Q. Fair enough. Okay. The only reason I'm asking is just so I understand exactly how that happened.

A. Right.

Q. Okay. Was your accident reported to Besser Company?

A. Not to my knowledge, no.

Q. Was your accident reported to E & R?

A. No.

Q. Okay.

A. It was brought up during a conversation, but it wasn't -- the call wasn't directly -- I was ordering parts and I started talking to Ron about it.

Q. About when was that?

A. A month after it happened.

Q. When you say Ron, did you mean Ron --

A. Ron Neese, right.

Q. Do you believe Mr. Jackson caused this accident?

A. Yes.

Q. Do you believe it was his fault?

A. Yes.

Q. Do you think there was anything wrong with the machine that caused the accident?

A. No.

Q. Again, in one of your discovery responses, you say: Mr. Jackson did not shut

off the machine as he had been instructed to do prior to placing his hand in the operational section of the block splitter. In addition, Mr. Jackson was provided with a tool to remove chunks of concrete, which may have been in the way, which may have interfered with the operation of the machine, which he did not utilize. Which tool was he given?

A. It was just a piece of wood.

Q. Just a piece of wood?

A. Uh-huh, (affirmative).

Q. I know it's been said before that Mr. Jackson was told many times not to stick his hand in the machine while it was running. Do you know approximately how many times he was told that?

A. That's probably the most emphasized thing that's brought up in the plant, almost on a daily basis. Splitter, don't stick your hand in there. It's something that's brought up on a daily basis.

Q. So Mr. Jackson would no doubt be aware of that, not to stick his hand in the

machine?

A. No doubt.

Q. Going back to the discovery responses, it's Number 11. Then your response, the question is: Has the subject product been altered in any way? The response is: Yes, after the incident, the manufacture provided some rubber flaps. Who provided the rubber flaps?

A. Ron Neese.

Q. That was after the Jackson accident?

A. Yes.

Q. Who installed them?

A. Dewayne Biggs and myself.

Q. Where were they installed?

A. On the splitters?

Q. Yeah, what were they for? Where were they put?

A. They were put above the head.

Q. The flaps that were given after the accident, those would not have prevented Mr. Jackson's accident?

A. No.

Q. You're sure those flaps were not included when the machine was originally delivered to the plant in 1997?

A. They were not on there. I personally unloaded the splitter myself. It was not on the splitter.

Q. Okay. After your own accident, did any safety policies change at the plant?

MR. RODGERS: With regard to?

Q. Just the day before your accident, then you had your accident going forward, were employees trained differently, people told to be more careful on the machine?

A. Yeah, it was more emphasized. But we're very safety oriented. It's something that we work on on a daily basis. Weekly basis. And anybody that gets around any equipment over there are told about the safe and unsafe things to do and not to do.

Q. Do you tell most of -- or do you tell employees, generally, about your accident?

A. Right away.

Q. When a new employee arrives on the job site, is that one of the first things that you tell them?

A. Yes, it is.

Q. Do you believe that's a good way to warn employees about the potential dangers of sticking your hand where it shouldn't be?

A. Yes, I do.

Q. Did you perform routine maintenance on the machine?

A. Yes.

Q. Can you tell me about what type of maintenance you performed on the machine?

A. We replaced parts constantly on it. Greasing it, replaced barrons, spent a lot of money on the splitter.

Q. Is there a set schedule?

A. No. No set schedule.

MR. CURTIS: Okay. I'm done.

MR. ANDREWS: I have a few follow up questions.

EXAMINATION

BY MR. ANDREWS:

Q. You said there were some warnings that were added to this machine at some point. You said they came with some warnings, then there were some that were added --

A. Stickers?

Q. Right.

A. Yeah.

Q. That was added or sent by Besser or E & R

MR. CURTIS: Object to the form.

