1    Q.    Are you making a claim for lost wages in

2    this case?

3

4            MR. ANDREWS:  Do you want me to

5            answer?

6            MR. SHEALY:  Yes.

7            MR. ANDREWS:  To the extent that

8            he might have any lost wages.  I will

9            tell you like I answered in the

10           interrogatories, I do not know yet what

11           the extent that might be.

12           MR. SHEALY:  Is it to any extent?

13           MR. ANDREWS:  Well, I have to

14           figure it out.

15           MR. SHEALY:  What I mean is:  I

16           want to know, are you making a claim for

17           lost wages?

18           MR. ANDREWS:  At this time, yes.

19           But I will tell you that I have to find

20           out if he has lost wages, to what

21           extent, any vocational loss, that sort

22           of thing.

23           MR. CURTIS:  Do you intend to have

1          an expert for that?

2                    MR. ANDREWS:  If we have got a

3          loss that a expert is needed, yes.

4

5     Q.    (By Mr. Shealy)  While we're asking

6  that, you're making as much or more than you were

7  at the time of the accident now; is that true?

8     A.    Yes.

9     Q.    And you're also a truck driver?

10     A.    No, I don't have a driver's license.

11     Q.    Why do you not have a driver's license?

12     A.    Because the state of Georgia took them.

13     Q.    Why did they take them?

14     A.    Probably for child support and some

15  fines that I have that I ain't never paid.

16     Q.    Well, so you have a suspended license?

17     A.    Yeah, they are revoked.

18     Q.    When did all this happen?

19     A.    It's been a few years.

20     Q.    Well, was it before or after the

21  accident?

22     A.    It was before.

23     Q.    All right.  How did you get your license

1    revoked?

2        A.    I just told you.

3

4            MR. ANDREWS:  He said there was

5            some fines and stuff in Georgia he

6            hadn't paid.  Child support.

7

8        Q.    For what?

9        A.    One of them is for child support.

10       Q.    Have you ever been in jail for child

11   support?

12       A.    Yeah.

13       Q.    Well, I mean, that's -- felony child

14   support or --

15       A.    No, misdemeanor child support.

16       Q.    So you've been convicted of not paying

17   child support?

18       A.    I don't know what you mean by convicted.

19   I ain't never been to jail over it.  As far as they

20   take me and make me bond out?

21       Q.    Have they arrested you?

22       A.    Yeah, they have arrested me.  It's been

23   years back.

1  Q.  Well, how long back?

2  A.  Shoot, I actually forgot about it to be

3 honest.  I don't even remember.

4  Q.  When did you get your license revoked?

5  A.  I don't know the exact days.  It's been

6 a few years back.

7  Q.  And, so, are you driving today?

8  A.  No.

9  Q.  Somebody brought you over here?

10  A.  That's correct.

11  Q.  Do you normally drive?

12  A.  No.

13  Q.  Why is that?

14  A.  Because I don't got a driver's license

15 and I ain't getting locked up no more.  I'm through

16 with all that life.

17  Q.  You said no more?

18  A.  That's right.

19  Q.  Have you been locked up for not having a

20 driver's license?

21  A.  Twice, years ago.

22  Q.  Well, how long is years ago?

23  A.  About six, seven years ago.  It's been a

1    while since I've had a license.  I just don't know

2    exactly when.

3         Q.    So you were caught several times driving

4    with a revoked license and had to go to jail; is

5    that true?

6         A.    Yes, two times.

7         Q.    Within the last six or seven years?

8         A.    Correct.

9

10              MR. ANDREWS:  Whenever it was.

11

12         Q.    Any other convictions?

13         A.    No.

14         Q.    And you have been arrested for not

15    paying child support?

16         A.    (Nods Head.)

17         Q.    And that was when?

18         A.    It's been a while.  Probably about

19    roughly five, six, seven years.

20         Q.    Five, six, or seven years ago.  Anything

21    else you did?

22         A.    Not that I know of.

23         Q.    I saw on your answers to interrogatories

1    where you've had numerous jobs.

2        A.    Yeah.

3        Q.    Why is that?

4        A.    I'm the first to tell you, if I don't

5    like somewhere where I'm working, I'm out of there,

6    and that's why.

7        Q.    Could you drive a truck if you had a

8    license?

9        A.    Yeah.

10       Q.    Well, why don't you try to get your

11   license restored?

12       A.    Because I don't have enough money to do

13   all that right now.

14       Q.    If I wanted to get a copy of all the

15   license issues and child support issues and all the

16   issues you've been involved in, where would I go?

17       A.    Dougherty County.

18       Q.    Where?

19       A.    Dougherty.

20       Q.    Is that in Albany, Georgia?

21       A.    Yes, sir.

22       Q.    If I pretty much wanted to find out most

23   anything about you, would it be in Dougherty

1    County?

2         A.    That's correct.

3         Q.    All right.

4         A.    That's where I was born and raised.

5         Q.    Born and raised, okay.  Are there

6    anymore convictions that we don't know about?

7         A.    No.  I just forget about those and

8    actually didn't think they meant anything.  So I

9    never even thought about them, to be honest with

10   you.

11        Q.    How would you get to work every day in

12   Andalusia?

13        A.    My wife would take me.

14        Q.    So your wife had to drive you to work to

15   Andalusia?

16        A.    Yes.

17        Q.    Did you ever serve any time in jail for

18   driving with a revoked license?

19        A.    No, sir.

20        Q.    Did they tell you if they caught you

21   again that you would?

22        A.    As a matter of fact, I think the judge

23   caught me -- I mean, I went in front of the judge

1  and that's what he said.

2       Q.    I just knew you said, I wasn't going to

3  go back to that, so I figured that's what the judge

4  told you.

5       A.    I'm just tired of doing time all

6  together.  I mean, going to jail, all in general.

7       Q.    Well, I can understand that.

8

9            (Whereupon, Defendant's Exhibit 7 was

10            marked for identification and same is

11            attached hereto.)

12

13       Q.    Let me show you a picture marked as

14  Defendant's Exhibit 7.  Is this the type of block

15  that y'all were cutting the day of the accident?

16       A.    That's it.

17       Q.    What's that block called?

18       A.    I have no clue.

19       Q.    That's a unique block, isn't it?

20       A.    That's what I was trying to explain to

21  you about the --

22

23            MR. ANDREWS:  That's a yes.

1

2      A.      Yes.

3      Q.      And thank you for explaining.  And now

4  I'm kind of ready for you to explain, okay.  It was

5  kind of out of my little sequence.  I know I act

6  like I don't have a clue, but there is some madness

7  to all this.

8

9            MR. ANDREWS:  Madness to your

10           method.

11

12     Q.      Y'all didn't -- this isn't the type of

13 block that you regularly cut with this block

14 splitter; is that true?

15     A.      Well, they cut all kind of blocks.

16     Q.      I know, but what we are looking at in

17 Defendant's Exhibit 7 is a unique type of block

18 that was being cut the day of your accident; is

19 that true?

20     A.      That's correct, yes.

21     Q.      Because all these other pictures -- you

22 know, when we went over there to inspect it and

23 they were running block through here, that's more

1  of your -- like Defendant's Exhibit 1 is more of

2  your standard kind of block?

3      A.    I think that's called a trailer block.

4      Q.    Now, the trailer block, you didn't have

5  the difficulty or issues with it getting caught; is

6  that a fair statement?

7      A.    True.

8      Q.    It's this block that we've marked as

9  Defendant's Exhibit 7 that would have a tendency

10  to, I guess, sheer off or break off and could get

11  caught; is that true?

12      A.    True.

13      Q.    Now, how often would you run this type

14  of block that's in Defendant's Exhibit 7?

15      A.    I don't know how often they run them,

16  but when they run them, they run them like three or

17  four days in a row.

18      Q.    Then would it be a week or two where

19  they wouldn't run them at all?

20      A.    To the best of my knowledge, it was

21  about every other week, something like that.  I'm

22  not real positive on that.

23      Q.    Okay.  Now, when the -- what we will

1  call the kind of routine of regular blocks going

2  through, what would you do?  Would you need as many

3  people on the conveyor?

4      A.    No.  We would stack them off -- off

5  stack them onto pallets ourselves, a lot of them,

6  and then they would send some down the line and the

7  cuber stack them.

8      Q.    What is the purpose of the cuber?

9      A.    To stack the blocks, that's all it does.

10 Stacks them on the pallet so many high.

11     Q.    Why would you manually stack -- as they

12 went through the splitter, would you take them off

13 and stack them on a pallet?

