# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID JACKSON,                              )
                                            )
          PLAINTIFF,                        )
                                            )
VS.                                         )          CIVIL ACTION NO.:
                                            )          2:06 CV0412-.DRB
E & R MANUFACTURING CO., INC., and          )
BESSER COMPANY, et al.,                     )
                                            )
DEFENDANTS.                                 )

## AFFIDAVIT OF IGOR L. PAUL, ScD, P.E.

STATE OF NEW HAMPSHIRE      )
COUNTY OF MERRIMACK         )

Before me, the undersigned, personally appeared Igor L. Paul, ScD, P.E., who being first duly sworn, deposes and says as follows:

My name is Igor L. Paul, ScD, P.E. . I am over the age of 21 and I have personal knowledge of all the facts and circumstances stated herein. I am a resident of Merrimack County, New Hampshire.

I am a Mechanical Engineer. I received my doctor's degree in mechanical engineering from M.I.T. in 1964. I was a member of the faculty of M.I.T.'s mechanical engineering department from 1964 until June 2003 when I retired. I have extensive education, training, and consulting experience in the areas of machine design, human factors in design, industrial equipment design, and plant and industrial safety. Pertinent to this case , I have designed successful "point-of-operation" guarding for at least two dozen industrial materials processing machines and equipment, including mechanical and hydraulic presses and vertical and horizontal injection molding presses. A resume of my qualifications is attached to this affidavit.

In 1989, I was retained by the defendants E&R Mfg. and Besser to review the design of their Model CM-24 Concrete Block Splitter in conjunction with an accident which had occurred on that splitter in 1985, severely injuring a worker in the unguarded "point-of-operation" of that splitter. At that time I rendered professional opinions relative to the design, found it defective and unreasonably dangerous, and proposed and recommended "point-of-operation" guarding for the Model CM-24 Block Splitter to make it safe. The

defendants failed to incorporate my safety guarding recommendations and, apparently, accidents have continued to occur on this equipment. In my professional opinion, Mr. Jackson's accident and injuries would have been prevented if my guarding recommendations had been incorporated into the E&R (Besser) Model CM-24 Concrete Block Splitter design.

Based upon my review of the materials you forwarded with respect to this case (as per the attached list), based upon my knowledge of the history and practice of industrial plant and equipment safety and applicable safety standards, based upon my prior experience with machinery of this type in general, and this particular concrete splitting machine, in particular, and based upon my education, background and experience, the following summarizes my professional opinions on the inadequate, defective, unsafe, and inherently and unreasonably dangerous design of the Model CM-24 Block Splitting Machine manufactured by E&R Mfg. Inc. under the Besser brand name, and its involvement in Mr. Jackson's accident and injuries. My professional opinions are based on the materials I have reviewed to date and my prior knowledge of this machine which I gained when I was retained by the defendants in 1989 to evaluate the design of the block splitting machine when it was involved in a very similar accident, which had occurred in 1985. This report may have to be supplemented if further discovery warrants.

## Equipment and Accident Scenario

The concrete splitting machine consists of an automated multi-functional hydraulic press used to split concrete blocks with hydraulically operated cutting blades or knives. During one operating cycle, a concrete block is automatically fed into the "point-of-operation" of the splitter and located between side knives and under the main splitting knives, the side and main knives perform the splitting functions, and the completed concrete block is pushed out of the "point-of-operation" of the splitter to make room for the next block(s). The block stops in the "point-of-operation" of the machine. After a delay, side knives are automatically activated and come in from both sides of the block at a speed and final wedging force which are variable and adjustable. After another delay of about 1.5 seconds (also adjustable), the main knives "split" the blocks. These various motions of the concrete blocks and the knives occur sequentially and intermittently with a variable overall cycle time on the order of up to 10 seconds (as shown on the machine video). The side knives are stationary throughout most of the cycle and are only activated automatically for a brief period of time. Multiple fast and intermittent crush, shear and trapping hazards are created during each cycle by the motions of the knives and the concrete blocks. Most of the concrete chunks and debris which are generated by the side knives and main splitting knives, are pushed out of the way by the next advancing concrete block(s). However, as part of the normal splitting operation, concrete chunks and debris remain and accumulate in and around the "point-of-operation" of the machine, particularly near the side knives . A laborer or "chunk remover" has to periodically and manually remove concrete chunks and debris from the area around and in the "point-of-operation" to prevent the accumulating debris from fouling up the splitting operations. The debris has to be cleared quite frequently particularly when the side knives are set at an angle (as they were at the time of Mr. Jackson's accident).

None of the multiple "points-of-operation" of the machine (where the actual extremely dangerous cutting or splitting of the concrete blocks is performed) are positively

guarded from access by operator's or "chunk remover's" hands while the machine is in operation. Neither are the multiple shear and crush points between the moving cutter holders and the machine frame or between the moving concrete blocks and the machine frame.

On 12/17/2004 Mr. Jackson was stationed near the outlet of the E&R(Besser) Model CM-24 Block Splitter at Couch Block USA, to observe proper operation of the equipment, to rectify any malfunctions and to clear debris, when appropriate, to prevent accumulation and malfunctions. He had been instructed on how to clear the debris from around the "point-of-operation" while the machine was in automatic operation and was doing so at the time of his accident. He was trying to retrieve a chunk of debris from the side of a concrete block (while the side knives were stationary) as he had done on many previous occasions, when his gloved hand accidentally got caught on a bolt and he could not "beat the cycle" and get his hand out before the side knives were automatically activated and suddenly closed on the concrete block . The side knife on Mr. Jackson's side of the equipment, trapped, crushed and sheared his hand, resulting in severe hand injuries. Since the main control panel was on the other side of the machine and there were no emergency stop controls where he was stationed near the unguarded "point-of-operation" of the splitter, he was unable to stop the side knives after his glove became accidentally caught on the bolt.

## Professional Opinions and Bases for Opinions

In my professional opinion the design of the E&R (Besser) Model CM-24 Concrete Block Splitting machine was improper, inadequate, defective and inherently and unreasonably dangerous, as follows:

1- In failing to adequately, effectively and positively guard the "point-of-operation" of the concrete splitting machine from ANY operator access when the cutting or splitting operation was in progress. ALL industrial machine safety standards and industrial safety practices require that ALL operator accessible "points-of-operation" of ALL industrial machinery be positively guarded from operator access during the operating cycle, or, alternatively, the operating cycle must automatically stop or not initiate at all while the operator has access to or has his hand(s) in the machine's "point-of-operation". These guarding requirements were well-known, widely practiced in industry, and specifically stated and promulgated in government and industrial safety standards and in the engineering literature on industrial machine safety. The alternate ways of accomplishing such guarding requirements were also well-known, widely practiced and published and promulgated in industrial standards and engineering safety literature well before the E&R (Besser) concrete block splitting machine involved in Mr. Jackson's accident was manufactured and sold.

2- OSHA Standards specifically require effective machine guarding on ALL machines to protect the operator from hazards such as those created by "point-of-operation" etc. {Sections 1910.212(a) through 1910.212(a)(2)} and have particular requirements for "point-of-operation" guarding {Sections 1910.212(a)(3) through 1910.212(a)(3)(iii)}. The latter requirements allow "special hand tools" but these "...shall NOT be IN LIEU of other guarding required by this section...." (emphasis added). Although there is no separate industry standard for concrete block splitting machinery, ALL ANSI (American National Standards Institute) standards for similar

materials processing machinery such as mechanical and hydraulic power presses, shears, vertical and horizontal molding machinery etc. require "point-of-operation" guarding to positively prevent operator access to the danger areas during the material forming or cutting process (ANSI B11.1-1988 through B11.19-1990). All other industrial safety and machine design literature requires effective and positive "point-of-operation" guarding (see, for example, any Edition of the "Accident Prevention Manual for Business and Industry" published by the National Safety Council, starting in the 1950's).

