IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID JACKSON,

   PLAINTIFF,

VS.

E & R MANUFACTURING CO., INC., and
BESSER COMPANY, et al.,

   DEFENDANTS.

)
)
)
)
)
)
)
)
)
)

RECEIVED

2007 AUG 21 P 4: 44

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

CIVIL ACTION NO.:
2:06 CV0412-~~DRB~~
WHA

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT BESSER COMPANY'S MOTION FOR SUMMARY JUDGMENT

This case arises out of an on the job accident on December 17, 2004, at the Block USA Plant in Andalusia, Alabama, when the Plaintiff, David Jackson's, hand became caught in an unguarded concrete block splitter machine. The concreted block splitter machine was manufactured and distributed by Defendants E&R Manufacturing Company and Besser Company. As a result of this accident, Plaintiff Jackson has required multiple surgeries, has suffered the amputation of three fingers on his dominant right hand, has lost most of the use of his right hand, and has otherwise been severely and permanently injured. (See attached photographs of Plaintiff's injuries, Exhibit 1)

## FACTS

On and prior to December 17, 2004, Plaintiff David Jackson was an employee of Able Body Labor, which is a temporary employment company, located in Defuniak Springs, Florida. Jackson was assigned to the Block USA plant in Andalusia, Alabama. Block USA is a concrete block manufacturing that manufactures a variety of concrete block products. Several of the block products initially formed and made together as a unit and then split into

1

separate blocks by a concrete block splitter machine. (See attached Exhibit 2; See also the attached video, Exhibit 3) The blocks are split by a concrete block splitter machine manufactured and distributed by Defendants E&R Manufacturing Company ("E&R") and Besser Company ("Besser"). (Exhibit 4, Deposition of Duane Rondeau, 199: 20-24)

The blocks are conveyed into the splitter on a cycle, and four (4) knives simultaneously cut into the block at a designated area at the predetermined cycle interval. The splitter can be adjusted to cycle anywhere from every three (3) or four (4) seconds, to at least every ten (10) seconds. (Exhibit 5, Deposition of Ronald Neese, 8:6-9) The knives do not actually cut a block completely; rather they crack the blocks into separate block products. The cracked blocks are known as rough face blocks and have a rough textured appearance. (Exhibit 6, Deposition of John Stephens, 21: 1-6) Attached hereto is a video produced by Karry Mackey, the Block USA plant manager, which accurately presents the splitter machine, its cycle, and how blocks are split.[1] In the video footage, the splitter machine cycles approximately every ten (10) seconds, and a Block USA worker can be seen pulling chunks and clearing debris from the subject machine by hand between cycles.

One of the concrete block products is known as an eight-inch Pro Diamond Tan beveled retaining wall block. (See attached Exhibit 7) (Stephens 24: 11-14) This block is a honeycomb shape. These bevel blocks require a specific knife attachment on the splitter which has two knives configured so as to cut a wedge, known as a "chunk" out of the block. (Stephens, 24: 15-20) When these beveled blocks are split with the two edged knives, pieces of broken block debris and the "chunk" is split out of the block. (Stephens, 30: 1-2;

---

[1] Mackey was a defendant at the time and this video was part of his rule 26 disclosures. A review of the video clearly establishes that there is ample time between cycles to clear the debris, and that the knives present no danger to a worker between cycles.

See also Exhibit 7)  The debris and chunk sometimes falls down beside the knives, and sometimes does not fall out of the gap between the two edged knives. (Stephens, 30: 3-19) As a result of each cycle, however, smaller pieces of concrete are broken off of the blocks as they are split, and can get "stuck" in the area of the knives.  (Exhibit 8, Deposition of Karry Mackey, 67: 17-22; Exhibit 9, Deposition of David Jackson, 148:4-6)  The chunk, and any associated concrete debris, must be removed between each cycle, and before the next block is conveyed into the cutting heads.  (Jackson12: 18-23; 18:1-2; Neese: 44:2-13)  The debris cannot be left in the knives before the next block is conveyed into the splitter and split. Importantly, if the debris and chunk is not removed before the next cycle, the smaller debris and chunk "gets crushed and messes up the next block", or may block the splitter feed. (Stephens 31: 1-4; Neese 44:1-8)  If a block is cracked irregularly in an undesirable manner as a result of the chunk and debris, the damaged block is wasted, and must be thrown away. (Jackson, 17:18-23; 18:1-2)  As a result, the entire production is delayed, and production could be compromised.

Some amount of debris is created each time the splitter cycles, and a chunk must be manually removed "about half the time".  (Stephens 30:13-15; Jackson 148:4-6) Therefore, a worker, known as a "chunk puller" must be constantly stationed at the block splitter in order to remove the chunks and debris as the machine cycles in order to maintain production levels. (Stephens, 42: 18-23; 43: 1-10)  The chunk puller is supposed to be looking at the knives to determine if any debris is created by the knives that must be removed. (Stephens 43:1-10)  When clearing the debris, the chunk puller must have his hands near the knives. (Mackey, 53: 13-21; 60: 6-11; Jackson 16:3-22; See also attached video Exhibit 3)  The chunk puller is stationed at the discharge side of the knives in order to pull the split blocks

through the knives and then clear any debris between cycles. (Jackson, 18:3-9; Neese, 128: 1-7; See video, Exhibit 3)  The chunk puller cannot reach the control panel or stop button from where he must stand. (Mackey 31: 8-15)  There is no stop button at the area where the chunk puller stands on the model CM 24 block splitter, however Defendants Besser and E&R manufacture other block splitters and products with stop buttons where the operator is expected to stand. (Neese, 13: 5-18; Deposition of Duane Rondeau, 165: 16-25; 166: 1-21) During production there is no worker stationed at the control panel where the only shut off switch on the splitter is located. (Stephens 40: 11-21; , 43:18-23; 44:1; Neese, 127:8-10)

Importantly, the splitter can be set to cycle from every four (4) seconds to ten (10) seconds or so. (Neese 8: 6-9)  When the splitter cycles the knives engage the block long enough to crack the blocks, then retract for up to ten (10) seconds or longer to allow the split block to be removed, the next block to be conveyed into the heads. (See attached video, Exhibit 3)  The chunks and the debris that results from a cycle must be cleared between cycles, i.e. after the knives retract, and before they engage again.  (Jackson 41:4-10)  There is enough time to clear debris between cycles  (Jackson, 17:15-17; See attached video, Exhibit 3)  Also, Stephens explained that a chunk puller develops a routine of pulling the block out, and then clearing the knives of the debris in a production line pace. (Stephens 49:18-23; 50:1-18) John Stephens explained that it is quicker and easier to use your hand to clear the debris when the production is going. (Stephens 50:1-18; 82:16-20) Stephens also explained that when the puller gets into a pace, it does not surprise him that a worker clears the debris with his hand, because its reflexive, and its faster to use their hand. (Stephens, 50:1-23; 51: 1-23; 52: 1-16)

4

Block USA employees get bonuses at the end of each year based on the number of blocks they produce. (Mackey, 33: 1-19) Therefore it is a goal at Block USA to keep he machines running. (Mackey, 31:19-22; 32:1-17) The quicker a chunk puller can clear any debris or unjam the splitter, the better so as to maintain production and achieve bonus levels. (Mackey 31: 19-23; 32: 1-3; Jackson, 23:14-19) Jackson testified that if you turn the machines off Mackey will go irate on you. (Jackson, 23:14-19)

Jackson was trained by John Stephens how to clear the debris from the machine. (Jackson, 15:14-23; 16:1-22) Jackson was not trained how to operate the machine or how to start and stop the machine, as that was John Stephens' job (Jackson, 27: 5-10; 35:18-19) Jackson did not know how to operate the control panel. (Jackson 35: 2-19) Jackson was trained to clear debris with his hands, without shutting the splitter off, to maintain production. (Jackson, 16: 3-22) Jackson was never given any pipe or rod to clear debris. (Jackson 36: 9-15) Jackson was shown by John Stephens to "stick your hand up in there" [indicating into the point of operation] between cycles and pull the debris out. (Jackson 16: 3-22) "John showed me how to clean the machine out and I cleaned it he same way he did…after the cycle runs and the block split, you reach up in there, and pull the block out, help it come out, and you reach in here and clean it, clean the side knives out with your hand and pull the chips out. (Jackson 41:2-10)[2] Jackson had cleaned the splitter machine heads in the manner in which Stephens trained him off and on for two and a half months without injury or reprimand prior to his injury. (Jackson 17:14-17) Jackson also saw his co-workers clear the debris in the same manner he was trained, and as he did. (Jackson, 59:9-21) Jackson learned that he could not shut the machine down to reach in and clear the debris

---

[2] The attached video, Exhibit 3, clearly shows a worker clearing debris and pulling chunks using his hand between cycles without shutting the machine off.

because that would reduce production, and Karry Mackey would "go irate" about the production stopping. (Jackson, 23:16-19)  Since Jackson worked for Able Body Labor, he was known as a "Rental Employee". (Mackey, 19:5-6)  Rental employees were not included in the Block USA safety meetings. (Jackson, 91:3-8; Stephens 89: 7-10; 106:17-22)

While Jackson worked at Block USA there were no other accidents involving the block splitter, and no other worker was injured. (Jackson, 59:9-12)  There is no evidence that anyone that has ever been reprimanded at Block USA for using their hands to clear debris. (Stephens 58:17-200  Prior to Jackson's injuries, the plant manager, Karry Mackey lost three fingers while clearing debris between cycles.  When Jackson started at Block USA Mackey showed Jackson his fingers and told Jackson to be careful when he was clearing debris between cycles. (Mackey, 19:5-16)  Mackey explained his injury happened when he was not looking at what he was doing, but was looking away from the machine and the knives and Mackey placed his hand in the knives during a cycle, instead of between cycles. (Mackey, 83: 14-20)[3]  Regardless, Jackson was trained by Stephens to clear debris between cycles of the machine, and Karry Mackey testified he knew workers hands must be near the knives when clearing debris between cycles. (Mackey, 53:18-21; Jackson, 16:3-22)

Disputed testimony suggests some workers use a piece of pipe to knock debris out of the knives.  However, Jackson was never trained or told about a pipe. (Jackson 36: 9-17)  Rather Jackson was trained to clear debris by hand between cycles without shutting the machine off to maintain production. (Jackson, 16:3-22; 41:2-20)  Mackey was not using any tool or pipe when he cleared debris because, according to John Stephens who trained

---

[3] Mr. Mackey is from Michigan, knows the Besser family, and received education from the Besser concrete school, and therefore has loyalties to Besser, and wouldn't want to hurt them (Mackey 94: 16-21; 96: 1-2)

Jackson, it was up to the chunk puller to use his hands. (Stephens 74:1-6) Sometime after Jackson's accident on December 17, 2004, another worker pulling chunks suffered injuries when her fingers were trapped in the knives while she was clearing debris between cycles like Jackson and Mackey. (Stephens, 73:4-23)

Prior to his accident Jackson was not aware that he was at any risk of being injured when clearing debris between cycles. Jackson testified he felt he was safe in clearing debris as he was trained to do, and in the same way as he had seen co-workers clear debris. (Jackson, 16:3-22; 41: 2-20; 59: 13-16; 150: 17-21) He felt he was as safe clearing debris as any other job. (Jackson, 112: 20-22) Jackson testified getting hurt never crossed his mind:

> **A.    Well, it never crossed my mind because it hadn't happened before, I mean, as far as getting hurt.  I mean, it really didn't cross my mind.**
> (Jackson, 45: 19-22)

Jackson explained, **"I mean, I didn't feel like I was going to get hurt or nothing like that."**(Jackson 150:17-21)

Jackson was never aware, and there is no evidence to suggest that anyone could have anticipated, that his hand could become caught on a bolt, or that he would not be able to retract his hand from the knives when clearing debris between cycles as he was trained to do.

