Page 101

1    come in and out.  Are you aware of that?

2         A.    No, I'm not.

3         Q.    Have you ever heard that before

4    today?

5         A.    No.

6         Q.    You're not aware of the name of the

7    MIT engineer, are you?

8         A.    No.

9              MR. MITCHELL:  If you find out,

10   we would like to know.

11             MR. ANDREWS:  Yes.

12        Q.    And I understand from E&R that the

13   MIT engineer provided them with a drawing or

14   explained to them a design by which the

15   blocks could be conveyed into the splitter

16   and the gate would close on either side of

17   the splitter and the split would take place

18   and the gates would open and the block would

19   be conveyed out.

20             Do you follow what I'm explaining?

21        A.    Yes.

22        Q.    Have you ever seen that before?

23        A.    No, I haven't.

24        Q.    You understand how that could work?

25        A.    It could.

Page 102

1          Q.    Can you envision any way how that

2     would impede the function of the block splitter

3     machine, to break the blocks I mean?

4          A.    No.  It's just a lot more

5     mechanism.

6          Q.    Would you think the gates could be

7     designed in such a way that they did not

8     create a hazard for the operator?

9          A.    Yes.

10          Q.    Tell me about that.

11          MR. MITCHELL:  Objection.

12          He's not being offered as an

13     expert, and I'm certainly not going to put

14     him up against an MIT professor.

15          MR. ANDREWS:  I understand.

16          A.    I would eliminate the gates.

17          Q.    I'm sorry?

18          A.    I would eliminate the actual gate.

19          Q.    No, no.  I'm sorry.

20          I'm asking, do you know how the

21     gates could be designed on the splitter so that

22     the gates would be present and that the gates

23     would not create any hazard for the operator?

24          A.    Not with a gate.

25          Q.    Not with a gate?

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 103

1        A.      Let me take that back.  I could.

2        Q.      Tell me about that.

3                MR. MITCHELL:  Same objection.

4        A.      You could put a bumper on each gate

5     that's electrically interlocked.

6        Q.      Tell me, what does that mean?

7        A.      It would be a bumper on the gate to

8     where if something got in the way, it would

9     stop or stop and reverse.

10       Q.      Like an electric garage door

11    opener, when it hits, it would go back up?

12       A.      Something like that.

13       Q.      Are there also devices that exist

14    where if a moving object does not go a

15    specified distance, that it knows to come back

16    or it knows to stop, does that make sense to

17    you?

18       A.      Yes.

19       Q.      What are those devices called?

20       A.      It could be different ones.  It

21    could be an encoder, it could be a linear

22    actuator.

23       Q.      Have you ever used those devices

24    before in any machines?

25       A.      Yes.

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 104

1          Q.      As I understand your testimony,

2    Besser did not design the subject machine?

3          A.      That's correct.

4          Q.      Do you know why E&R did not

5    incorporate some of these safety devices into

6    the subject machine?

7          A.      No, I don't.

8          Q.      In holding safety of public

9    paramount, would you agree that these would be

10   good ideas to look at?

11         A.      They would be ideas that we could

12   look at.

13         Q.      Now, earlier I asked you about all

14   the lawsuits or all cases that you've been

15   deposed in, and I believe I understand you

16   didn't remember the names of any of them?

17         A.      No.

18         Q.      You don't remember the names of

19   Plaintiffs in any of these accidents?

20         A.      No.

21         Q.      Is there any way that you could get

22   a copy of these depositions and get them to

23   your lawyer like I asked you in the notice?

24                MR. MITCHELL:  We're trying to

25   find them.  We'll get them to you when we

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 105

1   finally lay hands on them.

2        MR. ANDREWS:  Okay.

3     Q.   Do you participate at all in

4   applying and getting insurance coverage for

5   Besser?

6     A.   No, I don't.

7     Q.   Do you know who does?

8     A.   Yes.

9     Q.   Who?

10    A.   Scott Foerstner.

11    Q.   F-o-r-s-n-e-r?

12    A.   F-o-e-r-s-t-n-e-r.

13    Q.   Have you ever been asked to

14   participate in application for insurance to

15   fill out standards that Besser products

16   complies with?

17     A.   I filled out some forms,

18   questionnaire type things.

19     Q.   Do you know where those

20   questionnaires are kept?

21     A.   No, I don't.

22     Q.   How often do you fill those out?

23     A.   I only recall one time.

24     Q.   Do you remember the name of the

25   insurance company that it would have been

Page 106

1   for?

2        A.     No, I don't.

3        Q.     Do you know who insures Besser now?

4        A.     No.

5        Q.     Other than you and Arnold, do you

6   know of anybody else who has ever served as

7   corporate representative for Besser?

8        A.     No.

9        Q.     I think I know the answer to this

10  question.  Do you have any criminal history

11  at all?

12        A.     No.

13        Q.     Have you ever been in the military?

14        A.     No.

15        Q.     Other than these six or seven

16  lawsuits that you told me about at the

17  beginning of your deposition and the lawsuits

18  related to the documents in Exhibit 2, has

19  Besser ever been sued before?

20          MR. MITCHELL:  You mean for --

21          MR. ANDREWS:  For product

22  liability?

23        A.     Yes.

24        Q.     Can you explain your answer?

25        A.     Those are the only ones that I was

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 107

1    involved in and I know that there are other

2    lawsuits within the database that I had no

3    participation in.

4          Q.    What's the name of the database?

5          A.    I don't know what the name is.

6    It's just product liability database I would

7    guess.

8          Q.    Who would be the custodian of those

9    records, would that be you?

10         A.    No.

11         Q.    Who is that?

12         A.    Scott Foerstner.

13         Q.    What is his position?

14         A.    Corporate controller.

15         Q.    Did he assist you in gathering

16   these documents that we have in Exhibit 2?

17         A.    Yes.

18         Q.    And what is the database called

19   that keeps up with consumer complaints or

20   customer complaints like we see in Exhibit 2?

21         A.    Those wouldn't be complaints.

22         Q.    Thank you.

23               The lawsuits may be one file and

24   then consumer complaints may be another file,

25   at least that's the way I would envision it in

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 108

1    my mind.  Is that the way Besser keeps up

2    with it?

3         A.    No.

4         Q.    Does Besser keep up with consumer

5    complaints?

6         A.    Not with complaints.

7         Q.    So these in Exhibit 2, as far as

8    you know, these were all lawsuits?

9         A.    That's not correct.

10        Q.    Okay.  Obviously, I'm confused

11   between lawsuits and complaints.

12              Can you help me understand what

13   you're trying to say?

14        A.    That database contains all

15   accidents.  Some turned into lawsuits.

16        Q.    And some may not have been a

17   consumer complaint?

18        A.    It was just something reported

19   either by a customer or our field rep that

20   there was an accident.

21        Q.    Would it be a fair statement that

22   there may be other accidents that exist that

23   have taken place on block splitter machines

24   just like the one we're here about today that

25   Besser never knew about?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 109

1          A.      That could happen.

2          Q.      For example, there's no

3     documentation of the accident that Mr. Mackey

4     had at the Andalusia plant in your database; is

5     that right?

6          A.      No.

7          Q.      Yes, that's right?

8          A.      That is correct.

9          Q.      Now, is Besser a publicly-traded

10    company?

11         A.      No.

12         Q.      Who owns it?

13         A.      It's employee owned.

14         Q.      Tell me how that works.

15         A.      We became an ESOP company in 2005 I

16    believe, 4 or 5.

17         Q.      Do employees own shares?

18         A.      All employees own shares,

19    participation shares.

20         Q.      Before 2004 or 2005 what was the

21    structure of the company?

22         A.      Privately owned.

23         Q.      By who?

24         A.      Majority shareholder was the Park

25    family.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 110

1     Q.     The Park family?

2     A.     That's correct.

3     Q.     Did they sell it to the employees,

4  is that how it took place?

5     A.     Yes.

6     Q.     Who were some of the other owners?

7     A.     A bunch of the managers.

8     Q.     Have they since retired?

9     A.     No.  Everyone who was an owner at

10  that time sold to the ESOP trust and then the

11  employees are getting those shares.

12     Q.     Okay.

13            So are all of the managers that

14  were there then, are they still with the

15  company?

16     A.     Not all of them.

17     Q.     Can you think of the names of some

18  of them that have retired or gone on or left?

19     A.     There's I guess -- can you say that

20  question again?

21     Q.     Can you tell me the names of any

22  managers who were part of the owners with the

23  Park family but are no longer with Besser?

24            MR. MITCHELL:  I'm going to

25  object.

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 111

1          I don't see any relevance or

2   materiality to this, but go ahead and answer

3   if you can.

4          A.    There's a lot.  I was an owner.

5          Q.    You were one of the owners?

6          A.    Yes.  But not any longer, only as

7   an employee now.

8          Q.    I'm trying to understand how the

9   ownership, how were you an owner, did you own

10  shares?

11         A.    Through a bonus program I owned

12  shares.

13         Q.    Now or then?

14         A.    Then.  Now it's through the ESOP

15  program.

16         Q.    And does Besser now have any

17  corporate relationships, like sister companies

18  or parent companies?

19         A.    Corporate is in Alpena and we have

20  different manufacturing locations.

21         Q.    So the plants that are located

22  anywhere besides Alpena, they are owned by the

23  Alpena location just serving as manufacturing

24  locations?

25         A.    That's correct.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 112

1    Q.    Tell me about Lithibar.  How long

2  has Besser had a relationship with Lithibar

3  before it was purchased?

4    A.    Three years prior to the purchase.

5    Q.    Where was Lithibar based?

6    A.    Holland, Michigan.

7    Q.    Had Besser sold Lithibar products

8  before it bought Lithibar?

9    A.    No.  Excuse me.  Yes, during the

10  marketing agreement.

11    Q.    For that two or three years before

12  it was actually bought?

13    A.    That three-year period.

14    Q.    Before then did Besser ever sell

15  block splitter machines made by any other

16  company besides E&R?

17    A.    No.

18    Q.    Has Besser ever sold any block

19  splitter made by Columbia?

20    A.    No.

21    Q.    Can you think of any other

22  companies that manufacture block splitter

23  machines?

24    A.    Yes.

25    Q.    Who?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 113

1        A.      Paco.

2        Q.      How do you spell that?

3        A.      P-a-c-o.

4        Q.      Who else?

5        A.      Tiger.  Those are the only ones

6   that come to mind.

7        Q.      And Columbia?

8        A.      Columbia owns Paco now as well.

9        Q.      Are you familiar with Paco block

10   splitter machines?

11       A.      No.

12       Q.      Are you familiar with Tiger block

13   splitter machines?

14       A.      No.

15       Q.      Does Besser sell in all 50 states?

16       A.      Yes.

17       Q.      Would it sell pretty much in every

18   country in the world or do you know?

19       A.      We would sell anywhere that asked.

20       Q.      Can you tell me when or do you know

21   when the relationship between Besser and E&R

22   started?

23       A.      I don't know that.

24       Q.      As I understand from your previous

25   testimony, the reason that it ended is because

Page 114

1    Besser bought Lithibar?

2        A.    That's correct.

3        Q.    During the time that Besser was

4    selling E&R block splitter machines, do you

5    know if Besser ever met with E&R to discuss the

6    existence of these lawsuits or the existence

7    of any accidents on their machines?

8        A.    I don't know that.

9        Q.    Who would know that?

10       A.    I don't know if there's anyone that

11   would know that.

12       Q.    Would Arnold?

13       A.    He may.

14       Q.    Specifically as it relates to the

15   Domenici lawsuit, do you know if there was

16   ever any discussion between Besser and E&R

17   about this MIT engineer who came up with an

18   alternative design?

19            MR. MITCHELL:  For the record

20   I'm going to object.

21            Now you're talking about

22   sharing joint defense communications,

23   privileged communications, and work

24   product, but I don't think you know anything

25   anyhow.  So go ahead and answer.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 115

1          MR. ANDREWS:  Hang on.  I guess

2    your objection is because during the lawsuit

3    they would have talked to each other?

4          MR. MITCHELL:  Yes.

5          MR. ANDREWS:  I'm not asking

6    about during the pendency of the lawsuit.  I

7    would assume as co-defendants they would have

8    communicated.

9          Q.    My question is, do you know if

10   outside of that lawsuit there were ever any

11   discussions between Besser and E&R about this

12   accident, about the hazard or risk for an

13   injury to an operator like happened, and

14   specifically about the MIT engineer's design?

15         A.    I don't know of any correspondence.

16         Q.    Have you looked for any

17   communication in that regard, written

18   communication?

19         A.    I've looked through all of our

20   sales files, anywhere I thought it would be,

21   and I didn't find anything.

22         Q.    When Besser was selling E&R

23   machines, how did that relationship work?  How

24   would it come to be that Besser would sell an

25   E&R machine?

Page 116

1          A.      Typically we would provide a

2    complete plan.  If the customer decided they

3    wanted to produce a split product, we would

4    include the splitter in that.  We would get

5    pricing from E&R and include that in our

6    proposal.

7          Q.      Did Besser exclusively consult E&R

8    for splitters?  I'm trying to find out if

9    Besser ever sold any splitter made by anybody

10   besides E&R?

11         A.      Other than Lithibar, I don't

12   believe so.

13         Q.      I take it a customer would contact

14   Besser and request block making and splitting

15   machinery?

