# Exhibit 5

1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:06 CV0412-DRB

DAVID JACKSON,                    )
                                  )
                 Plaintiff,       )
                                  )
        -vs-                      )                    COPY
                                  )
E & R MANUFACTURING CO., INC.,    )
et al.,                           )
                                  )
                 Defendants.      )


          The deposition upon oral examination of

RONALD E. NEESE, a witness produced and sworn before

me, Sherry R. Reckas, RMR, CRR, CSR, a Notary Public

in and for the County of Hendricks, State of

Indiana, taken on behalf of the Plaintiff at the law

offices of Kincaid, Taylor, Sims, Chadd & Minnete,

127 West Main Street, Lebanon, Tippecanoe County,

Indiana, on the 1st day of February, 2007, pursuant

to the Federal Rules of Civil Procedure.


                    CIRCLE CITY REPORTING
                    2050 First Indiana Plaza
                    135 North Pennsylvania
                    Indianapolis, IN  46204
                       (317) 635-7857

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:      S. Mark Andrews
                             MORRIS CARY ANDREWS
 3                             TALMADGE & JONES
                             3334 Ross Clark Circle
 4                           Dothan, AL  36302

 5   FOR THE DEFENDANT:      Steadman S. Shealy, Jr.
     (E&R Mfg.)              SHEALY CRUM & PIKE
 6                           2346 West Main Street
                             Suite 1
 7                           Dothan, AL  36302

 8   FOR THE DEFENDANT:      Cory M. Curtis
     (Besser Co.)            BAKER HOSTETLER
 9                           303 East 17th Avenue
                             Suite 1100
10                           Denver, CO  80203

11   FOR THE DEFENDANT:      Christopher S. Rodgers
     (Karry Mackey)          HUIE FERNAMBUCQ & STEWART
12                           Three Protective Center
                             Suite 200
13                           2801 Highway 280 South
                             Birmingham, AL  35223
14
     ALSO PRESENT:           Marilyn Neese
15


16
              I N D E X   O F   E X A M I N A T I O N
17
                                          PAGES
18
     DIRECT EXAMINATION  .................... 4
19        QUESTIONS BY S. MARK ANDREWS

20   CROSS-EXAMINATION ..................... 167
          QUESTIONS BY CHRISTOPHER S. RODGERS
21
     FURTHER CROSS-EXAMINATION ............. 167
22        QUESTIONS BY CORY M. CURTIS

23   REDIRECT EXAMINATION .................. 169
          QUESTIONS BY S. MARK ANDREWS
24
     RECROSS-EXAMINATION ................... 171
25        QUESTIONS BY CORY M. CURTIS
```

```
1                I N D E X    O F    E X H I B I T S

2                                            PAGES
       Plaintiff's Deposition Exhibit No(s).:

3
       1  - Notice  ...........................     4
4      2  - Handwritten notes .................     7

5      3  - ISO warning label  ................    10
       4  - Photograph  .......................    12
6
       5  - Photograph  .......................    13
7      6  - Photograph .......................     52

8      7  - Photograph  .......................    52
       8  - Photograph .......................     64
9
       9  - Photograph  .......................    64
10     10 - Sale documents ....................    76

11     11 - Mission Statement  ................    95
       12 - Award and check ...................    96
12
       13 - Photograph  .......................   112
13     14 - Photograph .......................    112

14     15 - Photograph  .......................   115
       16 - Warning label locations ...........   116
15
       17 - Photograph  .......................   128
16     18 - Photograph .......................    130

17     19 - OSHA Regulation 1910.212  ..........   141
       20 - Photograph of hand  ...............   159
18
       21 - Photograph  .......................   162
19     22 - Photograph  .......................   162

