# Exhibit 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06 CV0412-DRB


DAVID JACKSON,

     Plaintiff,

vs.

E & R MANUFACTURING CO., INC.
ET AL,


    Defendants.

_____


DEPOSITION OF KARRY MACKEY

Date:  May 23, 2007

Time: 12 p.m.


COURT REPORTER:

APRIL R. BENDINGER, CSR


BENDINGER & ASSOCIATES
334.803.0161

 COPY

Page 2

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4            Mr. Mark Andrews

 5            MORRIS, CARY, ANDREWS, TALMADGE, JONES

 6            & DRIGGERS

 7            3334 Ross Clark Circle

 8            Dothan, Alabama 36303

 9

10    FOR THE DEFENDANT:

11            Mr. Steadman Shealy

12            SHEALY, CRUM & PIKE

13            100 Camellia Drive

14            Suite 101

15            Dothan, Alabama 36302

16

17    FOR THE DEFENDANT:

18            Mr. Cory M. Curtis

19            BAKER & HOSTETLER

20            303 East 17th Avenue

21            Suite 1100

22            Denver, CO 80203

23
```

BENDINGER & ASSOCIATES
334.803.0161

Page 3

1                 A P P E A R A N C E S

2

3

4   FOR THE DEFENDANT, STEPHENS AND MACKEY:

5          Mr. Christopher Rodgers

6          HUIE, FERNAMBUCQ & STEWART

7          Three Protective Center

8          Suite 200

9          2801 Highway 280 South

10         Birmingham, AL 35223

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    EXAMINATION INDEX

2

3    KARRY MACKEY

4        BY MR. ANDREWS . . . . . . . . . . . .     7

5        BY MR. SHEALY . . . . . . . . . . . .    56

6        BY MR. CURTIS . . . . . . . . . . .    80

7        BY MR. ANDREWS . . . . . . . . . . .    89

8        BY MR. CURTIS . . . . . . . . . . .   106

9        BY MR. ANDREWS . . . . . . . . . . .   107

10

11

12
                        EXHIBIT INDEX
13
                                                 MAR
14   Defendant's

15   1        Manual                               83
16

17

18

19

20

21

22

23

```
 1              S T I P U L A T I O N

 2              IT IS STIPULATED AND AGREED by and

 3    between the parties through their respective

 4    counsel that the deposition of KARRY MACKEY may

 5    be taken before April R. Bendinger, Notary

 6    Public, State at Large, at the Law Offices of

 7    Albrittons, Clifton, Alverson, Moody & Bowden,

 8    109 on Avenue, Andalusia, Alabama on May 23,

 9    2007, commencing at approximately 12 p.m.

10              IT IS FURTHER STIPULATED AND

11    AGREED that the signature to and the reading of

12    the deposition by the witness is waived, the

13    deposition to have the same force and effect as

14    if full compliance had been had with all laws

15    and rules of Court relating to the taking of

16    depositions.

17              IT IS FURTHER STIPULATED AND

18    AGREED that it shall not be necessary for any

19    objections to be made by counsel to any

20    questions, except as to form or leading

21    questions and that counsel for the parties may

22    make objections and assign grounds at the time

23    of trial or at the time said depositions is
```

Page 6

1    offered in evidence, or prior thereto.

2                    I, April R. Bendinger, a Court

3    Reporter of Dothan, Alabama, and a Notary Public

4    for the State of Alabama at Large, acting as

5    Commissioner, certify that on this date,

6    pursuant to the Federal Rules of Civil

7    Procedure, and the foregoing stipulation of

8    counsel, there came before me at the offices of

9    Albrittons, Clifton, Alverson, Moody & Bowden,

10   109 on Avenue, Andalusia, Alabama commencing at

11   approximately 12 p.m. on May 23, 2007, KARRY

12   MACKEY in the above cause, for oral examination,

13   whereupon the following proceedings were had:

14

15

16

17

18

19

20

21

22

23

