# Exhibit 9

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5  DAVID JACKSON,

6         Plaintiff,

7  vs.                                    CIVIL ACTION NO.:

8  E & R MANUFACTURING CO., INC.,        2:06 CV0412-DRB

9  ET AL.,

10         Defendants.

11

12  _____\

13

14         The deposition of DAVID JACKSON taken

15  pursuant to the Federal Rules of Civil Procedure

16  before Karen D. Strickland, Court Reporter and

17  Notary Public, State at Large, at the law offices

18  of Morris, Cary, Andrews, Talmadge, Jones &

19  Driggers, L.L.C., 3334 Ross Clark Circle, Dothan,

20  Alabama, 36301 on the 22nd day of May, 2007,

21  commencing at approximately 10:30 a.m.

22

23

COPY

2

1                            **APPEARANCES**

2

3

4    FOR THE PLAINTIFF:

5        Hon. Mark Andrews

6        MORRIS, CARY, ANDREWS, TALMADGE, JONES &

7        DRIGGERS, L.L.C.

8        3334 Ross Clark Circle

9        Post Office Box 1649

10       Dothan, Alabama   36302

11

12

13   FOR THE DEFENDANT/E & R MANUFACTURING:

14       Steadman S. Shealy, Jr.

15       COBB, SHEALY, CRUM, DERRICK & PIKE

16       Post Office Box 6346

17       206 North Lena Street

18       Dothan, Alabama   36302

19

20

21

22

23

1              APPEARANCES (continued)

2

3

4    FOR THE DEFENDANT/KARRY MACKEY:

5         Hon. Christopher S. Rodgers

6         HUIE, FERNAMBUCQ & STEWART, LLP

7         Three Protective Center, Suite 200

8         2801 Highway 280 South

9         Birmingham, Alabama   35223-2484

10

11

12   FOR THE DEFENDANT/BESSER COMPANY:

13         Hon. Cory Curtis

14         BAKER & HOSTETLER, LLP

15         303 East 17th Avenue

16         Suite 100

17         Denver, Colorado   80203

18

19

20

21

22

23

# STIPULATION

1

2

3    IT IS STIPULATED by and between Counsel

4  for the parties that this deposition be taken at

5  this time by Karen D. Strickland, Court Reporter

6  and Notary Public, State at Large, who is to act as

7  commissioner without formal issuance of commission

8  to her; that said deposition be taken down

9  stenographically, transcribed and certified by the

10  commissioner.

11    Except for objections as to the form of

12  the questions, no objections need be made at the

13  time of the taking of the deposition by either

14  party, but objections may be interposed by either

15  party at the time the deposition is read into

16  evidence, which shall be ruled upon by the Court on

17  the trial of the cause upon the grounds of

18  objection, then and there assigned.

19    The reading and signing of the deposition

20  is waived.

21

22

23

**INDEX**

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Shealy | 6 - 118 |
| Mr. Curtis | 119 - 174 |
| Mr. Rodgers | 174 - 175 |


**EXHIBIT INDEX**

Defendant's                                     MAR

| 1 | Photograph | 21 |
| 2 | Photograph | 23 |
| 3 | Photograph | 34 |
| 4 | Photograph | 79 |
| 5 | Photograph | 84 |
| 6 | Photograph | 91 |
| 7 | Photograph | 107 |
| 8 | Photograph | 134 |
| 9 | Photograph | 143 |
| 10 | Initial Evaluation | 164 |

1                          DAVID JACKSON,

2    being first duly sworn to tell the truth testified

3    as follows:

4

5                          REPORTER:   (Usual stipulations?)

6                          MR. ANDREWS:  Yes.

7

8                          EXAMINATION

9    BY MR. SHEALY:

10       Q.    State your name, please, sir.

11       A.    Elzie David Jackson, Jr.

12       Q.    Mr. Jackson, you're going to have to

13   speak up, okay.

14       A.    Uh-huh.  Okay.

15       Q.    And don't say uh-huh or huh-uh.  Say yes

16   or no, okay?

17       A.    Yes.

18

19                  MR. ANDREWS:  What he's trying to

20          tell you is that on the record, Uh-huh

21          and Huh-uh does not look right.  So yes

22          or no, so that it reads properly.

23

1      Q.      What's your address?

2      A.      311 Tanglewood Drive, Albany, Georgia.

3      Q.      How long have you lived there?

4      A.      Seven months, I think.  Since November

5  of last year.

6      Q.      Who do you live with?

7      A.      My wife and my daughter.

8      Q.      Is your wife's name Lori Leigh Jackson?

9      A.      Yes.

10      Q.      And your daughter is -- what's her name?

11      A.      Ashley.

12      Q.      How old is your daughter?

13      A.      15.

14      Q.      Why are you living in Albany?

15      A.      Because originally my dad had got cancer

16  and I went over there to be with him while he was

17  going through it, but he's passed now and I just

18  ain't been able to get out.

19      Q.      When did you move back to Albany?

20      A.      I think it was '04 or '05.  One of them.

21  I ain't real positive.

22      Q.      Well, your accident was 12-16 of '04.

23  Was it after your accident or before?

8

1    A.    It was after all that.

2    Q.    So would it have been '05?

3    A.    Yes.

4

5         MR. ANDREWS:  When you're talking

6    and he's talking, she can't get

7    everything down.  Even though you might

8    know the answer already, just let him

9    get done and then answer.

10

11    Q.    Where were you living at the time of the

12 accident?

13    A.    In Hartford, Alabama.  I don't know the

14 address.

15    Q.    Well, did you own your home?  Were you

16 renting?  Did you live with somebody?

17    A.    No, I rented.

18    Q.    Who were you living with?

19    A.    My wife.

20    Q.    Same Lori Leigh Jackson?

21    A.    Yes.

22    Q.    Was your daughter living with you at

23 that time?

1     A.    Yes.

2     Q.    Anybody else living with you?

3     A.    No.

4     Q.    And you don't know where you lived in

5    Hartford?

6     A.    I just don't remember the address, no.

7     Q.    Why were you living in Hartford?

8     A.    I was working over in Andalusia.

9     Q.    Why not live in Andalusia?

10    A.    I can't answer that.

11    Q.    Okay.  Had you worked in Hartford before

12   going to work in Andalusia?

13    A.    Yes.

14    Q.    Where did you work?

15    A.    I worked in Andalusia, not Hartford.

16    Q.    Okay.  Well, I guess what I'm asking

17   you, what made you pick Hartford?  Had you ever

18   lived there before?

19    A.    No.  Nothing in particular made me pick

20   it.

21    Q.    Okay.  At the time of your accident, who

22   were you working for?

23    A.    Able Body Labors.

1    Q.    And how long have you been working for

2  Able Body Labors?

3    A.    I would say about five months.

4    Q.    And what were you making an hour?

5    A.    Eight dollars.

6    Q.    Were you getting any benefits?

7    A.    No.

8    Q.    So you were just getting eight dollars

9  an hour; is that correct?

10    A.    Correct.

11    Q.    And with Able Body Labors, where were

12  you told to go to work?

13    A.    Andalusia.

14    Q.    Where in Andalusia?

15    A.    At Block USA.

16    Q.    How long had you worked at Block USA

17  before your accident?

18    A.    Well, this time two weeks, but I worked

19  there about two-and-a-half months before that.

20    Q.    Well, we are going to talk about that.

21  Okay.  You went to work for Able Body Labors about

22  five months prior to your accident; is that

23  correct?

1    A.    Yes.

2    Q.    Where is the first place you went to

3  work?

4    A.    They sent me all over.  I worked all

5  over the place, down at the beach.

6    Q.    When you mean sent you all over, doing

7  what?

8    A.    Just general construction work.

9    Q.    Did you consider yourself a carpenter, a

10  laborer?  What did you consider --

11    A.    I was doing labor work.

12    Q.    Do you have carpentry skills?

13    A.    No.

14    Q.    Do you have block laying skills?

15    A.    No.

16    Q.    Brick, any of that?

17    A.    No.

18    Q.    And you said you had been working at

19  Block USA for two weeks prior to your accident?

20    A.    Yes, this particular time, yeah.

21    Q.    Okay.  Now, let's talk about that a

22  minute.  Had you been working at Block USA in

23  Andalusia before?

12

A.    Correct.

Q.    When was that?

A.    Just about a month -- I was off from there for about a month and then I went -- they sent me back over there.

Q.    And how long had you worked the first time you were there?

A.    I was there about two months.  Something like that.

Q.    So had you ever worked at Block USA before that?

A.    No, sir.

Q.    So you went to work at Able Body Labors.  They sent you over to Block USA.  You worked there for two months?

A.    Roughly, yes, sir.

Q.    Is that correct?

A.    Yes, sir.

Q.    Then you got laid off, or why?

A.    No.  They just -- they sent other people over there and sent me somewhere else.

Q.    Where did they send you?

A.    Down on the beach cleaning up with

13

1    construction crews.

2        Q.    And what company were you working for?

3        A.    I don't know, man.

4        Q.    Okay.  During the two months that you

5    worked for Block USA, what were you doing?

6        A.    Just in general we was working on the

7    line where the blocks got split at the splitter,

8    and coming out and going back to the cuber, and it

9    involved chipping -- chipping stuff off the blocks

10   that didn't cut, pulling the blocks and cleaning

11   the debris out of the machine.

12       Q.    Is that what you did during those first

13   two months?

14       A.    Yeah, I did some of all of that.

15       Q.    So you were familiar with the machine,

16   how it worked, the procedures, training and all the

17   various aspects of the block splitter?

18       A.    I was familiar with the block splitter a

19   little bit, yeah.

20       Q.    Had you been trained on the block

21   splitter?