A. It was just stickers I had there in the office, and I stuck them up on the panel.

Q. You had some in your office, and you added them to the machine?

A. Yes, I did.

Q. There was testimony -- you know Ron Neese, don't you?

A. Yes, I do.

Q. You are friends with Ron Neese, aren't you?

A. Yes.

Q. How long have you known Ron Neese?

A. Ever since I had that splitter,

ten years.

Q. But you consider him to be a friend, don't you?

A. Yes.

Q. You wouldn't do anything to hurt Mr. Neese, would you?

A. No, I wouldn't.

Q. There is some testimony from Mr. Neese that he had sent some extra stickers on this machine --

A. He did.

Q. You remember that now?

A. Yes.

Q. You didn't remember that a while ago?

A. Yeah, true. I didn't remember it a while ago, but he did send stickers.

Q. It was part of an upgrade program he was doing, do you remember that, or did you know that?

A. No.

Q. Are you an engineer?

A. No, I'm not.

Q. Do you know about when warnings can be used as opposed to when design of a machine -- when you should design out hazard or guard against a hazard or risk of injury? Do you know anything about that?

A. Yes.

Q. What is your understanding about that then?

A. I can understand where to put a guard and where not to put a guard.

Q. Did you know then therefore that you were supposed to design out a hazard, then if you can't design out the hazard, then you are supposed to use a guard to from protect somebody from getting hurt, and only if you can't design out the hazard or put a guard on to prevent an injury, then you can only rely on warning, did you know that?

A. Yes.

Q. Did you know then that the warnings on this machine and in this manual, these are the last step in this design? You already knew that? Of this design phase or

hierarchy, your testimony is you already knew that?

A. Yes.

Q. Do you know why it is E & R and Besser skipped over the design out and guard against steps, do you know?

MR. CURTIS: Object to the form.

A. No.

Q. Do you know why it is if a company has had at least nine other accidents, before the three we know that happened here in Andalusia, why they didn't take steps to design out this potential for injury, guard against this potential for injury before they started warning against it?

MR. CURTIS: Object to the form.

A. No.

Q. Wouldn't you expect they would make the machine as safe as they possibly could and where they could design out a potential for injury, they ought to do that?

MR. SHEALY: Object to the form.

MR. CURTIS: Object to the form.

MR. RODGERS: Object to the form.

Q. You can answer.

A. Yes.

Q. You expect that to be reasonable and prudent actions too, wouldn't you?

A. Yes.

MR. CURTIS: Object to the form.

Q. You know that from being around these blocks splitters all these years, don't you?

A. Yes.

Q. You know this from all this education you received at Alpena Michigan, don't you?

A. Yes.

Q. Do you know Besser is from Alpena, Michigan?

A. Yes.

Q. Are they the one that put on the concrete school that you went to?

A. Yes.

Q. What certifications have you had from Besser?

A. I don't really have certifications.

Q. They are the ones that sponsored that school that you went to?

A. Yes.

Q. Are you friends with the folks at Besser too?

A. The ones that I know.

Q. Which ones do you know at Besser?

A. Bob Roland. Kevin Curtis.

Q. Who else?

A. That's about it.

Q. Have you talked to anyone at Besser about this lawsuit?

A. No.

Q. Have you talked to Ron Neese about this lawsuit?

A. Yes.

Q. What have you talked about with Mr. Ron Neese?

A. Not a lot. He asked him if I heard anything. I asked him if he heard anything. That's basically it.

Q. What about your friends at Besser, you wouldn't want to do anything to hurt them either, would you?

A. No.

Q. Now Mr. Shealy asked you if you expect somebody to send you a hammer to chip off concrete block, but you would expect them to make a machine as safe as it could to keep you and your workers from getting your hands cut off, wouldn't you?

A. I feel the machine is safe for what we do.

Q. Would you expect if there are other alternative designs they could take to make this machine safer, you would want them to do it, or you would want them to skip that?

MR. CURTIS: Object to the form.