14     A.    Yeah, they didn't come through the

15 splitter.  It would be like three bricks at one,

16 you take the odd one off just before the splitter.

17     Q.    Okay.

18     A.    And it would cut -- the form would make

19 three blocks, two of them together, they split that

20 one and those go down the line to the machine that

21 you stack them.

22     Q.    Where would you stand when you were

23 doing that?

1    A.    Up there, right in there.  On Exhibit 1

2    right where that man is standing, we would stack

3    them out in here on a pallet.

4    Q.    So there would be occasions when you

5    would stand right here and take the blocks off

6    before it even got to the splitter; is that true?

7    A.    Yeah, we was running flat blocks.

8    Q.    Okay.  So I guess when I asked you

9    earlier, y'all worked all up and down this assembly

10   line, did you not?

11

12            MR. ANDREWS:  Cutting different

13            blocks.

14

15   A.    Cutting different blocks.

16   Q.    Right, doing different jobs; isn't that

17   true?

18   A.    Yeah, on different jobs.

19   Q.    Who would be responsible to start the

20   machine or stop the machine or any of the buttons

21   that's on this control panel?

22   A.    John always did it.

23   Q.    Would any of the other employees do it?

1      A.      Wayne can do it and Karry come out there

2   and do it.

3      Q.      Who is Wayne?

4      A.      Wayne is the guy that runs where they

5   mix the blocks together and they go in and heat

6   them up and cook them and all that.

7      Q.      Did you ever read the owner's manual

8   with this machine?

9      A.      No, sir.

10      Q.      Did you ever ask for any training?

11      A.      No, sir.

12      Q.      Did you feel like you knew how to do

13   your job?

14      A.      From what they told me to do, yes, sir.

15      Q.      Did you feel like you knew what to do in

16   regard to this block splitting machine?

17      A.      As far as my job, yes, sir.

18      Q.      Okay.

19      A.      What I'm supposed to do.

20      Q.      Did you feel like this block machine was

21   safe?

22      A.      Safe as any other job.

23      Q.      Who has done all the surgeries on your

1    hand?

2        A.    Dr. Anderson -- Landon Anderson over at

3    Southwestern.  I believe that's the name of it.

4        Q.    Is that over in Albany?

5        A.    No, that's in -- Andalusia is where most

6    of them went on.

7        Q.    When did you leave Hartford?

8        A.    About 2005, I think.

9        Q.    Why did you leave Hartford?

10       A.    I went to be with my dad while he was

11   going through cancer.

12       Q.    So you went back home to be with your

13   parents?

14       A.    My dad.

15       Q.    And then you just stayed?

16       A.    Yeah.

17       Q.    Are you living at the home place?

18       A.    No, sir.

19       Q.    Does your wife work?

20       A.    No.

21       Q.    Does she take care of your daughter?

22       A.    Yes, sir.

23       Q.    Is your wife disabled?

1    A.    No, sir.

2    Q.    Have you ever filed bankruptcy?

3    A.    No, sir.

4    Q.    And have we covered all the crimes
5    you've been convicted of?

6    A.    Yes, sir.

7    Q.    Have you ever filed a lawsuit before?

8    A.    No, sir.

9    Q.    In your answers to interrogatories, I
10    felt like you made a -- you mentioned about in the
11    90s having a car wreck, and you made a claim for
12    some insurance money?

13    A.    Yeah, that was -- I got a little case of
14    whiplash, but I put all that on the paper.

15    Q.    Well, did you get some money?

16    A.    A sum of about -- it was like eight
17    hundred dollars.  If you want to call that
18    anything.

19    Q.    Well, have you ever been sued before?

20    A.    No, sir.

21    Q.    Have you ever filed for unemployment?

22    A.    Several occasions.

23    Q.    And do you remember who you filed with?

1    A.    Most of them Dougherty County.

2    Q.    What?

3    A.    Most of it's with Dougherty County,

4  Fluor-Daniels Construction, several different

5  construction companies.  But right off the top of

6  my head, no, I can't answer that.

7    Q.    You told me you had a tenth grade

8  education.  Did you ever get your GED?

9    A.    No, sir.

10    Q.    Did you ever have any subsequent

11  education or training?  I think you at one time had

12  your CDL?

13    A.    Yeah, I went to tractor-trailer driving

14  school.

15    Q.    Did you work for a trucking company for

16  a while?

17    A.    Worked with C & N Evans for a little

18  while, but I just didn't like truck driving.

19    Q.    Any other training you've had?

20    A.    No, sir.  Well, I say that.  I fit pipe

21  most of my life.

22    Q.    Did you work with the union?

23    A.    No, sir.

1    Q.    What do you mean fit pipe?

2    A.    Steel pipe at gas refineries, power
3    plants.

4    Q.    Were you considered a journeyman?

5    A.    Yes.

6    Q.    What I'm saying is, would you go to a
7    union hall and they would tell you where you go?

8    A.    No.

9    Q.    Or you worked outside the union?

10   A.    I didn't work with no union.

11   Q.    Now, were you ever explained any lockout
12   procedures that you're to follow?

13   A.    No, sir.

14   Q.    Do you know what a lockout procedure is?

15   A.    No.

16   Q.    Have you heard of the term "lockout"?

17   A.    Yeah, on construction jobs.

18   Q.    Well, you know what a lockout is, don't
19   you?

20   A.    Yes.

21   Q.    Tell us what it is.

22   A.    Where you tagout a piece of equipment,
23   so it don't operate.  You shut valves down.  See

1    with us, it was pipe valves we had to lockout.  As

2    far as this particular piece of equipment, I know

3    nothing about locking and tagging it out.

4         Q.    But you did know something about turning

5    it on and turning it off?

6

7                   MR. ANDREWS:  On what?

8                   MR. SHEALY:  The machine.

9

10   A.    No.

11

12                  MR. ANDREWS:  Object.

13

14   A.    I don't know how to turn it on.

15   Q.    You didn't know there was a button that

16   turned it on, the block splitter?

17   A.    I know there's a button that makes it

18   work, but I didn't know about it.

19   Q.    Well, I know, but that's something you

20   know.  I mean, you know you go hit a button and it

21   starts, and you hit another button and it turns

22   off; isn't that true?

23   A.    That is true.

1    Q.    And you worked around those buttons
2  every day?

3    A.    No.

4

5              MR. ANDREWS:  Objection.

6

7    Q.    You didn't walk by them?

8    A.    I ain't going to say I didn't walk by
9  them.

10

11             MR. ANDREWS:  There's a difference
12        between walking by them and --

13

14    Q.    I apologize.  You at least walked by
15  those buttons every day, true?

16    A.    That's true.

17

18             MR. SHEALY:  Let's take a break.
19        I'm hungry.

20

21        (Whereupon, a lunch break was taken.)

22

23             MR. SHEALY:  I am done for right

1          now.

2

3                     EXAMINATION

4    BY MR. CURTIS:

5          Q.     Hi, Mr. Jackson.  My name is Cory

6    Curtis.  I represent one of the defendants in this

7    case, Besser Company.  I'm going to follow up on

8    some of the questions that Mr. Shealy just asked.

9    You mentioned that you had a cocaine conviction.

10   Were you ever addicted to cocaine?

11         A.     I guess you could say I was.

12         Q.     You were?

13         A.     To an extent, yeah.

14         Q.     For how long?

15         A.     Probably about two years.

16         Q.     When did you first use cocaine?

17         A.     Y'all ask questions that I don't even

18   think about no more.  That was long ago.

19         Q.     When you were arrested in 2001 for

20   cocaine?

21         A.     Yeah, it was about 2000, '99, somewhere

22   around in there.

23         Q.     Were you addicted to cocaine at the time

1    you were arrested?

2        A.    Not so much cocaine.  It was mostly

3    meth.  I was trying to get off of meth and I used

4    the cocaine to get off of meth.

5        Q.    So you had been taking crystal meth?

6        A.    (Nods Head.)

7        Q.    How long had you been taking meth?

8        A.    About a year before that.

9        Q.    And you used cocaine to get off the

10   meth?

11       A.    Yes.

12       Q.    Had you used drugs before you started

13   using meth?