3- In failing to incorporate my "point-of-operation" guarding recommendations (or an alternate guarding design) into the E&R (Besser) concrete block splitting machine design back in the early 90's when the defendants retained me in 1989 to evaluate their design after they had a very similar accident in 1985 on a Model CM-24 block splitting machine. At that time, I formally advised them that the design of their concrete splitting machine was defective and inherently and unreasonably dangerous, had caused the 1985 accident, and would continue to cause accidents and injuries unless they properly guarded the "point-of-operation" of the equipment. I proposed and recommended positive perimeter guarding for the "point-of-operation" block splitter (including the main and side knives) with safety-interlocked observation, inspection and access gates which would allow observation of the "point-of-operation" of the block splitter and safe debris removal while the block splitter was in operation but would not allow operator access to the dangerous area during the splitting operations. The proposed safety-interlocked gates had access openings at the bottom which were big enough to allow safe removal of debris using a scraping tool, but would positively prevent operator's hands or fingers from reaching the danger areas. Thus the operator could not access the danger area without opening an access gate which would automatically stop all knife functions. I had personally designed and successfully used such safety-interlocked guarding for various other industrial machinery which required "point-of-operation" guarding. This design (using safety interlocked operator access gates) would have provided positive operator safety, would not have interfered with the normal machine functions, was both economically and technically feasible and practical, and would not pose any hazards to the operator. I also advised them of alternate guarding designs which could be used. My guarding design (or one of the alternate proposed designs) would have prevented Mr. Jackson's accident and injuries. It is completely incomprehensible to me how a responsible industrial machine manufacturer can continue to manufacture and distribute unsafe industrial equipment which continues to injure operators for well over 20 years after the first accident and after they had received specific recommendations on how they could make their equipment safe and safety standard compliant.

4- In failing to incorporate alternate "point-of-operation" guarding which I described and recommended such as adjustable light curtains which would prevent knife motion if the operator's hand(s) were in the danger area, or safety mats or pads which would limit access to the danger areas, or emergency shut-off bars or cables, and/or a combination of these well-known and widely used "point-of-operation" guarding methods. Any of these guarding methods would have prevented Mr. Jackson's accident and injuries.

5- In failing to provide easily accessible and convenient emergency stop controls around the "point-of-operation" of the CM-24 block splitter allowing the operator to easily and immediately stop or prevent knife motion by operating a local push button, push-pull bar or cable type of emergency control. The only stop controls on the subject block splitter were located on the other side of the machine from Mr. Jackson's position, at the main control panel, and required him to walk around the machine and the conveyor equipment to reach the only stop or emergency control provided on this equipment. A local emergency stop near the "point-of-operation" would have allowed Mr. Jackson to prevent the side knife operation when his glove became accidentally caught, or to stop side knife motion before it crushed his hand.

6- In failing to perform a task oriented Risk Assessment and Risk Reduction or Failure Mode and Effects analysis on the block splitter and its various operating modes and operator functions. Even a cursory human factors and risk analysis by E&H (Besser) when they were originally designing the machine (or at any time after they received notice of the 1985 accident, or after any of the many later accidents which have occurred on the Model CM-24 block splitter), would have revealed the hidden and inherent hazards created by the concrete chunks and debris which are generated during normal operation of this equipment and which have to be removed periodically by hand for proper continued operation of the equipment. Debris removal is part of the normal operating conditions of the equipment and requires a "chunk remover" to work in close proximity to the "point-of-operation" of the machine to frequently clear the debris. It is completely impractical (and certainly is not done in the field) to use LOTO (lock-out tag-out) procedures to accomplish this necessary task. It would certainly be reasonably foreseeable to any competent design engineer that removal of this debris would be performed in the field without shutting down the equipment, and, in fact, that the "chunk remover" would be required to clear debris near and around the "point-of-operation" while the machine was in automatic mode. Working in close proximity to intermittently moving parts creates a special hazard in that the "chunk puller" is performing his clearing function while the equipment and the knives are stopped and stationary. Thus, although he knows, as did Mr. Jackson, that the side knives represent a danger if they catch and crush the hand, the "normal" debris cleaning operation is performed near the knives but while they are stationary and is completed while they are stationary, and thus not perceived as an actual danger at that time. It was certainly reasonably foreseeable to the machine designer and manufacturer that the "chunk puller", while routinely clearing debris from around the unguarded "point-of-operation" (with the dangerous parts mostly stationary during the cycle) would accidentally get caught and/or be unable to "beat the cycle" and thus be injured. If it was not foreseeable to the defendants before the first reported accident in 1985, E&R (Besser) was certainly placed on notice that this was a real and foreseeable hazard by me in 1989 (and by subsequent accidents) and should have properly guarded the "point-of-operation" as discussed above.

7- In failing to adequately and effectively WARN against the inherent, hidden and unreasonable dangers posed by the unguarded "point-of-operation" of this equipment and to INSTRUCT on its proper and safe use. Although WARNINGS and INSTRUCTIONS cannot substitute for proper safety design, and for this

equipment proper "point-of-operation" guarding was both mandated and should have been provided by E&R (Besser), prominent WARNINGS and clear INSTRUCTIONS posted on the equipment near the danger areas, and audible and/or visual warnings just PRIOR to activation of knife motion, would have instructed Mr. Jackson about which specific areas near the "point-of-operation" could be manually cleared, and would have alerted him, BEFORE the side knives activated, about their impending motion. Although such warnings and instructions would not have adequately remedied the defective and inherently dangerous design of the E&R(Besser) block splitter, they would have prevented Mr. Jackson's accident in this case.

In my professional opinion, the improper, inadequate and defective design of the E&R (Besser) Model CM-24 Block Splitter (in failing to provide "point-of-operation" guarding and effective visual and audible warnings) directly caused Mr. Jackson's accident and injuries. Practical, economical (and industry and government mandated) state-of-the-art "point-of-operation" guarding on this equipment would have prevented Mr. Jackson's accident and injuries.

In my professional opinion, all of Mr. Jackson's actions as "chunk puller" at the time of his accident, were completely reasonable and reasonably foreseeable by the equipment manufacturer and he in no way contributed to the cause of his accident. He was an innocent victim of the defective and unreasonably dangerous design of the E&R (Besser) Model CM-24 Block Splitter.

FURTHER AFFIANT SAYETH NOT.

Igor L. Paul, Sc.D., P.E.
Engineering Consultant

STATE OF NEW HAMPSHIRE    )
COUNTY OF MERRIMACK    )

Before me, in and for said county, in said state, personally appeared Igor L. Paul, Sc.D., P.E., whose name is signed to the foregoing Affidavit and who is made known to me

and who, being first duly sworn and deposed, says that he has knowledge of the facts stated in the foregoing Affidavit, and that said facts as therein stated are true and correct.

Sworn to and subscribed before me on this the ⟶21⟵ day of August, 2007.

(SEAL)

_Linda Booker_
Notary Public
My Commission Expires:_____ LINDA BOOKER, Notary Public
My Commission Expires May 18, 2012

# Biographical Sketch
## Igor L. Paul, Sc.D., P.E.
### Professor of Mechanical Engineering (Retired)
### Massachusetts Institute of Technology
### igPaul@MIT.edu

**Contact** PO Box 178, 844 Lakeshore Drive, Elkins , NH 03257;  (603) 526-6631

**Personal** Born 1936, married, three grown children

**Languages** Fluent in Russian and German

**Education** B.S. in Mechanical Engineering, MIT, 1960
M.S. & M.E. in Mechanical Engineering, MIT, 1961 &1962
Sc.D in Mechanical Engineering, MIT, 1964
Shell Foundation Fellow;  Ford Foundation Post-Doctoral Fellow

## Employment History & Appointments
Mechanical Engineering Department Faculty, MIT; 1964 to June 30, 2003 (Retired)
Childrens Hospital Medical Center, Boston (Consultant in Biomedical Engineering)
Massachusetts General Hospital, Boston (Consultant in Engineering Science & Orthopedics)
Mount Auburn Hospital , Cambridge, MA (Consultant in Biomedical Engineering)