On December 17, 2004, David Jackson was clearing debris from the subject splitter machine near the splitter knives as he was trained to do. When Jackson reached in to clear debris and pull a chunk, however, without notice, as he was removing his hand before the next cycle of the knives, his glove got hung on a bolt and Jackson could not withdraw his hand.

"So when I was reaching in there to get this debris out, there was a piece hung up in there. And I was trying to get it out so that knife could come over. And as I was coming out, the corner of my glove got caught on the daggum bolt and side knife right there together, and that's how my hand got hung up in there to begin with." (Jackson 51:7-14)

Jackson did not place his hand in the knives as they cycled like Mackey did. Jackson testified that when he reached into the machine, the knives were not running. **"[W]hen I stuck my hand into the machine, it wasn't operating." (Jackson 152:3-7, 154:16-20)** When he realized his glove was stuck Jackson tried but could not get his hand out of his glove before the knives cycled again. Jackson was beyond the reach of the only stop button on the machine, and could not therefore stop the machine before the next cycle. (Mackey, 31:8-15; Neese, 13:5-18) When the machine cycled, Jackson suffered severe and permanent injuries to his fingers and hand, which ultimately required multiple surgeries and the amputation of three of his fingers on his dominant hand. (See attached photos, Exhibit 1.)

The subject splitter was manufactured by E&R and sold by Besser to Block USA in 1997. It was originally designed in 1957 and has remained unchanged since. (Neese:107:7-9) It has an open head design, and one of the stated reasons for leaving the splitting knife area open and unguarded is so that the operator can maintain access to the knives to clear the debris that's created. (Neese: 108:10-21)

There are no instructions that come with the splitter machine to tell a splitter operator, or a chunk puller, how to clear the debris or chunks, or how to clear a jam. (Mackey 29:12-20) Regardless, Jackson never was provided with any manual. He was trained by John Stephens to clear debris by hand between cycles. (Jackson, 16:3-22) There

is no tool that comes with the machine to clear debris, yet the debris must be cleared. (Mackey, 29:1-4; Stephens, 37:3-6)

Approximately 5000 –6000 blocks are split each day at the Block USA Andalusia plant (Mackey, 29:1-4; Stephens, 37:3-6) A chunk puller must stand at the knives to watch for debris for each block in order to maintain production. (Stephens, 42:18-23; 43: 1-10; Jackson, 12:18-23)

### E&R

The subject splitter was designed and manufactured by Defendant E&R Manufacturing Company. The subject splitter was manufactured in 1997, however the knife and splitter head configuration was originally designed in approximately 1957. (Neese: 107:7-9) There have been little or no changes to the design of the splitter since 1957. (Neese: 107:7-9) The splitter is designed with no guarding around the point of operation where the splitter knives are located. (See Exhibit 2) At least one specific reason E&R intentionally designed the knives in an open fashion was to allow workers to access the knives and point of operation to clear debris. (Neese, 108:10-21) It is undisputed by E&R that debris will be created when a block is split, and the debris must be removed before the next block is cycled into the knives and split so as to allow it to be properly split.

> Q.     Does that chip have to be removed from that area?
> A.     Yes, it does.
> Q.     Is that one of the reasons that you have described it's foreseeable that an operator may get in there to get that chip out?
> A.     Right.
> Q.     You expected that at E&R, or you foresee that may happen?
> A.     Right.
> (Neese 44: 12-17)

E&R knows, and has known since at least the 1980's, that workers reach into the knives to clear debris by hand between cycles without shutting the machine off. (Neese, 152:23-25; 153:1-25) At one point E&R admitted knowing since 1954 workers may reach into the knives to clear debris. (Neese 38:10-16) E&R knows that in real world applications the machine cannot be shut off between every cycle because production levels, and thereby profits, will be compromised. (Neese, 58:14-25; 59:1-2; 42:9-15) E&R actually testified that they intended that workers clear debris between cycles so that production does not stop:

> Q.    Okay. In the real work what happens is we see workers like we see in Exhibits 6 and 7 get that debris out so the production doesn't stop; is that right?
> A.    That's right.
> Q.    *That's what E&R intends to happen; right?*
> A.    *Right.*

(Neese, 58:14-25; 59:1-2)

At the time of his accident Jackson was clearing debris in the manner that was both foreseeable and intended by E&R.

In approximately 1986 Both E&R and Besser were sued by a worker in Massachusetts when he suffered multiple finger amputations while clearing debris on a model CM24 E&R block splitter. (Neese 36:3-8; See documentation of Raymond Domenici accident, Exhibit 10) As a result of that accident and lawsuit, Dr. Igor Paul an engineer with MIT evaluated the subject model CM24 block splitter, and made findings and recommendations as to the design and guards on the splitter. (Neese, 36:3-8; See also affidavit and Rule 26 disclosures from Dr. Igor Paul, attached hereto as Exhibit 11) Dr. Paul recommended a sliding door guarding system to Defendants. (Neese 36:3-8) The guards designed by the MIT engineer included sliding guard doors that would allow the block to be split when the machine cycled, and would open to allow the block out and debris to be cleared between cycles. (Neese 40: 9-14) Dr. Paul's design would have prevented David

10

Jackson's accident. (See Paul Affidavit Exhibit 11) E&R never implemented the design given to them by the MIT engineer because Ron Neese opined, "the doors presented a bigger hazard than what's -- what already exists." (Neese 40:9-19) Dr. Paul's design does not create any additional hazard, is feasible, and would protect the worker. (Paul Affidavit 11) Even Besser's corporate representative agreed that the gate system described by Dr. Paul would not impede the function of the machine. (Rondeau 102: 6-25; 103: 1-25) Neese is not a graduate engineer, and E&R has never had any engineer employed at E&R. (Neese, 28: 24-25) E&R has never asked any other engineer or safety consultant to inspect or review their splitters to determine if they could be designed safer, or to determine if they even comply with applicable safety standards. E&R has no idea whether their machines comply with OSHA, ANSI or any other safety promulgating entity. (Neese, 30:5-25; 31:1) E&R does not intend to have any hazard analysis performed or to determine if their products comply with OSHA or ANSI, or to assess the safety of their design. (Neese, 95:16-20)

As a result of the lawsuit in 1986, according to Neese, E&R undertook to provide barrier guards for the splitter machine in 1988 or 1989 to comply with OSHA. E&R retrofitted machines in 1990-91 to place warning stickers and "barrier guards" at the point of operation above the knives. (Neese 34:18-24) The "barrier guard" referred to by Neese is a rubber plate placed on the splitter with a hinge and offers no protection against side entrapment by a worker clearing debris between cycles. (See Ex.2)

In addition to guards designed by Dr. Paul, since 1986 E&R has considered the use of light curtains and temperature sensors to detect when a workers arm may be trapped in the point of operation and prevent the machine from cycling, however has never placed any of these sensors on the splitters. (Neese, 45:15-16; 46:6-8) E&R has also considered adding

11

a stop button within reach of a worker clearing debris at the discharge side of the knives. However E&R has not implemented these available safety devices. (Neese, 140: 8-22) If stop buttons had been installed on the machine where the puller stands, it would have been easier for a puller to clear the debris and would not have had to walk around the control panel. (Stephens 77:2-8) E&R offers a model CM-40 GFM that has guarding all around the heads different than on the subject model CM-24. (See Exhibit 13)

Since 1986, Defendants have documented 9 accidents involving hand injuries and amputations suffered workers clearing debris on their splitter machines. (See attached Exhibit 10) There is no warning on the splitter that warns against clearing debris between cycles or that properly identifies the hazard of hand entrapment (See Exhibit 2; Rondeau 183:12-22). There is an ambiguous warning sign on the heads of the splitter that reads "Keep Hands Clear." Plaintiff Jackson understood and interpreted this to mean to keep his hands clear when the machine cycles, since he was trained to clear debris between cycles. (Jackson, 32: 4-23; 33: 1-10; 154: 1-20) Defendants know the warnings do not comply with ANSI warning standards, and that they are inadequate because they "do not identify the hazard." (Neese: 158:5-15; Rondeau, 183:12-22; 85:7-24)

### Besser

The subject machine was sold as a Besser block splitter, and shipped from E&R to block USA. (Deposition of Duane Rondeau, 199: 20-24) Besser does not perform any hazard analysis on E&R splitter machines or any product Besser does not design. (Rondeau 18:9-18; 156: 19-25) Besser has maintained an accident database that identifies accidents and amputation injuries to workers operating their block splitter machines to assist in their hazard analysis of splitter machines. (Rondeau, 19: 2-24) Besser relies on their accident

database as a means to identify hazards associated with the operation of the block splitters, and to make sure the products they sell are safe. (Rondeau 19: 2-24)  Duane Rondeau, on behalf of Besser, explained the reason he maintains an accident database is learn from accidents, and to prevent future accidents. (Rondeau, 95: 18-25)  Besser does not know whether E&R was ever told of the number of documented accidents on E&R splitter machines between 1986 and Jackson's accident. (Rondeau, 20:5-25; 21:1-4)

Besser keeps up with all foreseeable uses and misuses of the splitter machines in order to know what typically happens in a plant. (Rondeau, 30:4-10)  And Besser knows that debris is created when blocks are split, and that the debris must be removed by workers reaching into the machine to clear the debris. (Rondeau, 55: 4-21; "That's part of splitting, correct.")