16         A.      Yes.

17         Q.      Is that what happened as far as you

18   know in the sale of the machine that made the

19   basis of this suit?

20         A.      I don't believe so.

21         Q.      What happened there?

22         A.      I believe this was a splitter going

23   to an existing plant.

24         Q.      Do you know how it is that Besser

25   came to buy it from E&R?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 117

1        A.    No, I don't.

2        Q.    What I'm asking you is, did

3   BlockUSA or Couch contact Besser for a

4   splitter?

5        A.    I believe there was communications

6   with all the parties together.

7        Q.    Right.

8              The other equipment in the

9   Andalusia plant is made by Besser, isn't it?

10       A.    Yes, it is.

11       Q.    And was that Couch plant already a

12   customer of Besser's?

13       A.    Yes, it was.

14       Q.    Do you know if there was anything

15   else in that plant made by E&R at all?

16       A.    I don't know that.  I don't believe

17   there was.

18       Q.    So do you know if Couch contacted

19   Besser or contacted E&R?

20       A.    I believe they originally contacted

21   E&R, but the sale eventually went through

22   Besser.

23       Q.    Do you know how that came to be

24   that Couch came to talk with Besser?

25       A.    We received a proposal from E&R

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 118

1    through our regional sales rep.

2        Q.    Is that Mike?

3        A.    Yes.

4            MR. MITCHELL:  Let's go off the

5    record.

6                (Discussion off the record.)

7        Q.    Have you talked with Mike about the

8    sale of this machine?

9        A.    No, I haven't.

10       Q.    How have you pieced together that

11   you understand that Couch contacted E&R?

12       A.    From a fax that I saw.

13       Q.    Are you talking about some of these

14   documents that are part of Mr. Neese's

15   deposition?  Is this what you're talking about?

16       A.    Yes.

17           MR. ANDREWS:  For the record,

18   he's referring to Plaintiff's Exhibit 10 to

19   Mr. Neese's deposition.

20       Q.    So you don't know if that had

21   happened, that's just what you gathered from

22   reading this fax?

23       A.    That's correct.

24       Q.    What in this fax led you to believe

25   that?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 119

1        A.      It's E&R letterhead and it was

2    addressed to Hal Webster and Doug Buss, who

3    are Couch/BlockUSA people, and it's from Ron,

4    who I'm assuming is Ron Neese.

5        Q.      So from that information you just

6    gathered that you believe Couch contacted E&R

7    and then E&R contacted Besser?

8        A.      From the other part of it I see

9    Mike Hadley contacting Besser.

10       Q.      Mike Hadley is the sales rep?

11       A.      Yes.

12       Q.      And there's some numbers on this

13   exhibit, $82,334, do you know what that is?

14       A.      No, I don't.

15       Q.      Do you know if that's what the

16   block splitter cost?

17       A.      I have no idea.

18       Q.      What do block splitters sell for?

19       A.      I don't know that either.

20       Q.      You don't know?

21       A.      No.

22       Q.      Who would know?

23       A.      I could find that out, but I don't

24   know right offhand.  It depends on the model.

25       Q.      The CM-24, you just don't know what

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 120

1    it would cost?

2         A.    We don't sell them anymore so I'm

3    not familiar with the pricing.

4         Q.    You told me you're an engineer?

5         A.    That's correct.

6         Q.    What is your engineering degree in?

7         A.    Mechanical engineering.

8         Q.    Where did you graduate?

9         A.    Michigan Tech University.

10        Q.    Your first job was with Besser?

11        A.    Yes.

12        Q.    You've been with Besser your whole

13   career?

14        A.    Yes, I have.

15        Q.    You told me earlier that you served

16   as a clerk or something, what was it?

17        A.    Co-op student.

18        Q.    You already told me about all of

19   the positions you've held with Besser?

20        A.    Yes, I have.

21                       -  -  -  -  -

22               (Thereupon, Plaintiff's Exhibit 7

23               was marked for purposes of

24               identification.)

25                       -  -  -  -  -

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 121

1          Q.    I'm going to show you Exhibit 7 to

2    your deposition, which has been produced to me.

3    That's a layout of the company as I understand

4    it?

5          A.    Of the sales portion.

6          Q.    I don't see your name on there is

7    one of my questions?

8          A.    That's correct.

9          Q.    Where would you fit in?

10          A.    This was at the time the splitter

11    would have been sold.

12          Q.    This is the structure of the

13    company and positions held by different

14    individuals at the time the subject machine was

15    sold in 1997?

16          A.    That's correct.

17          Q.    Where would you appear on this

18    hierarchy today or this structure today?

19          A.    In here.

20          Q.    The sales administration manager?

21          A.    Title has changed but same

22    responsibilities.

23          Q.    This gentleman, Calvin Maynard, is

24    he still with the company?

25          A.    No.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 122

1      Q.      Do you know where he is?

2      A.      He retired.

3      Q.      Would he have engaged in similar

4   activities as you do as far as determining

5   safety of products made by Besser?

6      A.      No.

7      Q.      We've established early on that

8   what you do today, that position didn't exist

9   before about 2004?

10     A.      Yes.

11     Q.      The engineers that we see over here

12  on the right side of Exhibit 7, are those

13  engineers still with the company?

14     A.      Those would be more sales type

15  engineering people and, yes, they are with

16  the company.

17     Q.      Dennis Baker, is he an engineer?

18     A.      Not degreed.

19     Q.      Mark Schultz, is he an engineer?

20     A.      No.

21     Q.      Was there any engineer employed by

22  Besser in 1997 when this machine was sold

23  other than you?

24     A.      Yes.

25     Q.      Who would they have been?  Would

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 123

1    there have been a lot of them?

2        A.    Yes.

3        Q.    Too many to list?

4        A.    Yes.

5        Q.    Would they have all been under the

6    sales design engineer position?

7        A.    No.

8        Q.    Who would they have been answerable

9    to?

10       A.    A different page of the chart under

11   engineering.

12       Q.    That's not been produced to me?

13       A.    No.

14       Q.    At the time this block splitter

15   machine was sold, would Besser's engineering

16   department have been involved with E&R from

17   an engineering analysis standpoint?

18       A.    No.

19       Q.    Why not?

20       A.    The sales department basically had

21   the marketing agreement with E&R.

22       Q.    But just so I'm clear, Besser never

23   did, as far as you know, meet with E&R's people

24   or review E&R's product for a safety analysis

25   before it was sold?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 124

1          A.     Not that I know of.

2          Q.     Are you familiar with the E&R Pitch

3    Master or Pinch Master?

4          A.     Somewhat with a Pitch Master.

5          Q.     As I understand, that product has

6    light curtains and interlocked gates on it, are

7    you familiar with that?

8          A.     No, I'm not.

9          Q.     You didn't know that?

10         A.     I didn't know that.

11         Q.     Are there any documents that

12   establish or set out the agreement between

13   Besser and E&R for the sale of block splitter

14   machines?

15         A.     No.

16         Q.     It was just an unwritten agreement?

17         A.     It had to be unwritten because I

18   couldn't find anything.

19         Q.     I asked you earlier about if you

20   could think of any other major purchaser of

21   block splitter machines in Alabama.  Can you

22   think of anybody else in Alabama that has

23   bought Besser products at all?

24         A.     No.  The only one, and I'm not sure

25   if they're in Alabama, is Harris Concrete, but

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 125

1    I'm not sure if they're in Alabama or not.

2         Q.    Has Besser ever participated with

3    E&R in any retrofit or safety upgrade program

4    for any of their products?

5         A.    Not that I know of.

6         Q.    I understand from E&R's deposition

7    that at some point it was discovered that some

8    barrier guards, what Mr. Neese calls barrier

9    guards, could have been added to the machine.

10   Were you aware of that?

11        A.    No, I wasn't.

12        Q.    I'm pointing now to Exhibit 5, and

13   I'm pointing to this area, it looks red but I'm

14   told it's ANSI orange.

15        A.    Okay.

16        Q.    This plate here, do you see that?

17        A.    Yes, I do.

18        Q.    Would you consider that a barrier

19   guard?

20        A.    When I think of barrier guards, I

21   think of fencing.

22        Q.    Did you participate or did Besser

23   participate with E&R in designing this

24   barrier guard or retrofitting any of its

25   machines with this guard that we see in

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 126

1  Exhibit 5 or in designing this guard that we

2  see in Exhibit 5?

3          MR. MITCHELL:  I'm going to

4  object to the extent that this asks about

5  anything other than -- I mean, this talks

6  about new machines, and the picture you're

7  showing us appears to be a brand new machine

8  still on the pallet.

9          To the extent you can answer,

10  go ahead.

11      Q.    I'll clear that up for you.  I'm

12  told by E&R that Exhibit 5 is a picture of the

13  subject machine when it was brand new.

14          Okay?

15      A.    Okay.

16      Q.    So my question now is, did Besser

17  participate with E&R in the design of this

18  guard or the decision to provide this guard

19  on this block splitter?

20      A.    I don't believe we did.

21      Q.    Did Besser ever participate with

22  E&R in designing this guard for retrofit of any

23  of its machines?

24      A.    I don't believe we had any design

25  input into any of their machines.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 127

1          Q.     If Besser asked E&R to put a

2    component part like a guard or stops at

3    different locations, would E&R typically

4    comply?

5          A.     I don't know that.  I don't know if

6    we ever have.

7          Q.     Have you ever participated in that

8    with E&R?

9          A.     No, I haven't.

10         Q.     Mr. Neese, on behalf of E&R, says

11   that if Besser recommended stops to be put in a

12   certain area or guards, they would listen to

13   Besser.

14                Do you know if that ever happened?

15         A.     No, I don't.

16         Q.     Can you tell me about what typical

17   conversations take place when a new machine

18   is being bought by a customer as it relates

19   to optional safety equipment or guards or

20   that sort of thing?

21                MR. MITCHELL:  Are you talking

22   about now or in 1996?

23                MR. ANDREWS:  1997.

24         A.     I don't have any idea what happened

25   in 1997.

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 128

1      Q.    As far as you know, there were no

2  discussions?

3          MR. MITCHELL:  Objection.

4          Go ahead.

5      A.    I don't know.

6      Q.    And you're the corporate rep for

7  Besser?

8      A.    Uh-huh.

9      Q.    Is that a yes?

10      A.    That's correct.

11      Q.    Today are there any discussions

12  with the customer about available safety

13  equipment and safety options?

14      A.    We have our standard -- whatever we

15  would consider our standard equipment.  We also

16  provide upgrades to old equipment of certain

17  safety features.

18      Q.    Why is it important to provide

19  upgrades and certain safety features for old

20  equipment?

21      A.    If we have seen the risk being

22  great, we would offer that to our customers.

23      Q.    What are some examples of some of

24  the safety upgrades you've provided?

25      A.    That slot conveyor photo switch,

Page 129

1    which I think you referred to earlier, we have

2    added gates on our rack loader/unloader,

3    emergency stops on block machines, start-up

4    horns.  I believe there's a few others.

5        Q.    The block machine, you said gates

6    on block machines?

7        A.    No.  Block machine, I think we've

8    added a start-up horn.

9        Q.    Shut-off switches?

10       A.    Remote shut-off.

11       Q.    And gates where?

12       A.    On our rack loader/unloader.

13       Q.    And start-up horns?

14       A.    That was on the block machine.

15       Q.    And the light curtain or electronic

16   sensor?

17       A.    Yes.  The electronic eye, the photo

18   light.

19       Q.    What purpose did these upgrades

20   serve?

21       A.    To increase the safety.

22       Q.    What prompted these to be provided,

23   was it because of keeping up with accidents

24   like we see in Exhibit 2?

25       A.    I can't say for certain, but it was

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 130

1    something that became standard at a later date,

2    which we felt we should offer as a retrofit.

3        Q.    Was it offered to all products that

4    had been sold even if it hadn't been made by

5    Besser?

6        A.    No.

7        Q.    Why would it not have been offered

8    to products that had not been made by Besser

9    but had been sold by Besser?

10           MR. MITCHELL:  Can I have that

11   question read back?

12              (Record read.)

13       A.    The equipment was --

14           MR. MITCHELL:  Let me object to

15   the form of the question.

16              Go ahead and answer.

17       A.    All of those updates were on Besser

18   designed equipment.

19       Q.    What I'm trying to find out is why

20   would you limit it to Besser designed

21   equipment?  If you come to realize a hazard

22   exists and you undertake to provide upgrades

23   for Besser equipment, why wouldn't you do the

24   same thing for E&R equipment?

25       A.    We don't design that equipment.  If

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 131

1    they would come to us and say we have this

2    safety feature, we would offer that.

3        Q.    Why didn't you notify E&R about

4    this upgrade and let them notify the customers?

5        A.    Because the upgrade was only on

6    Besser designed equipment.

7        Q.    Is that the reason why these

8    upgrades were not offered to E&R equipment?

9        A.    Yes.  Because they wouldn't fit,

10   they wouldn't work.  They were specifically

11   designed for other pieces of equipment.

12       Q.    These devices could be designed to

13   fit on E&R equipment, could they not?

14            MR. MITCHELL:  Objection.

15       A.    They could be.

16       Q.    But Besser just decided it was not

17   their responsibility to do so?