20

21

22

23

24

25
```

4

1    R O N A L D    E.    N E E S E, having been first duly

2        sworn to tell the truth, the whole truth and

3        nothing but the truth relating to said matter, was

4        examined and testified as follows:

5    DIRECT EXAMINATION,

6        QUESTIONS BY S. MARK ANDREWS:

7    Q   Will you tell us your name, please, sir.

8    A   Ronald E. Neese.

9    Q   Mr. Neese, my name is Mark Andrews.  We met just

10       before we got on the record.  I represent a man

11       named David Jackson with regard to an accident he

12       had while operating an E&R block splitter.

13           I understand you've been designated as the

14       corporate representative in this case to answer

15       questions about this accident.

16           I'll show you what I have marked as

17       Plaintiff's Exhibit 1, which is the corporate rep

18       notice.  Have you had a chance to review that?

19   A   Yeah.

20           (Plaintiff(s) Deposition Exhibit(s) 1 marked

21       for identification.)

22   Q   You understand you are answering today with regard

23       to the categories enumerated in that notice to be

24       the most knowledgeable person with your company

25       about these categories?

1  A  Right.

2  Q  Okay.  And in fact, are you the most knowledgeable

3     person with regard to these categories at E&R

4     Manufacturing Company?

5  A  Yes.

6  Q  What is your address?

7  A  3775 North 25 East, Lebanon, L-e-b-a-n-o-n, Indiana

8     46052.

9  Q  Okay.  Before we got on the record, you told me

10    that you need to take some frequent breaks.  I'll

11    tell you right now, if you need a break, just let

12    me know.  If you don't have time to let me know,

13    just do what you need to do, take a break.

14         If you don't understand any of my questions,

15    let me know and I'll try to rephrase it; otherwise,

16    I'll assume that you understand the question.

17  A  All right.

18  Q  I'm sure your lawyer has gone over this with you

19    some.  Answer with a yes or no.  Head nods and

20    uh-huhs and uh-uhs don't get on the record very

21    well, so try to answer with yes or no.

22         Let me get finished with my question so that

23    we are not talking over each other and I'm going to

24    do my best to let you get finished with your answer

25    so that we are not talking over each other.

1         What have you done to prepare for this

2    deposition?

3  A  What have I done?

4  Q  Yes, sir.

5  A  For at least six to eight weeks, we have been

6    drawing together all the documents, blueprints,

7    wiring diagrams in reference to the machine.

8  Q  Sure.  And what --

9       MR. SHEALY:  We have produced -- he meant for

10    this deposition right this minute.

11       THE WITNESS:  For this deposition?

12       MR. SHEALY:  Right.  We did all that for

13    discovery and we have given all that to him.  He

14    meant -- just tell him you met with me yesterday.

15    Just don't tell him what we said.

16  BY MR. ANDREWS:

17  Q  As much as I would like to know what your lawyer

18    told you or what you discussed, I'm not entitled to

19    it.  My question is this, what documents have you

20    reviewed?  Have you reviewed any witness

21    statements?

22  A  No.

23  Q  Have you reviewed any photographs of the accident

24    scene?

25  A  Yes, I did.

1  Q  You have a stack of documents with you today.  What

2     is it that you have?

3  A  Most of it is material that is already submitted,

4     but there is so many facts and figures that I can't

5     remember.

6  Q  Okay.  Very quickly, let me just make sure I know

7     what you've got here.  Tell me what you have.

8     Let's go through that stack.

9  A  Okay.  What I have got here is a picture of the

10    machine that shows all of the labels, warning

11    labels, and so forth; the connection diagram; a

12    brief description of the machine as to the serial

13    number and to the various options that were ordered

14    with the machine.

15  Q  You are looking at a handwritten page?

16  A  Yes.

17  Q  Let me see this.  Did you make this handwriting?

18  A  Yes.  That's my handwriting.

19       MR. ANDREWS:  Let me mark this as Plaintiff's

20    Exhibit 2.

21       (Plaintiff(s) Deposition Exhibit(s) 2 marked

22    for identification.)

23       MR. SHEALY:  Mark, we don't have anything you

24    haven't seen.  I have given you everything.  I just

25    told him to bring a few things.  All that is

1  just -- none of that is what you're going to need.

2  BY MR. ANDREWS:

3  Q  Just to ask you a couple questions about

4     Plaintiff's Exhibit 2.  There is a reference to

5     auto shutdown function.  What is that?

6  A  That's an automatic function built into the machine

7     that you can preset on the control panel for how

8     many seconds you want to allow one cycle to take,

9     whether it's four seconds, ten seconds.

10        And if the machine doesn't cycle, make a

11    complete cycle in that many seconds, it shuts down

12    by itself.  And the only way you can restart it is

13    turn the disconnect off before you can ever restart

14    it.  It does it all automatically.

15 Q  Okay.  And was that option on the subject machine?

16 A  It is, yes.

17 Q  To make sure I understand, it does not

18    automatically shut down the machine when a block

19    comes under the knives or anything like that.  What

20    you are saying is the machine can be programmed to

21    shut down after a delay of a certain amount of

22    time?

23 A  Right.

24 Q  Now, at the bottom down here, I'm pointing to an

25    area that says "Changes since 1997".

9

1  A  Yes.

2  Q  Would that be changes since the machine that we're

3     here about was made?

4  A  It's changes that we have made in similar

5     equipment.

6  Q  Okay.  It says -- read this line here to me.  I

7     can't read it upside down.

8  A  "The emergency stop is now detented to meet CE

9     standards."

10 Q  What are CE standards?

11 A  That's European common market.

12 Q  Do you all sell products in Europe?

13 A  Yes, sir.

14 Q  The machines that you make in Europe, are they

15    different than the ones you make in America?

16 A  No.  The only thing different are the warning

17    labels.  In Europe we have to use ISO.

18 Q  What's ISO?

19 A  International Standards Organization.

20 Q  In other words, are they warning labels similar to

21    the ANSI standards?

22 A  No.

23 Q  How are they different?

24 A  They have no signal word like "Danger", "Warning",

25    "Caution".  The only thing they have on it is a

1    pictorial that explains the hazard that exists.

2  Q  Do you have ISO or ISO standards in your possession

3     that you all use on your machines over in Europe?

4  A  I brought one.

5         MR. RODGERS:  We didn't do the usual

6     stipulation.  I assume we are taking the deposition

7     under the --

8         MR. ANDREWS:  Sure.

9  Q  Okay.

10 A  That's an ISO label right there (indicating).

11 Q  Okay.

12 A  This is an ISO label (indicating).

13        MR. ANDREWS:  The ANSI labels have been

14    produced.  I don't think I have seen the ISO

15    standard.  Could you agree just to make a copy of

16    that for me?

17        MR. SHEALY:  Yes.

18        MR. ANDREWS:  Thank you.

19 Q  Back to --

20 A  There is your copy (indicating).

21 Q  Can I have this one?

22 A  Yes.

23        MR. ANDREWS:  I'm not going to mark that --

24    well, I am going to mark it.

25        (Plaintiff(s) Deposition Exhibit(s) 3 marked

1      for identification.)

2   Q  Now, on Exhibit 2, in Paragraph 2 at the bottom, it

3      says "The emergency stop is now detented".  What

4      does that mean?

5   A  It means when you push it in, it stays in.  The

6      only way you can restart the machine is to pull

7      that back out.

8   Q  Was that the case with the subject machine?

9   A  No.  It was momentary contact.

10  Q  Okay.  And the emergency stop that you're referring

11     to, is that the one on the panel?

12  A  Right.

13  Q  Is there any other emergency stop anywhere on this

14     splitter other than on that operation panel?

15  A  There is also a splitter stop.  The splitter stop

16     function does not stop either the hydraulic power

17     motor or the splitter motor.  They continue to run,

18     but the other functions are completely shut off.

19  Q  What other functions are those?

20  A  Okay.  The pusher cylinder circuit.  Do you know

21     what the pusher cylinder is?

22  Q  I think I do, but tell me what it is.

23  A  All right.  It's what indexes the block forward

24     into the split position and then retracts to pick

25     up another block.

1   Q   So with the splitter stop at the splitter -- at the

2       knives, is that where this is?

3   A   No, it's on the control panel.

4   Q   Okay.

5   A   And it's a mushroom button.

6   Q   And so it stops the pusher cylinder.  What else

7       does it stop?

8   A   It stops the side knives, side knife circuit will

9       immediately stop; the top head that splits

10      lengthwise the block is immediately stopped.

11  Q   Okay.

12          MR. SHEALY:  Are you looking for a picture?

13      Here, look at this (indicating).

14          MR. ANDREWS:  I've got it.  Let's mark that.

15          (Plaintiff(s) Deposition Exhibit(s) 4 marked

16      for identification.)

17  Q   I'm going to show you Exhibit 4, the emergency stop

18      that you're referring to, is it located on here?

19  A   Right there (indicating).

20  Q   Take my pen and circle that stop you're referring

21      to.

22  A   (Witness Complies).

23  Q   That's the one that stops the side knives, as you

24      described?

25  A   The emergency stop shuts everything off, motors and

1   everything.

2  Q  The splitter stop that you're referring to is the

3    other button?

4  A  Yes.

5  Q  So you have circled now the two buttons on the

6    control panel that function as any type of

7    emergency stop?

8  A  Right.

9  Q  Now, my question now is is there any other

10    emergency stop anywhere on this machine?

11  A  No.

12  Q  Okay.  Is that true with the machine as it was

13    designed and sold in 1997 on the subject machine

14    and is that also true today?

15  A  That's true today.

16  Q  Is there any emergency stop at the splitter knives

17    themselves?

18  A  No.

19  Q  Why not?

20  A  Well, in our instructions, we suggest that a start

21    and stop be located from the feed or the depalleter

22    and also from the cuber side of the machine.

23    That's in our manual.

24        (Plaintiff(s) Deposition Exhibit(s) 5 marked

25    for identification.)

1  Q  Exhibit 5 is a photograph of the machine from a

2     distance.  As you look at this photograph,

3     Exhibit 5, the right side -- would that be the

4     feeder side?

5  A  This is the feed side here (indicating).

6        MR. SHEALY:  Well, that won't show up.  You've

7     got to describe it.

8  Q  The right side of the photograph, Exhibit 5 as

9     you're looking at it, that would be the feeder

10    side.  Then the side where the knives are, the left

11    side of Exhibit 5 as you are looking at it, would

12    be the cuber side?

13 A  That's right.

14 Q  Once the block goes through these knives, it's

15    going over the cuber; correct?

16 A  Right.

17 Q  Okay.  Any of the machines that you sell in Europe,

18    are there any other guards that are different than

19    as we see in Exhibit 5?

20 A  No.

21 Q  Do you know of any standards in Europe that require

22    any such guarding?

23 A  The only thing different in Europe is that they may

24    require, it depends upon the country -- if it's

25    Germany, they do; Spain doesn't; France does -- is

1    fencing along the entire line, and there is nobody

2    permitted within that fencing around those machines

3    and conveyors.

4    Q   And does E&R provide that fencing?

5    A   We do not provide the fencing, but we provide the

6        interlocks for access gates.

7    Q   Okay.  In the fencing?

8    A   For the fencing, yes.

9    Q   Make sure I've got a clear question.  In Europe,

10       because of safety standards, fencing is required

11       around this machine that --

12   A   Not the entire --

13       MR. SHEALY:  Wait a minute.  Let me object to

14       the form.  I would say in some countries in Europe.

15   Q   I'm sorry, Spain and --

16       MR. SHEALY:  There are a few countries that

17       require fencing, other countries don't.

18   Q   Just so I've got a clear question.  E&R does not

19       provide fencing that you described?

20   A   We do not.

21   Q   But E&R does provide the interlock switches for

22       access gates?

23   A   The interlock in the panel, yes.

24   Q   And in this panel that we see in Exhibit 5 --

25   A   Yes.

16

1    Q    -- and 4?

2    A    Right.

3    Q    Do you understand correctly that E&R provides

4         interlocks for the access gates in the fencing?

5    A    No, we do not.

6    Q    Does E&R get involved --

7    A    The interlocks in their fencing can be hooked into

8         the main E stop circuit in the splitter.

9    Q    And do you get involved in that design or setup at

10        all?

11   A    With the fence?

12   Q    Right.

13   A    No.

14   Q    What about with the connection with the interlocks

15        in the fence and the control panel for the

16        shutdown?

17   A    No.

18   Q    Have you been over there to meet with people that

19        buy these machines?

20   A    No.

21   Q    How do you know about this fencing that's required?

22        Tell me about how you've come to know that.

23   A    I see layouts from different plants over there that

24        Besser submits to me to look at.  They have X

25        number of feet for a machine to set in there and

17

1    the plant layouts generally show fencing.

2 Q  Are you aware of any machine that you've sold here

3    in America that has fencing in the layout?

4 A  None that I know of.

5 Q  Your relationship with Besser, does E&R primarily

6    sell these block splitters through Besser?

7 A  Up until 1999, practically all of them went through

8    Besser.  And then Besser bought another company

9    which also makes splitters, so consequently they

10    have kind of leaned towards theirs.

11 Q  What's the name of the company Besser bought?

12 A  Lithibar.

13        MR. SHEALY:  Spell it.

14 Q  L-i-t-h-o-b-a-r?

15 A  I think it's a-b-a-r.

16        MR. CURTIS:  L-i-t-h-i-b-a-r.

17 Q  Now, do you continue to sell machines through

18    Besser today?

19 A  We sell a few machines and a lot of replacement

20    parts for existing equipment.

21 Q  Do you sell the replacement parts through Besser or

22    direct?

23 A  Both.

24 Q  Does anybody besides Besser sell E&R block splitter

25    machines today?

1   A   Like this model here?

2   Q.  Exhibit 5, yes.

3   A   No.

4   Q   Does E&R sell splitters like we see in Exhibit 5,

5       which was the model of the machine we're here about

6       today, directly?

7   A   Yes.

8   Q   1999 when Besser bought Lithibar, before that, did

9       E&R sell these machines directly as well?

10  A   Yes.

11  Q   Would you say the No. 1 -- tell me what would be

12      the No. 1 means of selling; would it have been

13      through Besser or direct?

14  A   Besser.

15  Q   How many of these machines does E&R manufacture

16      today on average in a year's time?

17  A   In a year's time?  Probably --

18          MR. SHEALY:  Now, he asked you how many of

19      these machines.

20  A   This one right here?

21  Q   Let me get a clear question.  Is this a CM-24, is

22      that what you call this?

23  A   CM-24HFRC.

24  Q   How many of the CM-24HFRC machines does E&R sell in

25      a year currently?

1  A  About six.

2  Q  Before 1999 how many did E&R sell annually?

3  A  Probably around ten.

4  Q  Okay.  Are these custom-made machines?

5  A  There is modifications made to every one to suit

6     the customer need.

7  Q  Do any of the modifications deal with safety or

8     guarding or --

9  A  No.

10 Q  What type modifications do these differences deal

11    with?

12 A  Well, each customer has a different type block that

13    they want to split, like different types of

14    retaining wall block.  Some customers want to be

15    able to split return corners, which are a corner

16    unit that's got to be split two sides.

17        They want to do it in line, and the cross

18    knives on the splitter have got to be either on the

19    right or left-hand side, they can't be both.

20        Some customers may make a unit that they want

21    to split in the center, like the Couch machine.

22        Some customers run a four-at-a-time block

23    machine where you have to make the splitter longer

24    to accommodate 32 inches of block instead of

25    24 inches of block.

20

1   Q  Now, in all of those variations that you have just

2       described for us, the area where the knives are,

3       what I call the point of operation, is that

4       designed and manufactured in a similar fashion that

5       we see in Exhibit 5?

6   A  Yes, exactly.

7   Q  Okay.  In other words, the knives may go

8       horizontally rather than vertically or they may be

9       on one side different than the other --

10   A  Exactly.

11   Q  -- but other than that, this basic design we see in

12       Exhibit 5 is the same?

13   A  Right.

14   Q  While I'm on this Exhibit 5, what are these chains

15       on top for?

16   A  The height adjustment.  The block may be two and a

17       quarter high, or now we make them to go as high as

18       16 inches.

19   Q  In other words, you turn the handle in Exhibit 5,

20       it moves the chain which moves these shafts to

21       raise and lower the knives, the top of the knives?

22   A  Turns the nuts here on the threaded uprights.

23   Q  Okay.  Do you retain copies of the sales that you

24       make of these machines?

25   A  Yes.

```
 1   Q   How far back do you have those records?

 2   A   1954.

 3   Q   Where are those maintained?

 4   A   At our business.

 5   Q   Would that be basically all of the sales that were

 6       ever made?

 7   A   Yes, sir.

 8   Q   Who is the custodian of those records?  You?

 9   A   I suppose, yes.

10   Q   Okay.  How voluminous are those records?  Too much

11       to put in an envelope?

12   A   Well, the filing cabinets are probably -- they are

13       four-drawer cabinets and probably 16 to 18 feet.

14       I mean it would cover this entire wall here

15       (indicating).

16   Q   But nonetheless, you do maintain those records?

17   A   Absolutely.

18   Q   Okay.  Now, have you ever given a deposition or

19       been in a deposition before?