```
 1                KARRY MACKEY,
 2  being first duly sworn, was examined and
 3  testified as follows:
 4                EXAMINATION
 5  BY MR. ANDREWS:
 6      Q.    Tell us your name, please, sir.
 7      A.    Karry Mackey.
 8      Q.    How do you spell that?
 9      A.    K-A-R-R-Y.
10      Q.    Mr. Mackey, you sat through
11  Mr. John Stephens' deposition just now?
12      A.    Yeah.
13      Q.    I want to take your deposition
14  about Mr. Jackson's accident as well.  We met
15  before we got on the record.  But again, I'm
16  Mark Andrews, and I represent Mr. David Jackson
17  with regard to his accident and injuries out
18  there at Block USA when operating this block
19  splitter machine.  Do you remember that
20  accident?
21      A.    Yes.
22      Q.    Were you there that day?
23      A.    Yes, I was.
```

Page 8

1          Q.       Were you there at the plant?

2          A.       I wasn't at the plant when the

3     accident occurred, but later.

4          Q.       In other words, you were employed

5     there, but you weren't on the premises at the

6     time of the accident?

7          A.       Right.

8          Q.       I understood you were not present

9     at the time of the accident; is that true?

10         A.       That's true.

11         Q.       It's safe to say that you didn't

12    see the accident happen?

13         A.       No, I didn't.

14         Q.       All the information you may have

15    about how the accident happened is based on what

16    somebody else told you, I guess?

17         A.       Yes.

18         Q.       Quickly, if you need a break, let

19    me know.  If you don't understand my questions,

20    let me know.  Try to answer with a yes or no.

21    Head nods and and uh-huh and uh-uh don't get

22    down on the record very well.  Have you given a

23    deposition before?

Page 9

1      A.     Yes.

2      Q.     Tell me about that.

3      A.     It was back in '74.

4      Q.     What was it about?

5      A.     GentlemAn was hurt on-the-job.

6      Q.     Where?

7      A.     Michigan.

8      Q.     Is that where you're from?

9      A.     That's where I was raised.

10      Q.     What part of Michigan?

11      A.     Westland.

12      Q.     What part?

13      A.     Westland.  Southern Michigan.

14 Right across the Ohio line.  About 25 miles

15 outside of Detroit.

16      Q.     What was the name of the place you

17 were working at that time?

18      A.     National Block Company.

19      Q.     What type of injury was it?

20      A.     It was a foot injury.

21      Q.     What type of equipment?

22      A.     Cuber.

23      Q.     What happened?

Page 10

1      A.      He climbed up on the cuber while

2 the slight conveyer was running and caught his

3 foot.

4      Q.      Do you know who made the machine?

5      A.      Besser.

6      Q.      You have been around Besser

7 equipment for a good long time, haven't you?

8      A.      Yes, sir.

9      Q.      Are you familiar with Besser?

10      A.      Very.

11      Q.      Do you have any dealings or

12 contact with them?

13      A.      On a weEkly basis.

14      Q.      Do you talk to them about upgrades

15 or safety features for equipment at all?

16      A.      No.

17      Q.      Have you ever asked them about

18 any?

19      A.      No.

20      Q.      Have they ever told you about any?

21      A.      No.

22      Q.      You heard some of my questions I

23 asked Mr. Stephens, did you know on this kind of

BENDINGER & ASSOCIATES
334.803.0161

Page 11

1    block splitter that was involved in this

2    accident, I will call it the subject block

3    splitter, did you know on this subject block

4    splitter that E & R and Besser, they had

5    considered several different safety features,

6    including light curtains and guards that would

7    protect workers from getting their hands caught

8    in that area?

9                  MR. SHEALY:   Object to the form.

10                 MR. CURTIS:   Object to the form.

11        Q.      Would you have liked to have known

12   about that?

13        A.      Yes.

14        Q.      You suffered an injury on this

15   machine as well, didn't you?

16        A.      Yes.

17        Q.      You personally would have had a

18   vested interest in knowing about that safety

19   equipment, wouldn't you?

20        A.      Yes.

21        Q.      Do you know why it is they did not

22   tell you or make it available on this machine?

23        A.      No.

Page 12

1      Q.     What is your current title?

2      A.     Plant manager.

3      Q.     Before I leave that subject about

4 the other deposition, is that the only other

5 deposition you have given?

6      A.     Yes.

7      Q.     When you had your accident, did

8 you make a claim about that at all?

9      A.     Workmans' comp?  Yes.

10     Q.     Did you make any other kind of

11 claim at all?

12     A.     No.

13     Q.     Who was your lawyer?

14     A.     Um --

15     Q.     Did you use a lawyer?

16     A.     Workmans' comp lawyer.  I don't

17 remember his name.

18      MR. RODGERS:  Were you

19 represented?

20     A.     Yes.

21     Q.     Was he here in Andalusia?

22     A.     No.  Dothan, I believe.

23     Q.     Was a lawsuit filed?

Page 13

1      A.    No.

2      Q.    As plant manager, what are your

3 job duties?

4      A.    Raw production, trucks, personnel,

5 maintenance.

6      Q.    Sort of over the whole plant?

7      A.    Everything.

8      Q.    Would it be safe to say that you

9 don't involve yourself in every aspect in fine

10 detail, but you do involve yourself in the big

11 picture?

12      A.    Sometimes the fine detail, if I'm

13 needed.

14      Q.    You have worked this block

15 splitter machine too, haven't you?

16      A.    Yes.

17      Q.    Is that typical of you to do that?

18      A.    No.

19      Q.    When did you stop doing that?

20      A.    I haven't stopped.

21      Q.    Just not something that you

22 typically do?

23      A.    Right.

Page 14

1    Q.    How long have you been employed
2    out there?

3    A.    Seventeen years in July.

4    Q.    What position were you hired on
5    as?

6    A.    Plant manager.

7    Q.    Has anybody ever been the manager
8    of that plant besides you?

9    A.    No.

10   Q.    I guess you were there when the
11   subject machine was installed?

12   A.    Yes, sir.

13   Q.    How did you split block before
14   this block splitter was installed?

15   A.    We didn't.  I take that back.  We
16   had a used splitter for a short period of time.

17   Q.    Do you know what kind that was?

18   A.    Columbia.

19   Q.    Do you know what happened to it?

20   A.    I believe it went to Dothan.

21   Q.    Is there a plant in Dothan?

22   A.    Uh-huh, (affirmative).

23        MR. RODGERS:  Is that a yes?

BENDINGER & ASSOCIATES
334.803.0161

Page 15

1      A.      Yes.

2      Q.      Did it look different than this

3  block splitter?

4      A.      Yes.

5      Q.      How did it differ?

6      A.      It was larger.  Basically did the

7  same job, just larger.  Different brand.

8      Q.      But as far as the knives, could

9  you see the knives and reach into those knives

10  as well?

11      A.      Uh-huh, (affirmative).

12      Q.      Is that a yes?

13      A.      Yes.

14      Q.      Were there any guards or anything

15  on that machine?

16      A.      No.

17      Q.      Do you know how old that machine

18  was?

19      A.      No.

20      Q.      This machine was made and

21  delivered in 1997; is that right?

22      A.      Yes.

23      Q.      Did you participate in selecting

1    this particular splitter?

2        A.    No.

3        Q.    Who did?

4        A.    My supervisor.

5        Q.    Is that somewhere besides

6    Andalusia?

7        A.    Yes.

8        Q.    At that time, who were your

9    supervisors?

10        A.    At that time Hal Webster and Doug

11    Buss.

12        Q.    Doug who?

13        A.    Buss.

14        Q.    B-U-S?

15        A.    S.

16        Q.    Are they still employed with Block

17    USA?

18        A.    Yes.

19        Q.    When this was made -- when this

20    block splitter was purchased, were you at all

21    consulted about the selection of this block

22    splitter?

23        A.    Yes.

1       Q.      Did you know that shut off

2    switches or stop buttons were available for this

3    machine or could have been installed on the

4    subject machine like we see in Plaintiff's

5    Exhibit 8 like we see to Mr. Rondeau's

6    deposition?

7       A.      No.

8       Q.      Do you see these stop buttons I'm

9    talking about?

10      A.      Yes.

11      Q.      If you had known that was made

12   available where stop buttons could have been

13   installed where a chunk puller would be

14   stationed, do you think that would have been

15   important to know?

16      A.      Yes.

17      Q.      Would you have wanted that to be

18   in place, if possible?

19      A.      Yes.

20      Q.      Do you think it would make the

21   machine safer?

22      A.      Yes.

23      Q.      When the machine was installed,

Page 18

1   did anyone from Besser or E & R come down and

2   meet with everybody about how to operate this

3   machine?

4           A.      No.

5           Q.      Did anyone at E & R or Besser tell

6   anybody at your plant about other accidents that

7   had taken place on this machine when chunk

8   pullers got their hand caught in the machine?

9           A.      No.

10          Q.      Would you have thought that would

11  have been important to know?

12          A.      Yes.

13          Q.      Why is that?

14          A.      It would have just been

15  important.  I would have liked to have known

16  about it.

17          Q.      You felt like it would have made

18  you more aware of what could happen on this

19  machine?

20          A.      Yes.

21          Q.      You had an accident on this

22  machine as well, correct?

23          A.      Yes.

Page 19

1    Q.    Tell us, when did your accident

2 happen?

3    A.    2001.

4    Q.    What were you doing?

5    A.    I was over showing an Able Body

6 rental person how to pull chunks.

7    Q.    And what happened?

8    A.    Well, I got concerned with him.  I

9 was pulling the block down, and several times

10 when I pulled the block down, I pinched his

11 fingers.  So I was more concerned about his

12 fingers than I was my hand, and at the time I

13 wasn't pulling a chunk when this happened, I

14 reached up to grab the block, and I was watching

15 the Able Body rental person, and put my hand in

16 too far.

17    Q.    You weren't even reaching for a

18 chunk at the time?

19    A.    No.

20    Q.    So would it be a safe statement

21 that your fingers can get cut off in this block

22 splitter machine even when you're not reaching

23 in to clean debris, but when you're trying to

BENDINGER & ASSOCIATES
334.803.0161

Page 20

1    pull block out, that's what happened to you?

2         A.      You would have to reach in it.  I

3    just reached in it too far.  Before the block

4    was out, I reached over the block.

5         Q.      Sure.  I understand you obviously

6    reached in too far because you are missing two

7    fingers; is that right?

8         A.      Three.

9         Q.      Three fingers.  Which three

10   fingers?

11        A.      (Witness showing hand).

12        Q.      You're missing the tip of your

13   long finger, and basically all of your ring and

14   small finger?

15        A.      Right.

16        Q.      That happened not while you were

17   reaching for a chunk; is that right?

18        A.      That's right.

19        Q.      Was it on the side knife or top

20   knife?

21        A.      Side knife.

22        Q.      Was that the same area of the

23   block splitter machine that Mr. Jackson's

Page 21

1    accident?

2         A.    I was reaching to the other side.

3    I was standing on that side, but I was reaching

4    to the other side.

5         Q.    I see.  You were standing in the

6    same position Mr. Jackson was standing; is that

7    true?

8         A.    That's correct.

9         Q.    However, you are saying you were

10   reaching across the conveyer across the

11   production line to the other knife?

12        A.    Right.

13        Q.    Okay.  At that time, was debris

14   created at the time -- this debris we talked

15   about when the knives come in and break the

16   blocks, was debris createD at that time as well?

17        A.    Yes.

18        Q.    How did you clean it out?

19        A.    Shut the machine off.

20        Q.    Did you use a tool, is what I'm

21   asking, at the time?

22        A.    The tools were available.  No, I

23   didn't use a tool.

Page 22

1        Q.        When were tools first decided to