22       A.    Other than what I was doing -- just

23   showed me how to clean it out and all that.  That's

14

1    the only training I got.

2         Q.    But you had been cleaning it out and

3    doing that kind of work during the first two months

4    that you were at Block USA; is that a fair

5    statement?

6         A.    Yes.

7         Q.    And then you went to work at the beach

8    for a while, for about a month?

9         A.    Correct.

10        Q.    And then they sent you back to Block

11   USA?

12        A.    Correct.

13        Q.    And you worked two weeks and during the

14   two weeks you were there prior to your accident,

15   what were you assigned to do?

16        A.    Basically the same thing I just told you

17   but I was standing right at the back of the machine

18   most of the time where the blocks come out of the

19   splitter.

20        Q.    And it would be fair to say that you ran

21   the machine every day for two weeks prior to your

22   accident?

23        A.    I didn't run the machine.

15

Q.    You stood by the machine and watched it
work; is that right?

A.    Yeah.

Q.    And what was your duties and
responsibilities as a laborer at Block USA working
for Able Body Labors at the time of your accident?

A.    To keep debris cleaned out of the block
splitter and clean up the ground, keep the ground
clean, chip blocks, just whatever in general needed
to be done right there.

Q.    And you did that every day for two weeks
prior to your accident?

A.    Yes.

Q.    Now, tell us what kind of training you
had in regard to what you were doing at the time of
your accident?

A.    I was just showed by John and them how
to --

Q.    Hold on.  Who is John?

A.    I don't know what his last name is, but
John is one of the workers for Block USA.

Q.    Okay.  But John showed you how to do
what?

16

1    A.    To go up in there and clean the block

2 splitter out, the debris out of it.

3    Q.    Explain to us how you were told or

4 explained or trained to do that.

5    A.    You just had to take and stick your hand

6 up in there, and on the side knives right here

7 where it come out you had to pull the debris out of

8 there, the little chips and stuff, because it was

9 actually supposed to fall down into a bucket or

10 whatever, but it didn't do that.  So you had to

11 clean it out.

12    Q.    Okay.

13    A.    And that's what I was showed to do.

14    Q.    So you were showed to put your hand

15 where the side knives are located, correct?

16    A.    In between the cycles, that's correct.

17    Q.    So your training was in between cycles

18 to place hands in the area where the side knives

19 were located to clean out debris; is that correct?

20    A.    Correct.

21    Q.    Did I say that right?

22    A.    Yes, sir.

23    Q.    And had you put your hand in the area

1  where the side knives are located prior to this

2  accident?

3        A.    Had I?

4        Q.    Yes.

5        A.    I don't understand exactly what you're

6  trying to get --

7

8              MR. ANDREWS:  He's asking had you

9         ever cleaned it out just like you were

10        doing at the time of the accident, had

11        you done that before?

12

13        A.    Yes.

14        Q.    Had you done it numerous times?

15        A.    Oh, yeah, I've done it for -- like I

16  said, off and on for the last two-and-a-half months

17  other than, you know, that little break.

18        Q.    All right.  And why were you having to

19  put your hands in the area where the side knife was

20  located?

21        A.    Because if you didn't clean that out

22  that block would get turned sideways and when that

23  split -- that knives come in, it would split that

18

block to where all you had to do was just throw it

in that dumpster, because it was no good.

Q.    And where were you supposed to stand

during the entire time that you were working?

A.    Well, when you was doing that particular

thing, you had to stand right where the block come

out of the splitter at.  It's like right to the

right right there.  And you had to just reach in

there and knock the debris out.

Q.    So you were standing to the right of the

block splitter where the side knives are located?


        MR. ANDREWS:  Objection.


Q.    Is that correct?  That's what you just

told me; is that right?


        MR. ANDREWS:  The right, looking

    from which way?

        MR. SHEALY:  I'm just saying what

    he said.

        MR. ANDREWS:  Okay.  I understand.

    That was my objection.

19

1

2    A.    If you're facing the machine, I was on

3  the right side of the conveyor --

4    Q.    Right.

5    A.    Where the machine -- the blocks come

6  out.  I was on the right side in the corner right

7  there.

8    Q.    All right.  What kind of block were

9  y'all splitting at the time of your accident?

10   A.    I don't know the name of them.

11   Q.    Was there anything unusual about this

12  kind of block versus other block that was being

13  split?

14   A.    Yeah, it was -- they was shaped like --

15  they had two like 45 degree angles on each side,

16  and then it was like straight.  You come up like

17  this, this.  I know that don't go on that, but

18  that's how the blocks was shaped when they got cut.

19   Q.    Had you ever seen blocks split like this

20  before?

21   A.    Before this, no, sir.

22   Q.    Was this kind of an unusual running of

23  this type of block at the plant, or do you know?

20

1    A.    No.  This block got run quite often as

2  far as that plant goes.

3    Q.    You just never saw it done before?

4    A.    Not until I went to work there.

5    Q.    Okay.  But you had seen that block being

6  split before, correct?

7    A.    After I started working there, yes, sir.

8    Q.    And had you seen the side knives split

9  the block before your accident?

10    A.    Uh-huh.

11    Q.    Is that a yes?

12    A.    Yes.

13    Q.    So you saw that the side knives were

14  sharp, correct?

15    A.    I wouldn't say they were sharp.

16    Q.    Well, okay.  Let me ask it this way.

17    A.    They are a blunt-type blade.

18    Q.    If you put your hand in there and side

19  knives closed, would it injure your hand?

20    A.    Well, of course.

21    Q.    And you knew that before this accident,

22  didn't you?

23    A.    Of course, I knew that.

21

Q.    Okay.

A.    But all at the same time I got to do what I'm told to do.

Q.    I understand.


MR. SHEALY:  I'm going to mark as Defendant's Exhibit -- is that okay with y'all?

MR. CURTIS:  Let's call it Jackson Depo 1.


(Whereupon, Defendant's Exhibit 1 was marked for identification and same is attached hereto.)


Q.    Mr. Jackson, I'm going to show you what I've marked as Defendant's Exhibit 1 to your deposition.  Can you put an X where you were standing at the time of your accident.

A.    (Witness Complies).  All right, that's it.

Q.    Now, did you have to stand there the entire time or would you just kind of move around

22

1    in that general area?

2        A.    Let me see that.

3        Q.    (Hands Document, Defendant's Exhibit 1

4    to Witness).

5        A.    From right there --

6        Q.    Whoa, whoa, right there doesn't mean

7    anything.

8        A.    From where I was standing at the --

9        Q.    You're pointing where the X is located?

10       A.    Right.  Back -- there's another machine

11   back here.

12       Q.    And that's going away from the machine

13   towards --

14

15            MR. SHEALY:  What's it called,

16       Mark?

17            MR. ANDREWS:  The cuber.  As you

18       look at Exhibit 1, he's pointing from

19       the X to the left.

20

21       A.    And that's the area I worked.

22       Q.    All right.  Was there any rule where, or

23   were you told that you couldn't walk around the

23

1    machine towards the control panel?

2        A.    I don't think there was.

3

4            (Whereupon, Defendant's Exhibit 2 was

5            marked for identification and same is

6            attached hereto.)

7

8        Q.    Let me show you what I've marked as

9    Defendant's Exhibit 2 to your deposition.   Is this

10   the control panel?

11       A.    Yes, that's the control panel.

12       Q.    Tell me what the control panel does.

13       A.    Operates that block splitter.

14       Q.    Can you stop the block splitter at the

15   control panel?

16       A.    Yes.   But at the same time you can't

17   shut the machine down and stop production with

18   Karry Mackey sitting in there because he want to go

19   irate on you.

20

21            MR. ANDREWS:   Just answer his

22        questions.

23            THE WITNESS:   Okay.

1

2      Q.    I understand.  But there was no reason

3   that if a piece of block was caught in the block

4   splitter you couldn't walk three or four feet and

5   hit a button and it would stop the machine?

6      A.    Probably a few more feet than that, but

7   you would be correct.

8      Q.    Well, let's say five feet.

9      A.    It might be close.

10

11          MR. ANDREWS:  Are you talking

12          about and keeping the machine running?

13

14     Q.    There was no reason why you couldn't --

15   and there was a button that would stop the machine,

16   correct?

17     A.    Yeah, but not where I was at.

18     Q.    I understand that.  But there was a

19   button within five feet?

20     A.    Somewhere abouts there, yeah, I guess.

21     Q.    Okay.  And there was -- I mean, we've

22   all been out to the plant.  There was -- and you

23   can see in Defendant's Exhibit 1, there's an

25

1  individual there.  There wasn't any rule that you

2  couldn't be right where that individual was located

3  if you needed to be; isn't that true?

4  A.     I guess if I needed to go do something

5  down there, I could.

6  Q.     Well, what I mean is:  You just stood

7  around in that area anyway, right?

8

9           MR. ANDREWS:  Objection.

10

11  Q.     And as long as the blocks didn't get

12  caught, there wasn't anything for you to do?

13

14           MR. ANDREWS:  Objection.

15

16  Q.     Is that true?

17  A.     No, it ain't true.

18  Q.     Okay.  Well, you tell where I'm wrong.

19  A.     Because I have to make sure that this

20  line stays running.

21  Q.     Okay.

22  A.     And my job pertains to cleaning that

23  machine right there, running back here, and

26

1   chipping blocks that didn't come out of that

2   splitter right. So I couldn't be up there.

3

4             MR. ANDREWS: For the record, he

5       means up by the control panel.

6

7     Q.    Let me tell you what I'm -- I think we

8   are not as far off with each other. I just meant

9   if you wanted to be where this guy was and

10  everything is going great, there wasn't anything

11  that prevented you from just walking around and

12  standing right near where this guy was standing?