Q. You can answer.

A. Yes.

Q. You would want them to do that, wouldn't you?

A. Yes.

Q. That's a reasonable and prudent

action for somebody to do, isn't it?

A. Yes.

Q. Especially somebody in the business like Besser and E & R of making machines like this, that have the designs and have taken on and know about nine other lawsuits, nine other accidents -- know at least one lawsuit where someone designed a guard for this machine, you would want them to implement it if they could, wouldn't you?

MR. CURTIS: Form.

Q. That would be reasonable and prudent, wouldn't it?

MR. CURTIS: Form.

A. Yes.

MR. ANDREWS: I assume when you're saying form, that is some sort of an objection.

MR. CURTIS: Well, you're talking fast, so --

MR. ANDREWS: Is that a yes?

MR. CURTIS: If I say form, that's shorthand for object to the form.

MR. ANDREWS: Okay. I just wasn't

familiar with it.

Q. Would you agree with E & R or Mr. Neese that no risk of injury is acceptable if it can be designed out or guarded against? Would you agree with that?

A. Yes.

Q. You got your two fingers cut off, was that a painful experience for you?

A. Yes.

Q. Would you expect that had to be a painful experience for Mr. Jackson?

A. Yes.

Q. Even though he is a rental person?

A. Yes.

Q. It's a serious event for somebody to lose their fingers; isn't it?

A. Yes.

Q. Do you think Mr. Jackson meant to lose his fingers?

A. I think he could have prevented it.

Q. Do you think he wanted to lose his fingers?

A. No.

Q. Do you think he is proud he lost his fingers?

A. No.

Q. Do you think it hurt him?

A. Yes.

Q. Don't you think if something could have been done on this machine to guard it and protect him from losing his fingers, that it should have been done?

A. Well, like I said before, the product we run, I just don't think you could do --

Q. The question is --

MR. SHEALY: Objection. Let him answer his question. I know you don't like the answer, but --

Q. Well, go ahead and answer then.

A. The products we run, I don't think you can make it safer than what it is right now. It would be in the way, you couldn't produce the product we produce if you had any more guards on there.

Q. Okay.
A. You couldn't do it.
Q. That's your understanding?
A. That's my understanding.
Q. Now, E & R and Besser, both testified and we can see other products they got that could make it safer, do you know why they can do that?
MR. SHEALY: Object to the form.
MR. CURTIS: Object to the form.
MR. SHEALY: That is totally wrong.
Q. You can answer.
A. No.
Q. No what?
A. I don't know. I don't know how they could do it.
Q. No, you don't know how they could do it?
A. No.
Q. You're not saying they couldn't, you're just saying you don't know?
A. Right.

Q. Did you know Mr. Neese testified under oath that he suggested to you or suggested to your company that you put these extra stop buttons on these machines where the chunk pullers were going to be standing, but y'all didn't want it?

MR. CURTIS: Object to the form.

MR. SHEALY: That is totally wrong.

Q. Did you know that?

MR. CURTIS: Object to the form.

MR. SHEALY: Show him the deposition where he says that.

MR. ANDREWS: Sure I will.

MR. SHEALY: Show him where he says this.

A. No, I didn't know that.

Q. Page 140 to Mr. Niece's deposition. I will read it into evidence. I will start on Line 4: Why is the panel located there -- the panel where the stop button is -- why is the panel located there and not on the other side of the head where you anticipate

somebody may be standing under some circumstance so the person can access that mushroom -- meaning the stop button.

His answer: That's why we recommend auxiliary stop and starts on both ends of the machine is what he's talking about.

Question: So you do recommend that there be one there?

His answer: Yeah. It says it right in the manual.

And I asked: Was it offered to this plant? No.

Why not? Because they furnished their own emergency stop/start stations.

Did you know --

MR. SHEALY: That's a lot different than what you just said.

MR. ANDREWS: His testimony is what it is.

Q. Did you know these stop/start buttons could be put on the end of this machine, either end?

A. You can put a start/stop button

anywhere.