14       A.    Smoked marijuana.

15       Q.    Do you drink alcohol?

16       A.    No.

17       Q.    We talked a minute ago about the

18   medications you were taking.  You were taking

19   Methadone; is that correct?

20       A.    That's correct.

21       Q.    When was the last time you took

22   Methadone?

23       A.    This morning.

1    Q.    How much did you take this morning?

2    A.    10 milligrams.

3    Q.    And then I think previously you said you

4    take a total of 40 milligrams per day?

5    A.    Uh-huh.

6

7              MR. SHEALY:  Is that a yes?

8

9    A.    Yes.

10   Q.    So you take Methadone four times a day?

11   A.    That's correct.

12   Q.    Do you think Methadone has any effect on

13   your ability to recall events?

14   A.    No.

15   Q.    Does it have any effect on your ability

16   to function?

17   A.    It hadn't yet.

18   Q.    Does Methadone help you in your job

19   performance?

20   A.    It makes me where I can work, where I

21   can deal with the pain and go on with my life?

22   Q.    If you did not take Methadone, you would

23   not be able to work?

1    A.    I wouldn't be able to do nothing.

2    Q.    When you say you wouldn't be able to do

3 nothing, what do you mean?

4    A.    I mean, the hand hurts, man.  That's why

5 I take the pain pills.

6    Q.    What if you didn't have the pain pills?

7    A.    I would take something.

8    Q.    You would find them somewhere?

9    A.    Oh, yeah, they're plentiful.

10

11         MR. ANDREWS:  What he's asking

12    you, what things can't you do?  In other

13    words, if you didn't take your pain

14    medicine, what could you not do?

15

16    A.    Pretty much I just couldn't do nothing.

17 I mean, it hurts real bad.

18    Q.    What hurts?

19    A.    This hand right here.

20    Q.    Only your hand?

21    A.    Yeah, that's what hurts.

22    Q.    The hand --

23    A.    Where all these nerves are right here.

1      Q.     Where the amputation --

2      A.     Where it's all been cut, it just burns,

3  hurts all the time.

4      Q.     It burns and it hurts.  Can you describe

5  more about the pain you're experiencing?

6      A.     It's a constant, constant ache.

7      Q.     It's a constant ache?

8      A.     And burn.

9      Q.     And burn?

10     A.     From all the nerve damage.

11     Q.     Does it vary throughout the day, maybe

12  more in the morning?

13     A.     Yeah, it's different levels, different

14  times.  The cold makes a difference.  The heat

15  makes a difference.  When it's warm it don't hurt

16  quite as bad, and then when it's cold it just hurts

17  like crap.  I mean, I can't explain it, it hurts so

18  bad.

19     Q.     In your medical records I've seen

20  various documents that ask you to rate your pain on

21  a scale to one to 10.  Are you familiar with that

22  kind of a rating scale?

23     A.     Yes.

1    Q.    And you've been asked about that before?

2    A.    Yes.

3    Q.    How would you rate your pain today on a

4    scale of one to 10 similar to those scales you've

5    used in the past?

6    A.    About a two.

7    Q.    About a two?

8    A.    Uh-huh.

9    Q.    At what point on a scale of one to 10 is

10   your pain so much that you couldn't work?

11   A.    A lot of the times is when I'm trying to

12   work, if I don't take the meds that's when the pain

13   is so great because I'm using my hands constantly.

14   Q.    Is that about, say, an eight then you

15   wouldn't be able to work?

16   A.    Eight, 10, somewhere around there.

17   Q.    Okay.  When was the last time you smoked

18   marijuana?

19   A.    Probably about a month ago.

20   Q.    About a month ago.  So mid-April, late

21   April?

22   A.    I ain't sure.  I'm just guessing.

23   Q.    Okay.  How often have you used marijuana

1    since the last time?

2        A.    None.

3        Q.    So the last time you've used marijuana

4    was mid-April?

5        A.    When I told you.

6        Q.    How often had you been using up to

7    mid-April?

8        A.    I don't use it often.

9        Q.    How often had you used it?

10       A.    I don't know.  I don't pay attention to

11   how often I do.

12       Q.    Is it true that you used marijuana the

13   day before your January 13th, 2005 surgery?

14       A.    No.  I did use it before some of my

15   surgeries.

16       Q.    You used it before some of your

17   surgeries?

18       A.    One time or another I did, but I don't

19   know which one and the date that you're trying to

20   get me to admit to.

21       Q.    Why did you use it?

22       A.    Because my hand hurt.

23       Q.    Were you also taking pain killers?

1    A.    Yeah, but I had run out.

2    Q.    You had run out?

3    A.    Yeah.

4    Q.    So you would smoke marijuana when you

5    ran out of pain medication?

6    A.    Yes.

7

8         MR. ANDREWS:  On that occasion.

9

10   A.    That's right.

11   Q.    How about on other occasions?

12   A.    On other occasions, I don't understand

13   the question.

14   Q.    On other occasions were you using

15   marijuana recreationally or were you using it

16   because of the pain in your hand?

17   A.    I've used it recreationally.  I mean, I

18   ain't got nothing to hide as far as that goes.

19   Q.    I don't think you do.  Had you used

20   marijuana before the accident, the one we are

21   talking about here in this case?

22   A.    When the accident happened had I been

23   using marijuana, no.

1    Q.    Did you use it before the accident?

2    A.    No.

3    Q.    At any time before the accident?

4    A.    No.

5    Q.    How about at any time 48 hours before

6  the accident had you used any marijuana?

7    A.    No.

8    Q.    Now, because of the accident, are you

9  taking medications other than Methadone?

10    A.    Yes.

11    Q.    What are those medications?

12    A.    Neurontin 400 for the nerve damage, and

13  I take Lunesta to help rest at night.

14    Q.    Do you take any other medications not

15  related to the accident?

16    A.    Supposed to be taking some for my

17  diabetes, but I ain't had the money to go see a

18  doctor.  So I ain't got no diabetes medicines.  I

19  just been trying to control it myself.

20    Q.    How do you do that?

21    A.    By exercise, working, and working out

22  and stuff like that.

23    Q.    So you exercise, workout, and walk?

128

1     A.    Walk -- that's what I'm talking about

2  working out, walking.

3     Q.    So walking is working out, same thing?

4     A.    Uh-huh.

5     Q.    Do you lift weights?

6     A.    No.

7     Q.    Any other kinds of exercise?

8     A.    Just walk.  We walk after we eat.

9     Q.    Okay.  Have you ever discussed with

10  anyone being addicted to pain killers?

11     A.    I ain't never been on pain killers until

12  all this happened.

13     Q.    So you began taking pain killers after

14  the accident on December 16th, 2004?

15     A.    That's correct.

16     Q.    And by pain killer, I mean Methadone,

17  because that's what you said you take?

18     A.    That's correct.

19     Q.    Have you ever discussed with anyone

20  being addicted to Methadone?

21     A.    No.

22     Q.    Have you ever discussed with anyone --

23

1                     MR. ANDREWS:  That he was or that

2       he was afraid he might be?

3

4      Q.     Have you ever discussed with anyone that

5  you're afraid that you might be addicted to

6  Methadone?

7      A.    No, I haven't.

8      Q.    Or that you might become addicted to

9  Methadone?

10     A.    Well, there's a possibility you can

11  become addicted to anything.

12     Q.    Have you ever discussed it though?

13     A.    No.

14     Q.    Have you ever discussed with anyone the

15  idea that pain killers could make you crazy?

16     A.    No.

17     Q.    Okay.  Do you smoke cigarettes?

18     A.    Yes.

19     Q.    How long have you smoked?

20     A.    Since I was 15.

21     Q.    How much do you smoke?

22     A.    About a pack-and-a-half a day.

23     Q.    I take it you were a smoker on the day

1   of the accident?

2      A.     Uh-huh, yes.

3      Q.     Did they let you smoke in the plant?

4      A.     Yes.

5      Q.     Did you ever smoke while you operated

6   the machine?

7      A.     I'm sure I did.  I can't say for sure,

8   but I probably did because I smoked while I was

9   working.

10      Q.     Now, what particular post on the machine

11  were you manning when you were smoking?  All of

12  them, one of them?

13      A.     Yeah, probably all of them.

14      Q.     So is it fair to say that there were

15  times you were smoking cigarettes while operating

16  the machine in the way that you were injured?

17

18             MR. ANDREWS:  Objection.  He was

19          not operating the machine.

20

21      Q.     Or manning the machine?

22

23             MR. SHEALY:  Clearing debris.

1             MR. ANDREWS:  Clearing debris.

2

3     A.    Yes, but I just held my cigarette in my

4 mouth.  You ain't got to hold it.  I can still have

5 my hands.