## Professional Memberships & Honors and Awards
PE-Registered Prof. Engr. (Mass.); Member:  ASME; ASEE; SAE; NSPE; ASABE; ASSE;
IEEE(Control Systems Soc.; Eng'g. in Medicine & Biology Soc.; Product Safety Eng'g.
Soc.); Biomedical Engineering Soc.; Orthopedic Research Soc.; N.Y. Academy of Sciences;
American Soc. of Biomechanics; PI TAU SIGMA, SIGMA XI (Honorary Societies)
Awards: DeFlorez Award for Creativity in Design (MIT); Ralph R. Teetor Distinguished
Educator Award (SAE); Outstanding Orthopedic Research Award (Orthopedic research
Society); Carl Soderberg Distinguished Service Award (MIT, 2003)

**Teaching** Design and Manufacturing I and II; Product Engineering Process; Mechanical Design;
Mechanics & Materials ; System Modeling, Dynamics and Control; Micro-Processor and
Digital Control Systems; Dynamic Simulation; Measurement and Instrumentation;
Biomechanics; Quantitative Physiology (Musculo-Skeletal System, Ergonomics and Human
Factors); Real World Ethics (Professional Responsibility, Safe Product Design, Intellectual
Property); Practical Biomechanics (Kennedy Mem. Hosp., W. Virginia Univ. Med. Center);
Biomechanics in the Practice of Orthopedic Surgery (MGH, Harvard Medical School)

## Professional Interests
Product and Machine Design and Safety; Control Systems; Computers and AI in Product
Design and Education; Dynamic System Simulation, Robotics; Biomechanics, Ergonomics &
Human Factors in Product Design;  Musculo - Skeletal System Dynamics; Risk Analysis

**Research**
**Interests** **Transportation & Solid Waste Disposal:** Studies of advanced ground transportation
systems and solid waste disposal technology ( in 1960's-1970's)

**Bio-Engineering:** Orthopedic devices and implants. Biomechanics of musculo- skeletal
system, dynamic simulation, skeletal impact absorption, osteoarthritis; impact trauma
biomechanics; human body dynamics; impact attenuation effectiveness of human body,
protective helmets, sports equipment, and energy absorbing impact surfaces. Human factors
and ergonomics in product design. Design of aids and products for handi-capped.
**Product and Machine Design & Safety, Design Education:** Application of
computers and AI to product design, safe product design, dynamic simulation, design
education; simulation of mobile robot environments, human dynamics; computer control of
servo-systems; hazard and risk analysis in product design.

**Consulting** Product and machine design (consumer and industrial products and machinery; solid waste,
transportation, materials handling systems and equipment, biomedical devices, plant safety.
Expert witness consulting in areas of product design, safety and human factors in product
and industrial design, automated machinery, biomechanics of musculo-skeletal trauma and
protective and sports equipment, patent and intellectual property litigation (product design)

**Publications** Over eighty publications in areas of Design, Engineering Education, Solid Waste Disposal,
Transportation, Bio-Engineering and Orthopedics. Past Machine Design Editor for Product
Safety News and Editorial Board of Journal of Products Liability

**Igor L. Paul, Sc.D., P.E.**
**Engineering Consultants**
P.O. Box 178, 844 Lakeshore Drive
Elkins, NH 03233-0178

Home Office:
Phone (603) 526-6631
6802
Fax   (603) 452-8686

igpaul@mit.edu

igpaul@comcast.net

Home (Private):
Phone   (603) 526-
6802

Cellular (603) 748-1292

August 20, 2007

Mr. S. Mark Andrews
Morris, Cary, Andrews etal
3334 Ross Clark Circle
Dotham, AL  36302

Re: Jackson  v.
E&R Manufacturing et al

Dear Mr. Andrews:

Based upon my review of the materials you forwarded with respect to this case (as per the attached list), based upon my knowledge of the history and practice of industrial plant and equipment safety and applicable safety standards, based upon my prior experience with machinery of this type in general, and this particular concrete splitting machine, in particular, and based upon my education, background and experience, the following summarizes my professional opinions on the inadequate, defective, unsafe, and inherently and unreasonably dangerous design of the Model CM-24 Block Splitting Machine manufactured by E&R Mfg. Inc. under the Besser brand name, and its involvement in Mr. Jackson's accident and injuries. My professional opinions are based on the materials I have reviewed to date and my prior knowledge of this machine which I gained when I was retained by the defendants in 1989 to evaluate the design of the block splitting machine when it was involved in a very similar accident, which had occurred in 1985. This report may have to be supplemented if further discovery warrants.

## Equipment and Accident Scenario

The concrete splitting machine consists of an automated multi-functional hydraulic press used to split concrete blocks with hydraulically operated cutting blades or knives. During one operating cycle, a concrete block is automatically fed into the "point-of-operation" of the splitter and located between side knives and under the main splitting knives, the side and main knives perform the splitting functions, and the completed concrete block is pushed out of the "point-of-operation" of the splitter to make room for the next block(s). The block stops in the "point-of-operation" of the machine. After a delay, side knives are automatically activated and come in from both sides of the block at a speed and final wedging force which are variable and adjustable. After another delay of about 1.5 seconds (also adjustable), the main knives "split" the blocks. These various motions of the concrete blocks and the knives occur sequentially and intermittently with a variable overall cycle time on the order of up to 10 seconds (as shown on the machine video). The side knives are stationary throughout most of the cycle and are only activated automatically for a brief period of time. Multiple fast and intermittent crush, shear and trapping hazards are created during each cycle by the motions of the knives and the concrete blocks. Most of the concrete chunks and debris which are generated by the side knives and main splitting knives, are pushed out of the way by the next advancing concrete block(s). However, as part of

1

around the "point-of-operation" of the machine, particularly near the side knives . A laborer or "chunk remover" has to periodically and manually remove concrete chunks and debris from the area around and in the "point-of-operation" to prevent the accumulating debris from fouling up the splitting operations. The debris has to be cleared quite frequently particularly when the side knives are set at an angle (as they were at the time of Mr. Jackson's accident).

None of the multiple "points-of-operation" of the machine (where the actual extremely dangerous cutting or splitting of the concrete blocks is performed) are positively guarded from access by operator's or "chunk remover's" hands while the machine is in operation. Neither are the multiple shear and crush points between the moving cutter holders and the machine frame or between the moving concrete blocks and the machine frame.

On 12/17/2004 Mr. Jackson was stationed near the outlet of the E&R(Besser) Model CM-24 Block Splitter at Couch Block USA, to observe proper operation of the equipment, to rectify any malfunctions and to clear debris, when appropriate, to prevent accumulation and malfunctions. He had been instructed on how to clear the debris from around the "point-of-operation" while the machine was in automatic operation and was doing so at the time of his accident. He was trying to retrieve a chunk of debris from the side of a concrete block (while the side knives were stationary) as he had done on many previous occasions, when his gloved hand accidentally got caught on a bolt and he could not "beat the cycle" and get his hand out before the side knives were automatically activated and suddenly closed on the concrete block . The side knife on Mr. Jackson's side of the equipment, trapped, crushed and sheared his hand, resulting in severe hand injuries. Since the main control panel was on the other side of the machine and there were no emergency stop controls where he was stationed near the unguarded "point-of-operation" of the splitter, he was unable to stop the side knives after his glove became accidentally caught on the bolt.

## Professional Opinions and Bases for Opinions

In my professional opinion the design of the E&R (Besser) Model CM-24 Concrete Block Splitting machine was improper, inadequate, defective and inherently and unreasonably dangerous, as follows:

1- In failing to adequately, effectively and positively guard the "point-of-operation" of the concrete splitting machine from ANY operator access when the cutting or splitting operation was in progress. ALL industrial machine safety standards and industrial safety practices require that ALL operator accessible "points-of-operation" of ALL industrial machinery be positively guarded from operator access during the operating cycle, or, alternatively, the operating cycle must automatically stop or not initiate at all while the operator has access to or has his hand(s) in the machine's "point-of-operation". These guarding requirements were well-known, widely practiced in industry, and specifically stated and promulgated in government and industrial safety standards and in the engineering literature on industrial machine safety. The alternate ways of accomplishing such guarding requirements were also well-known, widely practiced and published and promulgated in industrial standards and engineering safety literature well before the E&R (Besser) concrete block splitting machine involved in Mr. Jackson's accident was manufactured and sold.