Besser knows that barrier guards are preferred on automated systems such as the splitter machine.  Besser knows that the barrier guards would not impede the function of the machine, and would allow the blocks to be split in an automated fashion.  Besser even offers barrier guards for some customers on request. (Rondeau, 89:7-25; 90: 1-25; 91: 1-25; 92:1-4)  Barrier guards were available when the subject machine was manufactured and sold, and could have been used as a means of guarding the subject splitter. (Rondeau, 96: 12-21; See also Exhibit 11)  Barrier guards would have made the splitter machine more safe than it existed on the date of Mr. Jackson's accident. (Rondeau, 97: 7-10)

Besser also has provided safety upgrades to their products as a result of identifying risks of injuries to operators. (Rondeau, 128: 18-22)  Among the safety upgrades are light curtains, gates, emergency stops and start up horns. (Rondeau 128: 23-25; 129: 1-4)  The stated purpose of these safety upgrades was "[t]o increase safety." (Rondeau: 19-21)  Duane

Rondeau also testified that light curtains do not fail in the block plant environment and is an effective safety device. (Rondeau 97: 11-25; 98: 1-13; 193: 17-24) Besser also knows that sliding gates, like Dr. Paul recommended years before Jackson's accident, could have been used and would not have impeded the function of the splitter. (Rondeau 102: 6-25; 103: 1-25) Besser has not told E&R of the number of accidents on splitters, or that additional safety equipment, such as guards, gates, light curtains and stop buttons, were available for the E&R machines because Besser did not design the E&R machines. (Rondeau 130:19-25; 131:1-6) Besser manufactures and sells other block splitters with emergency stop buttons within reach of the chunk puller. (Rondeau, 165: 16-25; 166: 1-21; See also attached photo of Besser model V-200, Exhibit 14) Additionally, Besser engaged in a warnings upgrade and retrofit program in or about 1991 to comply with ANSI warnings standards (Rondeau 186:10-15) Besser knew that the warnings on the E&R splitter were not ANSI compliant because "[i]t doesn't identify the hazard, its not pictorial, and it doesn't tell you how to avoid it [the hazard of amputation]." (Rondeau 183:12-22) Besser knew the warnings were not compliant when the splitter was sold in 1997, and knew of the number of other accidents and amputations to workers on their splitters based on their accident database. (Rondeau, 183:12-22; 85:7-24) Besser does not know why they never told E&R their warnings were not ANSI compliant or that the warnings do not identify the hazard. (Rondeau, 187: 8-11)

### AEMLD Claim

The Plaintiff has alleged that the subject block splitter was unreasonably dangerous at the time it was manufactured and as a result Defendant E&R is liable under the AEMLD. The AEMLD was developed by the Alabama Supreme Court in two cases, Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala. 1976) and Atkins v. American Motors Corporation,

335 So.2d 134 (Ala. 1976). According to <u>Casrell</u> and <u>Atkins</u>, in order to establish liability under the AEMLD, a plaintiff must show that:

> (1) he suffered injury or damage to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if (a) the seller is engaged in the business of selling such product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

<u>Casrell</u>, 335 So.2d at 132-133.

The Eleventh Circuit Court of Appeals interpreted this doctrine and further defined the showing of defect necessary for liability under AEMLD in <u>Nettles v. Electrolux Motor AB</u>, 784 F.2d 1574 (11th Cir. 1986). In <u>Nettles</u>, the court opined that under Alabama law a product is "defective" if it does not meet the reasonable expectations of ordinary consumers as to its safety. Under the AEMLD, manufacturers are not subject to liability merely because their products are not as safe as possible, but liability may attach if a product does not meet ordinary expectations "because it does not have some safety feature." <u>Nettles</u> at 1578.

It is undisputed that Plaintiff Jackson suffered injury and damages while operating a model CM24 block splitter manufactured by Defendants, that Defendants are engaged in the business of selling such a product, and that it was in the substantial condition it was sold in at the time of Plaintiff's accident. The facts herein reveal that a safer, practical, alternative design was already available to Defendants when the subject block splitter was manufactured and sold, and that it did not contain "some safety feature[s]". <u>Id</u>. Therefore the splitter was unreasonably dangerous and defective. (Exhibits 11 and 12)

Plaintiff contends the subject splitter was unreasonably dangerous and defective because it splits blocks in such a way so as to create debris that must be removed between

15

cycles of the splitter knives. If the debris is not removed between cycles of the splitter

knives, the subsequent blocks would be broken unevenly and rendered useless or production

is halted. Defendants knew that workers reach into the splitter between cycles to remove the

debris. In order to maintain production, the splitter machines are not shut off between cycles

to clear debris. The machine lacks any stop button within reach of where a worker must

stand to clear debris. Defendants had known all of this since the 1980's. Prior to Plaintiff's

accident, Defendants also knew of multiple accidents and amputation injuries to workers

whose hands were trapped in the splitter knives when they were clearing debris. (Exhibit

10) Ron Neese, on behalf of E&R, even testified they intended workers to clear debris

between cycles so that production is not stopped:

> Q.    Does that chip have to be removed from that area?
> A.    Yes, it does.
> Q.    Is that one of the reasons that you have described it's foreseeable that an
> operator may get in there to get that chip out?
> A.    Right.
> Q.    You expected that at E&R, or you foresee that may happen?
> A.    Right.
> (Neese 44:12-17)
> .........
> Q.    Okay. In the real work what happens is we see workers like we see in
> Exhibits 6 and 7 get that debris out so the production doesn't stop; is that right?
> A.    That's right.
> Q.    *That's what E&R intends to happen; right?*
> A.    *Right.*
> (Neese, 58:14-25; 59:1-2)

Jackson was clearing debris in the manner intended by E&R. Plaintiff Jackson was

injured when his hand was caught on an exposed bolt near the splitter knives while he was

attempting to clear debris between cycles. (Jackson, 51:3-14)

There is clear evidence that there were alternative designs available for the subject

splitter at the time it was manufactured and sold that would have eliminated or reduced the

risk of plaintiff's injuries. (See Dr. Paul Affidavit, Exhibit 11, and Dr. Booeshaghi, Exhibit 12)[4] There is clear expert testimony in this case that the subject splitter was unreasonably dangerous and defective. (Dr. Paul Affidavit Ex.11, Dr. Booeshaghi Affidavit Ex 12) Experts also explain that that Mr. Jackson's injuries would have been substantially lessened or eliminated if the subject splitter machine had been equipped with the available safety devices.

As early as 1989 both Defendants were aware the subject splitter was unreasonably dangerous and defective, did not have adequate warnings, and was going to continue to cause injuries until the point of operation was adequately guarded.  Dr. Igor Paul recommended feasible safety guards and designs, however Defendants refused to implement them.  (Dr. Paul Affidavit, Ex. 11)  Dr. Paul recommended a system of gates and guards, and other safety devices, that would allow blocks to be split and debris to be cleared between cycles without risk of injury.  (Dr. Paul Affidavit, Exhibit 11)  Dr. Paul advised Defendants their block splitter would continue to cause accidents and injuries unless the point of operation, at the knives, was properly guarded.  Dr. Paul's recommended a point of operation guarding system had been successfully used in similar industrial applications. (Ex. 11)  The design by Dr. Paul would have provided positive operator safety, would not interfere with the machine function, was feasible and would not pose any hazard to the operator.  (See Exhibit 11)  Defendants never incorporated the guards into the splitter machine because they felt it created a greater hazard than the splitter knives themselves. Since Dr. Paul's design recommendations there have been nine (9) accidents documented by the Defendants themselves involving amputations and other injuries to workers trying to clear debris and unjam block splitter machines similar to the one in the instant action.

---

[4] Expert depositions have not been taken in this case.  Expert Affidavits are attached hereto.

Ronald Neese, the corporate representative and owner of E&R, testified prior to the sale of the subject splitter machine he considered, in addition to the guarding system proposed by Dr. Paul, several available safety items for the block splitter that were not on the machine at the time of Plaintiff Jackson's injuries herein. Neese testified he has considered guards, light curtains, and temperature sensors, all of which are designed to detect the presence of a worker near the blades and prevent an injury during a cycle. (Neese, 45:15-16; 46:6-8) While both Defendants manufacture products with stop buttons at the point of operation, Defendants failed to install a stop button at the area where a worker stands to clear debris on the subject machine. (Neese, 70:5-25; 71:1-16; Rondeau 165: 16-25; 166: 1-21; See also Exhibits 13 and 14) The only stop button on the subject machine is beyond the reach of a worker clearing debris, thus encouraging work without shutting the machine down and preventing a trapped worker from stopping the machine before it cycles. There was nothing that prevented E&R or Besser from installing stop buttons at the workers station.

Defendant's contentions that Plaintiff's AEMLD claims fail is without merit. Defendants Motion for Summary Judgment is due to be denied.

**Plaintiffs AEMLD claims do not merge with his Negligence and Wantonness claims**

Also, Plaintiff's claims under the AEMLD and claims of negligence and wantonness are three separate and distinct claims. Plaintiff's claims for negligence and wantonness are not merged into his AEMLD claims. See Graham v. Sprout-Waldron and Co., 657 So. 2d 868 (Ala. 1995) (Court recognized that a negligence claim was a "separate allegation" from an AEMLD claim). Alabama Courts have long held that negligence is a distinct and

separate claim from AEMLD, as a result the instant Plaintiffs have the option of pursuing either or both claims in their action.

### WHETHER PLAINTIFF IS ENTITLED TO FAILURE TO WARN CLAIMS

To maintain an action for failure to warn based upon a negligence theory or under the AEMLD, the plaintiff must prove: (1) that the defendant had a duty to warn him or her of the product's danger when used in its customary manner; (2) the defendant's warning breached that duty because it was inadequate; and (3) the breach proximately caused the plaintiff's injuries. Strickland v. Royal Lubricant Company, 911 F. Supp. 1460, 1468 (M.D. Ala. 1995). A warning is "adequate" if it is "one that is reasonable under the circumstances, and it need not be the best possible warning." Strickland, 911 F. Supp. at 1468 (quoting Gurley v. American Honda Motor Co., 505 So. 2d 358, 361 (Ala. 1987)).

"If a manufacturer places goods on the market that are imminently dangerous when put to their intended purpose and the manufacturer knows or should know that the goods can create danger when used in their customary manner, the manufacturer must exercise reasonable diligence to make such danger known to the persons likely to be injured by the product. Ford Motor Co. v. Rodgers, 337 So. 2d 736, 739 (Ala.1976). "Where a warning is necessary, the warning need only be one that is reasonable under the circumstances and it need not be the best possible warning." Gurley v. American Honda Motor Co., 505 So. 2d 358, 361 (Ala.1987). There is "a duty to warn of those dangers which the user would not be aware of under the particular circumstances of his use of the product." Id. (emphasis added). A duty to warn of a dangerous condition in the workplace can be discharged by informing the employer of the dangerous condition. Cook v. Branick Mfg., Inc., 736 F.2d 1442, 1446

19

(11th Cir.1984) (interpreting Alabama law); Purvis v. PPG Indus., Inc., 502 So. 2d 714, 719

(Ala.1987)." Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 471 (11th Cir. 1993).