18            MR. MITCHELL:  Objection.

19       Q.    Is that your testimony?

20       A.    We were -- as an engineer, we were

21   designing our own equipment and those were

22   the features that we put on that equipment.

23       Q.    Let me ask you this question:  When

24   Besser recognized that we can install electric

25   eyes, gates, and start-up horns and all the

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 132

1    safety devices on the Besser equipment, I'm

2    trying to find out why it didn't connect with

3    someone to contact E&R and tell them there's

4    some features that could be added to your

5    splitters that we think may work, let's talk

6    about it, why didn't that take place?

7         A.    I really don't know.

8         Q.    Don't you think that would be a

9    good idea?

10             MR. MITCHELL:  Objection.

11        Q.    In hindsight, with knowledge of all

12   of these accidents that we see in Exhibit 2,

13   wouldn't that have been a good idea?

14             MR. MITCHELL:  Objection.

15        A.    We expect our suppliers to provide

16   safe equipment.  If they had any enhancements,

17   we would be open to listening to them.

18        Q.    So today Besser does not intend to

19   contact E&R to talk about any of these safety

20   upgrades?

21        A.    I don't know that right now.

22        Q.    Under what circumstances would you

23   think that Besser would contact E&R to discuss

24   providing these barrier guards that you've

25   explained earlier or any of these safety

Page 133

1     devices you've described?

2              MR. MITCHELL:  I'm going to

3     object.

4              It causes the witness to

5     speculate.

6         Q.    Let me ask you this:  As the

7     corporate representative for Besser and the

8     director of safety of products for Besser, and

9     the one that keeps up with these accidents or

10    certainly is aware of the accidents for the

11    stated purpose of providing safer equipment

12    and protecting operators of their machinery,

13    under what circumstances can you envision

14    that Besser would contact E&R to let them in

15    on the safety equipment that you all have

16    discovered may provide safer equipment?

17             MR. MITCHELL:  I'm going to

18    object to the form of the question.

19             Go ahead and answer.

20        A.    I would say that would come down to

21    if we saw the risk high enough, we would go to

22    E&R.

23        Q.    Is there a warranty department at

24    Besser?

25        A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 134

1      Q.     Who is in charge of that?

2      A.     Me.

3      Q.     Is there a parts or repair

4   department?

5      A.     Those would be separate

6   departments.

7      Q.     If the block splitter machine in

8   Andalusia falls into the need of some

9   attention, who would they contact at Besser?

10     A.     If they needed parts, they could

11  call our parts center.

12     Q.     Does Besser continue to sell parts

13  for that block splitter today?

14     A.     Yes.  We sell parts.

15     Q.     For the E&R block splitter?

16     A.     Yes.

17     Q.     Does Besser provide warranty work

18  on that block splitter today?

19     A.     No.

20     Q.     Is it because it's out of warranty?

21     A.     Yes.

22     Q.     While it was in the warranty

23  period, did Besser provide warranty work on

24  that block splitter?

25     A.     The warranty would have went back

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 135

1    to E&R.

2         Q.    What about servicing of the

3    machine, would that fall under Besser?

4         A.    It depends on the extent of it.  If

5    it was -- we would provide someone to evaluate

6    it, but if there was any changes to the

7    equipment or anything like that, we would go

8    to E&R.

9         Q.    When this subject machine was

10   installed, as I understand, Besser went down

11   and installed it?

12        A.    We may have had someone on-site,

13   but we typically don't install.  We provide a

14   technical assistant to be on-site.

15        Q.    Who would have installed it then?

16        A.    The customer typically installs his

17   own equipment per drawings provided by E&R or

18   Besser, and then we have a service technician

19   that provides start-up assistance.

20        Q.    Is the service technician an

21   employee of Besser?

22        A.    Yes.

23        Q.    And would they be on-site to assist

24   the customer in integrating the splitter into

25   their block assembly?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 136

1        A.      Typically it's put in place and

2  wired prior to the service technician coming

3  and then he will help them start it up.

4        Q.      Tell me what all the service

5  technician does when he's on-site.  Does he

6  explain how to use it, does he go through the

7  function of it?  Tell me what he does.

8        A.      I don't know specifically on the

9  E&R since I wasn't around when they installed

10  that one.  But today we would go through

11  operating instructions, manuals, check that

12  the wiring was correct, and then discuss any

13  types of safety features and show how they

14  use them.

15        Q.      The machine that made the basis of

16  this lawsuit, was this the first block splitter

17  machine Besser had ever sold that was made by

18  E&R?

19        A.      No.

20        Q.      There had been many of them, had

21  there not?

22        A.      There's been quite a few.

23        Q.      Would you think that Besser would

24  be familiar with how this block splitter

25  machine worked because of the number of sales

Page 137

1    that had taken place?

2         A.    Some of the people would.

3         Q.    Some of the people at Besser would

4    be familiar with it?

5         A.    Yes.

6         Q.    Do you hold any degrees with regard

7    to safety?

8         A.    No.

9         Q.    Do you attend or put on any

10   seminars like you see in Exhibit 5 for Besser

11   as it relates to safety?

12        A.    Those are typically for our

13   customers, but I will provide some training for

14   our engineers, typically the ones that are

15   responsible for safety at each site.

16        Q.    Safety of the design of the

17   machines?

18        A.    Design of machinery.

19        Q.    Is that a program or do you put on

20   a program that's in a power point presentation?

21        A.    No.

22        Q.    Do you attend seminars that educate

23   you on machine safety or design of machinery?

24        A.    I have attended some.

25        Q.    Which ones were those?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 138

1     A.     I've done some with the role of

2 instructions and warnings, risk assessment,

3 hazard analysis, some of the CE directives.

4 Those are the ones I can think of offhand.

5     Q.     Can you tell me all trade

6 publications or any magazines you receive that

7 deal with ongoing safety concerns?

8     A.     Personally?

9     Q.     Yes.

10     A.     Occupational Hazards, I think

11 that's really the only one that relates to

12 safety.

13     Q.     Is that one that's put out by

14 Besser?

15     A.     No.

16     Q.     Besser puts out safety

17 publications, right?

18     A.     We put out a publication called

19 Concrete Impressions, and there's one safety

20 article in that.

21     Q.     Is your wife still the editor of

22 that?

23     A.     Yes.

24     Q.     Who contributes to the safety

25 section in that?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 139

1       A.      I do.

2       Q.      Do you have a copy of all of the

3   articles that you've written or submitted to

4   that publication?

5       A.      I probably do.

6       Q.      Where would those be kept?

7       A.      The majority of them are on our web

8   site, but they would be in our advertising

9   area.

10      Q.      In other words, if I sent a request

11  for a copy of those, what would I call them,

12  just all articles that you've submitted for

13  publication?

14      A.      Safety articles for Concrete

15  Impressions.

16              MR. MITCHELL:  You could get

17  them online.

18      Q.      Are they all on the Internet?

19      A.      I'm not sure if all of them are.  I

20  know recent ones are.

21      Q.      You've told me the Occupational

22  Hazards publication is one that you take.  Does

23  Besser receive any other ones?

24      A.      Not regarding safety, I don't

25  believe.

Page 140

1          Q.     Does Occupational Hazards, does it

2     address the applicability of ANSI standards,

3     OSHA, CE standards?

4          A.     It's more in regard to workplace

5     safety, rather than product safety.

6          Q.     Do you receive any publications

7     that deal with ANSI and OSHA standards or ANSI

8     and CE standards, for example, and are you

9     familiar with ISO standards?

10         A.     Yes, I am.

11         Q.     Do any of these publications deal

12    with those standards?

13         A.     No.

14         Q.     Can you tell me all the

15    publications that Besser advertises in?

16         A.     Concrete Products Magazine, I think

17    it's called BFT, it's a German magazine, Rock

18    Products, and CM News.  That's all I can

19    think of.

20         Q.     What about trade shows and seminars

21    that Besser goes to, are there some that take

22    place?

23         A.     Yes.

24         Q.     Which ones are those?

25         A.     The NCMA has Masonry Expo,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 141

1    Con-Expo/Conagg, Bauma is another.

2         Q.    Have you been to any of these trade

3    shows?

4         A.    Yes, I have.

5         Q.    At those trade shows have you seen

6    any block splitters that have the barrier

7    guards on the side like you've described?

8         A.    Not at the shows.

9         Q.    Have you seen any of those before?

10        A.    Any other block splitters at shows?

11        Q.    Yes.

12        A.    Yes.

13        Q.    Have you seen any block splitters

14   anywhere besides at the shows that would have

15   the barrier guards on the side like you've

16   described before?

17        A.    I've seen facilities where

18   customers have added some barrier guards.  I

19   don't know if they were from the supplier or

20   not.

21        Q.    Can you think of where any of those

22   facilities are?

23        A.    The only one that comes to mind is

24   4D in Midland, Michigan.

25        Q.    4D?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 142

1      A.      Yes.

2      Q.      Do you know if that was an E&R

3  block splitter?

4      A.      I don't know that.

5      Q.      So you don't know if they added it

6  or if it came with the block splitter?

7      A.      I believe they added that on their

8  own.

9      Q.      Does it in any way impede the

10 ability for the block to be fed into the

11 operational area and then fed out?

12     A.      No.

13     Q.      Does it provide protection for the

14 operator from reaching into the point of

15 operation or the cutting area?

16     A.      If it stays in place.

17     Q.      In other words, the operator can't

18 reach it, right, can't reach the point of

19 operation?

20     A.      With the guard in place, no, he

21 can't.

22     Q.      You've told me that you've attended

23 training programs and also you acknowledge

24 the need to identify foreseeable hazards when

25 using that particular piece of machinery,

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 143

1    correct?

2         A.    Yes.

3         Q.    Why is that important?

4         A.    That helps determine the risk of

5    the equipment.

6         Q.    Why is it important to determine

7    the risk of the equipment?

8         A.    If the risk is high enough, we

9    could look at measures to redesign the

10   equipment or guard or warn against it.

11        Q.    Would you agree with me that no

12   risk of injury is acceptable where it can

13   either be designed out or guarded against, and

14   if it can't be designed out or guarded against,

15   then it should be warned against?

16        A.    Not necessarily.

17        Q.    Tell me why you say that.

18        A.    There's inherent -- take a door,

19   for example, there's a pinch point in the door,

20   but it's not designed out.

21        Q.    My question was, if a risk or a

22   hazard is identified, if it can be reasonably

23   designed out, it should be designed out if it

24   does not impede the function of the machine?

25        A.    But in the door example it's not

Page 144

1    designed out, you still have a pinch point.

2         Q.    Because it would impede the

3    function of the door, correct?

4         A.    No.

5         Q.    Tell me what you mean.

6         A.    You could put all pocket doors in.

7         Q.    Would there be a pinch point with

8    pocket doors?

9         A.    No.

10        Q.    There would not be a pinch point

11   with a pocket door?

12        A.    No.

13        Q.    Define the pinch point for the

14   swinging door.

15        A.    At the hinge point.

16        Q.    Is that the only location for pinch

17   point?

18        A.    You could have it on the other side

19   as well.

20        Q.    With a pocket door would there

21   still be a pinch point at the other side?

22        A.    It wouldn't be as great.

23        Q.    My question to you is, as an

24   engineer, have you ever heard of the hierarchy

25   of design principles where you design out a

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 145

1    hazard, if you can't design it out, you guard

2    against it, if you can't guard against it,

3    you warn against it?

4         A.    Yes.  I've heard it.

5              MR. MITCHELL:  I'm going to

6    object.

7              He's not being offered as an expert.

8         Q.    I'm not trying to ask you as an

9    expert.

10             I'm trying to ask you as an

11   engineer if you agree with that principle, that

12   if you can design out a hazard, you should do

13   so.

14             MR. MITCHELL:  I maintain my

15   objection.

16        Q.    Would you agree with that?

17        A.    Based on the risk.

18        Q.    Okay.

19             Then I guess it's your testimony it

20   would be up to each individual engineer to

21   determine how high the risk is?

22        A.    That's typically the way we do that

23   now.

24        Q.    Would you consider potential

25   hazards that could amputate multiple fingers on

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 146

1   an operator's hand to be a high enough risk to

2   engage in that hierarchy of design?

3              MR. MITCHELL:  Objection.

4        A.    The severity is high, but I don't

5   know what the frequency would be.

6        Q.    Tell me how you would engage in

7   that analysis then.

8        A.    You would identify all of the

9   hazards, identify at what point that hazard

10  takes place, and then what the severity of that

11  hazard would be, and the frequency of that

12  actually happening.

13       Q.    How frequent would it have to be

14  before it would be a high enough frequency to

15  provide guards or design out a hazard or

16  provide guards?

17       A.    I really don't have that

18  quantified.

19       Q.    Would the number of accidents that

20  we have documented in Exhibit 2 be enough?

21       A.    I really don't know that.

22       Q.    Why not?

23       A.    Again, that's not our equipment.

24       Q.    I understand that.  This is made by

25  E&R, the machine that we're here about today

Page 147

1    was made by E&R?

2         A.    Yes.

3         Q.    And some of the accidents that we

4    see in Exhibit 2 are made by E&R?

5         A.    That's correct.

6         Q.    However, Besser was aware of the

7    frequency of these accidents, true?