20   A   Yes, sir.

21   Q   Tell me about that.

22   A   Well, we got sued in 1986 by -- I forget his

23       name -- Domenici or something familiar, or some

24       name similar, that turned the machine off and then

25       he went and started working on it and it -- he lost
```

1     a finger or fingers.

2  Q  When the machine cycled?

3  A  Yes.

4  Q  Was that while he had his hand in the area of the

5     knives?

6  A  Right.

7  Q  I'm calling it the point of operation.  Is that

8     what you call it?

9  A  That's close enough, yes, sir.

10  Q  What do you call it at E&R?

11  A  The heads.

12  Q  The heads, okay.  He lost his finger while his

13     finger was in the heads?

14  A  Right, after he had shut it off.

15  Q  And what's the significance of that to you?

16  A  If it was shut off, it didn't run, won't run.

17  Q  And did you give a deposition in that case?

18  A  I did, yes.

19  Q  Do you have a copy of that deposition anywhere?

20  A  No.

21  Q  Do you know where we could get a copy of that

22     deposition?

23  A  No, I don't.

24  Q  Do you remember who your lawyer was?

25  A  No.

1    Q   Where was the lawsuit filed?

2    A   In Boston.

3    Q   Do you know the outcome of that lawsuit?

4    A   It was dropped.

5    Q   When you say "dropped", do you mean --

6            MR. SHEALY:  They dismissed the case.  They

7        didn't have a case.

8    A   Dismissed it.

9    Q   Are you saying there was no money paid in that

10       case?

11   A   I don't know.

12           MR. SHEALY:  No, the plaintiffs dismissed it.

13       In other words, they got an expert, took his

14       deposition, realized they didn't have a case and

15       dismissed it.

16   Q   Okay.

17   A   What they did, the stop button was manufactured by

18       Allen Bradley, so they had an expert come out and

19       run tests on that stop button; and after 10,000

20       cycles they couldn't get it to malfunction.

21   Q   So they were focusing, as far as you know, on the

22       electronic device that deals with the emergency

23       stop?

24   A   Right.  And then in 1986, we did not have ANSI

25       warning labels.

1        MR. SHEALY:  Now, did he ask you all that?

2        THE WITNESS:  Who?

3        MR. SHEALY:  This gentleman.

4        THE WITNESS:  I'm sorry.

5  Q  I was going to -- I'll get to it in a minute.  I'm

6     trying to speed it along as well.

7        Before I get to the ANSI warning labels.  The

8     case that you say was dropped, to your knowledge

9     did E&R not pay any money in that case; is that

10    what your understanding was?

11  A  I don't know.

12  Q  Okay.  What about Besser, were they sued in that

13     case as well?

14  A  Yes, they were.

15  Q  Do you know what the outcome of that case was?

16  A  I have no idea.

17  Q  Okay.

18  A  No idea.

19  Q  Now, you mentioned ANSI warning labels and I'm

20    going to get to that in just a little while.

21  A  All right.

22  Q  With regard to ANSI, when did ANSI come into effect

23    as far as you know?

24  A  Actually they started back in probably '88 with

25    meetings on trying to arrive at a standardized

1      warning label, and at the time most everybody was

2      using one that would meet OSHA specs.  Do you want

3      to see a sample of that?

4  Q  Yes, please.

5  A  (Indicating).

6  Q  Can I mark this?  Is this the only one?

7  A  That's the only one I've got.  I'll send you a bill

8      for $40.

9  Q  Okay.  I'll tell you what, I'm going to come back

10     to whether I mark this or not.  I'll try to figure

11     out the best way to handle this.

12         For the record, a yellow sign, black letters

13     at the top, says "Caution, this machine starts and

14     stops automatically".  Did I read it correctly?

15  A  Right.

16  Q  The warning we're talking about, you say this was

17     the warning that was used for OSHA compliance?

18  A  Yes.

19  Q  That was used before what year?

20  A  '88, '89.

21  Q  Since '88 or '89, have you used this warning at

22     all?

23  A  We still use it, yes.

24  Q  Is it on the subject machine?

25  A  Yes, it is.

26

1    Q  I see.

2    A  It's on the control panel.

3    Q  Got it.

4    A  Back to the ANSI warning labels --

5          MR. SHEALY:  Go ahead.

6    Q  Go ahead.

7    A  In '86, FMC Corporation because of a lot of

8      lawsuits wanted to see this procedure standardized,

9      and so they produced a book which showed you how to

10     come up with warning labels that would meet the

11     proposed ANSI standards.

12         We ordered one of these manuals I think in '88

13     maybe or '87, and then we found that there was a

14     manufacturer who also served on the ANSI board.  So

15     we went to them about how the labels should be

16     designed as a source for the labels.

17         So in the end of '90 and the start of '91

18     is when we started using the ANSI symbols

19     (indicating).

20    Q  Okay.  And are those the ones that you are holding

21     up and those are the ones that have been produced

22     in this case already?

23    A  Right.

24    Q  Why is it important to comply with ANSI or OSHA

25     standards?

1  A  You have to comply with some kind of standard.

2     It's our choice which way we want to go here in the

3     United States.  To us, ISO, with no -- they call

4     this a signal word (indicating), whether it's

5     "Danger", "Warning" or "Caution", and also the --

6     it tells you how to avoid the hazard, "turn it

7     off".  It also tells you that "If you can read

8     this, there was a guard there, don't use it."

9  Q  Okay.  My question is why is it important to strive

10    to have these warnings in place?  Why is it

11    important to you, for E&R, to comply with ANSI

12    standards?  Is it for the safety of the operator?

13 A  Yes.

14 Q  Is safety of the operator important to E&R?

15 A  Right.  Yes.

16 Q  Also, is it your understanding, or do you agree

17    with me, that E&R has to comply with OSHA and ANSI

18    standards in manufacturing these block splitter

19    machines?

20 A  Right.

21 Q  What experience do you have in compliance with ANSI

22    standards?

23 A  Well, ANSI has standards just for the labels.  They

24    don't have standards that I'm aware of for the

25    design of the block splitter.

```
 1   Q   Does OSHA?

 2   A   OSHA, it's left up to the individual inspector as

 3       to how he interprets the operation.

 4   Q   Are you an engineer?

 5   A   Yes.

 6   Q   What --

 7   A   I'm not a graduate engineer.  I went to Purdue and

 8       Indiana State.  I have not graduated.  I don't have

 9       a degree.

10   Q   What engineering training did you receive from

11       Purdue?

12   A   I took machine design, mechanical engineering

13       courses, and also I took industrial engineering

14       courses.

15   Q   But did you complete those courses?

16   A   Yes, but I did not -- I do not have a diploma

17       hanging up.

18   Q   How far did you get in those courses?

19   A   Probably two and a half years.

20   Q   Okay.  Is there anyone at E&R that is an engineer?

21   A   A graduate engineer?

22   Q   Yes.

23   A   No.

24   Q   Has there ever been an engineer at E&R?

25   A   No.
```

29

1    Q   Who else besides you has had some engineering

2        courses like you described?

3    A   Paul Mangis.  He's the only one that I'm aware of

4        that has had additional schooling.

5    Q   Who originally designed the machine like you see in

6        Exhibit 5?

7    A   Like this one (indicating)?

8    Q   Yes.

9    A   I did.

10   Q   You designed it?

11   A   Yes.

12   Q   In what year?

13   A   1973.

14   Q   Okay.  How did you design -- how did you come up

15       with the design of this machine?

16   A   Basically, we took one of the existing machines

17       that we were making and put an automatic feeder on

18       it.

19   Q   With regard to the heads, the knives and the point

20       of operation, did you design this configuration?

21   A   No.

22   Q   Who designed that configuration?

23   A   That was one of the original owners of E&R

24       Manufacturing, Elmer Mangis.

25   Q   Is he still alive?

30

1   A   No, he's not.

2   Q   Was he an engineer?

3   A   No.  I don't know.

4   Q   Mr. Mangis' partner, what was his name?

5   A   Randy Boeskool.

6   Q   Was he an engineer?

7   A   I don't know.

8   Q   Did Mr. Boeskool assist in the design of this

9       machine?

10  A   No.  No.

11  Q   As far as you know, Mr. Mangis is the one that came

12      up with the design of the head, the splitter, the

13      knives section?

14  A   Right.

15  Q   Do you know if E&R has ever had an engineer perform

16      a hazard analysis on the CM-24 -- the design of the

17      subject machine?

18  A   Not that I know of, no.

19  Q   Do you know why that is?

20  A   No, I don't.

21  Q   So as far as you know, as far as E&R knows, you

22      don't have any idea whether this machine complies

23      or fails to comply with any applicable ANSI

24      standards or any OSHA guidelines that may affect

25      this machine?

31

1   A  I don't know.

2        MR. SHEALY:  Object to the form.

3   Q  You do not know the answer to that?

4   A  No, I don't.

5   Q  Have you ever sought -- have you ever thought it

6      would be a good idea to have that done?

7   A  No.

8   Q  Why not?

9   A  It hasn't been that big of a problem.

10  Q  Okay.  Are you aware of any other accidents similar

11      to Mr. Jackson's accident, other than the

12      Mr. Domenici like you described?

13  A  Yes.  Karry had a similar thing happen to him.

14  Q  You mean Mr. Karry Mackey that --

15  A  Karry Mackey.

16  Q  He's the one that worked in Andalusia, Alabama at

17      the plant where Mr. Jackson was hurt?

18  A  Right.

19  Q  So he was injured on the same machine?

20  A  Right.

21  Q  Any other injuries like that?  Are you aware of any

22      others?

23  A  I know of maybe one or two over the last 30 years.

24  Q  Where did those happen?

25  A  I don't remember.

1   Q   Okay.  Those four or five that you have described,

2       are those the ones that you're saying that there

3       has not been that big a deal or that many accidents

4       involving this machine?

5           MR. SHEALY:  I object to the form.  I don't

6       think he said there were four or five but --

7           MR. ANDREWS:  He said Mr. Domenici,

8       Mr. Jackson, Mr. Mackey, and the two others that he

9       can't remember.  That would be five; right?

10          THE WITNESS:  Right.

11  Q   So are those five that you described or we just

12      talked about, are those the ones that you're

13      talking about that have not been that numerous or

14      that big a deal?

15  A   It hasn't been that numerous, yes.

16  Q   Is there a number of accidents that you would have

17      to be aware of before you would think that it would

18      be a safety hazard or a concern for the operator of

19      these machines in becoming injured like this, like

20      the plaintiff was?

21  A   I would say -- I don't know that we could put any

22      number on it.  We have built 1,200 machines, and

23      our number of injuries is very slight.

24  Q   Compared to the number that you've built?

25  A   Yes.

1  Q  My question is is there a number or do you have an

2     idea of how many accidents would have to take place

3     before you would endeavor to have an engineer

4     review this machine for safety analysis?

5  A  Not necessarily, no.

6        MR. SHEALY:  Let me object to the form.

7     That's assuming that you need an engineer to do a

8     safety analysis versus a guy that's been working on

9     them 46 years.

10        MR. ANDREWS:  Okay.

11        MR. SHEALY:  Okay?

12        MR. ANDREWS:  Sure.

13        MR. SHEALY:  I know you are using engineer,

14     but I put my client up against your engineers;

15     okay?

16        MR. ANDREWS:  Okay.

17        MR. SHEALY:  As far as experience goes.

18        MR. ANDREWS:  Okay.

19  BY MR. ANDREWS:

20  Q  Are you aware of any standard that requires there

21     to be barrier guards or any protection against an

22     operator from making access or gaining access to

23     the point of operation at the heads of this

24     machine?

25  A  No.

1    Q    And I've been using the term "this machine" and

2         I'll continue to use that term.  Can we be clear,

3         when I'm talking about "this machine" and I'm

4         pointing to Exhibit 5, I'm talking about the CM-24,

5         the model machine that was involved in

6         Mr. Jackson's accident; is that fair?

7    A    Right.

8    Q    You understand that's what I've been talking about?

9    A    Right.    Right.

10   Q    If you were aware of any such standards, would you

11        at E&R endeavor to comply with that standard?

12   A    Yes, we would.

13   Q    Why is that?

14   A    Well, we would have to comply in order to avoid any

15        further accidents, severe, and probably would have

16        to then offer retrofits for existing equipment.

17   Q    Okay.  Why do you think retrofits are for?

18   A    Well, just like we did in '90 and '91 when we

19        retrofit every machine clear back, we spent

20        thousands and thousands of dollars retrofitting all

21        existing equipment.

22   Q    With the warning stickers?

23   A    With the warning stickers and with the barrier

24        guards.

25   Q    Okay.  How did you come up with the barrier guard?

1  A  How?

2  Q  Yes.  How did you come up with the design of that

3     barrier guard and what standard or what reason were

4     you providing that guard?  What were you trying to

5     comply with?

6  A  No. 1 was trying to limit access to the top head.

7     First of all, the guard cannot present a greater

8     hazard than what already exists.

9  Q  Where did you learn that?

10 A  That's common sense.  That's not learning.  That's

11    common sense.

12 Q  Okay.  Go ahead.

13 A  We looked at making it out of different material.

14 Q  Looked at making what out of --

15 A  The barrier out of -- we looked at steel.

16 Q  What year are you talking about, by the way?

17 A  1989, 1990.

18 Q  And before that time, so I'm clear, there was no

19    barrier guard?

20 A  There was nothing there, just the splitter head.

21 Q  All right.  And you're telling me that you looked

22    at different materials.  And while you're telling

23    me that, can you tell me what prompted you?  Was

24    there a standard, was there a discussion, was there

25    an accident that prompted E&R to look into

```
 1        providing a barrier guard and retrofitting its

 2        machines?

 3   A    Well, in this lawsuit in '86, this is one thing

 4        that was throwed at us is why we did not have

 5        barriers on the top head.  They had their own

 6        engineer who was a professor at MIT, and he told us

 7        how to make the guards.  Not these (indicating),

 8        but what he came up with --

 9             MR. SHEALY:  Well, he asked you about the

10        barrier guards.  That's what he wants to know.