2   be used at that plant?

3        A.        From day one.  But it was -- you
4   know, we started out using less -- even with the
5   tool, I always emphasized to people, turn it
6   off.

7        Q.        I see.  But you said the tool was
8   used from day one when this machine was
9   installed?

10       A.        Yes.

11       Q.        Did that tool come with the
12   machine?

13       A.        No.

14       Q.        Did it come as a result of any
15   instruction or direction from Besser or E & R?

16       A.        No.

17       Q.        Did it come from your experience
18   around this type of machinery?

19       A.        Yes.

20       Q.        Have you ever seen workers reach
21   in there and clean debris out with their hands?

22       A.        Yes.

23       Q.        At your plant here in Andalusia?

BENDINGER & ASSOCIATES
334.803.0161

Page 23

1    A.    Yes.

2    Q.    Is it because that is easier and

3  quicker to get the debris out with your hands?

4         MR. CURTIS:  Object to the form.

5  Again, with machine on or off?

6    Q.    Sorry.  With the machine running.

7    A.    With the machine, would it be

8  easier?

9    Q.    I'm sorry.  Let me back up, and

10  ask you this again.  You have seen workers reach

11  in and clean debris out with their hands?

12    A.    Yes.

13    Q.    And that is while the machine is

14  still running and before they shut it off?

15    A.    Yes.

16    Q.    That's here in Andalusia?

17    A.    Yes.

18    Q.    Now we're back to where we were.

19  Is that because in your opinion, is it because

20  it's just quicker for the worker to reach in

21  there and clean the debris out with their hand

22  than with a tool?

23    A.    In their opinion it's probably

Page 24

1  quicker, yes.

2      Q.    What I'm getting at is, I've never

3  done it.  But it seems to me if you had to stop

4  and grab a tool from somewhere or pick up a

5  tool, that is just one step a little bit longer

6  than simply reaching in there with your hand; is

7  that a fair statement?

8      A.    When you're using the tool, you

9  are holding it at all times.  You don't have to

10  pick it up.

11      Q.    But apparently even when you're

12  holding the tool, it is a little quicker because

13  you have your bare hand there to reach in and

14  clean the debris out?

15      A.    No, not necessarily.  It's just as

16  fast with the tools.

17      Q.    Is it just because it's

18  instinctively, I guess, that you reach in, that

19  they would do that, if you know?

20          MR. RODGERS:  If you know.

21          MR. SHEALY:  Or is it stupidity?

22          MR. ANDREWS:  Wait a minute, you

23  can ask the questions, I'm asking some right

1    now.

2              MR. SHEALY:  Sorry, that slipped.

3              MR. ANDREWS:  Sure.

4        Q.     How often have you ever seen that

5    before, people reaching in there with their

6    hands?

7        A.     Not very often.

8        Q.     Can you think of any names of any

9    of them that have done that?

10       A.     No, they are normally always

11   around people.

12       Q.     You mean the --

13       A.     Able Body.

14       Q.     Is that who you typically use out

15   there?

16       A.     Who I used then.  I don't use Able

17   Body anymore.

18       Q.     We talked about a lady named

19   Sherry that got her hand caught in this machine

20   as well.

21       A.     Yes.

22       Q.     Or Mr. Stephens did.  Do you

23   remember her name?

Page 26

1         A.       Sherry.  I don't recall her last

2    name, no.

3         Q.       Which Able Body office was she out

4    of?

5         A.       Defuniak.

6         Q.       Do you know if she was a local

7    residence or from somewhere else?

8         A.       I believe, she lived in Defuniak,

9    yes.

10        Q.       Now, how would she have been --

11   I'm trying to find out any documentation I can

12   to help us locate this Sherry.  Is there going

13   to be any documentation at your office to locate

14   her?

15        A.       No.

16        Q.       Is there any wage information or

17   pay stubs or W-2 information?

18        A.       No.  Not at my office.

19        Q.       Do you know if somewhere at the

20   corporate office if there will be some

21   documentation?

22        A.       No.  They were strictly paid by

23   Able Body.

Page 27

1        Q.        Is there a contact person at Able
2   Body that you usually used that might know this
3   person's name?

4        A.        It was always different people.

5        Q.        When Sherry's accident happened,
6   did she have to go to the hospital?

7        A.        Yes.

8        Q.        Did workmans' comp have to pay the
9   bills, if you know?

10       A.        Their workmans' comp, yes.

11       Q.        Do you know which hospital she
12  went to?

13       A.        Here in Andalusia.

14       Q.        Do you know how her accident
15  happened?

16       A.        Uh-huh, (affirmative).

17       Q.        What happened?  Is that a yes?

18       A.        Yes.  Just like David Jackson.
19  She stuck her hand in there to pull a chunk.
20  Just like David Jackson, admitted it was her
21  fault.

22       Q.        Was she standing in the same spot
23  as David Jackson?

BENDINGER & ASSOCIATES
334.803.0161

Page 28

1    A.    Yes.

2    Q.    Was she pulling chunk?

3    A.    Yes.

4    Q.    Did you tell her to use a tool?

5    A.    Yes.

6    Q.    Did she use a tool?

7    A.    No.

8    Q.    How much of her hand or fingers
9  were cut off?

10    A.    Small tip.

11    Q.    On index finger?

12    A.    Yes.

13    Q.    Now, we've heard Mr. John Stephens
14  and others testify -- how often in your opinion
15  does this debris need be cleaned from the side
16  knives when the splitting process is going on?
17  Every block, every other block, or how often?

18    A.    Like John said, sometimes that
19  machine will run for 35 or 40 minutes --

20    Q.    And nothing?

21    A.    -- nothing.

22    Q.    And sometimes it will run almost
23  every other block?

BENDINGER & ASSOCIATES
334.803.0161

Page 29

1    A.    Sometimes you might get two or

2  three in a row.  I mean, you know, if you are

3  running 5 or 6,000 a day, it's not happening

4  every other block.

5    Q.    Okay.  None the less, when it does

6  happen, it does have to be removed?

7    A.    That's right.

8    Q.    You cannot allow the debris to

9  remain in there or else it will start to mess up

10  the block?

11    A.    Correct.

12    Q.    Is there anything in the Besser

13  manual or E & R manual that tells you how to

14  properly clean out the debris?

15         MR. CURTIS:  Object to the form.

16    A.    Not to my knowledge.

17    Q.    Is there anything that tells you

18  how to clean it out at all?

19         MR. CURTIS:  Object to the form.

20    A.    Not to my knowledge.

21    Q.    As my understand, at the time of

22  Mr. Jackson's accident, no one was standing at

23  the operator panel; is that your understanding

Page 30

1    as well?

2        A.    Yes.

3        Q.    Like Mr. Stephens said, that's not

4    uncommon, is it, for someone to not be at the

5    panel?

6        A.    No.

7        Q.    My understanding is that is more

8    common than not, more typical that someone will

9    not be at the panel, and be in another position

10   up and down the line?

11       A.    Yes.

12       Q.    At the panel is the only location

13   for this stop button or on/off switch?

14       A.    Other than the emergency stop in

15   the office.

16       Q.    So there's only two.  One way

17   inside the office, inside your office?

18       A.    That's correct.

19       Q.    And one on the machine, which is

20   on the panel?

21       A.    Two on the machine.

22       Q.    Are they both on that panel?

23       A.    Yes.

Page 31

1    Q.    There's two stop buttons on the
2    panel on the machine?

3    A.    Yes.

4    Q.    But there's only two locations for
5    any stop buttons:  Two on the panel and the one
6    in your office?

7    A.    Yes.

8    Q.    And the panel is further than
9    arms' reach from where a chunk puller typically
10   stands; is it not?  You can't reach over the top
11   of the splitter, that knife, and reach the
12   control panel?

13   A.    No.

14   Q.    That's true, isn't it?

15   A.    That's true.

16   Q.    Just like I asked Mr. Stephens,
17   production is important, is it not?

18   A.    Yes.

19   Q.    It's a goal at Block USA to keep
20   the blocks going if you can, without having to
21   stop the machine?

22   A.    Yes.

23   Q.    So the quicker you can clean any

Page 32

1    debris out or unjam the machine, the better.

2    Right?

3         A.    Yes.

4         Q.    Would it be a goal of any of the

5    chunk pullers or the machine operators to try to

6    avoid turning the machine off if you can?

7         A.    Be a goal to turn it off?

8         Q.    To try to not turn it off, if you

9    can.

10        A.    Not if it involves someone getting

11   hurt.  No, I would rather them turn it off.

12        Q.    I understand your testimony is

13   that if the debris comes down, your testimony as

14   I understand, the worker is supposed to go over

15   and turn it off?

16        A.    Yes.

17        Q.    My question is:  If you can keep

18   it to a minimum, is that not a goal out there?

19        A.    Yes.

20        Q.    Are there any incentives for

21   workers to keep machines going at all, like pay

22   incentives?

23        A.    No.

Page 33

1        Q.      Are there any bonuses that you, as

2   plant manager, to keep it going?

3        A.      Production bonus, yes.

4        Q.      Tell me about that bonus.

5        A.      Get it every year.

6        Q.      What is it based on?

7        A.      Production.

8        Q.      The more block that you put out,

9   the more your bonus will be?

10        A.      Yes.

11        Q.      That's at the end of the year?

12        A.      Yes.

13        Q.      Are you the only one at the plant

14   that gets that incentive or bonus?

15        A.      No.

16        Q.      Who else gets that?

17        A.      All the employees.

18        Q.      Even the temporary ones?

19        A.      No.

20        Q.      Who would be the Couch employees

21   that would be subject to that year-end bonus?

22        A.      Dewayne Biggs.  John Coleman,

23   which they haven't got yet, they are new

BENDINGER & ASSOCIATES
334.803.0161

Page 34

1  employees, except for Dewayne.  Eddie Moore.
2  Marcus McInnis.

3       Q.    John Stephens?

4       A.    No.  John's -- his bonus is based
5  on other things.

6       Q.    Dewayne.  John who?

7       A.    Coleman.

8       Q.    Dewayne.  John Coleman.  Eddie?

9       A.    Moore.

10      Q.    Marcus McInnis?

11      A.    Uh-huh, (affirmative).

12      Q.    Then yourself?

13      A.    Correct.

14      Q.    Anyone else?

15      A.    No, that would be it.

16      Q.    Can you think of any names of any
17  workers that don't work there anymore that used
18  to work there that operated this splitter, have
19  been a chunk puller?

20      A.    Brian Schoolmaster.  Randy
21  Templeton.

22      Q.    Okay.

23      A.    That would be about it.

Page 35

1      Q.      Okay.  You have been there longer
2  than John Stephens; is that right?
3      A.      Yes.
4      Q.      You just can't think of any more
5  names?
6      A.      No.  But since John has been
7  there, is about the only time we had the
8  splitter.
9      Q.      Do you know where Mr. Schoolmaster
10 or Templeton are now?
11     A.      Mr. Templeton is in Andalusia.
12     Q.      Do you know where he works?
13     A.      Rental place here in Andalusia.
14     Q.      Do you know where Mr. Schoolmaster
15 is?
16     A.      In Michigan.  Where, I don't know.
17     Q.      I see.  What about any of the Able
18 Body temporary people, do you know any of their
19 names that might have operated this splitter?
20     A.      Only the ones that were brought to
21 my attention like David Jackson and Sherry.
22 Other than that, it was different people.
23     Q.      This Willy Jackson guy, do you

1    know him?

2          A.      Uh-huh, (affirmative).

3          Q.      Does he still work there?

4          A.      He was temporary labor.

5          Q.      Does he still work there now?

6          A.      Off and on.

7          Q.      Is he currently employed out there

8    now today?

9          A.      No.

10         Q.      He may come back and forth, is

11   that what you're saying?

12         A.      Right.

13         Q.      Is it your testimony when a piece

14   of debris is created that needs to be cleaned

15   out, does the machine have to be locked out and

16   tagged out?  Turned off, locked out and tagged

17   out, then the debris cleaned out?