13

14            MR. ANDREWS: Objection. Go

15       ahead, you can answer.

16

17    A.    Wording it like that, yeah. I mean, you

18  know --

19    Q.    I'm just saying as long as everything is

20  going smoothly?

21    A.    Right. I mean, I could do that. There

22  wasn't no problem with that.

23    Q.    I guess what I was trying to cover,

27

1    there wasn't -- you were not told by Mr. Mackey or

2    anybody at Block USA that you couldn't walk over

3    here to this control panel and hit a stop button,

4    correct?

5        A.    I wasn't trained to hit that stop

6    button.  I knew what did it, but that's just from

7    me watching.  I was trained to --

8        Q.    In other words, the other guys would hit

9    the stop button?

10        A.    That was John's job.

11        Q.    During the time that the block is

12    running -- for instance, like at the time of your

13    accident, tell me where -- how many people would be

14    along the assembly line.

15        A.    It would be three, sometimes four,

16    sometimes five people.

17        Q.    Where would they be located?

18        A.    One would be at the cuber and there

19    would be two to three people on this conveyor right

20    here that's behind where I was standing when I got

21    hurt.

22        Q.    Would it be to your left?

23        A.    Yeah, it would be to my left.

28

Q.    So there were two or three people to your left.  What were they doing?

A.    They were doing the same thing I was doing, chipping blocks and making them go straight down the line, stuff like that.

Q.    And then you just happened to be the one closest to where the actual splitting of the block took place?

A.    That particular day that's where I was told to work, yes, sir.

Q.    Were there other days that you might work on down the line?

A.    That's correct.

Q.    So y'all would rotate out when you would work?

A.    Yes, sir.

Q.    Okay.  Now, there's a gentleman in this picture.  Was somebody required to be where he's standing at the time of the operation?

A.    Well, that's where John was supposed to work and that's -- that was his job, was to run that splitter.

Q.    Okay.

29

A.    He wasn't there.  Something had happened down at the cuber, and he took off and went down there.

Q.    So in actuality at the time you were injured, there was supposed to be a worker?

MR. ANDREWS:  Objection.

A.    Yes, sir.

Q.    Right where this gentleman in this picture is located in Defendant's Exhibit 1; is that correct?

A.    That's correct.

Q.    And there wouldn't have been any reason why when a piece of block got hung up you couldn't say, John, hit the stop button?

A.    That's correct.

Q.    And John would have done it?

A.    Would have done it, that's right.

Q.    All right.  But you said at the time you were injured he somehow had left his post and had gone somewhere else?

A.    Down at the cuber.

1      Q.     So he had gone down to the cuber, so

2 there wasn't anybody located up near the control

3 panel?

4      A.     No, sir.

5      Q.     Let's talk a little bit about the

6 control panel. What is the purpose of the control

7 panel?

8      A.     To operate the machinery, I guess. Is

9 what I would think, I mean.

10      Q.     If you hit the stop button, does it stop

11 the conveyer, or the block splitter?

12      A.     Yes, sir.

13      Q.     Does the conveyer keep going?

14      A.     I think there's another button for the

15 conveyer. I'm not sure because I don't know how

16 that operates because I was never trained on it.

17 So I have no clue.

18      Q.     But the control panel had a stop button

19 to stop the splitter so the side knives wouldn't

20 activate; is that correct?

21      A.     That is correct.

22      Q.     And that is right or near the exact spot

23 where John was supposed to be?

31

1    A.    Correct.

2    Q.    True?

3    A.    True.

4

5          MR. ANDREWS:  Objection.  Not

6    supposed to be.  He can be there.  The

7    worker can be there.

8

9    Q.    Well, at the time you were injured he

10   was supposed to be in that area; isn't that true?

11

12         MR. ANDREWS:  Objection.

13

14   A.    Well, he was -- I mean, that was his job

15   description as far as I knew, that he was the block

16   splitter operator.

17   Q.    Okay.

18   A.    I mean, he done other things too.

19   Q.    But when you're splitting block, the

20   block splitter operator is supposed to be right in

21   that control panel area?

22   A.    I would personally think so, yes, sir.

23   Q.    Okay.  Can you read and write?

1    A.    Yes.

2    Q.    Can you read signs?

3    A.    Yes.

4    Q.    I want to show you Defendant's Exhibit

5    1, and for the court and jury I want you to read

6    something for me.  I want you to read what it says

7    right here above the block splitter.

8    A.    Keep Hands Clear.

9    Q.    Do you understand that?

10    A.    Yes, I understand that.

11    Q.    Okay.

12    A.    But I also understand that my job was to

13    make sure that debris was out of there between

14    cycles.

15    Q.    I understand.

16    A.    I was doing my job.

17    Q.    I understand.  But on this machine in

18    letters you can read and understand on that

19    machine, it said, Keep Hands Clear.  While it's

20    operating, is that what you understood?

21    A.    That's right.

22    Q.    While it's cycling?

23    A.    That's correct.

33

1    Q.    Is that what you understood?

2    A.    That's the way I understood it.

3    Q.    At any time this machine is actually on

4    and running, is that what you understood?


6              MR. ANDREWS:  Objection.


8    A.    No, it ain't, because when the machine

9    had finished its cycling and them blocks are coming

10   out, I got to clean that out.

11   Q.    I know, but that's because your employer

12   --

13   A.    That's part of what this is, I mean.

14   Q.    I understand.  But you do recognize that

15   it says, Keep Hands Clear?

16   A.    Yes.

17   Q.    You can read that and you understood

18   that before your accident; is that true?

19   A.    Yes, I will agree with that, that I do

20   understand that.

21   Q.    Okay.  And there are some other --

22

23              MR. CURTIS:  I need to turn the

34

1          air on.

2

3              (Whereupon, a break was taken.)

4

5              (Whereupon, Defendant's Exhibit 3 was

6          marked for identification and same is

7          attached hereto.)

8

9     Q.     Let me show you what I've marked as

10 Defendant's Exhibit 3, which is a close-up picture

11 of the control panel.

12    A.     All right.

13    Q.     Have you ever seen that control panel

14 before?

15    A.     Yes.

16    Q.     In fact, you saw it every day you were

17 there, didn't you?

18    A.     Yes.

19    Q.     Is that the control panel that controls

20 the operation of the block splitter?

21    A.     As far as I know it operates everything

22 over there.

23    Q.     Okay.  Had you ever touched a button on

35

that control panel before you were injured?

A.    I don't use that control panel, no.

Q.    But you know how the control panel worked; is that true?


                    MR. ANDREWS:  Objection.


A.    No, I don't.

Q.    But you knew that all you had to do was hit a button and it would stop the block splitter; is that true?

A.    Yes.  But, I mean, I wasn't trained on that.  So as far as me going over there and hitting that button, I ain't going to hit it.

Q.    Once you hit the button to stop the block splitter, is it anything to hitting it again to start it?

A.    I don't know.  I ain't sure about how to start that machine.

Q.    Had you ever seen that done before, stop the block splitter and then hit the button again and start it?

A.    Not directly standing right there

36

1  watching nobody do it, no.

2       Q.    Well, I'm just saying, did somebody stop

3  the block splitter and then go boom and start it

4  back?  I mean, is that how it worked?

5       A.    Yes, that's how John did it.

6       Q.    Okay.  So it wasn't a big deal to stop

7  and start the block splitter?

8       A.    I don't guess.

9       Q.    While we were out there inspecting the

10  machine, we were shown a rod.  Do you know anything

11  about a steel rod that you are to use to put in

12  there to clear the debris out?

13      A.    No.

14      Q.    You don't know anything about that?

15      A.    No.

16      Q.    And that's your testimony under oath?

17      A.    Yes, that's my testimony under oath.

18      Q.    So if all the employees at the block

19  company say that they were all told never to put

20  their hand in the block splitter, but to use a

21  steel pipe or pole to clean it out, they would all

22  be wrong?

23      A.    That's right.  As far as that goes --

1    because the only thing that pipe you talking about

2    back over there on that wall was used for was to

3    clean that machine at the end of the day.  That's

4    the only time I ever got showed about that pipe.

5    Nobody never explained you could use this to do

6    this, to clean that debris out.

7         Q.    So you're saying -- you will admit there

8    was a pipe --

9

10                 MR. ANDREWS:  He's talking about a

11            metal pipe.

12                 THE WITNESS:  He ain't talking

13            about the air line?

14                 MR. ANDREWS:  No, he's talking

15            about a metal pipe.

16                 THE WITNESS:  We had a metal pipe

17            on the end of it that we used to blow

18            the machine out.

19                 MR. ANDREWS:  Okay.  At the end of

20            the day.  You may not be talking about

21            the same pipe.

22

23         Q.    (By Mr. Shealy)  I'm talking about a

38

1    pipe or some kind of object that was used to clean

2    out debris while the machine was operating?

3        A.    No.

4        Q.    You were not told or trained that's the

5    way to clean out the machine?

6        A.    No, sir, I sure wasn't.

7        Q.    And you were not told -- is it your

8    testimony that you were told by Karry Mackey and

9    your employer to put your hands in the block

10   splitter where the side knives were located?

11

12              MR. RODGERS:  Object to the form.

13

14       A.    Karry told us that we had to clean all

15   this debris out.  And when you clean it out, it's

16   after the cycle has run before the next block gets

17   pushed in.  And that's what I was doing.

18       Q.    How long between the cycles?

19       A.    Couple seconds, it ain't long.

20       Q.    So you got two seconds to do that?

21

22              MR. ANDREWS:  Objection.  He said

23          a couple.