Q. Did you know they offered them and suggested them in the manual?

A. No.

Q. This manual that we marked as an exhibit today, was that the same manual that you told Mr. Shealy that the Able Body people -- the rental folks, they don't read?

A. Able Body folks don't read it.

Q. That's the same manual we marked today, right?

A. Yes.

Q. Okay. Defendant's Exhibit 1 to your deposition; is that correct?

A. Yeah.

Q. You said the workers, when they are working around the splitter, they are not working around the knives, but at least three people had their hands cut up in this machine, haven't they? That's close enough to the knives, isn't it?

A. Yes.

Q. Now, your accident, there was some

testimony about whether your accident was substantially similar. Do you know what that term means, substantially similar, in any kind of legal sense?

A. Legal sense, no.

Q. Now, your accident happened on the side knives of the machine, did it not?

A. Yes it did.

Q. There are only two of those?

A. Yes.

Q. Do they work in a different manner or work in the same manner?

A. Work in the same manner.

Q. You also said you thought Mr. Jackson was trying to outrun the machine. How do you know that? Or in other words, do you know that or is that what you've been told?

A. That's what he told me.

Q. Now, when you unloaded the machine, did anybody else help you unload this machine?

A. There were -- my employees were there, but I was drove the fork lift. I picked

it off the low boy, and took it inside the plant.

Q. You are certain that when you unloaded this machine, there were no guards around the splitter?

A. No guards.

Q. Do you know why that is?

A. I have no idea.

Q. Did you ever ask Ron Neese why that is?

A. I didn't know there were supposed to be guards there. There was nothing to ask.

Q. Nothing on this machine indicated --

A. Like I said before, I don't consider them guards.

MR. RODGERS: You have answered.

Q. Nothing on this machine indicated there were any guards that were supposed to be in place.

A. No.

Q. What kind of documents are typically created after an accident where

somebody loses their fingers?

MR. RODGERS: For an employee at Block USA?

MR. ANDREWS: Any. Either.

MR. RODGERS: Do you do a report if an Able Body person is injured?

A. No.

Q. None at all?

A. No. Just call Able Body.

Q. And let them take it?

A. Yes.

Q. Does the safety director ever do any kind of written reports at all in Dothan?

A. Our safety?

Q. Correct. For an Able Body rental person?

A. No. Not to my knowledge.

MR. ANDREWS: Thank you. That's all I have.

EXAMINATION

BY MR. CURTIS:

Q. Let me ask this question: Did any Besser people participate in the installation of

the machine?

A. No.

Q. Do you get a trade magazine from Besser called Concrete Impressions?

A. Yes.

Q. Have you seen new model splitters in there, in any of the Concrete Impressions magazines that you have looked at?

A. Not really. Not that I've paid any attention to.

Q. When you were attending the training at Alpena Community College, did you notice any new models?

A. That was years ago.

MR. CURTIS: That's all I have.

EXAMINATION

BY MR. ANDREWS:

Q. Just out of curiosity, what years was that?

A. It was in the 70's and 80's when I attended.

Q. Who at Besser would have participated in that education?

A. That would have known I was there?

Q. Yes, sir.

A. Bob Roland.

Q. What is his position at Besser?

A. He was an instructor.

Q. At the college?

A. Yes.

Q. What's the name of the college?

A. Alpena Community College.

Q. What is his position at Besser, if you know?

A. He is retired now.

Q. Do you keep in contact with him at all?

A. I haven't talked to him in a while.

MR. ANDREWS: Thank you.

Ended at 1:27 p.m.

FURTHER DEPONENT SAITH NOT

C E R T I F I C A T E

STATE OF ALABAMA )
HOUSTON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the deposition give by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in any way interested in the result of said cause.

APRIL BENDINGER, CCR
CERTIFICATE NUMBER CCR-384

My Commission Expires
June 8, 2008