6     Q.    Smoke comes off the cigarettes, right?

7     A.    (Nods Head.)

8     Q.    We asked in some discovery about your

9 employment history and we got a really long list.

10 And I will tell you, at least by my account, there

11 were 43 different addresses, and they were from

12 dates of 1988 to 2004.  So that leaves a gap in

13 your employment history.

14         What did you do for employment before

15 1988?  That would have been basically from when you

16 were 27 younger.  What did you do?

17     A.    I worked construction all over the world

18 with Daniels.

19     Q.    All over the world?

20     A.    All over.

21     Q.    In other countries?

22     A.    No.

23     Q.    What other states?

132

A.    You're asking a question that -- could you remember it for the --

Q.    Yeah, because I haven't had that many jobs.

A.    Well, then that's the difference, I've got too many jobs to remember.


MR. SHEALY:  He was also in prison during that time.

MR. ANDREWS:  There are no questions presently for you to answer.

THE WITNESS:  Okay.


Q.    Speaking of prison, how many times have you gone to prison?

A.    Once.

Q.    How many times have you gone to jail?

A.    Probably five or six.

Q.    Now, other than child support or having to do with your driver's license, have you gone -- what have you gone to jail for?

A.    Child support and the drug charge and the '84 sexual battery charge.

1    Q.    Okay.  So the cocaine conviction you

2 just spent time in jail?

3    A.    I spent time in prison.

4    Q.    Cocaine was prison?

5    A.    That's correct.

6    Q.    And the sexual battery was jail?

7    A.    County jail.

8    Q.    Okay.  Now, that whole list of

9 employers, the list of 43 employers, did any of

10 them require a pre-employment drug screen?

11    A.    Yes, they did.

12    Q.    Did you fail any of those?

13    A.    No.

14    Q.    Did you take a pre-employment drug

15 screen for any other jobs and fail?

16    A.    No, not that I know of.

17    Q.    You've never failed a pre-employment

18 drug screen?

19    A.    Never failed no drug screen.

20    Q.    I want to show you this picture.

21

22        MR. CURTIS:  Could we go ahead and

23      mark that?

134

1

2      (Whereupon, Defendant's Exhibit 8 was

3      marked for identification and same is

4      attached hereto.)

5

6      Q.    I represent to you that Defendant's

7  Exhibit 8 is a picture of the machine.  Actually

8  it's the control panel that I can show you here

9  from a larger view.

10     A.    Uh-huh.

11     Q.    I've got a copy in front of me.  You can

12  go ahead and look at that.  What does it say at the

13  top?

14     A.    Safety Instructions.

15     Q.    What's the next thing it says?

16     A.    Suggested Lockout Procedure.

17     Q.    Did anyone explain to you the Suggested

18  Lockout Procedure that's on this Exhibit 8?

19     A.    No.

20     Q.    Did you ever -- was this procedure ever

21  followed when you were there?

22     A.    No.

23     Q.    Did you ever observe the machine locked

1    out?

2         A.    No.

3         Q.    Or tagged out?

4         A.    No.

5         Q.    In the time that you worked at the block

6    plant, did the machine ever jam?  Did debris ever

7    get caught in the machine such that it jammed?

8

9              MR. ANDREWS:  And cause the block

10             to break crooked?

11

12        Q.    Well, as I understand things, you need

13   to reach in to remove the debris so; one, the

14   blocks don't --

15        A.    Get caught.

16        Q.    They at least come out right.

17        A.    It didn't jam, but it would push them

18   blocks sideways and they wouldn't -- if you want to

19   call that jamming.

20        Q.    But never such that the machine stopped

21   or had to be stopped or anything?

22        A.    No.

23        Q.    On the day of the accident, what time

1    did you arrive for work?

2        A.      5:00.

3        Q.      Was that your normal shift?

4        A.      No.  We usually got there about 6:00,

5    6:30.

6        Q.      What had you been doing the night before

7    the accident?

8        A.      I went home and went to bed because I

9    didn't get home until like 6:00, 7:00 that evening.

10       Q.      What was the usually length of a shift

11   for you?

12       A.      Anywhere from 10 to 14 hours, 13 hours.

13       Q.      Did you do the same job, or did you man

14   the same post on the machine during your whole

15   shift?

16       A.      No.

17       Q.      So you would rotate?

18       A.      Well, you did different things.

19       Q.      What kind of things did you do?

20       A.      Just like I explained earlier about when

21   you had to chip the block and keep them in line and

22   send them down through the rollers.

23       Q.      On the day of the accident, how many

1    other people were working on the machine or manning

2    the machine?

3        A.    I think there was three of us there.

4        Q.    Who were those people?

5        A.    I don't know but one guy.  Just me and

6    John and the guy that worked on the cuber.  And

7    there was another guy there, but I don't know his

8    name.

9        Q.    Do you know what he looked like?

10       A.    He was a white guy.

11       Q.    About how old?

12       A.    I would say about 25.  He was a younger

13   guy.  He had only been there -- he was with the

14   temp service.

15       Q.    Anything remarkable about him?  Tattoo?

16       A.    No.

17       Q.    Earring?

18       A.    No.

19       Q.    Beard?

20       A.    No.

21       Q.    You were employed through Able Body,

22   correct?

23       A.    Correct.

1      Q.    Did anyone at Able Body tell you your

2   job at the block plant might be dangerous?

3      A.    No.

4      Q.    Did Able Body provide any kind of

5   training at all for you for what your job duties

6   would be at the block plant?

7      A.    No, sir.

8      Q.    Can you tell me, have you ever observed

9   the machine actually be turned on?

10

11             MR. ANDREWS:  While it is on?

12

13      Q.    When you arrived to work in the morning,

14   tell me how you see the machine get turned on or

15   start operating.

16      A.    I personally didn't stand there and

17   watch him start the machine, no.

18      Q.    So when you walked through the doors at

19   5:00 in the morning, what is the machine doing?

20      A.    Nothing.

21      Q.    When you go to your post?

22      A.    When I walk over there where I'm

23   supposed to work at John turns the machine on and

1    does what he do.

2        Q.    So when you're standing out there ready

3    to do your job, John turns your machine on?

4        A.    Yeah.  All I'm doing is waiting for

5    stuff to come through.

6        Q.    And then you spend a whole 10, 12 hours

7    working that same job?

8        A.    Pretty much.

9

10            MR. ANDREWS:  Objection.  He

11        testified that he worked on that shift,

12        on that line, not necessarily standing

13        in one spot.

14            MR. CURTIS:  Okay.

15

16        Q.    At the end of the shift, does John turn

17    the machine off?

18        A.    Uh-huh.

19

20            MR. ANDREWS:  Is that a yes?

21

22        A.    Yes.

23        Q.    Does anyone -- during a normal shift,

1    does anyone other than John operate the buttons

2    that control the on and off for the machine?

3         A.    If they have to, they would.  That would

4    be Wayne and Karry.

5         Q.    Wayne and Karry.  When you say if they

6    have to, what do you mean by that?

7         A.    There would be times when blocks get

8    stuck up there where they come down to the

9    splitter, they will get hung up, jammed up in there

10   on that roller, where they spin 'em around to come

11   down through the line, and they will have to shut

12   the stuff down to get it back to working right,

13   straighten it out.

14        Q.    So one of those guys stops the machine;

15   is that correct?

16        A.    Correct.

17        Q.    But no one ever follows the lockout/

18   tagout procedure; is that correct?

19

20              MR. ANDREWS:  Objection.

21

22        A.    I ain't never seen them do it.  They

23   shut the machine down, they fix what they was

1    doing, and just start it back up.

2        Q.      When they shut the machine down, no one

3    follows the eight steps that are listed in Exhibit

4    8?

5

6                        MR. ANDREWS:  Do you know what all

7                they do when the shut down the machine?

8                    In other words, do you know what

9                steps they do?

10                   THE WITNESS:  No, I don't know.

11

12       Q.      Let me ask this.  Did you ever hear

13   anyone announce a lockout?

14       A.      No, sir.

15       Q.      Did you ever see anyone take the key out

16   of the machine and put it in their pocket?

17       A.      No, sir.

18       Q.      When the machinery was stopped, was all

19   personnel cleared of the machine?  Did they move

20   people out of the way?

21       A.      I don't know if I'm understanding.  I

22   mean, I understand what your question is.  But I'm

23   not sure if you're meaning like once the machine is

1  shut down, is everybody out of the way of all

2  that?