2- OSHA Standards specifically require effective machine guarding on ALL machines to protect the operator from hazards  such as those created by "point-of-operation" etc. {Sections 1910.212(a) through 1910.212(a)(2)} and have particular requirements for

2

"point-of-operation" guarding {Sections 1910.212(a)(3) through 1910.212(a)(3)(iii)}. The latter requirements allow "special hand tools" but these "...shall NOT be IN LIEU of other guarding required by this section...." (emphasis added). Although there is no separate industry standard for concrete block splitting machinery, ALL ANSI (American National Standards Institute) standards for similar materials processing machinery such as mechanical and hydraulic power presses, shears, vertical and horizontal molding machinery etc. require "point-of-operation" guarding to positively prevent operator access to the danger areas during the material forming or cutting process (ANSI B11.1-1988 through B11.19-1990). All other industrial safety and machine design literature requires effective and positive "point-of-operation" guarding (see, for example, any Edition of the "Accident Prevention Manual for Business and Industry" published by the National Safety Council, starting in the 1950's).

3- In failing to incorporate my "point-of-operation" guarding recommendations (or an alternate guarding design) into the E&R (Besser) concrete block splitting machine design back in the early 90's when the defendants retained me in 1989 to evaluate their design after they had a very similar accident in 1985 on a Model CM-24 block splitting machine. At that time, I formally advised them that the design of their concrete splitting machine was defective and inherently and unreasonably dangerous, had caused the 1985 accident, and would continue to cause accidents and injuries unless they properly guarded the "point-of-operation" of the equipment. I proposed and recommended positive perimeter guarding for the "point-of-operation" block splitter (including the main and side knives) with safety-interlocked observation, inspection and access gates which would allow observation of the "point-of-operation" of the block splitter and safe debris removal while the block splitter was in operation but would not allow operator access to the dangerous area during the splitting operations. The proposed safety-interlocked gates had access openings at the bottom which were big enough to allow safe removal of debris using a scraping tool, but would positively prevent operator's hands or fingers from reaching the danger areas. Thus the operator could not access the danger area without opening an access gate which would automatically stop all knife functions. I had personally designed and successfully used such safety-interlocked guarding for various other industrial machinery which required "point-of-operation" guarding. This design (using safety interlocked operator access gates) would have provided positive operator safety, would not have interfered with the normal machine functions, was both economically and technically feasible and practical, and would not pose any hazards to the operator. I also advised them of alternate guarding designs which could be used. My guarding design (or one of the alternate proposed designs) would have prevented Mr. Jackson's accident and injuries. It is completely incomprehensible to me how a responsible industrial machine manufacturer can continue to manufacture and distribute unsafe industrial equipment which continues to injure operators for well over 20 years after the first accident and after they had received specific recommendations on how they could make their equipment safe and safety standard compliant.

4- In failing to incorporate alternate "point-of-operation" guarding which I described and recommended such as adjustable light curtains which would prevent knife motion if the operator's hand(s) were in the danger area, or safety mats or pads which would limit access to the danger areas, or emergency shut-off bars or cables, and/or a combination of these well-known and widely used "point-of-operation" guarding methods. Any of these guarding methods would have prevented Mr. Jackson's accident and injuries.

5- In failing to provide easily accessible and convenient emergency stop controls around the "point-of-operation" of the CM-24 block splitter allowing the operator to easily and

3

immediately stop or prevent knife motion by operating a local push button, push-pull bar or cable type of emergency control. The only stop controls on the subject block splitter were located on the other side of the machine from Mr. Jackson's position, at the main control panel, and required him to walk around the machine and the conveyor equipment to reach the only stop or emergency control provided on this equipment. A local emergency stop near the "point-of-operation" would have allowed Mr. Jackson to prevent the side knife operation when his glove became accidentally caught, or to stop side knife motion before it crushed his hand.

6- In failing to perform a task oriented Risk Assessment and Risk Reduction or Failure Mode and Effects analysis on the block splitter and its various operating modes and operator functions. Even a cursory human factors and risk analysis by E&H (Besser) when they were originally designing the machine (or at any time after they received notice of the 1985 accident, or after any of the many later accidents which have occurred on the Model CM-24 block splitter), would have revealed the hidden and inherent hazards created by the concrete chunks and debris which are generated during normal operation of this equipment and which has to be removed periodically by hand for proper continued operation of the equipment. Debris removal is part of the normal operating conditions of the equipment and requires a "chunk remover" to work in close proximity to the "point-of-operation" of the machine to frequently clear the debris. It is completely impractical (and certainly is not done in the field) to use LOTO (lock-out tag-out) procedures to accomplish this necessary task. It would certainly be reasonably foreseeable to any competent design engineer that removal of this debris would be performed in the field without shutting down the equipment , and, in fact , that the "chunk remover" would be required to clear debris near and around the "point-of-operation" while the machine was in automatic mode. Working in close proximity to intermittently moving parts creates a special hazard in that the "chunk puller" is performing his cleaning function while the equipment and the knives are stopped and stationary. Thus, although he knows, as did Mr. Jackson, that the side knives represent a danger if they catch and crush the hand, the "normal" debris cleaning operation is performed near the knives but while they are stationary and is completed while they are stationary and thus not perceived as an actual danger at that time. It was certainly reasonably foreseeable to the machine designer and manufacturer that the "chunk puller", while routinely clearing debris from around the unguarded "point-of-operation" (with the dangerous parts mostly stationary during the cycle) would accidentally get caught and/or be unable to "beat the cycle" and thus be injured. If it was not foreseeable to the defendants before the first reported accident in 1985, E&R (Besser) was certainly placed on notice that this was a foreseeable hazard by me in 1989 (and by subsequent accidents) and should have properly guarded the "point-of-operation" as discussed above.

7- In failing to adequately and effectively WARN against the inherent, hidden and unreasonable dangers posed by the unguarded "point-of-operation" of this equipment and to INSTRUCT on its proper and safe use. Although WARNINGS and INSTRUCTIONS cannot substitute for proper safety design, and for this equipment proper "point-of-operation" guarding was both mandated and should have been provided by E&R (Besser), prominent WARNINGS and clear INSTRUCTIONS posted on the equipment near the danger areas, and audible and/or visual warnings just PRIOR to activation of knife motion, would have instructed Mr. Jackson about which specific areas near the "point-of-operation" could be manually cleared, and would have alerted him, BEFORE the side knives activated, about their impending motion. Although such warnings and instructions would not have adequately remedied the defective and inherently dangerous

4

design of the E&R(Besser) block splitter, they would have prevented Mr. Jackson's accident in this case.

In my professional opinion, the improper, inadequate and defective design of the E&R (Besser) Model CM-24 Block Splitter (in failing to provide "point-of-operation" guarding and effective visual and audible warnings) directly caused Mr. Jackson's accident and injuries. Practical, economical (and industry and government mandated) state-of-the-art "point-of-operation" guarding on this equipment would have prevented Mr. Jackson's accident and injuries.

In my professional opinion, Mr. Jackson's actions as "chunk puller" were completely reasonable and reasonably foreseeable by the equipment manufacturer and he in no way contributed to the cause of his accident. He was an innocent victim of the defective and unreasonably dangerous design of the E&R (Besser) Model CM-24 Block Splitter.