Defendants cannot show they are relieved of their duty to warn in this case under

AEMLD or negligence principles. The Defendants first argument against Plaintiff's failure

to warn claims is that the danger of getting caught on the bolt was open and obvious to the

Plaintiff. Defendants correctly point out that "[w]hether a danger is open and obvious

depends on the plaintiff's *subjective* knowledge." Abney, 919 So.2d at 295. Duane

Rondeau has testified that the warnings on the splitter are inadequate and do not comply

with ANSI warnings standards because the warning "doesn't identify the hazard".

(Rondeau 183: 12-22) Since the warnings, according to Besser's own corporate

representative is inadequate because it does not identify the hazard, Jackson cannot be said

to have subjectively appreciated any hazard from the warnings. Defendant's argument is

without merit.

There is also evidence that Defendant undertook to add warnings in the early 1990's

on the splitter machines while they were aware of ongoing accidents and amputations

involving their splitter machines. (Neese, 34:18-24) As such, Defendants undertook the

duty to warn, and whether they did so reasonably is a jury question.

Additionally, Defendants' "open and obvious" argument regarding the machine's

dangerous condition is inapplicable to this stage of litigation. The Alabama Supreme Court

has stated, "[w]hether a condition is 'open' and 'obvious' does not go to the [legal] issue of

duty of the defendant under the AEMLD. Instead, 'open' and 'obvious' danger relates to

the affirmative defenses of assumption of the risk, the alleged 'defectiveness' of the product,

and the issue of causation." King v. S.R. Smith, Inc., 578 So. 2d 1285, 1287 (Ala. 1991)

(quoting <u>Entrekin v. Atlantic Richfield Co.</u>, 519 So. 2d 447 (Ala. 1987)). **"Therefore, a summary judgment based upon the danger's being open and obvious would be improper, as such a determination is a factual issue for the jury."** <u>Bean v. BIC Corp.</u>, 597 So. 2d 1350, 1353 (Ala. 1992) (emphasis added).

Regardless, Plaintiff's testimony prevents any conclusion that he subjectively appreciated any risk of injury. **"[I]t never crossed my mind because it [getting hurt or getting hung on a bolt] hadn't happened before, I mean, as far as getting hurt. I mean, it really didn't cross my mind...*Because when I stuck my hand into the machine, it wasn't operating... I felt safe about it... I have no clue. If the way I was doing it wasn't the proper way, I don't know." Id.* (Jackson 43:15-23; 44:1-23; 45:1-22; 145:11-14; 152:3-4) Clearly, Jackson did not subjectively appreciate any danger, and therefore, Defendants cannot meet their burden of establishing that danger was open and obvious to the Plaintiff. This is a factual question for the jury. Summary Judgment is due to be denied.

Moreover, there are really no warnings on this machine, and no warnings that speak to clearing debris. (See Exhibit 2) It is undisputed from everyone that the debris must be cleared, and that production depends on keeping the machine operating. The only sign located where Plaintiff was to stand says "Keep Hands Clear". Plaintiff testified that he understood this sign to mean when the machine cycled, since he was trained to clear the debris between cycles. (Jackson, 41:2-10; 32: 4-23; 33:1-10) This is also the sign that Besser's corporate representative Duane Rondeau testified is inadequate because it does not identify they hazard. (Rondeau 183:12-22) Jackson saw other workers clear debris without shutting the machine off, and was trained to clear the debris by hand without shutting the machine off. Jackson had done it many times without injury, without reprimand and he had

no stop button. A jury may certainly find Jackson's conclusions were reasonable. His clearing debris with his hand without shutting the machine off is certainly consistent with how Defendants knew workers were clearing debris in real world applications.

Another sign on the splitter, though only partially legible, references "servicing" the machine. (See Exhibit 2) Ron Neese on behalf of E&R agreed this is subject to interpretation by the worker or his supervisor, meaning the warning is ambiguous and therefore inadequate. (Neese: 159: 11-15) The warnings certainly do not clearly warn about the dangers Besser and E&R have known of since the 1980's that workers hands all too often get caught in the machine between cycles in real world efforts to clear debris to maintain production. As Duane Rondeau stated, the warnings do not "identify the hazard, its not pictorial, and it doesn't tell you how to avoid it [the hazard of amputation]." (Rondeau 183:12-22) There is simply no support that the hazards of the machine were open and obvious to David Jackson as a matter of law. This case is properly for a jury.

Defendants point to testimony that Jackson appreciated that the machine could cut fingers since it could cut blocks *when it cycled.* However, in Jackson's words, *"when I stuck my hand into the machine, it wasn't operating."* There is no evidence or testimony whatsoever that can establish Plaintiff Jackson, or anyone else, knew his glove would get caught on a bolt.

Defendants' next argument is that Plaintiff Jackson would not have heeded an adequate warning, tacitly admitting the inadequacy of the warnings as they existed. Such an argument is self-fulfilling. Defendants' position seems to be that Jackson was trained to clear the debris while the splitter remained running, and therefore he would not have heeded adequate warnings. The fundamental flaw in this argument is that the plaintiff was trained

22

to clear debris without shutting the machine off *because* of the inadequate warnings. A jury is free to conclude that had the warnings properly identified the hazards, his training would have been different and he would have followed that training. Apparently the warnings are not adequate since Karry Mackey lost three fingers on the same machine while clearing debris without shutting the machine off with his hand. There was no warning that told him not to. John Stephens testified clearing the splitter while it was running with by hand was the option of the worker. Clearly Stephens did not appreciate any warning to the contrary, and Stephens trained Jackson. Further, even after Plaintiff's accident there was another worker at the Block USA plant who lost a part of her finger in the subject splitter because she was clearing debris with the machine running. Their own corporate representative admits the warnings are inadequate because "it doesn't identify the hazard." Id. Finally, Defendants cannot deny they have documented amputations and hand injuries for over twenty (20) years, and in multiple states, to workers clearing debris between cycles without shutting the splitter off.

Essentially Defendants' argument is that their product is so dangerous it should be appreciated by the worker, and additional warnings would not make a difference. It would be a sad indeed to conclude that warnings on this splitter are adequate, or that the issue of whether the warnings were adequate is not properly for a jury, when there are at least 12 known amputations and hand injuries to workers clearing debris on these splitters.[5] It is clear the warnings are not adequate. Jackson did not appreciate any danger.

Alabama law requires that a manufacturer's warning be one that is reasonable under the circumstances and establishes a duty to warn of those dangers which the owner would

---

[5] Nine (9) accidents identified in Exhibit 10, plus Karry Mackey, Plaintiff Jackson and an additional co-worker after Jackson's accident.

not be aware of under the particular circumstances of his use of the product in question. Gurley, 505 So. 2d at 361. Brest v. Chrysler Corp., 939 F. Supp. 843, 849 (D. Ala. 1996). Clearly Defendants Besser and E&R knew workers were not aware of dangers under the particular uses of its splitter machines, since Defendants have known for over twenty (20) years that workers clearing debris with their hands while the machine is running to maintain production have suffered amputations. Defendant Besser has explained the warnings are inadequate because they fail to identify the hazard. Defendants have clearly failed to provide warnings that are "reasonable under the circumstances". Id. Summary Judgment is due to be denied.

The case of Mathis v. Harrell Co., 828 So. 2d 248 (Ala. 2002), is instructive to this case. Mathis was a farm worker who suffered injuries when, despite warnings to the contrary, he opened a piece of machinery in such a way so as to cause a cylinder to fall and impale his arm. Mathis' testimony was that he was aware that the warning labels warned specifically not to do what he did, however, he had observed others operating the machinery similarly on several prior occasions and had done so himself. Id. The appellate court reversed the entry of summary judgment by the trial court based on testimony from the plaintiff that supported he did not subjectively appreciate any risk for injury, and that the danger was not open and obvious to him. The Mathis court stated, "In this case there is testimony that Mathis stated that he was hurried and that he did not know, understand, and appreciate the danger." Id. In the instant action, "there is testimony that [Jackson] stated that he was [meeting production, acting as he was trained to clear the debris without shutting the machine off], and that he did not know, understand, and appreciate the danger." Id.

24

Whether a danger associated with a product in a claim brought pursuant to AMELD is open and obvious is based on the subjective perspective of the user. <u>Abney v. Crosman Corp.</u>, 919 So. 2d 289, 295 (Ala. 2005). Since Defendants cannot subjectively show that Jackson appreciated any risk, summary judgment is not proper in this action.

## <u>WHETHER PLAINTIFF JACKSON WAS<br>GUILTY OF CONTRIBUTORY NEGLIGENCE</u>

"In order to establish the affirmative defense of contributory negligence [which the defendant bears the burden of proving], there must be a showing that the party charged had knowledge of the dangerous condition; that he appreciated the danger under the surrounding circumstances; and that, failing to exercise reasonable care, he placed himself in the way of danger. <u>Bridges v. Clements</u>, 580 So.2d 1346 (Ala. 1991); <u>Knight v. Seale</u>, 530 So.2d 821 (Ala. 1988). Although contributory negligence may be found to exist as a matter of law when the evidence is such that all reasonable people must reach the same conclusion, the question of the existence of contributory negligence is normally one for the jury." <u>Bridges v. Clements</u>; <u>Knight v. Seale</u>; <u>Gulledge v. Brown & Root, Inc.</u>, 598 So. 2d 1325, 1327 (Ala. 1992)

"This Court has often noted that questions of negligence incorporate factual evaluations that are almost always within the province of the jury. <u>Osmer v. Belshe Industries, Inc.</u>, 585 So. 2d 791 (Ala. 1991). It follows that a summary judgment based on the doctrine of contributory negligence is seldom proper." <u>Jones v. Power Cleaning Contractors</u>, 551 So. 2d 996 (Ala. 1989), and <u>Knowles v. Poppell</u>, 545 So. 2d 40 (Ala. 1989); <u>Gulledge v. Brown & Root, Inc.</u>, 598 So. 2d 1325, 1330 (Ala. 1992).