8         A.    Right.

9         Q.    My question to you is this, how

10   many accidents have to take place before it is

11   seen as a high enough frequency before Besser

12   contacts E&R to say, "Hey, put some guards on

13   this thing"?

14        A.    I don't think I can actually put a

15   number on it.  It has to look at the

16   circumstances, and if they were following

17   their procedures, they wouldn't be put in

18   that situation.

19        Q.    The lockout/tagout is not a

20   substitute for proper safety and design, is it?

21        A.    It's not a substitute for design.

22        Q.    So before you get to lockout/tagout

23   or these other measures, a proper engineering

24   analysis that E&R should have engaged in

25   would have been design out the hazard if it

Page 148

1    can be designed out, guard against the hazard

2    if it can be guarded against, and then warn

3    against it if it can't be designed out or

4    guarded against, would you agree with that?

5         A.     That would be a way of doing it,

6    but you would have to look also at how much of

7    a design it would take, how radical is it, the

8    cost of it.  Again, in what atmosphere, are

9    they doing this routinely, is it part of

10   maintenance, is it part of something else.  I

11   really can't make that determination.

12        Q.     We know all those things now with

13   the splitters, do we not?

14             MR. MITCHELL:  I'm going to

15   object.

16             I don't know what we know about

17   splitters right now.

18        Q.     We know now how frequently they

19   happen, at least based on the documentation by

20   Besser, how frequently these type of

21   accidents happen like what happened to the

22   Plaintiff, correct?

23             MR. MITCHELL:  I'm going to

24   object because we don't know anything or we

25   know very little about these accidents.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 149

1           Go ahead and answer if you can.

2           Q.    You know how many times they've

3    happened because you documented them?

4           A.    I don't know exactly how many there

5    are.

6           Q.    Let's count them.  One, two, three,

7    four, five, six, seven, eight, there were

8    nine documented by Besser prior to the

9    Plaintiff's accident?

10          MR. MITCHELL:  I'm going to

11   object because we don't know the circumstances

12   of any of those accidents.

13          Q.    Let me ask the question right

14   before he objects.  We know there were nine

15   documented accidents to operators of splitters

16   before Mr. Jackson's accident, correct?

17          A.    That's correct.

18          Q.    Besser had this documentation?

19          A.    That's correct.

20          Q.    You've told me that you might be

21   able to identify a hazard but not need to

22   design it out because it doesn't happen too

23   frequently, right?

24          A.    That's correct.

25          Q.    Would nine accidents or nine

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 150

1    amputations or nine instances where an

2    operator has gotten his hand caught in a

3    block splitter be enough before you would

4    think that Besser or E&R should consider the

5    need to provide additional guarding?

6              MR. MITCHELL:   I'm going to

7    object to the form.

8              MR. SHEALY:   Object to the

9    form.

10         Q.    You can answer.

11         A.    There's millions of hours of

12   operation of these splitters, and without

13   knowing exactly what the details are, I can't

14   say that those nine accidents would make me do

15   something different.

16         Q.    Would you think that the barrier

17   guard like you've described earlier would be

18   expensive or inexpensive to provide?

19         A.    It depends on which guard you're

20   talking about.

21         Q.    The one you described, the barrier

22   guard on the sides?

23         A.    Just a fixed guard, no interlocks?

24         Q.    True.

25         A.    Probably inexpensive.

Page 151

1      Q.    Would it be difficult to design

2  into the machine?

3      A.    No.

4      Q.    And would it provide protection for

5  the operator?

6      A.    I don't believe it would have

7  provided protection in this case.

8      Q.    In which case?

9      A.    In the accident we're talking about

10  today.

11      Q.    Why is that?

12      A.    I believe he would have moved the

13  guard.

14      Q.    If it's a fixed place guard, you

15  believe he would have unwelded it from the

16  machine?

17      A.    I didn't say it was a fixed place

18  guard.

19      Q.    You understand what a fixed place

20  guard is, right?

21      A.    Bolted to the floor.

22      Q.    Or bolted to the machine?

23      A.    Okay.

24      Q.    You understand that it could be

25  bolted or welded to the splitter?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 152

1          A.      Okay.

2          Q.      Are you saying that you think

3    Mr. Jackson would have taken that guard off?

4                  MR. MITCHELL:  Objection.

5                  MR. SHEALY:  Let me object here

6    because what I think we're misunderstanding,

7    when he was earlier talking about the barrier

8    guard in the Lithibar machine, it's not a

9    fixed place guard per se.  I mean, you open a

10   door.

11                 Is that what you're talking

12   about or are you just talking about in

13   general a fixed place guard?

14                 MR. ANDREWS:  In general.  He's

15   described a couple of different barrier

16   guards today.

17                 One of them was a perimeter

18   guard, a fence around the machine entirely,

19   and one of them was a barrier guard along the

20   side of the splitter.  I'm talking about in

21   general.

22                 MR. SHEALY:  Okay.  Okay.  I

23   just wanted to be clear.

24         Q.      You can answer.

25         A.      In general I wouldn't design a

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 153

1    guard that was fixed that you couldn't get into

2    because you knew that eventually you would

3    have to do maintenance or clean out.

4         Q.    Clean the debris?

5         A.    Correct.

6         Q.    So access to the point of operation

7    -- and what I'm calling the point of operation

8    is where the knives come down and break the

9    block.

10        A.    Okay.

11        Q.    Access to that area is still going

12   to be needed, right?

13        A.    That's correct.

14        Q.    Could you put a door on the side

15   where you could reach in and the door would be

16   interlocked so that if it's open, the machine

17   won't be allowed to cycle?

18        A.    It could be.

19        Q.    Can you think of any instance, any

20   time when an operator reaches into this point

21   of operation of this splitter where they're not

22   at risk for injury if the power is still on

23   to the machine?

24        A.    Can you do that again for me,

25   please?

Page 154

1      Q.      Let me ask it this way:  We know

2  that operators are going to have to reach in

3  there to clean out debris at some time?

4      A.      That's correct.

5      Q.      We know that, therefore, it's

6  foreseeable their hands are going to be

7  around this point of operation where the

8  knives cycle, right?

9      A.      That's correct.

10      Q.      Can you think of any instance when

11  an operator would be able to reach into that

12  point of operation without risk for injury as

13  it existed on the day of the accident?

14      A.      Only if the machine was shut off.

15      Q.      Otherwise, would they be at risk

16  for injury?

17      A.      Yes.

18      Q.      If your hand gets caught or if your

19  glove gets caught on the side of the machine

20  or if your hand gets caught in that area and

21  the machine cycles, would you agree with me

22  that serious injury is probably or likely to

23  result?

24      A.      It's probable.

25      Q.      Has Besser ever engaged in any

Page 155

1    recall of any of their products?

2        A.    Not that I know of.

3        Q.    Do you agree that there's a need to

4    have an ongoing commitment to safety for

5    users of products that have been sold?

6        A.    Yes.

7        Q.    Why is that?

8        A.    We want to be -- we want all of our

9    customers and customers' employees to be

10    safe.

11        Q.    And do you embrace the principle

12    that all reasonable steps should be taken to

13    eliminate or reduce the risk of injury or

14    death in a machine?

15        A.    It is reasonable, yes.

16        Q.    We know from E&R's testimony that

17    no hazard analysis was ever performed on this

18    block splitter machine and that they have

19    never consulted with anybody to perform a

20    hazard analysis.  Do you know if Besser has

21    ever done that?

22            MR. MITCHELL:  With respect to

23    the E&R machine?

24            MR. ANDREWS:  With respect to

25    the E&R machine.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 156

1          A.      I don't believe we have.

2          Q.      Do you agree that Besser and E&R

3    should consider, and I guess E&R, in the design

4    of the machine, should consider the way the

5    operator interacts with the machine?

6               MR. MITCHELL:  I'm going to

7    object to the form of the question.

8          Q.      Let me restate it.

9               Do you think that E&R, when they

10   design this block splitter machine, should

11   consider the way the operator interacts with

12   the machine?

13         A.      Yes.   That's part of their

14   consideration.

15         Q.      Do you think that Besser should

16   make that same consideration when it sells a

17   machine like this and places it in the stream

18   of commerce?

19         A.      We expect our supplier to provide

20   something that's safe and they perform their

21   own analysis.

22         Q.      Is that Besser's policy?

23         A.      Yes.   I don't believe we've ever

24   done an analysis on someone else's piece of

25   equipment.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 157

1     Q.     You've already told me earlier that

2  you agree that in performance hazard analysis

3  that in proper design you should take into

4  consideration all reasonable uses and misuses

5  of the product?

6     A.     That would be part of it.

7     Q.     Why is that important?

8     A.     That would determine part of the

9  frequency of the hazard.

10     Q.     How would you use that information?

11     A.     You would need to know as part of

12  your risk assessment how often the operator

13  would be exposed to that hazard and then what

14  the frequency of actually being injured by that

15  hazard, and whether it was during normal

16  operation or installation of equipment or

17  maintenance, that would help determine your

18  frequency and determine whether or not we

19  would take some kind of action.

20     Q.     Do you know if that analysis has

21  ever been performed on the subject E&R machine?

22     A.     No, I don't.

23     Q.     By Besser?

24     A.     No, I don't believe so.

25     Q.     By anyone?

Page 158

1          A.      No.

2                  MR. MITCHELL:   Could we take a

3      quick break?

4                  MR. ANDREWS:   Sure.

5                      (Recess had.)

6          Q.      Mr. Rondeau, we talked about OSHA

7      and I asked you about 1910.212.  It's Exhibit

8      19 to Mr. Neese's deposition.  I'll direct your

9      attention down here to the bottom of this

10     page.  It reads, "Point of operation of

11     machines whose operation exposes an employee

12     to injury shall be guarded.  The guarding

13     device shall be in conformity with any

14     appropriate standards, therefore, or in the

15     absence of applicable specific standards

16     shall be so designed and constructed that

17     should prevent the operator from having any

18     part of his body in the danger zone during

19     operation cycle."

20                 Did I read that correctly?

21         A.      Yes.

22         Q.      When you look at the subject

23     machine, is there anything that prevents the

24     operator from having his body or any part of

25     his body in the operation zone during the

Page 159

1    cycle?

2        A.    Only when it's shut off.

3        Q.    Other than shutting the machine

4    off, is there any guard like is talked about in

5    OSHA 1910.212?

6            MR. MITCHELL:  I'm going to

7    object.

8            I don't exactly know the

9    context of 1910.212, and I don't know the

10   definition of operator.  Go ahead and answer

11   if you can.

12       Q.    Let me try to define operator for

13   you.

14           It would be Mr. Jackson because he

15   was operating the machine.  And then 1910.212

16   is entitled, "General requirements for all

17   machines."

18           Okay?

19       A.    Okay.

20       Q.    And the first section or the

21   heading is entitled, "Machine guarding."  With

22   those interpretations or answers or

23   explanations for you, my question to you is, we

24   just read this section that talks about, in

25   short, the need to have protection to keep an

Page 160

1   operator from having his or her body part

2   anywhere in the point of operation when it

3   cycles.

4         A.    Right.

5         Q.    Is there anything that does that,

6   anything that prevents the operator from

7   having his or her body parts in the point of

8   operation when this subject machine cycles?

9               MR. MITCHELL:  Same objection.

10              MR. SHEALY:  Same objection.

11        A.    The operator has no need to be in

12  that area, so he wouldn't have his hands in

13  there.

14        Q.    We know that the operator, from

15  what you've told me and from what E&R has told

16  me that he's going to have to reach in there to

17  clean out the debris from time to time, right?

18        A.    That's correct.

19        Q.    If the machine were to cycle when

20  he's got his hand in there, that would present

21  a risk for him or her being injured like

22  Mr. Jackson was injured, right?

23        A.    That's right.

24        Q.    My question is, is there any

25  barrier guard, is there any guard that keeps

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 161

1    the operator from having his hand in this point

2    of operation when the machine cycles?  Can

3    you point to anywhere on here and tell me?

4         A.    I'm confused now because that

5    wouldn't be -- he wouldn't have his hand in

6    there.  The guard would be two-fold.

7         Q.    We know he had his hand in there --

8         A.    That's correct.

9         Q.    -- don't we?

10        A.    Yes.

11        Q.    We know Mr. Domenici had his hand

12   in there, don't we?

13             MR. MITCHELL:  Objection.

14             We don't know that.  Go ahead.

15        Q.    We know that Mr. Domenici's fingers

16   got caught off while operating a block

17   splitter, right?

18        A.    Yes.

19        Q.    So we imagine, based on the

20   documentation in Exhibit 2, which you all

21   kept up with, he got his fingers caught in

22   the point of operation, right?

23        A.    Right.

24        Q.    This happened to these other

25   individuals listed in Exhibit 2 as well,

Page 162

1    right?

2         A.    Not necessarily.

3              MR. MITCHELL:  Are you saying

4    same point of operation as Mr. Jackson?  We

5    don't know that.

6         Q.    Is there any other point of

7    operation on these block splitter machines?

8         A.    Some of those accidents were not

9    what you're considering point of operation.

10        Q.    But we know some of them do, right?

11        A.    Some of they were.

12        Q.    It's no surprise that operators

13   have their hands in the point of operation,

14   same place where Mr. Jackson had his hand,

15   right?

16        A.    Some of those were feet, too.

17        Q.    Okay.  Well, we would include the

18   need to guard feet, wouldn't we?