11             THE WITNESS:  Okay.  Why we went that route?

12             MR. SHEALY:  Yes, he wants to know why in 1989

13        did you all of a sudden retrofit all your machines

14        and show such tremendous responsibility to your

15        customers that you took care of all that.

16             MR. ANDREWS:  Yes.

17             THE WITNESS:  I'm sorry.

18   A    And then also at the same time we furnished all of

19        the ANSI labels for the machines.

20   Q    Right.  Now, how did you come up with this design,

21        the one that we have in Exhibit 5, that red barrier

22        guard?  How did you arrive at that design?

23   A    Well, No. 1, that's not red.  That's OSHA orange.

24   Q    Okay, OSHA orange.

25   A    Which signifies hazard.
```

37

1   Q   Right.

2   A   Okay --

3   Q   Is that important to have that OSHA orange there

4       for the operator?

5   A   Absolutely.   It didn't catch your eyes?   I doubt it

6       did.

7   Q   My question to you is it important to E&R to

8       provide as much safety protection for the operator

9       as possible?

10  A   It is.

11  Q   You would agree with me that the safety of the

12      public and the safety of the operator of this

13      machine is of paramount concern to E&R?

14  A   Right.   Right.

15  Q   Okay.   Go ahead.   How did you come up with this

16      OSHA orange barrier guard in 1989 or '90?

17  A   We had to make the guards so that regardless as to

18      the height block that they are cutting that the

19      guards went with the head.   So that's the reason we

20      went that route.

21          We, first of all, looked at metal.   The

22      problem with metal is somebody accidentally or on

23      purpose sticks their hand underneath that guard,

24      you've got a greater hazard than what already

25      exists.

1   Q   I take it by that comment that in analyzing this

2       machine for safety and in analyzing the need to

3       provide a barrier guard like we see in Exhibit 5,

4       that there was an analysis of the -- that included

5       the foreseeability that an operator would place his

6       hand into the point of operation?

7   A   Could, yes.

8   Q   So that was known by E&R?

9   A   Yes.   Right.

10  Q   Had E&R known that a long time, going back to 1954,

11      that an operator may stick his hand into the point

12      of operation?

13  A   And that's why we had great big signs up there

14      "Keep Hands Clear".

15  Q   So is that a yes?

16  A   That's a yes.

17  Q   Now, you looked at metal and you decided that may

18      pose a different or a greater --

19  A   Another hazard.

20  Q   Another hazard.   How did you arrive at the one that

21      we have?

22  A   Okay.   This is rubber, three-inch thick rubber, and

23      if your hand should get -- fingers get caught in

24      there, you can pull them back.

25  Q   Okay.   Once your hand is caught in there -- those

1    knives are designed to do what?

2    A    Split.

3    Q    To split what?

4    A    Split, penetrate concrete block.

5    Q    Are those strong enough to penetrate and cut

6         fingers?

7    A    Oh, yes.

8    Q    Once the knife could catch a hand, is there really

9         a way that an operator could get his hand back

10        without suffering some injury?

11   A    No.

12   Q    Would you agree with me that it's substantially

13        certain that serious injury is probably or likely

14        to result if an operator has his hand in that point

15        of operation while the machine cycles?

16   A    Yes.

17   Q    And did you know that in 1990 and before?

18   A    Yes.

19   Q    Okay.  Now, with regard to how this guard we see in

20        Exhibit 5 bolts to the machine and the size and the

21        height of it, who came up with that?

22   A    I did.

23   Q    Okay.  You mentioned awhile ago that a professor at

24        MIT offered a design.

25   A    Uh-huh.

1   Q   Is that a yes?

2   A   Yes.

3   Q   Where is that design?

4   A   We didn't use it.

5   Q   Okay.  Do you have a copy of it?  Do you have any

6       information about it?

7   A   No.  I can tell you what it was.

8   Q   Okay.

9   A   He wanted sliding doors -- here is the block coming

10      towards me (indicating).  He wanted sliding doors

11      that when it split, the doors closed (indicating).

12  Q   All right.

13  A   After it split, the doors opened back up and let

14      the block out (indicating).

15  Q   All right.  Did you look at that design potential?

16  A   No, I didn't.

17  Q   Why not?

18  A   Because the doors presented a bigger hazard than

19      what's -- what already exists.

20  Q   How is that true?

21  A   Well, something that's got to -- you have about

22      three seconds for all this to take place

23      (indicating).  If you have watched that machine run

24      on a straight split, the block are one after

25      another after another after another.  There is no

1   room to run any doors sliding back and forth.

2 Q Okay.  Would you agree with me that those -- I'm

3   sorry.  What were the doors to be made of?

4 A Well, he didn't say.  He was just -- I don't know.

5   I imagine steel.

6 Q Okay.  Could they be made of expanded metal?

7 A As far as I'm concerned, no.

8 Q And why not?

9 A Because the doors closing, if you were to have the

10   doors out here and the head is here (indicating),

11   you would get your entire arm in there.

12 Q What's the need or the reason for workers to have

13   access into that point of operation?

14 A If a jam does occur, you turn it off.

15 Q My question is what is the reason that you are

16   anticipating a worker would have his hand in that

17   point of operation or in the area of the heads?

18 A If a jam occurs --

19 Q Right.

20 A -- you've got to turn it off.

21 Q Once again --

22   MR. SHEALY:  What he's asking you, he's asking

23  you why would someone have their hands around the

24  point of operation, and you said if a jam occurs

25  you turn it off.  Well, we know that's what the

1  company tells the worker to go do and that's what

2  the worker should do.  But what he wants to know --

3    MR. ANDREWS:  Wait a minute.

4    MR. SHEALY:  What he wants to know is why

5  would a worker even have his hand --

6    THE WITNESS:  Why would he?

7    MR. SHEALY:  Yes.

8 A I don't know.

9 Q Okay.  Why did you foresee -- why was it

10  foreseeable, as we discussed earlier, that a worker

11  may have his hand caught in the area of operation?

12  Is it because some need for occasionally debris to

13  build up in there in the point of operation at the

14  knives?

15 A Possibility, yes.

16 Q In other words, when these knives come down and cut

17  the block, isn't it true that chips of this

18  concrete come off?

19 A Right.

20 Q That's expected; right?

21 A Right.

22 Q In other words -- or also, the knives are designed

23  so as to cut the blocks in a particular shape.

24 A Right.

25 Q And as a result of cutting these larger sections of

1  blocks into the smaller blocks that we see used in

2  construction, it is intended that portions of this

3  large block would be chipped away and broken off so

4  that the smaller block is created; is that right?

5 A Right.

6 Q Now, when these smaller pieces of the concrete come

7  off, what effect do those smaller pieces have on

8  the ability for those knives to cut the next

9  product?

10 A Generally the problem occurs in running --

11    MR. SHEALY:  Did you listen to his question?

12    THE WITNESS:  No.

13    MR. SHEALY:  Then listen.

14 Q What effect do the chips have on the knives'

15  ability to cut the next product?

16 A Generally nothing.

17 Q Okay.  My question is this, the chips that come off

18  the larger portions of the block -- you understand,

19  are you saying those pieces of the concrete can

20  fall down around the side knives; you know what I'm

21  talking about?

22 A Uh-huh.

23 Q Is that yes?

24 A Yes.

25 Q Have you seen that?

44

1   A   Yes.

2   Q   Okay.  If some of those smaller pieces that have

3       chipped off or are in that area of the side knives

4       and are caught between the knife and the next

5       product, can that render the next product broken in

6       an uneven fashion?

7   A   Generally it blocks the feed of that completely.

8       It won't allow the next block to be pushed in.

9   Q   Why not?

10  A   Because the chip or chunk or whatever prohibits it

11      from sliding any farther.

12  Q   Does that chip have to be removed from that area?

13  A   Yes, it does.

14  Q   Is that one of the reasons that you have described

15      it's foreseeable that an operator may get in there

16      to get that chip out?

17  A   Right.

18  Q   You expected that at E&R, or you foresee that may

19      happen?

20  A   Right.

21  Q   Now, the design of the guard that we see in

22      Exhibit 5, it only covers or takes steps towards

23      protecting the top knife; is that right?

24  A   Right.

25  Q   There is no protection for the side knives; right?

1   A  Right.

2   Q  Do you know why that is?

3   A  We have not been able to design a guard which will

4      go in and protect the side knives after the block

5      is split, because the block is just setting there.

6      In order to keep somebody's hands from coming in

7      there, this guard has got to go in and block that.

8   Q  Okay.  So we've got a clear record, what you are

9      saying -- correct me if I'm wrong -- you have not

10     been able to come up with a barrier guard like we

11     see in Exhibit 5 that would guard the side knives

12     during its operation and remain as protection after

13     the split occurs?

14  A  Right.

15  Q  Okay.  What guards have you considered?

16  A  We were looking at temperature sensors.

17  Q  Was that all during this -- the design of this

18     original -- this top guard we see in Exhibit 5?

19  A  No.  That was probably before that.

20  Q  In other words, the temperature sensors that you're

21     referring to, you considered that before the --

22  A  Before that.

23  Q  -- before the top guard was designed?

24  A  Uh-huh.

25  Q  Okay.  Tell me about the temperature sensors.

46

1   A   The problem with the temperature sensors are that

2       the block have just -- were coming out of the

3       curing and they are probably above 110 degrees

4       Farenheit.  A temperature sensor isn't going to

5       sense 98 degrees when you have something there.

6   Q   Okay.  What other guards did you look at?

7   A   We have looked at light curtains.

8   Q   Okay.

9   A   And I really don't think that they are even

10      practical at a block plant.

11  Q   Why not?

12  A   Due to the environment, dust, dirt.

13  Q   Okay.  Did you consider putting light curtains on

14      this machine?

15  A   On this one here, when we were talking about light

16      curtains, it was probably six years ago when Allen

17      Bradley started pushing a new series of light

18      curtains.

19  Q   How long at E&R have you known about light

20      curtains?

21  A   Not over six years.

22  Q   We're February 1, 2007.  So you're talking about

23      approximately 2000, 2001?

24  A   Right.

25  Q   Before that time, had you ever heard of a light

1    curtain?

2  A  No.

3  Q  Have you ever heard of any type of present sensing

4    device?

5  A  Other than light curtains?

6  Q  Yes.

7  A  No.

8  Q  Is there an electronic eye in this area of

9    operation at the heads?

10  A  No.

11  Q  What triggers the cycling of the knives?

12  A  The pusher cylinder has a linear transducer running

13    external with it on this machine.  The linear

14    transducer puts out a signal to the computer and it

15    calculates the position of that pusher in