18         A.      No.

19         Q.      Tell me what's the proper method

20   of cleaning the debris.

21         A.      Turn the power off at the panel,

22   which kills all power.  Clean it out.  Three

23   buttons to start it back up.

Page 37

1        Q.        I think I asked Mr. Stephens, is

2    that an automatic start up, or does the machine

3    have to cycle back up at all?

4        A.        Yeah, it starts right back up.  I

5    mean, there is no movement when it starts back

6    up, just the power comes back on.

7        Q.        How long does it take before

8    movement starts to take place?

9        A.        When another block comes back in.

10    Three to five seconds.

11        Q.        Now, the people that made this

12    machine have testified that they have known, I

13    think, you heard me telling Mr. Stephens this,

14    they have known that workers in the real world

15    will reach their hand into the machine while

16    it's in operation.  And I understand that you

17    are critical of that, and everybody in this case

18    may be critical of that but nonetheless that

19    does happen, does it not?

20        A.        Yes.

21        Q.        In other words, you agree with the

22    people that made this machine that that is

23    certainly foreseeable the worker will reach into

Page 38

1    the machine with their hand while the machine is

2    on, without stopping it to try to clean out some

3    debris?

4              MR. CURTIS:   Form.

5         Q.    How often do you see that happen

6    out there at your plant?

7         A.    Very few.

8         Q.    Is it typically the Able Body

9    people?

10        A.    Yes, it is.

11        Q.    Have you ever reprimanded any of

12   them with a written reprimand?

13        A.    No, I'm not allowed, not rental

14   people.

15        Q.    So do you tell them, instruct them

16   verbally, not to do that anymore?

17        A.    Or certain people I have not

18   brought back.

19        Q.    Because of that?

20        A.    Well, that and different things.

21        Q.    Anybody specifically because of

22   that?

23        A.    No.

Page 39

1      Q.    Okay. Make sure I got a clear

2  question. There is nobody you can think of that

3  you have refused back at your plant in Andalusia

4  that works for Able Body specifically because

5  they reached their hand in a splitter?

6      A.    Normally when you tell them, they

7  are smart enough, for the most.

8      Q.    Mr. Jackson was not cited or

9  written up because of this accident, was he?

10     A.    No.

11     Q.    Y'all didn't terminate him because

12  of reaching his hand in the machine, did you?

13     A.    No.

14     Q.    Did you know Mr. Jackson, other

15  than working with him out here?

16     A.    No.

17     Q.    Like Mr. Stephens said, was he one

18  to follow instructions?

19     A.    Yes.

20     Q.    Typically, did you consider him to

21  be a safe worker, Mr. Jackson?

22     A.    No.

23     Q.    Tell me what you mean by that. Do

Page 40

1   you have any specific instances in mind or just

2   generally?

3         A.      Well, the splitter thing.  He kept

4   having to be told about the splitter just like

5   they all did.

6         Q.      When you say they all, all the

7   Able Body employees?

8         A.      Right.

9         Q.      You had to stay on the Able Body

10  employees?

11        A.      Right.

12        Q.      Was it a daily thing to tell them,

13  "don't reach your hand in there"?

14        A.      Well, they were all told on a

15  daily basis, "do not stick your hand in there".

16        Q.      Was it because on a daily basis

17  they would be reaching their hand in there?

18        A.      Because on a daily basis it was a

19  dangerous job, and we felt like we needed to

20  tell them.

21        Q.      But on a daily basis did you run

22  into that where workers were reaching into the

23  machine?

Page 41

1      A.      Yes, at least once a day you would

2   see it.

3      Q.      And since it happened, at least

4   once a day, there wasn't an accident once a day,

5   was there?

6      A.      No.

7      Q.      There's enough time for the knife

8   to cycle and a worker to reach his hand in

9   there, even though that may be improper, they

10  can reach their hand in there and get it out

11  without getting injured, can't they?  Because

12  there's not an accident every day, right?

13     A.      Well, you're not reaching your

14  hand in there on a steady basis.

15     Q.      How do you understand

16  Mr. Jackson's accident occurred?

17     A.      How do I understand it occurred?

18     Q.      Yes, who told you about his

19  accident?

20     A.      John Stephens.

21     Q.      Okay.  And what did he tell you?

22     A.      He told me a chunk was hung, he

23  tried to reach in from the top to pull it out,

Page 42

1    he couldn't get it out.  He reached in from this

2    side to pull it out, and got his finger.

3        Q.    With his palm towards the knife?

4        A.    That's right.

5        Q.    Did you talk with Mr. Jackson

6    about the accident?

7        A.    Yes, I did.

8        Q.    What did he say?

9        A.    His first words were it was

10   stupidity and his fault.

11       Q.    Was that in your office?

12       A.    At the hospital.

13       Q.    At the hospital.  Now, did you

14   ever prepare any report about this accident?

15       A.    Safety director did; I didn't.

16       Q.    Who is the safety director?

17       A.    David Rabold.  At that time I

18   believe it was Thomas Hawthorne.

19       Q.    Where is Mr. Hawthorne's office?

20       A.    Dothan.

21       Q.    Did he create a written report

22   about this accident?

23       A.    I believe he did.

Page 43

1    Q.    Does Mr. Hawthorne work there now?

2    A.    I believe he does, yes.

3    Q.    David who, the other fella?

4    A.    Rabold.

5    Q.    R-A-Y --

6    A.    R-A-B-O-L-D.

7    Q.    Where is his office?

8    A.    Theodore.

9    Q.    Mr. Rabold is now the safety

10   director?

11   A.    Yes, he is.

12   Q.    Mr. Hawthorne, he used to be the

13   safety director?

14   A.    That's correct.

15   Q.    What does Mr. Hawthorne do now?

16   A.    I believe, he is still safety

17   director.  He is on the ready mix side.

18   Q.    Okay.  Were you aware that the

19   First Report of Injury in this case, the report

20   that was turned into workers' compensation, did

21   you know that report indicated Mr. Jackson's

22   glove was caught on the splitter as he was

23   trying to pull his hand out?

BENDINGER & ASSOCIATES
334.803.0161

Page 44

1      A.      No.

2      Q.      I will show you Plaintiff's
3  Exhibit 10 to Besser's corporate representative,
4  Mr. Duane Rondeau.  This is, I believe, a Model
5  40, or may have a different number than a CM 24,
6  which is the kind of splitter that was involved
7  in Mr. Jackson's accident.  Do you see the head
8  where the splitter is, can you see there is a
9  guard or flaps all the way around the knives on
10  this machine?

11      A.      Uh-huh, (affirmative).

12      Q.      Is that a yes?

13      A.      Yes.

14      Q.      Do you know that guard existed or
15  was in existence for the splitters that are made
16  by E & R and Besser?

17      A.      No.

18      Q.      Do you know why this type of guard
19  was not on the machine as it existed at the day
20  of your accident and Mr. Jackson's accident?

21      A.      No.

22      Q.      When this machine, the subject
23  machine was delivered, did it have any guards

BENDINGER & ASSOCIATES
334.803.0161

1    around the knives?

2         A.       No, it didn't.

3         Q.       After Mr. Jackson's accident, did

4    you have any conversations with the E & R and

5    find out there were pieces missing?

6         A.       Yes, I did.

7         Q.       Have you taken any guards off this

8    machine?

9         A.       No.

10        Q.       Have you removed any piece of this

11   machine?

12        A.       No.

13        Q.       Do you know if anybody at that

14   plant has taken any guard or safety device off

15   this machine?

16        A.       Not to my knowledge.

17        Q.       On Defendant's Exhibit 4 to

18   Mr. Jackson's deposition, do you see this

19   sticker I'm pointing at?

20        A.       Yes.

21        Q.       Do you know why it is this

22   particular area is blacked out, where the

23   language would be but everything else is not?

Page 46

1        A.        Just dirt.

2        Q.        It just happened to be in that

3    form right there?

4        A.        Yes.

5        Q.        Can you take this knife off, you

6    can unbolt this from the machine?

7        A.        Yes.

8        Q.        In fact, you do do that sometimes?

9        A.        Yes.

10       Q.        This still exists out there at the

11   plant, doesn't it?

12       A.        Yes.

13       Q.        We could go look at it or pull it

14   off, and let the ladies and gentlemen of the

15   jury look to see if that's dirt or not, right?

16       A.        Yes.

17       Q.        Do you know what that language

18   says under there?

19       A.        I believe it's a sign saying don't

20   stick your -- it's something similar so that.

21       Q.        You're pointing to Exhibit 1 to

22   Mr. Stephens' deposition?

23       A.        Yes.

Page 47

1      Q.    Could you read the language on

2  that warning sticker?

3      A.    If you can read this sign, a guard

4  has been removed.  Do not --

5      Q.    If you could read that.

6      A.    I can't see it.

7      Q.    Let me see it, I will try to read

8  it.  It says:  If you can read this sign, a

9  guard has been removed.  Do not operate with

10  guard removed.

11      Did I read that accurately?

12      MR. RODGERS:  If he can't see it,

13  he can't say.

14      Q.    Did you know that's what the

15  sticker said?

16      A.    No, I didn't.

17      Q.    Do you know if any guard was ever

18  removed on this subject splitter before

19  Mr. Jackson's accident?

20      A.    No.

21      Q.    To your knowledge, did this

22  machine come in without guards in place?

23      A.    Yes.

Page 48

1    Q.    Do you think those guards would

2    have assisted in keeping Mr. Jackson's hand from

3    getting in a position where the block could

4    entrap it?

5    A.    No.

6    Q.    Why is that?

7    A.    Because they are more or less just

8    rubber curtains.

9    Q.    And --

10    A.    He stuck his hand in from the top.

11    Q.    In other words, the side knife is

12    what cut his hand, right?

13    A.    Right.

14    Q.    Not the knife where this guard

15    would have been located; is that true?

16    A.    The guard does hang down, but all

17    it is is a rubber curtain.

18    Q.    Your testimony is, even if the

19    guard was in place, that wouldn't have protected

20    Mr. Jackson's hand; is that true?

21    A.    That's true.

22    Q.    Did you know Besser and E & R had

23    been sued at least back in 1984 or '85, about

Page 49

1    someone losing their fingers when pulling chunks

2    out of CM-24 splitter machine just like the

3    subject machine, and in that lawsuit an engineer

4    with MIT designed some safety devices and guards

5    to prevent workers from having their hands

6    caught in the point of operation?

7                MR. CURTIS:  Object to the form.

8         Q.     Did you know that?

9         A.     No.

10        Q.     Would you have liked to have known

11   there were guards existed, or they had knowledge

12   of those guards?

13        A.     Yes.

14                MR. CURTIS:  Object to the form.

15        A.     Yes.

16        Q.     Do you think those kind of guards

17   would have helped your hand or Mr. Jackson's

18   hand?

19                MR. CURTIS:  Object to the form.

20                MR. RODGERS:  Don't guess or

21   speculate.  If you know, then you can answer the

22   question.

23        A.     No.

Page 50

1    Q.    No, you don't know, or no, they
2    wouldn't have helped?

3    A.    I don't know if they would have
4    helped.

5    Q.    You don't know what those guards
6    might have looked like or anything, do you?

7    A.    No, I don't.

8    Q.    Where were you when you first
9    learned of this accident?

10   A.    In the office.

11   Q.    Where, at Block USA?

12   A.    Block USA.

13   Q.    Had they already gone to the
14   hospital or something?

15   A.    Yes, they just left when I got
16   there.

17   Q.    Who called you?

18   A.    No one called me.  I was on my
19   way.  I pulled up right after they left.  Within
20   five minutes they were -- yeah, I didn't get a
21   phone call.

22   Q.    When you pulled up, did you see
23   them about to leave?

Page 51