39

A.      I don't know exactly how long it is.

        MR. SHEALY:  Well, a couple --
        normally you think of a couple as two.

A.      Two.

Q.      Okay.  So you had two seconds to reach
your hand in there at an area where you know can
injure your hand, and that's what your employer
told you to do?

A.      Yeah, that's what he told me to do.  And
I've been doing this all this time and I ain't
never had no other problem until this particular
time.

Q.      Were you on any kind of medication or
drugs at the time that this accident happened?

A.      No.

Q.      You weren't on any Schedule 3 narcotic?

A.      No.

Q.      What time of day did the accident
happen?

A.      6:00 in the morning, thereabouts.

1  Q.     Was the day just getting started?

2  A.     Would have been there about an hour,

3  give or take.  I ain't real positive.

4  Q.     Well, had y'all been running the machine

5  since 5:00?

6  A.     Yeah, we started up at 5:00 that

7  morning.

8  Q.     So what time did you have to be at work?

9  A.     5:00.

10  Q.     And how long would it take to get the

11  machine started up?

12  A.     It didn't take long.

13  Q.     Who was your person you worked under, or

14  your supervisor?

15  A.     At Able Body?  Or on that job?

16  Q.     Over at Block USA?

17  A.     I guess, it would be Wayne or John or

18  Karry.  I mean, because I answered to all of them

19  and they told me what to do.

20  Q.     Who gave you your training as to how to

21  run the block machine?

22  A.     Ain't nobody trained me how to run it.

23  Q.     Well, who trained you how to do your

job?

A.     John showed me how to clean the machine out and I cleaned it the same way he did.

Q.     And tell me exactly, walk me through how he told you to clean the machine out?

A.     Well, after the cycle runs and the block split, you reach up there and pull the block out, help it come out, and you reach in here and you clean it, clean the side knives out with your hand and pull the chips out.

Q.     Just for clarification, you put your hand near the block splitter?

A.     Correct.

Q.     And pull the block out; is that right?

A.     You just reach up there where the blocks come out -- where is that exhibit at?  Right here -- you're standing right here, you reach up there and grab that block and just help push it down the -- let it get a good start rolling down the rollers.

Q.     And it's already been split?

A.     Yes.

Q.     Okay.  So you don't put your hand in

42

1   there until after the block split; is that true?

2       A.    Yes.

3       Q.    Then once the block is split, another

4   block is coming in there to be split again?

5       A.    It will be coming in there.

6       Q.    Is that true?

7       A.    Yes.  That's why you have to be quick

8   about it.  Get it in there and out.

9       Q.    All right.  So, then, once you pull a

10  block out that's been split, and you move it down

11  the assembly line or the conveyer; is that right?

12      A.    Yes, sir.

13      Q.    Then you put your right hand in the area

14  where the side knives would close to split the

15  block; is that true?

16      A.    I'm actually doing it all at about the

17  same time.  As you're pulling out with this hand,

18  you're cleaning this out too, so that the block

19  don't come in on you.

20      Q.    So you would pull the block out with

21  your left hand and use your right hand to clean the

22  debris out so that the block doesn't come in on

23  you?

1    A.    That's right.

2    Q.    Is that true?

3    A.    That's what you're trying to do.

4    Q.    And you know that it's a very quick

5    process before this cycle starts again and those

6    side knives split that block, and you know a block

7    is coming right behind it; isn't that true?

8    A.    Yeah, that is true, but all at the same

9    time I got a job to do as far as --

10    Q.    I understand that's what your employer

11    told you to do.  Okay.  And you knew that if you

12    didn't beat the cycle, it would injure your hand

13    badly; isn't that true?

14    A.    Well, it's just common sense, but, yes.

15    Q.    I mean, common sense is what you know,

16    you know what I mean.  So you knew that at the time

17    that you put your hand in there, that if you didn't

18    beat the cycle, it was going to cut your hand off

19    or injure your hand; is that true?

20

21          MR. ANDREWS:  Objection.  He

22       didn't put it in there on the cycle.

23

1    A.    It was after the cycle.  I had time to

2  do what I was doing.

3    Q.    In other words, if that block comes in

4  there while your hand is there, you knew before you

5  were injured that it would hurt your hand, isn't

6  that true, and badly hurt it?

7    A.    I knew it could hurt you, but that don't

8  mean that you still ain't got to go and do what you

9  got to do.

10    Q.    I understand that.  But you knew that

11  before you were injured on 12-16 of '04; isn't that

12  true?

13

14          MR. ANDREWS:  Objection.

15

16    A.    I don't even want to answer it.  I'm

17  tired of being rambled about it.

18

19          MR. ANDREWS:  Well, you've got to

20          answer the question.  What he's trying

21          to ask you --

22          MR. SHEALY:  Whoa, whoa --

23          MR. ANDREWS:  Okay.  You got to

1      answer his question.

2

3    Q.    Just answer my question.  Would you like

4  for me to ask it again?

5    A.    Yes.

6    Q.    How about if I have her read it to you?

7    A.    All right, that would be fine.

8

9         MR. SHEALY:  Read it back.

10

11      (Whereupon, the following question was

12      read back by the court reporter:

13           "Q.    In other words, if that

14      block comes in there while your hand is

15      there, you knew before you were injured

16      that it would hurt your hand, isn't that

17      true, and badly hurt it?")

18

19    A.    Well, it never crossed my mind because

20  it hadn't happened before, I mean, as far as

21  getting hurt.  I mean, it really didn't cross my

22  mind.

23    Q.    Well, you already told me it did.  Why

1    are you changing your testimony?

2       A.    I'm not changing my testimony.

3       Q.    Do you want me to have her read back

4    what's on there?  You've already told me that

5    common sense --

6

7               MR. ANDREWS:  Stop.  Stop.  Let's

8             don't argue and harass him.  His

9             testimony is what his testimony is.

10            Let's just ask questions and let him

11            answer them.  He had most of his hand

12            cut off, he's doing the best he can.

13

14      Q.    Let me ask you a question.  I'm going to

15    ask it one last time.  Prior to you injuring and

16    cutting your hand by these side knives, you knew

17    that it was dangerous and you knew that you had

18    just a split second to get your hand in and out or

19    it would be injured?

20

21               MR. ANDREWS:  Objection, not a

22            split second.

23

1  Q.    Let's say a second and a half, or two

2  seconds, whatever.

3

4        MR. ANDREWS:  Objection.

5

6  Q.    You knew it was going to be quick, is

7  that true, or it was going to hurt your hand?

8  A.    That is true that it can hurt your hand.

9  Q.    And you knew that; isn't that true?

10  A.    I guess you could say I knew it, but I

11  didn't know it, I mean, because I never even

12  thought about it.

13  Q.    You say that, and that's interesting

14  that you said you never thought about it.  Because

15  isn't it true that Karry Mackey talked to you about

16  it prior to this accident?

17  A.    The only thing that Karry said -- when

18  all this was going on, the only thing that Karry

19  ever said was it can cut your fingers off, be

20  careful how you do it.

21  Q.    So you did think about it?

22  A.    No, I didn't think about it, other than

23  doing my job.

48

1    Q.    Prior to this accident, Karry Mackey

2    says, and even shows you his missing fingers; isn't

3    that true?

4    A.    That's true.

5    Q.    Prior to this accident, he showed you

6    his missing fingers; isn't that true?

7    A.    When I first came in that building he

8    showed me.

9    Q.    He showed you his and said, This block

10   splitter that cut your hand off will cut your

11   fingers off?  He told you that, didn't he?

12   A.    He said it could.

13   Q.    Right.  So you knew --

14

15              MR. ANDREWS:  When he's doing his

16         job.

17

18   Q.    You knew that this block splitter, if

19   you put your hand in there would cut your hand or

20   fingers off, prior to this accident, didn't you?

21

22              MR. ANDREWS:  Objection.

23

1    A.    Yeah.  All the same time I still had a
2  job to do.  No matter what you coming up with, I
3  had a job to do.
4    Q.    I understand.  All right.  Let's go back
5  to what Karry Mackey told you in regard to running
6  the block splitter.  Excuse me, you don't like that
7  word.  What was your job, exactly?
8    A.    I was just a flunky.
9    Q.    What did you -- I'm not trying -- I'm
10  not trying to give you a hard time, okay.  I'm just
11  trying to get my questions answered and stuff.
12  What were you called, or what was your job where
13  the X is on this exhibit?
14    A.    I don't know what I would be called as
15  far as a label for that particular job.
16    Q.    So it didn't have a name?
17    A.    No.
18    Q.    You just were removing debris from the
19  block splitter, moving the blocks as they were
20  split down the conveyor line?
21    A.    Yes.
22    Q.    Is that true?
23    A.    That's true.

50

1    Q.    How many had you done prior to this

2  accident?

3    A.    A number, I couldn't tell.

4    Q.    I'm talking about that day.  Let's go to

5  the day of the accident.  It starts at probably

6  5:30 or 5:15.  I don't know.  Somewhere around

7  there.  You were injured at 6:00.  How many times

8  had you put your hand in this area where your hand

9  was cut off?

10    A.    I cannot give you an exact amount of

11  time.

12    Q.    Would it have been more than once?

13    A.    Oh, yeah, a lot more than once.

14    Q.    Ten times?

15    A.    More than that.

16    Q.    20 times?

17    A.    Probably a lot more than that.  I just

18  ain't sure about how many times, and I ain't going

19  to give you no number because I ain't sure.

20    Q.    That's fine.  But it had been numerous

21  times prior to you having your hand hurt?

22    A.    That's correct.

23    Q.    Tell me as best you can how it came

1    about that you were injured at this block

2    splitter.