3      Q.    Right.

4      A.    Well, once they shut the machine down we

5  all usually just cleaned up the mess that was on

6  the floor.

7      Q.    Okay.  You weren't the only person that

8  operated the machine, correct?  There were others

9  that did the same job that you did the day that

10 you -- that manned the same position on the date of

11 your accident?  There were other people that did

12 that same --

13     A.    Other people did that same thing.

14     Q.    Okay.  Now, when those other people did

15 the same type of job you were doing that led to

16 your accident, did they use their hands to reach

17 into the machine?

18     A.    Yes.

19     Q.    Did you ever see anyone use a tool

20 rather than their hand?

21     A.    No, I didn't.

22     Q.    Did you ever ask anyone if you could use

23 a tool to clean out the machine?

A.    No, I didn't.

(Whereupon, Defendant's Exhibit 9 was marked for identification and same is attached hereto.)

Q.    Can you identify what's in Exhibit 9?

A.    Chipping hammer.

Q.    Have you ever seen that hammer at the block plant?

A.    Yes.

Q.    What was it used for?

A.    To chip the blocks, the extra pieces that was hanging on the side of the block after it come out of the splitter.

Q.    Just to make sure I'm understanding, pieces of block would kind of dangle?

A.    Yeah, there might -- let me show you. Like right here, see how that little piece is, that little lip right there?

Q.    Yes.

A.    That ain't supposed to be there.  And you got to chip that off with that hammer.

1      Q.     Where down the line would someone do

2    that?

3      A.     Right past the splitter -- if you are

4    standing where I was operating, working at right

5    there, it would be back behind here, this a-way.

6

7            MR. ANDREWS:  We're looking a

8            Exhibit 1 and he's describing down these

9            conveyor rollers that is depicted in

10           Exhibit 9.

11

12     Q.     Now, the person -- as you explained

13   before, there would be generally two or three

14   people manning this machine?

15     A.     Down this line.

16     Q.     Down the line.  Now, would the person

17   who does the chipping of the block not be the same

18   person that cleans debris?

19     A.     No, it could be.

20     Q.     It could be the same person?

21     A.     It could be, yeah.

22     Q.     Did you ever see anyone use the hammer

23   in Exhibit 9 to clear debris?

1    A.    No.

2    Q.    Did anyone ever show you how to clean

3  debris out of the machine?

4    A.    Yeah, John did.

5    Q.    How did he show you?

6    A.    With his hands, by reaching up in there

7  just like I did.

8    Q.    Was the machine on or off?

9    A.    It was on, running, going through.  We

10  was running a line.

11    Q.    Do you know what the proper way is to

12  remove debris from the machine?

13    A.    I have no clue.  If the way I was doing

14  it wasn't the proper way, I don't know.

15    Q.    Do you think it was proper?

16    A.    It was fine with me.  I didn't see

17  nothing wrong with it, you know.

18    Q.    Well, if I recall, one of the first days

19  you were at the block plant you met Karry Mackey?

20    A.    Uh-huh.

21    Q.    And on that first meeting with Karry

22  Mackey he told you about his accident; is that

23  correct?

1    A.    Yes.

2    Q.    What did he tell you about the accident?

3    A.    That he was stupid because he put his
4 hand on top of the block and then turned around and
5 was talking to somebody and the machine went
6 through the process and cut the tips of his fingers
7 off.

8    Q.    Was that the first day on the job?

9    A.    I can't answer that.

10   Q.    But it was very close?

11   A.    It was somewhere thereabouts, yes.  I
12 can't answer exactly when because I don't remember.

13   Q.    What was your reaction to his story,
14 Karry Mackey's story?

15   A.    Just to be careful.

16   Q.    So hearing Karry Mackey's story at the
17 beginning of working at the block plant made you be
18 careful about how you operated the machine?

19   A.    Yes.

20   Q.    And you knew it was possible for that
21 machine to cut fingers off?

22   A.    Yes, but at the same time I still had a
23 job to do.

Q.    I understand you had a job to do.

A.    And that consisted of doing what I was told to do, to put my hand there and pull the debris out.

Q.    So, I take it later on you learned how to -- someone showed you how to clear out debris after you learned about Karry Mackey's accident?

A.    Yes.

Q.    Looking at the blocks and how the splitter works, can you tell me, is there varying -- are there different amounts of debris that build up, or is it always the same piece of debris?

A.    No, it ain't always the same.  I mean, everything -- every brick breaks different.  I mean, there might be a lot of debris one time, be a little the next time.

Q.    How do you know the debris needs to be cleared out?

A.    Just because it's built up right there. At the knives it builds up right there.

Q.    It builds up after a series of cycles?

A.    I don't know exactly what you mean by

1   that.

2       Q.      Do you have debris after one block is

3   split?

4       A.      Yeah, you have debris after every block.

5       Q.      There's debris after every block is

6   split?

7       A.      Yeah.

8       Q.      At some point you have to make a call to

9   remove the debris; is that correct?  You have to

10  decide?

11      A.      I reckon you do got to make a decision,

12  but they just said that once you see the debris to

13  get it out of the way.  So that's what I did.

14      Q.      Is it a fist size amount of debris?

15      A.      No.

16      Q.      Is it a pencil eraser size?

17      A.      No.

18      Q.      What are we talking about?

19      A.      I don't know.  I don't know how much it

20  was.  I didn't never measure it or nothing in no

21  kind of way.  I just knocked it out of the way.

22      Q.      How did you know when to do that?

23      A.      I did it just about every time when the

1    debris got there.

2        Q.    When you say the debris got there, what

3    are you looking at?

4

5            MR. ANDREWS:   Concrete chips.

6

7        Q.    How much concrete chips?

8        A.    That's what I'm saying, I can't measure

9    how much.   I don't know how much.

10       Q.    Then if you're standing there working

11   and part of your job is to clear out the debris,

12   how do you know when to do it?

13       A.    Because they said it had to be cleaned

14   out.  That's how I know.  And if there was some

15   debris there, I pushed it out of the way.

16       Q.    Okay.  Just so I'm understanding,

17   whenever you saw any debris you cleared it out with

18   your hand?

19       A.    That's right.

20       Q.    Did you always wear a glove?

21       A.    Yes, I did.

22       Q.    Did you think the glove would protect

23   your hand?

1    A.    The glove did protect my hand because it
2    would eat your fingertips off trying to remove all
3    that concrete because it's just like sandpaper.

4    Q.    Did you think the glove would protect
5    you from the blades?

6

7                    MR. ANDREWS:  You mean from
8              getting cut?
9                    MR. CURTIS:  Yeah.

10

11    A.    I didn't feel uncomfortable with it or
12    nothing like that.  I mean, I just -- I used it to
13    protect my hands is what I did.

14    Q.    Okay.  Would you describe the block
15    plant as having a safety culture?  Was safety
16    something that was emphasized at the plant?

17    A.    Well, they didn't have no safety meeting
18    or nothing like that.  So I don't know how to
19    answer that question, other than to me I felt safe.
20    I mean, I didn't feel like I was going to get hurt
21    or nothing like that.

22    Q.    Did your supervisor ever talk to you
23    about the safe operation of the machine?

1    A.    No.

2    Q.    Never?

3    A.    Not that I can recall.

4    Q.    What about your co-workers, did they

5  ever talk about the safe --

6    A.    Oh, we always talked amongst each other

7  about y'all be careful when we was there.

8    Q.    You always talked about being careful?

9    A.    Yeah.  I worked with labor-ready people,

10  so we always just said, Y'all, let's have a good

11  safe day.

12    Q.    What did it mean to you to be careful?

13    A.    Just pay attention to what you was

14  doing.

15    Q.    So in your case, operating -- or manning

16  the splitter, it's an automatic machine, it runs

17  every three seconds, so being careful is being

18  quick?

19

20          MR. ANDREWS:  Objection.  Is that

21        a question?

22

23    Q.    How could you be careful -- how could

1    you act carefully in sticking your hand into the
2    machine to clean out the debris?

3        A.    Because when I stuck my hand into the
4    machine it wasn't operating.  I mean, you had two
5    or three seconds there -- whatever it might have
6    been I ain't exactly sure -- to get that debris
7    out.

8        Q.    So it's your testimony that because you
9    had two or three seconds, it was enough time, so it
10   was careful?  It was a safe thing to do?