Sincerely yours,

Igor Paul

5

I have reviewed, analyzed and considered the following materials and items:

1.    Analysis, photographic and video documentation of the subject block cutter machine and conveyor system.

2.    Depositions:
    a.    David Jackson (5/22/07), including exhibits
    b.    Karry Mackey (5/23/07), including exhibits
    c.    Duane Rondeau (3/21/07), including exhibits
    d.    Ronald E. Neese (2/1/07), including exhibits
    e.    John Stephens (5/23/07), including exhibits

3.    Engineering drawings

4.    Photographs:
    a.    concrete block machine- (7) 8 x 10 color images
    b.    block splitter- (20) color images
    c.    David Jackson's injuries- (22) color images
    d.    Elmer's Little Helper block splitting machine- (19) color images

5.    Pleadings:
    a.    Complaint
    b.    Answer to Complaint
    c.    First Amended Complaint
    d.    Answer of Defendant Karry Mackey to Plaintiff's 1st Amended Complaint
    e.    Plaintiff's 1st Interrogatories to Defendant E&R Manufacturing
    f.    Plaintiff's 1st Request for Production to Defendant E& R Manufacturing
    g.    Plaintiff's 1st Interrogatories and Request for Production to Defendant Karry Mackey
    h.    Defendant E&R Manufacturing's Rule 26(a)(1) Disclosures
    i.    Defendant E& R Manufacturing's Responses to Plaintiff's 1st Request for Production
    j.    Defendant Karry Mackey's Responses to Plaintiff's Interrogatories and Request for Production
    k.    Plaintiff's Answers to Defendant Karry Mackey's 1st Interrogatories
    l.    Defendant Karry Mackey's Responses to Plaintiff's 2nd Interrogatories and Request for Production
    m.    Plaintiff's Answers to Defendant E&R Manufacturing's 1st Interrogatories
    n.    Plaintiff's Answers to Defendant Besser Company's 1st Interrogatories and Request for Production
    o.    Defendant Besser Company's Rule 26(a)(1) Disclosures

6.    First Report of Injury

7.    Standards, Codes, Statutes:
    a.    Essentials of Machine Guardian- OSHA 2227

    b.    ANSI B11.19-1990- Safeguarding when referenced by other B11 machine tool safety standards

    c.    ANSI B11.TR3-2000- Risk Assessment and Risk Reduction- A Guide to Estimate and Reduce Risk Associated with Machine Tools

    d.    OSHA 1910.212- General requirements for all machines

    e.    Standard interpretation- OSHA 1910.147- Lockout/Tagout

    f.    MIOSHA- STD- 1121 (02-08)- Part 23 Hydraulic Power Presses

    g.    MIOSHA- STD- 1101 (1/04)- Part 1 General Provision

    h.    PUB-3000, Sec 5.3, Machine Safeguarding

8.    Technical data:

    a.    Machine invoice and warning label documents

    b.    Besser- Safety bulletin

    c.    Mold Changes and OSHA Lockout/Tagout Requirements

    d.    Applicable technical data related to machine guarding

9.    Video of block splitter inspection

**Igor Paul's Rule 26 Report Enclosure: List of Materials Reviewed**

I have reviewed, analyzed and considered the following materials and items:

1.    Analysis, photographic and video documentation of the subject block cutter machine and conveyor system.

2.    Depositions:
      a.    David Jackson (5/22/07), including exhibits
      b.    Karry Mackey (5/23/07), including exhibits
      c.    Duane Rondeau (3/21/07), including exhibits
      d.    Ronald E. Neese (2/1/07), including exhibits
      e.    John Stephens (5/23/07), including exhibits

3.    Engineering drawings

4.    Photographs:
      a.    concrete block machine- (7) 8 x 10 color images
      b.    block splitter- (20) color images
      c.    David Jackson's injuries- (22) color images
      d.    Elmer's Little Helper block splitting machine- (19) color images

5.    Pleadings:
      a.    Complaint
      b.    Answer to Complaint
      c.    First Amended Complaint
      d.    Answer of Defendant Karry Mackey to Plaintiff's 1st Amended Complaint
      e.    Plaintiff's 1st Interrogatories to Defendant E&R Manufacturing
      f.    Plaintiff's 1st Request for Production to Defendant E& R Manufacturing
      g.    Plaintiff's 1st Interrogatories and Request for Production to Defendant Karry Mackey
      h.    Defendant E&R Manufacturing's Rule 26(a)(1) Disclosures
      i.    Defendant E& R Manufacturing's Responses to Plaintiff's 1st Request for Production
      j.    Defendant Karry Mackey's Responses to Plaintiff's Interrogatories and Request for Production
      k.    Plaintiff's Answers to Defendant Karry Mackey's 1st Interrogatories
      l.    Defendant Karry Mackey's Responses to Plaintiff's 2nd Interrogatories and Request for Production
      m.    Plaintiff's Answers to Defendant E&R Manufacturing's 1st Interrogatories
      n.    Plaintiff's Answers to Defendant Besser Company's 1st Interrogatories and Request for Production
      o.    Defendant Besser Company's Rule 26(a)(1) Disclosures

6.    First Report of Injury

7.    Standards, Codes, Statutes:
      a.    Essentials of Machine Guardian- OSHA 2227
      b.    ANSI B11.19-1990- Safeguarding when referenced by other B11 machine tool safety standards
      c.    ANSI B11.TR3-2000- Risk Assessment and Risk Reduction- A Guide to Estimate and Reduce Risk Associated with Machine Tools
      d.    OSHA 1910.212- General requirements for all machines
      e.    Standard interpretation- OSHA 1910.147- Lockout/Tagout
      f.    MIOSHA- STD- 1121 (02-08)- Part 23 Hydraulic Power Presses
      g.    MIOSHA- STD- 1101 (1/04)- Part 1 General Provision
      h.    PUB-3000, Sec 5.3, Machine Safeguarding
      i.    ANSI B11.1-1988 to B11.19-1990

8.    Technical data:
      a.    Machine invoice and warning label documents
      b.    Besser- Safety bulletin
      c.    Mold Changes and OSHA Lockout/Tagout Requirements
      d.    Applicable technical data related to machine guarding

9.    Video of block splitter inspection

10.   Motions for Summary Judgment and Briefs filed by E&R and Besser

11.   Expert opinions by Van Calhoun

Deposition and Trial Testimony–4/1/03 to 4/1/07

| CASE CAPTION | SUBJECT MATTER | DEPOS. or TRIAL | PLAINTIFF or DEFENDANT |
|---|---|---|---|
| (Note: Some Cases May Have Had Testimony More Than 4 Years Ago) | | | |
| ALDRIDGE V. RECKART EQUIPMT. | Prod. Design: Bark Conveyor Guarding | D | P |
| ALVAREZ V. PNEUMOABEX ET AL | Prod. Design: Hydraulic Press Safety | D | P |
| BEIJAR V. STANLEY TOOLS | Prod.Design: Pneumatic Nailer | D | P |
| BRITT V. DANZINGER ETAL | Prod. Design: Sheetrock Safety | D | D |
| BROOKSHIRE V. HEIL ET AL | Prod.Design: Refuse Compactor | D | P |
| CAGLIOTI V. GRAHAM-FIELD | Prod. Design: Electric Wheelchair | D | P |
| CARDOSA V. BRASS EAGLE ET AL | Prod. Design:Paint Ball Gun | D | P |
| CARIFIO V. BENETTON SPORTS | Prod. Design: Roller Skates | T | P |
| CLARK V. HOBART | Prod. Design: Mixer Guarding | D | P |
| CLARK V. NYS DEPT. CORECTIONS | Prod. Design: Press | T | P |
| COAN V. BRASS EAGLE | Prod. Design: Air Gun (Paint Marker) | D | P |
| COLOMBO V. OMNIMED INC. | Prod. Design: Hospital Cart | T | P |
| DALRYMPLE V. HARRIS ET AL | Prod. Design: Compactor/Baler | D | P |
| DOWNEY V. DELONGHI ETAL | Prod. Design: Space Heater | D | P |
| EVANS V. REPUBLIC ETAL | Prod. Design: Refuse Compactor | D | P |
| FREELAND V. MBM  ETAL | Prod. Design: Trimmer Guarding | D | P |
| FROMETA V. GOULD ETAL | Trauma Biomechanics/Head Injury | D | P |
| FUJII V. GROVE ET AL | Prod. Design: Crane Safety Design | D | P |
| GALINDO V. CHIEF IND. ETAL | Prod. Design: Conveyor Guarding | D | P |
| HUDAK V. DELTA ET AL | Prod. Design: Jointer Guarding | D | P |
| HUGGINS V. KNOWLTON MACHINE | Prod. Design: Textile Roll Guarding | D | P |
| JARAMILLO V. WAL-MART ETAL | Prod. Design: Paint Ball Gun | D | P |
| LASISOMPHONE V. HARTFORD ET AL | Trauma Biomechanics/Fall Over Railing | D | P |
| MEDBURY V. CLARK ETAL | Prod.Design: Forklift | T | P |
| MILES V.  CT. STEEL CORP. | Prod. Design: Cargo Binder | D | P |
| MURPHY V. MITCHELL | Prod. Design: Machine Guarding | D | P |
| MYKROLIS V. PALL CORP. | Patent Infringement: Linkage Design | T | D |
| PASZKOWSKI V. MAXON | Prod. Design: Concrete Handling Equip. | D | P |
| PEOPLE V. UNGER | Trauma Biomechanics/Fall over Railing | T | D |
| PUTNEY V. MAGNUM DIAMOND | Prod. Design: Concrete Saw | D | P |
| RIDDLE V. BIL-JAX | Prod. Design: Man-Lift | D | P |
| RODRIGUEZ V. VARIOUS | Prod. Design: Dough Mixer Safty | T | P |
| ROMERO V. MAGIC CHEF ETAL | Prod. Design: Stove Tipping | D | P |
| SNOW V. PERMOBIL | Prod.Design: Electric Wheelchair | D | P |
| TYLER V. KAWAGUCHI | Prod. Design: Injection Molding Machine | D | P |
| VAN CULIN V. HAINES | Prod. Design: Conveyor Guarding | T | P |