"In order to sustain a finding of contributory negligence as a matter of law, there must be a finding that a plaintiff put himself in danger's way and a finding that the plaintiff

25

appreciated the danger confronted. Moreover, it must be demonstrated that the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred. Mere heedlessness is insufficient to warrant a finding of contributory negligence as a matter of law." Mathis v. Harrell Co., 828 So. 2d 248 (Ala. 2002).

"A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger. Hannah v. Gregg, Bland & Berry, 840 So. 2d 839, 861 (Ala. 2002). Assumption of the risk and contributory negligence as a matter of law are both subjective standards, focusing on the risk as known and appreciated by the plaintiff." Horn v. Fadal Machining Ctrs., LLC, 2007 Ala. LEXIS 26 (Ala. 2007).

Defendants cannot meet their burden of proving with undisputed evidence that David Jackson subjectively appreciated any risk that he was at risk for injury when clearing debris in the splitter machine. Jackson's testimony clearly establishes otherwise:

> Q.    I mean, common sense is that what you know, you know what I mean. So you knew that at the time that you put your hand in there, that Id you didn't beat the cycle it was going to cut your hand off or injure your hand; is that true?.....
> In other words, if that block comes in there while your hand is there, you knew before you were injured that it would hurt your hand, is that true, and badly hurt it?
> .........
> A.    **Well, it never crossed my mind because it hadn't happened before, I mean, as far as getting hurt. I mean, it really didn't cross my mind.**
> (Jackson, 43:15-23; 44: 1-23; 45: 1-22)
> .........
> Did you feel like this block machine was safe?
> **A.  Safe as any other job.**
> (Jackson, 112:20-22)

.........

Q.    So its your testimony that because you had two or three seconds, (footnote: its actually more like 5-10 seconds – see video) it was enough time, so it was careful? It was a safe thing to do?

*A.    I felt safe about it.*

(Jackson 152:8-11)

.........

Q.    Okay so you had two seconds to reach your hand in there at an area where you know can injure your hand, and that's what your employer told you to do?

A.    Yeah, that's what he told me to do. And I've been doing this all this time and I ain't never had no other problem until this particular time.

(Jackson 39:8-15)

.........

A.    Other people did the same thing.

Q.    Okay.  Now when those other people did the same type of job you were doing that led to your accident, did they use their hands to reach into the machine?

A.    Yes.

(Jackson, 142: 13-18)

.........

Q.    Okay. Would you describe the block plant has having a safety culture? Was safety something that was emphasized at the plant?

A.    Well, they didn't have no safety meeting or nothing like that. So I don't know how to answer that question, other than to me I felt safe. *I mean, I didn't feel like I was going to get hurt or nothing like that.*

(Jackson 150: 14-21)

.........

Q.    In the two-and-a-half months that you worked there, did you see anyone else get their hand caught or injured on this block splitter machine?

A.    No, I didn't.

Q.    Now the other people that were to do our job that you were doing at the time of this accident, how did they do it?

A.    **The same way I did it.**

Q.    So they would pull the block off through the – as its moving out of the block splitter with their left hand, stick their right hand where the side knife is located and remove the debris?

A.    Yes.

Q.    Is that what you're telling me how the other people did the job?

A.    Yes.

(Jackson 59:9-21)

.........

Q.    Do you know what the proper way is to remove debris from the machine?

> A.     *I have no clue.  If the way I was doing it wasn't the proper*
> *way, I don't know.*
> (Jackson, 145: 11-14)

This testimony alone precludes summary judgment in this case since clearly Jackson

lacked any subjective appreciation that he was confronted with danger, or that he was not

acting with ordinary care.  Defendants cannot meet their burden of undisputed evidence that

Jackson subjectively appreciated any danger.

Also, because Jackson was *trained* to use his hands to clear the debris from the

splitter machine without shutting it off he reasonably did not appreciate that he was placing

himself at risk, and reasonably felt that he was acting with ordinary care:

> Q.     Now, tell us what kind of training you had in regard to what you were doing
> at the time of your accident.
> A.     I was just showed by John and them how to –
> Q.     Hold on who is John?
> A.     I don't know what his last name is, but John is one of the workers for Block
> USA.
> Q.     Okay. But John showed you how to do what?
> A.     To go up in there and clean the block splitter out, the debris out of it.
> Q.     **Explain to us how you were told or explained or trained to do that.**
> A.     **You just had to take and stick your hand up in there, and on the side**
> **knives right here where it comes out you had to pull the debris out of there, the**
> **little chips and stuff, because it was actually supposed to fall down into a bucket**
> **or whatever, but it didn't do that.  So you had to clean it out.**
> Q.     Okay
> A.     And that's what I was showed to do.
> Q      **So you were showed to put your hand where the side knives are located,**
> **correct?**
> A.     **In between the cycles, that's correct.**
> Q.     **So your training was in between cycles to place hands in the area where**
> **the side knives were located to clean out debris; is that correct?**
> A.     **Correct**
> (Jackson 15: 14-23; 16:1-20)
> …
> A.     John showed me how to clean the machine, and I cleaned it the same way he
> did.
> Q.     And tell me exactly, walk me through how he [John] told you to clean the
> machine out?

A.    **Well, after the cycle runs and the block split, you reach up there and pull the block out, help it come out, and you reach in here and you clean it, clean the side knives out with your hand and pull the chips out.**
(Jackson 41:2-10)

. . . . . . . . .

Q.    How could you be careful – how could you act carefully in sticking your hand into the machine to clean out the debris?

A.    ***Because when I stuck my hand into the machine, it wasn't operating***.  I mean, you had two or three seconds there – whatever it might have been I ain't exactly sure – to get that debris out.

Q.    So it's your testimony that because you had two or three seconds, it was enough time, so it was careful? It was a safe thing to do?

A.    ***I felt safe about it.***
(Jackson, 151: 23; 152: 1-11)

Importantly, even though the splitter was not "shut off", it operated with a cycle where the machine was effectively shut off between cycles and the knives present no danger, and that is when Jackson was trained to reach into the machine.  In Jackson's own words *"when I stuck my hand into the machine, it wasn't operating."* (Jackson 152:3-4)[6] Clearly Jackson felt he was acting reasonably, with ordinary care, and subjectively had no appreciation he was at risk for injury "because when [he] stuck [his] hand into the machine, it wasn't operating." Id.

Jackson's testimony that he was trained by John Stephens to clear debris with his hand while the splitter was running is consistent with John Stephens' testimony.  Stephens, the supervisor who trained Jackson to pull chunks, explained it *"is up to the chunk puller of whether they use the rod or whether they use their hand."* (Stephens 74)  Jackson's position was even known as the "chunk puller."  Karry Mackey, the plant manager, also testified he knew chunk puller's hands had to be in the area of the knives when pulling chunks. (Mackey 53: 13-23; 54:1-4; 68:6-11)

---

[6] A review of the attached video clearly depicts the nature of the splitter as it cycles, and the method employed by chunk pullers to clear debris without shutting off the machine.  The video also supports Plaintiff's testimony that the splitter knives are no danger to a worker between cycles and there is time to clear the debris between cycles.

Further, video footage of a worker clearing debris on the subject machine has been produced by Karry Mackey. The worker can clearly be seen using his hands to clear debris and pull chunks between cycles as Jackson was trained. Jackson was simply clearing debris as he was trained and as he saw other workers clear debris. He had no reason to believe or expect his glove would get caught or that he would suffer injury if he just did as he was told. This case is properly for the jury.

That Jackson, and other workers at the Block USA plant, were trained to clear debris while the splitter remained running is no surprise to Defendants E&R or Besser. Testimony and evidence from the Defendants reveal they have known for years that workers routinely clear debris from their product without shutting it off. E&R's corporate representative also offered testimony that it is foreseeable, known and intended that workers will reach into the knives without shutting the machine down in order to clear the debris, just like Plaintiff Jackson was doing when he was injured.

Ron Neese, on behalf of E&R, testified as follows:

      Q.     Okay, why did you foresee – why was it foreseeable, as we discussed earlier, that a worker may have his hand caught in the area of operation? Is it because some need for occasionally debris to build up in there in the point of operation at the knives?
      A.     Possibility, Yes.
(Neese: 42: 9-15)

. . . . . . . . .

      Q.     Does that chip have to be removed from that area?
      A.     Yes, it does.
      Q.     Is that one of the reasons that you have described it's foreseeable that an operator may get in there to get that chip out?
      A.     Right.
      Q.     You expected that at E&R, or you foresee that may happen?
      A.     Right.
(Neese 44:12-17)

. . . . . . . . .

      Q.     Okay. In the real work what happens is we see workers like we see in Exhibits 6 and 7 get that debris out so the production doesn't stop; is that right?
      A.     That's right.

> Q.   *That's what E&R intends to happen; right?*
> A.   *Right.*

(Neese, 58:14-25; 59:1-2)

Defendants cannot reasonably argue that Plaintiff Jackson clearing debris while he machine was running was acting unreasonably, since they have known for years that in real world applications workers clear debris in this manner.  Ron Neese has seen workers clearing debris by hand in various plants throughout the United States and has known this is how workers typically clear debris since the 1980's.  (Neese, 152:23-25; 153:1-25)  Neese explained the splitter knives were left open to allow the block to be fed into them, and to allow workers to clear debris as needed.  (Neese, 108:10-21)  There is no warning on the machine that identifies any hazard while clearing debris between cycles.  Both Defendants agree the warnings are not ANSI compliant and do not identify the hazards.  (Neese, 158:9-10; Rondeau, 183: 12-22)  Jackson, in clearing debris with his hands while the splitter was running was not only acting in keeping with his training and how he observed his coworkers clear debris, it was no less reasonable than Defendants expected.

A jury is free to conclude Jackson acted reasonably under the circumstances since Jackson was told to stand on the discharge side of the knives, and knew there was no stop button at that side to stop the machine for the routine debris clearing and chunk removal.  Jackson could not reach the only stop button on the machine located at the control panel, and workers do not stand at the control panel during typical production.  Clearly a jury is free to conclude, as did Jackson, that clearing the debris was to be done by hand with the machine still running since he was so trained and since no other device was provided to him.  (Jackson 16:3-22; 36:9-13)  Jackson knew production must be maintained, and the machine cannot be constantly shut off.  (Jackson 23:16-19)  The debris must be cleared between

cycles.  A jury is surely free to conclude that Jackson was acting reasonably based on his training and experience under the circumstances to clear the debris between cycles, and that his glove became caught in an unforeseeable manner while he was acting in a foreseeable manner and with ordinary care.

At minimum there is disputed evidence, not undisputed evidence, as to whether Jackson appreciated any risk, or whether he acted with ordinary care, and thus summary judgment is improper. "We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger." See Hannah v. Gregg, Bland & Berry, 840 So. 2d 839, 861 (Ala. 2002)."