19        A.    Not at that point of operation.

20        Q.    Okay.

21              Can you point to anything in these

22   pictures to show that the operator is

23   prevented from having his body part in the

24   point of operation when it cycles?

25        A.    The operator location would not be

Page 163

1    that he would be in physical harm of that.

2        Q.    Can you point to anything in these

3    pictures to show me that the operator has

4    anything to keep his body parts out of the

5    point of operation when it cycles?

6        A.    Yes.   The emergency stop.

7        Q.    Other than the emergency stop?

8        A.    No.

9        Q.    Do you know why that is?

10       A.    No, I don't.

11       Q.    Based on reading that standard, do

12   you know if this E&R block splitter machine

13   even complies with Section 1910.212?

14            MR. MITCHELL:   Objection.

15            You don't have any foundation.

16            MR. SHEALY:   Same objection.

17       A.    E&R wouldn't have to comply with

18   that.   That's a workplace standard.

19       Q.    Do you know if it complies with

20   those guarding principles set forth in that

21   standard?

22            MR. MITCHELL:   The machine as

23   positioned at BlockUSA?

24            MR. ANDREWS:   Yes.

25       A.    I don't believe it did.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 164

1     Q.     Other than hitting the stop switch,

2     can you think of any way that an operator can

3     safely reach into this splitter without risk

4     of injury?

5     A.     No.   I would say it has to be off

6     before he reaches into it.

7     Q.     Does Besser recommend the use of

8     tools to clean out the debris in the splitter?

9     A.     We don't make any recommendations

10    for that.

11    Q.     Besser doesn't make any

12    recommendations as to how to properly clean out

13    the debris in the machines?

14    A.     Other than following your own

15    lockout/tagout procedures.

16                    -    -    -    -    -

17            (Thereupon, Plaintiff's Exhibit 8

18            was marked for purposes of

19            identification.)

20                    -    -    -    -    -

21    Q.     I'll show you Exhibit 8, can you

22    tell me which machine this is?

23    A.     It's a Besser V-200 splitter.

24    Q.     Does that split blocks like the E&R

25    splitter does?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 165

1        A.    No.

2        Q.    How does it differ?

3        A.    This only splits one type of block,

4    which is called an overbrick.

5        Q.    Does it break block in two and,

6    therefore, engage in a splitting function

7    like the E&R splitter does?

8        A.    Yes, it does.

9        Q.    I understand it splits in a

10    different way, it splits the block but,

11    nonetheless, knives or something comes together

12    to split block, right?

13        A.    Only the top knives.

14        Q.    There are knives in this machine?

15        A.    Yes.

16        Q.    Is it called the V-200?

17        A.    I believe it is, yes.

18        Q.    And is that area guarded on this

19    V-200?

20        A.    I think it's guarded by location.

21    I'm not that familiar with this one, but the

22    blades are back inside.

23        Q.    What is this button that I see

24    here?

25        A.    That's an emergency stop.

Page 166

1          Q.      What is this button that I see
2    here?
3          A.      That's an emergency stop.
4          Q.      Would that be so the operator could
5    press this emergency stop and stop the cycle
6    of this machine?
7          A.      Yes.
8          Q.      Would the operator be able to pull
9    that emergency stop back out and allow the
10   machine to continue?
11         A.      He would have to pull that out and
12   then probably hit an auto start button besides
13   that.
14         Q.      Where is that?
15         A.      I don't know.
16         Q.      But the --
17         A.      I don't know how this one works.
18         Q.      These emergency stop buttons are on
19   either side of point of operation; isn't that
20   right?
21         A.      That's right.
22         Q.      Has Besser ever sold these
23   emergency stop buttons as an aftermarket
24   product to anyone who has an E&R block
25   splitter?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 167

1          A.      Not that I know of.

2          Q.      Do you know if any of the accidents

3     that are identified in Exhibit 2, if any of

4     those machines have ever been retrofitted

5     with these emergency stops like we see in

6     Exhibit 8?

7          A.      I don't know that.

8          Q.      How could we find that out?

9          A.      I can see if we have a retrofit

10    kit, but I don't believe we have.  I don't

11    think we've done any retrofits on E&R

12    splitters.

13                         -   -   -   -   -

14                 (Thereupon, Plaintiff's Exhibit 9

15                 was marked for purposes of

16                 identification.)

17                         -   -   -   -   -

18         Q.      I'm going to show you Exhibit 9.

19    What are those, are those other models of block

20    splitters Besser makes?

21         A.      Yes, they are.

22         Q.      The bottom right, is that the semi-

23    automatic splitter?

24         A.      Yes.

25         Q.      Is that the two-hand control?

Page 168

1    A.    Yes.

2    Q.    Besides that semi-automatic with

3  two-hand control feature, do all of these

4  machines have these red emergency stop

5  buttons where the operator is going to stand?

6    A.    The top two I can see.  I'm not

7  sure about this one at the bottom here.

8    Q.    Is that pretty standard or as far

9  as you know, is that something that's typical

10 of the Besser block splitter machines that the

11 emergency stops are located where the operator

12 stands?

13        MR. MITCHELL:  Are you talking

14 about the ones today?

15        MR. ANDREWS:  Yes.

16    A.    Our current models, yes.

17    Q.    Do you know if Besser has a

18 retrofit package like you said you would have

19 to look and see if you have, do you know if you

20 have an emergency stop retrofit package?

21    A.    Not for E&R.

22    Q.    Could people that have E&R block

23 splitters, couldn't they go buy emergency

24 stop switches and put them on the E&R

25 splitter?

Page 169

1     A.     They could.

2     Q.     They could buy them from Besser?

3     A.     Typically we don't modify anybody

4  else's equipment.

5     Q.     But you have the emergency stop

6  that can be bought through Besser, right?

7     A.     Correct.  But we don't modify

8  anyone else's logic or controls.

9     Q.     I think what I hear you saying is

10  that if you buy the emergency stops for a

11  Besser product, you will actually come help put

12  it on?

13     A.     For that the customer would take

14  care of it themselves.

15     Q.     Could the emergency stops that

16  Besser sells be installed on the E&R product if

17  somebody knew how to code it in properly?

18     A.     They could be.

19     Q.     And if these emergency stops are

20  present, would that be one of the alternative

21  measures that are discussed in the

22  lockout/tagout standard as one of the

23  alternative measures to locking out and tagging

24  out a machine?

25     A.     That would be specific on the owner

Page 170

1  of the equipment and what they deem necessary,

2  but it would be something I would consider

3  alternative.

4      Q.    The reason I'm asking that is, I

5  understand from 1910.147, which is the

6  lockout/tagout standard, and from your article

7  in your power point, this Exhibit 5, that one

8  of the alternative measures to the

9  lockout/tagout policy is use of lockable

10  E-stops?

11      A.    That's correct.

12      Q.    Is that what we see here in Exhibit

13  9?

14      A.    I don't believe those are lockable.

15      Q.    Are these E-stops, would those

16  comply with this alternative measure if they're

17  not lockable?

18      A.    That particular power point

19  presentation was specifically for block

20  machines doing mold changes.

21      Q.    So is it required that there be

22  lockable E-stops or could they just be E-stops

23  that you push in?

24      A.    It could be just pushed in.

25      Q.    The ones we see in Exhibits 8 and 9

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 171

1    could qualify as an alternative measure for the

2    lockout/tagout standard as far as you know?

3         A.     They could.

4         Q.     If in the instance when Mr. Jackson

5    was injured when he was cleaning out the

6    debris, could he have had these buttons

7    installed on the E&R splitter and been able to

8    push that button, clean out the debris, and

9    then start the machine back up and not be

10   required to engage in lockout/tagout?

11              MR. MITCHELL:  I'm going to

12   object to the form of the question.  Go

13   ahead.

14        A.     That button would be part of his

15   lockout/tagout program.

16        Q.     What else would he have to do?

17        A.     I don't know.  It would be --

18        Q.     It would be up to the employer?

19        A.     It would be up to the employer.

20        Q.     What I understand from the OSHA

21   interpretation is that you don't have to

22   complete the lockout/tagout program or the

23   steps like we have gone through previously,

24   those eight steps, if you have this alternative

25   measure?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 172

1    A.    That's correct.

2    Q.    So then, once again, what I

3  understand that to mean, and tell me if I'm

4  correct, is that if you got these E-stops, that

5  you could use those E-stops to stop the

6  machine, clean out the debris and then start

7  the machine back up, and you don't have to go

8  through the lockout/tagout because that is an

9  alternative measure?

10    A.    The alternative measure is part of

11  the control of hazardous energy program which

12  is lockout/tagout.

13    Q.    I think I understand you.  You

14  would, therefore, comply with lockout/tagout?

15    A.    That's correct.

16    Q.    Let me make sure I got a correct

17  question.

18        If E&R provided these E-stops on

19  either side of the splitter for the operator to

20  hit the button and stop the machine, would that

21  allow the operator to comply with

22  lockout/tagout?

23        MR. MITCHELL:  Objection.

24  Foundation.  Go ahead.

25        MR. SHEALY:  Same objection.

Page 173

1    A.    It would definitely help.

2    Q.    Tell me what you mean by

3    "definitely help."

4    A.    Again --

5    MR. MITCHELL:  Let me again

6    state my foundation objection.  Go ahead.

7    A.    He would have to comply with

8    whatever his employer stated for lockout and

9    tagout, and if that was one of the alternative

10   measures that his employer said was okay,

11   then he would be in compliance.

12   Q.    And also part of your power point

13   presentation in Exhibit 5, it talks about the

14   hierarchy of design, to design out a hazard,

15   guard a hazard, and then warn about the

16   hazard, right?

17   A.    That's correct.

18   Q.    As I understand it, if you can

19   design it out, then you can't rely on guarding.

20   You should design it out, if it can be

21   reasonably done so, then you can guard against

22   it, and if you can't reasonably guard a hazard,

23   then you should only then resort to warning, is

24   that the way you understand it?

25   A.    Partly.  Sometimes you still will

Page 174

1    warn even if you have a guard on there.

2        Q.    In addition to the guarding or in

3    addition to the design?

4        A.    That's correct.

5        Q.    As I understand, you should never

6    just skip right to warning if you can

7    reasonably design out a hazard or warn against

8    a hazard?

9        A.    You always have to consider it.

10       Q.    And also in your power point

11   presentation, part of Exhibit 5, is a page

12   entitled, "Perimeter guarding." Is this some

13   of the fencing around the machinery like

14   you've described previously?

15       A.    Yes, it is.

16       Q.    And do those perimeters have doors

17   that open to allow operators to access the

18   machinery if they need to?

19       A.    Yes, they do.

20       Q.    Are these doors, if I'm reading

21   correctly, down here it says interlocked

22   doors?

23       A.    Okay.

24       Q.    Does that mean that when these

25   doors are opened the machinery would shut down?

Page 175

1    A.    Some are interlocked, some are not.

2    Q.    The ones that are interlocked,

3    would that mean that the machinery would shut

4    down?

5    A.    It would be taken off automatic and

6    shut down.  That's all it would do.  It

7    wouldn't shut the power off, it would take it

8    out of automatic.

9    Q.    What would be the reason or the

10    desire or objective in taking it out of

11    automatic?

12    A.    It stops the equipment.

13    Q.    There's some pictures we see here,

14    correct?

15    A.    Yes.

16    Q.    Also, I notice that there's a Yahoo

17    safety chat group in the industry resources,

18    what is that?

19    A.    That's something that National

20    Concrete Masonry Association started.

21    Q.    Is it on Yahoo?

22    A.    I haven't been on there in a while.

23    It was just something that they put together

24    that people could ask questions.

25            -  -  -  -  -

Page 176

1            (Thereupon, Plaintiff's Exhibit 10

2            was marked for purposes of

3            identification.)

4                  -   -   -   -   -

5        Q.    Exhibit 10, have you ever seen that

6    before?

7        A.    No.

8        Q.    I'll represent to you that that is

9    a E&R CM-40 GFM splitter.

10       A.    Okay.

11       Q.    Has Besser ever sold that before?

12       A.    Not that I know of.  I don't know.

13       Q.    Do you see these barrier guards or

14   these guards that I'm told are OSHA orange or

15   ANSI orange, do you see the area I'm pointing

16   to?

17       A.    Yes.

18       Q.    Do those appear to go around the

19   blades or the point of operation of this

20   splitter?

21       A.    They appear to.

22       Q.    In your opinion does this provide

23   any barrier protection or is that a barrier

24   guard that would provide safety for the

25   operator?

Page 177

1           A.      I really can't tell from the

2     picture, but it would probably help.

3           Q.      Do you hold any patents?

4                   MR. MITCHELL:  Him personally?

5                   MR. ANDREWS:  Yes.

6           Q.      You personally?

7           A.      Yes.

8           Q.      How many do you hold?

9           A.      Three.

10          Q.      What are they of?

11          A.      A concrete product washing device

12    and two different types of mold changing

13    devices.

14          Q.      Do those patents or those machines

15    include a point of operation that would

16    involve a nip point or somewhere a person's

17    hand might get caught?

18                  MR. MITCHELL:  I'm going to

19    object.

20                  A patent doesn't cover that

21    level of specificity.

22          Q.      Let me restate the question.

23                  I assume you've created a patent

24    for some machine, right?