16    thousandths of an inch from the knife.

17      You set the computer -- let's say you want it

18    to split at 12.  When that cylinder gets to

19    12 inches, then you get the side knife in first and

20    then a preset delay, depending on what he's got it

21    set at, and then the top head comes down and

22    splits.

23  Q  Okay.  So there is no electronic sensor that senses

24    the block's presence and then chops?

25  A  No.

1    Q   Okay.   Are you aware of any -- tell me other

2        manufacturers that manufacture block splitters.

3    A   There is Columbia Machine, Vancouver, Washington.

4    Q   Is that where Columbia is?

5    A   Yes.

6    Q   Who else?

7    A   Tiger Machine.

8    Q   Where are they located?

9    A   Tokyo.

10   Q   Okay.

11   A   There is maybe one or two left in Europe, but I'm

12       not sure.   That's Besser and us, that's it.

13   Q   Basically the ones you know of, Besser, E&R,

14       Columbia, Tiger Machine and then a couple others

15       that you can't think of their names?

16   A   Right, in Europe, and I'm not sure if they are

17       still in business or not.

18   Q   Are you aware of any of these, Columbia, any of

19       these designs, Besser, provide any barrier

20       protection at the heads?

21   A   No.

22   Q   Have you looked at all of their splitters?

23   A   Yes.

24   Q   Where have you seen their machines?

25   A   I have seen them in block plants, different block

49

1      plants.  I have seen their advertising literature.

2  Q  Okay.  Have you operated a block splitter before?

3  A  Yes, sir.

4  Q  Now, looking at Exhibit 5, where -- how many people

5      does it take to operate this machine?

6  A  Zero.

7  Q  Okay.  Explain that.

8  A  In most plants, there is nobody around.

9  Q  Okay.  We talked earlier about the need to put

10     those warnings on there for operators.  Where are

11     those operators --

12  A  If something happens.

13  Q  Okay.  Is there -- is it your understanding, or do

14     you expect that there is not going to be anyone

15     standing at this machine when it is in operation?

16  A  Generally there is no one there.  Generally there

17     is no one there.

18  Q  How is the area of operation monitored to make sure

19     that the debris from the blocks are not prohibiting

20     the function of the machine?

21  A  The first indication of debris pickup is that the

22     pusher won't put the next block into position.

23  Q  Have you ever seen blocks be pushed into position

24     and still debris in that area?

25  A  Yeah.

1  Q  Okay.  So it is -- you do know or you agree with me

2     that blocks can be pushed into the heads under the

3     point of operation with debris around the side

4     knives?

5  A  Definitely, yes.

6  Q  And that can happen?

7  A  Yes.

8  Q  When that happens, have you ever heard customers

9     say that -- or have you ever seen or have you ever

10    anticipated that these chips, these large pieces or

11    small pieces, can affect the ability of the knives

12    to cut the block properly and, therefore, that

13    block that's cut improperly is useless?

14 A  Correct.

15 Q  You know that happens; right?

16 A  Yes.

17 Q  In other words, what I understand can happen is

18    this block can come in under the knives, there can

19    be a piece of debris left from the previous cut,

20    and then as a result of that debris the next

21    product is broken crooked or broken a chunk out of

22    it so you have to throw that block away?

23 A  Right.

24 Q  So how is that monitored so there is not a

25    repetitive useless product being produced?

51

1    A   Generally on down the line the person on the cuber

2        picks this up, and that's another reason that we

3        ask for remote start/stops.

4    Q   Remote start/stops, what do you mean?

5    A   Down towards the cuber and also down toward the

6        depalleter of the machine that feeds the block into

7        this.

8    Q   Are you talking about remote control start/stops?

9    A   No.  What I'm talking about is permanent-mounted

10       start/stops that the person on the other side

11       towards the cuber doesn't have to run clear back to

12       the splitter to shut it off.

13   Q   Okay.  Is that important to have start/stops at

14       other areas just than at the panel?

15   A   Yes, absolutely.

16   Q   Why is that?

17   A   Well, if there is -- the cuber operator may have to

18       run 15 feet to stop it.

19   Q   If an operator or a worker, while working on one of

20       these machines, reaches his hand in like we've

21       talked about is foreseeable to occur, like

22       Mr. Jackson did, and his hand is caught, is there

23       any time to really hit a start/stop button?

24   A   No.

25   Q   The guard that we see in Exhibit 5 across the top,

1   that barrier guard there, does that provide any

2   protection whether it's present or not for the side

3   knife?

4   A   No.

5           (Plaintiff(s) Deposition Exhibit(s) 6 and 7

6   marked for identification.)

7   Q   I'll show you Exhibits 6 and 7 which are some

8   photographs that have been produced in this case by

9   some of the other lawyers.  I'll represent to you

10  these photographs were taken at the plant where

11  Mr. Jackson's accident occurred and include

12  portions of the machine involving Mr. Jackson's

13  accident.  Do you recognize this machine?

14  A   Yes.

15  Q   Have you seen pictures of the subject machine

16  before?

17  A   Yes, I have.

18  Q   You see the operator standing in these Photographs

19  6 and 7?

20  A   Uh-huh.

21  Q   Is that a yes?

22  A   Yes.

23  Q   And does it surprise you that someone is standing

24  here while this machine is being functioned or

25  being operated, or is that typical in this type of

53

1    operation?

2  A   On producing this type of split block, the bevel

3      retaining wall, it could be required that somebody

4      is close to that area.

5  Q   In other words --

6  A   To pull those chunks out.

7  Q   Right.  So that's what you would expect that this

8      machine be operated like we see in Exhibits 6 and 7

9      with a worker standing in this area for the purpose

10     of pulling this block out like we have talked

11     about?

12 A   Yes.

13 Q   Okay.  You see in Exhibit 6 the worker -- I guess

14     you can see it in both of them -- clearly in

15     Exhibit 6 -- workers reaching for some of this

16     debris that you're talking about.  Is that what

17     you're describing?

18 A   Yes.

19 Q   Is this -- is this type of activity expected by

20     E&R?

21 A   We anticipate --

22         MR. SHEALY:  Let me object to the form, "this

23     type of activity".

24 Q   Like we see in this photograph.  Do you

25     anticipate --

54

1    MR. SHEALY:  Well, let me object to the form.

2    I don't think it's real clear what he's doing.

3 A  What he's doing here is pulling the first half away

4    and then he's reaching in and grabbing these

5    chunks.

6 Q  Right.

7 A  Okay.  What --

8 Q  Go ahead.

9 A  Here is the block sliding into the machine

10   (indicating).

11 Q  Right.

12 A  It stops to split.

13 Q  Right.

14 A  Okay.  After it is split, he takes this first one

15   away.

16 Q  Right.

17 A  Exposing these chunks right here.

18 Q  Right.  Are those the naturally-occurring chunks

19   that we talked about?

20 A  Naturally-occurring.

21 Q  Expected by E&R?

22 A  Expected by E&R.  So what we want to do is let

23   these stay together and the chunks goes with them

24   (indicating) out away from the splitting area and

25   then pull the chunks.

55

1  Q  Okay.  That's what you would expect to happen?

2  A  That's what we would expect that happens, yes.  Not

3     in underneath the head but out here (indicating).

4  Q  Okay.

5         MR. SHEALY:  When you say "out here", you're

6     talking about away from the heads.

7         THE WITNESS:  Away from the head.

8  Q  Nonetheless, we have established that it is

9     foreseeable that workers will engage in the

10    activity that we see in Exhibits 6 and 7 and that

11    you and I discussed where workers will reach into

12    the point of operation to pull these chunks out?

13    That's foreseeable to E&R?

14  A  That's foreseeable, yes.

15  Q  And can you tell me anywhere in the manual or on

16    this machine does it give the instruction to allow

17    the blocks to come through and outside the point of

18    operation before the debris is removed?

19  A  I can't recall any particular place, no.

20  Q  Okay.  And you would agree with me that in fact

21    even if you did allow the blocks to stay together

22    and push out from the point of operation, there is

23    still some debris that actually falls down right

24    beside the knives and would not be on the conveyor?

25  A  Right.

1  Q  So that debris would not pull out with the bloc[k]

2     right?

3  A  But it's not going to be the big chunks that t[he]

4     are splitting out.  It would be smaller debris

5  Q  Right.  But it could be some larger chunks,

6     couldn't it?

7  A  If those chunks get lodged in the side kniv[es]

8     pusher cannot go ahead and extend so it jus[t]

9     there and waits, and this is where this aut[o]

10    comes in or else it tells the operator to g[o]

11    around, shut it off, take the chunks out.

12 Q  So that is the condition that you at E&R a[re]

13    that the auto cycle would function and tha[t]

14    operator would go and hit the emergency st[op]

15    out and tag out the machine?

16 A  Right.

17 Q  You would agree with me, however, that th[e]

18    activities we see in Exhibit 6 and 7, the

19    frequent occurrence that there is smalle[r]

20    that is not jamming the machine; wouldn'[t]

21    with me?

22 A  There is smaller chunks, yes.

23 Q  And those smaller chunks can still affect

24    cut of the block without jamming the mac[hine]

25    we have talked about?

1    to leave it alone because I think your concern is

2    misplaced and I don't think there is any need to go

3    back over it.  Do you want to take a break?

4         THE WITNESS:  Not yet.  When I have to, I'll

5    hit the door.

6         MR. ANDREWS:  That's fine.

7    BY MR. ANDREWS:

8    Q  Other than the one other deposition we have talked

9       about, have you ever given any other deposition?

10   A  Uh-uh.

11   Q  Is that a no?

12   A  No.

13   Q  Is there anyone else at your company that has

14      served as a corporate representative before?

15   A  No.

16   Q  Okay.  Your partner is a Mr. Tharp?

17   A  Mangis.

18   Q  Mr. Mangis?

19   A  Yes.

20   Q  Joe Tharp, have I got his name correct?

21   A  Right.

22   Q  Does he work with E&R?

23   A  Yes, he does.

24   Q  What is his position?

25   A  He's the general manager.

1    Q   Is he one of the owners?

2    A   No.

3    Q   Has he ever engaged in any safety analysis or have

4        any knowledge about the design of these machines?

5    A   Some, yes.

6    Q   Tell me what he does with regard to safety

7        analysis.

8    A   He makes several service calls and follows up on

9        setting up equipment and so forth.

10   Q   What about Mr. Mangis?

11   A   No.  He's retired.

12   Q   Okay.  What is your position?

13   A   Secretary/treasurer.

14   Q   And what is your job description as

15       secretary/treasurer?

16   A   I'll do most anything.

17   Q   Okay.

18           MR. RODGERS:  The utility man?

19           MR. SHEALY:  Tell him, you work half a day now

20       or not even that much.

21   A   Half a day, yes.

22   Q   Is Mr. Tharp pretty much in charge out there now?

23   A   Yes.

24   Q   Present at the facility, am I correct, there are

25       about nine employees?

62