```
 1        A.      No, they had just left.

 2        Q.      Who was the first person who said

 3   something to you about this accident?

 4        A.      Dewayne Biggs.

 5        Q.      What did he say?

 6        A.      He explained to me what had

 7   happened and who was involved and who just left.

 8   And I left at that time and went to the

 9   hospital.

10        Q.      Is Dewayne still employed out

11   there?

12        A.      Yes.

13        Q.      Then you went to the hospital?

14        A.      Yes.

15        Q.      When you got to the hospital, who

16   did you see?

17        A.      I seen David.

18        Q.      Did you go up to him?

19        A.      Yes, I did.

20        Q.      What did he say?

21        A.      When I walked in, he was shaking

22   his head and said, "stupid me," that's what came

23   out of his mouth.
```

1    Q.    Did you have any other
2  conversations with him there at the hospital?
3    A.    Not about the accident because he
4  knew it had already been explained to me.
5    Q.    Okay.  Then did you go back to the
6  office?
7    A.    About an hour, hour and a half I
8  did.
9    Q.    Has Mr. Jackson been back out
10  there to work at all?
11    A.    Not to work, but he's been out
12  there.
13    Q.    Have you talked to him about the
14  accident since then?
15    A.    Not about the accident.  Just
16  about his hand.
17    Q.    So really the only conversation
18  you had about how the accident happened, would
19  have been the one time there at the emergency
20  room?
21    A.    That's correct.
22    Q.    Did you ever take a statement from
23  him at all?

Page 53

1      A.      No.

2      Q.      Are you aware of any eyewitnesses

3 to this accident?

4      A.      No.

5      Q.      Did you participate at all in

6 training Mr. Jackson, or was that John Stephens

7 that did that?

8      A.      No, I didn't participate in

9 training.  But I told him the same thing John

10 told him, and showed him my hand and this is

11 what will happen to you if you stick your hand

12 in there.

13      Q.      When you showed him your hand,

14 were you talking about in terms of while you're

15 pulling chunks?  Be careful about getting your

16 hand in the area.

17      A.      Yes, I did.

18      Q.      Because you knew your hand had to

19 be in the area when pulling chunks, right?

20      A.      In the area, yeah, not inside the

21 knife.

22      Q.      So what you were saying was:  Be

23 careful while you're sticking your hand in that

BENDINGER & ASSOCIATES
334.803.0161

Page 54

1   area because you can get your hand caught like

2   yours, even when you're not pulling chunks,

3   right?

4          A.      Yes, sir.

5          Q.      Are you the one that chose this

6   kind of tool to use to clean the debris out?

7          A.      Yes.

8          Q.      How many tools are there?

9          A.      Just a piece of steel and wooden

10  lass?

11         Q.      Wooden what?

12         A.      Lass.  A flat piece of wood.

13         Q.      Okay.  So you just expect that the

14  chunk puller or whoever is standing in that

15  position to use that or go get one of the --

16         A.      Las.

17         Q.      Okay.  Now, when they're not

18  pulling chunks, when they're using the knives

19  that create a chunk, do people still have to

20  stand there and watch the debris they build up

21  in smaller amounts?

22         A.      Are you saying is there someone

23  there all the time?

BENDINGER & ASSOCIATES
334.803.0161

Page 55

1      Q.      Yes.

2      A.      Yes.  All the time.

3      Q.      What are they doing when they're

4    there all the time?

5      A.      The chunks had come out, and they

6    take the chunks and pick them up and throw them

7    in the dumpster.

8      Q.      That regardless really of what

9    kind of block is being split, someone has to

10   stand in that position all the time?

11     A.      No.

12     Q.      Is there someone standing in that

13   position all the time when?

14     A.      Only when making a bevel split.

15     Q.      Okay.  Otherwise does anyone need

16   to be standing in that chunk pulling position?

17     A.      No.

18     Q.      Is that a fair way to describe it,

19   a chunk pulling position?

20     A.      Right.  Yes.

21     Q.      There was no protocol that you

22   went through in trying to figure out what

23   qualifies as a good tool.  There's nothing

Page 56

1  scientific about it, you just said grab

2  something that's long to reach in there with; is

3  that right?

4      A.    Well, I suggested the wood or a

5  bar.  In the same token, I suggested I would

6  rather you turn the machine off.

7      Q.    But you also know that you have to

8  try to keep production going as best you can,

9  don't you?

10     A.    Yes.

11     Q.    If you can clean the machine out

12 without turning it off, try to do that, right?

13     A.    Right.

14           MR. ANDREWS:  I believe that's all

15 the questions I have.

16                    EXAMINATION

17 BY MR. SHEALY:

18     Q.    When you were discussing with

19 Mr. Jackson about your hand, you made it very

20 clear to him not to put his hand in the area

21 where the side knife is located?

22     A.    Yes.

23     Q.    He understood that?

1      A.      Yes.

2      Q.      Do you feel like you adequately

3  and fully explained to him if you do, that

4  you're going to get your hand cut or injured

5  just like you did?

6      A.      Yes.

7      Q.      He was aware of that?

8      A.      Yes, he was.

9      Q.      And you also saw these warnings

10  that were on the machine to keep hands clear,

11  there were pictorials, if you put your hand in

12  where a knife is, it's going to get cut?

13      A.      Yes.

14      Q.      Those warnings and pictorials were

15  there when the machine first arrived; is that

16  correct?

17      A.      Yes.  Plus some have been added.

18      Q.      USA Block set up this machine,

19  right?

20      A.      Yes.

21      Q.      You would have had electricians

22  and people come out and hook it all up and do

23  whatever it is you do; is that right?

Page 58

1      A.      Yes.

2      Q.      If you wanted a stop button you,

3  could have put one right there where the guy

4  operates the machine if you thought it was

5  necessary; isn't that true?

6      A.      Yes.

7      Q.      That is no big deal, is it?

8      A.      No.

9      Q.      That is something you could do if

10  you wanted to?

11      A.      Yes.

12      Q.      In fact, you chose not to since

13  the control panel is within a couple of steps of

14  where the chunk remover's located as part of his

15  job when there's an occasion to do that?

16      A.      Yes.

17      Q.      In fact, you testified that

18  sometimes it's 30 to 45 minutes before you even

19  have some block jammed into the knives that have

20  to be cleaned out; is that true?

21      A.      Yes.

22      Q.      This is an automatic block

23  machine?

Page 59

1      A.    Yes.

2      Q.    It's to work automatically?

3      A.    Yes.

4      Q.    Isn't that true?

5      A.    Yes.

6      Q.    Isn't that why you got it?

7      A.    Yes.

8      Q.    Does the machine work well and do

9   what it's intended to do?

10     A.    Yes.

11     Q.    Do you feel like it's safe?

12     A.    Yes.

13     Q.    You wouldn't want your men working

14  on a machine that you didn't feel was safe,

15  would you?

16     A.    No.

17     Q.    You have been around block

18  splitters, block cutters, the block industry

19  almost your whole life, haven't you?

20     A.    Yes.

21     Q.    Do you feel like you have

22  knowledge of machines such as the one that's

23  made the subject of this lawsuit?

BENDINGER & ASSOCIATES
334.803.0161

Page 60

1      A.    Yes.

2      Q.    You have worked around them,

3 haven't you?

4      A.    Yes.

5      Q.    And you are familiar with how they

6 work, are you not?

7      A.    Yes.

8      Q.    You have seen various

9 manufacturers of this machine, have you not?

10     A.    Yes.

11     Q.    Do you feel like this machine that

12 Mr. Ron Neese and E & R Manufacturing sent to

13 Besser who sent it down to Block USA, where it

14 was located, that it was a reasonably safe

15 machine when put to its intended use of

16 splitting block?

17         MR. ANDREWS:  Objection.  Calls

18 for expert opinion.

19     A.    Yes.

20     Q.    Well, let me ask you this:  You

21 have worked around block machines your whole

22 life, haven't you?

23     A.    Yes.

Page 61

1       Q.      You are familiar with how they

2  work?

3       A.      Yes.

4       Q.      Do you feel like this block

5  machine is reasonably safe?

6       A.      Yes.

7               MR. ANDREWS:  Objection.

8       Q.      Do you feel like in any way it's

9  unreasonably defective when put to its intended

10  use?

11              MR. ANDREWS:  Objection.

12      A.      No.

13      Q.      You know Ron Neese, don't you?

14      A.      Yes.

15      Q.      Do y'all talk?

16      A.      Yes.

17      Q.      Do you feel like Ron Neese would

18  in any way, as Mr. Andrews has tried to portray

19  to you, send out a block machine that wouldn't

20  be reasonably safe?

21      A.      No.

22      Q.      Does he appear to be the kind of

23  guy who cares about the workers and cares about

Page 62

1   doing a good job and responding to any needs

2   that you may have?

3        A.    Yes.

4        Q.    That's the kind of guy he is,

5   isn't it?

6        A.    Yes, he is.

7        Q.    You know, your understanding of

8   the accident, if I'm correct, is that he

9   actually put his hand down in the slot right at

10  the bottom part of where the bottom knife comes

11  up and the side knife comes up; isn't that true?

12       A.    Yes.

13       Q.    Is that your understanding?

14       A.    Yes.

15       Q.    Help me out here, I'm looking at

16  this guard Mr. Andrews showed you, but he didn't

17  show it to you very closely, okay.

18       Let me show you something:  That guard

19  doesn't guard down below where his hand would

20  have been, does it?  Because the knife won't

21  even work down there, will it?

22       A.    No.

23            MR. CURTIS:  For the record, what

Page 63

1  exhibit is that?

2           MR. SHEALY:  Plaintiff's Exhibit

3  Number 10.

4       Q.     You have been around these block

5  splitter machines all your life, and you have

6  never seen a guard around the side knife, have

7  you?

8       A.     No, sir.

9       Q.     Because a machine has to operate,

10  and the reason the side knives cut blocks is

11  they have to go out and cut them to do its job;

12  isn't that true?

13       A.     Yes.

14       Q.     Now, as a plant manager and as a

15  block worker, you felt like you knew how to do

16  your job, and that's manufacture block, right?

17       A.     Yes.

18       Q.     You didn't expect E & R to send

19  you a hammer to chip off part of the block that

20  is being manufactured, did you?

21       A.     No.

22       Q.     You didn't expect E & R to send

23  you a steel pole if you decided to clean out

Page 64

1    debris, and not turn the machine off, did you?

2         A.    No.

3         Q.    You don't think that's not being a

4    good manufacturer, do you?

5         A.    No.

6         Q.    You would have expected that as a

7    customer, would you?

8         A.    No.

9         Q.    If you decided to use a pole of

10   wood or tell them to cut it off or move where

11   the cut off, that's your decision that you could

12   make as a customer or as an employer or as a

13   producer of block; isn't that true?

14        A.    Yes.

15        Q.    You wouldn't expect the

16   manufacturer to do that, would you?

17        A.    No.

18        Q.    Now, do you use a lawn mower?

19        A.    Only when I have to.

20        Q.    Have you ever used one?

21        A.    Yes.

22        Q.    Does grass get caught in it

23   sometimes?

Page 65

1       A.      Yes.

2       Q.      If grass was caught in it, but it

3    would still run, would you pull it up and try to

4    beat the swinging blade to try to get the grass

5    out or would you turn it off?

6       A.      I would turn it off.

7       Q.      Do you feel like what Mr. Jackson

8    did was unreasonable to put his hand in this

9    machine where the side knife was located while

10   it was running?

11      A.      Yes.

12      Q.      That is not what a reasonably

13   prudent person would do, is it?

14              MR. ANDREWS:  Object to the form.

15      A.      No.

16      Q.      That's not a what a person would

17   do that had been instructed not to do it on

18   numerous occasions; is that true?

19      A.      True.

20      Q.      Mr. Jackson had been instructed?

21      A.      Yes.

22      Q.      Mr. Jackson admitted that he had

23   done something stupid and that it was his fault

Page 66

```
 1    to you within less than an hour of this accident

 2    taking place?

 3         A.    Yes.

 4         Q.    Mr. Andrews was asking, why didn't

 5    this come up.  Well, USA is not even the comp

 6    carrier, is it?  The workers' comp is through

 7    Able Body labor, isn't it?

 8         A.    Yes.

 9         Q.    So y'all would have really even

10    had anything to do with Mr. Jackson, that would

11    have been Able Body labor?  That was essentially

12    his employer, wasn't it?

13         A.    Yes.

14         Q.    Did anybody ever asked you, before

15    you got sued, what Mr. Jackson said, that it was

16    stupid, and it's my fault?

17         A.    Did he say he was stupid?

18         Q.    No, he said that.  Did they ever

19    ask you about that?