3        A.    When I was working I had been doing this

4    for all along for the last two-and-a-half months

5    off and on, everything.  So I got pretty -- I mean,

6    you get comfortable with what you're doing when

7    things ain't happening and going crazy.  So when I

8    was reaching in there to get this debris out, there

9    was a piece that was hung up in there.  And I was

10    trying to get it out so that knife could come

11    over.  And as I was coming out, the corner of my

12    glove got caught on that daggum bolt and side knife

13    right there together, and that's how my hand got

14    hung up there to begin with.

15        Q.    So you put your hand right where the

16    side knife is located?

17        A.    Yes, because there's a little slot right

18    there.  I was trying to pull that piece out, and it

19    was just hung up.  When I finally got it --

20        Q.    The piece --

21

22            MR. ANDREWS:  Hold on, let him

23            finish.  When you finally got to it,

1          what?

2

3      A.      That's when -- when I was starting to

4  come out is when everything got hung up and my

5  glove got hung up and the machine started pushing

6  my hand.  I tried to snatch my hand out of my glove

7  and I couldn't get it out.  So that's how it

8  happened.

9      Q.      Would it be a fair statement that the

10  block itself was hung up down in that slot more

11  than maybe before?

12      A.      Yeah, it was.

13      Q.      And you probably spent a little bit too

14  much time trying to yank it out?

15      A.      Good possibility, yes, sir.

16      Q.      Well, I'm not trying to -- I mean that

17  sounds like a fair statement as to what happened?

18      A.      Actually what happened was -- it don't

19  usually get hung up like that and you can usually

20  push it on out pretty easy.  But this time it just

21  happened to be a little bit longer.

22      Q.      So it got hung up and you spent a little

23  more time trying to get it out, and then as you

1    were trying to yank it your glove got caught --

2        A.    Correct.

3        Q.    And then all the sudden the block is

4    there, and then this closes on your hand; is that

5    true?

6        A.    That's true right there.

7        Q.    Every time before this, were you trying

8    to beat the cycle?  In other words, when you put

9    your hand in there you knew if you didn't get it

10   out quickly, something could happen?

11       A.    Why sure.

12       Q.    Okay.  And so you had -- you would pull

13   with your left hand, clear debris with your right

14   hand, and you knew that you had just a couple

15   seconds to get whatever debris was there out of the

16   way and get your hand out of there; is that a fair

17   statement?

18       A.    Yes, that's a fair statement.

19       Q.    Okay.  And that happened every time

20   before this accident where your glove got hung, you

21   were kind of under the clock, so to speak, to get

22   in there and get it done quickly, get debris, and

23   get your hand out of there?

1    A.    Yeah, but most of the time you didn't

2  have to really rush because it was pretty simple.

3  I mean, it wasn't a hard thing.

4    Q.    But you didn't dally either?

5    A.    No, you didn't.  Common sense tell you

6  don't leave your hand there.

7    Q.    I gotcha.  Okay.  Did you feel like this

8  machine was dangerous?

9    A.    I mean, no, because I worked

10  construction all my life, so, you know, danger is

11  in everything you do.  So I didn't look at it as

12  any danger.

13

14             MR. ANDREWS:  You've answered his

15        question.

16

17    Q.    Do you feel like the machine was

18  defective in any way?

19    A.    I felt like there should have been some

20  kind of way for you to be able to get up in there

21  and that machine not keep operating, yeah, the

22  whole time I was working on that machine.

23    Q.    Did you mention that to Karry Mackey and

55

1  the people that worked there?

2      A.      No.

3      Q.      Did you mention it to any other laborers

4  that you felt that was what --

5      A.      Not that I can recall, no.

6      Q.      In other words, you may have felt that

7  way, but you didn't express it to anyone?

8      A.      No.

9      Q.      Is that true?

10     A.      No.

11     Q.      Is that a yes?

12     A.      Yes.

13     Q.      It's going to read --

14

15          MR. ANDREWS:  Wait a minute.  Wait

16      a minute.  Let's do this.  Listen to his

17      questions and you answer his questions.

18      If you don't understand his questions,

19      tell him you don't understand the

20      question.  We don't need to ramble.  We

21      don't need to add extra information.

22          And the other thing is, you're not

23      an expert, you're not an engineer.  So

56

he's not asking you specific things that ought to be on there.  Just answer his questions.

THE WITNESS:  Okay.

Q.    (By Mr. Shealy)  Did you feel like this machine was unreasonably dangerous?

MR. ANDREWS:  And I object to the extent that calls for a legal conclusion or an engineering expert opinion.  Based on the knowledge you had at the time of this accident, feel free to answer.

A.    No dangerous than any other job.

Q.    Okay.  Did the machine function and do what it was intended to do, and that's split block?  Did it work appropriately?

A.    I don't know that I could really answer that question, because I don't know how that machine was supposed to work anyway.  I've never seen one of them before until I went to work there.  It worked the same as it always did since

57

1    I've been there.

2        Q.      What did you understand was the purpose

3    of this machine?

4        A.      To split block.

5        Q.      Did it split block?

6        A.      Yes.

7        Q.      Did it split block that y'all sold to

8    people?

9        A.      Yes, sir.

10       Q.      Did y'all load the block on trucks, take

11   them out and sell it?  I mean, in other words, did

12   it -- you understood it was a block splitter?

13       A.      Correct.

14       Q.      The purpose of a block splitter is to

15   split block?

16       A.      Correct.

17       Q.      Different height, different size; is

18   that true?

19       A.      True.

20       Q.      Did it operate and work as a block

21   splitter?

22       A.      Yes.

23       Q.      And did it split hundreds and hundreds

58

1    and hundreds of block every day, successfully?

2        A.    Yes.

3        Q.    And did people work around these

4    hundreds and hundreds and thousands of block every

5    day that you were there those two-and-a-half months

6    and there wasn't a problem?

7

8                MR. ANDREWS:  Objection.

9

10       Q.    Is that true?

11       A.    No.

12       Q.    It's not true?

13       A.    No.  There was problems.  The machine

14   breaks down.

15       Q.    Okay.  Let's say it breaks down a time

16   or two.  All right.  I mean we all know machines

17   break down.  My point is:  Hundreds of blocks would

18   run through the block splitter and would be sold.

19       A.    Correct.

20       Q.    Every day?

21

22                MR. ANDREWS:  Wait a minute.  Let

23            him ask a question.  He's making a

1              statement.

2         •

3         Q.    Is that true?

4         A.    Say it again, please.

5         Q.    Hundreds of blocks would go through this

6    machine every day that would be sold to the public;

7    is that true?

8         A.    Yes.

9         Q.    In the two-and-a-half months that you

10   were there, did you see anyone else get their hand

11   caught or injured on this block splitter machine?

12        A.    No, I didn't.

13        Q.    Now, the other people that were to do

14   your job that you were doing at the time of this

15   accident, how did they do it?

16        A.    The same way I did it.

17        Q.    So they would pull the block off through

18   the -- as it's moving out of the block splitter

19   with their left hand, stick their right hand where

20   the side knife is located and remove debris?

21        A.    Yes.

22        Q.    Is that what you're telling me how the

23   other people did the job?

1    A.    Yes.

2    Q.    And you're telling me that nobody used a

3  stick or a wand to help clean debris out?

4    A.    No.

5    Q.    And was there any reason that you

6  couldn't have walked around and hit the stop button

7  to stop the machine and then remove that piece of

8  debris that was caught or lodged in there?

9    A.    No, because my job was to stand right

10 there and operate and do what I was supposed to do.

11   Q.    I know that's what your job was, but was

12 there anything that prevented you physically --

13

14          MR. ANDREWS:  A barrier you mean?

15

16   Q.    Or in any way from walking five feet and

17 hitting a button because a piece of block got

18 lodged in the side where the side knives were

19 located?

20   A.    I don't guess there would be, but, I

21 mean, I wasn't trained to do all that.  I was told

22 to stand right there and work.

23   Q.    I'm not talking about your training.

1   I'm just saying, was there any reason you

2   couldn't --

3

4            MR. ANDREWS:  He's answered.

5

6    Q.    -- walk five feet and do that?

7

8            MR. ANDREWS:  He's answered the

9       question.

10

11   A.    I already answered that.

12   Q.    No, you hadn't answered it.

13

14            MR. ANDREWS:  Yes, he did.  He

15       just answered the question.  He said

16       there was no barrier that kept him from

17       doing it, but that was not what he was

18       trained to do.

19

20   Q.    I guess my question, I thought, was:

21  Was there anything that kept you from being able to

22  walk five feet?

23

MR. ANDREWS:  Asked and answered.

THE WITNESS:  What?

MR. ANDREWS:  I said, That's asked and answered.  You go ahead.  You've already answered it one time, but you can go ahead and answer it again.

A.     No, there was nothing to stop me from walking over there.

Q.     Okay.  And if you had -- once you realized that it was lodged, if you had taken your hand out and walked around you could have hit the stop button and it would have stopped the block; is that true?

A.     Yeah, that's true.

Q.     Let me ask you this way.  Once you realized that there was a piece of block lodged as you were pulling the block off, there wasn't anything or any reason you couldn't have walked around and hit a stop button at that time, was there?

A.     At that time I didn't know the piece of block was lodged in there until I got off into it.

63

1     Q.    Would you -- as you were pulling the

2    block off with your left hand, would you always put

3    your right hand in there, or were there times that

4    you didn't have to do that?

5     A.    I didn't have to every single time.

6     Q.    In other words, sometimes it would split

7    right and you would just pull it with your left

8    hand.  You don't put your right hand in there every

9    time?

10    A.    That's correct.

11    Q.    Isn't that true?

12    A.    That's true.

13    Q.    What would happen to the block as to

14    make you feel like you had to put your right hand

15    in the area where the side knives were located?