11       A.    I felt safe about it.

12       Q.    Okay.  In your second amended complaint,
13   which is -- I'm sure your lawyer has shown you
14   these things.  There's an allegation that says, As
15   a direct and proximate result of the removal of the
16   guard, the failure by Mr. Mackey to install the
17   safety guard and/or maintain the safety guard,
18   plaintiff was injured.

19            What guard exactly are you talking
20   about in your second amended complaint?

21       A.    What I was thinking was there should
22   have been something running down the side of it to
23   keep you from being able to get up in there, or at

153

1    least something that would stop that machine from

2    operating while you was in there.

3        Q.    How would -- how would you have hit --

4    what's the best way to ask this.  Did you ever see

5    a guard on the machine?

6        A.    No, sir.

7        Q.    The guard that you testified about just

8    a minute ago was hypothetical, right?

9        A.    From what I know now, yes, sir.  But at

10   that time, no, sir, it wasn't.

11       Q.    Okay.  I understand.

12       A.    Okay.

13       Q.    You understood the machine ran

14   automatically, correct?

15       A.    Correct.

16       Q.    And you also understood that it

17   wouldn't -- that it would not stop by itself?

18       A.    Yes, I guess I did.  I mean, I didn't

19   never -- I ain't never thought about it, but...

20       Q.    You understood for the machine to stop

21   running, someone had to turn it off?

22       A.    Hit the button, yes, sir.

23       Q.    Okay.  You testified before that you saw

1    this sign here on Exhibit 5 where it says, Keep

2    Hands Clear?

3         A.    Correct.

4         Q.    And you saw that before the accident?

5         A.    Yes.

6         Q.    Now, if you had followed that warning

7    and kept your hands clear, would that have

8    prevented the accident?

9

10             MR. ANDREWS:  You mean when --

11

12        Q.    Had you just done what this says, Keep

13   Hands Clear, would you have had your accident?

14        A.    No, because when --

15        Q.    Okay.

16        A.    Let me explain.  When I put my hand in

17   there, this machine wasn't operating it.  And when

18   -- I understood that that's what that meant, when

19   that machine was operating that I didn't stick my

20   hand in there.  That's the way I felt about it.

21

22             MR. ANDREWS:  In other words, you

23             understood that when you read to, Keep

Hands Clear --

      MR. SHEALY:  Huh-uh, huh-uh.

Object to the form.

      MR. ANDREWS:  You can answer.

      MR. SHEALY:  Object to the form.


Q.    (By Mr. Curtis)  Quite a while back you had a motorcycle accident; is that correct?

A.    Back in '84.

Q.    Did you injure a hand in that motorcycle accident?

A.    This hand.

Q.    The left hand?

A.    Yes.

Q.    Do you have any problems with your left hand from that motorcycle accident?

A.    No.

Q.    Did you injure your right hand in this motorcycle accident?

A.    No.

Q.    Did you have any other injuries from that motorcycle accident?

A.    No.

1    Q.    You had a series of surgeries.  It looks
2  like about five?
3    A.    I think it was six or either seven.  I'm
4  not real positive, to be honest with you.
5    Q.    Okay.  I count six.
6    A.    Okay.  Well, that's what it was then.

7

8        MR. ANDREWS:  It's whatever the
9        record shows.

10

11    Q.    Now, I want to understand what happened.
12  On December 16th, 2004, that was the day of the
13  accident; is that correct?
14    A.    That's correct.
15    Q.    You went to the emergency room that day;
16  is that correct?
17    A.    That's correct.
18    Q.    Did you go by ambulance?
19    A.    No.  Some guy that drives a truck for
20  them took me in his car with John in his truck.
21    Q.    With John?
22    A.    Yes, sir.
23    Q.    Did you go immediately after your

1    accident to the hospital?

2        A.    Yes.

3        Q.    Did they perform surgery on you on the

4    day of the accident?

5        A.    Yes.

6        Q.    The next date I have is December 20th,

7    2004, as another surgery?

8        A.    Okay.

9        Q.    Do you know what happened, what that

10   surgery was for?

11       A.    I ain't exactly sure what it was for,

12   no, sir.  He said he had to do some more stuff

13   inside there.  I don't know if he was still working

14   on circulation or what.

15       Q.    I'm not trying to play hide the ball.

16   Let me back up.  When you first had the accident on

17   December 16th, 2004, were your fingers amputated?

18       A.    No.

19       Q.    At what point were your fingers

20   amputated?

21       A.    I'm not absolutely -- I think it was the

22   fifth one and the sixth one, if I ain't mistaken.

23   The fifth one they cut them off short and I

1    couldn't function with it because of not being able
2    to do nothing, they got in the way.   They were
3    little bitty stubs.
4         Q.    Was your last surgery about March 24th,
5    2005?  Does that sound about right?
6         A.    Sounds close, I just ain't sure about
7    dates.
8         Q.    Did your doctor, Dr. Anderson, did he
9    tell you to quit smoking?
10         A.    Yes, he did, and I tried to quit
11    smoking.  Me and my wife both tried to quit
12    smoking.  I went out and bought patches, gum, and
13    everything else, until he told me it don't matter
14    no more, I can go to smoking.
15         Q.    Did he tell you why it was important
16    that you quit smoking?
17         A.    For the circulation to try and help my
18    fingers not lose their circulation.
19         Q.    What did you understand would happen if
20    your fingers lost circulation?
21         A.    That I could lose them.
22         Q.    Did you ever understand there was a
23    relationship between gangrene and smoking?

1    A.    No, I didn't.  Not me personally, no,
2  sir.
3    Q.    Do you understand that the reason -- let
4  me ask it this way.  Why do you understand that
5  your fingers were amputated?
6    A.    Because they got gangrene.  They turned
7  black.
8    Q.    Okay.
9    A.    Whether that's gangrene or not, I don't
10  know.
11    Q.    So there was a chance then, as of
12  December 16th of '04 when you first had the
13  accident -- at that point in time, there was a
14  chance that your fingers would not need to be
15  amputated?
16
17             MR. ANDREWS:  Object to the form.
18  That calls for medical testimony.  The
19  medical records actually say the doctor
20  does not think he's going to be able to
21  save the fingers, but he's going to try.
22  He's already testified he doesn't know
23  about gangrene or circulation.

160

MR. CURTIS:  We can ask the
doctors, that's fine.

Q.     (By Mr. Curtis)  Do you remember going
to a hospital called the Flowers Hospital about
December 20th, '04?  It was right after the
accident.

A.     I went there one time or another when I
run out of some meds, trying to get some more meds.

Q.     And that was the reason you went there?

A.     Yes.  Because my hand was hurting.

Q.     To get pain killers?

A.     Uh-huh.

Q.     As a result of this accident, how do you
contend that you're disabled?

MR. ANDREWS:  Try to put that in
words.

THE WITNESS:  That's what I'm
trying to do.  I'm trying to think of
it.

A.     I'm disabled because I cannot hold a lot

of different things with the same hand that I'm used to operating with.  So it's having to make me regroup my whole life; so therefore, that makes me disabled.

Q.    The disability you're describing is a physical disability; is that correct?

A.    That's correct.


MR. ANDREWS:  I want to make sure he understands.  You are asking, if I'm not mistaken, about any way that that's disabling -- disabling to you, not just your gripping.  Tell him how this has affected your life.  I think that's what you're asking as well, correct?

MR. CURTIS:  Sure.

MR. ANDREWS:  In other words, this is a big question.  You might want to tell him every way that this has affected you, because I don't want him later to say that you didn't tell him.

THE WITNESS:  Maybe I just ain't understanding what's going on this

1          second.

2

3          Q.      (By Mr. Curtis)  Why aren't you

4    understanding what's going on right this second?

5          A.      I don't understand exactly what you're

6    trying to get at.

7          Q.      You sued a number of defendants for

8    money?

9          A.      Who?

10         Q.      Besser Company, E & R Manufacturing and

11   Karry Mackey.

12         A.      Okay.

13         Q.      And some of the items that are in your

14   complaint say that you're permanently disabled.

15   I'm asking you, how are you disabled?

16         A.      Because I don't have no fingers on my

17   hand no more.

18         Q.      Okay.

19

20              MR. ANDREWS:  And again --

21              MR. CURTIS:  Well, at this point

22         there's no more --

23              MR. ANDREWS:  That's fine.  That's

1  fine.  If you don't want to hear all --

2  if you don't want to hear his full

3  testimony, that's fine with me.  But I

4  want to make sure -- he's here today and

5  if you want to ask him open-ended

6  questions and not follow up on any

7  emotional -- I mean, he's missing three

8  fingers on his dominant hand.  He's

9  already talked about pain.  He's talked

10  about pain medicines.  He's talked about

11  how it's affected his ability to work.