Igor L. Paul

**Igor Paul's Rule 26 Report Enclosure: List of Materials Reviewed**

I have reviewed, analyzed and considered the following materials and items:

1.      Analysis, photographic and video documentation of the subject block cutter machine and conveyor system.

2.      Depositions:
        a.      David Jackson (5/22/07), including exhibits
        b.      Karry Mackey (5/23/07), including exhibits
        c.      Duane Rondeau (3/21/07), including exhibits
        d.      Ronald E. Neese (2/1/07), including exhibits
        e.      John Stephens (5/23/07), including exhibits

3.      Engineering drawings

4.      Photographs:
        a.      concrete block machine- (7) 8 x 10 color images
        b.      block splitter- (20) color images
        c.      David Jackson's injuries- (22) color images
        d.      Elmer's Little Helper block splitting machine- (19) color images

5.      Pleadings:
        a.      Complaint
        b.      Answer to Complaint
        c.      First Amended Complaint
        d.      Answer of Defendant Karry Mackey to Plaintiff's 1st Amended Complaint
        e.      Plaintiff's 1st Interrogatories to Defendant E&R Manufacturing
        f.      Plaintiff's 1st Request for Production to Defendant E& R Manufacturing
        g.      Plaintiff's 1st Interrogatories and Request for Production to Defendant Karry Mackey
        h.      Defendant E&R Manufacturing's Rule 26(a)(1) Disclosures
        i.      Defendant E& R Manufacturing's Responses to Plaintiff's 1st Request for Production
        j.      Defendant Karry Mackey's Responses to Plaintiff's Interrogatories and Request for Production
        k.      Plaintiff's Answers to Defendant Karry Mackey's 1st Interrogatories
        l.      Defendant Karry Mackey's Responses to Plaintiff's 2nd Interrogatories and Request for Production
        m.      Plaintiff's Answers to Defendant E&R Manufacturing's 1st Interrogatories
        n.      Plaintiff's Answers to Defendant Besser Company's 1st Interrogatories and Request for Production
        o.      Defendant Besser Company's Rule 26(a)(1) Disclosures

6.      First Report of Injury

7.    Standards, Codes, Statutes:
    a.    Essentials of Machine Guardian- OSHA 2227
    b.    ANSI B11.19-1990- Safeguarding when referenced by other B11 machine tool safety standards
    c.    ANSI B11.TR3-2000- Risk Assessment and Risk Reduction- A Guide to Estimate and Reduce Risk Associated with Machine Tools
    d.    OSHA 1910.212- General requirements for all machines
    e.    Standard interpretation- OSHA 1910.147- Lockout/Tagout
    f.    MIOSHA- STD- 1121 (02-08)- Part 23 Hydraulic Power Presses
    g.    MIOSHA- STD- 1101 (1/04)- Part 1 General Provision
    h.    PUB-3000, Sec 5.3, Machine Safeguarding
    i.    ANSI B11.1-1988 to B11.19-1990

8.    Technical data:
    a.    Machine invoice and warning label documents
    b.    Besser- Safety bulletin
    c.    Mold Changes and OSHA Lockout/Tagout Requirements
    d.    Applicable technical data related to machine guarding

9.    Video of block splitter inspection

10.    Motions for Summary Judgment and Briefs filed by E&R and Besser

11.    Expert opinions by Van Calhoun

## Publications of IGOR L. PAUL
### January 1, 2007

### Books and Contributions to Books:

1.  *Practical Bio-mechanics for the Orthopedic Surgeon*, Radin, E., Paul, I., Rose, R., John Wiley and Sons, New York, 1978.  Also published in Spanish and Italian Language Editions.

2.  "Optimization", Article in McGraw-Hill *Yearbook of Science and Technology*, Paul, I., McGraw-Hill, 1970.

3.  "Decision Theory", Article in McGraw-Hill *Yearbook of Science and Technology*, Paul, I., McGraw-Hill, 1970 and 1990 Revision

4.  *Proceedings of 8th Annual Northeast Bioengineering Conference*, Paul, I., Editor, Massachusetts Institute of Technology, 1980.

5.  "Osteoarthrosis as a Final Common Pathway, " Radin, E. L., Paul, I. L., and Rose, R. M.,*The Aetiopathogenesis of Osteoarthrosis*, G. Nuki, Editor, Pitman Publishing Co., Ltd., Kent, England, 84-89 (1980).

6.  "Bio-mechanical Aspects of Orthopaedic Implants," Paul, I., Radin, E., and Rose, R., *Proc. Symposium on Perspectives in Biomedical Engineering*, Paul, I., Radin, E., and Rose, R., Glasgow, Scotland, June 1972.

### Papers, Articles, Reports etc

7.  "The Effects of a Radial Thermal Gradient on the Burning of a Solid Propellant Cylinder", Paul, I., *B.S. Thesis*, Department of Mechanical Engineering, M.I.T., May 1960.

8.  "An Investigation of Compact Power Sources for Externally Powered       Prosthetic and Orthopedic Devices", Paul, I., *S.M. Thesis*, Department of Mechanical Engineering, M.I.T., 1961.

9.  "Evaluation of Energy and Power Requirements for Externally Powered Upper-Extremity Prosthetic and Orthopedic Devices", Paul, I.,  ASME Paper No. 62-WA-121, 1962.

10. "Solid Propellant Burning Rate Control Through Mechanical Variation of Heat Transfer from the Combustion Flame", Paul, I., *Sc.D. Thesis,* Department of Mechanical Engineering, M.I.T., June 1964.

11. Contributor to Chapters IV and V: <u>Survey of Technology for High-Speed Ground Transport, Part I,</u> Prepared for the U. S. Department of Commerce by M.I.T., June 1965 (U.S. Clearinghouse No. PB 168 648).

12. "Stress and Strain in Rolling Bodies in Contact", Paul, I. and Nayak, P., Engineering Projects Laboratory, M.I.T., DSR 76109-4, 1966, PB 173 651.

13. "General Vehicle Dynamic Model", Paul, I. and Sankaran, H., Engineering Projects Laboratory, M.I.T., DSR 76109-3, 1966, PB 173 650.

14. "Partial Bibliography on Subjects Related to Active Vehicle Suspensions", Paul, I. and Bender E., Engineering Projects Laboratory, M.I.T., DSR 76109-2, 1966, PB 173 649.

15. "Active Suspensions", Paul, I. and Bender, E., Engineering Projects Laboratory, M.I.T., DSR 76109-1, 1966, PB 173 648.

16. "A New Theory of Rolling Contact", Paul, I. and Nayak, P., Engineering Projects Laboratory, M.I.T., DSR 76109-7, September 1967.