Defendants argue, as they must, in their Motion for Summary Judgment, that Jackson had a general awareness of a danger associated with the splitter, and that if he placed his hands in the knives the side knives closed his hand could be injured because the splitter was made to split block.  Alabama law is clear, however, that a worker must have more than a general appreciation of a danger, he must have a conscious appreciation of the specific danger and it must be at the moment it occurred.  Mathis v. Harrell Co., 828 So. 2d 248 (Ala. 2002). Defendants lack any testimony or evidence that Jackson was subjectively aware that he was at risk for injury when clearing debris between cycles, when the blades were not activated, and were not moving, just as he was trained put him at risk of injury. Defendants also cannot point to any evidence that Jackson, or anyone, was aware his glove may get caught on a bolt when he was clearing debris as he was trained.  This case is properly for a jury.

Defendants argue in vain Plaintiff Jackson did appreciate danger at the moment his injury occurred since Jackson tried to snatch his hand out of his glove once he discovered his hand was hopelessly trapped because his glove was caught on a bolt. Defendants have confused the "at the moment it occurred" element of contributory negligence. Jackson is not found to have knowledge of a danger at the moment it occurred simply because he realized all too late he was in peril and about to suffer a traumatic amputation. To establish Jackson appreciated a risk of injury "at the moment it occurred" Defendants must show Jackson knew and appreciated at the moment he placed his hands in the knives he may be unable to remove his hand before the machine cycled, that his glove may get caught on a bolt, or that his hand may otherwise be trapped in the knives. Defendants simply cannot meet this burden. Jackson repeatedly, and clearly, testified to the contrary. *"[W]hen I stuck my hand into the machine, it wasn't operating."* (Jackson 152:3-4) " *I mean, I didn't feel like I was going to get hurt or nothing like that"* (Jackson 150: 14-21) *"I felt safe about it.*(Jackson 152:8-11)

The Alabama Supreme Court has already addressed a similar argument in Mathis v. Harrell Co., 828 So. 2d 248 (Ala. 2002). Plaintiff Mathis was a farm worker who suffered injuries when, despite warnings to the contrary, he opened a piece of machinery in such a way so as to cause a cylinder to fall and impale his arm. Mathis' testimony was that he was aware that the warning labels warned specifically not to do what he did, however, he had observed others operating the machinery similarly on several prior occasions and had done so himself. Id. Summary Judgment was reversed because Mathis' testimony was that he did not subjectively appreciate any risk for injury, and that the danger was not open and obvious to him. The Mathis court stated, "In this case there is testimony that Mathis stated

that he was hurried and that he did not know, understand, and appreciate the danger." Id. As in Mathis, herein "there is testimony that [Jackson] stated that he was [meeting production, acting as he was trained to clear the debris without shutting the machine off], and that he did not know, understand, and appreciate the danger." Id. A jury may reasonably appreciate Jackson did not appreciate any risk because he was trained to clear debris with his hands while the machine was running.

Defendants rely primarily on the case of <u>Rowden By and Through Rowden v. Tomlinson</u>, 538 So.2d 15 (Ala. 1988), in arguing for contributory negligence. <u>Tomlinson</u> involved injuries to a seventeen (17) year old plaintiff who, while working as a farmers helper for two weeks when he reached into visibly moving augers.

<u>Tomlinson</u> is easily distinguishable from the facts of the instant case. First, in <u>Tomlinson</u> there is no evidence that the Plaintiff was trained to use his hands to reach into the auger mechanism to clear the debris. In fact, there is specific evidence to the contrary. The minor Plaintiff Rowden specifically testified he was *not* instructed to lie across the motor as he did or to perform *any* work on top of the combine. There is likewise no evidence that Rowdens co-workers cleared debris while the auger was running. The <u>Rowden</u> Court based its opinion and findings of contributory negligence entirely on Rowden's testimony. Rowden's testimony is in stark contrast to the evidence in the case at issue.

Jackson was specifically trained to use his hands to clear the debris from the splitter without turning power off. (Jackson, 16:3-22; 23:16-19) Jackson's was told to pull chunks and clear debris exactly where he was standing when he was injured which was beyond the reach of any stop buttons. (Jackson, 18:3-9; Mackey, 31: 8-15; Neese, 13:15-18) A jury is

34

free to rely on this fact alone and determine that since debris must be removed, and he was told to stand in that position and clear debris with his hand, and that no stop button was provided for him at that point, and that the only stop button was beyond his reach, that he was not to stop the machine to clear debris. And again this is a consistent conclusion based on his training, his observance of other workers reaching into this machine, and now based on the intent of E&R. It is undisputed herein that debris must be cleared from the splitter heads between cycles by Jackson to maintain production of blocks. Jackson had seen a demonstration by John Stephens how to clear the debris while the machine was running. Karry Mackey, the plant supervisor, testified he knew workers had to be in the area of the knives to clear the debris as Jackson was doing. (Mackey, 53:13-23; 54:1-4; 69:9-10) Additionally, whereas Rowden never saw his co-workers reach into the augers, there is clear evidence in the instant action case that Jackson's co-workers cleared the debris from the block splitter just as he was doing when he was injured. (Jackson, 41: 2-3; 59:9-21)

Moreover, in this case we have, whereas Tomlinson did not, evidence that Defendants Besser and E&R, the parties who manufactured the splitter product involved in Jackson's accident, were aware that workers in real world applications routinely reach into the knives to clear debris without shutting the machine off and have known this for more than twenty (20) years and more than nine (9) similar accidents. Defendants herein have known since the late 1980's their machine was unreasonably dangerous and defective but have done nothing. Defendants herein have known their warnings do not identify the hazards, but have done nothing. Tomlinson really has no application to this case.

Another important distinction between this case and Tomlinson is that in the instant action, the splitter has a cycle, whereas the machine involved in the Rowden case involved

continual action. Rowden admitted knew he was reaching into a *moving* auger and that it was dangerous to do so, whereas Jackson reached into the subject splitter between cycles when it was *not moving*, and Jackson never was at risk of injury in doing so while the machine was not cycling. As Jackson has stated *"when I stuck my hand into the machine, it wasn't operating."* (Jackson 152:3-4) The splitter in this case, while not turned off, has a cycle during which there is a defined and predictable period that the machine is not functioning. Jackson's injury occurred when his glove was caught on a bolt, and there was no access to a stop button to stop the next cycle. His injury did not happen as a result of contact with visibly moving parts as was true in <u>Tomlinson</u>. <u>Tomlinson</u> simply has no application in this case as it involves different machinery, and vastly different testimony as to critical elements of training and accident causation.

Likewise, Defendant Besser's reliance on the case of <u>Wallace v. Doege</u>, 484 So.2d 404 (Ala. 1986) is misplaced. Plaintiff Doege was injured when she attempted to knock off some catfish debris from a row cleaning saw blade. The evidence indicates that the saw blade was running, and moving, at the time Doege made contact with the saw. Doege admitted that she knew it was dangerous to touch the saw with it moving, and most importantly, and as in <u>Tomlinson</u>, Doege testified she was trained not to clean the saw blade without shutting the saw off.

As was the distinction from <u>Tomlinson</u>, <u>Doege</u> is vastly different from the case before this Court. Jackson was trained to clear the debris without shutting the machine. He had been given demonstrations by his supervisor how to clear debris with the machine off. He had observed other workers clearing debris without shutting the splitter off. Jackson's testimony is that he did not appreciate any risk in clearing the debris between cycles of the

splitter.  And the splitter had a cycle such that the machine was not constantly operating like the saw blade involved in <u>Doege</u>.  Summary Judgment is inappropriate in this action.

This case is actually factually identical to the facts in *Gulledge v. Brown & Root, Inc.*, 598 So.2d 1325 (Ala. 1992).  Plaintiff Gullege was operating a conveyor machine, and was injured when she became caught in the belt while trying to clean the belt from debris without shutting the machine down.  Evidence in <u>Gullege</u> revealed that Plaintiff Gullege had received safety training that included specific training never to reach into the machine while it was running, and had actually received safety awards for her appreciation for safety.  However, the machine began to jam because of debris, and she was trained by her supervisor to reach into the machine without shutting it off and clear the machine in order to maintain production.  Gullege had seen her supervisor and other workers at the plant clear the machine with it running.  While attempting to clear the machine without shutting it off, Gullege was pulled into a nip point and severely injured.

In <u>Gulledge</u>, the Alabama Supreme Court held that summary judgment on the issue of contributory negligence was not appropriate and should be reserved for the jury to decide.  <u>Id</u>. at 1329.  The <u>Gullege</u> Court found that although the plaintiff appreciated the danger of the moving belt, and was aware that her attempts to clean a conveyor during operation violated safety procedures she had been taught, summary judgment was not proper because 1) plaintiff had been instructed by her supervisor to clean the conveyor without turning it off, 2) plaintiff had seen a demonstration as to how the conveyor could be cleaned without turning it off, and 3) this cleaning procedure had been used by other employees prior to her injury.

37

Hereto, as in <u>Gullege</u>, Jackson was trained to clear the splitter without turning it off. (Jackson, 16:3-22) Jackson was given a demonstration by John Stephens how to clear debris from the knives without shutting the splitter off in order to maintain production. (Jackson, 41;2-3) Jackson also saw other workers clearing the debris by reaching into the knives without shutting it off, and had done so himself daily without any incident, without any appreciation of any danger, and without any reprimand by his superiors. (Jackson, 59:13-16) As in <u>Gullege</u>, there can be no finding that Jackson subjectively appreciated any danger posed by clearing the machine between cycles when (1) he was trained to use his hand to clear the debris and pull chunks without turning the machine off, (2) had seen demonstrations as to how to clear the debris without turning the machine off, (3) and had seen other workers employ this same procedure without injury, incident or reprimand. More than in <u>Gullege</u>, Jackson used this same method daily without injury, incident or reprimand, and without any feeling that he was in danger of being injured. He simply could not foresee getting caught on a bolt in such a manner that would preclude him from removing his hand before the next cycle as he had always done.