25          A.      Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 178

1          Q.      For some machines; is that correct?

2          A.      Yes.

3          Q.      And do those machines have points

4     of operation where operators of the machines

5     may get their hand caught?

6                  MR. MITCHELL:    Objection.

7                  Foundation.

8          A.      Yes.

9          Q.      And do you have guarding provided

10    for those machines?

11         A.      On some of them.

12         Q.      On some of them you do not?

13         A.      That's correct.

14         Q.      Tell me which ones do.

15         A.      The mold insertion device does.

16         Q.      What does a mold insertion device

17    do?

18         A.      It lifts the mold about an inch so

19    that it can be rolled into the block machine

20    and then dropped in there.

21         Q.      What hazards are you guarding

22    against in that machine design?

23         A.      There's a pneumatic cylinder that

24    pushes a plate in a cam, and there's a pinch

25    point in there.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 179

1      Q.    How do you guard that pinch point?

2      A.    We bolt a plate onto it.

3      Q.    You do what?

4      A.    Bolt a plate onto it.

5      Q.    Does it keep the operator from

6   getting his hand caught in there?

7      A.    It eliminates the hazard.

8      Q.    Is that the intent?

9      A.    Yes.

10              -   -   -   -   -

11           (Thereupon, Plaintiff's Exhibit 11

12           was marked for purposes of

13           identification.)

14              -   -   -   -   -

15      Q.    Exhibit 11 is a list of some

16   patents that I found with your name on it.

17   There were four listed.  Are those some of the

18   machines?

19      A.    Automated mold change, okay.  I

20   guess we patented a method, too.  It's not a

21   machine, it's a process.  It's all those same

22   machines.

23      Q.    To your knowledge are these all the

24   patents you hold?

25      A.    Yes.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 180

1     Q.    Which one, if you could take my pen

2   and circle or put an X or somehow identify the

3   machine that has the point of operation guard

4   like you've described?

5          MR. MITCHELL:   I'm going to

6   object.

7          I don't think he described a

8   point of operation guard.  Go ahead if you

9   can.

10     A.    I believe it's this one.

11     Q.    The others, do they have areas or

12   hazards where an operator may get their hand

13   or foot caught in the machine?

14     A.    They may.

15     Q.    Are they guarded?

16     A.    I'm not sure.  The one doesn't have

17   any hazards or actually the two of them, the

18   other one, possibly.  The texturizing is just

19   spraying water there.

20     Q.    The method for texturizing, there's

21   no hazard there as far as you know; is that

22   right?

23     A.    That's correct.

24     Q.    And the apparatus for texturizing

25   the upper surfaces of concrete products, is

Page 181

1    there any hazard for hand or foot to be

2    entrapped in that machine?

3        A.    No.

4        Q.    The first one, the automated mold

5    changing system, is there any hazard with

6    that machine?

7        A.    Yes.

8        Q.    Is it guarded?

9        A.    I'm not sure if it's guarded or

10   not.

11       Q.    Tell me what the hazard is for that

12   machine.

13       A.    There is a carriage that moves a

14   mold from a storage area to a rack or to the

15   block machine.

16       Q.    What's the hazard?

17       A.    That if -- while it was moving

18   someone could walk in the way.

19       Q.    How did you account for that

20   hazard?

21       A.    Put a warning horn and a flashing

22   beacon on it.

23       Q.    Now, the one you circled here that

24   has the guard on it, is there any lockout and

25   tagout involved in that machine?

Page 182

1       A.      The pneumatic power supply probably

2   would come into play.

3       Q.      Do you have a recommended

4   lockout/tagout policy for that machine?

5       A.      Not for -- we don't recommend

6   lockout/tagout policies.

7       Q.      I understand Besser doesn't get

8   involved in lockout/tagout at all, that's an

9   employer's responsibility?

10       A.      That's correct.

11       Q.      Is anyone at Besser, any of the

12   engineers employed with Besser, have any of

13   them ever served on any standards

14   promulgating committee like ANSI?

15       A.      No.

16       Q.      Are you familiar with ANSI B11?

17       A.      No.

18       Q.      Do you ever consult ANSI standards

19   in the design or the sale of any of the

20   machines made or sold by Besser?

21       A.      Other than the ANSI Z535 for the

22   safety decals.

23       Q.      For the warnings?

24       A.      The warning decals.

25       Q.      Do you know what those standards

Page 183

1    require?

2        A.    The warning decals?

3        Q.    Yes.

4        A.    Basically it's how you design a

5    decal with pictorial warnings.

6        Q.    Do you know if the warnings that

7    were on the subject machine at the time of

8    Mr. Jackson's accident, do you know if those

9    warnings comply with ANSI-Z standards?

10       A.    Which photograph are you looking at

11   there?

12       Q.    Let's look at photograph 14.

13   There's a white sign with black letters, it

14   says, "Keep hands clear," does that comply with

15   ANSI-Z standards?

16       A.    No.

17       Q.    Why not?

18       A.    It doesn't identify the hazard,

19   it's not a pictorial, and it doesn't tell you

20   -- it does tell you how to avoid it, but you're

21   missing two things.  And it doesn't have a

22   signal word.

23       Q.    Did Besser know that when it sold

24   this machine to Couch in 1997?

25       A.    The other photos that were there

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 184

1    had decals that were correct.

2         Q.    Which one are you referring to?

3         A.    The next one that you had there.

4         Q.    Which one?

5         A.    There, that one and that one.

6         Q.    For the record, you're pointing at

7    Exhibit 15, you were pointing to the warning

8    on the side of the machine above some cans

9    with a picture on it and then also on the

10   control panel, correct?

11        A.    That's correct.

12        Q.    So Besser would have been aware of

13   these warnings that comply, I assume?

14        A.    Those probably were Besser decals.

15        Q.    Do you know why it is that Besser

16   put ANSI compliant warnings in these two

17   locations that we have identified in Exhibit

18   15, but why this warning here on Exhibit 14

19   that you've told us does not comply with ANSI

20   was allowed?

21             MR. MITCHELL:  Objection.

22             Foundation.  Go ahead.

23        A.    I don't believe Besser put those

24   decals on there, I believe the customer did.

25        Q.    Do you know why there was no ANSI

Page 185

1    compliant warning provided by Besser for this

2    area that we see in Exhibit 14?

3        A.    Say that again, please.

4        Q.    We see in Exhibit 14 a white sign,

5    "Keep hands clear."

6        A.    Okay.

7        Q.    You told me that does not comply

8    with ANSI?

9        A.    That's correct.

10       Q.    Do you know why it is Besser did

11   not provide a warning in that area that did

12   comply with ANSI?

13       A.    One is that wasn't a Besser

14   splitter, that was an E&R.  Secondly, those

15   other decals were put out by Besser in 1991 I

16   believe that we offered to all of our

17   customers that they could put on existing

18   equipment.

19       Q.    Did Besser just leave it up to the

20   customer as to whether they put them on there

21   or not?

22       A.    On equipment, prior equipment.  On

23   new equipment we will place them on there.

24       Q.    New?

25       A.    New Besser designed equipment.

Page 186

1     Q.    From 1991 forward?

2     A.    On Besser designed equipment.

3     Q.    But you provided it to E&R for E&R

4 equipment from 1991 forward; is that your

5 testimony?

6     A.    I don't believe so.

7     Q.    What was your testimony about the

8 1991 provision of these ANSI compliant

9 warnings?

10    A.    1991 we redesigned all of our

11 warning decals, and at that time we sent a

12 mailing out to all of our customers telling

13 them that we had these warning decals available

14 for equipment, and we had recommended locations

15 for them to put them on to existing equipment.

16    Q.    Did you make that same

17 recommendation to E&R at that time?

18    A.    I don't know that.

19    Q.    Is it your testimony that Besser

20 simply left it up to E&R as to whether to use

21 this warning sticker we see in Exhibit 14 or

22 whether to use an ANSI compliant sticker?

23    A.    That was their design, and we

24 didn't even see the splitters.  They were

25 typically shipped direct.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 187

1      Q.      Again, this was not the first

2   splitter that Besser sold?

3      A.      That's correct.

4      Q.      And Besser would have had a

5   representative on-site to facilitate the

6   installation?

7      A.      That's correct.

8      Q.      So why did Besser not speak up and

9   say, "This needs to have ANSI compliant

10  stickers on there"?

11     A.      I don't know why.

12     Q.      Do you think that that would be a

13  good idea?

14     A.      I don't know.  The customers knew

15  the stickers were out there.

16     Q.      Do you fault E&R for not providing

17  emergency stops on the sides of these

18  machines in any fashion?

19             MR. MITCHELL:  Objection.

20     A.      No.

21     Q.      Why not?

22     A.      Because the operator had an E-stop

23  accessible to him.

24     Q.      Based on the prior accidents that

25  are identified in Exhibit 2, is it your opinion

Page 188

1    that that E-stop was sufficient?

2         A.    Yes.

3               MR. MITCHELL:  Objection.

4                    -  -  -  -  -

5               (Thereupon, Plaintiff's Exhibit 12

6               was marked for purposes of

7               identification.)

8                    -  -  -  -  -

9         Q.    Let me show you Exhibit 12.  Have

10   you ever seen Exhibit 12, it's ANSI B11 or at

11   least what I think is ANSI B11?

12        A.    No.  I haven't seen that.

13        Q.    There's language in this ANSI

14   standard that I would like to look at.  You

15   would agree that the ANSI standards are

16   important for designers of machinery to follow?

17        A.    Some may be.

18        Q.    They're good safety principles in

19   your opinion?

20        A.    I'm not familiar with all of them.

21        Q.    But you did consult them at least

22   for the warning standard, right?

23        A.    Yes, we did.

24        Q.    You would agree with me that ANSI

25   is designed for the safety of operators of

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 189

1    machinery, right?

2        A.    Among other things, yes.

3        Q.    That's one of the goals for sure?

4        A.    Yes.

5        Q.    Would you agree with me that ANSI

6    standards are probably some of the best

7    standards there are, along with OSHA and CE

8    standards and ISO standards?

9        A.    In this particular one I think this

10   is kind of modeled after the European standard.

11       Q.    You're familiar with this ANSI

12   standard?

13       A.    I'm familiar with the European

14   version of it.

15       Q.    What is the European version of it?

16       A.    EN-1050.

17       Q.    Tell me about that.

18       A.    It's how to perform risk

19   assessments.

20       Q.    Is that the risk assessment that

21   you were describing earlier where you would

22   take into consideration the frequency of a

23   hazard and you would take into consideration

24   the level of risk of hazard?

25       A.    Yes.

Page 190

1        Q.      The level of risk and frequency for

2   injury?

3        A.      The risk is based upon the severity

4   and the frequency.

5        Q.      That's what these standards call

6   for, correct?

7        A.      I'm not familiar with the ANSI one.

8        Q.      Let me direct your attention to

9   ANSI B11, the one that I've marked as Exhibit

10  12, I think it's paragraph 3.7.

11       A.      Okay.

12       Q.      In a note under it it says, "The

13  intended use also involves compliance with

14  the supplier's instructions, which should

15  take into account reasonably foreseeable

16  misuse," right?

17       A.      Yes.

18       Q.      Is that, again, consistent with

19  what you told me earlier, that foreseeable

20  misuse of the product should be considered when

21  designing a machine?

22       A.      Yes.

23       Q.      And over on the paragraph 3.14 on

24  page 2, under reasonably foreseeable misuse it

25  reads, "The predictable use of a machine in a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 191

1   way not intended by the supplier or user, but

2   which may result from human behavior."

3            And then down under the note it

4   explains that the reflexive behavior of a

5   person in case of a malfunction, incident,

6   failure during use of the machine as well as

7   the behavior resulting from taking the path

8   of least resistance in carrying out a task is

9   included in this reasonably foreseeable

10  misuse, do you see that?

11       A.    It is in this one, yes.

12       Q.    And would you agree with me that

13  when a worker is standing at the area we've

14  described on the subject splitter between the

15  point of operation and the cuber, that when

16  there's debris there that needs to be cleaned

17  out, based on the accidents we see in Exhibit

18  2 and what we know Mr. Jackson did, a worker

19  is likely to take the path of least resistance

20  and act reflexively and try to clean out that

21  debris?

22            MR. MITCHELL:   Objection.

23            It's well beyond the scope of

24  the 30(b)(6) notice and this witness'

25  expertise.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 192

1              MR. SHEALY:   Objection.

2         Q.    You can answer.

3         A.    I believe that he had a means there

4    to use.

5         Q.    My question is to you, would you

6    think that what he did would be considered

7    reflexive and taking the path of least

8    resistance?

9              MR. MITCHELL:   Same objection.

10        A.    No.   I would think that he knows

11   what he needs to do to safely do that, which

12   would be to shut the machine off and clear the

13   debris.

14        Q.    Do you think that the other

15   splitter models that Besser makes that has the

16   stop buttons right there in front of the

17   operator would be a better design for the

18   subject splitter?

19        A.    I don't know if it's better, but

20   it's a different design.

21        Q.    Would it be easier for the operator

22   to hit the stop button and clean out the

23   debris?

24        A.    It could.   I think the problem here

25   is that the panel is remote on ours, it's not

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 193

1    mounted on the machine.

2        Q.    How do you understand this accident

3    happened?