```
 1   A   We have eight.

 2   Q   Who are those eight?

 3   A   There is me; Mr. Mangis which works part time,

 4       semi-retired; Joe Tharp; Rick Neese.

 5   Q   That's your son?

 6   A   That's my brother.

 7   Q   Your brother, N-e-e-s-e?

 8   A   Right.

 9   Q   What does he do?

10   A   He works in the assembly as well as service work,

11       outside service.  Jim Morton, he's a machinist.

12       Glen Northcott.

13   Q   Northcutt?

14   A   -- cott.  He's also a machinist.

15   Q   Now, as a machinist, are they cutting the machine

16       parts; is that what they basically do?

17   A   Yes, sir.

18   Q   Okay.

19   A   We have about 4,000 parts.

20   Q   Okay.

21           MR. SHEALY:  Is that what he asked you?

22           THE WITNESS:  No.  Sorry, sir.

23   Q   All right.  Who else?  Neese, Mangis, Tharp, Rick

24       Neese, Jim Morton, Glen Northcott?

25   A   Jackie Price, that's secretary.
```

63

1   Q   Does she work in the office?

2   A   Yes.

3   Q   Okay.

4   A   And Gary Childers.

5   Q   What does he do?

6   A   Welding.

7   Q   Okay.  Any of these employees engineers?

8   A   No.

9   Q   Who is the salesman, if any?

10  A   Joe Tharp.

11  Q   How do you market your product?

12  A   Most of it is by word of mouth from one producer to

13      another.

14  Q   Does Besser market your product?

15          MR. CURTIS:  Object to the form.

16  Q   As far as you know?

17  A   As far as I know?

18  Q   Yes.

19  A   Yes.

20  Q   Does Besser make these splitters or does Besser --

21      before they bought Lithibar, did Besser advertise

22      that they can sell splitters and then get them from

23      you?

24          MR. CURTIS:  Object to the form.

25  A   Besser bought the splitters from us.

1   Q  Before they bought Lithibar?

2   A  No.

3         MR. SHEALY:  Well, he said that.

4   A  No.  No.  After they bought Lithibar, then they

5      started selling Lithibar splitters.

6   Q  I guess one of my questions is, has Besser ever

7      made splitters themselves to your knowledge?

8   A  I can't answer that question.  They sold a splitter

9      before 1958.  I don't know whether they made it or

10      somebody else made it.

11        (Plaintiff(s) Deposition Exhibit(s) 8 and 9

12      marked for identification.)

13   Q  I'm going to show you Exhibits 8 and 9.  These are

14      documents that are Bates stamped BES14 and BES15.

15      These machines that are shown on these exhibits,

16      they have "Besser" on them, do they not?  They say

17      at the top "Besser Block Splitters".

18   A  Right.

19   Q  Is this E&R machines?

20   A  Right.

21   Q  So this is where I'm coming from with these

22      questions.  It appears to me -- I don't know how

23      else to ask this question -- it appears to me that

24      what happens is Besser markets that they can sell

25      block splitters like this CM-24 hydrofeed splitter

1    in Exhibit 9, and it's actually an E&R splitter

2    that they are putting their name on?

3  A  That's right.

4       MR. CURTIS:  Object to form.

5  Q  Was that kind of the norm or the relationship back

6    before Lithibar came into existence?

7  A  Right.

8  Q  So this CM-24 hydrofeed splitter, Besser doesn't

9    make a hydrofeed splitter --

10 A  No.

11      MR. CURTIS:  Object to form.

12 Q  -- separate, as far as you know?

13 A  No.

14 Q  Now, in Exhibit 9, in both of them, it says,

15   "Barrier guards removed for illustration."  What

16   barrier guards are you referring to, or does that

17   language refer to?

18 A  That's these guards on the top head here

19   (indicating).

20 Q  Okay.  Has anyone at Besser ever discussed with you

21   any need to guard the heads or the point of

22   operation in a different fashion?

23 A  No.

24 Q  Has anyone at -- do you know if anyone at Besser is

25   an engineer?

1    A    Yes.  I don't know any personally.

2    Q    But --

3    A    They do have engineers, yes.

4    Q    Okay.  Now, in Exhibit 8 it looks like the knives

5         go a different direction.  Am I looking at that

6         correctly?

7    A    You're right.

8    Q    Is that some of the distinctions you were making

9         earlier that different ways that the same CM-24

10        hydrofeed splitter can be made?

11   A    Right.

12   Q    Let me go through a couple questions I skipped

13        over.  You don't have any criminal history, do you?

14   A    No.

15   Q    Okay.  Has E&R ever sued or been sued other than

16        the lawsuit we talked about before?

17   A    One time in Alabama in 1984?

18            MR. SHEALY:  I don't know, but it doesn't have

19        anything to do what we're talking about.

20   A    Stuck his foot in the gears.

21   Q    Who did that?

22   A    I don't remember what his name was.

23   Q    Okay.

24   A    Stuck his foot in a pair of gears.

25   Q    I think what you're trying to tell me is E&R was

67

1    sued in Alabama somewhere around 1984 because a

2    worker or some person got his foot or leg caught in

3    some gears?

4  A   Right.

5  Q   What do you know about that accident?

6  A   There was no guarding on the machine whatsoever.

7    They had taken it off.

8        MR. SHEALY:  But he wants to know what do you

9    know about the accident.  Listen to the question,

10   Ron.  He asked you what do you know about the

11   accident.  He didn't ask you there wasn't any guard

12   or taking it off.  What he meant or wants to know,

13   what is the --

14       MR. ANDREWS:  He's getting there.  He's

15   getting there.  That's probably a bad question.

16   Let me start back before that.

17 Q   What part of Alabama was this in, if you know?

18 A   I don't remember.

19 Q   Do you remember the name of the plant?

20 A   No, I don't.

21 Q   Do you have any record or document at your office

22   related to this at all?

23 A   No.

24 Q   Do you remember the name of any lawyer involved in

25   it?

```
1   A   No, I don't.

2   Q   Do you remember anything that would help me?

3       Obviously I want to track it down if I can.  Do you

4       remember anything that would help me track it down?

5           MR. SHEALY:  They got summary judgment.

6           MR. ANDREWS:  How do you know that?

7           MR. SHEALY:  That's what he told me.  He

8       didn't say summary judgment.  He said the judge

9       threw it out.

10          THE WITNESS:  The judge threw it out.

11          MR. SHEALY:  The two cases they had is the

12      lawyer dismissed it and the judge threw it out.

13      That's what I know.

14          MR. ANDREWS:  Okay.

15  Q   Now, the 1984 in Alabama, did that lawsuit include

16      allegations that the guard was not provided by E&R;

17      is that what they were suing you for?  What were

18      the allegations in the lawsuit?

19  A   The allegations were that there were open gears

20      where somebody could stick their foot in.

21  Q   Okay.  And your response was we provided guards?

22  A   Absolutely, and the -- am I talking too much?

23          MR. SHEALY:  You're fine.

24  Q   Go ahead.

25  A   We quit building that particular machine in the
```

1    1960s, and just so happened we kept literature of

2    the finished machine, and we said "Here, there is

3    the way it looked when it went out of here"

4    (indicating).

5  Q  I see.  Now, with regard to guards and the removal

6    thereafter, have you ever interlocked any guards on

7    your machines?

8  A  Interlocked?

9  Q  Yes.  You know what the term interlocked means;

10   right?

11  A  With rotary switches or whatever.

12  Q  Or any other present sensing device that would

13   signal a guard is removed and therefore shut down

14   the machine?

15  A  On a splitter?

16  Q  On any machine, let's start there.

17  A  Yes.

18  Q  What machines?

19  A  A machine called a Pitchmaster.

20  Q  Pinchmaster?

21  A  Pitch, P-i-t-c-h-m-a-s-t-e-r.

22  Q  What does it do?

23  A  It rock-faces a split face and makes it look

24   bolder.

25  Q  And do you have interlocks on that machine?

```
 1   A   Yes, we do.

 2   Q   Are there interlocks on the guards at point of

 3       operation?

 4   A   Yes.

 5   Q   When did you first design the Pitchmaster?

 6   A   The Pitchmaster, the first?

 7   Q   Yes.

 8   A   1958 or '59.

 9   Q   Did that original design have these same guards?

10   A   No.

11   Q   When did the guards get incorporated?

12   A   Probably 2001.

13   Q   Do you have a picture of the Pitchmaster today?

14   A   I don't think I brought any.

15   Q   Does it have knives at the head or something?

16   A   No.

17   Q   What does the point of operation look like?

18   A   It's just a conveyor coming into the machine and

19       the product goes through the conveyor like this

20       (indicating).