20         A.    No.

21         Q.    If somebody would have just

22    approached you before you got sued, you would

23    have told them, wouldn't you?
```

Page 67

1    A.    Yes.

2    Q.    Mr. Jackson testified to something

3  yesterday I need you to help me with.  He said

4  in his deposition that he would reach in there

5  every time with his left hand and pull the block

6  through, and with his right hand, clean debris.

7  That's what he did continually.  As a chunk

8  puller, is that how you do your job?

9    A.    I think there is a

10  misunderstanding about cleaning debris.  There

11  is chunk, which is not considered -- not which I

12  call debris.  When I reach up there to get the

13  chunks, those chunks are clear of the knives

14  already.

15    Q.    So you are not even near the

16  knives, are you?

17    A.    No.  When the block is pushed

18  through it, it pushes the chunks, the chunks are

19  grabbed and thrown in a container.  What John

20  was calling debris and what we call debris is

21  little pieces that gets down, it's stuck, left

22  off the chunk.

23    Q.    That's what would happen when you

Page 68

1    would have to, on an indication, to where you

2    might have to turn the machine off?

3        A.     That's right.

4        Q.     That's why all this stuff about

5    production is really a bunch of hogwash; isn't

6    it?

7        A.     Yes.

8        MR. ANDREWS:  Objection.

9        Q.     Because that's the way a lawyer

10   creates to try to somehow --

11       MR. ANDREWS:  Wait a minute.  Wow,

12   wow, wow.  He doesn't know what a lawyer does.

13       MR. SHEALY:  I know.

14       MR. ANDREWS:  Well, you're on a

15   roll, but he doesn't know what a lawyer does.

16       Q.     Let me ask you this --

17       A.     I put safety first.

18       Q.     I understand.  You do put safety

19   above production, don't you?

20       A.     Yes.

21       Q.     That's why you tell these people

22   from Able Body labor or from your company that

23   if a chunk gets caught in the knife area, just

Page 69

1    like Mr. Jackson, to turn the machine off?

2         A.    Right.

3         Q.    That doesn't happen that often

4    during the day, does it?

5         A.    No.

6         Q.    So if a picture is being painted

7    here, that a worker has got his hands around

8    these knives all the time, that is not even

9    true, is it?

10        A.    He is in a vicinity of the knives,

11   yes, but not in the knives.

12        Q.    They are not in the knives, are

13   they?

14        A.    No.

15        Q.    Not in an area where the knives

16   can hurt him?

17        A.    No.  To do his job.

18        Q.    To do his job, isn't that true?

19        A.    Yes.

20        Q.    So to occasionally ask somebody to

21   walk three steps and take three seconds to turn

22   the machine off, is not unreasonable, is it, by

23   a manufacturer?

Page 70

1       A.      No.

2       Q.      And by the way this machine was

3   set up, that you approved?

4       A.      Yes.

5       Q.      Isn't that true?

6       A.      Yes.

7       Q.      You approved it, didn't you?

8       A.      Yes.

9       Q.      It doesn't happen that often that

10  a piece of block gets lodged down in the knife

11  area, like what happened to Mr. Jackson?

12      A.      No.  Not steadily.

13      Q.      That would mess up production if

14  it happened every other one?

15      A.      Yes, it would.

16      Q.      That isn't how it happens, true?

17      A.      True.  Yes.

18      Q.      If you choose not to turn the

19  machine off, you use the steel pole and go boom,

20  and move on; isn't that true?

21      A.      Yes.

22      Q.      Real simple, right.

23      A.      Yes.

Page 71

1       Q.     That is why you tell them not to

2  put your hands in there, there is no reason to,

3  isn't that true?

4       A.     Yes.

5       Q.     Isn't that true?

6       A.     Yes.

7       Q.     Your accident wasn't like

8  Mr. Jackson's accident, was it?

9       A.     No.

10      Q.     Not even close?

11      A.     No.

12      MR. ANDREWS:  Objection.

13      Q.     So it's not even substantially

14  similar to his accident, was it?

15      MR. ANDREWS:  Objection.

16      A.     No.

17      Q.     Okay.  And Able Body Laborer

18  wouldn't read the owner's manual, would they?

19      A.     No.

20      Q.     That's not something you have the

21  temporary help do; isn't that true?

22      A.     Right.

23      Q.     You would be the one that you

Page 72

1    would expect how to train people how to clean

2    out debris; isn't that true?  Or let me say

3    this, your people, not the manufacturer.  You

4    wouldn't expect Ron Neese --

5                    MR. ANDREWS:  Objection.

6         Q.      -- to train your people how to

7    clean out debris, would you?

8                    MR. ANDREWS:  Objection.

9         A.      No.

10        Q.      Would that even be reasonable?

11        A.      No.

12        Q.      Would that be ludicrous to even

13   suggest that?  That's something that you know

14   how to do; isn't that true?

15        A.      Yes.

16        Q.      You would train people how to

17   clean debris out and how to be safe around the

18   machine, and how to do all the proper things

19   that ought to be done in running a block

20   operation, wouldn't you?

21        A.      Yes.

22        Q.      Now, you said you would on an

23   occasional see a worker put a hand in there?

Page 73

1       A.      Yes.

2       Q.      Is that true?

3       A.      Yes.

4       Q.      You would reprimand them or at

5   least get on them and tell them not, and they

6   would stop?

7       A.      Yes.

8       Q.      If they didn't, you would fire

9   them, or tell them to go home?

10      A.      Yes.

11      Q.      The way your operation is set up

12  and the way this splitter is used, do you feel

13  the way it's set up is safe?

14      A.      Well, there's not a lot you could

15  do to that splitter to make it any safer and

16  still produce the kind of product that we

17  produce.

18      Q.      Let me ask it this way:  You

19  participated in setting up this machine, did you

20  not?

21      A.      Yes.

22      Q.      And I guess you had some thoughts

23  about how you wanted it to set up and how it

Page 74

1    worked best, true?

2         A.    Yes.

3         Q.    In fact, you decided how it would

4    be set up?

5         A.    Yes.

6         Q.    Not the manufacturer; isn't that

7    true?

8         A.    Yes.

9         Q.    What they did is send it to Besser

10   or through Besser, but they shipped it down

11   there and you set it up totally?

12        A.    Yes.

13        Q.    E & R didn't know how exactly you

14   were going to use it or in what way you were

15   going to use it, per se, they just sent you a

16   block splitter, you set it up so you could make

17   production and produce your product the best way

18   you felt possible; isn't that true?

19             MR. RODGERS:  Objection.

20        Q.    True?

21        A.    Yes.

22        Q.    How long have you been in the

23   block production and manufacturing business?

Page 75

1       A.      Thirty-seven years.

2       Q.      Do you feel like you are

3   experienced?

4       A.      Yes.

5       Q.      Do you feel like you are

6   knowledgeable?

7       A.      Yes.

8       Q.      Do you feel like you are

9   knowledgeable of block splitters?

10      A.      Yes.

11      Q.      Do you feel like you are

12  knowledgeable about how they work and operate in

13  the safety of block splitters?

14      A.      Yes.

15      Q.      Do you feel like this block

16  splitter that you have at your plant that you're

17  still using is a reasonably safe block splitter?

18      A.      Yes.

19      Q.      And you're still using this block

20  splitter?

21      A.      Yes.

22      Q.      And, I think, we have asked this,

23  but Block USA, your company, doesn't put safety

Page 76

1    ahead of production, does it?

2         A.        Yes, they do.

3              MR. SHEALY:  Strike the question.

4         Q.        Block USA doesn't put production

5    ahead of safety?

6         A.        No, they don't.

7         Q.        In fact, Mr. Jackson, he got paid

8    $8 an hour whether he produced any block or

9    didn't produce, he didn't get any production,

10   did he?

11        A.        No.

12        Q.        There wasn't any reason for him to

13   not go turn the machine off?

14        A.        No.

15        Q.        Did you also instruct him to turn

16   the machine off and not put his hand in there?

17        A.        Yes, I did.

18        Q.        Was he aware that he was to turn

19   the machine off before he ever cleaned out any

20   debris in the area around or near where the

21   knives are located?

22        A.        Yes.

23        Q.        You told him that before this

Page 77

1    accident, did you not?

2         A.     Yes.

3         Q.     He understood that?

4         A.     Yes.

5         Q.     Did he acknowledge to you he

6    understood that?

7         A.     Yes, he did.

8         Q.     Did he acknowledge to you that if

9    you put your hand where the knives are located,

10   that that is a hazardous place he could be

11   injured?

12        A.     Yes.

13        Q.     He knew that?

14        A.     Yes.

15        Q.     You talked to him about that?

16        A.     Yes.

17        Q.     In fact, you showed your hand what

18   the knives could do to you?

19        A.     Yes.

20        Q.     Okay.  When you injured your hand,

21   you didn't sue Ron Neese or the manufacturer,

22   did you?

23        A.     No.

Page 78

1     Q.     You didn't feel like they did
2  anything wrong, did you?
3     A.     No.
4     Q.     You felt like you just made a
5  mistake, it was your fault, and you honed up to
6  it, and that was that; isn't that true?
7     A.     Yes.
8     Q.     You didn't sue Besser Company
9  either, did you?
10    A.     No.
11    Q.     What's your education?
12    A.     High school.
13    Q.     High school.  What's your
14 experience around block splitters such as the
15 one that this lawsuit is about?
16          MR. ANDREWS:  Asked and answered.
17 Objection.
18    A.     What?
19          MR. RODGERS:  How long have you
20 been working around splitters?
21    A.     Twenty-five years.
22    Q.     Have you had training?
23    A.     Yes.

BENDINGER & ASSOCIATES
334.803.0161

Page 79

1     Q.    Tell me about your training?

2     A.    Well, I attended Alpena Community

3 College in block making, splitter machines.

4     Q.    Did you take courses on them?

5     A.    Yes.

6     Q.    Have you gained knowledge as to

7 how they operate and work?

8     A.    Yes.

9     Q.    As a part of that, have you taken

10 safety courses?

11     A.    Safety courses towards splitter

12 or --

13     Q.    Yeah.  Splitters and in general.

14     A.    Not directly to splitters, no.

15     Q.    But you had just general safety

16 courses?

17     A.    Yes.

18     Q.    Would you consider yourself

19 knowledgeable of splitters?

20     A.    Yes, I would.

21     Q.    Would you consider this splitter

22 that is at your plant being used probably right

23 now, as a reasonably safe machine when put to

Page 80

1    its intended use?

2              MR. ANDREWS:  Objection.

3         A.    Yes.

4         Q.    Would you agree it's designed in

5    its operation that's reasonably safe for your

6    workers and the people to use it?

7              MR. ANDREWS:  Objection.

8         A.    Yes.

9              MR. SHEALY:  That's all.

10                  EXAMINATION

11   BY MR. CURTIS:

12        Q.    Hi, Mr. Mackey.  My name is Corey

13   Curtis, I represent one of the defendants in

14   this case, Besser Company.  I have a few

15   questions I need to follow up with Steadman.

16        When did your plant start making these

17   diamond blocks, the type of blocks being

18   produced when Mr. Jackson had his accident?

19        A.    Approximately six years ago.

20        Q.    Now, I know Mr. Andrews asked you

21   about some information that was contained in the

22   manual for the CM-24.  This may have been marked

23   as an exhibit previously, can you take a look at

Page 81

1    that.

2           First off, is this the manual for the
3    splitter that's at your plant now, the one
4    involved in the accident?  On a note at the top,