16    A.    Just a piece of the block it get split

17    off, the trash that comes off, two knives on each

18    one of the side knives where it splits it right

19    there, some of that trash falls right there and

20    won't let that knife come out and you got to move

21    it.

22    Q.    Would the knife not work if that block

23    is in there?

1    A.    No, it will work, but it just won't

2    split the block like it's supposed to.

3    Q.    It messes up your block?

4    A.    Yes.

5    Q.    Now, after you injured your hand, what

6    happened?

7    A.    Do you mean directly right afterwards?

8    Q.    Yes, sir.

9    A.    As soon as my hand went through the

10    cycle, when I got my hand out I just grabbed it and

11    held it and went to the office and went to the

12    emergency room.

13    Q.    Did you talk to anybody in the office?

14    A.    I can't really say, because I ain't real

15    sure.

16    Q.    Did you tell anybody in the office that

17    it was your fault?

18    A.    No.

19    Q.    That you knew better than to do that?

20    A.    No.

21    Q.    Did anybody see or witness your hand

22    being cut or injured that you know of?

23    A.    Not unless John and them back there at

1   the cuber was able to see anything that happened.

2   I think actually John actually figured it out after

3   I held my hand up and told him I got my hand

4   caught.

5       Q.    Have you talked to John about how the

6   accident happened?

7       A.    No.

8       Q.    So you don't know if anybody actually

9   saw the accident, you hadn't talked to them about

10  it?

11      A.    No, sir.

12      Q.    Have you been back to work since this

13  accident?

14      A.    To there?

15      Q.    Yes.

16      A.    No, I ain't never been back to the block

17  plant since then.

18      Q.    Have you talked to anybody at the block

19  plant, any employees that were there, anybody with

20  Able Body Labors about what may have happened or

21  how the accident happened?

22      A.    I don't think in general I have.  I may

23  have talked to John and Karry, I don't know.  I've

1    been up there to see them, but I really didn't talk

2    to them about the accident.

3        Q.    You went up there after the accident and

4    talked to them?

5        A.    I went up there and showed them my hand

6    and stuff like that.

7        Q.    Did y'all discuss how it happened?

8        A.    I can't say that we did.  I vaguely

9    don't remember all that.

10        Q.    Did you tell them how it happened, or

11    did you admit that there was --

12        A.    Not them, I didn't, no.

13        Q.    Have you told anyone?

14        A.    Somebody took a statement from me -- I

15    don't remember who it was -- with the workmen's

16    comp people.  Other than that, I don't know.

17

18            MR. SHEALY:  Do we have that?

19            MR. ANDREWS:  (Shakes Head.)

20            MR. CURTIS:  I asked for that in

21        discovery.  I don't remember getting any

22        kind of statement.

23            MR. SHEALY:  Did you send a

1          subpoena to them?

2                    MR. ANDREWS:  I don't think

3          there's a written statement from

4          anybody.

5                    MR. SHEALY:  Off the record.

6

7          (Whereupon, a discussion was held off the

8          record.)

9

10      Q.    (By Mr. Shealy)  Who is the worker's

11   comp, do you know?

12      A.    Right off the top of my head, I can't

13   think of the name of it.

14

15                    MR. CURTIS:  Crawford.

16

17      A.    Crawford, that's it.  Crawford and

18   Company.

19

20                    MR. SHEALY:  They are the third

21          party administrators.

22                    MR. RODGERS:  They are the

23          adjusters.

1                    MR. SHEALY:  So they actually

2              handled it?

3                    MR. RODGERS:  Yes.

4

5        Q.    (By Mr. Shealy)  You settled with your

6    worker's comp carrier; is that correct?

7        A.    Yes.

8        Q.    How much did you settle for?

9        A.    It was 21 thousand, I think.

10       Q.    Did you close meds out?

11       A.    No, sir.

12       Q.    Are meds left open?

13       A.    Yes, sir.

14       Q.    Has worker's comp paid all your medical

15   bills?

16       A.    Yes.

17       Q.    So you're not making any claim for

18   medical bills in this case; is that true?

19

20                   MR. ANDREWS:  Objection.  We are

21              making a claim for medical bills.  They

22              will be entitled to a subrogation

23              claim.  But we are going to be able to

69

present his medical damages in the case.
Let me put this on the record --

    MR. SHEALY:  The employer is
responsible for the bill.  Of course,
I've always wondered how you can ask for
it and they get it back.

    MR. ANDREWS:  That's the law.
The question is, are we making a claim
for it?  Of course, we are.


Q.    (By Mr. Shealy)  But you haven't had to
pay for it and you weren't responsible to pay for
it, your employer was; is that true?

A.    That's correct.

Q.    And they are responsible to pay for any
future medical care; isn't that true?

A.    As far as I know, workmen's comp has
still got it.

Q.    And they paid you 21 thousand dollars
for the injury to your hand; is that true?

A.    Yes.

Q.    Is that true?

A.    Yes, sir.

1

2          MR. ANDREWS:  And let me -- I

3      don't think you're making a big deal out

4      of it, but to the extent he can recover

5      under work comp.

6          MR. SHEALY:  I'm just saying

7      that's what work comp paid him.

8          MR. ANDREWS:  Right.

9          MR. SHEALY:  I'm not talking about

10     to what extent.

11

12     Q.    (By Mr. Shirley)  Just whatever they

13 paid you, they paid you 21 thousand dollars; isn't

14 that true?

15     A.    I think that's what it was.

16     Q.    And they paid all your meds, and that's

17 true, correct?

18     A.    That is true, correct.

19     Q.    At the time of this accident, did you

20 have any kind of health insurance?

21     A.    No, sir.

22     Q.    Do you today have any kind of health

23 insurance?

1    A.    No, sir.

2    Q.    Have you had any health insurance in the

3    last five years?

4    A.    No, sir.

5    Q.    Are you presently working?

6    A.    Yes, sir.

7    Q.    What are you doing?

8    A.    Roofing houses.

9    Q.    How much do you make by the hour?

10    A.    I don't get paid by the hour. I do my

11    own. I'm a subcontractor.

12    Q.    What's the name of your business?

13    A.    I really ain't got a name. I mean, I

14    just --

15    Q.    So you sub out --

16    A.    I've been working for a guy named Ken

17    Drawdy.

18    Q.    Where is he located?

19    A.    Albany, Georgia. D-r-a-w-d-y. He owns

20    the company that I've been working under.

21    Q.    Do you work 40 hours, 50 hours, 60 hours

22    a week?

23    A.    Probably more than that.

72

1    Q.    70 hours a week?

2    A.    Give or take a little bit, yeah.

3    Q.    And are you on roofs?

4    A.    Yes, sir.

5    Q.    Are you doing the nailing of the

6    shingles?

7    A.    Yes, sir.

8    Q.    So you can at least do your roofing?

9    A.    Well, yeah, I can now, but I had to go

10   and get me a bunch of different tools to be able to

11   do the job with because I can't hold my hammer no

12   more.

13   Q.    I gotcha.  But you're working 70 hours a

14   week doing roofing hard as you can go; is that

15   true?

16   A.    Yes, sir.

17   Q.    And you're making a lot more than eight

18   dollars an hour; isn't that true?

19   A.    Not really, because I pay four other

20   people so I can get the job done.

21   Q.    Okay.  Well, how much do you make?

22   A.    I average about three hundred, three

23   fifty a week, if I had to try to figure it all

1    out.  It might vary.  One week I might make six

2    hundred, the next week I might make two.

3        Q.    You're doing it by the job.  But you're

4    making at least as much money as you were before

5    and probably more?

6        A.    Right at it, I'm sure.

7        Q.    All right.  And how long have you been

8    roofing, working 70 hours a week?

9        A.    For the last seven months.

10       Q.    Had you worked -- and you are working

11   for the same guy?

12       A.    Yes, sir.

13       Q.    Does he build a lot of houses?

14       A.    No, he's just a roofer.

15       Q.    He's just a roofer, but he stays real

16   busy?

17       A.    Yeah, he's got plenty of work.

18       Q.    And you've been working for him for

19   seven months as a subcontractor?

20       A.    I've only been with him for about four

21   months.

22       Q.    Okay.  Did you work for somebody else

23   the other three months?

1    A.    Just myself on some new houses,
2  different builders and stuff like that.

3    Q.    So you're -- okay.  But you're staying
4  real busy with him?

5    A.    Yeah, I'm staying fairly busy with
6  Drawdy.

7    Q.    Do you have guys that work under you?

8    A.    Yeah.

9    Q.    And you have a crew?

10    A.    Yeah.  I got three other guys that work
11  with me.

12    Q.    Do you have a roofing crew?

13    A.    Yeah.

14    Q.    Are you required to pay worker's comp or
15  any kind of --

16    A.    No, it's --

17    Q.    Social security?

18    A.    Drawdy takes all of that out of my --

19    Q.    So he does that for you?

20    A.    Yeah, he's handling all of that.

21    Q.    So in a way you're really like an
22  employee?

23    A.    Well, I'm being 1099'd every year.

1     Q.    They just want to call you an

2  independent contractor?

3     A.    So they don't have to pay taxes, right.

4     Q.    I gotcha.  About how much do you get

5  paid?

6     A.    It's hard to figure, man.

7     Q.    Well, you're going to go roof a house.

8  What do you charge them?  Don't you have like a set

9  fee?

10     A.    Yeah, I get like 17.50 and 30 dollars a

11  square.

12     Q.    17.50?

13     A.    17.50 for a walkable roof, that you can

14  get up there and walk on.