12  If you want to ask him about all those,

13  that's fine.  If you don't want to know

14  it, that's fine too.

15         MR. CURTIS:  I'm not saying either

16  one of those things.  I'm just asking my

17  question.

18         MR. ANDREWS:  Sure.

19         MR. CURTIS:  And I asked him that

20  same question --

21         MR. ANDREWS:  Okay.  That's fine.

22         MR. CURTIS:    -- kind of a couple

23  different ways with a couple of the same

1        answers.

2                MR. ANDREWS:  That's fine.

3                MR. CURTIS:  But it's on my

4        outline.

5                MR. ANDREWS:  Sure.

6

7        Q.      (By Mr. Curtis)  Some of the things you

8   did in order to get better were physical therapy;

9   is that correct?

10       A.      Yes.

11       Q.      How much physical therapy did you do?

12       A.      I ain't real sure how long.  I think it

13  was about three months or so, I think.

14       Q.      About three months?

15       A.      I'm not sure.

16       Q.      If I told -- well --

17

18          (Whereupon, Defendant's Exhibit 10 was

19          marked for identification and same is

20          attached hereto.)

21

22       Q.      Have you had an opportunity to review

23  Defendant's Exhibit 10?

1     A.     Yes.

2     Q.     What is the title of this document?

3     A.     Initial Evaluation.

4     Q.     And this is from Flowers Hospital, The

5  Hand Center; is that correct?

6     A.     That is correct.

7     Q.     Does this refresh your recollection as

8  to when you started physical therapy?

9     A.     1-27-05 is what it says right there.

10     Q.     Is it correct that you started physical

11  therapy on January 27th, 2005?

12     A.     Yes.

13     Q.     Go down toward the bottom of that page

14  and it says, Long Term Goals?

15     A.     Yes.

16     Q.     Can you tell me what the only Long Term

17  Goal is?  Can you read that for me?

18     A.     Functional use of his right hand.

19     Q.     And what's the time frame?

20     A.     10 weeks.

21     Q.     Now, were you told that at physical

22  therapy when you began, that you could have

23  functional use of your right hand?

1    A.    Yes.

2    Q.    Do you recall --

3    A.    That's all I can get out of it.  That's

4  all he could get in the time frame that we had.

5    Q.    Okay.  So this is post the amputation,

6  okay, January 27th, 05; is that correct?

7    A.    Yes.

8    Q.    Okay.

9    A.    Post or after?

10    Q.    This is after.

11    A.    That's what I thought.

12    Q.    Did you do any physical therapy before

13  the amputation?

14    A.    No.

15    Q.    So have you seen a psychiatrist about

16  this injury?

17

18          MR. ANDREWS:  I'm going to object

19      to the form.  He doesn't have to testify

20      about any kind of psychiatry treatment.

21          MR. CURTIS:  We can just lay a

22      foundation for it, right?  If you're

23      going to assert the privilege you have

```
 1        the burden to prove it, so at least I
 2        can ask him if he has seen a
 3        psychiatrist.
 4                MR. ANDREWS:  Well, I'm going to
 5        assert the privilege and you can answer
 6        it.
 7                MR. CURTIS:  You're going to
 8        assert --
 9                MR. ANDREWS:  I can tell you what
10        the answer is.  He hasn't ever seen a
11        psychiatrist.
12                MR. CURTIS:  Well, I need to hear
13        that from him.

15   A.    No, I have not seen a psychiatrist.
16   Q.    Have you seen a psychotherapist?
17   A.    No.
18   Q.    Have you seen a therapist of any kind
19   about your injury from the accident?
20   A.    Brian Shealy.

22            MR. SHEALY:  Shelley.
```

1  A.  Shelley, whatever.

2  Q.  You've seen Brian Shelley?

3  A.  I mean for this therapy on my hand.

4  Q.  That's physical therapy.

5  A.  Okay.

6  Q.  Have you seen any doctor or therapist

7 about your emotional health?

8  A.  No, sir

9  Q.  As a result of the accident, have you

10 sought any treatment for mental suffering?

11  A.  No.

12  Q.  Have you experienced depression since

13 the accident?

14  A.  Yeah, I'm depressed all the time.

15  Q.  Have you been treated for the

16 depression?

17  A.  No.

18  Q.  Have you experienced depression at any

19 other time in your life before the accident?

20  A.  When I was doing drugs -- I mean, you

21 get depressed when you're doing drugs anyway.

22  Q.  Have you ever taken medication for

23 depression?

1    A.    No.

2    Q.    Have you ever seen a doctor for

3    depression?

4    A.    No.

5    Q.    After your accident, did you follow all

6    of your doctor's instructions to give yourself the

7    best chance you could to save your fingers?

8    A.    Yes.

9    Q.    What instructions did he give you?

10    A.    He didn't really -- the only

11    instructions he gave me was at the beginning he

12    told me not to smoke.  That's pretty much the only

13    thing.  I mean, you can't pick nothing up anyway.

14    Q.    The one thing he told you not to do was

15    smoke?

16    A.    Yes, at the beginning.

17    Q.    But you did -- but you smoked anyway?

18    A.    Well, I mean, yeah, I smoked.  But you

19    know what, I've been smoking since I was 15 years

20    old.  You don't walk away from an addiction like

21    that in a minute.

22    Q.    Well, in addition to cigarette smoking

23    you also smoked marijuana?

170

1  A.  Well, so.

2  Q.  After the accident, right?

3  A.  Before, after.

4  Q.  Okay.  Were you addicted to marijuana?

5  A.  No, I'm not addicted to marijuana.

6  Q.  Thinking about this case and that you're

7 asking the defendants for money, it looks like

8 that's because of the disability that you've

9 described?

10  A.  Yes.

11  Q.  I also understand that it's for pain and

12 suffering; is that correct?

13  A.  That's correct.

14  Q.  Now, if you had to balance the two,

15 would you say that you want more money for physical

16 disability, or that you want more money for mental

17 disability?

18

19    MR. ANDREWS:  Now, on this, this

20    is legal question, and we are going to

21    ask the jury to return whatever amount

22    they think is appropriate.  And the jury

23    is certainly the one to weigh whether

171

they give more money for disability or
whether they give more money for --

MR. CURTIS:  And they can --

MR. ANDREWS:  He's going to ask
the jury -- I can tell you what:  I'm
going to be the one asking, and I'm
going to ask the jury to assess all of
that however they deem fit.  I'm not
going to stand up and say, please, give
more for disability or give more for
depression.  I'm going to tell the jury
what this man has been through and let
them assess the damage.

Q.    (By Mr. Curtis)  What do you consider to
be more serious, the physical loss of your fingers
or the mental suffering you've had as a result of
the accident?

A.    Personally I think they are both pretty
equal.

Q.    They are both equal?

A.    Yeah.

Q.    Do you plan to see a psychiatrist in the

172

future?

    A.    I hadn't thought about that.

    Q.    How about to see a therapist?

    A.    I hadn't really --

    Q.    You hadn't thought about that?

    A.    No, sir.

    Q.    But you're contending they are equal, correct?

    A.    Yeah, because I just go on -- I got to work, and I can't take and be out of work.  I have to go to work.  I have a family to take care of. And no matter what it takes to do it, this boy is going to do it.  That's all there is to it as far as that goes.  I don't have time to go deal with that.  I have to deal with it in my own way, and I do that.

    Q.    I understand --

    A.    Okay, thank you.

    Q.    But it's true you're taking medication for physical pain, correct?

    A.    That's correct.

    Q.    It's true you're not taking medication for anything having to do with any kind of

1  emotional or mental state?

2

3           MR. ANDREWS:  I object.  I think

4      some of the pain medicine probably helps

5      to some --

6           MR. CURTIS:  I understand what you

7      think --

8           MR. ANDREWS:  That's for a doctor

9      to testify to.

10          MR. CURTIS:  Either just object or

11     just let him answer.

12          MR. ANDREWS:  Well, I object.

13          MR. CURTIS:  Can you read back the

14     last question.

15

16     (Whereupon, the following question was

17     read back by the court reporter:

18          "Q.    It's true you're not

19     taking medication for anything having to

20     do with any kind of emotional or mental

21     state?")