17. "Analysis of Optimum and Preview Control of Active Vehicle Suspensions", Bender, E. and Paul, I., Engineering Projects Laboratory, M.I.T., DSR     76109-6,     1967, PB 176 137.

18. "The Junior Engineering Design Course at M.I.T.", Paul, I. L., <u>Proceedings of     the Fourth National Conference on Engineering Design.</u> Dartmouth College, July 1967.

19. "On the Optimization of Vehicle Suspensions Using Random Process Theory", Paul, I.L., ASME Paper No. 67-TRAN-12, published in <u>Transportation: A Service, Proceedings Joint Conference on Transportation,</u> N.Y. Academy of Sciences, N.Y., 1967.

20. "Some Implications of Non-Stop Inter-Intra-City Transportation", Paul, I., <u>Proceedings of the 1966 National Transportation Symposium,</u> ASME, N.Y., 1967.

21. "Effects of Surface Roughness on Creep Rates in Rolling Metal Wheels", Paul, I. and Nayak, P., <u>Proceedings of First International Conference on Vehicle Mechanics,</u> Wayne State University, July 16-18, 1968.

22. "Factors Influencing Articular Cartilage Wear in Vitro", Radin, E. L., Seann, D. L., Paul, I. L., McGrath, P. J., and Myttas, N., <u>J. Arth. Rheum.,</u> 1968

23. Contributor to: *"Summer Study on the Management of Solid Wastes, Volumes I and II"*, Wilson, D. et al, Mechanical Engineering Department, M.I.T., September, 1968.

24. "Design and Computer Simulation of A Near-Optimum Active Vibration Isolation System", Paul, I., Proceedings of the Transportation Sessions (Process Industries Division), 1968 Winter Annual Meeting, ASME, N.Y.,    1969.

25. "Review of Prospects for Automating Urban Solid-Waste Collection", Paul, I., and Wilson, D., ASME Paper No. 69-WA/PID-21, 1969.

26. "Technical and Cost-Effectiveness Considerations Of At-Speed Passenger Transfer", Paul, I., Proceedings of the Transportation Sessions (Process Industries Division ), 1968 Winter Annual Meeting, ASME, N.Y., 1969.

27. "Quadruple-Mode Automated  Transport", Wilson, D., Clarkson, J., Paul, I., and Bisbee, E., Proceedings of the Transportation Sessions (Process Industries Division), 1969 Winter Annual Meeting, ASME, N.Y., 1969.

28. "Simulation of a Hydraulic Active Suspension System" Paul, I.,ASME Vibrations Conference, March 30, 1969, Philadelphia, PA.

29. "Active Roll and Pitch Control", Paul, I. and Carter, J., Engineering Projects Laboratory, M.I.T., DSR 76109-9, 1969.

30. "Design and Computer Simulation of a Near-Optimum Active Vibration Isolation System", Paul, I. and Fenoglio, R., Engineering Projects Laboratory, M.I.T., DSR 76109-8, 1969.

31. "Failure of Synovial Fluid to Cushion", Radin, E., and Paul, I., Nature, 222:999, 1969

32. "Current Comment: Joint Function", Radin, E., and Paul, I., J.Arth. and Rheum., 13: 276-279, 1970.

33. "Subchondral Bone Changes in Patients with Early Degenerative Joint Disease", Radin, E., Paul, I., and Tolkoff, M., Arth. and Rheum. 13: 400, 1970.

34. "Does Cartilage Compliance Reduce Skeletal Impact  Loads? The Relative Force  Attenuating  Properties  of  Articular  Cartilage,  Synovial  Fluid, Peri-Articular Soft Tissue and Bone", Radin, E., and Paul, I., J.Arth. and Rheum., 13:139-144, 1970.

35. "A Comparison of The Force Transmitting  Properties of Subchondral Bone and Articular Cartilage", Radin, E., Paul, I., and Lowy, M., J. Bone and Joint Surg., 52A: 444, 456, 1970.

36. "Animal Joint Behavior Under Excessive Loading", Radin, E., Paul, I., and Pollock, D., Nature, 226:554, 1970.

37. "Design of an Automated Residential Refuse Collection Vehicle", Paul, I., Nicholson, R., Engineering Projects Laboratory, M.I.T., DSR 76109-12, 1970.

38. "Creep and Vibration in Rolling Contact", Paul, I. and Ramakrishnan, P., Engineering Projects Laboratory, M.I.T., DSR 76109-11, 1970.

39. "Creep and Adhesion in Rolling Contact", Paul, Il and Urcioli, J., Engineering Projects Laboratory, M.I.T., DSR 76109-10, 1970.

40. "Experimental Investigation of Rolling Contact Phenomena", Paul, I., Dagalakis, N., Urcioli, J., Ramakrishnan, P., McDougall, J., Engineering Projects Laboratory, M.I.T., DSR 76109-13, 1971.

41. "The Pattern of Degenerative Arthritis: Preferential Involvement of Distal Finger Joints", Radin, E., Parker, H., and Paul, I., The Lancet I: 377-379, 1971.

42. "Joint Lubrication with Artificial Lubricants", Radin, E., Paul, I., Weisser, P., J.Arth. and Rheum., 14: 126-129, 1971.

43. "The Lubrication of Synovial Membrane", Radin, E. and Paul, I., Swann, D. and Schottstaed, E., Annals of Rheum. Dis. 30: 322-325, 1971.

44. "The Response of Joints to Impact Loading: I. In Vitro" , Radin, E., and Paul, I., J. Arth. and Rheum. 14: 356-362, 1971.

45. "Importance of Bone in Sparing Articular Cartilage From Impact", Radin, E. and Paul, I., Clin. Orthop. & Rel. Res. 78: 340-344, 1971.

46. "A Study of Innovative Transportation for New Communities in Puerto Rico", Beinart, J., Fiorenzoli, G., Lawson, J., Loebl, S., Paul, I., and Wilson, D., Final Report to the Puerto Rico Planning Board, Urban Systems Laboratory, M.I.T., April, 1971.

47. "Introduction to Engineering Systems" class notes on a number of topics including "Scope and Function of Engineering Activities"; "Experiment Planning and Execution"; "Materials Sciences"; "Thermal and Fluid Sciences"; "Friction, Lubrication and Wear"; "Systems and Design"; "Instrumentation and Measurement"; "Hazard Analysis", 1964-1972

48. "Consolidated Concepts of Joint Lubrication", Radin, E. and Paul, I., J. Bone and Joint Surgery, 54-A, No. 3, April 1972

49. "The Response of Joints to Impact Loading: II. *In Vivo* Wear", Simon, S., Radin, E., and Paul, I., J. Biomech. 5, 267-272 (1972)

50. "Factors Influencing Articular Cartilage Wear in Vitro", Radin, E. L., Seann, D. L., Paul, I. L., McGrath, P. J., and Myttas, N. , J.Arth. Rheum., 15:84-87, 1972

51. "The Lubrication of Artificial Hip Joints", Weightman, B., Simon, S., Paul, I., Rose, R., and Radin, E.,J. Lubric. Tech. 94, No.2,131 (1972)

52. "Environmental Fatigue Testing of Silastic Finger Joint Prostheses", Weightman, B., Simon, S., Paul, I., Rose, R., and Radin, E., J. Biomed. Mats. Res. No.3, 6, 15 (1972)

53. "Biomechanical Aspects of Orthopedic Implants", Paul, I., Radin, E., L., Invited Paper, Biomedical Engineering Conference, University of Strathclyde, June 1972.

54. "Hypothesis: Role of Mechanical Factors in the Pathogenesis of Primary Osteoarthritis," Radin, E., Paul, I., and Rose, R.,The Lancet, 1, 519-522 (1972).

55. "A Comparative Study of Total Hip Replacement Prostheses," Weightman, B., Paul, I., Rose, R., Simon, S., and Radin, E.,J. Biomech. 6, 299-311 (1973).

56. "Response of Joints to Impact Loading: III *Relationship Between Trabecular Microfractures and Cartilage Degeneration*," Radin, E., Parker, H., Pugh, J., Steinberg, R., Paul, I., and Rose, R., J. Biomech. 6, 51-57 (1973).