Moreover, Gullege admitted she received training not to reach into the belt without turning it off. It is undisputed that Jackson never received safety training at any Block USA safety meetings, since as a "rental employee" he was not included in the safety meetings. (Stephens, 89:7-10; 106:17-22; Jackson, 91:3-8) To the contrary, Jackson was trained to use his hand to clear the debris to clear the debris. (Jackson, 16:3-22) Jackson observed other workers using their hands to clear the debris, and never felt at risk for injury. (Jackson, 59:13-16) Jackson's supervisor, John Stephens, testified clearly that it was "up to [Jackson as] the chunk puller …..whether they use their hand." (Stephens, 74:4-6) Further, while the

machine in <u>Gullege</u> was a continually operating belt, that presented a continual and visible risk of injury, the block splitter in this case operated on a cycle, and the risk for injury was not present between cycles when Jackson was trained to reach into the machine. In other words, if Gullege is not found to have committed contributory negligence in reaching into a constantly moving belt because she was trained to do so, then Jackson cannot be chargeable with contributory negligence in reaching into the splitter between cycles when he was trained to do so. Jackson was not injured immediately as a result of the belt, he was injured when his glove, without notice, became hung on a bolt and he could not retract his hand. If summary judgment was not appropriate in <u>Gullege</u>, it is even less appropriate in this case.

### Dennis v. American Honda Motor Co.

Established case law dictates that contributory negligence is not available as an affirmative defense to claims arising out of an AEMLD action where the alleged defect lies in a safety device or guard. The Alabama Supreme Court has addressed the applicability of contributory negligence to an AEMLD claim and has stated:

> "A plaintiff's mere inadvertence or carelessness in causing an accident should not be available as an affirmative defense to an AEMLD action. To allow a plaintiff's negligence relating to accident causation to bar recovery would go against the purpose of the AEMLD, which is to protect consumers from defective products. The defense of contributory negligence in an AEMLD action should be limited to assumption of the risk and misuse of the product. The plaintiff's negligence relating to accident causation should not bar recovery." <u>Dennis v. American Honda Motor Co.</u>, 585 So.2d 1336, 1339, (Ala. 1991).

> "Contributory negligence can be roughly divided into two categories: first, the plaintiff's negligence, or failure to use reasonable care, in actually using the product; second, the plaintiff's negligence in causing the accident in which the product is used. <u>Campbell v. Robert Bosch Power Tool Corp.</u>, 795 F. Supp. 1093, 1097 (M.D. Ala. 1992) v. <u>Robert Bosch Power Tool Corp.</u>, 795 F. Supp. 1093, 1097 (M.D. Ala. 1992). In an AEMLD action, the contributory negligence defense is limited to acts within the first category. That is, the plaintiff's acts with regard to negligence or failure to use reasonable care in handling the product are admissible; the

39

plaintiff's acts regarding the cause of the accident itself are not. <u>Dennis v.</u>
<u>American Honda Motor Co.,</u> 585 So. 2d 1336, 1339 (Ala. 1991) ("To
allow a plaintiff's negligence relating to accident causation to bar recovery
would go against the purpose of the AEMLD, which is to protect
consumers from defective products."); see also <u>Campbell v. Cutler</u>
<u>Hammer, Inc.,</u> 646 So. 2d 573, 574 (Ala. 1994) <u>Culpepper v. Hermann</u>
<u>Weihrauch KG,</u> 991 F. Supp. 1397, 1399-1400 (D. Ala. 1997).

This case involves AEMLD claims. Plaintiff's actions in clearing the debris as he
was trained by hand without shutting the machine off cannot be said to involve unreasonable
misconduct, and therefore the defense of contributory negligence does not apply to
Plaintiff's claims under the AEMLD.

## WHETHER PLAINTIFF JACKSON
## WAS GUILTY OF ASSUMPTION OF THE RISK

"The affirmative defense of assumption of the risk requires that the defendant prove
(1) that the plaintiff had knowledge of, and an appreciation of, the danger the plaintiff faced;
and (2) that the plaintiff voluntarily consented to bear the risk posed by that danger." <u>Ex</u>
<u>parte Potmesil</u>, 785 So.2d 340, 343 (Ala. 2000). The Court has held that assumption of the
risk proceeds from the injured person's **actual** awareness of the risk. (<u>Id.</u>)(emphasis added).

"[A] 'general awareness of danger' is not sufficient to establish [that] the plaintiff
assumed the risk of injury," (quoting Bowden ex rel. Bowden v. Wal-Mart Stores, Inc., 124
F. Supp. 2d 1228, 1235 (M.D. Ala. 2000)). <u>Horn v. Fadal Machining Ctrs.</u>, LLC, 2007 Ala.
LEXIS 26 (Ala. 2007)

Assumption of the risk and contributory negligence as a matter of law are both
subjective standards, focusing on the risk as known and appreciated by the plaintiff. <u>Horn v.</u>
<u>Fadal Machining Ctrs., LLC</u>, 2007 Ala. LEXIS 26 (Ala. 2007). It goes without saying that
one cannot knowingly, intelligently, and voluntarily embrace the consequences of an

40

unknown risk. <u>Bowden v. Wal-Mart Stores, Inc.</u>, 124 F. Supp. 2d 1228, 1235 (D. Ala. 2000).

Defendants fall well short of carrying their burden.[7]  "In determining whether assumption of the risk has been proven, the fact-finder looks to the plaintiff's state of mind, using a subjective standard, asking whether the plaintiff knows of the risk, not whether he should have known of it." *Id.*  The actual testimony reveals that Mr. Jackson was not aware of the danger posed by his glove being caught on a bolt and not being able to remove his hand from the machine as it cycled:

> Q.     I mean, common sense is that what you know, you know what I mean. So you knew that at the time that you put your hand in there, that Id you didn't beat the cycle it was going to cut your hand off or injure your hand; is that true?.....
> In other words, if that block comes in there while your hand is there, you knew before you were injured that it would hurt your hand, isn't that true, and badly hurt it?
> .........
> **A.     Well, it never crossed my mind because it hadn't happened before, I mean, as far as getting hurt.  I mean, it really didn't cross my mind.**
> (Jackson, 43:15-23; 44: 1-23; 45: 1-22)
> .........
> Did you feel like this block machine was safe?
> **B.  Safe as any other job.**
> (Jackson, 112:20-22)
> .........
> Q.     So it's your testimony that because you had two or three seconds, (footnote: its actually more like 5-10 seconds – see video)  it was enough time, so it was careful? It was a safe thing to do?
> *A.     I felt safe about it.*
> (Jackson 152:8-11)
> .........
> Q.     Okay so you had two seconds to reach your hand in there at an area where you know can injure your hand, and that's what your employer told you to do?
> A.     Yeah, that's what he told me to do. And I've been doing this all this time and I ain't never had no other problem until this particular time.

---

[7] Plaintiff incorporates by reference all evidence and arguments set forth in his argument on contributory negligence as if set forth again herein in full.

(Jackson 39:8-15)

. . . . . . . . .

     A.     Other people did the same thing.

     Q.     Okay. Now when those other people did the same type of job you were doing that led to your accident, did they use their hands to reach into the machine?

     A.     Yes.

(Jackson, 142: 13-18)

. . . . . . . . .

     Q.     Okay. Would you describe the block plant has having a safety culture? Was safety something that was emphasized at the plant?

     A.     Well, they didn't have no safety meeting or nothing like that. So I don't know how to answer that question, other than to me I felt safe. *I mean, I didn't feel like I was going to get hurt or nothing like that.*

(Jackson 150: 14-21)

. . . . . . . . .

     Q.     In the two-and-a-half months that you worked there, did you see anyone else get their hand caught or injured on this block splitter machine?

     A.     No, I didn't.

     Q.     Now the other people that were to do our job that you were doing at the time of this accident, how did they do it?

     A.     **The same way I did it.**

     Q.     So they would pull the block off through the – as its moving out of the block splitter with their left hand, stick their right hand where the side knife is located and remove the debris?

     A.     Yes.

     Q.     Is that what you're telling me how the other people did the job?

     A.     Yes.

(Jackson 59:9-21)

. . . . . . . . .

     Q.     Do you know what the proper way is to remove debris from the machine?

     A.     *I have no clue. If the way I was doing it wasn't the proper way, I don't know.*

(Jackson, 145: 11-14)

Jackson's testimony is that he was trained to reach into the knives with his hands to clear the debris without shutting the machine off to maintain production, that he had seen other reach into the blades without injury, and that he had seen his supervisors reach into the blades as he was trained to reach into the knives between cycles. (Jackson, 16:3-22; 41:2-4;

59:13-16)   The overwhelming testimony set forth hereinabove is that Jackson did not assume any risk of injury.  Defendants cannot show with undisputed evidence that Jackson assumed any risk, or that he voluntarily placed himself at risk of injury.  Jackson's injury came as a result of his glove being caught on a bolt.  Jackson could not free his hand and could not reach any stop button. David Jackson also never received any safety training since he was a "rental employee" and not invited to the Block USA safety meetings. He was clearing the machine as he had been trained to do by John Stephens, and as he had seen other co-workers do.  Jackson had cleared the splitter numerous times before his accident, without any incident, and never knew his glove could get caught like it did on the day of his accident.  As Jackson has testified getting injured, "never crossed [his] mind", and he felt safe doing his job. (Jackson, 43:15-23; 44: 1-23; 45: 1-22; Jackson 152:8-11)

Defendants, instead, argue that Jackson he had a general appreciation that the splitter machine had the capacity to cut flesh since it could obviously split concrete blocks. Defendant's arguments fall well short of the standard for establishing assumption of the risk. "[A] 'general awareness of danger' is not sufficient to establish [that] the plaintiff assumed the risk of injury," (quoting Bowden ex rel. Bowden v. Wal-Mart Stores, Inc., 124 F. Supp. 2d 1228, 1235 (M.D. Ala. 2000)).  Horn v. Fadal Machining Ctrs., LLC, 2007 Ala. LEXIS 26 (Ala. 2007)

Moreover, "to prevail with an assumption-of-the-risk defense, the defendant must show that the plaintiff actually appreciated the specific danger which caused his injuries. "The fact that the plaintiff is fully aware of one risk . . . does not mean that he assumes another of which he is unaware." Davis v. Liberty Mut. Ins. Co., 525 F.2d 1204, 1206-07 (5th Cir. 1976) (applying Alabama law) (quoting W. Prosser, Law of Torts, § 68, at 449 (4th

ed. 1971). See also <u>Rahmig v. Mosley Machinery Co.</u>, 226 Neb. 423, 412 N.W.2d 56, 74 (Neb. 1987); <u>Ellsworth v. Sherne Lingerie, Inc.</u>, 303 Md. 581, 495 A.2d 348, 356 (Md. 1985). <u>Campbell v. Robert Bosch Power Tool Corp.</u>, 795 F. Supp. 1093, 1100 (D. Ala. 1992).