4        A.    I believe that they were splitting

5    what we call a three-way split, which would

6    leave a chunk on each side of the product, and

7    that chunk typically will fall off after it's

8    split and then the block will continue on

9    through.

10            In this case it didn't fall out of

11    there and either caused the machine not to

12    operate or he thought it would not operate

13    properly, and instead of doing what I think

14    he was told, to use the hammer to pull it

15    out, he stuck his hand in and at that time

16    the side knives got his fingers.

17        Q.    Do you think a light curtain could

18    have been installed on the front of this

19    machine so that if his hand was in there, it

20    could have prevented the machine from cycling?

21        A.    It could have.

22        Q.    That would not have impeded the

23    function of the machine, would it?

24        A.    Not from the side.

25        Q.    Did you know that E&R had

Page 194

1    considered using light curtains and a heat

2    sensor prior to this accident?

3         A.    No, I didn't.

4         Q.    Do you know if anybody at Besser

5    participated in that analysis with E&R?

6         A.    No, I don't.

7         Q.    After this accident what did you

8    do, what did Besser do?

9              MR. MITCHELL:  Objection.

10             You mean after the lawsuit was

11   filed, and they were notified of the accident?

12        Q.    How did you receive notice of the

13   accident?

14        A.    With the lawsuit.

15        Q.    What did you do after that?  I'm

16   not talking about anything privileged where you

17   talked with your lawyer.  I'm just curious,

18   what did you do?

19             MR. MITCHELL:  I'm going to

20   object to testimony about subsequent remedial

21   measures, if any, but go ahead.

22        A.    I was taking care of discovery type

23   things.

24        Q.    I'm not aware of any subsequent

25   remedial measures that have been taken in

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 195

1    this case, but after this accident has Besser

2    sold any parts for that machine?

3         A.    I don't know that.

4         Q.    I understand from E&R that a part

5    was installed on the machine, that flap or what

6    he called a barrier guard for the top area of

7    this machine that we don't see in Exhibit 14.

8    Do you know if Besser sold that or if E&R sold

9    that?

10        A.    I don't know that.  We did bring a

11   list of parts that we sold in the past here.

12        Q.    Is that for the subject machine?

13        A.    No.    That's just all E&R parts that

14   we've purchased.

15                    -   -   -   -   -

16              (Thereupon, Plaintiff's Exhibit 13

17              was marked for purposes of

18              identification.)

19                    -   -   -   -   -

20        Q.    Exhibit 13, could you identify that

21   for me?

22        A.    Sure.   This is a history of all

23   parts purchased from E&R by Besser.

24        Q.    For what time period?

25        A.    January '05 through January '07.

Page 196

1      Q.    So is that since the lawsuit I

2  guess is what you're saying?

3      A.    Yes.  I think that started in '06.

4      Q.    You've told me you've been to the

5  scene where the accident happened, right?

6      A.    Yes.

7      Q.    Other than meeting with your

8  lawyers, has anything been done?

9      A.    No.

10     Q.    Are these items identified in your

11 parts manual, your parts catalog?

12           MR. MITCHELL:  I don't think I

13 understand that question.

14     Q.    The items listed in Exhibit 13, are

15 these items also in Besser's parts catalog

16 where a customer can find these parts, contact

17 you, and then you get them from E&R, is that

18 how that works?

19     A.    I'm not sure if they're in our

20 catalog, but I think you can either go directly

21 to E&R or come to us.

22     Q.    Does Besser provide any manuals for

23 this E&R block splitter machine at all?

24     A.    I didn't see any when I looked.

25     Q.    Does Besser typically rely on E&R's

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 197

1    manuals for any manual information?

2        A.    Yes.

3        Q.    That's the way that would work?

4        A.    That's the way it would work.

5        Q.    Tell me about Besser, when was it

6    started, do you know?

7        A.    1904.

8        Q.    Where was it based?

9        A.    Alpena.

10        Q.    Who started it?

11        A.    Herman and Jesse Besser.

12        Q.    Were they brothers?

13        A.    Father/son.

14        Q.    Are either one of them still alive?

15        A.    No.

16        Q.    Are you aware of any accidents in

17    other countries involving any E&R block

18    splitter that you've sold?

19        A.    No.

20        Q.    Besser has sold E&R block splitters

21    in other countries, hasn't it?

22        A.    Yes.

23        Q.    Are there any particular states or

24    regions that Besser does more business than

25    in others?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 198

1      A.      No.

2      Q.      We've talked about that Besser puts

3  its name on the block splitters that are made

4  by E&R.  Does Besser make any changes to the

5  block splitter when it puts its name on the

6  E&R block splitter?

7              MR. MITCHELL:  I'm going to

8  object to the lack of foundation in that

9  question.

10             MR. ANDREWS:  What do you mean,

11  lack of foundation?

12             MR. MITCHELL:  I don't think

13  there's any testimony that they do put their

14  name on the block splitter.

15     Q.      Let's go to Exhibits 8 and 9, I

16  think it was of Mr. Neese's deposition.  In

17  Exhibit 8 we see a picture of a block splitter

18  machine with Besser's tag on it, right?

19     A.      That's right.

20     Q.      I think I understood you to say

21  that that was typical that they put their name

22  on the block splitter machine made by E&R?

23     A.      I didn't see it on the one at --

24     Q.      Pardon?

25     A.      I didn't see it on the one at

Page 199

1    BlockUSA, but typically we would.

2         Q.    My question to you is that, when

3    Besser puts their name on these block

4    splitters, do they make any changes to the

5    block splitter?

6         A.    I would say the majority of these

7    are shipped direct from E&R so we don't even

8    see them.

9         Q.    Who puts the name on there?

10        A.    E&R.

11        Q.    E&R makes the machine and just puts

12   Besser's name on it?

13        A.    That would be correct.

14        Q.    Would that be the case with the one

15   in Andalusia, except for the fact that you did

16   not see the name on there, would that be the

17   case, it was made the same way by E&R and

18   shipped to Andalusia?

19        A.    Correct.

20        Q.    But we know from at least Exhibit 6

21   that it was sold as a Besser CM-24 block

22   splitter?

23        A.    It was sold that way but shipped

24   direct.

25        Q.    Right.

Page 200

1          Do you have any criticism of E&R

2     for never consulting with any engineer to find

3     out if there are any hazards that should be

4     guarded out or designed out of this machine?

5          MR. SHEALY:   Object to the

6     form.

7          A.    The only thing I would say is if

8     they came up with some guards like you showed

9     me, the orange things in there, I would think

10    they would let us know as well.

11         Q.    Why would they let you know?

12         A.    If we continue to sell parts for

13    them, they may want that in there.

14         Q.    As far as the design of this

15    machine from a safety standpoint, do you have

16    any criticisms of E&R?

17         A.    No.

18         Q.    Do you think this design takes into

19    consideration all foreseeable hazards and

20    risks of injury to the operators?

21         A.    I believe so.

22         Q.    Do you have a marketing department?

23         A.    Yes.

24         Q.    Who is the head of the marketing

25    department?

Page 201

1        A.      Jeff Wallace is vice president of

2    sales and marketing.

3        Q.      How are these E&R splitters

4    marketed or when they were marketed, how were

5    they marketed by Besser?

6        A.      I don't know that.  Other than the

7    literature we provided, it was just a product

8    that we could offer to sell.

9        Q.      You don't know how they were

10   marketed?

11       A.      I guess define how they were

12   marketed.

13               We had a brochure for them, and we

14   could sell them.

15       Q.      How would you let folks like

16   BlockUSA know that you could sell them?

17       A.      If they were interested in a

18   splitter, they would come to us and say, what

19   do you have to offer.  If the E&R splitter was

20   the only thing we had, that's what we would

21   propose to them.

22       Q.      In this exhibit there's some

23   discussion in here or indication that you had

24   talked with OSHA representatives with Ohio

25   about the alternative measures?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 202

1          A.     Only for block machines.

2          Q.     Would that apply only to block

3      machines or would that be a lockout/tagout

4      alternative application that could be uniform

5      to block splitters?

6          A.     I only spoke to them about block

7      machines so I don't know what would happen.

8              MR. MITCHELL:   Go off the

9      record for just a second.

10             (Discussion off the record.)

11         Q.     Does Besser have a policy

12     statement, like a company policy, like a

13     mission statement?

14         A.     Yes.

15         Q.     What is it about?

16         A.     Just basically it's four goals,

17     customer satisfaction, financial stability --

18     what are the other two -- innovative products,

19     and I don't know the other.   Process

20     improvements.

21         Q.     If you found out that any of the

22     products that Besser designs and sells fails

23     to comply with OSHA or ANSI standards, what

24     would Besser do?

25         A.     Again, OSHA is for the workplace.

Page 203

1          Q.     ANSI and CE standards then?

2          A.     If there were things specifically

3    for our equipment, we would have to evaluate

4    them to find out how we would incorporate them

5    into our product line.

6          Q.     Would that be because you hold the

7    safety of the operator paramount?

8          A.     Yes.

9          Q.     Do you know if anybody besides

10   Besser ever sold E&R block splitter machines?

11         A.     I don't know that.

12         Q.     Who were Besser's competitors?

13         A.     Columbia, Pathfinder/Tiger, those

14   would be the two large ones in North America.

15         Q.     Are there any smaller ones?

16         A.     For mold parts Bergen would be one.

17         Q.     How do you spell that?

18         A.     B-e-r-g-e-n.  And then Europe would

19   be Rekers, R-e-k-e-r-s, Hess.

20         Q.     H-e-s-s?

21         A.     Correct.

22         Q.     Is that both in Europe, Rekers and

23   Hess?

24         A.     Yes.  And that's the only ones.

25         Q.     Does Besser put out any training

Page 204

1    video or training literature for the operators

2    of block splitters?

3            MR. MITCHELL:  Of E&R block

4    splitters?

5        Q.    Of any block splitters and then E&R

6    block splitters?

7        A.    Nothing for E&R block splitters.

8    We have training programs in-house for pretty

9    much all of our equipment, not specifically a

10   block splitter.

11       Q.    When you say your equipment, you

12   mean equipment designed by Besser?

13       A.    That's correct.

14       Q.    Now, Besser has manufacturing

15   facilities, right?

16       A.    Yes.

17       Q.    And they have plants that make

18   these machines, right?

19       A.    Right.

20       Q.    So the workers would be using

21   machinery, would that be true?

22       A.    Yes.

23       Q.    Do you know if Besser has ever been

24   cited by OSHA for violating any guarding

25   standards?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 205

1    A.    Yes.

2    Q.    Tell me about that.

3         MR. MITCHELL:    Objection.

4         Go ahead.

5    A.    Through typical OSHA compliance

6    inspections, I think we've been -- I think we

7    had -- the last time I was part of that we

8    had four citations and we put guards on them

9    and it was taken care of.

10        Q.    Do you know if any of those

11   citations involved a violation of 1910.212?

12        A.    I don't know that.

13        Q.    Was it guarding of areas where

14   people might get hurt while they're operating a

15   machine?

16        A.    I don't know the details of them.

17        Q.    Now, you told me how you understand

18   the accident happened.  What do you think the

19   worker, Mr. Jackson, should have done?  Tell

20   me all the steps he should have taken.

21        A.    He should have shut the power off,

22   either following the procedure for

23   lockout/tagout or just hitting the E-stop to

24   make sure the motion of the equipment was

25   stopped before he went in and cleaned the

Page 206

1    debris out of there.

2        Q.    Would that have been true every

3    time the machine had debris that needed to be

4    cleaned?

5        A.    I would say he has to shut it off

6    every time that he has to go in to clean it.

7        Q.    Have you ever had any customer

8    complaints about having to shut the machines

9    off every time the machine needed to be

10   cleaned out and how that affected the

11   automated ability to produce blocks?

12       A.    Not that I know of.

13       Q.    In E&R's corporate rep deposition

14   he told us that there are different guarding

15   requirements in Germany that E&R block

16   splitters have to comply with when Besser

17   sells them.  Do you know what those are?

18       A.    Not -- no.  I don't have the

19   specifics on them.  They would have to follow

20   the same CE procedures we would for our

21   equipment.

22       Q.    Do you know of any E&R block

23   splitters that have been sold by Besser in

24   Germany or in Europe that have different

25   guarding features than we see on the subject

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 207

1    machine?

2         A.    Not that I know of.

3         Q.    Have you ever seen any E&R block

4    splitter machines look different than the one

5    involved in this accident?

6         A.    No.

7              MR. MITCHELL:  Let me clarify.

8    You're talking about the CM-24 model?

9              MR. ANDREWS:  Correct.  Because

10   other models would look different.

11        Q.    Let me ask that question, have you

12   ever seen any of the E&R block splitter

13   machines, regardless of the model, that have a

14   point of operation that is guarded differently

15   than the way we see the CM-24 machine that's

16   the basis of this lawsuit?

17        A.    Not that I know of.

18        Q.    Have you ever seen any customers

19   that have purchased an E&R splitter from Besser

20   install light curtains or other safety

21   equipment like we've talked about today other

22   than the barrier guard you told me about?

23        A.    No.  I haven't seen any.

24        Q.    Once a worker's hand were to get

25   caught in these blades, once they're cycled, is

Page 208

1   there any way for the worker to get their

2   hand out?

3        A.    The blade should retract if it

4   continues to cycle.