21   Q   Through a point of operation?

22   A   Yes.

23   Q   And is the point of operation covered?

24   A   Yes.

25   Q   And are there doors on the point of operation?
```

1   A   Yes.

2   Q   Are those doors interlocked?

3   A   They have got limit switches on them.

4   Q   If the doors are open, the machine won't function?

5   A   Right.

6   Q   Who came up with that?

7   A   I did.

8   Q   How did you come up with that?

9   A   How?

10  Q   Yes.  I mean what inspired you, what caused you

11      to -- were you trying to meet a standard, trying to

12      be creative, trying to look out for safety?  Why

13      did you come up with this?

14  A   From a safety standpoint, yes.

15  Q   In other words, common sense safety?

16  A   Right.

17  Q   Now, how did you -- is it like a hood that covers

18      this area?

19  A   Similar to a hood, yes.

20  Q   What causes the operation -- what events take

21      place?  Are there knives in there?  What's in the

22      hood?

23  A   They are knives that rotate.  A knife on top and a

24      knife on the bottom, and it knocks chips off of --

25      off of the edge of the brick, block, whatever it

1    is.

2    Q    Where do the chips go?

3    A    They fall down onto a conveyor.

4    Q    Underneath the --

5    A    Underneath the machine.

6    Q    So the block is on a conveyor?

7    A    Right.

8    Q    Is there a conveyor below that conveyor?  There is

9         two conveyors, one for the block and one for the

10        debris?

11   A    Yes.

12   Q    And does the debris fall down out of the way for

13        the next product; is that what happens?

14   A    Yes.  It's knocked off of the block, falls down.

15   Q    And then carried away by way of conveyor?

16   A    Yes, customer-furnished conveyor.

17   Q    Okay.  And the Pitchmaster 2 is the one that has

18        these guards?

19   A    Right.

20   Q    What year do you think you started using this type

21        of guarding?

22   A    Probably 2000, 2001.

23   Q    Is that when the Pitchmaster 2 came out, before

24        that it was the Pitchmaster 1?

25   A    No.  1 is for brick, 2 is for stone and concrete.

73

1   Q   Okay.  Do you have documentation as to the sale of

2      those machines as well?

3   A   Yes.

4   Q   How many of those do you sell a year?

5   A   Four, five.

6   Q   Do you know, are any of those in Alabama anywhere?

7   A   I don't know.  I can't remember.

8   Q   Do you remember where the last one went by any

9      chance?

10   A   I could find out.  Oh, it went to Canada.  I know

11      where it went.

12   Q   The hood and the interlock device that you have

13      described on the Pitchmaster, were you striving to

14      comply with any kind of standard, guarding

15      standards?

16   A   No.

17   Q   Did you consult any guarding standards in coming up

18      with those guards?

19   A   No.

20   Q   The word hydrofeed, does that deal with the

21      hydraulics?

22   A   Yes.

23   Q   In other words, it's the feed of the hydrofeed

24      block splitter, in Exhibits 8 and 9, it's fed by

25      way of a conveyor that's hydraulics and the

1    splitter is hydraulic operated?

2  A  No.

3  Q  What does the hydraulics do?

4  A  The hydraulics run the chain conveyor which brings

5     the block in, it runs the pusher cylinder, and it

6     runs the side knives.  There is three circuits on

7     the hydraulics.

8  Q  Okay.  Now, back to the Pitchmaster, is it set up

9     similar to the conveyor system in --

10 A  No.  Doesn't look anything like it.

11 Q  I understood the Pitchmaster has a conveyor that

12    feeds the product in?

13 A  That's right.

14 Q  Feeds it into the point of operation and the

15    conveyor feeds it out?

16 A  It's carried -- the machine carries the product

17    through on belts.

18 Q  Up to the point of operation and then through

19    afterwards?

20 A  It stays on the belts through the entire operation.

21 Q  I see.  Okay.  When Besser would market your

22    product, would Besser get a percentage of the

23    profits off of that sale?

24       MR. CURTIS:  Object to form.

25 Q  You can answer.

1  A  I can?

2  Q  Yes.  All these objections are to preserve -- for

3     the record, you can answer unless that fellow tells

4     you not to answer.

5  A  I don't know what they sold it for.  They might

6     have give it to them.

7  Q  I see.  So you sell it at one price and they can

8     get whatever they want out of it.

9  A  That's right.

10 Q  Okay.  Has anyone besides Besser ever sold any of

11    your machines for you?

12 A  Years ago Columbia sold a couple.

13 Q  What years would that have been?

14 A  Back in the middle '70s.  Lithibar has sold one or

15    two; again, probably in the early '80s.

16 Q  Would the Columbia and Lithibar, would those have

17    been America sales, sales in America or overseas?

18 A  Probably overseas.  A lot of times we don't know

19    where these machines end up at.

20 Q  Do you have documentation as to this?

21 A  As to the sales to them?

22 Q  Yes.

23 A  Probably, yes.

24        MR. ANDREWS:  Let's take a break, take about

25    five minutes.

76

1          (A brief recess was taken.)

2   BY MR. ANDREWS:

3   Q   Mr. Neese, do you remember the sale of the machine

4       that we're here about today?

5   A   Yes.

6   Q   Were you contacted or how -- did Couch contact E&R

7       or did they contact Besser?  Tell me about that.

8   A   I'm not sure which occurred first, whether they

9       contacted Besser or us to discuss the application,

10      and then Besser contacted us about it.

11  Q   Did you know the machine was going to be sold into

12      Alabama, did you know it was going to be delivered

13      down there?

14  A   At the time they didn't know whether it was going

15      to Alabama or Florida.

16  Q   Ultimately when it was sold, you knew it was going

17      to be going -- you did learn it before you

18      delivered it?

19          MR. SHEALY:  We shipped it down there.

20  A   Right, we shipped it.

21  Q   Who did you sell the machine to?

22  A   Besser.

23  Q   Then Besser sold it to Couch?

24  A   I presume, yes.

25          (Plaintiff(s) Deposition Exhibit(s) 10 marked

77

1        for identification.)

2   Q    Exhibit 10 is a composite exhibit of documents

3        produced by Besser that are sale documents, and I

4        believe they are Bates stamped BES1 through BES13.

5        I'll show you Exhibit 10 and ask you if you

6        recognize these documents?

7             MR. SHEALY:  He asked if you recognize it.

8   A    Yes, I do.

9   Q    Are those the documents involved with the sale of

10       the machine involved with Mr. Jackson's accident?

11  A    Right.

12  Q    With regard to BES13, is there anything significant

13       on that page with regard to the sale of this

14       machine, the delivery?

15  A    No.

16  Q    Okay.  Is this basically a standard sale, the way

17       it typically occurred with the sale of your

18       machines through Besser?

19  A    Right.

20  Q    Is that a fair way of saying it was sold through

21       Besser?

22  A    Exactly.

23  Q    You sold it through Besser knowing it was going to

24       be sold to someone else?

25  A    Right.

1   Q  Are you aware of any other document associated with

2      the sale of this machine?

3   A  No, I'm not.

4   Q  To your knowledge, the documents included in

5      Exhibit 10 include all the sale documents?

6   A  (Affirmative nod).

7   Q  How much did this machine sell for?

8   A  To Besser?

9   Q  Yes.  How much did you all sell it for?

10        MR. CURTIS:  Just to be clear, he asked if

11     there were any other sale documents other than that

12     Plaintiff's Exhibit 10.  Is that the same thing

13     that you're looking at there, the same documents?

14        THE WITNESS:  What he's got there -- right

15     here it is.

16   A  67,194.68.

17   Q  On the front of Exhibit 10 there is a number of

18      82,000 and 76,000.  Is that with some options that

19      didn't come with the machine?

20   A  That must be the price that they charged.  I have

21      no idea where that come from.

22   Q  Now, on the Page BES2, there is a paragraph in the

23      middle that's X'ed out.  Do you see that that's

24      your writing?

25   A  Yes.

1    Q    What is that referring to?

2    A    What that is is they use on Keystone retaining

3         wall.  That part number that pushes the block in.

4              MR. SHEALY:  What ton of block is being

5         produced; is that what you're saying?

6    A    Retaining wall.  Keystone, that's another

7         manufactured retaining wall.

8    Q    In other words, that's the type of block this

9         machine can't split?

10   A    Yes.

11   Q    There is a reference there to a hinged gate.  Do

12        you see that?

13   A    Okay.  That's also for the Keystone setup.

14   Q    What does that mean?

15   A    Well, the standard feeder pull setup will not feed

16        some of the Keystone units so you have to use a

17        different type of a mechanism to push the block in.

18   Q    Is it a hinged gate?

19   A    It's a hinged gate like this (indicating) that

20        pushes the block in.

21   Q    Does the block go through the gate?  I don't

22        understand how the hinge gate works.

23   A    No.  Here is the block on the conveyor line coming

24        into the splitter (indicating).  The hinge gate up

25        here flips up like this (indicating), drops back

1    down and picks up the back of the block and pushes

2    it into the machine (indicating).

3  Q  Okay.

4  A  With the Keystone unit, there is no pickup points

5    on here that you can actually position it with.

6  Q  Okay.  So does the gate -- the gate closes down

7    behind the block once the block is pushed into the

8    heads?

9  A  Right.

10  Q  Do you sell those parts; in other words, do you

11    sell that option?

12  A  Yes, they have Keystone; but they don't -- have

13    never made a Keystone again.

14  Q  Who has never made Keystone again?

15  A  Block USA, Couch.

16  Q  E&R can provide that option if they wanted it?

17  A  Right.

18  Q  So I'm clear for the record, what you're saying is

19    the block would come in, would be fit in towards

20    the point of operation just like exists on the

21    subject machine up to a point, and then the block

22    for the type that you're referring to that requires

23    the gate, it has to come up to a certain point,

24    then the gate -- the block goes through the gate

25    that swings open and allows the block to go through

1    the gate, then the gate closes down behind the

2    block and pushing the block through the point of

3    operation?

4  A  The gate goes ahead and pushes it in.

5  Q  On the other side, is there a gate that has to feed

6    it on?

7  A  No, there is nothing.  It's all the same.

8  Q  Okay.  I guess on the subject machine, could you

9    put a hinged gate for that operation on the subject

10    machine?

11  A  On the machine that was shipped to Couch?

12  Q  Yes.

13  A  Yes.

14  Q  Okay.  And it wouldn't impede the operation of the

15    knives or the function of the cutting, would it?

16  A  No.

17  Q  Has E&R ever filed bankruptcy?

18  A  No.

19  Q  The sale in 1970 that went through with old man

20    Mr. Mangis, when he sold it -- what was his

21    original name?

22  A  Elmer.

23  Q  Mr. Elmer, when he sold it, did he sell it to you

24    and Paul?

25  A  He sold his half to his son.  Mr. Boeskool sold his

1    half to me.

2    Q   Okay.   When did you come to work at E&R?

3    A   1961.

4    Q   Before that where had you worked?

5    A   Commercial Filters Corporation.

6    Q   What's that?

7    A   It's a company that built filtration equipment for

8        paint booths, steel mills.   They were located here

9        in Lebanon and they announced they were going to

10       move so I went to E&R.

11   Q   What was your position there?   What were your

12       duties?

13   A   I worked in engineering.

14   Q   Did you design machines there?

15   A   I did.

16   Q   Who was your supervisor there?

17   A   I don't recall.   Yes, I do.   Ernie Lewis.

18   Q   Did you -- at that company, did you have to deal

19       with ANSI standards, OSHA standards, that sort of

20       thing?

21   A   In 1961, there was no OSHA.

22   Q   That's right.   ANSI was around though, wasn't it?

23   A   Not that I recall.

24   Q   Okay.   What about National Safety Council, did you

25       ever have to deal with that?

1    A    No.

2    Q    Did you ever have to deal with any safety

3         standards?

4    A    Not that I recall.

5    Q    Nonetheless, in designing these machines did you

6         contemplate the way an operator would be

7         interfacing that machine?

8    A    Yes.

9    Q    Did you take into consideration all reasonably

10        foreseeable hazards that --

11   A    Yes.

12   Q    And did you take that reasonably foreseeable hazard

13        that you may recognize and incorporate a desire to

14        either design out that hazard, guard against that

15        hazard or warn against that hazard?

16   A    Right.

17   Q    Even in 1960?

18   A    Yes.

19   Q    You are familiar with that hierarchy of design?

20   A    Yes.

21   Q    That's the way you do it, is it not?

22   A    Right.

23   Q    Once you recognize a hazard within a machine, like

24        this block splitter, all prudent design steps would

25        include a hazard analysis to identify any

84

1     foreseeable hazards; right?

2  A  Right.

3  Q  Once you identify any reasonably foreseeable

4     hazards, the next proper step would be to design

5     out those hazards?

6  A  Right.

7  Q  If you cannot design out those hazards, then you

8     would guard against those hazards?

9  A  Right.

10  Q  If you cannot provide any reasonable guarding

11     against those hazards, then you warn against?

12  A  Warn.

13  Q  You agree that's the steps you take?

14  A  Yes.

15  Q  You agree that's the order of those steps?

16  A  Right.

17  Q  In other words, you can't just warn if you could

18     guard.

19  A  Right.

20  Q  And you can't just guard if you could design out

21     the hazard.

22  A  Right.

23  Q  And that's reasonable, prudent safety steps?

24  A  Yes.

25  Q  You agree with me those are the steps that you

85

1      should take when designing, developing,

2      manufacturing and selling the subject block

3      splitter?

4  A  Right.

5         MR. CURTIS:  I'm going to object to the form

6      of that last question.

7  Q  Does E&R go to any seminars like trade shows or

8      anything?

9  A  We used to, yes, until it got so expensive.

10  Q  Where did you go?

11  A  All over the United States.

12  Q  Is there a particular association that puts them

13      on?

14  A  Not -- National Concrete Masonry Association.

15  Q  Are you all a member of that?

16  A  Yes.

17  Q  When was the last time you all went to some of

18      those trade shows?

19  A  2002, Kansas City.

20  Q  From 2002 previously going back, you would have --

21      someone at E&R would have been present at these

22      trade shows?

23  A  Every.

24  Q  But since 2002 no one has been there?