5    it says CM-24 HFRC Manual.

6           A.    Best of my knowledge, it's the
7    same one.

8           Q.    Hang on to it, I have flagged a
9    couple of things I want to ask you a couple of
10   questions.  If you can turn to the first flagged
11   item there.  Go down to the fourth paragraph.
12   Can you take a look at the fourth paragraph, it
13   says: Do not attempt to remove broken block.

14          A.    Uh-huh, (affirmative).

15          Q.    Can you review that paragraph,
16   please.

17          A.    This one?

18          Q.    Yeah.

19          A.    (Witness reading.)

20          Q.    Have you had a chance to look at
21   it?

22          A.    Uh-huh, (affirmative).

23                MR. ANDREWS:  Is that a yes?

Page 82

1      A.     Yes.

2      Q.     Do you agree with me that the

3 manual does say that one is not to attempt to

4 remove broken block or to perform any kind of

5 maintenance without shutting off the machine?

6      A.     Yes.

7      Q.     Let's move to the next tabbed

8 item.  Go down to the very last thing that says,

9 "Danger".  Take a look at that sentence or two.

10 In the decal to the right.  Can you read for me

11 what that says?

12     A.     Do not reach under or around the

13 barrier surrounding the splitting edge.

14     Q.     Can you also take a look at the

15 decal and tell me what that says.

16     A.     Blade hazard. Stay clear of

17 splitter.  Follow lock out procedure before

18 servicing.

19     Q.     Do you agree with me then that the

20 manual does address a person putting -- or

21 strike that.  Do you agree the manual says a

22 person cannot stick their hand in or around the

23 blades of the machine?

BENDINGER & ASSOCIATES
334.803.0161

Page 83

1       A.      Yes.

2       Q.      Okay.

3               MR. SHEALY:  Do you want to mark

4    that as an exhibit?

5               (Whereupon, Defendant's Exhibit 1

6    was marked for identification.)

7    BY MR. CURTIS:

8       Q.      Can you describe for me how your

9    accident was different than Mr. Jackson's

10   accident?

11      A.      My accident?

12      Q.      Yeah.  What facts make it

13   different than Mr. Jackson's.

14      A.      Mr. Jackson was trying to outrun

15   the machine.  I merely wasn't looking in that

16   direction.  I wasn't pulling a chunk.  Like I

17   said, I just reached over the top of the block

18   and grabbed the block.  I was engaging in a

19   conversation with the rental person, and stuck

20   my hand too far.

21      Q.      Which blade caused your injuries?

22      A.      Side knife.

23      Q.      Side knife?

Page 84

1       A.      Right.  On the other side.

2       Q.      Maybe you can explain this to me,

3   I want to be clear, I'm not trying to cause

4   problems for you or anything.  If you go to

5   Interrogatory Number 13.  What your response

6   says, it's a question about your accident.  It

7   says:  Yes, I was injured and lost two fingers

8   and a portion of a third finger when I was

9   operating the machine and not paying attention

10  and placed my hand between the block and the

11  blade, the machine activated the top blades when

12  my hand was on the block and crushed my hand.

13  Can you explain to me --

14              MR. RODGERS:  His lawyer made a

15  mistake.

16      A.      No, they weren't on the top.

17      Q.      Fair enough.  Okay.  The only

18  reason I'm asking is just so I understand

19  exactly how that happened.

20      A.      Right.

21      Q.      Okay.  Was your accident reported

22  to Besser Company?

23      A.      Not to my knowledge, no.

Page 85

1      Q.      Was your accident reported to E &
2    R?

3      A.      No.

4      Q.      Okay.

5      A.      It was brought up during a
6    conversation, but it wasn't -- the call wasn't
7    directly -- I was ordering parts and I started
8    talking to Ron about it.

9      Q.      About when was that?

10     A.      A month after it happened.

11     Q.      When you say Ron, did you mean
12   Ron --

13     A.      Ron Neese, right.

14     Q.      Do you believe Mr. Jackson caused
15   this accident?

16     A.      Yes.

17     Q.      Do you believe it was his fault?

18     A.      Yes.

19     Q.      Do you think there was anything
20   wrong with the machine that caused the accident?

21     A.      No.

22     Q.      Again, in one of your discovery
23   responses, you say:  Mr. Jackson did not shut

BENDINGER & ASSOCIATES
334.803.0161

Page 86

1    off the machine as he had been instructed to do

2    prior to placing his hand in the operational

3    section of the block splitter.  In addition,

4    Mr. Jackson was provided with a tool to remove

5    chunks of concrete, which may have been in the

6    way, which may have interfered with the

7    operation of the machine, which he did not

8    utilize.  Which tool was he given?

9         A.      It was just a piece of wood.

10        Q.      Just a piece of wood?

11        A.      Uh-huh, (affirmative).

12        Q.      I know it's been said before that

13   Mr. Jackson was told many times not to stick his

14   hand in the machine while it was running.  Do

15   you know approximately how many times he was

16   told that?

17        A.      That's probably the most

18   emphasized thing that's brought up in the plant,

19   almost on a daily basis.  Splitter, don't stick

20   your hand in there.  It's something that's

21   brought up on a daily basis.

22        Q.      So Mr. Jackson would no doubt be

23   aware of that, not to stick his hand in the

1   machine?

2        A.    No doubt.

3        Q.    Going back to the discovery

4   responses, it's Number 11.  Then your response,

5   the question is:  Has the subject product been

6   altered in any way?  The response is:  Yes,

7   after the incident, the manufacture provided

8   some rubber flaps.  Who provided the rubber

9   flaps?

10       A.    Ron Neese.

11       Q.    That was after the Jackson

12  accident?

13       A.    Yes.

14       Q.    Who installed them?

15       A.    Dewayne Biggs and myself.

16       Q.    Where were they installed?

17       A.    On the splitters?

18       Q.    Yeah, what were they for?  Where

19  were they put?

20       A.    They were put above the head.

21       Q.    The flaps that were given after

22  the accident, those would not have prevented

23  Mr. Jackson's accident?

Page 88

1    A.    No.

2    Q.    You're sure those flaps were not

3    included when the machine was originally

4    delivered to the plant in 1997?

5    A.    They were not on there.  I

6    personally unloaded the splitter myself.  It was

7    not on the splitter.

8    Q.    Okay.  After your own accident,

9    did any safety policies change at the plant?

10                MR. RODGERS:  With regard to?

11    Q.    Just the day before your accident,

12    then you had your accident going forward, were

13    employees trained differently, people told to be

14    more careful on the machine?

15    A.    Yeah, it was more emphasized.  But

16    we're very safety oriented.  It's something that

17    we work on on a daily basis.  Weekly basis.  And

18    anybody that gets around any equipment over

19    there are told about the safe and unsafe things

20    to do and not to do.

21    Q.    Do you tell most of -- or do you

22    tell employees, generally, about your accident?

23    A.    Right away.

Page 89

1        Q.      When a new employee arrives on the
2    job site, is that one of the first things that
3    you tell them?
4        A.      Yes, it is.
5        Q.      Do you believe that's a good way
6    to warn employees about the potential dangers of
7    sticking your hand where it shouldn't be?
8        A.      Yes, I do.
9        Q.      Did you perform routine
10   maintenance on the machine?
11       A.      Yes.
12       Q.      Can you tell me about what type of
13   maintenance you performed on the machine?
14       A.      We replaced parts constantly on
15   it.  Greasing it, replaced barrons, spent a lot
16   of money on the splitter.
17       Q.      Is there a set schedule?
18       A.      No.  No set schedule.
19              MR. CURTIS:  Okay.  I'm done.
20              MR. ANDREWS:  I have a few follow
21   up questions.
22                  EXAMINATION
23   BY MR. ANDREWS:

BENDINGER & ASSOCIATES
334.803.0161

Page 90

1    Q.    You said there were some warnings
2    that were added to this machine at some point.
3    You said they came with some warnings, then
4    there were some that were added --
5    A.    Stickers?
6    Q.    Right.
7    A.    Yeah.
8    Q.    That was added or sent by Besser
9    or E & R
10           MR. CURTIS:  Object to the form.
11   A.    It was just stickers I had there
12   in the office, and I stuck them up on the panel.
13   Q.    You had some in your office, and
14   you added them to the machine?
15   A.    Yes, I did.
16   Q.    There was testimony -- you know
17   Ron Neese, don't you?
18   A.    Yes, I do.
19   Q.    You are friends with Ron Neese,
20   aren't you?
21   A.    Yes.
22   Q.    How long have you known Ron Neese?
23   A.    Ever since I had that splitter,

BENDINGER & ASSOCIATES
334.803.0161

Page 91

1    ten years.

2          Q.      But you consider him to be a

3    friend, don't you?

4          A.      Yes.

5          Q.      You wouldn't do anything to hurt

6    Mr. Neese, would you?

7          A.      No, I wouldn't.

8          Q.      There is some testimony from

9    Mr. Neese that he had sent some extra stickers

10   on this machine --

11         A.      He did.

12         Q.      You remember that now?

13         A.      Yes.

14         Q.      You didn't remember that a while

15   ago?

16         A.      Yeah, true.   I didn't remember it

17   a while ago, but he did send stickers.

18         Q.      It was part of an upgrade program

19   he was doing, do you remember that, or did you

20   know that?

21         A.      No.

22         Q.      Are you an engineer?

23         A.      No, I'm not.

Page 92

1     Q.    Do you know about when warnings

2  can be used as opposed to when design of a

3  machine -- when you should design out hazard or

4  guard against a hazard or risk of injury?  Do

5  you know anything about that?

6     A.    Yes.

7     Q.    What is your understanding about

8  that then?

9     A.    I can understand where to put a

10  guard and where not to put a guard.

11     Q.    Did you know then therefore that

12  you were supposed to design out a hazard, then

13  if you can't design out the hazard, then you are

14  supposed to use a guard to from protect somebody

15  from getting hurt, and only if you can't design

16  out the hazard or put a guard on to prevent an

17  injury, then you can only rely on warning, did

18  you know that?

19     A.    Yes.

20     Q.    Did you know then that the

21  warnings on this machine and in this manual,

22  these are the last step in this design?  You

23  already knew that?  Of this design phase or

Page 93

1    hierarchy, your testimony is you already knew

2    that?

3        A.      Yes.

4        Q.      Do you know why it is E & R and

5    Besser skipped over the design out and guard

6    against steps, do you know?

7            MR. CURTIS:   Object to the form.

8        A.      No.

9        Q.      Do you know why it is if a company

10   has had at least nine other accidents, before

11   the three we know that happened here in

12   Andalusia, why they didn't take steps to design

13   out this potential for injury, guard against

14   this potential for injury before they started

15   warning against it?

16           MR. CURTIS:   Object to the form.

17       A.      No.

18       Q.      Wouldn't you expect they would

19   make the machine as safe as they possibly could

20   and where they could design out a potential for

21   injury, they ought to do that?

22           MR. SHEALY:   Object to the form.

23           MR. CURTIS:   Object to the form.

Page 94

1             MR. RODGERS:  Object to the form.

2      Q.    You can answer.

3      A.    Yes.

4      Q.    You expect that to be reasonable

5  and prudent actions too, wouldn't you?

6      A.    Yes.

7             MR. CURTIS:  Object to the form.

8      Q.    You know that from being around

9  these blocks splitters all these years, don't

10 you?

11     A.    Yes.

12     Q.    You know this from all this

13 education you received at Alpena Michigan, don't

14 you?

15     A.    Yes.

16     Q.    Do you know Besser is from Alpena,