15     Q.    Explain to me.  I don't understand.

16

17          MR. ANDREWS:  He's trying to.

18

19     A.    That's what I'm trying to do.  Anything

20  you can get up there and not have to toe board

21  it -- you know, put any kind of boards up there

22  where you can walk around on --

23     Q.    We are not communicating.  I don't

1    understand the 17.50.

2        A.    That's a square for three bundles of

3    shingles.  Did that explain it to you?

4        Q.    Yeah.

5        A.    Three bundles of shingles is a square.

6        Q.    So you get 17.50 a square?

7        A.    Yes, sir.

8        Q.    And then you get --

9        A.    If I do one where I tear the roof off,

10    an old roof off and put it back on, I will get

11    30.00 dollars a square.

12        Q.    What's your average job?

13        A.    Somewhere between 40 square, 50 square

14    maybe.

15        Q.    And then how long does it take you to

16    roof a house?

17        A.    About four days.

18        Q.    Okay.  So if you have 40 times 17.50,

19    that's about seven hundred and something dollars?

20        A.    That's right.

21        Q.    Every four days?

22        A.    But I got three other people that work

23    with me.

Q.      I understand.

A.      It ain't like I'm walking away from the table --

Q.      I'm just asking.  I guess the bigger the roof, the more money you make?

A.      That is correct.  Unless it's a new roof.

Q.      But if you have to tear it off, then you make 30.00 dollars?

A.      Yes.

Q.      Then you make 12 hundred dollars.  Let me ask you something.  Does it take you four days to do 40 squares, or is that tearing a roof off and doing it?

A.      Takes me --

Q.      With four guys?

A.      No, it don't take that long with four guys.

Q.      I was going to say, you can do 40 squares in a day.

A.      No, you can't.

Q.      With four guys?

A.      I would like to meet that guy, that

1  crew.  At least my crew don't.

2      Q.      Okay.  What does it take you, two days?

3      A.      About three days.

4      Q.      All right.  What's your education?

5      A.      Tenth grade, completed the ninth.

6      Q.      Can you read the newspaper?

7      A.      Yes.

8      Q.      Can you read the Bible?

9      A.      Yes.

10     Q.      Can you read a book?

11     A.      Yes.

12     Q.      Can you like look at these exhibits

13  here, for instance -- and there's nothing behind

14  this.  But it's got, Danger.  Can you read that

15  word?

16     A.      Yes.

17     Q.      And it says, Hazardous Voltage, Follow

18  Lockout Procedure Before Servicing Panel of the

19  Machine.

20     A.      Uh-huh.

21     Q.      Is that a yes?  Can you read and

22  understand that?  If you read that --

23     A.      Yes, I can read and understand that.

1   Q.   Okay.  And I'm not trying to be

2  disrespectful, but I've been doing this over 23

3  years and I've had all different kinds of responses

4  about understanding things.

5   A.   On that lock --

6

7       MR. ANDREWS:  Hold on.  He hadn't

8   asked you a question.  You've answered

9   his last question.

10      THE WITNESS:  Okay.

11

12   (Whereupon, Defendant's Exhibit 4 was

13   marked for identification and same is

14   attached hereto.)

15

16   Q.   Let me show you what I've marked as

17  Defendant's Exhibit 4, okay.  Can you identify

18  Defendant's Exhibit 4, please, sir?

19   A.   It's the end of the block splitter where

20  I was standing.

21   Q.   Okay.  Let me show you something.  Do

22  you see a picture on there that shows somebody -- a

23  knife cutting somebody's hand off, basically in the

place where your hand was cut off?

    A.    Yes.

    Q.    Did you see that pictorial warning before your accident?

    A.    No, I ain't never seen it.

    Q.    Okay.  So it was in front of the block splitter that you worked around, but you never saw it?

    A.    Uh-huh.

    Q.    Do you know why it was blacked out?

    A.    I have no clue.

    Q.    Okay.  So it's your testimony you never saw that warning that's -- I mean, can you see it now?

    A.    I see it now.

    Q.    I'm not fussing with you.

    A.    I know.

    Q.    But your testimony is that you never saw this pictorial or warning prior to your accident, is that what you're telling me?

    A.    Yes.

    Q.    Let me ask you this.  Was -- in Defendant's Exhibit 1 when it says, Keep Hands

1    Clear, you had seen that before?

2         A.    Yes, that's right in front of you as

3    you're standing right there.  I mean, there's no

4    way to miss that.  I mean, it's right there at you,

5    in your face.

6         Q.    Help me out here.  Where is this located

7    on the block splitter?

8

9              MR. ANDREWS:  He's pointing now to

10             Exhibit 4, or Mr. Shealy is referencing

11             Exhibit 4.

12

13        Q.    Can you tell me where -- if we're

14   looking at Defendant's Exhibit 1, isn't this the

15   stop rail where --

16        A.    That's where -- yeah, that's this part

17   right here.

18        Q.    So if you look --

19        A.    I don't know exactly.  That looks like

20   it's on the under side of the machine to me, from

21   here, from the way it looks.  And I wasn't even --

22   probably wasn't even paying that no mind.

23        Q.    Okay.

82

A.      To be honest.

                MR. ANDREWS:  You can't see it.
                THE WITNESS:  Uh-huh.

Q.      Well, let me show you this.  You see
this right here, where the block is coming through,
it looks like there's some kind of guard right
here.  What is this right here?

A.      I have no clue.

Q.      So the record will understand, I'm
pointing to -- as the block is going through the
splitter, it appears some type of guard that is
hanging down.  Was that there at the time of your
accident?

A.      I don't think it was.

Q.      All right.  We are going to go back to
Defendant's Exhibit 1, which is the picture that
shows where you were standing.  Can you put an H
where you put your hand at the time it was injured?

A.      No, you can't actually see where the
knives are at on that picture.

Q.      Is there a better picture?

83

1

2          MR. CURTIS:  Let me look.  Here

3     are a couple of real close-up ones.

4

5     Q.    Does that show you anything?

6     A.    I can do it on this one right here.

7

8          MR. ANDREWS:  And it is already

9     marked.

10

11    Q.    All right.  Just put an H.

12

13         MR. ANDREWS:  This is on Exhibit

14    4.

15

16    A.    (Witness Complies).  It's in this

17 general area right here.

18    Q.    Let the record reflect that on

19 Defendant's Exhibit 4 the plaintiff wrote an H in

20 the area where his right hand was injured; is that

21 true?

22    A.    That's correct.  The general area.  I

23 can't say positive.

MR. CURTIS:  Can we take a break?

MR. SHEALY:  Sure.


(Whereupon, Defendant's Exhibit 5 was marked for identification and same is attached hereto.)

Q.    Let me show you what I've marked as Defendant's Exhibit 5 to your deposition.  Can you look at this exhibit?

A.    Uh-huh.

Q.    Is that how the machine looked the day of your accident?

A.    Looks pretty much like what it looked like.

Q.    Is there anything different?

MR. ANDREWS:  If you have any specific distinction you're looking for, ask him, but if --

MR. SHEALY:  Are you going to testify or is he going to testify?

85

1          MR. ANDREWS:  I would love to

2     testify if you would let me testify.

3          MR. SHEALY:  But you can't.  The

4     witness is supposed to testify.

5          MR. ANDREWS:  I understand that.

6          MR. SHEALY:  And you're supposed

7     to object to the form.  Are we under

8     usual stipulations in federal court?

9          MR. CURTIS:  We are now.

10          MR. SHEALY:  You can object to the

11     form.

12          MR. ANDREWS:  Okay.

13

14     Q.    Go ahead.

15     A.    I answered your question.

16     Q.    You did, what did you say?

17     A.    I said it looks like it's probably the

18 same.

19     Q.    All right.  Do you remember me showing

20 you the warning where it shows somebody's hand

21 getting cut and -- it looks like somebody blacked

22 it out, the warning on this machine?

23     A.    Yeah, I see what you're talking about

86

1   right there.

2        Q.     Okay.  So you can see, Keep Hands Clear,

3   and as you're looking -- if you were working down

4   at the cuber and were looking back towards the

5   area, you would be able to see this warning and

6   the, Keep Hands Clear, if you were looking; is that

7   true?

8        A.     If that's what you was looking at,

9   correct.  But that ain't -- that ain't what I -- I

10  hardly ever paid anything any attention except for

11  what was going on right in there.  So I never

12  looked up.  I knew that sign was there.  But, I

13  mean...

14       Q.     I gotcha.  Why would someone black out

15  that warning, do you know?

16       A.     I have no clue.

17       Q.     Okay.  Now, what would happen if debris

18  was caught on the other side of the machine?  You

19  know, your right hand -- you're using your left

20  hand to pull the block, right hand to clean on the

21  knife side that's closest to you.  What about the

22  other side, because isn't their a knife on the

23  other side?

1    A.    All the debris fell down on the ground

2  over there on the back side of that machine.

3    Q.    So it never got caught on the back side?

4    A.    It did, but it never did it like the

5  other side and John always cleaned that side when

6  he was up there.

7    Q.    Well, what about when you're up there?

8    A.    I don't work on that side.

9    Q.    Was there somebody working on the other

10  side?

11    A.    No, sir.

12    Q.    So it wouldn't get messed up on the

13  other side then, it would just be on the side --

14    A.    Most of it fell down on to the floor.

15    Q.    Isn't that the way normally it is

16  supposed to work, that the debris falls down and

17  the blocks just keep running?  Isn't that how it

18  normally works?

19    A.    It ain't never worked that way since

20  I've been there, but.

21    Q.    So you're saying what, then?  You told

22  me you didn't have to clean out every block?

23    A.    No, you don't.

1    Q.    Some would run through there and no

2  problem?