22

23  A.    True, I'm not for that particular thing,

1    but the pain pills do help me as far as dealing

2    with being able to work and go on with my everyday

3    life.  Whether they just for that or whatever, they

4    are prescribed for the pain in my hand.

5

6              MR. CURTIS:  I'm all done.

7              MR. RODGERS:  I've got about two

8         questions.

9

10                   EXAMINATION

11   BY MR. RODGERS:

12      Q.     Mr. Jackson, I'm Chris Rodgers and I

13   represent Mr. Mackey.  As I understand what you've

14   testified to here today, your hand actually got

15   caught between the block and the side knife; is

16   that correct?

17      A.     That is correct.

18      Q.     Okay.  Are you aware of any evidence

19   that Mr. Mackey ever took a guard off of this block

20   splitter machine?

21      A.     No, sir, I am not.

22

23              MR. RODGERS:  I don't have any

1        other questions.

2                MR. SHEALY:   That's all.

3                MR. CURTIS:   That's all.

4

5            (FURTHER DEPONENT SAITH NAUGHT)

## REPORTER CERTIFICATE

STATE OF ALABAMA   )

COUNTY OF HOUSTON )

    I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

    I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in any way interested in the result of said cause.

    Certified this the 24th day of May, 2007.


Karen D. Strickland

Certified Court Reporter

(334) 793-3673

# Color Photos
# WILL NOT SCAN

# Available for conventional viewing in the Clerk's Office



**FLOWERS HOSPITAL**
4370 WEST MAIN STREET                    DOTHAN AL. 36305              **THE HAND CENTER**
                                                                      (334) 794-5000, EXT 8440

# INITIAL EVALUATION

**PATIENT NAME**: David Jackson
**DATE: 1/27/05**                              **MEDICAL RECORDS #**: 334516
                                               **THERAPIST**: Brian Shelley, OTR/L, PT, CHT

**SSN**: 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

Referring Physician: Dr. Landon Anderson

This is a 43 y.o. (R) hand dominant male who was working in Andalusia sustained a severe crush injury to his (R) hand on December 16th 2004. He underwent salvage procedures to the fingers and the hand apparently times 5 according to the patient. Ultimately ended up in amputations of the long, ring and little fingers either through the MP joint or through the proximal phalanx. The index and thumb apparently sustained essentially no injury. He is now referred to physical therapy for wound care and ROM.

**UPON EXAMINATION TODAY:**
Patient presents with obvious amputations of the long, ring and little fingers approximately through the proximal phalanx areas. He has moderate amount of swelling. He has an open wound in the palm at the distal palmer crease approximately 2 cm by 6 cms. He has open wounds at the tip of the long stump. There is no evidence of infection. We have cleaned the wounds with soap and water. Debrided non-viable tissue and instructed the patient in keeping the hand elevated and redressed. We then fabricated a dynamic MP flexion splint to dynamically flex the MP joint. We instructed him in ROM exercises of the index finger and thumb. ROM of the wrist is essentially WNLs. MP flexion of the index finger is 45°. PIP flexion is 25° and DIP flexion is 15°. Passive extension is WNLs. ROM of the thumb is essentially WNLs. Patient will wear the dynamic splint 30 mins 5 times a day. He does understand this. In between splinting he will work on ROM exercises and joint mobilization, which is what we have worked on here in the clinic, and instruct him in home exercise program.

**SHORT-TERM GOALS:**
1.   Promote wound healing.
     Full active ROM of index finger.
Time Frame: 6 weeks

**LONG-TERM GOALS:**
1.  Functional use of his (R) hand.
**Time Frame: 10 weeks**

**PLAN OF TREATMENT:** Patient will be followed for ROM exercises and splinting as indicated.

**FREQUENCY & DURATION:** Patient will be followed daily for 2 wks and 3 –x wk for 4 wks.

**CHARGES TODAY:** Initial eval, exercise, wound care and splint.

Thank you very much for this referral.

Brian Shelley, OTR/L, PT, CHT



DEFENDANT'S EXHIBIT
10

# Flowers Hospital

FLOWERS HOSPITAL • 4370 W. MAIN STREET • DOTHAN, AL. 36305

## PATIENT SUMMARY

| | | |
|---|---|---|
| PATIENT NUMBER 05027-00193 | ROOM/TYPE HAN | M.R. UNIT NUMBER 0000334516 |

**PT. TYPE SER**  HAN HAN  **ATTENDING PHYSICIAN** ANDERSON,LANDON  **FAMILY PHY.**

**P A T I E N T**

ADMIT DATE/TIME 01/27/05 1031   SEX M   RACE 1   MS M   DATE OF BIRTH/AGE 10/24/61 43Y   SOCIAL SECURITY NUMBER 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   EMPLOYMENT STATUS FULL TIME

PATIENT
JACKSON,DAVID
305 SOUTH FIFTH AVE    PHONE (334)588-0196
HARTFORD    AL 36344

SMK VETERAN U NO    OCCUPATION cell# 248-7208   538-0041

EMPLOYER
ABLE BODY LABORS
477 WEST NELSON ST    PHONE (850)892-4405
DEFUNIAK SPGS FL 32433

BRANCH OF SERVICE    PAY GRADE    MILITARY STATUS

**G U A R A N T O R**

GUARANTOR
JACKSON,DAVID
305 SOUTH FIFTH AVE    wife 248 7206 Laurie    PHONE (334)588-0196
HARTFORD    AL 36344

RELATIONSHIP SELF   SOCIAL SECURITY NUMBER 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   GUARANTOR OCCUPATION

GUARANTOR EMPLOYER
ABLE BODY LABORS
477 WEST NELSON ST    PHONE (850)892-4405
DEFUNIAK SPGS FL 32433

EMPLOYMENT STATUS FULL TIME

**R E L A T I V E**

RELATIVE/FRIEND (OTHER THAN GUARANTOR)
JACKSON,LORI
305 SOUTH FIFTH AVE    PHONE (334)588-0196
HARTFORD    AL 36344

RELATIONSHIP SPOUSE   SOCIAL SECURITY NUMBER 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   GUARANTOR OCCUPATION

RELATIVE/FRIEND EMPLOYER
SCOOTER STORE    PHONE (334)588-0271
HARTFORD    AL 36344

EMPLOYMENT STATUS FULL TIME

**I N S**

CARRIER WORKER'S COMPENSATION   F/C 04   POLICY NUMBER 253296033
INSURED NAME JACKSON,DAVID   SOCIAL SECURITY NUMBER 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
GROUP NUMBER   COMMENTS

MAIL TO:
PO BOX 4699
CLEARWATER    FL 33758
GROUP PHONE/EXT: (727)771-1111 230

**I N S 2**

CARRIER W/C 1500 PLAN   F/C 04   POLICY NUMBER 253295033
INSURED NAME JACKSON,DAVID   SOCIAL SECURITY NUMBER 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
GROUP NUMBER   COMMENTS

MAIL TO:
PO BOX 4699
CLEARWATER    FL 33758
GROUP PHONE/EXT: (727)771-1111 230

**I N S 3**

CARRIER   F/C 04   POLICY NUMBER
INSURED NAME   SOCIAL SECURITY NUMBER
GROUP NUMBER   COMMENTS

MAIL TO:

GROUP PHONE/EXT:

Cindy notes

**I N S 4**

CARRIER   F/C 04   POLICY NUMBER
INSURED NAME   SOCIAL SECURITY NUMBER
GROUP NUMBER   COMMENTS

MAIL TO:

Fax
334-764-3398

GROUP PHONE/EXT:

**I S C**

DIAG CODE DIAGNOSIS
POST OP PROBLEMS   ALLERGIES   AMD   ORG   PRC

ACCIDENT TYPE ACCIDENT/EMPLOYMENT   ACCIDENT DATE 12/16/04   ACC. TIME 0600   PLACE OF ACCIDENT COVINGTON CO/WORK   PREVIOUS VISIT DATE 12/21/04   ARRIVAL MODE PERSONAL VEH

TRANSFERRING FACILITY   CHURCH PATIENT DECLINED   A.T.C. 3   INIT.

COMMENTS   LOCATION HAN   INIT. BHJ

1/27/05 Cindy w/ Cranford approved therapy.
Adj Lorine Gregg 954-491-4470 ext. 7738
dm # 2026-56517

| COPIED | ABSTRACTED | FINAL CHECK |
|---|---|---|

FL BU 6230 (Rev 12-98) ADMISSION FORM