57. "Biomechanical Aspects of Orthopaedic Implants", Paul, I. L., Radin, E. L., and Rose, R. M., Proc. Symp. on Perspectives in Biomed. Eng., London: MacMillan, 1973, pp. 95-102.

58. "An Analytical Model for Wear Applied to the Design of Total Hip Prostheses", Weightman, B. and Paul, I., Wear, Vol. 24, 1973, pp.229-234.

59. "Repairing the Human Skeleton: *Materials for Orthopaedics*," Rose, R., Radin, E., and Paul, I., Technology Review, March/April 1974.

60. "Wear and Loosening of Total Joint Replacements," Radin, E., Paul, I., Rose, R., Schiller, A., and Nusbaum, H.,Acta Orthop. Belg. 40, 831-835 (1974).

61. "Standardization of Orthopaedic Implants in the United States of America," Radin, E., Paul, I., and Rose, R.,Acta Orthop. Belg. 40, 893-897 (1974).

62. "Organization and Mechanical Properties of the Trabecular Bone of the Human Patella," Townsend, P. R., Raux, P., Paul, I. L., Miegel, R. E., Rose, R. M., and Radin, E. L., Orthopaedic Research Society Annual Meeting,1974.

63. "Mechanical Factors in the Aetiology of Osteoarthrosis, " Radin, E. L., Paul, I. and Rose, R. M.,Ann. Rheum. Dis.. 34, Supplement, 132-133 (1975).

64. "The Mechanics of Joints as It Relates to Their Degeneration," Radin, E. L., Paul, I. L., Rose, R. M. and Simon, S. R.,Amer. Acad. of Orthop. Surg. Symp. on Osteoarthritis, 34-43, C. V. Mosby, St. Louis, Mo (1976).

65. "Ultra-High Molecular Weight  Polyethylene as Used in Articular Prostheses", Crugnola, A., Paul, I., Radin, E., and Rose, R., J. Applied Polymer Science 20:809, 1976.

66. "Stiction-Friction of Total Hip Prostheses", Simon, S., Paul, I., Radin, E., Rose, R., J. of Bone and Joint Surg., 57A, 216-230, 1976.

67. "The Mechanics of Joints as it Refers to Their  Degenaration", Radin, E., Paul, I., Rose, R., AAOS  Symposium on Osteoarthritis, pg. 34-43, 1977.

68. "Current Concepts of The Etiology of  Idiopathic Osteoarthrosis", Radin, E., Paul, I. L., and Rose, R. M., Bull. Hosp. Jt. Dis. 38:117-19, 1977.

69. "Effect of Repetitive Impulsive Loading on the Knee Joints of Rabbits" Radin, E.L., Ehrlich, M. G., Chernack, R., Abernethy, P., Paul, I. L., and Rose, R. M., Clin. Orthop.. 131:288-93, 1978.

70. "Musculo-Skeletal Shock Absorption:   *Relative Contribution of Bone and Soft Tissue At Various Frequencies*", Paul, I. L., Munro, M., Abernethy, P., Simon, S. R., and Radin, E. L., J. Biomech. 11: 237-40, 1978.

71. "The Role of Bone Changes in The Degeneration of Articular Cartilage in Osteoarthrosis", Radin, Eric L., Abernethy, Peter J., Paul, I.L., and Rose, R.,M., Acta Orthop. Belg., 44: 55-64, 1978.

72. "A Method for the Quantitative Recovery of Polyethylene Wear Debris From the Simulated Service of Total Joint Prosthesis,"  Rose, R. M., Schneider,H. Ries, M., Paul, I., Crugnola, A., Simon, S. R., and Radin, E., Wear, Vol. 51, No. 1, 77-84 (1978).

73. "Wear  Mechanisms for Ultrahigh Molecular Weight Polyethylene in the Total Hip Prosthesis," Rose, R. M., Nusbaum, H. J., Paul, I., Crugnola, A., and Radin, E. L., J. of Appl. Polymer Sci.. 23, 777-789 (1979).

74. "On the Origins of High *In Vivo* Wear Rates in Polyethylene Components ofTotal Joint Prostheses," Rose, R. M., Crugnola, A., Ries, M., Cimino, W., Paul, I., and Radin, E. L., Clinical Orthopaedics and Related Research, 277-296 (1979).

75. "Peak Dynamic Force in Human Gait", Simon, S. R., Paul, I. L., Mansour, J., Munro, M. Abernethy, P. J., and Radin, E. L., Clin. Orthop.,132:241-58, 1979

76. "On the True Wear Rate of Ultrahigh Molecular Weight Polyethylene in the Total Hip Prosthesis," Rose, R. M., Nusbaum, H. J., Schneider, H.,      Ries, M., Paul, I., Crugnola, A., Simon, S. R., and Radin, E. L., J. of Bone and Jt. Surg., Vol 62-A, No. 4, 537-549 (1980).

77. "Effect of Prolonged Walking on Concrete on Joints of Sheep", Radin, E. L., Kelman, J. L., Eyre, D. R., and Paul, I. L. et al, Proceeding of Eighth Annual Northeast Bioengineering Conference, Massachusetts Institute of Technology, March 27-28, 1980.

78. "Femoral Component Loosening After Total Hip Replacement," Radin, E. L., Rubin, C. T., Lanyon, L. E., Thrasher, E. L., Crugnola, A. M., Schiller, A. S., Paul, I. L., and Rose, R. M., Proceedings of 8th Annual Northeast Bioengineering Conference at MIT, March 1980.

79. "In Vivo Strain Measurements from Bone and Prosthesis Following Total Hip Replacement," Lanyon, L. E., Paul, I. L., Rubin, C. T., Thrasher, E. L.,     DeLaura, R., Rose, R. M. and Radin, E. L., J. Bone and Jt. Surg., 63-A, 989-1001, July 1981.

80. "Effects of Prolonged Walking on Concrete on Joints of Sheep," Radin, E.L., Eyre, D.R., Orr, R.B.,Kelman, J.L., Paul, I.L., and Rose, R.M., J. Bio-mechanics, 15, 487-492 (1982)

81. "Changes in the Bone-Cement Interface After Total Hip Replacement, An InVivo Animal Study," Radin, E. L., Rubin, C. T., Thrasher, E. L., Lanyon, L. E., Crugnola, A. M., Schiller, A. S., Paul, I. L., and Rose, R. M., J. Bone and Jt. Surg., 64-A, No. 8, 1188-1200, October 1982.

82. "Engineering Design" notes on: "Decision Theory and Optimization", "Shaft Design", "Warnings and Instructions for Product Design", "Products Liability for the Engineer", "Guarding of Machines","Sketching for the Engineer", "Hydraulic Systems and Control", "Pneumatic Systems and Control", "Hazard Analysis", "Micro-Processor Control in Industrial and Consumer Products", Paul, I.,1978-1996

83. "Mechanical Resonance Spectra in Human Cancellous Bone," Pugh, J.W., Rose, R.M., Paul, I.L., and Radin, E.L. Science, 181, 271-272 (1983).

84. "On The True Wear Rate of Ultrahigh Molecular Weight Polyethylene in The Total Knee Prosthesis", Rose, R. M., Ries, M. D., Paul, I. L., Crugnola A. M., and Ellis, E., J. of Biomed. Materials Research, Vol. 18, 207-224, 1984.

85.    "The Behavior of the Patella Under Impact Loads:  The Biomechanics of Its Bony and Chondral Fracture Patterns," Raux, P. R., Rose, R. M., Paul, I.,Townsend, P. R., and Radin, E. L., <u>Annual IRCOBI Conf., Lyon, France,</u>1984.

86.    "An Analytical and Experimental Program to Develop Algorithms for Mobile Manipulators," Dubowsky, S., Paul, I., West, H., <u>Proc. of RoManSy 88,</u> Udine, Italy, 1988.

87.    "The Design and Implementation of a Laboratory Test Bed for Space Robotics: The VES Mod II", Dubowski, S., Durfee, W., Kuklinski, A., Mueller, U., Paul, I., <u>Proc. of 23rd ASME Mechanisms Conf.,</u> Minneapolis,        1994