Defendants cannot point to any evidence that Jackson appreciated the specific risk that his glove may get hung on a bolt and that he may be unable to extract his hand before the next cycle and that he was not afforded a stop button within his reach. Jackson did not "actually appreciate the specific danger which caused his injuries." <u>Id</u>. Instead, Jackson's testimony was that getting caught on a bolt and/or getting hurt in the splitter when clearing debris in the manner in which he was trained "never cross [his] mind because it hadn't happened before, I mean, as far as getting hurt. *I mean, it really didn't cross my mind* ... If the way I was doing it wasn't the proper way, I don't know...*I didn't see nothing wrong with it...I felt safe about it*" (Jackson, 45, 145, 152)(emphasis added). This case involves questions of fact. Summary Judgment is simply inappropriate.

### Wantonness

Finally, assuming arguendo there is a finding of contributory negligence in this matter, or assumption of the risk, such defenses are not affirmative defenses to Plaintiff's claims for wantonness.

Wantonness is a question of fact for the jury. <u>Cash v. Caldwell</u>, 603 So. 2d 1001, 1003 (Ala. 1992). "Wantonness should be submitted to the jury unless there is a total lack of evidence from which the jury could reasonably infer wantonness." <u>McDougle v. Shaddrix</u>, 534 So. 2d 228, 231 (Ala. 1988).

The Alabama Supreme Court defines wantonness as:

> [t]he conscious doing of an act or omission or some duty under
> knowledge of existing conditions and conscious that from doing of
> such act or omission or such duty and injury will likely or probably
> result. Before a party can be said to be guilty of wanton conduct, it
> must be shown that with reckless indifference to the consequences,
> he either consciously or intentionally did some wrongful act or
> consciously omitted some known duty which produced the injury.

Shuler v. Nelson Weaver Cos., 121 So. 2d 908, 909 (Ala. 1960).

"One may be guilty of wanton misconduct without actual intent to injure anyone."

Burns v. Moore, 494 So. 2d 4, 5 (Ala. 1986) (citing Birmingham Railway, Light & Power

Co. v. Murphy, 56 So. 817 (Ala. 1911)).

> The concept is, of course, universal that to constitute wantonness it
> is not essential that the defendant should have entertained a
> specific design or intent to injure the plaintiff. A willful or
> intentional act may not necessarily be involved in wantonness. It
> may consist of an inadvertent failure to act by a person with
> knowledge that someone is probably imperiled and the act or
> failure to act is in reckless disregard of the consequences.

McNickle v. Strippling, 67 So. 2d 832, 835 (Ala. 1953).

There is substantial evidence in this case to support a finding of wantonness.

Defendants have known for years that workers, like Jackson, in real world applications

foreseeably reach into their splitter product to clear debris without shutting it off in order to

maintain production. Defendants have been made aware of reasonable alternative designs

and safety features, such as guards, gates, light curtains, and additional stop buttons for

chunk pullers, however have never implemented any one of them on the splitter.

Defendants have known based on the number of similar accidents that their warnings are not

adequate to warn workers they may suffer amputation, and Defendants do not argue that

their warnings do not comply with ANSI. After admitting knowledge that workers reach

into splitters to clear debris, and admitting to nine known accidents that took place prior to

Jackson's, Defendant E&R offered the following exchange:

> Q.    Once you recognize a hazard within a machine, like this block splitter, all prudent design steps would include a hazard analysis to identify any foreseeable hazards; right?
> A.    Right.
> Q.    Once you identify any reasonable foreseeable hazards, the next proper step would be to design out those hazards?
> A.    Right.
> Q.    If you cannot design out those hazards, then you would guard against those hazards?
> A.    Right
> Q.    If you cannot provide any reasonable guarding against those hazards, then you would warn against [them]?
> A.    Warn.
> Q.    You agree that's the steps you take?
> A.    Yes.
> Q.    You agree that's the order of the steps?
> A.    Right.
> Q.    In other words, you can't just warn if you could guard.
> A.    Right
> Q.    And you can't just guard if you could design out the hazard.
> A.    Right.
> Q.    And that's reasonable, prudent safety steps?
> A.    Yes.
> Q.    You agree with me those are the steps that you should take when designing, developing, manufacturing and selling the subject block splitter?
> A.    Right.
> (Neese 83: 23-25; 84:1-25; 85:1-4)
> .........
> Q.    Would you agree with me that its substantially certain that serious injury is probably or likely to result if an operator has his hand in that point of operation while the machine cycles?
> A.    Yes.
> (Neese 39:12-16)

Defendants have known since at least the late 1980's that the splitter machine

involved in Plaintiff's accident was unreasonably dangerous and defective, and would

continue to cause accidents and injuries unless the point of operation was properly guarded.

(See Paul Affidavit, Ex. 11)  Defendants were proposed specific point of operation design

alternatives that were proven to be effective in industrial applications. The designs as recommended by Dr. Paul would have provided operator safety, and would have prevented Mr. Jackson's accident and injuries. Clearly there is substantial evidence from which reasonable men could conclude that the Defendants acted with wantonness and reckless disregard in this case, and that as a result, Plaintiff Jackson suffered severe and permanent injuries. At a minimum, however, this case is properly for a jury.

### WHETHER THE DEFECT WAS OPEN AND OBVIOUS

Defendant E&R seems to raise in passing the defense of open and obvious as to the hazard of the splitter.

"The 'open and obvious' defense requires proof of three elements: (1) knowledge by the plaintiff of the condition; (2) appreciation by the plaintiff of the danger or risk posed by that condition; and (3) a voluntary, affirmative exposure to the danger or risk. See Rodgers v. Shaver Mfg. Co., 993 F. Supp. 1428, 1437 (M.D. Ala. 1998). (quoting Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 470 (11th Cir. 1993)(applying Alabama law)).

Whether a danger associated with a product in a claim brought pursuant to AMELD is open and obvious is based on the subjective perspective of the user. Abney v. Crosman Corp., 919 So. 2d 289, 295 (Ala. 2005). **"To say that a product's risks were open and obvious is another way of saying that Plaintiff assumed the risk of injury." Bowden v. Wal-Mart Stores, Inc., 124 F. Supp. 2d 1228, 1235 (D. Ala. 2000)**

Additionally, Defendant's "open and obvious" argument regarding the machine's dangerous condition is inapplicable to this stage of litigation. The Alabama Supreme Court has stated "[w]hether a condition is 'open' and 'obvious' does not go to the [legal] issue of duty of the defendant under the AEMLD. Instead, 'open' and 'obvious' danger relates to

the affirmative defenses of assumption of the risk, the alleged 'defectiveness' of the product, and the issue of causation." King v. S.R. Smith, Inc., 578 So. 2d 1285, 1287 (Ala. 1991) (quoting Entrekin v. Atlantic Richfield Co., 519 So. 2d 447 (Ala. 1987)). **"Therefore, a summary judgment based upon the danger's being open and obvious would be improper, as such a determination is a factual issue for the jury."** Bean v. BIC Corp., 597 So. 2d 1350, 1353 (Ala. 1992) (emphasis added).

Regardless, since an open and obvious defense in a product liability action is essentially an assumption of the risk defense, Defendants clearly cannot meet their burden. Jackson did have any appreciation of any risk that he may get caught on a bolt and be unable to withdraw his hand before suffering irreparable injuries. Jackson did not voluntarily expose himself to any danger or risk. Jackson was clearing debris as he had been trained to do, as he had seen demonstrated, and as he had observed co-workers. He understood he was to clear the machine without shutting it off to maintain production. There is no evidence that Jackson was aware his glove might get caught on a bolt. "It goes without saying that one cannot knowingly, intelligently, and voluntarily embrace the consequences of an unknown risk." Bowden v. Wal-Mart Stores, Inc., 124 F. Supp. 2d 1228, 1235 (D. Ala. 2000). Defendants claim of open and obviousness is essentially a claim of assumption of the risk. For the reasons stated hereinabove in the section that address Assumption of the Risk, Defendants claim of open and obviousness fails also.

The case of Mathis v. Harrell Co., 828 So. 2d 248 (Ala. 2002), is instructive to this case. Mathis was a farm worker who suffered injuries when, despite warnings to the contrary, he opened a piece of machinery in such a way so as to cause a cylinder to fall and impale his arm. Mathis' testimony was that he was aware that the warning labels warned

specifically not to open the machinery in the manner in which he did, however, Mathis had observed others operating the machinery similarly on several prior occasions and had done so himself without injury. Id. Most importantly, Mathis testified he did not appreciate any risk for injury. The appellate court reversed the entry of summary judgment by the trial court based on testimony from the plaintiff that he did not subjectively appreciate any risk for injury, and that the danger was not open and obvious to him. The Mathis court stated "In this case there is testimony that Mathis stated that he was hurried and that he did not know, understand, and appreciate the danger." Id. In the instant action, "there is testimony that [Jackson] stated that he was [meeting production, acting as he was trained to clear the debris without shutting the machine off], and that he did not know, understand, and appreciate the danger." Since Defendants cannot subjectively show that Jackson appreciated any risk, summary judgment based on an open and obvious defense is not proper in this action.

## CONCLUSION

It is clear that there is ample evidence in this case that prevents reasonable men from reaching any conclusion that Plaintiff Jackson was, as a matter of law, contributory negligent, or that he assumed any risk in this case. Likewise, there is insufficient evidence to conclude that the warnings, or the hazard of getting his glove caught on a bolt while clearing debris was open and obvious as a matter of law. What is more likely, based on this evidence, is that reasonable men will agree that the plaintiff was following instructions, and clearing the machine with his hands like he was trained to do; that he was acting reasonably under the circumstances, and not contributory negligent, when he cleared debris between cycles as he was trained and as he saw coworkers clear debris. Jackson knew the machine must be cleared to maintain production and keep his job. There is clear evidence in this case

that at the time of his accident Jackson was acting no less reasonable than the Defendants herein foresaw, anticipated, and even intended, and that Jackson's accident could have been guarded against and prevented altogether of the Defendants had simply guarded the point of operation of the splitter machine like experts recommended some twenty (20) years ago. Summary Judgment is not proper in this action, and Defendants motions are due to be denied.

Respectfully submitted this the ___21___ day of August, 2007.

MORRIS, CARY, ANDREWS,
TALMADGE & DRIGGERS, LLC


_____

S. Mark Andrews (AND063)
Attorney for Plaintiffs
P.O. Box 1649
Dothan, Alabama 36302
(334) 792-1420

## CERTIFICATE OF SERVICE

I, hereby certify that I have this the ___21___ day of August, 2007, mailed a copy of the foregoing, postage prepaid and properly addressed, to:

Steadman S. Shealy, Jr.
SHEALY, CRUM & PIKE
P.O. Box 6346
Dothan, AL 36302-6346

Cory M. Curtis
BAKER & HOSTETLER, LLP
303 East 17th Avenue
Suite 1100
Denver, CO 80203

_____
S. Mark Andrews (AND063)

51