5        Q.    Is there any way for them to get

6   their hand out without suffering injury?

7             Let me ask a different question.

8   If a worker reaches in to clear out debris in

9   this point of operation of an E&R block

10  splitter machine and the machine cycles so that

11  the knives engage and the hand is caught in

12  that cycle, is there any way for the worker to

13  get his hand out without suffering injury that

14  you can think of?

15       A.    No.

16       Q.    Is there any way, once that machine

17  cycles, for the worker to have time to hit an

18  emergency stop button to avoid that from

19  happening once the machine has started to

20  cycle?

21       A.    He should have hit the E-stop

22  before he stuck his hand in.

23       Q.    Once the cycling starts, it's

24  pretty much over with, correct?

25       A.    That's correct.

Page 209

1    Q.    But if there was an E-stop button

2   right in front of him, he could hit that button

3   and safely reach into the point of operation in

4   your opinion?

5    A.    No matter where the E-stop was

6   located, he should have hit that button before

7   he stuck his hand in.

8    Q.    Let me ask you this question, if

9   you hit an E-stop, could you safely then reach

10  into the point of operation?

11   A.    Yes.

12   Q.    E&R also described another machine

13  that has a conveyor below the area where the

14  block is split so that any debris that is

15  created falls down on this conveyor and is

16  taken away, are you familiar with that product?

17   A.    I'm familiar with some similar

18  products.

19   Q.    How does that work?

20   A.    Typically there is a chute or a

21  guide that the debris falls down to, and we

22  call it a waste conveyor, it just takes that

23  material and puts it into a dumpster.

24   Q.    Does that prevent the need for the

25  debris to be cleaned out by the operator?

Page 210

1    A.    It takes care of the majority of

2  it, but I wouldn't say that you wouldn't have

3  to go in there eventually and clean it out, but

4  it reduces that.

5    Q.    In other words, that's the purpose

6  of this conveyor below is that it allows the

7  debris to fall down so there's not as much

8  buildup and not as frequent an instance of

9  buildup of this debris?

10    A.    I wouldn't say that.  I would think

11  the waste conveyor gets it out from under the

12  machine more than actually getting it off of

13  the plate.

14    Q.    Do you consider it proper safety in

15  design or proper safety analysis to rely on

16  the end user to determine where emergency

17  stops will be placed?

18    A.    No.  Typically we dictate where the

19  E-stops are.

20    Q.    Why is that?

21    A.    Because we're the ones that design

22  the equipment, and we know how it operates.

23    Q.    In other words, would it be true

24  that when Besser designs the equipment that

25  you're referring to, Besser would be familiar

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 211

1   with how the machine operates and, therefore,

2   know where the E-stops would need to be placed

3   for the operator?

4       A.    I would agree with that.

5       Q.    Would you think, therefore, it

6   would be reasonable for E&R to have relied on

7   the end user to allow the end user to determine

8   if additional E-stops were needed or where they

9   may go?

10      A.    I don't think they relied on the

11  end user.

12      Q.    If the testimony from Mr. Neese is

13  that they did, would you think that would be a

14  wise safety practice?

15      A.    No.

16      Q.    Why not?

17      A.    Again, it's the manufacturer is the

18  one that decides where to put the E-stops.  I

19  don't think we would -- if a customer wanted

20  to put an E-stop somewhere else, we wouldn't

21  be against it, but I wouldn't rely on it.

22          MR. ANDREWS:  Do you want to

23  take a break?

24          MR. MITCHELL:  Yes.

25              (Recess had.)

Page 212

1    Q.    You've told me about all the

2    lawsuits involving sales by Besser of E&R

3    products.

4         Has Besser ever been sued about a

5    block splitter made by anybody besides E&R?

6    A.    Not that I know of.

7    Q.    The Exhibit 2, those are accidents

8    that involved Lithibar and E&R as I recall; is

9    that right?

10   A.    That's correct.

11   Q.    The ones that were the Lithibar

12   accidents, what was the allegation in those,

13   do you know the allegation in those accidents?

14   A.    Just what's written on those forms.

15   Q.    And you produced today a list of

16   sales of E&R block splitters.  And in your

17   interrogatory answer number 13 there's an

18   indication that there were approximately 36

19   model CM-24 block splitters sold in the last

20   ten years, is that the list?

21        MR. MITCHELL:  I think that's

22   the source of that.

23   A.    I think it came from that, yes.

24   Q.    Have you talked with anybody at

25   Besser to find out anything about this MIT

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 213

1    design?

2         A.     I just found out about that.

3         Q.     So you didn't know that before this

4    deposition?

5         A.     No.

6         Q.     Who at Besser would know anything

7    about that MIT design?

8         A.     I don't know of anyone that would

9    know anything about it.

10         Q.     The law firm, Wilson Elser, do you

11    think they would have documents that would

12    have been involved in that Domenici lawsuit?

13         A.     If they were the ones representing

14    us, they may have some documents.

15         Q.     Do you remember what other firm may

16    have represented you if it wasn't Wilson Elser?

17         A.     That's the only one that I know

18    since my time.

19              MR. ANDREWS:  Is that who you

20    think it was?

21              MR. MITCHELL:  That's who we

22    think it was.

23              MR. ANDREWS:  You say you're

24    already trying to get whatever you can?

25              MR. MITCHELL:  We're trying to

Page 214

1    get what we can.

2                    Off the record.

3                    (Discussion off the record.)

4         Q.    Just out of curiosity, do you know

5    why it is or what reasons you switched law

6    firms?

7         A.    I wouldn't say we switched law

8    firms.

9         Q.    Explain your answer.

10        A.    We're still utilizing Wilson Elser.

11        Q.    Just for the defense of this case?

12        A.    That's correct.

13        Q.    Have we talked about all of the

14   Lithibar block splitter machines that Besser

15   makes now?

16        A.    Yes.

17        Q.    Exhibit 9, is that all four of the

18   Lithibar block splitter machines?

19        A.    On this exhibit, but we no longer

20   make the S600.

21        Q.    So there are only five block

22   splitter machines that Lithibar has ever made

23   through Besser?

24        A.    We've made -- we've got older

25   models.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 215

1          Those are the present ones that we

2     have.

3          Q.    Now, do you remember the picture in

4     Mr. Neese's deposition where the language was

5     barrier guards have been removed?

6          A.    Yes.

7          Q.    Have you ever seen any of the E&R

8     block splitter machines or any of the Lithibar

9     machines with those barrier guards in place?

10         A.    No, I haven't.

11         Q.    Do you know where the barrier

12     guards would be affixed on the E&R block

13     splitter?

14         A.    No.

15         Q.    But it's your belief that some

16     barrier guards did exist based on that

17     language?

18         A.    Based upon the language.

19         Q.    Do any of the block splitters made

20     by Lithibar have any barrier guards on the side

21     like you're describing?

22              MR. MITCHELL:  I'm not sure I

23     understand that.  You're referring to any of

24     these on Exhibit 9?

25              MR. ANDREWS:  No.

Page 216

1      Q.      My question is, have any of the

2   Lithibar block splitter machines ever had

3   barrier guards on the side to protect workers

4   from contact at the point of operation or

5   from injury at the point of operation?

6      A.      Not the fixed fencing, they just

7   have -- the S63 model has the door on the

8   side.

9      Q.      Exhibit 2, these documents here,

10  are these made in the ordinary course of

11  business at Besser or is it the ordinary course

12  of business at Besser to make and keep these

13  records?

14     A.      We don't have the hard copies, but

15  we do have the database.

16     Q.      That's the printout of the

17  documents that you keep electronically?

18     A.      Yes.

19     Q.      Same question as it relates to this

20  sale receipt and this Exhibit 6 and Exhibit

21  13 and Exhibit 3, are these --

22          MR. MITCHELL:  Looking at the

23  absence of a Bates number, it doesn't look

24  like Exhibit 6 came from us.

25          MR. ANDREWS:  It's on Besser

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 217

1    letterhead.

2              MR. MITCHELL:  Yes.  I don't

3    know that it has been maintained in the

4    ordinary course of business.

5         Q.      What is Exhibit 6?

6         A.      It's a purchase order from Besser.

7         Q.      Is that something that you make in

8    the ordinary course of business when you sell a

9    machine?

10        A.      When we purchase anything, we issue

11   a purchase order.  It's nothing that we will

12   keep.

13        Q.      When you bought this E&R block

14   splitter, was that document created?

15        A.      Our business system would have

16   created it.

17        Q.      Is that ordinary course of your

18   business to make those records like that,

19   Exhibit 6?

20        A.      Yes.  But we probably don't retain

21   them.

22        Q.      How long would you keep them?

23        A.      A purchase order I'm not sure how

24   long we keep.  This was done on our prior

25   business system so we wouldn't have any of

Page 218

1     those documents.

2          Q.     You know what that document is,

3     Exhibit 6?

4          A.     It's a purchase order.

5          MR. MITCHELL:  We're not going

6     to contest that it's Besser purchase order,

7     it's just that I don't think it was maintained

8     in the ordinary course.

9          Q.     Does Besser have meetings with your

10    engineers to discuss safety of their products

11    and safety of E&R block splitter machines

12    from time to time?

13         A.     Not of E&R block splitters.  The

14    engineers, if there's any issues or new

15    products, we may get together to discuss

16    that.

17         Q.     To your knowledge has anyone at

18    Besser ever discussed E&R block splitter

19    machines?

20         A.     No.

21         Q.     Have you ever asked Arnold to know

22    if he ever did with anybody?

23         A.     No.  I haven't talked to him since

24    he retired.

25         MR. ANDREWS:  I believe that's

Page 219

1     all the questions I have.

2          EXAMINATION OF DUANE RONDEAU

3     BY MR. CRAWFORD:

4          Q.    Mr. Rondeau, my name is Jacob

5     Crawford, and I'm one of the attorneys that

6     represents Mr. Mackey.  We've met before and

7     obviously we met at this deposition.  I've just

8     got a couple questions.

9               You told us earlier that the

10    lockout/tagout procedures, that that's done

11    by the customer, not Besser, correct?

12         A.    Correct.

13         Q.    And so would it be fair to say that

14    you have no personal knowledge of the

15    tagout/lockout procedures that were in place

16    at the time of the accident which is the basis

17    of this lawsuit?

18         A.    That would be correct.

19         Q.    Do you have any personal knowledge

20    of any guard that was removed off the subject

21    machine once it was installed at the Andalusia

22    plant?

23         A.    No, I don't.

24         Q.    Same question in regards to warning

25    decals, do you have any personal knowledge of

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 220

1    any warning decals that were removed from the

2    subject machine after it was installed at the

3    plant in Andalusia?

4        A.    Not that I know of.

5        Q.    Do you have any personal knowledge

6    of anything done by Mr. Mackey that contributed

7    to this accident?

8        A.    No.

9             MR. CRAWFORD:   That's it.

10            MR. MITCHELL:   Steadman?

11            MR. SHEALY:   I don't have

12    anything.

13            MR. MITCHELL:   Any followup,

14    Mark?

15            MR. ANDREWS:   No.   I don't have

16    any other questions.

17            MR. MITCHELL:   We will review.

18                  - - - - -

19            (Deposition concluded.)

20                  - - - - -

21

22

23

24

25

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 221

1                    CERTIFICATE

2    The State of Ohio,      )

3                              SS:

4    County of Cuyahoga.   )

5

6           I, Grace M. Hilpert, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, DUANE RONDEAU,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19           I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 223

1                   SIGNATURE OF WITNESS

2

3

4

5

6           The deposition of DUANE RONDEAU, taken

7    in the matter, on the date, and at the time and

8    place set out on the title page hereof.

9           It was requested that the deposition be

10   taken by the reporter and that same be reduced

11   to typewritten form.

12          It was agreed by and between counsel

13   and the parties that the Deponent will read and

14   sign the transcript of said deposition.

15

16

17

18

19

20

21

22

23

24

25

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 224

1                    A F F I D A V I T

2    The State of Ohio,      )

3                            ) SS:

4    County of Cuyahoga      )

5

6        Before me, a Notary Public in and for

7    said County and State, personally appeared

8    DUANE RONDEAU, who acknowledged that he/she did

9    read his/her transcript in the above-captioned

10   matter, listed any necessary corrections on the

11   accompanying errata sheet, and did sign the

12   foregoing sworn statement and that the same is

13   his/her free act and deed.

14            In the TESTIMONY WHEREOF, I have

15   hereunto affixed my name and official seal at

16   this_____day of _____ A.D 2007.

17

18

19

20        _____

21        Notary Public

22

23

24        _____

25        My Commission Expires:

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 225

```
1                    DEPOSITION ERRATA SHEET

2

3    RE:          DAVID JACKSON VS. BESSER CO., ET AL.

4

5    Job No.:              7888 - GMH

6    Deponent:             DUANE RONDEAU

7    Deposition Date:      3-21-07

8

9    To the Reporter:

10   I have read the entire transcript of my

11   Deposition taken in the captioned matter or the

12   same has been read to me.  I request that the

13   following changes be entered upon the record

14   for the reasons indicated.  I have signed my

15   name to the Errata Sheet and the appropriate

16   Certificate and authorize you to attach both to

17   the original transcript.

18

19

20

21

22   ----------------------------------------

23   DUANE RONDEAU

24

25
```