25  A  No.

1   Q  Are there any publications that E&R receives about

2      machine design or safety or anything like that?

3   A  Not that I'm aware of.

4   Q  Do you all receive any guarding magazine --

5   A  No.

6   Q  -- or safety --

7   A  No.

8   Q  Okay.  Do you contribute or have you ever

9      contributed any articles to any publications?

10   A  No.

11   Q  Any newsletters regarding safety?

12   A  No.

13   Q  Have you ever put on any shows about safety?

14   A  Yes.

15   Q  Tell me about that.

16   A  Well, we have a customer in Florida that's got five

17      machines.

18   Q  Five of your machines?

19   A.  Yes.  And I went down and spent a day with them,

20      shut the plant down, and they all listened to what

21      I said.

22   Q  When was that?

23         THE WITNESS:  Boss, when was it?

24         MRS. NEESE:  You're the one with the memory.

25   A  2002?

1   Q   Do you remember what part of Florida?

2   A   Yeah, it was Cement Products, Hudson, Florida.

3           MR. SHEALY:  What's that near, help us.

4           THE WITNESS:  North of Tampa.

5   Q   What type machines did they have?  Did they have

6       one of these CM --

7   A   They've got two like this (indicating).

8           MR. SHEALY:  Don't say "like this".  Like

9       Exhibit 9 and 8.

10  A   They have two like Exhibit 8.  They have -- excuse

11      me.  One like Exhibit 8, two like Exhibit 9, and

12      then two of a machine that we call the high-speed

13      splitter, for a total of five in this one plant.

14  Q   Do any of those machines at Hudson, Florida have

15      this hinged gate feature?

16  A   No.

17  Q   The high-speed splitter, how is it different?

18  A   It can produce four per second.

19  Q   How does Hudson, Florida, that plant, how do they

20      clean out the debris at that high speed?

21  A   From the high-speed?

22  Q   The debris.

23  A   The block coming in sweeps it off each time.

24  Q   I think I saw some documentation in Exhibit 10 that

25      the subject machine would split 21 to 23 a minute?

88

1  A  No.  It's up to 64 per minute.

2  Q  The subject machine that Mr. Jackson was injured

3     on?

4  A  No.  That one was 21 to 23.

5  Q  Just so we're clear.

6        MR. SHEALY:  Listen to his question.

7  Q  Just to get a clear question, the Hudson plant will

8     do 64 a minute?

9  A  Right.

10 Q  Which is a little more than one a second?

11 A  Yes.

12 Q  The subject machine was 21 to 23 blocks per minute?

13 A  Right.

14 Q  So that's one every three seconds would be the

15    highest approximately?

16 A  Yes.

17 Q  Are you the most knowledgeable person at E&R about

18    OSHA and ANSI standards, would you say?

19 A  Yes.

20 Q  Are you the one that would ensure or make sure that

21    these products comply with any OSHA or ANSI

22    standards?

23 A  Right.

24 Q  Are you on any safety committees or organizations

25    or is anyone at E&R?

89

1   A  No.

2   Q  Have you ever been a member of any safety

3      organization?

4   A  No.

5   Q  Do you hold any patents?

6   A  They have all run out.

7   Q  Have you --

8         MR. SHEALY:  He asked you do you hold any

9      patents?  The answer is no.

10   A  No.

11   Q  The next question is have you ever held any

12      patents?

13   A  Yes.

14         MR. SHEALY:  That's how you do it; okay?

15   Q  What are those?

16   A  We had a patent on the acentric principle of --

17      mechanical principle of splitting the block.  A

18      patent on the knife principle, the multiple knife.

19      Another patent is on this Pitchmaster that I was

20      telling you about.  And there was another patent on

21      another pitching principle, and that's all I can

22      recall right now.

23   Q  Now, when you say "we", are you saying that you

24      hold it or E&R holds it?

25   A  E&R held it.

1  Q  Have you personally ever held any?

2  A  No.

3  Q  Who obtained the patents that you just described?

4  A  Elmer Mangis.

5  Q  Anyone else there ever come up with a design that's

6     been patented?

7  A  No.

8  Q  In the history of E&R?

9  A  No.

10 Q  Now, we have discussed hazard analysis previously;

11    correct?

12 A  Correct.

13 Q  How do you engage in hazard analysis of this

14    machine?

15 A  Would you rephrase the question?

16 Q  Sure.  How do you become involved or how does

17    anyone at E&R become involved in performing a

18    hazard analysis for the subject machine?

19 A  First of all, we have to pinpoint the hazard.  We

20    try to guard out the hazard.  If we can't guard it

21    out, then we use warnings.

22 Q  And you would only resort to warnings if you have

23    exhausted all available --

24 A  All possibilities.

25 Q  Of guards?

1    A    Of guards.

2    Q    Or an alternative feasible design.

3    A    Right.

4    Q    What guards were considered -- we have talked about

5         some guards for the subject splitter, have we not?

6    A    Yes.

7    Q    Talked about light curtains.

8    A    Yes.

9    Q    Barrier guards?

10   A    Right.

11   Q    Talked about gates that open and close?

12   A    Right.

13   Q    Have you ever heard of guarding by location?

14   A    No.

15   Q    Okay.  Have you ever heard of a -- we have talked

16        about the electronic eye, similar to the light

17        curtains; correct?

18   A    Right.

19   Q    And all of these guards and the designs that you

20        were considering in this hazard analysis, if I'm

21        understanding you correctly, those were intended --

22        those were considered and intended to protect

23        against operators getting hurt similar to the way

24        Mr. Jackson got hurt?

25   A    Right.

92

1   Q   Now, the -- have you ever heard of any other type

2       guards like a trip switch or an emergency stop at

3       the splitter that would pause the machine for a

4       period of time until you pull the stop back out?

5   A   That's what it says in there (indicating).

6   Q   In where?

7   A   In the manual.

8   Q   You're talking about the button on the panel;

9       right?

10  A   Right.

11  Q   Have you ever considered putting one at the

12      splitter knives?

13  A   Which side of the machine are we going to put it

14      on?

15  Q   Either one.

16  A   It would have to be ordered special because we

17      don't know where the -- whether the person is

18      right-handed or left-handed.

19  Q   Okay.  Could you put it on both sides?

20  A   It's a possibility, yes.

21  Q   Have you ever considered that?

22  A   No.

23  Q   Why not?

24  A   Not as a standard.

25  Q   Why not?

1   A   I think the guy can take two steps to push a stop

2       button.

3   Q   Okay.  So it was considered, you just decided it

4       was just as well to put it where you put it?

5   A   Right.

6   Q   Is that right?  Now, what about any body bars or

7       anything, any mechanical device or electronic

8       device that would trip if someone is reaching over,

9       for example, or would bump a bar?  Have you ever

10      heard of such as that?

11  A   Yes.

12  Q   Had you ever considered that?

13  A   No.

14  Q   You would agree you could install that and it would

15      not impede the function of the machine.

16          MR. SHEALY:  Object to the form.

17  A   Possible.

18  Q   Do you know why that was never done?

19  A   No.  I really don't think it's practical.

20  Q   You would agree with me, would you not, that if

21      there had been a barrier device, like the doors the

22      MIT engineer recommended or the light curtain that

23      would stop the knives from cycling if someone's

24      hand was impeding the light curtain, or any of

25      these other guards that we talked about, if that

1   had been in place that would have protected against

2   Mr. Jackson being able to gain access to the point

3   of operation?

4            MR. SHEALY:   Object to the form.

5   A   No.

6   Q   It would not have -- your contention is it would

7       not -- if there were gates there that would close

8       when the knife cycled, that would not protect him

9       against --

10  A   No.   Where is the gates going to close at?

11  Q   Around the point of operation.

12  A   Where?

13  Q   Completely around it.

14  A   In front or behind?

15  Q   Yes.

16  A   It's impossible.

17  Q   Okay.   All right.   Assume for the purposes of this

18      question that if a design were to be created that

19      would close behind the block and in front of a

20      block so that while the block is being cut by the

21      knives in the point of operation, assume that that

22      could be designed, would you agree with me that

23      then the operator could not gain access to the

24      point of operation?

25            MR. SHEALY:   Object to the form.

1  A  I would have to see the guard.

2  Q  Okay.  In the hazard analysis that we have talked

3     about, talked about designing, then guarding, then

4     warning, did you consult with OSHA standards and

5     ANSI standards that you're aware of?

6  A  That I'm aware of, yes.

7  Q  Have you ever looked at OSHA Standard 1910.212?

8  A  I'm not familiar with the numbers.

9  Q  Were you familiar or aware that that particular

10     standard requires that all machines that have a

11     point of operation like the one we have here, that

12     that point of operation be guarded and all steps be

13     taken to prevent an operator from gaining access to

14     a point of operation?

15  A  I'm not aware of that, no.

16  Q  Having told you that, assume for the purposes of

17     this question that that is true, do you intend to

18     have anyone, any engineer come and analyze this

19     machine for OSHA compliance or ANSI compliance?

20  A  No.

21  Q  Exhibit 11 is what I understand to be E&R's Mission

22     Statement.

23  A  Yes.

24        (Plaintiff(s) Deposition Exhibit(s) 11 marked

25     for identification.)

1  Q  It references an ongoing desire to provide safe

2     products.

3  A  Right.

4  Q  How does E&R endeavor to accomplish that currently?

5  A  We are continually changing the design and the

6     operation and efficiency of the machine in order to

7     get the operator out away from the machine.

8  Q  Okay.  Including where possible the inclusion of

9     any barrier guards or light curtains or any of the

10    other guards that we talked about?

11 A  Right.

12 Q  If it could be shown to you that there is a

13    feasible system of guarding this machine that would

14    protect workers like Mr. Jackson and prevent

15    operators of this splitter machine from reaching

16    into the point of operation when the machine is

17    cycling, would you want to include that in your

18    machine?

19 A  Yes.

20 Q  And why is that?

21 A  In order to improve the safety.

22 Q  And that's because safety of operators is

23    paramount?

24 A  Right.

25           (Plaintiff(s) Deposition Exhibit(s) 12 marked

1       for identification.)

2   Q   Now, Exhibit 12 is a composite of two documents

3       which is a copy of a check for $2,000 and a copy of

4       an award that you all -- that E&R received.  Are

5       you familiar with that?

6   A   Yes, I am.

7   Q   And that was an award for implementation of the

8       ANSI Z standards, the warnings?

9   A   Right.

10  Q   Given our discussion of the hierarchy of safety and

11      design where you can only get -- you can only use

12      warnings after you have exhausted all design

13      measures or guarding measures, you would agree with

14      me that although E&R received an award such as this

15      that that award is not -- does not have anything to

16      do with design or guarding measures, it simply is

17      an award as to the implementation of warnings?

18  A   Warnings, right.

19  Q   You still agree with me that you can't resort -- a

20      prudent safety design or prudent safety rules do

21      not allow you to result to warnings until you have

22      exhausted designing and guarding issues?

23  A   Right.

24  Q   And compliance with OSHA and ANSI, like we see in

25      Exhibit 12, that's important to E&R, is it not?

1   A  Right.

2   Q  Do you know what the definition of a hazard is?

3   A  I believe so, yes.

4   Q  What's your definition of a hazard?

5   A  Anything that might subject to injury.

6   Q  Why is it important to determine all hazards of a

7      machine such as the splitter?

8   A  To try to eliminate all points of possible injury.

9   Q  Do you embrace the principle that if you can

10     eliminate or minimize the potential for injury by

11     design or guarding that you should do so?

12   A  Correct.

13   Q  You also agree with me that no risk of injury is

14     acceptable where that risk could be eliminated or

15     minimized by designing it out or guarding against

16     it?

17   A  Right.

18         MR. SHEALY:  Object to the form.

19   Q  You agree with that, don't you?

20   A  Yes.

21   Q  And you agree with me that where it's feasible to

22     prevent injuries, eliminate or minimize potential

23     for injuries, where that can be done feasibly it

24     should be done?

25   A  That's right.

1    Q   And that's because safety is paramount?

2    A   Right.

3    Q   You would agree with me that the design of the

4        subject splitter, like we see in Exhibits 8 and 9,

5        that there is nothing that prevents a worker from

6        sticking their hand in this area of operation, is

7        there?

8            MR. CURTIS:  I object to the form.  Are we

9        absolutely clear that this is the subject splitter?

10       These appear to be two different models, are they

11       not?

12           MR. ANDREWS:  We have talked about Exhibit 9,

13       but I can also get a picture of the fact machine if

14       we want to.

15           MR. SHEALY:  Let's just talk about the

16       machine.

17   Q   My question is this, the subject machine that was

18       involved in Mr. Jackson's accident, there is

19       nothing -- there is no barrier, nothing, no guard

20       to prevent an operator from sticking their hand in

21       that area, is there?

22   A   In the --

23           MR. SHEALY:  In where are we talking about?

24   A   In where?

25   Q   Into the heads, in the point of operation.  We'll

1  use Exhibit 5.  This is the subject machine, is it

2  not?

3  A  Right.

4  Q  You would agree with me there is nothing that would

5  keep an operator from reaching into the machine

6  while it's cycling?

7    MR. SHEALY:  Object to the form.  There is.

8    MR. CURTIS:  Same objection.

9    MR. ANDREWS:  What is?

10   MR. SHEALY:  There is a guard.

11   MR. ANDREWS:  Where?

12   MR. SHEALY:  Right here.  The way you asked

13 your question, I think you meant to put your hand

14 where the side knives are located.

15   MR. ANDREWS:  I'm using point of operation

16 to --

17   MR. SHEALY:  The way you asked is as if there

18 is nothing.

19 BY MR. ANDREWS:

20 Q  You would agree with me, Mr. Neese, there is

21 nothing that would prevent a worker from reaching

22 into the side knives of the subject machine while

23 the side knives are cycling like we see in

24 Exhibit 5 and Exhibit 6 and 7?

25   MR. CURTIS:  Object to the form.