17 Michigan?

18     A.    Yes.

19     Q.    Are they the one that put on the

20 concrete school that you went to?

21     A.    Yes.

22     Q.    What certifications have you had

23 from Besser?

Page 95

1      A.      I don't really have
2  certifications.
3      Q.      They are the ones that sponsored
4  that school that you went to?
5      A.      Yes.
6      Q.      Are you friends with the folks at
7  Besser too?
8      A.      The ones that I know.
9      Q.      Which ones do you know at Besser?
10     A.      Bob Roland.  Kevin Curtis.
11     Q.      Who else?
12     A.      That's about it.
13     Q.      Have you talked to anyone at
14  Besser about this lawsuit?
15     A.      No.
16     Q.      Have you talked to Ron Neese about
17  this lawsuit?
18     A.      Yes.
19     Q.      What have you talked about with
20  Mr. Ron Neese?
21     A.      Not a lot.  He asked him if I
22  heard anything.  I asked him if he heard
23  anything.  That's basically it.

Page 96

1    Q.    What about your friends at Besser,
2  you wouldn't want to do anything to hurt them
3  either, would you?
4    A.    No.
5    Q.    Now Mr. Shealy asked you if you
6  expect somebody to send you a hammer to chip off
7  concrete block, but you would expect them to
8  make a machine as safe as it could to keep you
9  and your workers from getting your hands cut
10  off, wouldn't you?
11    A.    I feel the machine is safe for
12  what we do.
13    Q.    Would you expect if there are
14  other alternative designs they could take to
15  make this machine safer, you would want them to
16  do it, or you would want them to skip that?
17          MR. CURTIS:  Object to the form.
18    Q.    You can answer.
19    A.    Yes.
20    Q.    You would want them to do that,
21  wouldn't you?
22    A.    Yes.
23    Q.    That's a reasonable and prudent

BENDINGER & ASSOCIATES
334.803.0161

1    action for somebody to do, isn't it?

2        A.    Yes.

3        Q.    Especially somebody in the

4    business like Besser and E & R of making

5    machines like this, that have the designs and

6    have taken on and know about nine other

7    lawsuits, nine other accidents -- know at least

8    one lawsuit where someone designed a guard for

9    this machine, you would want them to implement

10   it if they could, wouldn't you?

11           MR. CURTIS:  Form.

12       Q.    That would be reasonable and

13   prudent, wouldn't it?

14           MR. CURTIS:  Form.

15       A.    Yes.

16           MR. ANDREWS:  I assume when you're

17   saying form, that is some sort of an objection.

18           MR. CURTIS:  Well, you're talking

19   fast, so --

20           MR. ANDREWS:  Is that a yes?

21           MR. CURTIS:  If I say form, that's

22   shorthand for object to the form.

23           MR. ANDREWS:  Okay.  I just wasn't

Page 98

1    familiar with it.

2         Q.    Would you agree with E & R or

3    Mr. Neese that no risk of injury is acceptable

4    if it can be designed out or guarded against?

5    Would you agree with that?

6         A.    Yes.

7         Q.    You got your two fingers cut off,

8    was that a painful experience for you?

9         A.    Yes.

10        Q.    Would you expect that had to be a

11   painful experience for Mr. Jackson?

12        A.    Yes.

13        Q.    Even though he is a rental person?

14        A.    Yes.

15        Q.    It's a serious event for somebody

16   to lose their fingers; isn't it?

17        A.    Yes.

18        Q.    Do you think Mr. Jackson meant to

19   lose his fingers?

20        A.    I think he could have prevented

21   it.

22        Q.    Do you think he wanted to lose his

23   fingers?

Page 99

1    A.    No.

2    Q.    Do you think he is proud he lost

3  his fingers?

4    A.    No.

5    Q.    Do you think it hurt him?

6    A.    Yes.

7    Q.    Don't you think if something could

8  have been done on this machine to guard it and

9  protect him from losing his fingers, that it

10  should have been done?

11    A.    Well, like I said before, the

12  product we run, I just don't think you could

13  do --

14    Q.    The question is --

15    MR. SHEALY:  Objection.  Let him

16  answer his question.  I know you don't like the

17  answer, but --

18    Q.    Well, go ahead and answer then.

19    A.    The products we run, I don't think

20  you can make it safer than what it is right now.

21  It would be in the way, you couldn't produce the

22  product we produce if you had any more guards on

23  there.

Page 100

1      Q.     Okay.

2      A.     You couldn't do it.

3      Q.     That's your understanding?

4      A.     That's my understanding.

5      Q.     Now, E & R and Besser, both

6  testified and we can see other products they got

7  that could make it safer, do you know why they

8  can do that?

9             MR. SHEALY:   Object to the form.

10            MR. CURTIS:   Object to the form.

11            MR. SHEALY:   That is totally

12  wrong.

13     Q.     You can answer.

14     A.     No.

15     Q.     No what?

16     A.     I don't know.  I don't know how

17  they could do it.

18     Q.     No, you don't know how they could

19  do it?

20     A.     No.

21     Q.     You're not saying they couldn't,

22  you're just saying you don't know?

23     A.     Right.

Page 101

1        Q.      Did you know Mr. Neese testified

2   under oath that he suggested to you or suggested

3   to your company that you put these extra stop

4   buttons on these machines where the chunk

5   pullers were going to be standing, but y'all

6   didn't want it?

7                   MR. CURTIS:   Object to the form.

8                   MR. SHEALY:   That is totally

9   wrong.

10       Q.      Did you know that?

11                  MR. CURTIS:   Object to the form.

12                  MR. SHEALY:   Show him the

13  deposition where he says that.

14                  MR. ANDREWS:   Sure I will.

15                  MR. SHEALY:   Show him where he

16  says this.

17       A.      No, I didn't know that.

18       Q.      Page 140 to Mr. Niece's

19  deposition.  I will read it into evidence.  I

20  will start on Line 4:  Why is the panel located

21  there -- the panel where the stop button is --

22  why is the panel located there and not on the

23  other side of the head where you anticipate

1   somebody may be standing under some circumstance

2   so the person can access that mushroom --

3   meaning the stop button.

4        His answer: That's why we recommend

5   auxiliary stop and starts on both ends of the

6   machine is what he's talking about.

7        Question: So you do recommend that there

8   be one there?

9        His answer:  Yeah.  It says it right in

10  the manual.

11       And I asked:  Was it offered to this

12  plant?  No.

13       Why not?  Because they furnished their

14  own emergency stop/start stations.

15       Did you know --

16            MR. SHEALY:  That's a lot

17  different than what you just said.

18            MR. ANDREWS:  His testimony is

19  what it is.

20       Q.    Did you know these stop/start

21  buttons could be put on the end of this machine,

22  either end?

23       A.    You can put a start/stop button

Page 103

1    anywhere.

2        Q.    Did you know they offered them and

3    suggested them in the manual?

4        A.    No.

5        Q.    This manual that we marked as an

6    exhibit today, was that the same manual that you

7    told Mr. Shealy that the Able Body people -- the

8    rental folks, they don't read?

9        A.    Able Body folks don't read it.

10       Q.    That's the same manual we marked

11   today, right?

12       A.    Yes.

13       Q.    Okay.  Defendant's Exhibit 1 to

14   your deposition; is that correct?

15       A.    Yeah.

16       Q.    You said the workers, when they

17   are working around the splitter, they are not

18   working around the knives, but at least three

19   people had their hands cut up in this machine,

20   haven't they?  That's close enough to the

21   knives, isn't it?

22       A.    Yes.

23       Q.    Now, your accident, there was some

Page 104

1    testimony about whether your accident was

2    substantially similar.  Do you know what that

3    term means, substantially similar, in any kind

4    of legal sense?

5         A.    Legal sense, no.

6         Q.    Now, your accident happened on the

7    side knives of the machine, did it not?

8         A.    Yes it did.

9         Q.    There are only two of those?

10        A.    Yes.

11        Q.    Do they work in a different manner

12   or work in the same manner?

13        A.    Work in the same manner.

14        Q.    You also said you thought

15   Mr. Jackson was trying to outrun the machine.

16   How do you know that?  Or in other words, do you

17   know that or is that what you've been told?

18        A.    That's what he told me.

19        Q.    Now, when you unloaded the

20   machine, did anybody else help you unload this

21   machine?

22        A.    There were -- my employees were

23   there, but I was drove the fork lift.  I picked

it off the low boy, and took it inside the plant.

Q. You are certain that when you unloaded this machine, there were no guards around the splitter?

A. No guards.

Q. Do you know why that is?

A. I have no idea.

Q. Did you ever ask Ron Neese why that is?

A. I didn't know there were supposed to be guards there. There was nothing to ask.

Q. Nothing on this machine indicated --

A. Like I said before, I don't consider them guards.

MR. RODGERS: You have answered.

Q. Nothing on this machine indicated there were any guards that were supposed to be in place.

A. No.

Q. What kind of documents are typically created after an accident where

Page 106

1    somebody loses their fingers?

2                MR. RODGERS:  For an employee at

3    Block USA?

4                MR. ANDREWS:  Any.  Either.

5                MR. RODGERS:  Do you do a report

6    if an Able Body person is injured?

7         A.    No.

8         Q.    None at all?

9         A.    No.  Just call Able Body.

10        Q.    And let them take it?

11        A.    Yes.

12        Q.    Does the safety director ever do

13   any kind of written reports at all in Dothan?

14        A.    Our safety?

15        Q.    Correct.  For an Able Body rental

16   person?

17        A.    No.  Not to my knowledge.

18                MR. ANDREWS:  Thank you.  That's

19   all I have.

20                      EXAMINATION

21   BY MR. CURTIS:

22        Q.    Let me ask this question:  Did any

23   Besser people participate in the installation of

1    the machine?

2         A.     No.

3         Q.     Do you get a trade magazine from

4    Besser called Concrete Impressions?

5         A.     Yes.

6         Q.     Have you seen new model splitters

7    in there, in any of the Concrete Impressions

8    magazines that you have looked at?

9         A.     Not really.  Not that I've paid

10   any attention to.

11        Q.     When you were attending the

12   training at Alpena Community College, did you

13   notice any new models?

14        A.     That was years ago.

15             MR. CURTIS:  That's all I have.

16                    EXAMINATION

17   BY MR. ANDREWS:

18        Q.     Just out of curiosity, what years

19   was that?

20        A.     It was in the 70's and 80's when I

21   attended.

22        Q.     Who at Besser would have

23   participated in that education?

Page 108

1      A.      That would have known I was
2    there?
3      Q.      Yes, sir.
4      A.      Bob Roland.
5      Q.      What is his position at Besser?
6      A.      He was an instructor.
7      Q.      At the college?
8      A.      Yes.
9      Q.      What's the name of the college?
10     A.      Alpena Community College.
11     Q.      What is his position at Besser, if
12   you know?
13     A.      He is retired now.
14     Q.      Do you keep in contact with him at
15   all?
16     A.      I haven't talked to him in a
17   while.
18              MR. ANDREWS:  Thank you.
19              Ended at 1:27 p.m.
20          FURTHER DEPONENT SAITH NOT
21
22
23

Page 109

1              C E R T I F I C A T E

2

3    STATE OF ALABAMA )

4    HOUSTON COUNTY    )

5

6          I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   give by said witness upon said hearing.

13          I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in any way interested in

16   the result of said cause.

17

18

19

20   APRIL BENDINGER, CCR
     CERTIFICATE NUMBER CCR-384

21

     My Commission Expires
22   June 8, 2008

23

BENDINGER & ASSOCIATES
334.803.0161