3    A.    And they would fall.

4    Q.    Okay.  But you're telling me that on the

5  back side, it would never, the block, get caught in

6  the knife or anything?  You didn't never have to

7  clean it out that you know of?

8    A.    I didn't, no.

9    Q.    Okay.  And the only time you would have

10  to clean it out would be on your side over here,

11  which is where you were standing; is that true?

12    A.    That's all I ever did, yes, sir.

13    Q.    Why would you stand on the side that you

14  were standing and not on the other side?

15    A.    Because that's where I was told to

16  stand.

17    Q.    But I mean, why?

18    A.    I don't have a clue, except to clean it

19  out.

20    Q.    So you don't know why they told you to

21  stand there?

22    A.    To clean it out.

23    Q.    Okay.

1    A.    To clean the debris out of that side

2  knife right there.  And we worked that side of the

3  line.

4    Q.    Okay.  Let me show you -- do you see

5  this hammer, Keep Hands Clear, on Defendant's

6  Exhibit 1?

7    A.    What, this?

8    Q.    Yes.  There's a hammer sitting up there,

9  do you see it?

10    A.    Yeah.  I see the hammer handle right

11  there, yes.

12    Q.    Would y'all ever use the hammer?  Why

13  would you use the hammer?

14    A.    I never used that hammer.

15    Q.    Do you know what it was used for?  Did

16  anybody ever use it?

17    A.    Not that I know of.

18    Q.    I mean, we go out there to inspect the

19  machine and I didn't know why there was a hammer

20  there, do you know?

21    A.    No.

22    Q.    Do you know what its use was for?

23    A.    No, I don't.

1    Q.    Explain to me what either Karry Mackey,

2 John, or anyone with USA told you about injuring

3 your hand prior to this accident, that could happen

4 to you while you were doing your job?

5    A.    Other than what Karry said, as I said

6 earlier, you know, but still had to do your job to

7 get the stuff out.  So that's saying be careful and

8 do what you got to do.  And that's what I was

9 doing.

10    Q.    Did they tell you to be careful when you

11 put your hand in there?  Did they actually tell you

12 that?

13    A.    No.  I mean, I really don't know for

14 sure if they told me that or not.

15    Q.    Okay.  Well, I guess I was trying to

16 figure out what -- you know, they told you about

17 the job, I guess.  Did they explain to you what

18 you're supposed to do?

19    A.    Yeah, keep the line clear.

20    Q.    That's all they said?

21    A.    Yes.

22    Q.    They didn't give you any guidance,

23 anymore what to do or not do?

1    A.    Other than just keep the block cleared

2    out -- I mean, the debris cleared out.

3    Q.    Did y'all ever have any safety meetings

4    that you would go to or sign any safety sheets that

5    you've been explained, you know, how to operate or

6    use a block splitter or keep it cleaned out or

7    anything like that?  Did you ever sign any of that?

8    A.    No, sir.

9

10    MR. SHEALY:  Off the record.

11

12    (Whereupon, a discussion was held off the

13    record.)

14

15    (Whereupon, Defendant's Exhibit 6 was

16    marked for identification and same is

17    attached hereto.)

18

19    Q.    Let me show you what I've marked as

20    Defendant's Exhibit 6 to your deposition.  I will

21    represent to you this is the new machine that was

22    shipped out.  Just take a look at it.  Does that

23    look somewhat like the block splitter that you were

1  working on at the time of your accident?  It just

2  looks real new and clean?

3      A.    Yes.

4      Q.    And as you can see, you can see, Keep

5  Hands Clear, that was there.  And then you can see

6  a guard that's in red and -- right here -- that has

7  that warning about getting your hand caught, can

8  you see that?

9      A.    Yes, I see it.

10      Q.    Was that removed or the guard or -- from

11  the machine at the time you were using it, was that

12  there?

13      A.    I can't say whether it was or not.

14      Q.    You just don't know?

15      A.    I don't know.

16      Q.    All right.

17      A.    I don't remember seeing it, but I just

18  don't know for sure.

19      Q.    Okay.  Now, how many surgeries -- I

20  think you told me in your answer to interrogatories

21  that you've had numerous surgeries on your hand; is

22  that correct?

23      A.    Yes, sir.

1     Q.    If your hand -- and don't take this the

2 wrong way.  Are you through with the surgeries now

3 as far as your hand goes and you just get along as

4 best you can with it?

5     A.    As far as I know I'm through, yes, sir.

6     Q.    When is the last time you've seen a

7 doctor about any kind of treatment to your hand?

8     A.    You mean for pain management?

9     Q.    In any way.

10     A.    Pain management doctor I still see every

11 month.

12     Q.    Well, are you on medications now?

13     A.    Uh-huh.

14     Q.    What are you on?

15     A.    Methadone.

16     Q.    But being on Methadone means you can

17 work, correct?

18     A.    That's what it makes me be able to do,

19 yes, sir.  Deal with it and work.

20     Q.    How often are you taking your Methadone?

21     A.    40 milligrams a day.

22     Q.    And you're able to roof with your hand

23 as best you can?

94

1     A.     Uh-huh, yes, sir.

2     Q.     And you're able to work 70 hours a week

3 and do, I guess, the best you can do; is that true?

4     A.     Yes, it's pretty rough, but I deal with

5 it and go on.   I got to live.

6     Q.     Who is your pain management doctor that

7 you're seeing?

8     A.     Dr. Moree at Phoebe Putney in Albany,

9 Georgia.

10     Q.     Is workmen's comp paying for the pain

11 management?

12     A.     That is correct.

13     Q.     So it's not costing you anything?

14     A.     No, sir.

15     Q.     When did you settle your worker's comp

16 claim?

17     A.     I don't know.   Not right off, I don't.

18     Q.     Did you apply for Social Security?

19     A.     No.

20     Q.     Do you file an income tax return every

21 year?

22     A.     No, sir.

23     Q.     When is the last time you filed an

1   income tax return?

2        A.    I probably don't need to discuss that

3   because it might incriminate myself.   1980.

4        Q.    Well, so you have not filed an income

5   tax return since 1980?

6        A.    Yes, that's correct.

7        Q.    Have you made wages since 1980 every

8   year?

9        A.    Yes.   You see my work record.

10        Q.    Well, did you knowingly not file an

11   income tax return?

12

13                  MR. ANDREWS:   Now, wait a minute.

14                  If he doesn't feel comfortable -- he's

15                  already asserted his -- if he doesn't

16                  want to answer, he doesn't have to.   You

17                  already know the information you want to

18                  know.

19

20        Q.    Let me ask it this way.   You knew you

21   were supposed to file income tax returns; is that

22   true?

23        A.    Yeah.

1  Q.     While we are talking about that -- I
2  don't mean to bring this up, but in reading your
3  answers to interrogatories I saw where you were
4  convicted in 1984 of sexual assault?

5  A.     Yes.

6  Q.     Was that first degree, second degree,
7  third degree?

8  A.     Sexual battery, whatever you want to
9  call it.  I don't know what degree or whatever it
10  was.

11  Q.     Where was that conviction?

12  A.     In Virginia.

13  Q.     Did you serve any time?

14  A.     I did 12 months.  It's all on record.
15  There ain't nothing to hide.

16  Q.     What does sexual battery mean?

17  A.     I have no clue.

18  Q.     Well, I guess what I'm saying is, was it
19  a rape, or a --

20  A.     No, it wasn't no rape.

21  Q.     But sexual battery --

22  A.     Just touch somebody.

23  Q.     And then you were convicted of

1   possession of cocaine in 2001?

2      A.   Yes, sir.

3      Q.   Did you serve any time for that?

4      A.   Yes, sir.

5      Q.   How much time?

6      A.   Ten-and-a-half months.

7      Q.   And where did you serve?

8      A.   Wakulla CI in Florida.

9      Q.   Where?

10     A.   Wakulla.

11     Q.   Where were you caught or convicted, what

12 town?

13     A.   Lakeland, Florida.

14     Q.   Were you charged with possession or

15 charged with selling?

16     A.   Possession.

17     Q.   Had you ever been charged with

18 possession before?

19     A.   No.

20     Q.   Is that your only drug offense?

21     A.   Yes, sir.

22     Q.   And it was cocaine?

23     A.   Yes.

98

1    Q.    Were you using?

2    A.    Yes, sir.

3    Q.    Have you used drugs since this accident?

4    A.    No.

5    Q.    Now listen to my question.

6

7              MR. ANDREWS:  Since this

8         accident.

9

10   A.    Other than my medical drugs, yeah.  No

11   illegal drugs.

12

13             MR. ANDREWS:  He's not talking

14        about just cocaine.  He's wanting to

15        know if you've used marijuana, cocaine,

16        or any other kind of drug since this

17        accident.

18

19   A.    Oh, yeah, yeah.  I've used marijuana.

20   Q.    What else?

21   A.    Methadone.  I got some from a friend of

22   mine in Alabama when I was there when I run out of

23   meds and my hand was hurting.

99

1       Q.    How often have you used marijuana?

2       A.    I ain't used it -- it's been a while, a

3  good while.  I couldn't say how often because I

4  don't use it no more.

5       Q.    How many times did you use it just right

6  after the accident?

7       A.    Probably just a few times.  A couple

8  times, maybe.

9       Q.    Did you ever do cocaine?

10      A.    No.

11      Q.    Did you ever do any other --

12      A.    Just that Methadone that I was telling

13  you about that I got from a friend of mine, one

14  Methadone.

15      Q.    Had you used any illegal drugs a day or

16  two before this accident or on the day of the

17  accident?

18      A.    No.

19      Q.    Were you using marijuana prior to this

20  accident?

21      A.    No.

22      Q.    What about cocaine?

23      A.    No.